**FILED UNDER SEAL**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

[UNDER SEAL],

**PLAINTIFF,**

v.

[UNDER SEAL],

**DEFENDANTS**

No. 15 Civ. _____

**FILED UNDER SEAL**

**MEMORANDUM OF LAW**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

SECURITIES AND EXCHANGE
COMMISSION,

                        Plaintiff,

        v.

ARKADIY DUBOVOY, et al.,

                        Defendants.

CA No.
*Filed Ex Parte*

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION'S *EX PARTE*
APPLICATION FOR A TEMPORARY RESTRAINING ORDER
FREEZING ASSETS, GRANTING OTHER EQUITABLE
RELIEF, AND FOR AN ORDER TO SHOW CAUSE WHY A
PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED**

David Axelrod
Kelly Gibson
John Donnelly

U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(215) 597-3100
DonnellyJ@sec.gov

**Of Counsel**
Joseph Sansone

August 10, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. i

BACKGROUND ................................................................................ 4

ARGUMENT .................................................................................... 12

I.   The Court Should Enter A Temporary Restraining Order Freezing
     TRO Defendants' Assets ............................................................ 13

     A.   Legal Standard For An Asset Freeze ...................................... 13

     B.   The Commission Is Likely To Succeed On The Merits
          Against TRO Defendants And The Court Can Infer That They
          Violated The Federal Securities Laws ..................................... 15

          1.   Defendants Violated Section 17(a) of the Securities Act and
               Section 10(b) of the Exchange Act and Rule 10b-5
               thereunder ................................................................... 15

               a.   Defendants Perpetrated A Fraudulent Scheme In
                    Which They Stole Material Nonpublic Information
                    They Used to Gain an Unlawful Advantage ............. 15

               b.   Defendants' Acted With Scienter ............................. 18

               c.   The CFD Trades Were Done In Connection With And
                    Adversely Affected The US Markets ........................ 20

          2.   The Trader Defendants, Including The TRO Defendants,
               Are Also Liable For Aiding And Abetting The Hacker
               Defendants Violations of Section 17(a) of the Securities Act
               and Section 10(b) of the Exchange Act and Rule 10b-5
               Thereunder .................................................................. 24

          3.   The Trader Defendants, Including TRO Defendants, Are Also
               Liable Under Section 20(b) of the Exchange Act .............. 25

     C.      Freezing TRO Defendants' Accounts Is Necessary ................26

II.    This Court Should Enter An Order Requiring The TRO Defendants
To Repatriate The Proceeds Of The Fraud .........................................28

III.   This Court Should Enter An Order To Show Cause ..........................28

IV.   This Court Should Enter An Order Prohibiting The Destruction Of
Documents  .......................................................................................29

V.    This Court  Should Authorize Alternative Service Of The Pleadings
And Documents Relating To This Motion.........................................29

CONCLUSION    .........................................................................................31

# TABLE OF AUTHORITIES

**CASES**                                                    **Page**

*Basic v. Levinson*, 485 U.S. 224 (1988) ........................................17

*Broad v. Rockwell Int'l Corp.*, 642 F.2d 929 (5th Cir. 1981) ........................18

*CFTC v. Am. Metals Exchange Corp.*, 991 F.2d 71 (3d Cir. 1993)..............13

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)........................................18

*Fed. Trade Comm'n v. Pecon Software, Inc.*, ................................................30
    2013 WL 4016272  (S.D.N.Y. Aug. 7, 2013)

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944)................................................14

*In re Global Crossing, Ltd. Sec. Litig.,* 322 F. Supp. 2d 319 .......................16
    (S.D.N.Y.  2004)

*International Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir. 1974)..........13

*Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793 (3d Cir. 1978).............25

*Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247 (2010).................22

*SEC v. Aimsi Technologies, Inc.*, 650 F. Sup. 2d 296 (S.D.N.Y. 2009).......28

*SEC v. Aragon Capital Advisors, LLC*, 2011 WL 3278642 .........................28
    (S.D.N.Y. July 26, 2011)

*SEC v. Babikian*, No. 14 Civ. 1740, 2014 WL 2069348...............................30
    (S.D.N.Y. April 21, 2014)

*SEC v. Banner Fund Int'l*, 211 F.3d 602 (D.C. Cir. 2000) ...........................28

*SEC v. Cavanagh,* 155 F.3d 129 (2d Cir. 1998)............................................14

*SEC v. Chang,* No. 14 Civ. 4132, (S.D.N.Y. June 9, 2014).........................30

TABLE OF AUTHORITIES

**CASES**          **Page**

*SEC v. Compania Internacional Financiera, S.A.,* ...............................22, 24
   2011 WL 3251813 (S.D.N.Y. July 29, 2011)

*SEC v. Dorozhko*, 574 F.3d 42 (2d Cir. 2009) .........................................16, 17

*SEC v. Estate of Hirshberg*, 101 F.3d 109 (2d Cir. 1996) ...........................14

*SEC v. First Jersey Sec., Inc.* 101 F.3d 1450 (2d Cir. 1996) .......................13

*SEC v. Forte*, 598 F. Supp. 2d 689  (E.D. Pa. 2009)....................................13

*SEC  v. Grossman*, 887  F. Supp. 649 (S.D.N.Y. 1995) ...............................14

*SEC v. Illarramendi*, No 11-civ-78, 2011 WL 2457734..............................28
   (D. Conn. June 16, 2011).

