**FILED UNDER SEAL**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| [UNDER SEAL], | PLAINTIFF, | No. 15 Civ. \_\_\_\_ |
| v. | | **FILED UNDER SEAL** |
| [UNDER SEAL], | DEFENDANTS | |

## DECLARATION OF DANIEL KOSTER

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>ARKADIY DUBOVOY, et al.,<br><br>    Defendants. | Case No. |

### Declaration of Daniel L. Koster

I, Daniel L. Koster, hereby declare as follows:

1. I am employed as a Data Analytics Specialist for the Complex Financial Instruments Unit in the Division of Enforcement of the United States Securities and Exchange Commission (the "Commission"), the Plaintiff in this matter, located at 1617 JFK Boulevard, Suite 520, Philadelphia, Pennsylvania 19103. I have been employed by the Commission since July 2000. My official duties include participating in fact-finding inquiries and investigations to determine whether federal securities laws have been, are presently being, or are about to be violated, and assisting in the Commission's litigation of enforcement actions.

2. I received a Bachelor of Science degree in Business Administration with a concentration in Finance from the University of Central Florida in 2000 and a Master of Accountancy degree from The George Washington University in 2006. I passed all sections of the Certified Public Accountant exam in 2007.

3. In connection with my work, I have, among other things, reviewed records of brokerage accounts held or controlled by Jaspen Capital Partners Limited ("Jaspen") and Bering Explorer Fund Ltd. ("Bering"), including records and information the Commission received from foreign financial firms that allow customers to trade derivatives known as Contracts for

Differences ("CFD"). In addition, I have reviewed documents produced by the domestic broker-dealers and stock exchanges related to CFD trades executed by the foreign financial firms.

4. I make this declaration based on my personal knowledge, information and/or belief, and my review and analysis of the records referenced above, in support of the Commission's Motion for a Temporary Restraining Order Freezing Assets and Granting Other Relief.

### Background

5. Jaspen is an entity established in Bermuda with its principal place of business in Kiev, Ukraine. **Exhibit 21** is a true and correct copy of Jaspen's incorporation documents. Jaspen also purports to be a full service investment bank that provides advisory services including asset management and sales and trading. **Exhibit 22** is a true and correct excerpt of Jaspen's website. Its principals include defendant Andriy Supranonok, who resides in Kiev, Ukraine. He is a dual citizen of Ukraine and the United Kingdom. **Exhibits 34 and 35** are true and correct redacted copies of Supranonok's passports. Jaspen's website lists Supranonok as the Chief Executive Officer of Jaspen. **Exhibit 36** is a true and correct excerpt of Jaspen's website listing Jaspen's officers. Previously, Supranonok was employed as head of sales and trading at Kiev-based Phoenix Capital. **Exhibit 39** is a true and correct excerpt of Supranonok's LinkedIn profile that lists his previous employers. Defendant Oleksandr Makarov was also employed by Phoenix Capital. **Exhibit 40** is a true and correct excerpt of offering documents that list his previous employers.

6. Bering is an entity established in the Bahamas with its principal place of business in Moscow, Russia Federation. One of its directors is defendant Maxim Zakharchenko, who

resides in Moscow, Russian Federation. He is one of two Bering directors and had trading authority in Bering's brokerage accounts at Cantor Fitzgerald Europe ("Cantor"). Zakharchenko appears to have directed Bering's illicit trades. **Exhibit 42** is a true and correct redacted copy of Zakharchenko's passport.

7. During the relevant period, Jaspen had accounts at Cantor Fitzgerald Europe, GFT Global Markets U.K. Limited ("GFT"), ADM Investor Services International ("ADM"), and Saxo Bank A/S ("Saxo"), and used these accounts to trade in the securities of companies whose stock was traded on U.S. exchanges and whose confidential press releases had been stolen. **Exhibits 29 and 30** are true and correct copies of excerpts of Jaspen's account records with ADM for account numbers ending in *CMO7, *CMO8, and *CM21. **Exhibit 31** is a true and correct copy of Jaspen's account opening form with Cantor for account numbers ending in *0011 and *0994. **Exhibits 32 and 33** are true and correct excerpts of Jaspen's trading with Saxo for account numbers ending in *INET1 and *INET2. Suprananok also had an account at GFT, which was used to trade securities of companies whose press releases had been stolen (GFT account ending *1765). That account is included in the discussion of Jaspen's conduct in this Declaration. **Exhibit 37** is a true and correct copy of an excerpt of Supranonok's account records with GFT for account number ending in *1765. **Exhibit 38** is a true and correct excerpt of Jaspen's account opening form with Cantor that lists Supranonok as an authorized trader.

