Counsel of Record:
David Axelrod
Kelly Gibson
John Donnelly
Securities and Exchange Commission
Philadelphia Regional Office
One Penn Center
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ARKADIY DUBOVOY, IGOR DUBOVOY, PAVEL DUBOVOY, NELIA DUBOVA, DAVID AMARYAN, ALEXANDER FEDOSEEV, ALEKSANDR GARKUSHA, OLEKSANDER IEREMENKO (a.k.a. Aleksander Eremenko), VLADISLAV KHALUPSKY, VITALY KORCHEVSKY, ROMAN LAVLINSKIY, OLEKSANDR MAKAROV, LEONID MOMOTOK,NIKOLAI SLEPENKOV,  ANDRIY SUPRANONOK, IVAN TURCHYNOV, MAXIM ZAKHARCHENKO, APD DEVELOPERS, LLC, BERATTO GROUP LTD., BERING EXPLORER FUND LTD., CONCORDE BERMUDA LTD., ESCADA LOGISTICS LTD., EXANTE LTD., GLOBAL HEDGE CAPITAL GROUP, GUIBOR S.A., INTERTRADE PACIFIC S.A., MEMELLAND INVESTMENTS LTD., JASPEN CAPITAL PARTNERS LIMITED, NTS CAPITAL FUND, OCEAN PRIME INC., OMEGA 26 INVESTMENTS LTD., SOUTHEASTERN HOLDING AND INVESTMENT COMPANY LLC, COPPERSTONE ALPHA FUND, and COPPERSTONE CAPITAL<br><br>Defendants. | Case No: 15-cv-06076 (MCA-MAH)<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), One Penn Center,

1617 JFK Boulevard, Suite 520, Philadelphia, Pennsylvania 19103, alleges as follows against the

following defendants, whose names and last known addresses are set forth below:

a.   Arkadiy Dubovoy
     3374 Cedar Farms Ct.
     Alpharetta, GA 30004

b.   Igor Dubovoy
     6240 Crested Moss Dr.
     Alpharetta, GA 30004

c.   Pavel Dubovoy
     3374 Cedar Farms Ct.
     Alpharetta, GA 30004

d.   David Amaryan
     Akademichaskaya B. Street, House 15, 1, 255
     Moscow, Russia 125130

e.   Nelia Dubova
     UL Marseljskaya 32/2-1
     Odessa, Ukraine

f.   Alexander Fedoseev
     Holzunova 40 G
     Voronezh, Russia 394068

g.   Aleksandr Garkusha
     4090 Asheville Manor Court
     Cumming, GA 30040

h.   Oleksander Ieremenko (a.k.a. Aleksander Eremenko)
     [Street address unknown]
     Kiev, Ukraine

i.   Vladislav Khalupsky
     2 Armeyskaya Street
     Apt. 23
     Odessa,Ukraine

j.   Vitaly Korchevsky

2

       1709 Slitting Mill Road
       Glenn Mills, PA 19342

k.   Roman Lavlinskiy
       Svobody, 10-26 Voronezh
       Voronezhskaiy, Russia

l.   Oleksandr Makarov
       Saksahanskoho 92, 18
       Kiev, Ukraine

m.  Leonid Momotok
       1610 Pepperbush Court
       Suwannee, GA 20024

n.   Nikolai (Nikolay) Slepenkov
       4, Sevanskaya Street,
       Apt. 420
       Moscow, Russia

o.   Andriy Supranonok
       7b L. Ukrainky Boulevard, Apt. 51
       Kiev, Ukraine, 01001

p.   Ivan Turchynov
       Apartment No. 4 at 5-b Festivalna Street in the Village of Shchaslyve
       Boryspil District
       Kiev, Ukraine

q.   Maxim Zakharchenko
       Bering Capital Partners Ltd
       4th Floor
       15 Pozharbky Pereulok
       Moscow, Russia 119034

r.   APD Developers, LLC
       6495 Shiloh Road, Suite 400
       Alpharetta, GA 30005

s.   Beratto Group Ltd.
       Geneva place, Waterfront Drive
       Roadtown, Tortola BVI

t.   Bering Explorer Fund Ltd.

4th Floor
15 Pozharbky Pereulok
Moscow, Russia 119034

u. Concorde Bermuda Ltd.
2 Mechnykova Str.
Kiev, Ukraine 01601

v. Copperstone Alpha Fund
Harbour Place, 2nd Floor
103 South Church Street
P.O. Box 10364
Grand Cayman KY1-1004
Cayman Islands

w. Copperstone Capital
16 Sadovnicheskaya Street, bld. 1
Moscow, 115035 Russia

Harbour Place, 2nd Floor
103 South Church Street
P.O. Box 10364
Grand Cayman KY1-1004
Cayman Islands

x. Escada Logistics Ltd.
4, Sevanskaya Street, APT. 420
Moscow, Russia 115516

y. Exante Ltd.
Portomaso Business Tower, Level 7
St. Julians, Malta

z. Global Hedge Capital Group
Bolshoy Savvisky 11
Moscow, Russia 119435

aa. Guibor S.A.
2 Rue Alfred de Vigny
Paris, France 75008

bb. Intertrade Pacific S.A.
Akademichaskaya B. Street, House 15, 1, 255
Moscow, Russia 125130

cc. Jaspen Capital Partners Limited

Schorsa, 32G, 1st floor
Kiev, Ukraine, 01001

dd. NTS Capital Fund
1709 Slitting Mill Road
Glenn Mills, PA 19342

ee. Memelland Investments Ltd.
2, Christaki kai Elpinikis Kinni
Flat 8, Summer Gardens, Limassol
4046, Cyprus

ff. Ocean Prime Inc.
16 Sadovnicheskaya St.
Moscow, Russia 115035

gg. Omega 26 Investments Ltd.
2 Rue Alfred de Vigny
Paris, France 75008

hh. Southeastern Holding and Investment Company LLC
3421 Preston Pointe Way
Cumming, GA 30041

## **SUMMARY**

1.      Defendants perpetrated an international fraudulent scheme by hacking the
computer servers of at least two newswire services and stealing, through deception, confidential
earnings information for numerous publicly-traded companies from press releases that had not
yet been released to the public.  Defendants then used that stolen material nonpublic information
to trade securities and reap over $100 million in unlawful profits.

2.      Over an approximately five-year period, defendants Ivan Turchynov and
Oleksander Ieremenko—computer hackers residing in the Ukraine (the "hacker defendants")—
hacked into certain U.S. newswire services and, through deception, stole more than 100,000
press releases for publicly-traded companies before they were issued to the public.  Many of the

stolen press releases contained information about quarterly and annual earnings data for these companies.

3.      The hacker defendants worked in concert with a network of traders, located in the United States and abroad, who paid the hacker defendants for the stolen information, either through a flat fee or a percentage of the illicit profits gained from the illegal trading on the information.

4.      The hacker defendants oscillated primarily between two newswire services, focusing on obtaining the press releases from one or the other depending on the hacker defendants' access to the newswire services' computer networks.

5.      The hacker defendants stole the press releases and passed them, directly or indirectly, to the trader defendants in the window of time between when the press releases were uploaded to the newswire service's system and when the press releases were publicly issued.  As a result, the trader defendants had an unfair trading advantage over other market participants because they knew the content of the press releases before that information was publicly announced.

6.      The defendant traders capitalized on this advantage by initiating trades before the press releases were issued to the public.  The defendant traders bought or sold securities depending on their anticipation of how the market would respond to the information in the stolen press releases.

7.      The traders used deceptive means to conceal their access to the stolen releases and make payments to the hackers.  The traders also concealed their trading activities through use of multiple accounts and entities.

8.      Then, after the press release was publicly issued, and the price of the securities changed as the market learned the previously undisclosed information, the defendant traders reaped enormous profits.

9.      Collectively, the trader defendants used this stolen information to realize over $100 million in illicit gains.

10.     On information and belief, at least some of the defendants have continued to pursue this scheme at one or more newswire services.  As recently as May 2015, some of the defendants traded in front of press releases issued from a third newswire service that had been hacked.

11.     By knowingly or recklessly engaging in the conduct described in this Amended Complaint, defendants violated, and unless enjoined, will continue to violate the securities laws.

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. §§ 77t(b) and 15 U.S.C. § 77t(e)] and Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1] to enjoin such transactions, acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

13.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa].

14.     Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein

occurred within the District of New Jersey and elsewhere, and were effected, directly or indirectly, by making use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange. For example, during the relevant time period, Newswire Service 2's computer servers, which were hacked in connection with the scheme, were located in Jersey City, New Jersey and Piscataway, New Jersey. In addition, securities transactions related to this matter were executed on NASDAQ servers in Carteret, New Jersey and by broker dealers in Jersey City, New Jersey.

## DEFENDANTS

### I. The Hacker Defendants

15.     **Oleksandr Ieremenko, a.k.a. Aleksander Eremenko, ("Ieremenko")** is 23 years old and resides in Kiev, Ukraine.

16.     **Ivan Turchynov ("Turchynov")** is 27 years old and resides in Kiev, Ukraine.

17.     The hacker defendants perpetrated the scheme from multiple IP addresses, including but not limited to: XXXXXX-18.42; XXXXX-9.101; XXXXXX-136.6; and XXXXXX-26.98.

18.     To conceal their true identities, the hacker defendants used multiple email accounts and online "handles" in carrying out and communicating about the scheme. To the extent referenced in the amended complaint, other documents filed with the Court, or exhibits, these unique handles and aliases will be redacted. They will be replaced with the hacker defendant's name followed by "Alias" (i.e., "Ieremenko Alias").

## II. The Trader Defendants

### A. The Dubovoy Group Defendants

19.     The Dubovoy Group defendants are a close-knit group of traders, consisting

primarily of family, friends, and business associates of Arkadiy Dubovoy.  Collectively, the

Dubovoy Group defendants realized over $31 million in illicit gains from the scheme.

20.     As part of this scheme, the Dubovoy Group defendants opened trading accounts

in their names, names of companies they owned, and in the names of at least four of their

associates ("Straw Owners").

    a.   Straw Owner 1 is the manager of Ukrainian ice cream company owned by

        Arkadiy Dubovoy, who had straw ownership for accounts at Interactive Brokers

        ending in *4463, Cimbanque ending in *C011, and Tradestation ending in *7799.

    b.   Straw Owner 2 is the brother of defendant Leonid Momotok, and had straw

        ownership for accounts at E*Trade ending in *0592, TD America ending in

        *2779, Charles Schwab ending in *3160.

    c.   Straw Owner 3 is the manager of the Ukrainian branch of one of Arkadiy

        Dubovoy's companies, R.J. Construction, and had straw ownership for Interactive

        Brokers account ending in *8348.

    d.   Straw Owner 4 is another manager of the Ukranian branch of RJ Construction,

        and had straw ownership of Interactive Brokers account ending in *8944, Charles

        Schwab account ending in *0875, and Bank of America account ending in *9456.

21.     **Arkadiy Dubovoy ("Arkadiy Dubovoy")** is 50 years old and resides in

Alpharetta, Georgia.  He is the owner or partial owner of several limited liability corporations

ostensibly involved in the construction business, including defendants APD Developers LLC and

Southeastern Holding and Investment Company LLC.  He also owns Boni Inc. which is

purportedly in the brokerage services business.  The following brokerage accounts, opened in the

name of Arkadiy Dubovoy or in the name of entities he owns, were involved in the scheme and

trading in those accounts generated over $11 million in ill-gotten gains:  Options House account

ending in *8957; Trade King account ending in *8312; Charles Schwab accounts ending in

*0365 and *8834; E*Trade account ending in *6987; Fidelity account ending in *6216; Merrill

Lynch account ending in *9078; Scottrade account ending in *0584; TD Ameritrade accounts

ending in *7954 and *4751.

      22.    **Igor Dubovoy ("Igor Dubovoy")** is 28 years old and is Arkadiy Dubovoy's son.

