# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> ARKADIY DUBOVOY, et al. <br><br> Defendants. | Civil Action No.: 15-cv-06076 (MCA-MAH) <br><br> **DECLARATION OF** <br> **DAVID AMARYAN** |

DAVID AMARYAN, declares under penalty of perjury as follows:

1.      I am one of the defendants in the above-captioned action ("Action"). I make this declaration in opposition to the application of plaintiff, the United States Securities and Exchange Commission (the "SEC"), for a preliminary injunction, and in support of the Amaryan Defendants[1] cross-motion to dismiss the SEC's Amended Complaint, filed on August 23, 2015 (the "Amended Complaint").

2.      To be absolutely clear, I have never possessed or traded on material, nonpublic information obtained through illicit or unlawful means, including but not limited to any kind of breach of fiduciary duty, misappropriation, or deception. Nor have I ever directed anyone working for me to obtain or to trade on such information. The SEC's allegations against me and my related companies in this regard are erroneous.

3.      Moreover, I never had access to the public company earnings reports that are the subject of this Action, or the information contained therein, prior to their public release.

---

[1] The "Amaryan Defendants" are David Amaryan, Copperstone Capital, Copperstone Alpha Fund, Ocean Prime Inc. and Intertrade Pacific S.A.

Moreover, to my knowledge, no one working for me or any of the entities owned and/or managed by me ever had access to the earnings reports that are the subject of this Action, or the information contained therein, prior to their public release.

4.     As discussed below, ¶ 81, I caused a Russian agency in Moscow where I live and work to examine all electronic forms of communication, including computers and phones, of all relevant Copperstone Capital employees for any evidence of improper activity. I was told none of my people were involved.

5.     Prior to seeing the SEC's initial complaint in this Action, I had never heard of any of the Hacker Defendants named herein. To be absolutely clear, I have never met, spoken with, or communicated in any way with any of them.

6.     Prior to seeing the SEC's initial complaint in this Action, I had never heard of any of the Trader Defendants named therein, with the exception of Nikolai Slepenkov and Escada Logistics LTD ("Escada"). My relationship with Mr. Slepenkov and Escada is described below.

7.     In implementing the trading strategies discussed below, I believed—and continue to believe—that my actions were legal and permissible, and that no illicit means were employed in implementing these strategies.

8.     Also, neither I nor any of my related companies have made any payments, or provided any personal benefits, to any person or entity, including those mentioned in the SEC's Amended Complaint, to obtain material, nonpublic information, including but not limited to the earnings reports, prior to their public release. As described below, I am confident that no one working for me or for any entity owned and/or operated by me, has ever made any payments, or provided any personal benefits, to any person or entity, including those mentioned in the SEC's

Amended Complaint, to obtain material, nonpublic information, including earnings reports, prior to their public release.

9.      The SEC has also erroneously accused me of creating numerous entities to hide my identity and to trade securities illegally. I have never hidden my identity in my investment vehicles. Also, those allegations show a lack of appreciation for the manner in which investment funds operate and their investors maintain their assets.

10.     The SEC seeks to have this Court enter a preliminary injunction, including a continued asset freeze order, against me and my investment vehicles based on nothing but conjecture. As this Declaration and the other papers submitted in opposition will show, the SEC's claims are misplaced. The mere existence of this Action is causing me and my related companies significant financial damage and reputational harm as discussed below. It is also causing harm to my clients, and affecting my business and personal relationship with them, all for something neither I nor any of the Amaryan Defendants did that was improper. Accordingly, the SEC's requested relief should be denied and the Amended Complaint should be dismissed as against the Amaryan Defendants.

**Background**

11.     I was born on June 3, 1980, in Yerevan, the capital city of the Republic of Armenia, which was then part of the Soviet Union until its independence in 1990. In 1995, when I was fifteen years old, I traveled to the United States for a year to attend Trinity School in New York City as part of a foreign exchange program. I returned to Armenia in 1996 for a few months in order to take certain exams and graduate from high school. I then joined my parents in Saratov, Russia, where they had previously moved.

12.     I later moved to the United States in pursuit of higher education. I obtained a bachelor of science degree in finance and international business in 2001 from Miami University in Oxford, Ohio, which I attended on a full merit scholarship.

13.     After college, I joined AllianceBernstein L.P. where I worked as an Associate Portfolio Manager for U.S. Equities for two years, managing value and growth portfolios of U.S. equities. In 2003, I moved to Russia at the behest of my parents who had decided not to immigrate to the United States.

