IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>**Plaintiff,**<br>**v.**<br>**ARKADIY DUBOVOY, et al.,**<br>**Defendants.** | **CA No: 15-cv-06076 (MCA-MAH)** |

# Reply Memorandum Of Law In Support of Plaintiff's Motion For a Preliminary Injunction

David Axelrod
Kelly Gibson
John Donnelly

U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(215) 597-3100
DonnellyJ@sec.gov

September 24, 2015

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... i

LEGAL STANDARD ..... 2

ARGUMENT ..... 3

I. The Commission Has Produced Substantial Evidence To Support Its Claims Against The Amaryan Defendants ..... 4

II. The Amaryan Defendants Fail To Meet Their Burden To Show Cause Why The Asset Freeze Should Be Lifted ..... 5

A. Amaryan Lied About A Material Issue Of Fact ..... 5

B. The Amaryan Defendants' Trading Demonstrates Their Connection to the Fraudulent Scheme ..... 6

1. There Is Substantial Overlap In The Illicit Trading of the Amaryan Entities and the Bering Fund ..... 6

2. The Amaryan Defendants Trading Mirrored The Hacking Of The Newswire Services ..... 9

3. Amaryan's "Impulse" Strategy Is Not Supported By The Evidence ..... 10

C. Fischel's Declaration Is Inherently Unreliable ..... 11

III. The Equities Also Support Preserving The Status Quo And Maintaining The Asset Freeze ..... 14

CONCLUSION ..... 15

**TABLE OF AUTHORITIES**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......... 12

*Dressler v. Busch Entertainment Corp.*,
143 F.3d 778 (3d Cir. 1998) .......... 6

*SEC v. First City Financial Corp.*,
890 F.2d 1215 (D.C. Cir. 1989) .......... 3

*SEC v. Infinity Group, Co.*,
212 F.3d 180 (3d Cir. 2000) .......... 3

*SEC v. Unifund SAL*,
910 F.2d 1028 (2d Cir. 1990) .......... 3, 4

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011) .......... 2, 5

*United States v. First National City Bank*,
379 U.S. 378 (1965) .......... 4

The issue in dispute is a narrow one: where the Commission has shown the Amaryan Defendants (David Amaryan, Intertrade Pacific SA, Ocean Prime, Inc., Copperstone Alpha Fund, and Copperstone Capital) made over $8 million in gross ill-gotten gains from illegal trading in connection with the scheme detailed in the Amended Complaint, declarations, and exhibits filed in this case, should the Court maintain the status quo and continue to freeze the assets in the Amaryan Defendants' accounts.

The Amaryan Defendants argue that the freeze should be lifted because: (1) Amaryan does not know any of the other defendants named in this case; (2) their highly suspicious trading, which mirrors illegal trading by other defendants, was actually the result of a "sophisticated" trading strategy supposedly conceived by a "junior trader;" and (3) an expert they hired concluded that the illegal trading was not that profitable when compared with their other trading.

These arguments fail for several reasons. First, Amaryan lied when he said in his sworn declaration that he had "never heard" of any of the other trading defendants. On the contrary, Amaryan not only knows defendant Maxim Zakharchenko and defendant Bering Explorer Fund Ltd. ("Bering Fund"), but Amaryan and Zakharchenko worked together, and Amaryan owned 33% of Bering Capital Partners ("Bering Capital"), for which Zakharchenko served as a director, and which formed Bering Fund.

Second, the purported "sophisticated" trading strategy is a ruse the Amaryan Defendants concocted in an attempt to explain away their illegal trading. Notably, in putting forth this "explanation," defendants do not explain why their trades were repeatedly executed in the window between the upload of press releases to the newswire services and the public issuance of the press releases. Nor do they explain why their trading matched the shift in access the defendant hackers had to the newswire services.

And, third, the declaration of Mr. Fischel employs a flawed methodology and, predictably, reaches incorrect conclusions.

For all these reasons, the Amaryan Defendants' arguments should be rejected and the Commission's application for a preliminary injunction should be granted.