*SEC v. Infinity Grp., Co*., 212 F.3d 180  (3d Cir. 2000) ..........................13, 27

*SEC v. Kornman*, 391 F. Supp. 2d 477 (N.D. Tex. 2005)............................18

*SEC v. Lucent Technologies, Inc.*, 610 F. Supp. 2d 342 (D.N.J. 2009) .......25

*SEC v. Maillard*, No. 13-cv-5299, 2014 WL 1660024 ..........................21. 24
   (S.D.N.Y. Apr. 23, 2014)

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ...............................................18

*SEC v. Resource Devel. Int'l LLC*, 160 F. App'x 368  ................................28
   (5th Cir. Dec. 21, 2005)

*SEC v. Sabrdaran*, No. 14-cv-04825, 2015 WL 901352  .......................23, 24
   (N.D. Cal. Mar. 2, 2015)

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990)..................13, 14, 27, 29

## TABLE OF AUTHORITIES

**CASES**                                                        **Page**

*SEC v. Zanford*, 533 U.S. 813 (2002) .........................................................20

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011)...................................................14

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,* ...............16
552 U.S. 148 (2008)

*U.S. v. First National City Bank*, 379 U.S. 378 (1965) ...............................26

*U.S. v. Georgiou*, 777 F.3d 125 (3d Cir. 2015) ...........................................22


## OTHER AUTHORITIES

Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).....................21

Plaintiff Securities and Exchange Commission ("Commission") requests that the Court grant its *Ex Parte* Application for a Temporary Restraining Order Freezing Assets, Granting Other Equitable Relief and for An Order To Show Cause, and freeze the following defendants' assets, including but not limited to those assets in the brokerage accounts identified in the accompanying proposed order against the following defendants: Oleksander Ieremenko and Ivan Turchynov (together the "hacker defendants"); Global Hedge Capital Group; Exante Ltd.; Memelland Investments Ltd.; David Amaryan, Ocean Prime Inc.; Intertrade Pacific S.A.; Nikolai Slepenkov; Escada Logistics Ltd.; Roman Lavlinskiy; Alexander Fedoseev; Omega 26 Investments Ltd.; Guibor S.A.; Oleksander Makarov; Concorde Bermuda Ltd.; Andriy Suprananok; Maxim Zakharchenko; Bering Explorer Fund Ltd.; and Jaspen Capital Partners Limited (collectively "TRO Defendants").[1]

For approximately five years, defendants perpetrated a massive fraud on the U.S. markets, reaping over $100 million in illicit profits. Freezing the TRO

---

[1] Arkadiy Dubovoy, Igor Dubovoy, Pavel Dubovoy, Aleksandr Garkusha, Vladislav Khalupsky, Vitally Korchevsky, Leonid Momotok, Nelia Dubova, Beratto Group Ltd., APD Developers LLC, NTS Capital Fund, and Southeastern Holding and Investments Ltd. (collectively "Dubovoy Group defendants") are not subject to the Commission's request for a Temporary Restraining Order. Their illicit profits are included in the calculation of the profits realized from the scheme, their conduct is discussed herein, and they are included in references to all defendants.

Defendants' assets will preserve the status quo and the Commission's ability to recover disgorgement, prejudgment interest, and civil penalties for the fraud.

## **INTRODUCTION**

Defendants' fraudulent scheme worked as follows. The "hacker defendants" (defendants Oleksander Ieremenko and Ivan Turchynov) hacked into the computer systems of at least two newswire services, through deceptive means, and illegally accessed press releases that had been uploaded to the newswire service by companies whose stock was traded on U.S. securities exchanges before those press releases were publicly disseminated by the newswire service. In most cases, the stolen press releases contained critical quarterly earnings data. The hacker defendants transmitted the unpublished press releases to the "trader defendants" (all the defendants except the hacker defendants).

Armed with the unfair advantage that the inside information gave them over an unsuspecting market, the trader defendants bought or sold (depending on whether they concluded that, when the information was publicly announced, the price of the company's stock would increase or decrease) securities in those companies whose press releases had been stolen. The trader defendants made their initial trades in the window of time between when the press releases were uploaded to the newswire services' computer systems and when they were publicly disseminated—which, often, was only a few hours later. After market reacted to

the news, resulting in an increase or decrease in the price of the company's stock, the trader defendants closed their positions.  Defendants realized over $100 million in ill-gotten gains from this fraud.

It is necessary to freeze the assets in TRO Defendants' accounts, including accounts that may not yet be known to the Commission, to preserve the status quo and the Commission's ability to recover disgorgement and civil penalties once the Commission prevails on its claims.  Currently, the Commission has identified a number of brokerage accounts in the United States that belong to the TRO Defendants, many of which were used in the scheme.  Recently, these accounts collectively held approximately $30 million in assets—a fraction of the TRO Defendants' illicit profits from the scheme.  Absent an asset freeze, there is a substantial risk that the assets in these accounts will be transferred outside the United States or dissipated.  Nearly all the individual TRO Defendants are citizens of the Russian Federation or Ukraine or have ties to those nations.

Accordingly, the Commission respectfully requests that this Court grant this motion and issue a temporary restraining order: (1) freezing TRO Defendants' assets; (2) requiring TRO Defendants to repatriate the proceeds of the fraud; (3) prohibiting TRO Defendants from destroying, altering, or concealing records of any kind; (4) requiring TRO Defendants to show cause why a preliminary injunction freezing such assets should not be entered; and (5) authorizing service

of this motion and Order and any other pleadings or documents relating to this

motion by personal delivery, facsimile, overnight courier, email, or first-class mail.