8. Bering had accounts at Cantor that it used to trade in the securities of companies whose stock was traded on U.S. exchanges and whose confidential press releases had been stolen. **Exhibit 41** is a true and correct copy of Bering's account opening form with Cantor for account numbers ending in *0966 and *0969.

9. Cantor is a CFD firm located in London. Cantor Fitzgerald L.P., a limited partnership organized under the laws of Delaware, is the parent company of Cantor. In 2014, Solo Capital, another CFD firm located in London, United Kingdom purchased Cantor's CFD business. Jaspen and Bering's accounts transferred to Solo Capital following the sale.

10. GFT is a CFD firm located in London, United Kingdom. In mid-2014, GAIN Capital Forex.com Limited, a CFD firm located in London, United Kingdom acquired GFT's parent company. For ease of reference, "GFT" refers collectively to GFT Global Markets U.K. Limited and GAIN Capital Forex.com Limited. GAIN Capital Forex.com Limited is a subsidiary of GAIN Capital Holdings Inc., a company organized under the laws of Delaware and whose stock is listed on the New York Stock Exchange. GAIN Capital Holdings Inc. is headquartered in Bedminster, New Jersey.

11. ADM is a CFD firm located in London, United Kingdom. ADM is a subsidiary of Archer-Daniels-Midland (UK) Limited which is a subsidiary of Archer-Daniels-Midland Co., a company organized under the laws of Delaware and whose stock is listed on the New York Stock Exchange.

12. Saxo is a Danish company headquartered in Copenhagen.

13. Newswire Service 1 is a newswire service based in Toronto, Canada. It provides end-to-end content, news production, and distribution services to its clients, including many issuers in the United States.

14. Newswire Service 2 is a newswire service with headquarters in New York, New York. It provides end-to-end content, news production, and distribution services to its clients, including many issuers in the United States.

15. Newswire Service 3 is a newswire service with its headquarters in New York and California.

### How CFD Work

16. CFD are securities traded overseas that derive their value from stocks. The stocks at issue in this case are all listed on stock exchanges in the United States. When a trader executes a trade in a CFD, they either buy to go long (betting the price of the underlying stock will go up) or sell to go short (betting the price of the underlying stock will go down). When the traders close their position by selling or buying the contracts, they receive the difference between the price of the underlying stock at the time they opened the position and the time they closed the position (minus a fee paid to the CFD firm).

17. "Leverage" refers to the difference between the amount of money a trader has on deposit at a CFD firm and the notional value of the underlying securities traded.

18. "Notional value" refers to the cash value of the positions in the underlying stocks. In this case, the total notional value of the positions Bering took while in possession of the illegally obtained press releases is approximately $176 million and Jaspen is approximately $1 billion.

19. "Direct Market Access" refers to an arrangement whereby a broker-dealer permits customers to enter orders into a trading center but such orders flow through the broker-dealer's trading systems prior to reaching the trading center. In the context of this case, certain CFD firms placed trades in the U.S. markets using Direct Market Access provided by U.S. broker-dealers. These trades included trades in stocks underlying the CFD bets, thereby hedging their exposure on the CFD contracts through trades on U.S. stock exchanges.

20. The CFDs at issue in this case were equity CFDs, which are agreements between two parties to exchange the difference in value of an underlying stock between the time the contract is opened and the time it is closed. If the share price increases, the seller pays the difference to the buyer. If the share price declines, the buyer must pay the seller.

21. Because equity CFDs mirror the movement and pricing of the underlying stock on a dollar-for-dollar basis, any fluctuation in the public market price of the underlying security is reflected in the unrealized gain or loss of the CFD position. The purchase and sale prices of equity CFDs are identical to the prices quoted for the shares on the public exchange on which the underlying stock is listed.

22. Generally, a CFD investor benefits by acquiring the future price movement of the underlying stock without having to pay for or take formal ownership of the underlying stock.

23. Usually, purchasers of long CFDs also receive other benefits commonly associated with stock ownership, such as the right to receive dividend payments and participate in stock splits. CFDs normally do not have an expiration date or delivery date, and there is no restriction on the entry or exit price of a CFD.