He resides in Alpharetta, Georgia.  He owns Dawson & Dawson ("Dawson") and M& I Advising

Inc. ("M&I Advising"), and assists Arkadiy Dubovoy in operating Boni Inc., an entity used to

transfer funds between brokerage accounts.  Accounts in the name of M&I Advising (TD

Ameritrade account ending *7757) and Dawson (TD Ameritrade account ending *3311) were

involved in the scheme.  Approximately $250,000 in illicit gains were generated in these

accounts.  Igor Dubovoy also had trading authority on and/or managed several of Arkadiy

Dubovoy's brokerage accounts involved in the scheme, including:  TD Ameritrade accounts

ending in *4751 and *7954, and Charles Schwab account ending*0365.  Igor Dubovoy gave

Power of Attorney to Leonid Momotok to trade in the accounts with respect to which Igor

Dubovoy was associated**.**

      23.    **Pavel Dubovoy ("Pavel Dubovoy")** is 32 year old and resides in Kiev, Ukraine

and Alpharetta, Georgia.  He shares a credit card account with Arkadiy Dubovoy.  During the

scheme, Pavel Dubovoy told other Dubovoy Group defendants, including Aleksandr Garkusha,

how to access the press releases the hacker defendants stole.  He also directed payments to

Turchynov using a Dubovoy entity and confirmed those payments with Arkadiy Dubovoy. Using one or more intermediaries, Pavel Dubovoy also communicated with the hacker defendants and, in at least one instance, told them which press releases to unlawfully acquire.

24.     **Nelia Dubova ("Dubova")** is 38 years old and resides in Odessa, Ukraine.  She owned a brokerage account used in the scheme (APX account ending in *4899) and she was the signatory officer for another account involved in the scheme in the name of defendant Beratto Group (APX account ending in *5038).  Khalupsky and Igor Dubovoy possessed the login and password information for the Beratto APX *5038 account.  The Dubovoy Group defendants used these two accounts to make illicit trades resulting in approximately $1 million in ill-gotten gains.

25.     **Aleksandr Garkusha ("Garkusha")** is 47 years old and resides in Cumming, Georgia.  He is the executive vice president of defendant APD Developers, which is owned by Arkadiy Dubovoy.  He also manages the trading operations of Tanigold Assets, an entity which was used by Pavel Dubovoy to make payments to Turchynov.  In addition, Garkusha was the former principal at Verum Capital Group LLC which was located at the same address as APD Developers in Georgia.

26.     **Vladislav Khalupsky ("Khalupsky")** is 44 years old and resides in Brooklyn, New York, and Odessa, Ukraine.  Khalupsky worked in the securities industry as a registered representative until June 2011.  Along with Igor Dubovoy, Korchevsky, and Garkusha, Khalupsky helped the Dubovoy Group set up off-shore accounts.  He assisted Arkadiy and Igor Dubovoy in wiring money.  He directed the configuration of one Arkadiy Dubovoy's brokerage accounts involved in the illegal scheme (Merrill Lynch account ending *9078) (an account he referred to in a conversation with Arkadiy Dubovoy as "our account") and helped to direct the

Dubovoy's trading in other accounts. He made or directed illicit trades in those accounts in connection with the scheme alleged in this Amended Complaint.

27.    **Vitaly Korchevsky ("Korchevsky")** is 49 years old and resides in Glen Mills, Pennsylvania.  Korchevsky was a registered investment adviser who previously established and managed hedge funds.  He has partnered with Arkadiy Dubovoy in various enterprises, including hedge funds.  Korchevsky coordinated his illegal trading with Arkadiy Dubovoy and other members of the Dubovoy Group and used the following brokerage accounts to make unlawful trades:  E*Trade account ending 6623; Fidelity account ending *4716; and TD Ameritrade accounts ending *2449 and *1014.  Along with his wife, Korchevsky owns defendant NTS Capital Fund L.P., which also traded in connection with this scheme.  Korchevsky made more than 600 unlawful trades as part of the scheme, realizing approximately $17.5 million in ill-gotten gains.

28.    **Leonid Momotok ("Momotok")** is 47 years old and resides in Cumming, Georgia.  He owns a one-percent interest in two of Arkadiy Dubovoy's companies, RJ General Maintenance LLC and defendant Southeastern Holding and Investment Company LLC. Momotok is also the managing member of defendant Southeastern Holding.  Momotok had a comprehensive role in the scheme described in this Amended Complaint.  He advised Arkadiy Dubovoy how to trade using the stolen information, and he had formal trading authority for brokerage accounts used in the scheme but held in the name of other members of the Dubovoy Group, including:  Arkadiy Dubovoy's Scottrade account ending *0584; Southeastern Holding's Scottrade account ending *5408, Charles Schwab account ending *3154, and TD America account ending *6350.  Momotok also used accounts held by Igor Dubovoy and Straw Owners 1, 2, 3, and 4 to trade in this scheme.

29.    **APD Developers, LLC ("APD")** purports to be a construction business based in Atlanta, Georgia.  Arkadiy Dubovoy owns APD and opened brokerage accounts in the name of APD that were used tin the fraudulent scheme, including TD Ameritrade accounts ending *4751 and *7954 and Charles Schwab account ending *0365.

30.    **Beratto Group LLC ("Beratto")** purports to be a real estate and investment company based in the British Virgin Islands.  Beratto owned an APX account ending *5038. Dubova, Khalupsky and Igor Dubovoy had access to this account and it was used to make illicit trades in connection with the fraudulent scheme.

31.    **NTS Capital Fund L.P. ("NTS")** purports to be a hedge fund based in Glen Mills, Pennsylvania, owned by Korchevsky and his wife.  NTS has a brokerage account at Jeffries/JP Morgan ending in *0336.  Unlawful trades were made in this account resulting in approximately $3.2 million in ill-gotten gains.

32.    **Southeastern Holding and Investment Company LLC ("Southeastern")** is a Georgia limited liability corporation with its principal place of business in Cumming, Georgia. Its managing members are Arkadiy Dubovoy and Momotok.  Southeastern had the following brokerage accounts, Charles Schwab account ending *3154, and TD Ameritrade account ending *6350.  Illicit trades were made in these accounts as part of the scheme resulting in approximately $165,000 in ill-gotten gains.

### B. The Foreign Trader Defendants

33.    **David Amaryan ("Amaryan")** is 35 years old and resides in Moscow, Russian Federation.  He is the CEO of defendant Ocean Prime Inc. ("Ocean Prime") and the sole director of defendants Intertrade Pacific S.A., ("Intertrade") and Copperstone Capital ("Copperstone Capital").  Intertrade owns all shares of Copperstone Capital, and Copperstone Capital manages

Copperstone Alpha Fund ("Copperstone Fund"), a Cayman islands-based hedge fund.  Ocean Prime and Intertrade purport to be proprietary trading funds.  Amaryan opened accounts for Ocean Prime (Interactive Brokers account ending *9827) and Intertrade (Interactive Brokers account ending *8284).  Illicit trades based on stolen press releases were made in the Ocean Prime and Intertrade accounts resulting in approximately $3.7 million in ill-gotten gains.  Upon information and belief, Amaryan controlled accounts in the name of Copperstone Fund at Merrill Lynch, Credit Suisse Securities (USA) Ltd., and Credit Suisse Securities (Europe) Ltd., identified below.  Illicit trades based on stolen press releases were made in the Copperstone Fund accounts resulting in at least $4.4 million in ill-gotten gains.  As described below, Amaryan and defendant Nikolai Slepenkov, who owns defendant Escada Logistics, often made illicit trades in the same securities, on the same days and around the same time and, frequently, via the same IP addresses.

34.     **Copperstone Alpha Fund ("Copperstone Fund")** purports to be a hedge fund established in the Cayman Islands with its principal place of business at Harbor Place, 2nd Floor, 103 South Church Street, P.O. Box 10364, Grand Cayman, Cayman Islands.  Copperstone Fund is managed by Copperstone Capital, another Cayman entity, which is located at the same address as Copperstone Fund.  Copperstone Fund has an account at Merrill Lynch ending *2X05, and a prime brokerage account at Credit Suisse Securities (USA) account ending *0WM0.  In connection with the fraudulent scheme, the Copperstone Fund executed illicit trades in this account resulting in at least $4.4 million in ill-gotten gains.  Upon information and belief, Copperstone Fund has accounts at Credit Suisse Securities (Europe) ending *0WM0, *KMG0, *KZS0, *6DY0, and *6GL0.

35.     **Copperstone Capital ("Copperstone Capital")** is a company owned by defendant Intertrade Pacific S.A., a corporation registered in the British Virgin Islands, and has as its principal places of business Harbor Place, 2nd Floor, 103 South Church Street, P.O. Box 10364, Grand Cayman, Cayman Islands, and16 Sadovnicheskaya Street, bld. 1, Moscow, 115035 Russia. David Amaryan is the sole Director of Copperstone Capital, and he owns all shares of Intertrade Pacific.

36.     **Ocean Prime Inc. ("Ocean Prime")** purports to be a proprietary trading fund established in the British Virgin Islands with its principal place of business in Moscow, Russian Federation. Amaryan is the CEO.

37.     **Intertrade Pacific S.A. ("Intertrade")** purports to be a proprietary trading fund established in the British Virgin Islands with its principal place of business in Moscow, Russian Federation. Amaryan is the owner and sole director of the fund. Intertrade's address is the same as Amaryan's home address in Moscow.

38.     **Nikolai Slepenkov ("Slepenkov")** is 46 years old and resides in Moscow, Russian Federation. He is the CEO and owner of defendant Escada Logistics Ltd., which purports to be a proprietary trading fund. He has an account at Interactive Brokers ending *6218. In connection with the fraudulent scheme, he executed illicit trades in that account resulting in approximately $1.25 million in ill-gotten gains, often in the same securities, on the same days, close to the same times and frequently via the same IP addresses as Ocean Prime, Intertrade and Escada.

39.     **Escada Logistics Ltd. ("Escada")** purports to be a proprietary trading fund established in the British Virgin Islands with its principal place of business in Moscow, Russian Federation. Slepenkov runs Escada out of his apartment in Moscow and opened an account in

15

the name of Escada at Interactive Brokers (ending *2806), which he used to execute unlawful

trades resulting in approximately $850,000 in ill-gotten gains.

40.     **Alexander Fedoseev ("Fedoseev")** is 29 years old and resides in Voronezh,

Russian Federation, the same town as defendant Roman Lavlinskiy.  Fedoseev owns Interactive

Brokers account ending *4148, which he used to make unlawful trades in that account resulting

in approximately $700,000 in ill-gotten gains.  In the brokerage accounts they controlled,

Fedoseev and Lavlinskiy often traded based on stolen press releases in the same securities, on the

same days, close to the same times and frequently via the same IP addresses.

41.     **Roman Lavlinskiy ("Lavlinskiy")** is 29 years old and resides in Voronezh,

Russian Federation.  Lavlinskiy owns or owned Interactive Brokers account ending *7182 and

TD Ameritrade accounts ending *3933 and *9065, which he used in connection with the

fraudulent scheme to make unlawful trades resulting in over $400,000 in ill-gotten gains.

Lavlinskiy's illicit trades were often made in the same securities, on the same days, close to the

same times and frequently via the same IP addresses as Fedoseev.

42.     **Oleksandr Makarov ("Makarov")** is 32 years old and resides in Kiev, Ukraine.

Previously, he worked in the financial services industry for various investment companies,

including Phoenix Capital.  He has a brokerage account at Interactive Brokers ending *4548 and

a sub-account ending *4548F.  In connection with the fraudulent scheme, Makarov executed

illicit trades in his account resulting in approximately $80,000 in ill-gotten gains.  His illicit

trades were often made in the same securities, on the same days and close to the same times, and

often through the same IP addresses as Defendant Concorde Bermuda Ltd.

43.     **Concorde Bermuda Ltd. ("Concorde")** purports to be a hedge fund established

in Bermuda with its principal place of business in Kiev, Ukraine.  Concorde has proprietary

trading accounts at Interactive Brokers ending *4237, *1358, and *2720, which were used in connection with the fraudulent scheme, resulting in approximately $3.6 million in ill-gotten gains.  Those trades were often made in the same securities, on the same days and close to the same times, and often through the same IP addresses as defendant Makarov.  In addition, Concorde transferred money to defendant Jaspen Capital Partners.

44.     **Exante Ltd. ("Exante")** purports to be a Malta-based hedge fund.  Exante holds proprietary trading accounts at Interactive Brokers (ending *2751) and at Lek Securities, which were used in connection with the fraudulent scheme to make trades resulting in approximately $24.5 million in ill-gotten gains.  Several of Exante's directors are also owners of defendant Global Hedge Capital Fund Ltd., and the two entities share employees.  Exante and Global Hedge frequently made illicit trades in the same securities, on the same days and around the same time, and often through the same IP addresses.

45.     **Global Hedge Capital Fund Ltd. ("Global Hedge")** purports to be a Cayman Islands-based hedge fund with its principal place of business in Moscow, Russian Federation. Several of its owners are directors of Exante and the two entities share employees.  Global Hedge has a proprietary trading account at Interactive Brokers ending *4444.  In connection with the fraudulent scheme, Global Hedge executed unlawful trades in that account resulting in over $3.8 million in ill-gotten gains, often in the same securities, on the same days and close to the same times, and often through the same IP addresses as Exante.