14.     In late 2003, I joined Citigroup's Moscow Wealth Management team where my responsibilities included helping to set up this business in Russia, acquiring high net worth clients and helping them with their commercial banking and investment needs. In 2005, I left Citigroup to join Troika Dialog (now Sberbank CIB), one of Russia's largest multinational investment banking and asset management firms headquartered in Moscow, Russia. At Troika, I was a Vice President for Sales and Trading. As part of my job responsibilities, I created and managed the Ultra High Net Worth Group within the trading desk of the firm and made it one of the most profitable divisions of the firm. I remained with Troika until approximately the end of 2009, at which time I left to form my own investment boutique, BCD Wealth Management, which was later renamed Copperstone Capital. When I left Troika, I had approximately $400 million of clients' assets under management.

15.     In 2014, I was accepted into the MBA program at the University of Chicago Booth School of Business. I started this program in June 2014 and I am currently enrolled and expected to graduate in the fall of 2016. I should note that my original expected graduation date was March of 2016, but because of this Action, I was forced to take a brief leave of absence in order to concentrate on defending myself.

16.     I currently live and work in Moscow, Russia, with my wife and our two young daughters.

**The Copperstone Entities**

17.     Copperstone Capital, a defendant in this Action, is an investment management firm registered in the Cayman Islands. I founded Copperstone Capital with my younger brother, Vardan Amaryan, on March 24, 2010. Copperstone Capital manages the assets of high net worth individuals and institutions. Its areas of operation include investment management, personal net worth management, private equity and advisory services.

18.     I am Copperstone Capital's Chief Executive Officer. Vardan Amaryan is Copperstone Capital's Chief Operating Officer.

19.     Copperstone Capital's official address is Harbour Place, 2nd Floor, 103 South Church Street, P.O. Box 10364, Grand Cayman, Cayman Islands. The head office of Copperstone Capital is located at 16 Sadovnicheskaya St., Moscow, Russia, where day to day operations, research and securities trading take place. In addition to Vardan and myself, there are approximately a dozen employees at Copperstone Capital, including those in roles of Chief Financial Officer, Chief Analyst, Chief Trader, Portfolio Manager, accountant, back office manager, risk manager, in-house counsel and administrative assistant.

20.     Copperstone Capital's UK operations, established in April, 2015, are conducted under the name Copperstone Capital Management UK ("Copperstone Capital UK"). Its business address is 23 King Street, London, United Kingdom. David Papazian is the head of the UK operations. We had planned on having an investor relations specialist, an analyst, an execution trader and an administrative assistant join Copperstone Capital UK as of September 1, 2015. The trader, the analyst and the assistant have informed us, however, that they refuse to join Copperstone Capital UK due to the pendency of this Action. While the investor relations

specialist has expressed a willingness to come on board, we have nevertheless put a hiring freeze in place until this Action is resolved.

21.     Copperstone Capital is the investment manager of defendant Copperstone Alpha Fund (the "Alpha Fund"), also a defendant in this Action. The Alpha Fund is an investment fund established on March 24, 2010. It has approximately ten non-U.S. citizen who live outside of the United States and myself as investors. Vardan Amaryan and I are the sole directors of the Alpha Fund. Credit Suisse Securities (Europe) Limited (London) is the prime broker for the Alpha Fund.[2]

22.     The Alpha Fund has been very successful and has received recognition for its activities. Acquisition International Hedge Fund Awards 2015, where peer companies vote on the winners, named the Alpha Fund the Best Russian Fund (Since Inception). (*See* Exhibit A attached hereto.) The Alpha Fund also received The European Finance and Business Award for Investment Fund of the Year in 2015. Copperstone Capital also received the ACQ5 Global Award in 2015 for the Investment Management Firm of the Year (Russia). In addition, there has been press coverage about the Alpha Fund and me. Excerpts from articles published in The European and Forbes (Russia) magazines are attached hereto as Exhibits B and C.

23.     The Alpha Fund, however, has suffered significantly as a direct result of this Action. Even before the Court issued the temporary asset freeze, Credit Suisse halted all trading in the Alpha Fund's accounts. Due to the volatility in the market during the month of August 2015, and our inability to respond to it appropriately, the Alpha Fund has sustained serious

---

[2] We were in the process of engaging Morgan Stanley as a second prime broker, but Morgan Stanley has stopped that process due to the pendency of this Action.

losses, making August 2015 the worst performance month in the Fund's history. Prior to the SEC bringing this lawsuit, the Alpha Fund was worth $24.5 million. Today, it is worth $23 million.

24.    My interest in and connection with Copperstone Capital has always been open and notorious. For example, the Forbes magazine feature on me and my brother, Vardan Amaryan, clearly identifies me as Copperstone Capital's CEO. A simple Google search also reveals my connection to Copperstone Capital, which I have never hidden.