## LEGAL STANDARD

Because the Commission is seeking only an asset freeze to maintain the status quo and preserve assets to satisfy a judgment in this case, including penalties and prejudgment interest, the Commission need only show "either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011).

In granting orders freezing the Amaryan Defendants' assets (Docket Nos. 13 and 33), the Court held that the Commission had demonstrated that an asset freeze

was "necessary to preserve the status quo and to protect this Court's ability to award relief in the form of disgorgement of illegal profits from the violations, prejudgment interest, and civil penalties." (Docket Nos. 13 and 33 at ¶¶ 1-4.) Thus, the burden is on the Amaryan Defendants to show cause "why this Court should not enter a preliminary injunction extending the asset freeze and other ancillary relief entered in this Order until a final adjudication of this case on the merits." (Docket No. 13 at Section II; *accord* Docket No. 33 at Section I.) *See SEC v. First City Financial Corp.*, 890 F.2d 1215, 1233 (D.C. Cir. 1989) (stating that once the SEC has presumptively satisfied its burden, the burden shifts to the defendant to show that the disgorgement figure is not a "reasonable approximation."). The Amaryan Defendants have not and cannot meet that burden.

## **ARGUMENT**

As demonstrated in the Commission's opening brief and declarations, the asset freeze is necessary to preserve the status quo so that the Commission can collect disgorgement, penalty, and prejudgment interest when it prevails after discovery and a resolution on the merits of its claims. *See SEC v. Infinity Group, Co.*, 212 F.3d 180, 197 (3d Cir. 2000); *SEC v. Unifund SAL*, 910 F.2d 1028, 1041-42 (2d Cir. 1990). Amaryan is a Russian citizen and his entities are operated primarily from Moscow. There is no dispute that if the freeze is lifted, the assets

will be moved off-shore and dissipated and the Commission will be left with no ability to recover against these defendants. *See, e.g., United States v. First National City Bank*, 379 U.S. 378, 385 (1965) (holding that asset freeze was "eminently appropriate to prevent further dissipation of assets" where foreign defendants would likely dissipate assets but for the freeze); *Unifund SAL*, 910 F.2d at 1041-42.

## I. The Commission Has Produced Substantial Evidence To Support Its Claims Against The Amaryan Defendants

Substantial evidence supports the Commission's claims that the Amaryan Defendants used stolen press releases to trade and reaped huge profits as a result. (*See*, *e.g*., Second Dec. of Eugene Canjels, September 24, 2015; Third Declaration of Lynn O'Connor, Docket No. 35-3, August 24, 2015; and Declaration of Lynn O'Connor, Docket No. 5, August 10, 2015.) The trading in their accounts shifted along with the hacker defendants' extraction of pre-publication press-releases from the different newswire services. (Second Canjels Dec. at ¶¶ 12, 17.) When trading on earnings releases, they almost always traded in the narrow window of time between upload of the press release to the newswire service and the public dissemination of the press release. (*Id*. at ¶ 12, Tables 2-3, and Chart 1.) There was also overwhelming similarities between their trading and the trading of other defendants, including Slepenkov/Escada, Bering, Jaspen Capital Partners, and the Dubovoy Group. (*Id*. at ¶ 12 and Table 4.)

Further, when a lone outlier trade that is itself suspicious is removed from the analysis, the profits the Amaryan Defendants realized on their illegal trading far outdistanced the profits realized on their other trading during the same period. (*Id.* at ¶¶ 13-16, Exs. K-1and K-2.) For these reasons the Commission has shown both "a likelihood of success on the merits or that an inference can be drawn that the party has violated the federal securities laws." *Smith*, 653 F.3d at 128.

## II. The Amaryan Defendants Fail To Meet Their Burden To Show Cause Why The Asset Freeze Should Be Lifted

### A. Amaryan Lied About A Material Issue Of Fact

In an effort to persuade the Court to unfreeze their assets, the Amaryan Defendants submitted a declaration signed by defendant Amaryan ("Amaryan Dec."). Under penalty of perjury, Amaryan declared that other than defendants Slepenkov and Escada and the other Amaryan Defendants, Amaryan "had ***never heard*** of any of the Trader Defendants named" in the SEC's initial complaint in this action. (Amaryan Dec. ¶ 6.) (emphasis added). This statement is false.