## STATEMENT OF FACTS[2]

Over approximately five years, the hacker defendants—computer hackers

residing in the Ukraine—hacked into Newswire Service 1 and Newswire Service 2

and, through deception, stole more than 100,000 press releases for publicly-traded

companies before they were issued to the public.  (O'Connor Decl. ¶¶ 6, 7, 36-37,

49-51; Zavos Decl. ¶ 2)  The hacker defendants used a variety of deceptive and

sophisticated techniques to gain unauthorized access to the unpublished press

releases, including: (1) employing stolen username/password information of

authorized users to pose as authorized users; (2) deploying malicious computer

code designed to delete evidence of the computer attacks; (3) concealing the

identity and location of the computers used to access the Newswire Services'

computers; and (4) using back-door access-modules.   (Zavos Decl. ¶¶ 6, 10, 11,

14.)  The hacker defendants transmitted this information to the trader defendants—

a network of traders, located in the United States and abroad, who paid the hacker

defendants for the stolen information, either through a flat fee or a percentage of

---

[2]     In addition to this memorandum, filed herewith are the Commission's
Complaint; Motion for Temporary Restraining Order; the Declarations of Lynn
O'Connor ("O'Connor  Decl."), Kenneth Zavos ("Zavos Decl."), and Daniel
Koster ("Koster Decl.") and Exhibits cited therein; and Rule 65 Certification of
John Donnelly.

the illicit profits gained from the illegal trading on the information.[3] (O'Connor

Decl. ¶ 55.)

Many of the stolen press releases contained information about quarterly and

annual earnings data for companies whose stock was traded on U.S. stock

exchanges. (*Id.* ¶¶ 45-47.) It is common for financial analysis firms to estimate or

predict a given issuer's quarterly or annual earnings. (*Id.* ¶ 52.) The "market"

reaches a consensus expectation based on these different predictions. When an

issuer releases its earnings, the share price for that issuer generally increases if its

earnings exceed the market consensus and generally decreases if its earnings fall

short of the consensus prediction. (*Id.*)

The trader defendants used the stolen material nonpublic information to

place trades in the window of time between when the press releases were uploaded

to the newswire service's system and when the press releases were publicly issued

("window"). (*Id.* ¶¶ 48-49, 70, 72.) They bought or sold securities, such as stocks,

options, and contracts-for-differences (a derivative) (*see* Koster Decl. ¶¶ 3, 16),

depending on their anticipation of how the market would respond to the

information in the stolen press releases. After the press releases were publicly

---

[3] The hacker defendants ensured they were receiving the agreed-upon percentage by monitoring the trader defendants' trading, either through reports from the traders or direct access to the accounts used to make unlawful trades. (O'Connor Decl. ¶¶ 55-57.)

disseminated and the price of the securities changed as the market learned the previously undisclosed information, the defendant traders closed their positions. Over the course of the scheme, they reaped over $100 million in profits. (O'Connor Decl. ¶¶ 70,72.)

The hacker defendants oscillated primarily between two newswire services, focusing on obtaining the press releases from one or the other depending on the hacker defendants' access to the newswire services' computer networks. (*Id.* ¶¶ 49-51.) The Trader Defendants' trading activity mirrored the access and focus of the hacker defendants. (*Id.* ¶¶ 51, 73, 80, 86, 91, 94, 98.) When the hacker defendants stole press releases from Newswire Service 1, the trader defendants traded in the securities of the issuers whose press releases were stolen from Newswire Service 1. (*Id.*) When the hacker defendants stole press releases from Newswire Service 2, the trader defendants traded in the securities of issuers whose press releases were stolen from Newswire Service 2. (*Id.*)

**Dubovoy Group Defendants**

The Dubovoy Group defendants worked in concert to execute the fraudulent scheme, using the information stolen by the hacker defendants to make illicit trades in numerous accounts at more than 10 brokerage firms in the names of various individuals and entities. (*Id.* ¶¶ 8-21, 64.) They shared control of the accounts involved in the scheme, either through formal trading authorization and powers of

attorney, or informally via shared logins and security information which allowed scheme members to pose as one another and trade online.  (*Id.* ¶¶ 8-21, 64-69.) They helped each other and certain affiliated individuals ("Straw Owners") establish brokerage accounts that were used in the scheme, and they kept each other informed of their progress and developments.  (*Id.* ¶ 65.)

Collectively, the Dubovoy Group realized over $31 million in illicit gains from the scheme.  (*Id.* ¶ 70.)

### Foreign Trader Defendants

The Foreign Trader defendants are interconnected and connected to the Dubovoy Group.  (*Id.* ¶¶ 74-99.)  They can be broken into distinct groups based on their trading, common ownership, and other similarities.  (Id.)  Like the Dubovoy Group defendants, the Foreign Trader defendants made enormous profits trading in the window between issuers' upload of press releases to the Newswire Services and public dissemination of the press releases.  (*Id.* ¶¶ 72-73.)  Often, these trades occurred close in time to the issuers' upload of releases to the Newswire Service – an event that, but for the hacking, would only be known by the client and the Newswire Service.  As set forth below, the Foreign Trader defendants collectively traded in connection with over 1,000 events and realized over $76 million in illicit gains:

| Traders | No. of Events Traded | Window Profits |
|---|---|---|
| Memelland Global Hedge Exante | 256 | $28.8M |
| Amaryan, Ocean Prime, Intertrade, Slepenkov, Escada | 149 | $5.8M |
| Lavlinskiy Fedoseev | 186 | $1.1M |
| Omega 26 Guibor | 81 | $5.7M |
| Makarov Concorde | 132 | $3.7M |
| Jaspen Supranonok | 150 | $25M |
| Bering Zakharchenko | 73 | $6.7M |
| **Total** | **1,027** | **$76.8M** |

(O'Connor Decl. ¶ 72.)