24. An equity CFD investor typically initiates a long position in the same manner in which he or she would purchase common stock, by submitting an order with a CFD provider to buy a certain number of CFDs in a particular stock. The provider ordinarily purchases the corresponding number of the underlying shares to hedge its position and writes the CFDs to the investor at the same price. As with stock transactions, the buyer is able to enter market, limit, or stop loss orders when initiating CFD positions.

25. When initiating an equity CFD position, the investor normally is not required to pay for the related shares or pay any premium. So the main costs associated with CFDs are

transaction fees charged by CFD providers when a customer opens and closes a position, plus a potential payout based on any decline in the value of the underlying asset. However, CFD providers typically require the investor to post margin on the underlying equity value.

26. During the relevant time period discussed in the complaint in this case, Jaspen and Bering traded equity CFD through Cantor, GFT, ADM, and Saxo.

27. Firms such as Cantor, GFT, ADM, and Saxo that provide equity CFD trading, hedge client positions by buying or selling the stocks underlying the CFD. The CFD trades by Jaspen and Bering that I tracked each resulted in a corresponding hedge trade in the U.S. markets.

28. All NASDAQ trades are processed through NASDAQ's computer servers in Carteret, New Jersey.

### Jaspen and Bering's CFD Trades were Hedged in the United States

29. As part of this investigation, I interviewed personnel from Cantor, GFT, ADM, and Saxo about the process those firms use to hedge their risk on CFD trades.

30. Each of the firms Jaspen and Bering used to trade CFDs hedged their exposure created by Jaspen and Bering's trading. As a result, each firm, either directly or indirectly, caused stocks to be traded in the United States. Thus, Jaspen and Bering's CFD trades were the proximate cause of trades in the United States equity markets.

31. Cantor hedged Jaspen and Bering's trades by trading stocks in the United States, primarily in an account labeled Cantor Fitzgerald EU at Credit Agricole Securities.

32. GFT hedged Jaspen's trades by indirectly causing stocks to be traded in the United States by using Direct Market Access platforms provided by Commerzbank AG and ING UK. Commerzbank AG executed its hedging trades in stocks listed in the United States through

7

UBS, Citadel, and RBC. ING UK executed its hedging trades in stocks listed in the United States primarily through Credit Suisse Europe Limited.

33. ADM hedged Jaspen's trades by indirectly causing stocks to be traded in the United States by ING UK or Cheuvreux International Limited, an affiliate of Credit Agricole. ING UK executed its hedging trades in stocks listed in the United States primarily through Credit Suisse Europe Limited.

34. Saxo hedged Jaspen's trades by trading stocks in the United States, primarily by executing trades in an account labeled Saxo Clrg at Nomura Securities.

### Jaspen and Bering Were Experienced CFD Traders

35. When Jaspen opened its CFD account with Saxo, it received account opening documents explaining that the price and liquidity of CFD mirror the activity of the stocks they reference that are traded on the New York Stock Exchange or NASDAQ. **Exhibit 1** is a true and correct copy of Jaspen's account opening documents with Saxo.

36. When Jaspen opened its CFD account with ADM, it represented that it had experience trading CFD and it intended to trade "CFDs on US MKTS." **Exhibit 2** is a true and correct copy of Jaspen's account opening form with ADM.

37. Cantor told Bering on at least two occasions that it needed to confirm a hedge trade in the U.S. before it could process Bering's CFD trade. First, on July 26, 2012, Bering placed an order with Cantor to sell CFD referencing 100,000 shares of ACME Packet, Inc. Prior to confirming that CFD trade Cantor told Bering it needed to "check[ ] the borrow first," meaning it had to confirm that it could sell short 100,000 shares of ACME Packet, Inc. in the U.S. **Exhibit 3** is a true and correct record of the instant message conversation between Bering and Cantor related to this trade.

8

38. Then, on August 9, 2012, Bering asked Cantor to confirm it could sell CFD referencing 100,000 shares of Digital Generation, Inc. Cantor informed Bering that its ability to process this trade was contingent on Cantor's ability to sell short 100,000 shares in the U.S. **Exhibit 4** is a true and correct record of the instant message conversation between Bering and Cantor related to this trade.