46.     **Memelland Investments Ltd. ("Memelland")** purports to be a hedge fund established in the British Virgin Islands with its principal place of business in Limassol, Cyprus. Memelland has a trading account at Interactive Brokers ending *2799, which was used in

connection with the fraudulent scheme to make illicit trades, realizing profits of approximately $375,000.

47. **Guibor S.A. ("Guibor")** purports to be a proprietary trading fund established in France with its principal place of business in Paris, France. It shares a business address and an owner with defendant Omega 26 Investments Ltd. Guibor has a proprietary trading account at Interactive Brokers ending *2450, which was used in connection with the fraudulent scheme to execute trades resulting in $3.5 million in ill-gotten gains. Guibor and Omega 26 frequently traded in the same securities, on the same days and close to the same times, and often through the same IP addresses.

48. **Omega 26 Investments Ltd. ("Omega 26")** purports to be a proprietary trading fund established in Samoa with its principal place of business in Paris, France. Omega 26 has proprietary trading accounts at Interactive brokers ending *2898 which it used in connection with the fraudulent scheme to execute trades resulting in approximately $2.1 million in ill-gotten gains. In addition, Omega 26 also had a proprietary trading account at Cantor Fitzgerald ending *055, which, on information and belief, it used to make unlawful trades in connection with the scheme resulting in approximately another $1 million in ill-gotten gains.

49. **Bering Explorer Fund Ltd. ("Bering")** purports to be a Bahamian company with its principal place of business in Moscow, Russian Federation. Bering had accounts at Cantor Fitzgerald Europe ending *966 and *969, which were used in connection with the fraudulent scheme to make trades resulting in over $6.6 million in ill-gotten gains.

50. **Maxim Zakharchenko ("Zakharchenko")** resides in the Russian Federation. He is one of two Bering directors, and had trading authority in Bering's brokerage accounts at

18

Cantor Fitzgerald Europe.  On information and belief, Zakharchenko directed Bering's illicit trades.

51.    **Andriy Supranonok ("Supranonok")** is 33 years old and resides in Kiev, Ukraine.  He is the CEO and owns 30% of defendant Jaspen Capital Partners' shares. Supranonok has an account at GFT UK Global Markets Limited ending *1765 and is an authorized trader in certain of Jaspen's brokerage accounts.  Previously, Supranonok was employed as head of sales and trading at Kiev-based Phoenix Capital, where Makarov was also employed.

52.    **Jaspen Capital Partners ("Jaspen")** purports to be a Bermudian company based in Kiev, Ukraine.  Jaspen also purports to be a full service investment bank that provides advisory services including asset management and sales and trading.  Jaspen had the following proprietary trading accounts:  Interactive Brokers accounts ending *2712 and *6768; R.J. O'Brien account ending *0006; and AJK, Inc. accounts ending *0397, *5787, *5796, and *0765; ADM Investor Services International Limited ending *CMO7, *CMO8, and *CM21 (based in London, England); Cantor Fitzgerald Europe ending *011, *994 (based in London, England); and Saxo Bank A/S ending *INET and *NET2 (based in Hellerup, Denmark).  In connection with the fraudulent scheme, illicit trades were placed in some of Jaspen's accounts and Supranonok's account resulting in nearly $25 million in ill-gotten gains.

## HACKED NEWSWIRE SERVICES

53.    Newswire Service 1 is a newswire service based in Toronto, Canada.  It provides end-to-end content, news production, and distribution services to its clients, including many issuers in the United States.

54.     Newswire Service 2 is a newswire service with headquarters in New York, New York.  It provides end-to-end content, news production, and distribution services to its clients, including many issuers in the United States.  Throughout the relevant time period, Newswire Service 2's computer servers were located in Jersey City, New Jersey and Piscataway, New Jersey.  Collectively, Newswire Service 1 and Newswire Service 2 are referred to herein as the "Newswire Services."

55.     Newswire Service 3 is a newswire service with its headquarters in New York and California.  On information and belief, from at least December 2014 through May 2015, at least some of the defendants perpetrated the same scheme against Newswire Service 3, and may have targeted other newswire services as well.

## TERMS USED IN THIS AMENDED COMPLAINT

### Options

56.     A stock option, commonly referred to as an "option," gives its purchaser-holder the option to buy or sell shares of an underlying stock at a specified price (the "strike" price) prior to the expiration date.  Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock.

57.     A "call" option gives the purchaser-holder of the option the right, but not the obligation, to purchase a specified amount of an underlying security at a specified strike price within a specific time period.  Generally, the buyer of a call option anticipates that the price of the underlying security will increase during a specified amount of time.

58.     A "put" option gives the holder of the option the right, but not the obligation, to sell a specified amount of an underlying security at a specified strike price within a specific time period.  Generally, the buyer of a put option anticipates that the price of the underlying security will decrease during a specified amount of time.

20

## Short-Selling

59.     Short-selling is the sale of a security not owned by the seller and is a technique used to take advantage of an anticipated decline in price.  An investor borrows stock for delivery at the time of the short sale.  If the seller can buy that stock later at a lower price, a profit results; if, however, the price rises, a loss results.

## Contracts for Differences

60.     A contract for difference ("CFD") is a stock derivative that is an agreement between two parties to exchange the difference in value of an underlying stock between the time the contract is opened and the time at which it is closed.  If the share price increases for the underlying security, the seller pays this difference to the buyer.  If, however, the underlying share price declines, the buyer must pay the seller the difference.

61.     A CFD typically mirrors the movement and pricing of its underlying stock on a dollar-for-dollar basis, such that any fluctuation in the market price of the underlying security is reflected in the unrealized gain or loss of the CFD position.

62.     Generally, the investor in a CFD position benefits by acquiring the future price movement of the underlying common stock without having to pay for or take formal ownership of the underlying shares.

63.      Generally, the investor in a CFD is not required to pay for the underlying shares of the security.  Instead the CFD investor only pays the transaction fees charged by the CFD provider.  Thus, a CFD, like a stock option, allows an investor to recognize significant value from an underlying equity's price movement without having to pay for the underlying shares.

## Margin

64.     "Buying on Margin" is the practice of borrowing money to purchase securities.

21

65.    Buying with borrowed money can be extremely risky because both gains and losses are amplified.  That is, while the potential for greater profit exits, there is a corresponding potential for greater losses.  Buying on margin also subjects a trader to additional costs such as the interest payment for use of the borrowed money.

## IP Address

66.    An "internet protocol address" ("IP address") is a unique number required for online activity conducted by a computer or other device connected to the internet.  In simple terms, it is like a return address on a letter.

## FACTS

### The Newswire Services Are Repositories For Material Nonpublic Information

67.    The Newswire Services edited and released press releases for publicly-traded companies (also known as "issuers") in the United States.  Often these press releases contained quarterly earnings data and other important financial information for a given issuer.  Until the Newswire Services released the press release to the general public, the sensitive financial information in the press releases constituted material non-public information.

68.    To facilitate the process of disseminating quarterly earnings information to the public, issuers routinely provided draft press releases to the Newswire Services.  The Newswire Services then edited, prepared, and stored electronically the press release for public dissemination.

69.    In providing these services, the Newswire Services become repositories for material non-public information from their issuer-clients.  From 2010 through early 2014, the Newswire Services issued more than one million press releases on behalf of their clients.  Many of these releases related to issuer earnings announcements.  The publication of quarterly earnings

information often has a significant positive or negative short-term effect on a given issuer's share price.

70.     For each press release, there is a window of time between when the issuer provides a draft press release to the Newswire Service and when the Newswire Service publishes the release (the "window"). This window varied between a number of minutes and a number of days.

### The Hacker Defendants Fraudulently Accessed
### Unpublished Press Releases From Newswire Service 1 and Newswire Service 2

71.     Defendants took advantage of the window by hacking into the Newswire Services' computer systems, accessing the press releases prior to their publication, and then trading on the material, non-public information contained in the releases before the information was published to the investing public. After the press release was publicly issued, defendants then closed the trading position they had opened during the window of time between the upload of the press release and its public dissemination.

72.     From 2010 until 2014, the hacker defendants electronically intruded ("hacked"), without authorization, into the Newswire Services' computer systems and stole over 100,000 press releases before they were publicly issued.

73.     The hacker defendants used deceptive means to gain unauthorized access to the Newswire Services' computer systems, using tactics such as: (a) employing stolen username/password information of authorized users to pose as authorized users; (b) deploying malicious computer code designed to delete evidence of the computer attacks; (c) concealing the identity and location of the computers used to access the Newswire Services' computers; and (d) using back-door access-modules.

74.     The hacker defendants' theft of un-published press releases oscillated between the two Newswire Services depending on their ability to gain access to the Newswire Services' servers.  The following chart indicates the time periods during which the hacker defendants were focusing on the different Newswire Services:

| Date Range | Newswire Service 1 | Newswire Service 2 |
|---|---|---|
| February 2010 to July 2010 | Hackers had access to network and press releases. | Limited access to the network. |
| July 2010 to January 2011 | Hackers had access to network and press releases. | Hackers had access to network and press releases |
| January 2011 to July 2011 | Hackers had access to network and press releases. | Change in Newswire Service 2's computer system blocked access. |
| July 2011 to March 2012 | Hackers had access to network and press releases. | Hackers had access to network and press releases. |
| March 2012 to January 2013 | Hackers had access to network and press releases. | Change in Newswire Service 2's computer system blocked access. |
| January 2013 to March 2013 | Hackers had access to network and press releases. | Hackers had access to network and press releases. |
| March 2013 to November 2013 | Hackers had access to network and press releases. | Change in Newswire Service 2's computer system blocked access. |
| November 2013 to Present | Change in Newswire Service 1's computer system blocked access. Continued attempts by hackers to access the network. | Continued attempts by hackers to access the network. |

75.     The Trader Defendants' trading activity mirrored the access and focus of the hacker defendants.  When the hacker defendants stole press releases from Newswire Service 1, the trader defendants traded in the securities of the issuers whose press releases were stolen from Newswire Service 1.  When the hacker defendants stole press releases from Newswire Service 2, the trader defendants traded in the securities of issuers whose press releases were stolen from Newswire Service 2.

24

**The Stolen Press Releases Gave The Defendants An Illegal Trading Advantage**

76.     Throughout this scheme, the hacking defendants stole more than 100,000 press releases before they were publicly issued.  Many of the stolen press releases included corporate earnings results and, often, forecasted future earnings.

77.     It is common for financial analysis firms to estimate or predict a given issuer's quarterly or annual earnings.  The "market" reaches a consensus expectation based on these different predictions.  When an issuer releases its earnings, the share price for that issuer generally increases if its earnings exceed the market consensus and generally decreases if its earnings fall short of the consensus prediction.  Accordingly, the stolen press releases contained material information that a trader could use to place securities trades and reap illicit profits.

**The Hacker Defendants Distributed The Stolen Information
To Traders In Exchange For A Percentage Of Their Profits Or A Flat Fee**

78.     The hacker defendants joined with the trading defendants to profit on the material nonpublic information they stole through their deceptive hacks on the Newswire Services.  The hackers distributed video evidence of their ability to steal information from the Newswire Services.  On October 25, 2010, Turchynov attached a video file to an outgoing email message.  This video shows a computer screen listing more than 300 files, many containing the term "release" in the file name.  A text window then pops up with a message in Russian, explaining that what appears on the screen is an administrative panel for files and explaining how to download the files.  The message concludes that access data will be sent to the email the viewer provides.

79.     As the video continues, it shows ten files being selected and downloaded to a zip file dated October 24, 2010.  The video further shows that the IP address used to download the files was XXXXXX-26.98.

25

80.     Newswire Service 2's server logs confirm that its servers were unlawfully accessed on October 24, 2010—the date of the zip file in the Turchynov video.  Newswire Service 2's logs also confirm that, on October 24, 2010, the ten files in the Turchynov video were downloaded via IP address XXXXXX-26.98.

81.     In October 2010 alone, Turchynov distributed via email more than 400 stolen press releases from Newswire Service 2.

82.     Ieremenko also distributed stolen press releases electronically.  For example, on October 10, 2012, Iermenko electronically sent a link to a press release stolen from Newswire Service 1 to an unidentified person before the press release was publicly issued and described how he now had emails for employees at Newswire Service 1 that would allow him to hack into their host server.

83.     As part of the scheme, the trader defendants compensated the hacker defendants for stealing the press releases from the Newswire Services.  At times, the hacker defendants received a flat fee and, at other times, a percentage of the profits obtained from trading on the material nonpublic information stolen by the hacker defendants.  The hacker defendants ensured they were receiving the agreed-upon percentage by monitoring the trader defendants' trading, either through reports from the traders or direct access to the accounts used to make unlawful trades.