25.    My brother Vardan Amaryan's connection with Copperstone Capital has also been open and notorious. For example, his LinkedIn account lists him as Copperstone Capital's Chief Operating Officer.

**Ocean Prime Inc.**

26.    On November 17, 2009, I founded defendant Ocean Prime Inc. ("Ocean Prime"). Ocean Prime is a registered British Virgin Islands company with its principal place of business located at 16 Sadovnicheskaya St., Moscow, Russia. I am, and have always been, the sole beneficial owner of Ocean Prime. Many investment funds, all legitimate, are founded in the B.V.I. They are founded abroad, in places such as B.V.I. or the Cayman Islands, so non-U.S. citizens who invest in them are not subject to U.S. taxes.

27.    I initially created Ocean Prime as a holding company to hold my personal assets, including a bank account in Switzerland. It was, and remains, my understanding that this is a common practice for individuals, especially Europeans and Eastern European citizens, who wish to hold assets in foreign banks such as Swiss banks.

28.    At all times, my ownership of Ocean Prime has been open and notorious. I never sought to conceal the true identity of Ocean Prime's beneficial owner, nor have I ever concealed my ownership interest in Ocean Prime. My name appears on all relevant account documents and other filings showing Ocean Prime's ownership. Indeed, so does my home address. If I was

trying to hide my identity or shield myself from the taint of any illicit activities as the SEC alleges, I never would have used my correct home and business addresses as I have done.

29.     I gradually began using Ocean Prime for purposes other than simply holding money. For example, I established a brokerage account at a Russian broker-dealer in the name of Ocean Prime in which I traded Russian securities.

30.     Today, Ocean Prime functions primarily as an operations company for my various business ventures. For example, I use Ocean Prime to purchase merchandise for distribution by my on-line perfume and cosmetics business. I also use Ocean Prime to support the operations of several real estate ventures. Ocean Prime also operates as a holding company for my personal assets. I continue to use Ocean Prime to make personal investments in the market.

**Intertrade Pacific S.A.**

31.     On November 8, 2009, I founded defendant Intertrade Pacific S.A. ("Intertrade"). Intertrade is a registered British Virgin Islands company with its principal place of business address at Akademichaskaya B. Street, House 15, 1, 255, Moscow, Russia. I am the sole beneficial owner and director of Intertrade.

32.     Intertrade was initially created as a holding company in order to hold my beneficial ownership in Copperstone Capital. From 2010 until 2012, Intertrade was the 100% owner of Copperstone Capital.

33.     Intertrade was also used to manage my personal assets, including my interest in Copperstone Capital, and to carry out certain administrative functions.

34.     At all times, my ownership of Intertrade has been open and notorious. I never sought to conceal the true identity of Intertrade's beneficial owner, nor have I ever concealed my ownership interest in Intertrade. My name appears on all relevant account documents and other filings showing Intertrade's ownership.

35.     In 2014, I began winding down Intertrade's operations because I decided to create a different holding company to hold my interest in Copperstone Capital. The paperwork to do this was created, and I had assumed Intertrade was officially dissolved last year. Only after the commencement of this Action have I learned that my instructions to close Intertrade were not fully executed.

**Our Investment Process**

36.     I am the Chief Investment Officer for the Alpha Fund. My investment team for the last several years includes Senior Analyst Igor Sitnikov, Chief Trader  Maxim Baytashev, and Portfolio Manager Garnik Meliksetyan. Two junior analysts report to Mr. Sitnikov and one junior trader reports to Mr. Baytashev. Mr. Baytashev and Mr. Meliksetyan are responsible for executing and/or approving the overwhelming majority of the trades in our various accounts.

37.     Investment ideas are generally generated by the team based on the fund's investment strategy and are presented to the Investment Committee, of which I am a member and the chair, for further consideration. We usually meet each Monday morning to discuss investment ideas, strategies and the Alpha Fund portfolio.

38.     At Copperstone Capital, we are constantly reevaluating our investment strategies to ensure that we are taking full advantage of any market inefficiencies. It is required for analysts to try to learn as much public information as possible about a particular stock or trading ideas. We routinely discuss our views on particular companies and any present fundamental and technical analysis generated by the team, as well as research from other sources such as Bloomberg, CNBC, Seeking Alpha, WhisperNumbers.com, Bespoke Investments, The Gartman Letter, and OptionMonster. Also, it is not uncommon or unusual to try to determine if a company's earnings will be below or above the market's and the analysts' expectations. This is what investment managers are supposed to do for their clients. We do it.