Amaryan has worked with defendants Zakharchenko and Bering Fund, and he owned 33% of Bering Capital, the investment manager for Bering Fund. (*See* Fourth O'Connor Dec. ¶¶ 5-11.) Indeed, Amaryan and Zakharchenko served as investment advisors for Bering Capital. (*Id.* at ¶ 10 and Ex. 169).[1] It also appears

---

[1] The same Caymanian director who signed this agreement on behalf of Dizuchi Capital Partners, also opened defendant Global Hedge Capital Group's

that, at a minimum, Amaryan was involved in negotiations to provide investment advisory services, with Zakharchenko, to Bering Fund. (*Id.* at ¶ 11 and Ex. 170.)

It is clear that Amaryan has attempted to distance himself from other defendants in this case in the hope that it exculpates him. However, because Amaryan lied in his declaration about a material issue of fact, the Court can and should disregard his declaration as unreliable. *See Dressler v. Busch Entertainment Corp.*, 143 F.3d 778, 781 (3d Cir. 1998) (Noting that "it is consistent with the longstanding principles of jury deliberation[,]" that a jury may disbelieve the testimony, in whole or in part, of a witness who has "deliberately testified falsely" as to a "'material fact.'").

**B. The Amaryan Defendants' Trading Demonstrates Their Connection to the Fraudulent Scheme**

**1. There are Overwhelming Similarities In The Illicit Trading of the Amaryan Defendants and the Bering Fund**

The illegal trading of the Amaryan Defendants establishes their connection to the fraudulent scheme. Tellingly, this trading is overwhelmingly similar to Zakharchenko's illegal trading for Bering Fund. The Amaryan Defendants traded in seven of the eleven examples of illegal trading detailed in the Amended Complaint. Through Zakharchenko, Bering Fund traded in six of those seven events. (*See* Am. Compl. ¶¶ 185, 191, 198, 205, 212, and 218; O'Connor Dec at

---

brokerage account at defendant Exante Ltd. (*See* Fourth O'Connor Dec. ¶ 10 and Exs. 169 and 179.) It is unlikely that this is a coincidence.

¶¶ 137, 143, 150, 157, 164, and 170, Docket No. 5, filed Aug. 10, 2015; Third O'Connor Dec. at ¶ 11 and Ex. 159, Docket No. 35-3, filed Aug. 25, 2015.)

For example, Brocade Communications Systems uploaded its press release to the newswire service on May 1, 2013 at 3:29 p.m., and it was distributed to the public at 4:06 p.m. In that brief window of time, within approximately three minutes of each other, the Amaryan Defendants and Bering Fund made similar Brocade trades, both anticipating that Brocade's share price would decrease. (O'Connor Dec. at ¶¶ 134-140; Third O'Connor Dec. at ¶ 11 and Ex. 159).

In the other five examples detailed in the Amended Complaint, as described below, the Amaryan Defendants (and Slepenkov/Escada) and Bering Fund traded in the window between upload of the press release to the newswire service and the public announcement of the press release, traded close in time with each other, and traded in the same direction (*e.g.* betting the stock price would increase or decrease):

- **Edwards Life Sciences (April 23, 2013).** Edwards uploaded the press release at 11:39 p.m. and the public announcement was made at 4:01 p.m. At 1:42 p.m., Copperstone traded. One minute later, Intertrade traded. Eleven minutes later, Bering Fund traded. Thirty-five minutes later, Slepenkov traded. The Dubovoy Group also traded during the window. All the defendants traded in anticipation that the stock price would drop. (*See* O'Connor Dec. at ¶¶ 141-146, Docket No. 5; Third O'Connor Dec. at ¶ 11 and Ex. 159, Docket No. 35-3).