And, like the Dubovoy Group, the Foreign Trader defendants shifted their focus between the Newswire Services throughout the relevant period, in step with the hackers' shifting access. (*Id.* ¶ 73.) When the hacker defendants accessed the unpublished press releases on the computer systems of Newswire Service 1, the Foreign Trader defendants traded based on information in those releases. (*Id.*) When the hackers changed their focus to Newswire Service 2, the Foreign Trader defendants traded in the securities of the issuers that were the subject of those releases. (*Id.*)

10

### The CFD Trades Were Tied To U.S. Markets

Because equity CFDs mirror the movement and pricing of the underlying stock on a dollar-for-dollar basis, any fluctuation in the public market price of the underlying security is reflected in the unrealized gain or loss of the CFD position. (Koster Decl. ¶ 21.)  The purchase and sale prices of equity CFDs are generally identical to the prices quoted for the shares on the public exchange on which the underlying stock is listed.  (*Id.*)  (In addition, when purchasing a long CFD position, Jaspen and Bering received other benefits commonly associated with ownership of the underlying stock, such as the right to receive dividend payments and participate in stock splits.)  (*See id.* ¶ 23.)

Here, because the fraud pertained to securities traded on U.S. securities exchanges, the purchases and sales prices of the CFDs traded by Jaspen and Bering were determined by the prices on the U.S. exchange on which the underlying stock was issued.  (*Id.* ¶ 21.)  Moreover, the prices were denominated in U.S. dollars.

Jaspen and Bering traded CFD through: Saxo, Cantor, GFT, and ADM ("CFD Providers").  (*Id.* ¶ 26.)  Each of the CFD Providers hedged its exposure created by the CFD trades by executing trades in the United States.  (*Id.* ¶¶ 27, 30-34, 42-44, 51-53, 59.)  Thus, these CFD trades were the proximate cause of trades in the United States equity markets.  (*Id.* ¶ 30.)

### Examples of Fraudulent Trading

The O'Connor declaration sets forth in detail 11 different examples of trading by the defendants, including the TRO defendants, in securities of companies whose press releases were stolen from the hacking. (O'Connor Decl. ¶¶ 100-173.) Each of these examples shows defendants trading in these securities, in the window which was often only a few hours, and profiting. (*Id.*)

### Recent Conduct

It appears that at least some of the defendants have continued to pursue this scheme at one or more newswire services. As recently as May 2015, some of the defendants traded in front of press releases issued from a third newswire service that had been hacked. (Koster Decl. ¶ 64.)

## ARGUMENT

Defendants engaged in a massive fraudulent scheme through which they collectively realized over $100 million in ill-gotten gains during an approximately five-year period. And it appears that at least some of the defendants used illegally obtained access to another newswire service to perpetrate the same scheme and realize additional ill-gotten gains. To preserve the status quo, and to prevent the TRO Defendants from transferring the assets in their US brokerage accounts overseas and/or dissipating assets, the Court should grant this motion and issue a temporary restraining order: (1) freezing TRO Defendants' assets, including but

not limited to their brokerage accounts (both known and unknown); (2) ordering

TRO Defendants to repatriate the proceeds of the fraud; (3) ordering TRO

Defendants to show cause why a preliminary injunction freezing such assets should

not be entered; (4) prohibiting TRO Defendants from destroying documents; and

(5) authorizing additional means of service of the pleadings and documents relating

to this motion.

## I.  The Court Should Enter A Temporary Restraining Order Freezing TRO Defendants' Assets.

### A.  Legal Standard For An Asset Freeze

"A freeze of assets is designed to preserve the status quo by preventing the

dissipation and diversion of assets." *SEC v. Infinity Grp., Co.*, 212 F.3d 180, 197

(3d Cir. 2000). *See also CFTC v. Am. Metals Exchange Corp.*, 991 F.2d 71, 79 (3d

Cir. 1993). An asset freeze can ensure "that any of the funds that may become

due," such as disgorgement, civil penalty, and prejudgment interest, "can be

collected." *SEC v. Unifund SAL*, 910 F.2d 1028, 1041-42 (2d Cir. 1990) (holding

that a freeze order on a brokerage account in an amount equal to the potential

disgorgement and civil monetary penalty was appropriate relief). *See also SEC v.

First Jersey Sec., Inc.* 101 F.3d 1450, 1476 (2d Cir. 1996); *Int'l Controls Corp. v.

Vesco*, 490 F.2d 1334, 1347 (2d Cir. 1974). "In initiating securities litigation, the

Government frequently obtains a court-ordered freeze of the defendant's assets."

*SEC v. Forte*, 598 F. Supp. 2d 689, 692 (E.D. Pa. 2009) (denying defendant's

request to release funds subject to asset freeze) (citing *Unifund Sal*, 910 F.2d at 1041).