### Examples Demonstrating How Jaspen and Bering's CFD Trades Impacted U.S. Markets
### Trading in Edwards Life Sciences

39. On April 23, 2013 at 4:01 p.m., Edwards Life Sciences ("Edwards"), a stock listed on the New York Stock Exchange, announced first quarter earnings results by issuing a press release through Newswire Service 1. **Exhibit 5** is a true and correct copy of Edwards's press release.

40. The press release was submitted to Newswire Service 1 on April 23, 2013 at 11:39 a.m. The press release stated that the company's earnings per share (a key performance metric) was four cents lower than what the market was expecting.

41. Newswire Service 1 confirmed that the release was accessed by unauthorized persons.

42. Shortly thereafter, at approximately 1:13 p.m. Jaspen began selling CFD relating to Edwards in its GFT account. That day, prior to dissemination of Edwards's press release, Jaspen sold CFD referencing a total of 23,500 Edwards Life Sciences shares. **Exhibit 6** is a true and correct redacted copy of the GFT record of the trades. GFT hedged these trades in the U.S. markets by causing Citadel Derivatives Group, LLC to sell short 23,500 Edwards shares. **Exhibit 7** is a true and correct redacted Citadel record of the trades.

9

43. During that same time, Jaspen also sold CFD referencing a total of 15,196 Edwards's shares in two Cantor accounts. **Exhibit 8** is a true and correct redacted Cantor record of the trades. Cantor hedged these trades in the U.S. markets by causing Commerzbank AG to sell short 15,196 Edwards shares in the U.S. using a UBS Securities (a broker-dealer registered in the U.S.) account for $1,263,367. **Exhibit 9** is a true and correct redacted record of those hedge trades.

44. Bering also sold CFD relating to Edwards stock during the window between the upload of the press release and its public dissemination. Bering sold CFD referencing a total of 15,000 Edwards shares in its Cantor account. **Exhibit 10** is a true and correct redacted Cantor record of the trades. Cantor hedged Bering's CFD trades in the U.S. markets by causing Commerzbank AG to sell short 15,000 Edwards shares in the U.S. using a UBS Securities account for $1,243,200. See **Exhibit 9.**

45. When the press release was publicly disseminated after the U.S. markets closed on April 23, 2013, the price per share of Edwards's stock dropped from a closing price of $82.81 on April 23, 2013 to a closing price of $64.60 on April 24, 2013.

46. On April 24, 2013, Jaspen closed its CFD positions relating to shares of Edwards, realizing a total profit of over $670,000. **Exhibit 6** is a true and correct redacted GFT record of the trades reflecting a profit of $430,675; **Exhibit 8** is a true and correct redacted Cantor record of the trades reflecting a profit of $171,378 in Cantor account *0994 and a profit of $68,520 in Cantor account *0011.

47. On April 24, 2013, Bering closed its CFD positions relating to shares of Edwards, realizing a total profit of over $280,000. **Exhibit 10** is a true and correct redacted Cantor record of the trades.

48.     Jaspen and Bering's combined profits trading Edwards Life Sciences CFDs on April 23-24, 2015 was approximately $950,000.

### Trading in Walter Energy Inc.

49.     On August 1, 2012 at 4:00 p.m., Walter Energy Inc. ("Walter"), a stock listed on the New York Stock Exchange, announced quarterly earnings results by issuing a press release through Newswire Service 1.  **Exhibit 11** is a true and correct copy of Walter Energy Inc.'s press release.

50.     The press release was submitted to Newswire Service 1 at 1:48 p.m. on August 1, 2012. It revealed that the Walter's earnings for the prior quarter exceeded market expectations.

51.     At 2:14 p.m., Jaspen starting buying Walter CFD in its GFT account ultimately referencing 36,000 Walter shares.  **Exhibit 12** is a true and correct redacted GFT record of the trades.  GFT hedged these trades in the U.S. markets by causing Citadel Derivatives Group, LLC to buy 36,000 Walter shares for $1,236,535.  **Exhibit 13** is a true and correct redacted record of the trades.

52.     During this period, Jaspen also bought CFDs referencing 41,123 Walter shares in its Cantor account.  **Exhibit 14** is a true and correct redacted Cantor record of the trades.  Cantor hedged these trades in the U.S. markets by buying 41,123 Walter shares using a Credit Agricole Securities (a broker-dealer registered in the U.S.) account for $1,413,332.  **Exhibit 15** is a true and correct redacted record of the trades.