84.     For example, on July 20, 2011, the Dubovoy Group provided the hacker defendants account information and login credentials to one of the trading accounts in the name of Arkadiy Dubovoy.  This allowed the hacker defendants to monitor the trading in this account to determine the compensation owed for certain trades.

85.     The next day, that account was accessed from IP address XXXXXX-18.42—the
IP address for a workstation Turchynov used to access webpages and one of the IP addresses the
hacker defendants used to hack the Newswire Services.  Over the next six months, that same IP
address accessed Dubovoy's trading account more than 300 times.

86.     At times, the hacker defendants used entities for the purpose of collecting their
share of the ill-gotten gains from the illicit trading.  For example, upon information and belief, an
individual associated with Turchynov controlled, in whole or in part, an account at a bank in
Estonia.  In February and March 2012, the Dubovoy Group defendants sent $225,000 to that
account.  The Dubovoy Group defendants attempted to conceal the illegal payments by sending
them from Tanigold Assets, one of Arkadiy Dubovoy's companies, and mislabeling them as
payments for "technological equipment" and "building equipment."

**The Dubovoy Group Communicated With The Hacker Defendants**

87.     The Dubovoy Group had access to the press releases the hacker defendants stole.
On November 26, 2010, Pavel Dubovoy emailed Garkusha a link to the internet location of the
server Turchynov used in the October 24, 2010 internet hacking video—a server located at the IP
address XXXXXX-26.98—as well as login and password information to the server.  Pavel
Dubovoy provided instructions, which informed the reader how to log in to the server and
download files and advised users to conceal the identity of the computer they used to access the
server.  Garkusha forwarded Pavel Dubovoy's email to an unidentified individual.

88.     In addition, as noted earlier, on July 20, 2011, the Dubovoy Group defendants
provided the hacker defendants with access to at least one of the brokerage accounts held in the
name of Arkadiy Dubovoy.  The next day, a Ukrainian IP address (XXXXXX-18.42) began
accessing that brokerage account.  Turchynov used that same IP address to access webpages, and

the hacker defendants used that IP address in multiple hacking attacks on the Newswire Services. That IP address also accessed a second brokerage account belonging to Arkadiy Dubovoy.

89.     Turchynov used another IP address, XXXXX-9.101, to hack Newswire Service 2 from January 15, 2013 to March 2, 2013.  That same IP address was also used to access one of Arkadiy Dubovoy's brokerage accounts in May 2012.

90.     In addition, the Dubovoy Group defendants instructed the hacker defendants about which press releases to target.  For example, on October 12, 2011, via an intermediary, Pavel Dubovoy emailed Turchynov a list of fourteen U.S. issuers whose upcoming earnings releases were to be disseminated after the U.S. markets closed on October 12, 2011 and October 13, 2011, and the following week as well.

91.     Moreover, although the defendants took extensive measures to conceal their fraud, those efforts were not always successful.  For example, on December 18, 2013, at approximately 1:21 p.m. ET, Khalupsky emailed a screen shot of an unpublished press release relating to an earnings announcement the hacker defendants had stolen from Newswire Service 1 to his own email account.  The unpublished release had been stolen by the hacker defendants and was not published until hours later, at 4:04 pm ET.  To take the picture, Khalupsky used a smartphone application that does not retain data.  However, the picture was preserved because Khalupsky sent it via email.

### Trading By The Dubovoy Group Defendants

92.     The Dubovoy Group defendants worked in concert to execute the fraudulent scheme, using the information stolen by the hacker defendants to make illicit trades in numerous accounts.  They shared control of the accounts involved in the scheme, either through formal

trading authorization or informally via shared logins and security information which allowed scheme members to pose as one another and trade online.

93.     The Dubovoy Group defendants tried to conceal their fraud by deceptively spreading their illicit trading across numerous accounts at more than 10 brokerage firms in the names of various individuals and entities.  Through this strategy, they hoped to avoid detection by brokers, regulators, and law enforcement.

94.     In addition, the Dubovoy Group defendants coordinated their illegal efforts.  They helped each other and the Straw Owners establish brokerage accounts that were used in the scheme, they shared trading access to the brokerage accounts, and they kept each other informed of their progress and developments.

95.     Igor Dubovoy and Khalupsky helped Arkadiy Dubovoy set up domestic trading accounts connected with the scheme and Momotok helped Arkadiy Dubovoy and the Straw Owners establish domestic accounts connected with the scheme. Likewise, Igor Dubovoy, Pavel Dubovoy, Garkusha, Khalupsky and Korchevsky also helped the Dubovoy Group defendants to set up off-shore accounts connected to the scheme.

96.     For example, on April 26, 2013, Igor Dubovoy emailed Korchevsky stating: "Arkadiy asked me to sell all of the stocks if you do not have Internet can you please let me know if I should do it or if you have the service to do it." Korchevsky did not have formal trading authority in any of Arkadiy Dubovoy's accounts, but he nevertheless made trades in Arkadiy Dubovoy's accounts.

97.     Similarly, although Khalupsky did not have any accounts in his name or any formal trading authority in any of the accounts involved in the scheme, he considered himself a co-owner of at least one of Arkadiy Dubovoy's accounts, at one point instructing him: "Please

29

configure *our* CMA-Edge [ending] *9078 as described below" (emphasis added).  That same

email chain also shows that Khalupsky placed trades in that Merrill Lynch account.

98.     The Dubovoy Group defendants coordinated their unlawful trading through

emails in which they:  (1) shared information about access to the hacker defendants' secure

website and different trading accounts used in the scheme; (2) identified earnings releases to

steal and trade on; (3) directed the trading activity; (4) shared information about payments, costs,

and profits; and (5) discussed creating new entities or accounts to participate in the scheme.

99.     From January 2011 through February 2014, the Dubovoy Group defendants used

the stolen press releases to collectively take more than 1,400 trading positions in the window

between upload to the Newswire Service's computer system and public dissemination.

Collectively, the Dubovoy Group defendants profited by more than $31 million from their

involvement in the scheme.

100.    When trading on the stolen press releases, the Dubovoy Group defendants often

used leverage to increase their ill-gotten gains, trading in options and trading on margin.


### The Foreign Trader Defendants Used The Stolen Information
### To Profitably Trade In Advance Of Public Issuance Of The Press Releases

101.    Throughout the scheme, the Foreign Trader defendants used the material

nonpublic information stolen by the hacker defendants to trade profitably.

102.    Like the Dubovoy Group defendants, the Foreign Trader defendants made

enormous profits trading in the window between issuers' upload of press releases to the

Newswire Services and public dissemination of the press releases.  Often, these trades occurred

close in time to the issuers' upload of releases to the Newswire Service – an event that, but for

the hacking, would only be known by the client and the Newswire Service. The chart below sets

forth the volume and profitability of the Foreign Trader defendants' unlawful window trades

(except Jaspen and Bering, which are discussed further below):

| Traders | No. of Events Traded | Window Profits |
|---|---|---|
| Memelland Global Hedge Exante | 256 | $28.8M |
| Amaryan, Ocean Prime, Intertrade, Slepenkov, Escada | 149 | $5.8M |
| Copperstone Fund and Copperstone Capital | 153 | $4.4M |
| Lavlinskiy Fedoseev | 186 | $1.1M |
| Omega 26 Guibor | 81 | $5.7M |
| Makarov Concorde | 132 | $3.7M |
| Total | 957 | $49.5M |

103.    Like the Dubovoy Group, the Foreign Trader defendants shifted their focus

between the Newswire Services throughout the relevant period, in step with the hackers' shifting

access. When the hacker defendants accessed the unpublished press releases on the computer

systems of Newswire Service 1, the Foreign Trader defendants traded based on information in

those releases. When the hackers changed their focus to Newswire Service 2, the Foreign Trader

defendants traded in the securities of the issuers that were the subject of those releases.

104.    Like the Dubovoy Group, the Foreign Trader defendants used middle-men and

off-shore entities to facilitate the exchange of non-public press releases and payments for this

information.

105.    Like the Dubovoy Group, the Foreign Trader defendants used a variety of

electronic communication methods to obtain the non-public information, including text messages

and the Viber application.

31

106.    Upon information and belief, like the Dubovoy Group defendants, the Foreign Trader defendants paid the hackers a flat fee or a percentage of their profits for the material, non-public information in a similar manner as members of the Dubovoy Group did.

107.    Upon information and belief, each of the Foreign Trader defendants knowingly or recklessly engaged in a deceptive act, similar to those deceptive acts described above, in furtherance of the scheme to acquire and trade on the material, non-public information.

### The Foreign Trader Defendants Are Inter-Connected And Connected To The Dubovoy Group

108.    The Foreign Traders can be separated into the following six groups based on similar trading patterns and inter-connections: (1) Global Hedge, Exante, and Memelland; (2) Amaryan, Copperstone Fund, Copperstone Capital, Ocean Prime, Intertrade, Slepenkov, and Escada; (3) Lavlinskiy and Fedoseev; (4) Omega 26 and Guibor; (5) Makarov and Concorde; and (6) Jaspen, Suprananok, Bering, and Zakharchenko.

### Global Hedge, Exante, And Memelland

109.    Global Hedge, Exante, and Memelland are connected to each other and to the Dubovoy Group by common IP address usage and common account ownership.

110.    For example, the Chief Executive Officer of Global Hedge is also an authorized trader for Exante.  This person used IP address XXXXXX-5.166 in February 2013, to access Global Hedge's Interactive Brokers account ending *4444.

111.    A few months later, in July 2013, that same IP address was used to access the email account Dubovoy01@gmail.com, an email address used by Arkadiy Dubovoy.

112.    About eight months later, in March 2014, the same IP address was used by the username assigned to an owner of Memelland to access Memelland's Interactive Broker's account ending *2799.

32

113.   The next month, the same IP address was used to access the email account Dubovoyp@gmail.com, an email address used by Pavel Dubovoy.

114.   As discussed above, Global Hedge, Exante, and Memelland's trading illustrates their participation in the scheme.  Their trading occurred in the window of time between when the press releases were uploaded to the Newswire Service's computer system and when they were publicly released, often close in time to the issuers' upload of releases to the Newswire Services.  And their trading oscillated between securities of issuers who disseminated their press release through Newswire Service 1 or Newswire Service 2 in lock-step with the hackers shifting access.

## Amaryan, Copperstone Fund, Copperstone Capital, Ocean Prime, Intertrade, Slepenkov, And Escada

115.   Amaryan is connected directly to Copperstone Fund, Copperstone Capital, Ocean Prime, and Intertrade, and is connected to Slepenkov and Escada through common IP usage and trading patterns.  Amaryan is also connected to the Dubovoy Group through a common business relationship.

116.   Amaryan is the CEO of Ocean Prime, has power of attorney for it, and opened Ocean Prime's brokerage account that was used in the scheme.  Amaryan is also the lone director of Intertrade and an owner of the Intertrade brokerage account used in the scheme.  Moreover, Intertrade's address is the same as Amaryan's home address in Moscow.  Copperstone Capital manages Copperstone Fund.  Intertrade is the sole owner of Copperstone Capital and Amaryan is the sole director of Copperstone Capital.

117.   Slepenkov is the CEO and owner of Escada.  He controls two accounts at Interactive Brokers, one in his name and one in the name of Escada, which were used in the scheme.

33

118.    The same two IP addresses accessed the Ocean Prime, Intertrade, Slepenkov, and Escada accounts at Interactive Brokers hundreds of times, and these four accounts traded frequently in the same securities, on the same dates, close in time to each other

119.    Amaryan and Ocean Prime are also connected to the Dubovoy Group through a common business relationship.  The owner of Ocean Prime is the sole director of a foreign trading company established by Pavel Dubovoy, Korchevsky, and Khalupsky.

120.    As discussed above, the trading in these accounts controlled by Amaryan and Slepenkov and the entities they control illustrates their participation in the scheme.  The trading occurred in the window of time between when the press releases were uploaded to the Newswire Services' computer systems and when they were publicly released, often close in time to the issuers' upload of releases to the Newswire Services.  And their trading oscillated between securities of issuers who disseminated their press release through Newswire Service 1 or Newswire Service 2 in lock-step with the hackers shifting access.

**Lavlinsky And Fedoseev**

121.    Lavlinsky and Fedoseev are connected to each other through common IP usage and trading patterns.   Nine IP addresses have logged into both of their accounts numerous times.  One of these nine IP addresses, XXXXXXXX-0.168, accessed both of their Interactive Brokers accounts over 100 times.