39.     Copperstone Capital maintains an in-house research database which contains many stocks we have examined to date, as well as many ideas generated by the investment team. The team constantly monitors, studies and evaluates the market, as well as historical trends, and usually tests out its models and strategies within this in-house database before implementing them in individual funds or accounts. The goal of this effort is to identify any market inefficiencies and to take advantage of them ahead of the other investors.

40.     One specific event market analysts watch for is unusual activity in the market. For example, unusually large bullish options trades by a trader on the stock of the company ahead of an earnings announcement that is widely predicted to miss market expectations might signal that the investor possesses certain analysis or information that suggests a better than expected earnings report. It is the goal of sophisticated market watchers to spot such unusual trends and take advantage of them.

41.     In fact, there are service providers that attempt to monetize this phenomenon. For example, optionMONSTER®, co-founded and co-led by the well-respected trader and analyst Jon 'DRJ' Najarian of CNBC, provides stock market insight, option trade ideas and options education to the so-called do-it-yourself investors. As part of its paid subscription service called InsideOptions™, it provides a "mid-day" update where it reports on "unusual activity" in the options market. While not all unusual activities are meaningful and merit action, the service provides additional information that attempts to identify instances where subscribers should "follow the smart money." This allows their subscribers to take advantage of a market inefficiency created by trading activities of a market participant that appears to have additional information not yet known to the trading public. A screenshot of the optionMONSTER® website is attached hereto as Exhibit D.

42.     Jon Najarian and other analysts regularly appear on CNBC and other financial news channels to discuss their views of the markets and any "edge" they can identify for the investors. There are several TV monitors in Copperstone Capital's trading room in Moscow where CNBC, Bloomberg and RBC (a 24-hour business news channel in Russia) are on view continuously throughout the day and where our traders can listen to such analysis.

43.     There is a seven or eight hour time difference between New York and Moscow, depending on daylight savings time. The U.S. markets are open in Moscow between 4:30 p.m. (or 5:30 p.m.) and 11:00 p.m. (or 12:00 a.m.), local time. In 2012, I believe there was a nine hour time difference, and the markets closed in Moscow at 1:00 a.m. During this window, we typically have two or three traders—usually Senior Analyst Igor Sitnikov, Chief Trader Maxim Baytashev and Portfolio Manager Garnik Meliksetyan—in the office to monitor the market and execute trades. These more senior employees have discretion to execute trades of several million dollars per day and there is usually no need to clear individual trading activities with me or the rest of the investment team on a daily basis. That is because our investment team, which is fairly small, is in regular contact and we continuously discuss and approve ideas and trading strategies, which are later implemented by our traders. Thus, to the extent that the trading activities are consistent with our overall strategy and prior discussions of the investment team, or a good trading opportunity, there is no need for individual authorization on each trade.

44.     Our team is constantly looking for innovative and new investment ideas we could test and offer to our clients in order to provide them with more value and a better return on their investments.

**Impulse Trading Strategy**

45.    Defendant Nikolai Slepenkov is one of my employees at Copperstone Capital. I met Mr. Slepenkov in or about 2006. He joined Copperstone Capital in January of 2011 as a junior trader.

46.    Shortly after joining Copperstone Capital, Mr. Slepenkov came to our team with an investment idea. He had observed the behavior of various companies' stocks after the release of their quarterly earnings reports and had noticed significant movement in the stock price of certain small and mid-cap companies shortly after their earnings announcements. These movements were often exaggerated in comparison to the implied volatility of the stock as indicated by options pricing prior to the public earnings announcements.

47.    After an analysis of these companies, we concluded that the reactions to the earnings reports were overly exaggerated and that this exaggeration was not due to any fundamental reasons, such as the quality of a company's revenue or earnings. Instead, we believed this was caused by algorithmic and computerized trading, which reacts to surprise moves in the market. In other words, the post-announcement movements were generated by some initial trades, but then were compounded and exaggerated by algorithmic, high frequency and other computerized trading systems that traded automatically based in part on the dramatically increased volatility and significant stock price movements. For example, Finisar Corporation (FNSR) reported its earnings on June 15, 2011, and the stock dropped 20%. As we had anticipated, this move was an overreaction and the stock fully recovered within two weeks. Similarly, Advanced Micro Devices (AMD) reported its earnings on July 21, 2011, and the stock went up over 20%. We believed this was an overreaction, and were proven right when the stock lost all these gains within 2-3 weeks. Finally, Las Vegas Sands (LVS) reported its earnings on

May 4, 2011, and the stock dropped 11%. We thought that this was not justified and were proven right when the stock fully recovered its losses within two months.