- **Panera Bread Co. (July 23, 2013).** Panera uploaded the press release at 10:00 a.m. and the public announcement was made at 4:00 p.m. At 3:41 p.m., Bering Fund traded. Six minutes later, Intertrade, Slepenkov, and

Copperstone all traded. The Dubovoy Group also traded during the window. All the defendants traded in anticipation that the stock price would drop. (O'Connor Dec. at ¶¶ 147-153; Third O'Connor Dec. at ¶ 11 and Ex. 159.)

- **VMWare, Inc. (July 23, 2013).** VMWare uploaded the press release at 12:09 p.m. and the public announcement was made at 4:01 p.m. At 1:37 p.m., Copperstone and Slepenkov traded. One minute later, Ocean Prime traded. Thirty-three minutes later, Bering Fund traded. Fourteen minutes later, Intertrade traded. Twenty-three minutes later, Bering Fund traded again. The Dubovoy Group also traded during the window. All the defendants traded in anticipation that the stock price would increase. (O'Connor Dec. at ¶¶ 154-160; Third O'Connor Dec. at ¶ 11 and Ex. 159.)

- **TIBCO Software (September 19, 2013).** TIBCO uploaded the press release at 1:47 p.m. and the public announcement was made at 4:05 p.m. At 3:17 p.m., Slepenkov traded. One minute later, Ocean Prime traded. One minute later, Bering Fund traded. Five minutes later, Intertrade traded. Thirteen minutes later, Copperstone traded. The Dubovoy Group also traded in the window. All the defendants traded in anticipation that the stock price would increase. (O'Connor Dec. at ¶¶ 161-167; Third O'Connor Dec. at ¶ 11 and Ex. 159.)

- **Align Technology Inc. (October 17, 2013).** Align uploaded the press release at 1:28 a.m. and the public announcement was made at 4:00 p.m. At 2:28 p.m., Intertrade traded. One minute later, Escada and Copperstone traded. One minute later, Ocean Prime traded. Two minutes later, Bering Fund traded. The Dubovoy Group also traded in the window. All the defendants traded in anticipation that the stock price would increase. (O'Connor Dec. at ¶¶ 168-173; Third O'Connor Dec. at ¶ 11 and Ex. 159.)

This pattern repeats itself with respect to numerous illegal trades. Between October 2012 and February 2014, the Amaryan Defendants traded securities in the window between upload and public dissemination for at least 136 different earnings releases. During that same period, the Bering Fund traded in connection with 100 earnings events, and overlapped with the Amaryan Defendants 67 times.

(Second Canjels Dec. ¶ 12 and Table 4.) And 94% of the time, Bering Fund and the Amaryan Defendants traded in the same direction. (*Id.*)

This trading was not due to some "sophisticated strategy," but the result of participation in the fraudulent scheme based on trading on stolen press releases.

**2. The Amaryan Defendants Trading Mirrored The Hacking Of The Newswire Services**

The Amaryan Defendants' trading tracks the defendant hackers' access to stolen press releases. Indeed, Amaryan admits that the Amaryan Defendants traded until February 2014, then stopped for nearly a year, until resuming in the first quarter of 2015. (Amaryan Dec. ¶ 59.) That timing correlates with the hackers' access to Newswire Services 1 and 2, subsequent loss of access in 2014, and access gained to Newswire Service 3 in or around the beginning of 2015. While the Amaryan Defendants' pre-2015 illegal trading was concentrated in securities of issuers who distributed their press releases through Newswire Service 1, in 2015, their trading shifted to securities of issuers who distributed their press releases through Newswire Service 3. (Second Canjels Dec. at ¶¶ 12, 17.) In addition to tracking the defendant hackers' access to the press releases, that pattern tracks the trading of the Dubovoy Group and other defendants.[2]

---

2 The Amaryan Defendants incorrectly state that the press releases were not accessible after November 2013. (Amaryan Dec. at ¶ 60.) On the contrary, after that date, the hackers continued to try to gain access at Newswire Service 1 and 2. (Am. Compl. ¶¶ 74.) In addition, "from at least December 2014 through May

### 3. Amaryan's "Impulse" Strategy Is Not Supported By The Evidence

In a blatant effort to concoct some innocent explanation for unlawful trading, Amaryan claims that the trading by the Amaryan Defendants was actually the product of a trading strategy called "impulse" trading. (Amaryan Dec. ¶¶ 45-46.)[3] In addition to being inherently untrustworthy due to Amaryan's false statements, Amaryan's purported explanation for the illegal trading does not add up. It does not explain why the Amaryan Defendants' trading tracked the defendant hackers' access, why their trading overlaps with other defendants, and most importantly why they traded during the narrow window of time between upload of the press release to the newswire service and the public dissemination of that press release.