Because the Commission has an obligation to protect the public interest, the standard for issuing an injunction sought by the Commission is different than those governing a private party's request for that relief: "the standards of public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief." *Unifund SAL*, 910 F.2d at 1035-36 (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944)). To obtain an asset freeze at the temporary restraining order or preliminary injunction stage, the Commission need only show "either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) (internal quotations omitted). This standard is considerably lower than what applies in a civil litigation between private parties. Unlike private litigants, the SEC need not show a risk of irreparable injury. *See Unifund SAL*, 910 F.2d at 1036; *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998). Where a freeze order is appropriate, a court may freeze any available assets, including assets not traceable to the fraud. *SEC v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995), *aff'd*, *SEC v. Estate of Hirshberg*, 101 F.3d 109 (2d Cir. 1996).

**B.** **The Commission Is Likely To Succeed On The Merits Against TRO Defendants And The Court Can Infer That They Violated The Federal Securities Laws**

    **1.** **Defendants Violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

TRO Defendants engaged in a fraudulent scheme to steal through deception material nonpublic information and trade securities based on that information, in violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. Section 17(a) of the Securities Act proscribes fraudulent conduct in the offer or sale of securities. Section 10(b) of the Exchange Act and Rule 10b-5 thereunder proscribe fraudulent conduct in connection with the purchase or sale of securities.

    **a.** **Defendants Perpetrated A Fraudulent Scheme In Which They Stole Material Nonpublic Information They Used to Gain an Unlawful Advantage**

The securities laws prohibit any person from engaging in a fraudulent scheme in connection with the purchase or sale of any security. Section 17(a)(1) and Rule 10b-5(a) prohibit any person from knowingly or recklessly employing any device, scheme, or artifice to defraud in the offer or sale of securities or in connection with the purchase or sale of any security. Section 17(a)(3) and Rule 10b-5(c) prohibit any person from engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any purchaser

(§17(a)) or upon any person (Rule 10b-5) in the offer or sale of securities (§17(a)) or in connection with the purchase or sale of any security (Rule 10b-5).  Conduct can supply the requisite deception for scheme-based fraud claims, like those under Section 17(a)(1) and (3) and Rules 10b-5(a) and (c).  *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148, 158 (2008); *In re Global Crossing, Ltd. Sec. Litig.,* 322 F. Supp. 2d 319, 335 (S.D.N.Y.  2004) ("It is apparent from Rule 10b-5's language and the case law interpreting it that a cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant").

Here, defendants employed fraudulent devices and engaged in a fraudulent scheme and pursued a fraudulent course of business in violation of the federal securities laws, by deceptively hacking into the computer systems of the Newswire Services, stealing material nonpublic information regarding publicly traded companies in not-yet-published press releases, and trading in securities based on that information.  The TRO Defendants participated in and profited from this scheme.

The hacker defendants obtained the material nonpublic information used to trade by misrepresenting themselves and hacking into the Newswire Services' computer systems.  *See SEC v. Dorozhko,* 574 F.3d 42, 49-50 (2d Cir. 2009)

16

(holding that defendant could be liable for securities fraud for hacking into company's computer system and trading securities based on the stolen material nonpublic information). The hacker defendants used a plethora of sophisticated and deceptive techniques to trick, circumvent, or bypass computer security to gain illicit access to the Newswire Services' computer systems, including: (1) employing stolen username/password information of authorized users to pose as authorized users; (2) deploying malicious computer code designed to delete evidence of the computer attacks; (3) concealing the identity and location of the computers used to access the Newswire Services' computers; and (4) using back-door access-modules. (Zavos Decl. ¶¶ 6, 10, 11, 14.) This conduct is "deceptive" under the securities laws. *Dorozhko*, 574 F.3d at 50-51.

Having gained unfettered access to the Newswire Services' computer systems, through these deceptive means, the hacker defendants proceeded to steal the material nonpublic information stored on those systems in the form of press releases of companies whose stocks were publicly traded. *See Basic v. Levinson*, 485 U.S. 224, 231-32 (1988) (concluding that information is material if there is a substantial likelihood that a reasonable investor would consider that the information significantly altered the "total mix" of available information). Between 2010 and 2014, the hacker defendants stole over 100,000 press releases before they were publicly released. Many of these press releases pertained to the

17

companies' earnings reports, which reasonable investors consider important when making an investment decision. Indeed, information regarding the financial condition of a company is presumptively material. *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980). The materiality of the information is also evidenced by, among other things, defendants' conduct—engaging in this complex scheme to steal and trade on it—and the fact that they devoted substantial amounts to their trading, used leverage to amplify their gains, and reaped huge illicit profits from this conduct

### b. Defendants' Acted With Scienter

In perpetrating this scheme, defendants, including TRO Defendants, acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). Scienter may be established by showing intentional or severely reckless conduct.[4] *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981); *SEC v. Kornman*, 391 F. Supp. 2d 477, 493 (N.D. Tex. 2005). The hacker defendants acted intentionally when they illegally accessed the Newswire Services' computer systems and stole the material nonpublic information in the unpublished press releases. Likewise, the trader defendants acted intentionally in participating in the scheme by obtaining

---

[4] Scienter under Section 17(a)(1) and Section 10(b) and Rules 10b-5(a) and (c) can also be established by recklessness. Negligence is only required for a claim under Section 17(a)(3).

18

the stolen information, often from accessing a secure computer server established to enable the covert transmission of this information. The trader defendants also knowingly traded in connection with the stolen information, frequently in a window of only a few hours between when the information was stolen and when the press release was publicly issued. And the substantial assets they devoted to these trades and use of leverage also demonstrate that they acted with scienter.