53.     During the window of time between upload and public dissemination, Bering bought CFD referencing 45,000 Walter shares in its Cantor account.  **See Exhibit 13.**  Cantor hedged these trades in the U.S. markets by buying 45,000 Walter shares using Credit Agricole Securities for $1,552,050.  **See Exhibit 15.**

54. The press release regarding Walter's earnings caused Walter's stock to increase from a closing price of $34.50 on August 1, 2012 to $35.39 on August 2, 2012.

55. The next day, Jaspen closed its Walter CFD position, realizing a profit of nearly $90,000. **See Exhibit 12** for the redacted GFT record of the trades reflecting a profit of $41,965 in GFT account *1765; **Exhibit 14** for the redacted Cantor record of the trades reflecting a profit of $47,965 in Cantor account *0011.

56. That same day, Bering closed its Walter CFD position, realizing a profit of $36,944 in Cantor account *0966. **See Exhibit 14**.

### Trading in RadioShack Corp.

57. On January 30, 2012 at 4:17 p.m., RadioShack Corp. ("RadioShack"), a stock listed (at the time) on the New York Stock Exchange, announced quarterly earnings results by issuing a press release through Newswire Service 2. **Exhibit 16** is a true and correct copy of RadioShack Corp.'s press release.

58. RadioShack submitted the press release to Newswire Service 2 at 2:26 p.m. on January 30, 2012, disclosing that RadioShack had realized lower earnings than expected.

59. At 2:51 p.m. Jaspen started selling RadioShack CFD in its Saxo account ultimately referencing a total of 226,200 RadioShack shares. **Exhibit 17** is a true and correct redacted record of the trades. Saxo hedged Jaspen's RadioShack CFD trades in the U.S. markets by selling 226,200 RadioShack shares. **Exhibit 18** is a true and correct redacted record reflecting these trades.

60. After the press release was publicly disseminated, the price of RadioShack stock dropped nearly 30%.

61. Jaspen closed its position in RadioShack CFDs at Saxo the next day, realizing profits of $668,696. **See Exhibit 17.**

### The Extent of Jaspen and Bering's Trading

62. From at least September 2011 to February 2014, more than 200 times, Jaspen traded before dissemination of a press release where that press release had been stolen from a Newswire Service. Jaspen realized ill-gotten gains of approximately $25 million on these trades.

63. From at least July 2012 to February 2014, more than 50 times, Bering traded before dissemination of a press release where that press release had been stolen from a Newswire Service. Bering realized ill-gotten gains of approximately $7 million on these trades.

64. It appears that Jaspen is continuing to trade based on information from stolen press releases. From December 2014 to at least May 2015, Jaspen made more than 75 CFD trades during the window between when a press release was uploaded to Newswire Service 3 and when it was disseminated. Jaspen realized over $15 million in profits on these trades.

### Jaspen and Bering Transferred Money to Other International Financial Institutions

65. Jaspen sent and received funds in its CFD trading accounts to and from the following financial institutions:

   a. ING Bank Slaski SA in Poland;

   b. Lloyds TSB Bank PLC in London, U.K.;

   c. Societe Generale Cyprus Limited in Cyprus; and

   d. Raiffeisen Bank International AG in Vienna, Austria.

**Exhibit 19** is a true and correct redacted record of these transfers.

66. Jaspen also owned brokerage accounts held by three broker-dealers located in the United States. Jaspen used brokerage accounts located in Norway that were held with Apex, a U.S. broker-dealer, to trade equities before releases that had been stolen (account numbers

ending in *0397, *5787, *5796 and *0765). **Exhibits 26, 27, and 28** are true and correct copies of excerpts of Jaspen's account records with Apex. Jaspen had brokerage accounts with the U.S. broker-dealer, InterActive Brokers (account numbers ending in *2712 and *6768). **Exhibit 20** is a true and correct redacted summary record of wire transfers relating to Jaspen's InterActive Broker's account. **Exhibits 23 and 24** are true and correct copies of excerpts of Jaspen's account records with InterActive Brokers. Additionally, Jaspen had an account with the U.S. broker-dealer, R.J. O'Brien located in Chicago, IL (account number ending in *0006). **Exhibit 25** is a true and correct copy of an excerpt of Jaspen's account records with R.J. O'Brien.

I, Daniel L. Koster, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge. Executed on this 5th day of August, 2015.

_____
Daniel L. Koster