122.    Lavlinsky and Fedoseev are also connected to the Dubovoy Group through common trading patterns.  Trades in Lavlinskiy and Fedoseev's accounts traded many of the same securities, on the same dates, in the same direction, within minutes of trades in accounts held in the names of Beratto Group, Dubova, and other Dubovoy Group members.

123.    As discussed above, the trading in these accounts controlled by Lavlinskiy and Fedoseev illustrates their participation in the scheme.  The trading occurred in the window of time between when the press releases were uploaded to the Newswire Services' computer systems and when they were publicly released, often close in time to the issuers' upload of releases to the Newswire Services.  And their trading oscillated between securities of issuers who disseminated their press release through Newswire Service 1 or Newswire Service 2 in lock-step with the hackers shifting access.

### Omega 26 And Guibor

124.    Omega 26 and Guibor share a business address and are linked to each other by common ownership.  The owner of Guibor also owns part of Omega 26.

125.    They are also connection by common IP address usage and trading data.  The same four IP addresses accessed both accounts more than 100 times.  And Guibor and Omega 26 traded many of the same securities, on the same dates, in the same direction, within minutes of one another.

126.    In addition to equities, Omega 26 also engaged in CFD trading in connection with the scheme.  Omega 26's CFD trading was frequently in the same securities as the CFD trading by defendants Jaspen and Bering.  Moreover, Omega 26, Jaspen, and Bering all used the same broker at Cantor Fitzgerald Europe.

127.    As discussed above, the trading in these accounts controlled by Omega 26 and Guibor illustrates their participation in the scheme.  The trading occurred in the window of time between when the press releases were uploaded to the Newswire Services' computer systems and when they were publicly released, often close in time to the issuers' upload of releases to the Newswire Services.  And their trading oscillated between securities of issuers who disseminated

their press release through Newswire Service 1 or Newswire Service 2 in lock-step with the hackers shifting access.

### Makarov And Concorde

128. Makarov and Concorde are connected to one another and to CFD traders, Jaspen and Supranonok.

129. Marakov and Concorde are connected to each other through common IP usage and trading patterns. The illicit trading in Makarov's and Concorde's accounts was often done in the same securities, on the same days, around the same time, and often using the same IP address. Indeed, the same IP address accessed both Makarov's and Concorde's accounts over 100 times.

130. In addition, previously, Makarov worked at the same investment company as Supranonok (and several other Jaspen partners).

131. In April 2014, Concorde wired Jaspen approximately $1.5 million.

132. As discussed above, the trading in these accounts controlled by Makorov and Concorde illustrates their participation in the scheme. The trading occurred in the window of time between when the press releases were uploaded to the Newswire Services' computer systems and when they were publicly released, often close in time to the issuers' upload of releases to the Newswire Services. And their trading oscillated between securities of issuers who disseminated their press release through Newswire Service 1 or Newswire Service 2 in lock-step with the hackers shifting access.

**Jaspen And Bering Used The Stolen Information**
**To Profitably Trade In CFDs In Advance Of Public Issuance Of The Press Releases**

133.    The sixth group of foreign traders consists of Jaspen and Bering, and their respective owners and operators Suprananok and Zakharchenko (when distinguished from the other Foreign Traders, "Foreign CFD Traders").  While the Foreign CFD Traders largely used CFD to take advantage of the stolen information, their pattern of trading in-the-window between the upload of press releases to the hacked Newswire Services and the public dissemination of those press releases and the outsized profitability of that trading mirrored the activity of the Dubovoy Group and the other Foreign Trader defendants.

134.    For example, from June 16, 2011 through April 15, 2014, nearly all of Jaspen's trades were "in-the-window" between upload and public dissemination of press releases from the Newswire Services.  And Jaspen made over 150 window trades.

135.    Similarly, from July 19, 2012 through February 20, 2014, nearly all of Bering's trades were "in the window" between upload and public dissemination of press releases from the Newswire Services.  Bering made over 70 window trades.

136.    Combined, Jaspen and Bering made over $31 million in illicit profits from these window trades.

137.    Because equity CFDs mirror the movement and pricing of the underlying stock on a dollar-for-dollar basis, any fluctuation in the public market price of the underlying security is reflected in the unrealized gain or loss of the CFD position.  The purchase and sale prices of equity CFDs are generally identical to the prices quoted for the shares on the public exchange on which the underlying stock is listed.  (In addition, when purchasing a long CFD position, Jaspen and Bering received other benefits commonly associated with ownership of the underlying stock, such as the right to receive dividend payments and participate in stock splits.)

138.    Here, because the fraud pertained to securities traded on U.S. securities exchanges, the purchases and sales prices of the CFDs traded by Jaspen and Bering were determined by the prices on the U.S. exchange on which the underlying stock was issued. Moreover, the prices were denominated in U.S. dollars.

139.    Jaspen and Bering traded CFD through: Saxo, Cantor, GFT, and ADM ("CFD Providers"). Each of the CFD Providers hedged its exposure created by the CFD trades by executing trades in the United States. Thus, these CFD trades were the proximate cause of trades in the United States equity markets.

140.    For example, at 4:00 PM on August 1, 2012, Walter Energy Inc. ("Walter Energy"), a stock listed on the New York Stock Exchange, announced quarterly sales results by issuing a press release through Newswire Service 1.

141.    The press release was submitted to Newswire Service 1 earlier that same day, at 1:48 p.m., a little more than two hours before it was publicly released.

142.    At 2:14 p.m.—less than 30 minutes after the press release had been uploaded to Newswire Service 1's system—Jaspen bought Walter Energy CFDs. That afternoon, in less than two hours, Jaspen bought CFDs referencing 36,000 Walter Energy shares of stock. These trades were hedged in the US markets by Citadel Derivatives Group, LLC, which bought 36,000 shares of Walter Energy stock using an account at Citadel Securities LLC, a broker-dealer registered in the United States. The notional value of the purchases was $1,236,535.

143.    During that same, short window of time, Jaspen also bought CFDs referencing a total of 41,123 shares of Walter Energy stock in a second account, Cantor account XXXXX0011. These trades were hedged in the US markets by Cantor Fitzgerald Europe buying 41,123 shares

of Walter Energy stock using an account at Credit Agricole Securities, a broker-dealer registered in the United States.  The notional value of the purchases was $1,413,332.

144.    Bering also bought Walter Energy CFDs that afternoon in the short window of time between when the Walter Energy press release was uploaded to Newswire Service 1's system and when it was publicly released.  Bering bought CFDs referencing a total of 45,000 shares of Walter Energy stock.  These trades were hedged in the US markets by Cantor Fitzgerald Europe buying 45,000 Walter Energy shares in an account at Credit Agricole Securities.  The notional value of the purchases was $1,552,050.

145.    The next day, after the press release had been issued, Jaspen closed its positions in Walter Energy CFDs, realizing a profit of nearly $100,000.

146.    That same day, Bering also closed its position in Walter Energy CFDs, realizing a profit of $36,944.

147.    The Foreign CFD Traders were sophisticated traders who knew, or were reckless in not knowing, that their trades in CFDs would cause equivalent trades in the underlying stocks in the U.S. Markets.

## Examples Of Defendants' Illegal Trading Using The Stolen Press Releases

148.    Below are 11 examples of where the trader defendants used the material nonpublic information stolen by the hacker defendants.

### Example 1 – Caterpillar

149.    During the relevant period, Caterpillar, Inc. ("Caterpillar"), a U.S. company headquartered in Peoria, IL, was in the business of manufacturing and selling construction equipment, among other things.  Caterpillar's common stock was listed on the NYSE.

39

150.    Caterpillar uploaded an earnings release to Newswire Service 2 on October 21,
2011, announcing third quarter results, including all-time record third quarter sales and revenues
and an improved outlook for 2011.

151.    Between the time it was uploaded at 9:40 a.m. ET on October 21 and the public
distribution of the earnings release by Newswire Service 2, a number of defendants bought,
and/or opened bullish option positions in, Caterpillar securities and profited, as set forth below:

| Date | Time (ET) | Event | Profits |
|---|---|---|---|
| 10/21/2011 | 9:40 am | Caterpillar uploads 3Q earnings release to Newswire Service 2 | |
| 10/21/2011 | 1:30 pm | Jaspen buys Caterpillar CFDs in GFT *1765 | $42,310 |
| 10/21/2011 | 1:40 pm | Jaspen buys Caterpillar stock in APX *0765 | $34,688 |
| 10/21/2011 | 3:28 pm | Dubovoy Group buys Caterpillar stock in Korchevsky's TD Ameritrade *2449 | $448,241 |
| 10/21/2011 | 3:29 pm | Dubovoy Group buys Caterpillar stock in APD Developers' TD Ameritrade *4751 | $69,000 |
| 10/21/2011 | 3:34 pm | Dubovoy Group buys Caterpillar stock in APD Developers' Charles Schwab *0365 | $43,500 |
| 10/21/2011 | 3:35 pm | Dubovoy Group buys Caterpillar stock in Arkadiy Dubovoy's Charles Schwab *8834 | $45,007 |
| 10/21/2011 | 3:46 pm | Dubovoy Group buys Caterpillar stock in APD Developers' TD Ameritrade *7954 | $37,207 |
| 10/21/2011 | 3:52 pm | Dubovoy Group buys Caterpillar stock in Straw Owner 2's Charles Schwab *3160 | $5,048 |
| 10/24/2011 | 7:30 am | Newswire Service 2 distributes Caterpillar's 3Q earnings release to the public | |

152.    The price of Caterpillar stock rose $4.38 per share after the news was announced.

153.    With the benefit of the stolen material nonpublic information, all of the
defendants who traded in Caterpillar securities during the window between upload of the
earnings release and its publication traded in a manner expecting the price of the stock to
increase when the news was published.

154.    All of these defendants profited.  The Dubovoy Group collectively realized over $648,000 in ill-gotten gains.  And the Foreign Trader defendants collectively realized over $76,000 in ill-gotten gains.

**Example 2 – TreeHouse Foods, Inc.**

155.    During the relevant period, TreeHouse Foods, Inc. ("TreeHouse") was involved in the food manufacturing industry.  The company was incorporated in Delaware with its principal place of business in Illinois.  TreeHouse common stock was listed on NYSE.

156.    On January 19, 2012, TreeHouse uploaded to Newswire Service 2 a press release announcing lower than expected earnings numbers for the fourth quarter of 2011.

157.    Newswire Service 2 publicly distributed that press release at 7:00 a.m. the next day, before the U.S. markets opened.

158.    Between the time it was uploaded at 2:26 p.m. ET and the public distribution of the earnings release by Newswire Service 2, a number of defendants sold short TreeHouse stock, sold CFDs, and/or engaged in bearish option positions and profited, as set forth below:

41

159.    The price of TreeHouse stock fell over $6 per share after the news was announced.

| Date | Time (ET) | Event | Profits |
|---|---|---|---|
| 1/19/2012 | 2:26 pm | TreeHouse uploads release to Newswire Service 2 | |
| 1/19/2012 | 2:40 pm | Dubovoy Group buys TreeHouse put options in Straw Owner 2's TD Ameritrade *2779 | $4,600 |
| 1/19/2012 | 2:50 pm | Jaspen sells TreeHouse CFDs in Saxo *INET | $163,252 |
| 1/19/2012 | 3:12 pm | Dubovoy Group buys TreeHouse put options in Korchevsky's E*Trade *6623 | $144,230 |
| 1/19/2012 | 3:17 pm | Dubovoy Group sells short TreeHouse stock in APD Developers' TD Ameritrade *7954 | $162,074 |
| 1/19/2012 | 3:21 pm | Dubovoy Group sells short TreeHouse stock in Straw Owner 2's Charles Schwab *3160 | $12,888 |
| 1/19/2012 | 3:23 pm | Dubovoy Group sells short TreeHouse stock in Arkadiy Dubovoy's Scottrade *0584 | $10,091 |
| 1/19/2012 | 3:25 pm | Dubovoy Group sells short TreeHouse stock in M&I Advising's TD Ameritrade *7757 | $1,487 |
| 1/19/2012 | 3:27 pm | Dubovoy Group sells short TreeHouse stock in APD Developers' Charles Schwab *0365 | $15,581 |
| 1/20/2012 | 7:00 am | Newswire Service 2 distributes the TreeHouse press release | |

160.    With the benefit of the stolen material nonpublic information, all of the defendants who traded in TreeHouse during the window between upload of the earnings release and its publication traded in a manner expecting the price of the stock to decrease when the news was published.

161.    All of these defendants profited.  The Dubovoy Group collectively realized over $350,000 in ill-gotten gains.  And the Foreign Trader defendants realized over $163,000 in ill-gotten gains.