48.    The effect of these types of traders and trading systems were felt even more during the afterhours trading, when the volumes are lower than usual. A basic principle of fundamental value investing is the belief that overreactions and inefficiencies caused by non-fundamental factors will be eliminated eventually and the stock price will return to the levels reflecting the fundamental fair value of the company. This pattern of activity provided us with an opportunity to take advantage of market inefficiencies caused by non-fundamental factors.

49.    After analyzing numerous examples of these cases, we started noticing a different pattern. In many small- and mid-cap companies, the sharp movement and increase in volumes began before the earnings announcements. In many cases, the direction of the movement *before* the earnings announcements directly corresponded to the resulting move after the earnings announcements. It appeared that the dramatic overreactions were corrected by the market in a relatively short period of time, usually a day or two after an earnings announcement; but that window provided an opportunity to take advantage of this market inefficiency.

50.    There was nothing unusual about Mr. Slepenkov sharing his observation and insight with the investment team and proposing this investment strategy. Mr. Slepenkov has considerable experience in the industry and valuable insights into the market. In fact, I expect the members of my investment team to regularly come up with new and innovative ideas that could give us and our clients an "edge" in the market place and allow us to distinguish ourselves from other money managers.

51.    As we do with many of the ideas presented by our team members, we started examining this theory by "testing" it, using an internal database of securities, selecting the test

stocks based on certain characteristics such as market cap, liquidity, volatility, industry, etc. We monitored the stock behavior using, among other things, historical data and in-depth analysis. Having a detailed profile for each company we studied allowed us to quickly identify any inefficiencies and find as many common patterns among these companies as possible. We conducted the testing before we put any money into such trades.

52.    Attached hereto as Exhibit E is a true and correct copy of an Excel spreadsheet, created in 2012, that shows how we kept track of the performance of the stocks we were monitoring.[3]

53.    The result of our analysis was the emergence of a clear pattern concerning certain securities, where the spike in price and in trading volume occurred on the day of, or the day before, the earnings announcement; before the numbers were officially reported. We observed this phenomenon with several of the securities from our universe of companies. We also observed that in most cases, these "impulse" moves were strongly correlated to the post-release market reaction.

54.    We continued our observation and analysis for at least six months. Based on our extended and detailed analysis, we speculated that someone, somewhere, may have thought they had access to some or all of the information in the earnings reports before they were officially released. Of course, we did not know if, or who, might have had that advance information, or if they had obtained it improperly. Indeed, once we implemented this strategy, we won on some trades and lost on others.

---

[3] During the time period they were active, these spreadsheets received a live feed from Bloomberg, which populated the cells with the most up to date market information. This is why various cell values cannot be displayed properly since the documents are old and have not been updated in some time.

55.    Given that most professional traders are always trying to be as subtle as possible in executing trades in order to avoid triggering algorithmic trading, which is looking for large trades to follow and thus make the stock trade more costly, we believed that the person or entity behind these trades was not a professional trader. That is because the trades were done without any regard to current market liquidity, execution time and the effect these trades had on the stock price or the trader's Volume Weighted Average Price ("VWAP").[4] The VWAP is a useful tool to consider because a stock purchase at a price that is lower than the VWAP represents a potential gain.

56.    After observing and analyzing this phenomenon for a good period of time, we decided to include it as an investment strategy. However, this data became one of the factors—but not the only factor—that influenced our decision-making process. Other important factors included a fundamental value analysis of the company at issue. This meant looking at, for example, complete fundamental analysis of the company, upgrades/downgrades, smart estimates compared to market estimates, historical price, P/E ratios, short interest, activity in the options market, third party analyst reports, company and sector news, or corporate developments in the company. Also, we monitored the technical price charts for the company's security. Copies of our technical and fundamental value analysis for several of our stock trades being question by the SEC, all of which was created before the trades at issue, are attached hereto as Exhibits F, G, H and I.

---

[4] The VWAP is calculated by adding up the dollars traded for every transaction (price multiplied by number of shares traded) and then dividing that by the total shares traded for the day. It represents the average price of the shares of a particular stock on a particular day based on the volume in which it traded.

57.    While this strategy was generally successful, it was not always profitable. The SEC has identified 153 trades by Copperstone Capital, which the SEC claims were executed as part of the allegedly illicit trading scheme. (*See* SEC-DUB-L-0000001-5, attached hereto as Exhibit J.) This list includes some of our losing trades. For example, on November 8, 2012, we bought Nvidia Corp. (NVDA) (Ex. J, SEC-DUB-L-0000002, ID 36). Our research, captured on the screenshot attached hereto as Exhibit K, showed a clear impulse move upward during the second half of the trading session. Our decision to buy this stock was also supported by bullish fundamental expectations. Thus we bought Nvidia as part of our impulse strategy, but the trade was closed as a loss making trade.