The purported proof that their trading was a product of this strategy also falls short. The Amaryan Defendants attached what they claim are screen shots of charts that show their trades are part of a "sophisticated" strategy. But they only attached these screenshots for 4 of the 136 earnings events they illegally traded in from October 2012 – February 2014. (Amaryan Dec. at Exs. F-I.) This limited

---

2015, at least some of the defendants perpetrated the scheme against Newswire Service 3." (Am. Compl. ¶ 55.) *See also id.* at ¶¶ 10, 74.

[3] The Court has already entered a preliminary injunction against Slepenkov and his company, Escada Logistics Ltd., Zakharchenko, and Bering Fund. (Docket No. 31, August 24, 2015.) None of these defendants have appeared in this action even though over $3 million of their assets (combined) have been frozen.

submission falls far short of overcoming the overwhelming evidence to the contrary.

Furthermore, other trades not discussed by the Amaryan Defendants show they traded counter to the purported strategy. (Fourth O'Connor Dec. at ¶¶12-20.) The charts at Exhibit 171 to 174 of the Fourth O'Connor Declaration represent the price for a single stock for a single day. The line is the graphical representation of the last trade price in one minute intervals over the trading day. The chart shows the time the issuer uploaded the news release to the newswire service ("submission time") and the time at which the Amaryan Defendants began to trade ("started selling [or buying]"). Had the Amaryan Defendants truly been pursuing an "impulse" strategy, they should have taken the opposite position on these trades or not traded at all. (Fourth O'Connor Dec. at ¶¶ 12-20 and Exs. 171-178.) Instead, they traded as if they already knew the information in the unpublished press releases and profited from their trades in those four securities.[4]

**C. Fischel's Declaration Is Inherently Unreliable**

The Amaryan Defendants rely on the Fischel Declaration for the proposition that the "questioned trades" are not that different from the "non-questioned trades,"

---

4 Contrary to the Amaryan Defendants' argument, the Commission has recognized that some of their illegal trading resulted in losses. This is not surprising. The market could move in the opposite direction than anticipated for a variety of reasons, such as an earnings announcement containing both positive and negative information, commentary from company management not contained in the announcement, or broader issues regarding the economy or politics.

but Fischel's declaration is terminally flawed for three reasons. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-95 (1993). First, Fischel does not confine his analysis of "total" trading and "non-questioned trading" to the period of time the Amaryan Defendants illegally traded in connection with the hacked press releases. Thus, his analysis is not relevant. Second, Fischel's analysis fails to account for and exclude an outlier trade—which was itself highly suspicious and generated nearly $22 million in profits for the Amaryan Defendants. (Second Canjels Dec. ¶¶ 14-16 and Exs. F-1, K-1, F-2, K-2.) And, third, Fischel's analysis incorrectly counts 2015 trades based on hacked press releases issued by Newswire Service 3 as "non-questioned trades." When those trades are correctly considered as questioned events, the analysis further confirms that the Amaryan Defendants participated in the fraudulent scheme. (*Id.* at ¶ 17 and Exs. C-3 – L-3.)