Indeed, defendants' long-running, complex, and extremely lucrative fraudulent scheme was no accident. For example, defendants knowingly agreed on the division of the proceeds of the fraud, with the trader defendants often providing the hacker defendants a percentage of their ill-gotten gains. In addition, defendants went to great lengths to conceal the fraud from detection, further demonstrating their scienter. As discussed above, among other things, the hacker defendants concealed their true identity when illegally accessing the Newswire Services networks, used computer code to erase their electronic footprints, and established a secure server to covertly transmit the stolen information to the trading defendants. Likewise, among other things, the trader defendants sought to conceal the fraud by using multiple accounts to carry out their illegal trading, including accounts in the names of entities or other individuals, and transmitting payments to the hacker defendants under false pretenses; for example, making payments from a company account and mislabeling it for "construction" or "building materials."

19

Accordingly, there can be no serious dispute that defendants perpetrated this fraudulent scheme with the requisite scienter.

### c. The CFD Trades Were Done In Connection With And Adversely Affected The US Markets

There can be no doubt that the hacking and theft of the material nonpublic information was done "in connection with the purchase or sale of any security" because that was an essential element of the fraudulent scheme. *See SEC v. Zanford*, 533 U.S. 813, 820-21 (2002) (holding that broker's alleged conduct of selling securities with undisclosed intent to misappropriate the proceeds constituted fraud "in connection with the purchase or sale of any security"). Defendants designed the scheme to trade on securities and profit from their advantage of having material information not yet available to the investing public. The stolen information was of no other use to them.

Because the Foreign CFD Traders' illegal trading involved conduct directed at the United States markets and in connection with securities traded on the United States markets, the Commission's claims against them are also appropriately heard by this Court. The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") declared that district courts shall have jurisdiction over any action by the Commission alleging a violation of Section 17(a) of the Securities Act or Section 10(b) of the Exchange Act involving: "(1) conduct within the United States that constitutes significant steps in furtherance of the violation, even

20

if the securities transaction occurs outside the United States and involves only foreign investors; or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States." Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).

Both prongs of this provision provide an independent basis for jurisdiction over the CFD trades. The first prong is satisfied because the hacking was a significant step in furtherance of the scheme and it occurred in the United States as one of the hacked Newswire Services had computer servers that were located in New Jersey. The second prong is independently satisfied because the Foreign CFD Traders' conduct outside the United States had a foreseeable substantial effect within the United States. The CFD trades were hedged with equivalent trades on the US markets, which trades disrupted those markets. (Koster Decl. ¶¶ 27, 30-34, 42-44, 51-53, 59.) "Purchasers of CFDs specifically target their investments at the U.S. market, as they receive the benefit or loss of any price changes on the domestic exchange, the dividends paid on the underlying shares, and sometimes receive voting rights. Indeed, CFDs provide foreign investors with a way to access American exchange-traded securities without opening U.S. brokerage accounts." *SEC v. Maillard*, No. 13-cv-5299, 2014 WL 1660024, at *1 (S.D.N.Y. Apr. 23, 2014) (granting SEC's motion for an asset freeze against a CFD trader) (quoting

*SEC v. Compania Internacional Financiera, S.A.*, No. 11-cv-4904, 2011 WL

3251813, at *5 (S.D.N.Y. July 29, 2011)).

 The Foreign CFD Traders' conduct also satisfies the standard set forth by

the Supreme Court in *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247

(2010). *Morrison* involved a private litigation brought by foreign individuals who

were suing for securities fraud in connection with securities of a foreign issuer that

were traded on foreign exchanges. The Court held that the Exchange Act did not

reach such circumstances and concluded that Section 10(b) applied to the use of a

manipulative or deceptive device or contrivance in two circumstances: (1) the

purchase or sale of a security listed on an American stock exchange; and (2) the

purchase or sale of any other security in the United States. *Morrison*, 561 U.S. at

273; *United States v. Georgiou*, 777 F.3d 125, 133-34 (3d Cir. 2015) (holding that

trading in over the counter stocks and "pink sheets" satisfied the *Morrison* test).

 Courts have found that foreign CFD trading satisfies the *Morrison* test. For

example, in *Compania*, defendant purchased CFDs in England related to the stock

of a company traded on a US exchange. The court held that the CFD purchases

fell squarely within Section 10(b) and Rule 10b-5 because the purchase of CFDs

was "clearly the use of a manipulative or deceptive device or contrivance . . . in

connection with the purchase or sale of a security listed on an American stock

exchange." *Id.* at *6 (quoting *Morrison*, 561 U.S. at 273). The court also

concluded that *Morrison* does not require that the defendant "must itself" trade in securities listed on U.S. exchanges, and that it was sufficient that the defendant's CFD trades were tied to the corresponding transactions in the U.S. markets. *Id.* at *6-7.

Relying in part on *Compania*, in *Maillard*, the court also concluded that the Commission could bring securities fraud claims against a defendant who traded CFD pertaining to securities traded in the United States. Like the Foreign CFD Traders in this case, the defendant in *Maillard* was a sophisticated investor who knew that his purchases and sales of CFDs were triggering corresponding purchases and sales on the U.S. exchange. *See id.* at *2. In rejecting the defendant's *Morrison* argument, the Court wrote:

> Although [defendant] did not himself purchase a security that is listed on an American exchange, the fraudulent scheme as alleged by the SEC involved purchasing CFDs in Luxembourg, which directly caused the [broker] to purchase securities that were listed on the [U.S. exchange]. The defendant has cited no case—and the court is aware of none—that holds the Supreme Court intended to limit the first prong of Morrison to transactions in which the defendant himself actually purchases or sells a listed security and to exclude transactions in which the defendant causes a third party, as an integral part of the alleged fraudulent scheme, to purchase or sell a listed security.