**Example 3 - RadioShack**

162.    During the relevant period, RadioShack was an American electronics retail chain. RadioShack's common stock was traded on NYSE.

163.    On January 30, 2012, RadioShack uploaded a press release announcing its

preliminary results for fourth quarter 2011 to Newswire Service 2 at approximately 2:26 p.m.

ET.  The press release disclosed that RadioShack had realized lower earnings than expected.

164.    Newswire Service 2 publicly distributed that press release later that day at

approximately 4:17 p.m.

165.    Between the time it was uploaded at 2:26 p.m. ET and the public distribution of

the earnings release by Newswire Service 2, a number of defendants sold short RadioShack

stock, sold CFDs, and/or engaged in bearish option positions and profited, as set forth below:

| Date | Time (ET) | Event | Profits |
|---|---|---|---|
| 1/30/2012 | 2:26 pm | RadioShack uploads press release to Newswire Service 2 | |
| 1/30/2012 | 2:51 pm | Jaspen sells RadioShack CFDs in Saxo *1048 and GFT *1765 | $766,736 |
| 1/30/2012 | 2:54 pm | Dubovoy Group purchases RadioShack put options in Straw Owner 2's TD Ameritrade *2779 | $14,600 |
| 1/30/2012 | 3:29 pm | Dubovoy Group sells short RadioShack stock in APD Developers' TD Ameritrade *7954 | $297,613 |
| 1/30/2012 | 3:38 pm | Dubovoy Group sells short RadioShack stock in Straw Owner 2's Charles Schwab *3160 | $24,502 |
| 1/30/2012 | 3:40 pm | Dubovoy Group sells short RadioShack stock in Arkadiy Dubovoy's Scottrade *0584 | $5,380 |
| 1/30/2012 | 3:47 pm | Dubovoy Group sells short RadioShack stock in M&I Advising's TD Ameritrade *7757 | $1,693 |
| 1/30/2012 | 4:17 pm | Newswire Service 2 distributes the RadioShack press release | |

166.    After the press release was issued, the price of RadioShack stock dropped nearly

30%.

167.    With the benefit of the stolen material nonpublic information, all of the

defendants who traded in RadioShack during the window between upload of the earnings release

and its publication traded in a manner expecting the price of the stock to decrease when the news was published.

168.    All of these defendants profited.  The Dubovoy Group collectively realized over $343,000 in ill-gotten gains.  Jaspen realized over $766,000 in ill-gotten gains.

**Example 4 – Acme Packet**

169.    During the relevant period, Acme Packet, Inc. ("Acme"), a U.S. company headquartered in Bedford, MA, was involved in the technology industry.  Acme's common stock was listed on NASDAQ.

170.    Acme uploaded an earnings release to Newswire Service 1 on July 25, 2012, announcing second quarter results, including a decline in revenue and net income as compared to the second quarter of 2011.

171.    Between the time it was uploaded at 5:53 p.m. ET on July 25 and the public distribution of the earnings release by Newswire Service 1, which occurred at 4:05 p.m. the following day, a number of defendants sold short, and/or opened bearish option positions in, Acme securities and profited, as set forth below:

| Date | Time (ET) | Event | Profits |
|------|-----------|-------|---------|
| 7/25/2012 | 5:53 pm | Acme uploads 2Q earnings release to Newswire Service 1 | |
| 7/26/2012 | 1:36 pm | Dubovoy Group  sells Acme call options and buys Acme put options in Straw Owner 2's TD Ameritrade *2779 | $14,100 |
| 7/26/2012 | 1:46 pm | Exante sells short Acme stock in Interactive Brokers *2751 | $29,755 |
| 7/26/2012 | 1:51 pm | Global Hedge sells short Acme stock in Interactive Brokers *4444 | $12,134 |
| 7/26/2012 | 1:55 pm | Guibor sells short Acme stock in Interactive Brokers *2450 | $259,753 |
| 7/26/2012 | 2:06 pm | Dubovoy Group sells short Acme stock in Arkadiy Dubovoy's Charles Schwab *8834 | $372,398 |

| 7/26/2012 | 2:19 pm | Bering sells Acme CFDs in Cantor Fitzgerald *0966 | $257,405 |
|-----------|---------|---------------------------------------------------|----------|
| 7/26/2012 | 2:51 pm | Dubovoy Group sells short Acme stock in Straw Owner 1's TradeStation *7799 | $25,745 |
| 7/26/2012 | 2:54 pm | Dubovoy Group buys ACME put options in Arkadiy Dubovoy's Fidelity *6216 | $33,779 |
| 7/26/2012 | 3:02 pm | Dubovoy Group sells short Acme stock in Arkadiy Dubovoy's Scottrade *0584 | $69,255 |
| 7/26/2012 | 3:20 pm | Dubovoy Group sells short Acme stock in Straw Owner 4's Interactive Brokers *8944 | $42,535 |
| 7/26/2012 | 3:30 pm | Dubovoy Group sells short Acme stock in Arkadiy Dubovoy's E*Trade *6987 | $127,704 |
| 7/26/2012 | 4:05 pm | Newswire Service 1 distributes Acme's 2Q earnings release to the public | |

172.    The price of Acme stock fell $1.16 per share after the news was announced.

173.    With the benefit of the stolen material nonpublic information, all of the defendants who traded in Acme securities during the window between upload of the earnings release and its publication traded in a manner expecting the price of the stock to decrease when the news was published.

174.    All of these defendants profited.  The Dubovoy Group collectively realized over $685,000 in ill-gotten gains.  And the Foreign Traders collectively realized over $559,000 in ill-gotten gains.

**Example 5 – Zumiez, Inc.**

175.    During the relevant period, Zumiez, Inc. ("Zumiez") was a clothing store company, specializing in the retail of action sports related apparel and accessories.  The company was incorporated in and maintained its principal place of business in Washington.  Zumiez's common stock was listed on NASDAQ.

176.    On October 31, 2012, Zumiez uploaded a press release to Newswire Service 1 in which it, among other things, revised its third-quarter guidance downward due to a challenging sales environment in Europe.

45

177.   Newswire Service 1 publicly disseminated the press release that same day at 4:05

p.m. ET, after the U.S. markets closed.

178.   Between the time it was uploaded at 1:29 p.m. ET and the public distribution of

the earnings release by Newswire Service 1, a number of defendants sold short Zumiez stock,

and profited, as set forth below:

| Date | Time (ET) | Event | Profits |
|------|-----------|-------|---------|
| 10/31/2012 | 1:29 pm | Zumiez uploads press release to Newswire Service 1 | |
| 10/31/2012 | 1:52 pm | Intertrade (Amaryan) sells short Zumiez stock in Interactive Brokers *8284 | $66,849 |
| 10/31/2012 | 1:53 pm | Copperstone Fund sells short Zumiez stock in Credit Suisse *0WM0 | $138,831 |
| 10/31/2012 | 1:54 pm | Slepenkov sells short Zumiez stock in Interactive Brokers *6218 | $33,613 |
| 10/31/2012 | 2:09 pm | Omega 26 sells short Zumiez stock in Interactive Brokers *2898 | $103,018 |
| 10/31/2012 | 2:09 pm | Guibor sells short Zumiez stock  in Interactive Brokers *2450 | $69,016 |
| 10/31/2012 | 2:21 pm | Exante sells short Zumiez stock in Lek account | $75,861 |
| 10/31/2012 | 2:30 pm | Fedoseev sells short Zumiez stock  in Interactive Brokers *4148 | $11,822 |
| 10/31/2012 | 2:34 pm | Lavlinskiy sells short Zumiez stock  in Interactive Brokers *7182 | $2,114 |
| 10/31/2012 | 3:01 pm | Global Hedge sells short Zumiez stock  in Interactive Brokers *4444 | $87,610 |
| 10/31/2012 | 4:00 pm | Newswire Service 1 distributes Zumiez earnings release | |

179.   The price of Zumiez stock fell over $4 per share after the news was announced.

180.   With the benefit of the stolen material nonpublic information, all of the

defendants who traded in Zumiez during the window between upload of the earnings release and

its publication traded in a manner expecting the price of the stock to decrease when the news was

published.

181.   All of these defendants profited.  The Foreign Trader defendants realized over

$587,000 in ill-gotten gains.

**Example 6 – Brocade Communications Systems**

182.    During the relevant period, Brocade Communications Systems ("Brocade") was a technology company, incorporated in Delaware with its principal place of business in California. Brocade's common stock was listed on NASDAQ.

183.    On May 1, 2013 at approximately 3:29 p.m. ET, Brocade uploaded a press release to Newswire Service 1, announcing that it had revised earnings per share and revenue guidance downward.

184.    Newswire Service 1 publicly disseminated the press release that same day at 4:05 p.m. ET, after the U.S. markets closed.

185.    As the timeline below indicates, many of the Foreign Trader defendants traded in advance of this announcement by Brocade, and they did so within the 36-minute window of time between when Newswire Service 1 received the release and when it made the release public. Moreover, the Foreign Trader defendants' trading activity is clustered in an even smaller eight-minute window, and all of the Foreign Trader defendants took short positions, which is the logical trade to make in advance of negative guidance:

| Date | Time (ET) | Event | Profit |
|---|---|---|---|
| 5/1/2013 | 3:29 pm | Brocade uploads news release to Newswire Service 1 | |
| 5/1/2013 | 3:39 pm | Jaspen sells Brocade CFDs in Saxo *NET2 | $16,000 |
| 5/1/2013 | 3:39 pm | Makarov sells short Brocade stock in Interactive Brokers *4548 | $470 |
| 5/1/2013 | 3:43 pm | Exante sells short Brocade stock in Lek account | $20,836 |
| 5/1/2013 | 3:45 pm | Guibor sells short Brocade stock in Interactive Brokers *2450 | $153,671 |
| 5/1/2013 | 3:45 pm | Omega 26 sells short Brocade stock in Interactive Brokers *2898 | $183,913 |
| 5/1/2013 | 3:45 pm | Copperstone Fund sells short Brocade stock in Credit Suisse *0WM0 | $39,860 |
| 5/1/2013 | 3:46 pm | Slepenkov sells short Brocade stock in Interactive Brokers *6218 | $27,690 |

| 5/1/2013 | 3:46 pm | Bering sells Brocade CFDs in Cantor Fitzgerald *0969 | $72,258 |
| 5/1/2013 | 3:47 pm | Ocean Prime (Amaryan) sells short Brocade stock in in Interactive Brokers *9827 | $36,539 |
| 5/1/2013 | 4:05 pm | Newswire Service 1 distributes Brocade press release to public | |

186.   The price of Brocade stock fell $0.32 per share after the news was announced.

187.   With the benefit of the stolen material nonpublic information, all of the defendants who traded in Brocade during the 30 minute window between upload of the release and its publication traded in a manner expecting the price of the stock to increase when the news was published.

188.   All of these defendants profited.  The Foreign Trader defendants realized over $550,000 in ill-gotten gains.

**Example 7 – Edwards Life Sciences**

189.   During the relevant period, Edwards Lifesciences ("Edwards") was involved in the science of heart valves and hemodynamic monitoring.  It was incorporated in Delaware and headquartered in California.  Edwards' common stock was listed on the NYSE.

190.   Edwards uploaded an earnings release to Newswire Service 1 on April 23, 2013, at approximately 11:39 a.m. ET.  The earnings release stated that Edwards' earnings per share had increased by 125% but that the Company was lowering its guidance for the next quarter.