58.    Also on November 8, 2012, we sold a short position on Pegasystems, Inc. (PEGA) (Ex. J, SEC-DUB-L-0000002, ID 37). Our research, captured on the screenshot attached hereto as Exhibit L, showed a clear impulse move downward during the second half of the trading session. Our decision to short the stock was supported by bearish fundamental expectations. Our decision to short this stock, however, was closed as a loss making trade. We did not possess information other than what I have described.

**Suspension of the Impulse Trading Strategy**

59.    It is noteworthy that we largely suspended the use of this strategy between the first quarter of 2014 and the first quarter of 2015 because we began incurring significant losses. We continued to monitor the stocks without executing trades and noticed that the same pattern began emerging again. We therefore resumed the regular use of this trading strategy in the first quarter of 2015.

60.    These dates are important because the SEC alleges that one of the newswire services from which the Amaryan Defendants are accused of having received advance press releases was not accessible from November 2013. However, as the trading records—which are in

the SEC's possession—show, we continued to employ this strategy in the same way until the first quarter of 2014. Had we been basing our trades on improper inside information from these stolen press releases, one would expect that we would have stopped trading in November 2013 when that newswire service became inaccessible.

61.    The discovery of this pattern of behavior, which allowed us to take advantage of a market inefficiency, was no different from a myriad of different and creative investment strategies we have explored and adopted over the years. Any other investment manager willing to dedicate the time and the resources necessary to research and scrutinize the market as we did could have discovered this pattern and the resulting market inefficiency.

62.    At no time did I believe that employing this investment strategy was in any way illicit, improper or unlawful. Upon information and belief, none of the individuals employed by me who worked on and implemented this strategy ever believed it to be in any way illicit, improper or unlawful. I have spoken to Mr. Slepenkov about this case, and he assures me that he does not know any of the other defendants in this Action, except Escada, Ocean Prime, Intertrade, me, Copperstone Capital and the Alpha Fund, and has never given or received a payment or other transaction or gift from or to them. I verified as best I could what he said. (*See* ¶ 81 below.)

63.    I considered this investment strategy to be valuable and proprietary as it was the result of a significant investment of time and resources in developing an in-depth market analysis to test and validate the original theory. The proprietary and confidential nature of the strategy, however, is not an indication that anyone, including myself, ever considered it to be illicit, improper or unlawful.

**Pair Trading Strategy**

64.    Another investment strategy we employ is called pair trading. Also referred to as statistical arbitrage or "Stat Arb," pair trading is a market-neutral trading strategy that matches a long position with a short position in a pair of highly correlated securities. To properly execute this strategy, an investor must identify a pair of highly correlated stocks, spot a weakness in the correlation, and then go long on the under-performer while simultaneously going short on the over-performer, closing the positions as the relationship returns to its statistical norm. This trading strategy generates a profit based on the difference in price change between the two stocks.

65.    Pair trading is a highly sophisticated investment strategy because while the fundamental principle behind the strategy is simple, correctly identifying the pair, creating the optimal position in each and correctly timing the trades require investment skills.

66.    The SEC has identified 153 trades by Copperstone Capital, which the SEC claims were executed as part of the allegedly illicit trading scheme. (*See* Ex. J.) A number of these supposedly illegal transactions, however, were in fact pair trades. The following are four examples of such pairs.

67.    **Caterpillar, Inc.** (Ex. J, SEC-DUB-L-0000001, ID 1). This was a pair trade with Deere. As demonstrated by the correspondence on Feb 17, 2012, between our Senior Analyst, Igor Sitnikov and an outside consultant on pair trading, a true and correct copy of which is attached hereto as Exhibit M, the decision to open this pair trade was made well before any quarterly numbers were released. We discussed the idea over the next three days and executed the trades on Feb 20, 2012, selling Caterpillar short and buying Deere. As illustrated by the performance graph attached hereto as Exhibit N, this was not an impulse trade, and the pair trades were closed on Apr 9, 2012.

68.   **Verizon Communications, Inc.** (Ex. J, SEC-DUB-L-0000001, ID 2). This was part of a pair trade with Vodafone. As the communication between Senior Analyst Igor Sitnikov and Chief Trader Maxim Baytashev on September 4, 2012, attached hereto as Exhibit O, clearly shows, we had previously considered pairing the Vodafone trade with an AT&T trade, but decided to replace AT&T with Verizon. We sold Vodafone short and bought Verizon on Sep 6, 2012. The pair was closed on Oct 1, 2012. The Verizon trade was not executed as part of our impulse trading strategy. It was specifically executed as part of a pair with Vodafone after due consideration and because we determined the stock was particularly suitable for the pair trade strategy as explained in Exhibit P.