Fischel's comparison of questioned events with non-questioned is not persuasive because he analyzes a different time period than the period in which the Amaryan Defendants illegally traded on the hacked press releases stolen from Newswire Services 1 and 2. The Amaryan Defendants' illegal trading based on those press releases occurred over 16 months for Copperstone and Intertrade and 11 months for Ocean Prime. Rather than make a comparison based on that period of time, Fischel analyzes trades from a much longer time period—43 months for

Copperstone, 37 months for Intertrade, and 24 months for Ocean Prime.[5] (Fischel Dec. at Ex. F.) Fischel repeats this error throughout his declaration. (*Id.* at Exs. F-L.) Fischel also incorrectly assumes that trading outside the period October 2012-February 2014 is not suspicious. On the contrary, the Amaryan Defendants' 2015 trading (discussed below) is highly suspicious. (*See* Second Canjels Dec. ¶ 17.)

In addition to the timeframe problem, Fischel's methodology is flawed because he fails to account for an aberrational trade that skews the data. In December 2013 and January 2014, the Amaryan Defendants purchased shares of Intercept Pharmaceuticals anticipating that the stock price was going to increase. These trades were placed over 20 days leading up to Intercept's announcement of positive drug trial results. After that announcement, Intercept's stock price skyrocketed, increasing 281 percent and the Amaryan Defendants collectively realized over $22 million from those trades. This trade was grossly out of character for the Amaryan Defendants. Notably, prior to this period, the Amaryan Defendants had not traded Intercept securities.

Fischel ignores the aberrational nature of this trade. As a result, Fischel concludes that the "Other Trading" of the Amaryan Defendants resulted in profits of more than $25 million, which Fischel calculates represents nearly 87% of the

---

5 Here, the Commission uses the net profits from the illegal trading so that the calculations can be easily compared between the Canjels Declaration and the Fischel Declaration. However, when calculating disgorgement the ill-gotten gains from the fraud should not be offset by any losing trades.

Amaryan Defendants' profits. (Fischel Dec. at Ex. K.) However, when the $22 million Intercept profit is removed from that total, the profits from the Amaryan Defendants' "Other Trading" drops to around $1.2 million and the percentage of profits realized from the fraud rises to over 78%. (*See* Second Canjels Dec. Ex. K-1.) Properly removing the Intercept trade from Fischel's analysis demonstrates the flaws in his conclusions.

Fischel incorrectly considers the Amaryan Defendants 2015 trading as "non-questioned." While the Amended Complaint does not yet charge defendants with securities fraud based on the hacking of Newswire Service 3 in 2015, the Commission has developed evidence showing that Newswire Service 3 was hacked in 2015 and the defendants traded based on stolen press releases. When this 2015 trading is considered fraudulent, the Amaryan Defendants' profits attributed to the fraud increase even more, resulting in a total net profit of $8.1 million due to the fraud. (*Id.* at ¶ 17 and Exs. K-2, C-3 – L-3.) During the full duration of the fraud, the Amaryan Defendants experienced a net ***loss*** of nearly $4 million on other trading (when the Intercept profits are excluded). (*Id.* at Ex. K-2.).

**III. The Equities Also Support Preserving The Status Quo And Maintaining The Asset Freeze.**

The Amaryan Defendants baldly declare that the asset freeze is causing them undue hardship. (Amaryan Dec. ¶¶ 82-85.) However, they offer no evidence of the alleged impact of the freeze, nor can they show any undue hardship. Indeed,

Amaryan has previously asserted that he has $300 million in assets under management. (Fourth O'Connor Dec. ¶ 21 and Ex. 180.) The amount frozen is less than 10% of that amount. Given the seriousness of the conduct and the certainty that if the freeze is lifted the Amaryan Defendants will remove their frozen assets from the Court's jurisdiction, leaving the Commission with little ability to recover once it prevails, the Court should maintain the freeze while the case proceeds through discovery and to trial.

## CONCLUSION

For all the foregoing reasons and the reasons articulated in the Memoranda of Law previously filed by the Commission in support of its motion for a preliminary injunction (Docket Nos. 3-3; 35-1.) , the Court should grant the Commission's motion for a preliminary injunction and maintain the status quo pending final resolution of this case.

Respectfully submitted,

By: s/ John Donnelly
David Axelrod, Esq.
Kelly Gibson, Esq
John Donnelly, Esq.

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(215) 597-3100
DonnellyJ@sec.gov

September 24, 2015