*Id.* at *3. The court concluded further that although the broker "was an unwitting player, the domestic market was harmed by the trades that were directly and inextricably bound" with defendant's fraudulent conduct. *See also SEC v. Sabrdaran*, No. 14-cv-04825, 2015 WL 901352, at *12 (N.D. Cal. Mar. 2, 2015)

(concluding that "spread bets" made outside the country but hedged on US exchanges cause harm in domestic securities and satisfy the *Morrison* standard).[5]

Accordingly, as in *Compania* and *Maillard*, the Commission's claims against the Foreign CFD Traders are appropriately heard here.

2. **The Trader Defendants, Including The TRO Defendants, Are Also Liable For Aiding And Abetting The Hacker Defendants Violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

The trader defendants are also liable under Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act for aiding and abetting the hacker defendants' violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. Pursuant to Section 15(b) and Section 20(e), which Congress amended in 2010 in enacting the Dodd-Frank Act, a defendant is liable for aiding and abetting when: (1) there is an underlying primary securities law violation by another; (2) defendant provided substantial assistance to

---

[5] Because the courts in *Compania* and *Sabrdaran* concluded that the alleged conduct satisfied the Morrison test, they did not decide whether the Dodd-Frank Act test had supplanted the *Morrison* test. *Compania*, 2011 WL 3251813, at *6 n.2; *Sabrdaran*, 2015 WL 901352, at *14, n.7. The *Malliard* court concluded that the conduct in that case also satisfied the *Morrison* standard, and did not mention the issue in its decision. *Maillard*, 2014 WL 1660024, at *2-3.

the violator; and (3) defendant acted knowingly or recklessly in providing that assistance.[6]

Here, for the reasons discussed in the section relating to primary liability under Section 17(a), Section 10(b) and Rule 10b-5, the trader defendants knowingly or recklessly provided substantial assistance to the defendant hackers' primary violation. Indeed, their involvement and trading and their payments to the hacker defendants were essential for the hacker defendants defendants to profit from their fraudulent scheme. By statute, any defendant liable for aiding and abetting a primary violation "shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." Accordingly, the trader defendants are subject to the same disgorgement and potential penalties for aiding and abetting as they are for their primary violations.

### 3.    The Trader Defendants, Including TRO Defendants, Are Also Liable Under Section 20(b) of the Exchange Act

The trader defendants, including the TRO Defendants, are also liable for the conduct of the hacker defendants. Section 20(b) of the Exchange Act prohibits

---

[6]    The Court of Appeals for the Third Circuit has not yet addressed the standard. Prior to Congress enacting the Dodd-Frank Act, which became effective July 21, 2010, some district courts interpreted the statute to require that the aider and abettor have actual knowledge of the underlying violation. *See, e.g., SEC v. Lucent Technologies, Inc.*, 610 F. Supp. 2d 342, 361 (D.N.J. 2009) (citing *Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978). Although the enactment of Dodd-Frank renders the issue moot in this instance, the conduct at issue also satisfies that higher standard.

unlawful activity through or by means of any other person: "It shall be unlawful for any person, directly or indirectly to do any act or thing which it would be unlawful for such persons to do under the provisions of this title or any rule or regulation thereunder through or by means of any other person." Thus, here, independent of the scheme, pursuant to Section 20(b), the Trader Defendants are also liable for violations of 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder because the conduct of the defendant hackers in deceptively stealing the material nonpublic information from the Newswire Services is attributable to the Trader Defendants.

**C.     Freezing TRO Defendants' Accounts Is Necessary**

Here, an asset freeze is necessary because there is a significant risk that defendants will either dissipate assets or move them offshore. Because all of the defendants either reside overseas or have significant ties overseas, particularly in the Russian Federation and Ukraine, it is likely that when they learn of this case, defendants will attempt to move overseas those assets that are currently in the United States and dissipate or hide any assets held abroad. Therefore, an asset freeze is necessary to preserve the status quo and preserve assets to satisfy a judgment in favor of the Commission. *See United States v. First National City Bank,* 379 U.S. 378, 385 (1965) (concluding that asset freeze was appropriate to

prevent dissipation of assets or transfer of assets abroad); *Unifund SAL*, 910 F.2d at 1041-42.

Moreover, defendants' accounts should be frozen in their entirety to maintain the status quo and preserve the opportunity to collect on a judgment in this case, including civil penalties. *See Infinity Group*, 212 F. 3d at 197 ("A freeze of assets is designed to preserve the status quo by preventing the dissipation and diversion of assets."); *Unifund SAL*, 910 F.2d at 1041-42 (holding that a freeze order on a brokerage account in an amount equal to the potential disgorgement and civil monetary penalty was appropriate relief). Defendants are subject to a range of substantial penalties for their misconduct. Pursuant to Section 21A of the Exchange Act 15 U.S.C. § 78u-1], defendants could be penalized up to three times their ill-gotten gains. Alternatively, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], defendants are subject penalties of up to $775,000 per violation for entities and $160,000 per violation for individuals. Collectively, the total amount of defendants' disgorgement, pre-judgment interest, and penalties, could exceed $400 million.