191.   Between the time it was uploaded at 11:39 a.m. ET on April 23 and the public distribution of the earnings release by Newswire Service 1, a number of defendants sold short Edwards stock and CFDs and profited, as set forth below:

| Date | Time (ET) | Event | Profits |
|---|---|---|---|
| 4/23/2013 | 11:39 pm | Edwards uploads 1Q earnings release to Newswire Service 1 | |
| 4/23/2013 | 12:33 pm | Makarov sells short Edwards stock in Interactive | $1,088 |

| | | Brokers *4548 | |
|---|---|---|---|
| 4/23/2013 | 12:43 pm | Exante sells short Edwards stock in Interactive Brokers *4548 | $1,939,716 |
| 4/23/2013 | 1:04 pm | Lavlinskiy sells short Edwards stock in Interactive Brokers *7182 | $63,359 |
| 4/23/2013 | 1:04 pm | Fedoseev sells short Edwards stock in Interactive Brokers *4148 | $128,947 |
| 4/23/2013 | 1:09 pm | Global Hedge Capital Fund sells short Edwards stock in Interactive Brokers *4444 | $71,593 |
| 4/23/2013 | 1:13 pm | Jaspen sells Edwards CFDs in GFT *1765, Cantor Fitzgerald*0994, Cantor Fitzgerald *0011 | $670,573 |
| 4/23/2013 | 1:28 pm | Dubovoy Group sells short Edwards stock and sells Edwards put options in Korchevsky's E*Trade *6623 | $250,254 |
| 4/23/2013 | 1:30 pm | Dubovoy Group sells short Edwards stock in Korchevsky's JP Morgan *0336 | $47,487 |
| 4/23/2013 | 1:32 pm | Dubovoy Group sells short Edwards stock in Arkadiy Dubovoy's Merrill Lynch *9078 | $172,876 |
| 4/23/2013 | 1:41 pm | Dubovoy Group sells short Edwards stock in Straw Owner 1's TradeStation *7799 | $31,699 |
| 4/23/2013 | 1:42 pm | Copperstone Fund sells short Edwards stock in Credit Suisse *0WM0 | $159,345 |
| 4/23/2013 | 1:43 pm | Intertrade sells short Edwards stock in Interactive Brokers *8284 | $154,482 |
| 4/23/2013 | 1:54 pm | Bering sells Edwards CFDs in Cantor Fitzgerald *969 | $280,240 |
| 4/23/2013 | 1:55 pm | Dubovoy Group sells short Edwards stock in Arkadiy Dubovoy's E*Trade *6987 | $117,849 |
| 4/23/2013 | 2:29 pm | Slepenkov sells short Edwards stock in Interactive Brokers *6218 | $107,000 |
| 4/23/2013 | 2:43 pm | Omega 26 sells short Edwards stock in Interactive Brokers *2898 | $166,434 |
| 4/23/2013 | 2:44 pm | Guibor sells short Edwards stock in Interactive Brokers *2450 | $113,092 |
| 4/23/2013 | 3:02 pm | Dubovoy Group sells short Edwards stock in Arkadiy Dubovoy's Scottrade *0584 | $9,841 |
| 4/23/2013 | 3:02 pm | Dubovoy Group sells short Edwards stock in Arkadiy Dubovoy's Fidelity *6216 | $182,063 |
| 4/23/2013 | 3:10 pm | Dubovoy Group sells short Edwards stock in Straw Owner 4's Interactive Brokers *8944 | $31,353 |
| 4/23/2013 | 4:01 pm | Newswire Service 1  distributes EW earnings release to the public | |

192.     After the news was publicly released, the market responded the way defendants

anticipated and the price of Edwards stock dropped from $82.81 per share to $64.60 per share.

193.    With the benefit of the stolen material nonpublic information, all of the defendants who traded in Edwards stock and CFDs during the window between upload of the earnings release and its publication traded in a manner expecting the price of the stock to decrease when the news was published.

194.    With the unfair advantage of the stolen material nonpublic information, the Dubovoy Group realized over $843,000 in illicit profits on these transactions, and the Foreign Trader defendants collectively realized over $3.7 million in illicit profits.

**Example 8 – Panera Bread Co.**

195.    During the relevant period, Panera Bread Co. ("Panera") was a company involved in the food industry, incorporated in Delaware with its principal place of business in Missouri. Panera's common stock was listed on NASDAQ.

196.    At approximately 10:00 a.m. ET on July 23, 2013, Panera uploaded a press release to Newswire Service 1, which announced among other things, that Panera was revising downward its diluted earnings per share target for fiscal 2013.

197.    Newswire Service 1 publicly disseminated the press release later that same day at 4:00 p.m., after the U.S. markets closed

198.    Between the time it was uploaded and the public distribution of the earnings release by Newswire Service 1, a number of defendants sold short Panera securities or CFDs and profited, as set forth below:

| Date | Time (ET) | Event | Profit |
|---|---|---|---|
| 7/23/2013 | 10:00 am | Panera uploads press release to Newswire Service 1 | |
| 7/23/2013 | 12:15 pm | Jaspen sells Panera CFDs in ADM *CM07 and Cantor Fitzgerald *0011 | $1,561,703 |
| 7/23/2013 | 2:05 pm | Global Hedge sells short Panera stock in Interactive Brokers *4444 | $19,076 |
| 7/23/2013 | 3:11 pm | Dubovoy Group sells short Panera stock and buys Panera put options in Korchevsky's E*Trade *6623 | $216,451 |

| | | | |
|---|---|---|---|
| 7/23/2013 | 3:32 pm | Dubovoy Group sells short Panera stock in Arkadiy Dubovoy's Fidelity *6216 | $89,508 |
| 7/23/2013 | 3:33 pm | Dubovoy Group sells short Panera stock in Straw Owner 1's Interactive Brokers *7799 | $6,110 |
| 7/23/2013 | 3:34 pm | Dubovoy Group sells short Panera stock in Arkadiy Dubovoy's E*Trade *6987 | $15,254 |
| 7/23/2013 | 3:38 pm | Concorde sells short Panera stock in Interactive Brokers *1358 | $219,045 |
| 7/23/2013 | 3:39 pm | Dubovoy Group sells short Panera stock in Arkadiy Dubovoy's Merrill Lynch *9078 | $25,277 |
| 7/23/2013 | 3:40 pm | Dubovoy Group sells short Panera stock in Beratto Group's APX *5038 | $23,231 |
| 7/23/2013 | 3:41 pm | Bering sells Panera CFDs in Cantor Fitzgerald *0969 | $93,244 |
| 7/23/2013 | 3:42 pm | Dubovoy Group sells short Panera stock in Straw Owner 4's Interactive Brokers *8944 | $6,480 |
| 7/23/2013 | 3:45 pm | Memelland sells short Panera stock in Interactive Brokers *4300 | $19,808 |
| 7/23/2013 | 3:47 pm | Intertrade sells short Panera stock in Interactive Brokers *8284 | $22,229 |
| 7/23/2013 | 3:47 pm | Slepenkov sells short Panera stock in Interactive Brokers *6218 | $26,984 |
| 7/23/2013 | 3:47 pm | Copperstone Fund sells short Panera stock in Credit Suisse *0WM0 | $52,726 |
| 7/23/2013 | 3:49 pm | Makarov sells short Panera stock in Interactive Brokers * 4548 | $303 |
| 7/23/2013 | 3:50 pm | Dubovoy Group sells short Panera stock in Korchevsky's JP Morgan *0366 | $50,279 |
| 7/23/2013 | 4:00 pm | Newswire Service 1 disseminates Panera news release to the public | |

199.   The price of Panera stock fell from a closing price of $182.01 per share on July 23 to a closing price of $169.62 per share on July 24.

200.   With the benefit of the stolen material nonpublic information, all of the defendants who traded in Panera during the window between upload of the earnings release and its publication traded in a manner expecting the price of the stock to decrease when the news was published.

201.    All of these defendants profited.  The Dubovoy Group collectively realized over $432,000 in ill-gotten gains.  And the Foreign Trader defendants realized over $1.95 million in ill-gotten gains.

**Example 9 - VMWare**

202.    During the relevant period, VMware, Inc. ("VMware"), a U.S. company headquartered in Palo Alto, CA, was involved in virtualization and cloud infrastructure. VMware's common stock was listed on the NYSE.

203.    At approximately, 12:09 p.m. on July 23, 2013, VMware uploaded an earnings release to Newswire Service 1 announcing second quarter results, including 11% year-over year revenue growth and a record high non-GAAP operating margin.

204.    Newswire Service 1 publicly disseminated the press release that same day at 4:01 p.m., after the U.S. markets closed.

205.    Between the time it was uploaded and the public distribution of the earnings release by Newswire Service 1, a number of defendants bought VMware securities and profited, as set forth below:

| Date | Time (ET) | Event | Profits |
|------|-----------|-------|---------|
| 7/23/2013 | 12:09 pm | VMware uploads 2Q earnings release to Newswire Service 1 | |
| 7/23/2013 | 1:23 pm | Makarov buys VMware stock in Interactive Brokers *4548 | $5,398 |
| 7/23/2013 | 1:37 pm | Slepenkov buys VMware stock in Interactive Brokers *6218 | $64,622 |
| 7/23/2013 | 1:37 pm | Copperstone Fund buys VMware stock in Credit Suisse *0WM0 | $122,836 |
| 7/23/2013 | 1:38 pm | Ocean Prime (Amaryan) buys VMware stock in Interactive Brokers *9827 | $110,908 |
| 7/23/2013 | 2:11 pm | Bering buys VMWare CFDs in Cantor Fitzgerald *0969 | $112,173 |
| 7/23/2013 | 2:12 pm | Concorde buys VMware stock in Interactive Brokers *1358 | $709,310 |

| 7/23/2013 | 2:25 pm | Intertrade buys VM stock in Interactive Brokers *8284 | $11,662 |
|-----------|---------|--------------------------------------------------------|---------|
| 7/23/2013 | 2:48 pm | Bering buys VMware CFDs in Cantor Fitzgerald *0969 | $112,174 |
| 7/23/2013 | 3:31 pm | Dubovoy Group buys VMware stock in Arkadiy Dubovoy's Fidelity *6216 | $50,182 |
| 7/23/2013 | 3:35 pm | Dubovoy Group buys VMware stock in Arkadiy Dubovoy's E*Trade *6987 | $5,897 |
| 7/23/2013 | 3:35 pm | Dubovoy Group buys VMware stock in Korchevsky's E*Trade *6623 | $83,061 |
| 7/23/2013 | 3:35 pm | Memelland buys VMware stock in Interactive Brokers *4300 | $40,748 |
| 7/23/2013 | 3:46 pm | Dubovoy Group buys VMware stock in Straw Owner 4's Interactive Brokers *8944 | $12,445 |
| 7/23/2103 | 3:50 pm | Dubovoy Group buys VMware stock in Southeastern Holding's TD Ameritrade *6350 | $14,759 |
| 7/23/2013 | 3:55 pm | Dubovoy Group buys VMware stock in Korchevsky's JP Morgan *0336 | $99,717 |
| 7/23/2013 | 4:01 pm | Newswire Service 1 distributes VMware's 2Q earnings release to the public | |

206.    The price of VMware stock rose $11.92 per share after the news was announced.

207.    With the benefit of the stolen material nonpublic information, all of the defendants who traded in VMware securities during the window between upload of the earnings release and its publication traded in a manner expecting the price of the stock to increase when the news was published.

208.    All of these defendants profited.  The Dubovoy Group collectively realized over $266,000 in ill-gotten gains.  And the Foreign Trader defendants collectively realized over $1.1 million in ill-gotten gains.

**Example 10 – TIBCO Software**

209.    During the relevant period, TIBCO Software ("TIBCO"), a U.S. company headquartered in California, was involved in the development of infrastructure and business intelligence software.  TIBCO's common stock was listed on NASDAQ.

210.    On September 19, 2013, at approximately 1:47 p.m., TIBCO uploaded a news release to Newswire Service 1 announcing third quarter results, including record third quarter total revenue and an increase in earnings per share over the prior year's third quarter earnings per share.

211.    Newswire Service 1 publicly disseminated the press release that same day at 4:05 p.m., after the U.S. markets closed.

212.    Between the time it was uploaded and the public distribution of the press release by Newswire Service 1, a number of defendants purchased TIBCO securities and profited, as set forth below:

| Date | Time (ET) | Event | Profits |
|---|---|---|---|
| 9/19/2013 | 1:47 pm | TIBCO uploads 3Q earnings release to Newswire Service 1 | |
| 9/19/2013 | 2:35 pm | Dubovoy Group buys TIBCO stock in Arkadiy Dubovoy's Options House *8957 | $15,570 |
| 9/19/2013 | 3:15 pm | Jaspen buys TIBCO CFDs in GFT *1765 and CF *0011 | $56,830 |
| 9/19/2013 | 3:16 pm | Makarov buys TIBCO stock in Interactive Brokers *4548 | $7,796 |
| 9/19/2013 | 3:17 pm | Slepenkov buys TIBCO stock in Interactive Brokers *6218 | $93,892 |
| 9/19/2013 | 3:18 pm | Ocean Prime (Amaryan) buys TIBCO stock in Interactive Brokers *9827 | $108,300 |
| 9/19/2013 | 3:19 pm | Bering buys TIBCO CFDs in Cantor *969 | $88,780 |
| 9/19/2013 | 3:23 pm | Makarov buys TIBCO CFDs in Interactive Brokers *4548F | $2,070 |
| 9/19/2013 | 3:24 pm | Intertrade buys TIBCO stock in Interactive Brokers *8284 | $20,447 |
| 9/19/2013 | 3:29 pm | Dubovoy Group buys TIBCO stock in Arkadiy Dubovoy's Merrill Lynch *9078 | $37,451 |
| 9/19/2013 | 3:31 pm | Jaspen buys TIBCO CFDs in SAXO *INET | $18,020 |
| 9/19/2013 | 3:36 pm | Dubovoy Group buys TIBCO stock in Beratto Group's APX *5038 | $33,358 |
| 9/19/2013 | 3:36 pm | Dubovoy Group buys TIBCO stock in Straw Owner 3's Interactive Brokers *8348 | $7,580 |
| 9/19/2013 | 3:36 pm | Guibor buys TIBCO stock in Interactive Brokers *2450 | $51,269 |
| 9/19/2013 | 3:37 pm | Copperstone Fund buys TIBCO stock in Credit Suisse *0WM0 | $108,804 |
| 9/19/2013 | 3:40 pm | Dubovoy Group buys TIBCO stock in Arkadiy Dubovoy's E*Trade *6987 | $30,663 |

| 9/19/2013 | 3:45 pm | Dubovoy Group buys TIBCO stock in Korchevsky's E*Trade *6623 | $60,448 |
| 9/19/2013 | 3:53 pm | Dubovoy Group buys TIBCO stock in Arkadiy Dubovoy's Fidelity *6216 | $66,407 |
| 9/19/2013 | 4:05 pm | Newswire Service 1 distributes TIBCO's 3Q earnings release to the public | |

213.    The price of TIBCO stock rose $0.45 per share after the news was announced.

214.    With the benefit of the stolen material nonpublic information, all of the defendants who traded in TIBCO during the window between upload of the earnings release and its publication traded in a manner expecting the price of the stock to increase when the news was published.