69.   **AT&T Inc.** (Ex. J, SEC-DUB-L-0000002, ID 46). This is an example where we paired AT&T with Verizon. We sold Verizon short and bought AT&T on Dec 11, 2012, and closed the pair on Jan 3, 2013. As illustrated by the performance graph, attached hereto as Exhibit Q, this was not part of our impulse trading strategy, but rather a pair trade.

70.   **AT&T Inc.** (Ex. J, SEC-DUB-L-0000002, ID 50). This is another pair trade where we paired AT&T with the S&P 500 Index Exchange Traded Fund ("SPY"). We sold SPY short and bought AT&T on Jan 28, 2013 and closed the pair on Feb 21, 2013. As illustrated by the performance graph, attached hereto as Exhibit R, this was not part of our impulse trading strategy, but rather a pair trade.

71.   In all of the foregoing examples, the documents clearly show that the trades were considered and discussed well before they were executed and unrelated to any earnings report announcements. Unlike the impulse strategy trades, which implies a very short holding period of one or two days, we held the positions in the above pair trades for considerably longer periods of time. Moreover, had the trade flagged by the SEC indeed been part of an illicit scheme, it would

have made no sense for us to execute the second half of the pair and try to hedge our position or take additional risk.

**Responses to Particular Allegations in the Amended Complaint**

72.    Paragraph 34 of the Amended Complaint, which enumerates a number of Credit Suisse accounts owned by the Alpha Fund to create the impression of something underhanded or stealth, is misleading. Credit Suisse is the prime broker that executes transactions for the Alpha Fund and Ocean Prime. The Alpha Fund has a single relationship with Credit Suisse and only one prime brokerage account, which Credit Suisse has chosen to segregate onto multiple sub-accounts as part of its trading platform system for its own internal accounting reasons. Each subaccount corresponds to a different kind of asset being traded, such as currencies, securities, etc.

73.    Paragraph 38 of the Amended Complaint and paragraph 84 of the Supporting Declaration of Lynn O'Connor ("O'Connor Decl."), state that trades were executed in Mr. Slepenkov's personal account at Interactive Brokers, "often in the same securities, on the same days, close to the same times and frequently via the same IP addresses as Ocean Prime, Intertrade and Escada." (Amended Complaint ¶ 38.) This fact—assuming it is true—is entirely unremarkable because, as stated earlier, Mr. Slepenkov is a Copperstone Capital employee, and the computers located next to each other in Copperstone Capital's trading room were used to execute trades on behalf of Copperstone Capital (Alpha Fund), Ocean Prime, Intertrade and Escada.

74.    Moreover, the same investment strategies were often implemented in all of these accounts as they were generally overseen by the same investment management team. Thus, the fact that the same (or similar) trades were made in the accounts of investment funds in which I

have an interest through the IP address of computers located in the offices of Copperstone Capital is evidence only of a unified trading strategy and not any nefarious activity.

75.    Paragraphs 115 and 119 of the Amended Complaint, which seek to establish a connection between me and Ocean Prime on the one hand, and the Dubovoy Group (as defined in the Amended Complaint) on the other, also lead to improper conclusions. There is no such connection. What the Amended Complaint and the O'Connor Decl. (¶ 85) state is that an individual—whom I believe to be Alfred Victor Brewster—who for some time was a director of Ocean Prime—is/was also the director of one of the entities established by one or more of the Dubovoy Group. From this the Amended Complaint infers a connection between me and the Dubovoy Group. That inference is false and misleading for several reasons.

76.    First, as fully demonstrated in the Declaration of Dmitry Andreev, Copperstone Capital's In-House Counsel ("Andreev Decl."), Mr. Brewster was never an "owner" of Ocean Prime. I have always been and remain the sole beneficial owner of Ocean Prime since its inception. The SEC's claim that Mr. Brewster is Ocean Prime's owner appears to be based on an Ocean Prime statement from Interactive Brokers. As Mr. Andreev's Declaration establishes, Mr. Brewster's designation as "owner" in the Interactive Brokers' form was an oversight, and Ocean Prime's official business records clearly establish that he never had any ownership interest in that company. Even a superficial inquiry into this matter by the SEC would have revealed that fact.

77.    Second, as established by Mr. Andreev's Declaration, Mr. Brewster was appointed as Ocean Prime's nominal director at the recommendation of Apollo Business Solutions (Pty) Ltd. ("Apollo"), Ocean Prime's administrator. Mr. Brewster is a "professional" director who, as of August 24, 2015, was associated with over three hundred different companies. (*See* Andreev Decl., Ex F.) I have never met or spoken to Mr. Brewster, nor have I

ever communicated with him directly. Other than his tenure as Ocean Prime's nominal director between November 17, 2009 and December 30, 2013, I have had no other dealings or connections with Mr. Brewster.