The total estimated amount in the defendants' known domestic accounts subject to the requested freeze order is approximately $30 million—far less than defendants' potential liability. Accordingly, the Court should freeze all

27

defendants' assets in the known accounts and any unknown accounts that the Commission may identify.

## II. This Court Should Enter An Order Requiring The TRO Defendants To Repatriate The Proceeds Of The Fraud

The Commission also seeks a repatriation order requiring the TRO Defendants to transfer to the registry of this Court, an amount equal to the ill-gotten gains they realized from the fraud. Repatriation of these assets is appropriate because they represent unlawful proceeds of the TRO defendants' fraud, and the TRO defendants do not appear to have assets in the United States sufficient to satisfy the Commission's claims for disgorgement and civil penalties. *See, e.g., SEC v. Aragon Capital Advisors, LLC*, 2011 WL 3278642, at *10 (S.D.N.Y. July 26, 2011); *SEC v. Illarramendi*, No 11-civ-78, 2011 WL 2457734, at *7 (D. Conn. June 16, 2011). Courts frequently enter repatriation orders to enforce freeze orders of assets held abroad. *See, e.g., SEC v. Resource Devel. Int'l LLC*, 160 F. App'x 368 (5th Cir. Dec. 21, 2005) (affirming asset freeze and repatriation order); *SEC v. Banner Fund Int'l*, 211 F.3d 602 (D.C. Cir. 2000); *SEC v. Aimsi Technologies, Inc.*, 650 F. sup. 2d 296 (S.D.N.Y. 2009). Such an order is appropriate here.

## III. This Court Should Enter An Order To Show Cause

The continuation of any relief obtained pursuant to this Motion, and the consequent preservation of the status quo, is dependent upon the Court's entry of a

preliminary injunction within fourteen days.  Fed. R. Civ. P. 65(b)(2).

Accordingly, the Commission requests that the Court enter an order requiring

defendants to show cause why a preliminary injunction imposing the same relief as

set forth in the temporary restraining order should not be entered.

## IV.  This Court Should Enter An Order Prohibiting The Destruction Of Documents

In order to protect all documents and tangible things necessary to establish a

complete record in this matter, the Commission seeks an order prohibiting the

destruction of documents or tangible things.  Such "innocuous" orders are routinely

granted to protect the integrity of the litigation.  *See, e.g., Unifund SAL*, 910 F.2d at

1040, n.11.  Good faith preservation of documents cannot be assumed in the

context of such a fraudulent scheme.

## V.  This Court  Should Authorize Alternative Service Of The Pleadings And Documents Relating To This Motion

In addition to the means of service provided by the Federal Rules of Civil

Procedure, the Commission asks this Court to authorize service of any Order

issued by the Court in connection with this Application, as well as the papers on

which the Order was granted, upon defendants by email and by overnight delivery

to the brokers with whom defendants have accounts that the Commission seeks to

freeze.  These alternative means are calculated to provide notice of the Court's

Order and the underlying documents and have been approved by courts in similar

circumstances in other cases. *See SEC v. Chang,* No. 14 Civ. 4132, Docket No. 3

(S.D.N.Y. June 9, 2014) (approving service through email and service on broker)

(Ramos, J.) (unpublished). *See also Unifund SAL*, 910 F.2d at 1033 (service on

foreign investor was proper where the papers were delivered to investor's broker,

which forwarded the papers to foreign country where they were received by the

investo); *SEC v. Babikian*, No. 14 Civ. 1740, 2014 WL 2069348 (S.D.N.Y. April

21, 2014) (order noting that the Court had "permitted alternative service of process

on [defendant] via email" for Canadian citizen whose whereabouts were

unknown); *Fed. Trade Comm'n v. Pecon Software, Inc.*, Nos. 12 Civ. 7186, 12

Civ. 7188, 12 Civ. 7191, 12 Civ. 7192, 12 Civ. 7195, 2013 WL 4016272, at *5

(S.D.N.Y. Aug. 7, 2013) ("Service by email alone comports with due process

where a plaintiff demonstrates that the email is likely to reach the defendant.")

(citations omitted).

The brokerage accounts that the Commission seeks to freeze remain active.

Transmission of the documents to the email addresses used in connection with

those accounts (and other email addresses used by those defendants) is calculated

to provide notice to defendants. In light of the assets remaining in the accounts,

defendants likely continue to monitor the accounts and can be contacted by the

brokers.

Case 2:15-cv-06076-MCA-MAH Document 3-3 Filed 08/10/15 Page 37 of 38 PageID: 442

In light of these facts, the Commission respectfully requests that the Court authorize the following alternative means of service upon defendants of the TRO application and supporting papers, including this Memorandum and any Order of the Court granting this application via the methods set forth in the "Service Schedule" attached hereto. These alternate methods of service are tailored to the circumstances of the case and designed to give defendants actual notice and a meaningful opportunity to respond to the Commission's application for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, and those set forth in the accompanying declarations and exhibits, the Commission respectfully requests that the Court issue the Order to Show Cause, Temporary Restraining Order, and Order Freezing

Assets and Granting Other Relief in the form of the order submitted with this motion.

Respectfully submitted,

By:  s/ John Donnelly
David Axelrod
Kelly Gibson
John Donnelly
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(215) 597-1047 (Vivolo)
DonnellyJ@sec.gov

**Of Counsel**
Joseph Sansone

Dated:  August 10, 2015