215.    All of these defendants profited.  The Dubovoy Group collectively realized over $250,000 in ill-gotten gains.  And the Foreign Trader defendants realized over $505,000 in ill-gotten gains.

**Example 11 – Align Technology**

216.    During the relevant period, Align Technology, Inc. ("Align"), a U.S. company headquartered in San Jose, CA, was involved in designing, manufacturing, and marketing Invisalign, a proprietary method for treating the misalignment of teeth.  Align's common stock was listed on NASDAQ.

217.    Align uploaded an earnings release to Newswire Service 1 on October 17, 2013, announcing third quarter results, including 20.5% year-over year revenue growth.

218.    Between the time it was uploaded at 1:28 a.m. ET on October 17 and the public distribution of the earnings release by Newswire Service 1, a number of defendants bought Align securities and profited, as set forth below:

| Date | Time (ET) | Event | Profits |
|---|---|---|---|
| 10/17/2013 | 1:28 am | Align uploads 3Q earnings release to Newswire Service 1 | |
| 10/17/2013 | 12:34 pm | Dubovoy Group buys Align stock in Arkadiy Dubovoy's Options House *8957 | $72,067 |
| 10/17/2013 | 1:14 pm | Jaspen buys Align CFDs in Cantor *0994 | $291,318 |
| 10/17/2013 | 1:15 pm | Jaspen buys Align CFDs in Cantor *0011 | $410,693 |
| 10/17/2013 | 1:22 pm | Concorde buys Align stock in Interactive Brokers *1358 | $532,323 |
| 10/17/2013 | 1:34 pm | Dubovoy Group buys Align stock in Beratto Group's APX *5038 | $114,393 |
| 10/17/2013 | 1:43 pm | Dubovoy Group buys Align stock in Arkadiy Dubovoy's Merrill Lynch *9078 | $96,942 |
| 10/17/2013 | 1:56 pm | Jaspen buys Align CFDs in SAXO *INET | $114,900 |
| 10/17/2013 | 2:25 pm | Intertrade (Amaryan) buys Align stock in Interactive Brokers *8284 | $126,136 |
| 10/17/2013 | 2:26 pm | Escada (Slepenkov) buys Align stock in Interactive Brokers *2806 | $243,869 |
| 10/17/2013 | 2:26 pm | Copperstone Fund buys Align stock in Credit Suisse *0WM0 | $453,941 |
| 10/17/2013 | 2:27 pm | Ocean Prime (Amaryan) buys Align stock in Interactive Brokers *9827 | $375,599 |
| 10/17/2013 | 2:29 pm | Bering buys Align CFDs in Cantor Fitzgerald *969 | $357,058 |
| 10/17/2013 | 2:36 pm | Dubovoy Group buys Align stock in Korchevsky's JP Morgan *0336 | $252,609 |
| 10/17/2013 | 2:36 pm | Dubovoy Group buys Align stock in Korchevsky's E*Trade *6623 | $336,410 |
| 10/17/2013 | 2:55 pm | Dubovoy Group buys Align stock in Arkadiy Dubovoy's Fidelity *6216 | $406,296 |
| 10/17/2013 | 3:05 pm | Dubovoy Group buys Align stock in Arkadiy Dubovoy's E*Trade *6987 | $190,543 |
| 10/17/2013 | 3:17 pm | Dubovoy Group buys Align stock in Straw Owner 3's Interactive Brokers *8348 | $38,972 |
| 10/17/2013 | 3:17 pm | Dubovoy Group buys Align stock in Korchevsky's Fidelity *4716 | $58,703 |
| 10/17/2013 | 3:27 pm | Exante buys Align stock in LEK account | $48,225 |
| 10/17/2013 | 3:46 pm | Memelland buys Align stock in Interactive Brokers *2799 | $40,537 |
| 10/17/2013 | 4:00 pm | Newswire Service 1 distributes Align's 3Q earnings release to the public | |

219.    The price of Align stock rose $12.05 per share after the news was announced.

220.   With the benefit of the stolen material nonpublic information, all of the defendants who traded in Align securities during the window between upload of the earnings release and its publication traded in a manner expecting the price of the stock to increase when the news was published.

221.   All of these defendants profited.  The Dubovoy Group collectively realized over $1.5 million in ill-gotten gains.  And the Foreign Trader defendants collectively realized over $2.9 million in ill-gotten gains.

**The Defendants Realized Over $100 Million From The Fraudulent Scheme**

222.   Defendants engaged in a long-running, deceptive scheme to steal material nonpublic information from the Newswire Services and use that information to gain an illegal advantage in the markets.  Defendants realized over $100 million from their scheme.

223.   Both the hacking and the trading were essential to the scheme.  As a result, the scheme oscillated between Newswire Services, as the hacker defendants' accessed ebbed and flowed.

224.   For each illicit trade, defendants traded on the basis of material nonpublic information.

225.   At all times relevant to this Amended Complaint, defendants acted knowingly and/or recklessly.  In addition, defendants attempted to conceal their conduct from detection in a variety of ways, such as:  using computer technology to hide their true identities, pose as others to access the Newswire Services' computer systems, and delete evidence of their illegal intrusions and their access to stolen releases; using aliases and "handles" to hide their true identity; using a secret, secure webserver to disseminate and retrieve the stolen press releases;

spreading their illicit trading across numerous accounts at multiple brokerages and in a plethora of names of both individuals and entities; and transmitting funds under fraudulent pretenses to entities established for the purpose of receiving those funds.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

### (Against all defendants)

226.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 221, inclusive, as if they were fully set forth herein.

227.    Defendants, by engaging in the conduct described above, knowingly or recklessly, in connection with the offer or sale of securities, by the use of the means or instruments of transportation, or communication in interstate commerce or by use of the mails, directly or indirectly:

    (a)    employed devices, schemes or artifices to defraud;

    (b)    obtained money or property by means of untrue statements of material facts, or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    (c)    engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

228.    By engaging in the foregoing conduct, defendants violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

58

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

### (Against all defendants)

229.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 224, inclusive, as if they were fully set forth herein.

230.    By engaging in the conduct described above, defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a)    employed devices, schemes or artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

231.    By engaging in the foregoing conduct defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## THIRD CLAIM FOR RELIEF

### Violations of Section 20(e) of the Exchange Act

### (Against all defendants except Ieremenko and Turchynov)

232.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 227, inclusive, as if they were fully set forth herein.

233.     As alleged above, the hacker defendants violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder, as alleged in this Amended Complaint.

234.     Through their illicit trading, payments to the hacker defendants, instruction about which releases to obtain, and other means alleged in this Amended Complaint, the trader defendants knowingly provided substantial assistance to, and thereby aided and abetted, the hacker defendants in connection with the hacker defendants' violations of the securities laws.

235.     By engaging in the foregoing conduct, pursuant to Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act, defendants, except Ieremenko and Turchynov, violated, an unless enjoined will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## FOURTH CLAIM FOR RELIEF

### Violations of Section 20(b) of the Exchange Act

### (Against all defendants except Ieremenko and Turchynov)

236.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 231, inclusive, as if they were fully set forth herein.

237.    By engaging in the foregoing conduct, the trader defendants violated Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5],

thereunder through or by means of the hacker defendants.

238.    By engaging in the foregoing conduct, pursuant to Section 20(b) of the Exchange

Act [15 U.S.C. § 78t(b)], defendants, except Ieremenko and Turchynov, violated, an unless

enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and

Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter an

emergency, temporary, and preliminary order freezing the assets of those defendants' subject to

the motion for a temporary restraining order and preliminary injunction, including but not limited

to brokerage accounts and bank accounts (both known and unknown), requiring those defendants

to repatriate amounts equal to their the ill-gotten gains derived from the scheme, as alleged in

this Amended Complaint, prohibiting the destruction of documents, and ordering alternative

means of services.

Further, the Commission respectfully requests that the Court enter a final judgment:

## I.

Permanently restraining and enjoining defendants from, directly or indirectly, violating

Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Ordering each defendant to disgorge all ill-gotten gains or unjust enrichment derived

from the activities set forth in this Amended Complaint, together with prejudgment interest

thereon;

**III.**

Ordering each defendant to pay a civil penalty up to three times the profits made pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] or, alternatively, to pay a civil penalty under Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

**IV.**

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Respectfully submitted,

BY: _____

David Axelrod
Kelly Gibson
John Donnelly
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

Of Counsel:

Joseph Sansone

Date:  August 23, 2015

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

ARKADIY DUBOVOY, et al.,

Defendants.

Case No. 15-cv-06076 (MCA-MAH)

### DESIGNATION OF AGENT
### FOR SERVICE

Pursuant to Local Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the captioned action. Therefore, service upon the United States or its authorized designee, Leticia Vandehaar, Deputy Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102 shall constitute service upon the Commission for purposes of this action.

Respectfully submitted,

s/ John Donnelly
David Axelrod
Kelly Gibson
John Donnelly

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(215) 597-3100
DonnellyJ@sec.gov

August 23, 2015

## CERTIFICATE OF SERVICE

      I hereby certify that on this  23rd  day of August, 2015, that I caused to be served a true and correct copy of the Amended Complaint for Violations of the Federal Securities Laws upon the following parties in the manner set forth below:

Via ECF:

Howard Schiffman, Esq<br>
Robert E. Griffin, Esq.<br>
Eric A. Bensky, Esq.<br>
SCHULTE ROTH & ZABEL LLP<br>
919 Third Avenue<br>
New York, NY 10022<br>
**Attorneys for Defendants Exante Ltd**

Matthew I. Menchel, Esq.<br>
Kobre & Kim, LLP<br>
2 South Biscayne Boulevard<br>
35th Floor<br>
Miami, FL 33131<br>
**Attorneys for Defendant Guibor, SA and Omega 26 Investments, Ltd**

Eric Bruce, Esq.<br>
Kobre & Kim, LLP<br>
1919 M Street NW<br>
Washington, DC 20036<br>
**Attorneys for Defendant Guibor, SA and Omega 26 Investments, Ltd**

Via email and US Mail, postage prepaid:

Seth T. Taube, Esq.<br>
Alex Bourelly, Esq.<br>
Bridget Moore, Esq.<br>
BAKER BOTTS LLP<br>
30 Rockefeller Plaza<br>
New York, New York 10112<br>
**Attorneys for Defendant Concorde Bermuda Ltd.**

John Moscow, Esq.<br>
Marc Powers, Esq.<br>
BAKER HOSTETLER<br>
45 Rockefeller Plaza<br>
New York, NY 10111<br>
**Attorneys for Defendants David Amaryan, Ocean Prime Inc., and Intertrade Pacific S.A.**

## <u>CERTIFICATE OF SERVICE</u>
## <u>(CONT'D)</u>

Barry A. Bohrer, Esq.
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022
**Attorneys for Defendants Jaspen Capital Partners Limited and Andriy Supranonok**

Michael Tremonte, Esq.
Robert Knuts, Esq.
SHER TREMONTE
80 Broad Street
Suite 1301
New York, NY 10004
**Attorneys for Defendant Memelland Investments, Ltd.**

<u>s/ John Donnelly</u>
JOHN DONNELLY

2