78.     As described in more detail in Mr. Andreev's Declaration, Mr. Brewster was removed as Ocean Prime's director on December 30, 2013, at the recommendation of Apollo due to Apollo's dissatisfaction with Mr. Brewster's performance. At Apollo's recommendation, we replaced Mr. Brewster with Lindy Ravinia. (Andreev Decl. ¶ 16.) I have not met nor spoken to Ms. Ravinia directly since her appointment as Ocean Prime's nominal director.

79.     The SEC got it wrong—badly—in describing the nature of Mr. Brewster's involvement with Ocean Prime. That Mr. Brewster was associated with over **three hundred** different companies as of August 2015—a fact the SEC could and should have discovered through a simple Google search—makes the SEC's allegation that I am "connected to the Dubovoy Group" through Mr. Brewster, and thus over $25 million of the Amaryan Defendants' assets should be frozen, a serious breach of trust in the expected good faith of this United States agency.

80.     There are allegations in paragraphs 104, 106 and 234 of the Amended Complaint that imply that I or one of the entities under my control paid the Hacker Defendants in order to gain access to earnings reports prior to their release. This too, is absolutely false, and the SEC has provided no specific allegations, let alone any evidence, to the contrary.

81.     I take the allegations by the SEC very seriously. As a result, after I received notice of the initial complaint and read the allegations therein, I approached an agency that has law enforcement powers in Russia and requested that it conduct a full examination of Copperstone Capital's relevant electronic communications and those of Mr. Slepenkov's to

determine whether there is any connection to the Hacker Defendants or the other defendants. This agency went through and examined all of the computers and the telephone records of all relevant employees, including their home computers (and in the case of Mr. Slepenkov, also his country home), and found no connection with or any payments to any other defendants in this Action (with the obvious exception of the connection with Mr. Slepenkov, who is a Copperstone Capital Employee, and Escada, which is managed by Mr. Slepenkov). Furthermore, the agency found no indication that any one of them was ever in possession of any earnings reports or portions thereof, orally or in writing, in advance of their public release.

**The Manifest Harm to the Amaryan Defendants**

82.     Finally, I wish to advise the Court of the significant reputational and financial harm the SEC's spurious allegations have caused me, my related companies and the Alpha Fund. Once the initial complaint was publically filed on August 11, 2015, our prime broker, Credit Suisse, refused to execute *any* transactions for the Alpha Fund. As stated earlier, that fund consists of monies mostly of Eastern European investors. There are about ten investors in the fund. I am also personally invested in the Alpha Fund. As previously noted, Credit Suisse's refusal to allow any trading in the fund's accounts because of this Action has caused serious damage, with the fund losing approximately $1.5 million of its value, principally due to our inability to sell or hedge our positions.

83.     In addition, there has been significant reputational harm to me and my companies by these wrongful allegations of fraud and insider trading. As noted earlier, I am trained and have experience as an investment manager at fine organizations. I have never before had a regulatory problem or been accused of wrongdoing by any of my former employers. As noted earlier, the Alpha Fund was named the best Russian hedge fund of 2015. Our net returns for 2012, 2013 and 2014 were +14%, +22%, and +0.56%, respectively. For the six months of 2015,

our returns were +12.18%. The losses we have sustained since this lawsuit was filed has made August 2015 our worst performance month since the fund's inception.

84.     Recently, I attempted to register Copperstone Capital UK with the Financial Conduct Authority (FCA) in the United Kingdom. As part of that registration process, we had planned roadshows to be held in August 2015 in New York, Shanghai and Hong Kong in order to raise funds. As a direct result of this Action and the temporary restraining order that has frozen my and the Amaryan Defendants' assets, we had to cancel some of the roadshows, causing significant financial and irreparable reputational harm to me and my companies. This is one of the main reasons I am eager to resolve the Action and get the Amended Complaint dismissed so I can salvage the reputation and financial health of my businesses, and those of my trusting investor clients.

85.     The SEC has made improper leaps from one or two documents in the absence of any communications between us and the other defendants, or any payments from us to the other defendants. Instead, the SEC has decided that lawful trading activities by the Amaryan Defendants based on publicly available information constituted improper insider trading in violation of the federal securities laws. These charges are meritless and are based on allegations and inferences that, as we have hopefully shown, are wrong. I respectfully submit that the Court should deny the requested preliminary injunction and dismiss the Amended Complaint as against the Amaryan Defendants.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on September 16, 2015.
Moscow, Russia

_____
                DAVID AMARYAN