# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>ARKADIY DUBOVOY, et al.,<br><br>　　　　　Defendants. | CA No. 15-cv-06076 (MCA) |

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S SUMMATION IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION AS TO THE AMARYAN DEFENDANTS

David Axelrod
Kelly Gibson
John Donnelly

U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(215) 597-3100
DonnellyJ@sec.gov

October 13, 2015

# TABLE OF CONTENTS

Page

Table of Authorities............................................................................................i

**I. The Commission Has Satisfied The Legal Standard For A Preliminary Injunction Freezing Assets** ........................................... 1

    A. The Amaryan Defendants' Trading Matched The Hackers Access To The Newswire Services.................. 3

    B. The Amaryan Defendants Traded In The Narrow Window Of Time Between Upload And Public Dissemination Of The Press Release............................................................. 4

    C. The Amaryan Defendants' Trading Overlaps With the Trading of Other Defendants, Including Bering (Through Zakharchenko) .......................... 6

    D. The Amaryan Defendants Made Enormous Profits From Their Illegal Trading........................................ 6

**II. The Amaryan Defendants' Purported Defenses Fail** ...................... 8

    A. David Amaryan Lied Under Oath, Again ........................... 8

    B. Dean Fischel's Expert Report Is Fundamentally Flawed And, Thus, Unreliable ........................................... 10

    C. The Amaryan Defendants Cannot Establish That Their Illegal Trades Were Actually The Result Of A Legitimate Trading Strategy .......................... 12

**CONCLUSION**.............................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

*Dressler v. Busch Entertainment Corp.*, 143 F.3d 778
(3d Cir. 1998).............................................................. 9

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ............................ 7

*SEC v. Estate of Hirshberg*, 101 F.3d 109 (2d Cir. 1996) ............................... 2

*SEC v. Ginsburg*, 362 F.3d 1292 (11th Cir. 2004) ......................................... 7

*SEC v. Grossman*, 887 F. Supp. 649 (S.D.N.Y. 1995) ................................... 2

*SEC v. Infinity Grp., Co.*, 212 F.3d 180 (3d Cir. 2000) ................................... 1

*SEC v. Johnson*, 174 Fed. Appx. 111 (3d Cir. 2006) ...................................... 7

*SEC v. Roszak*, 495 F. Supp. 2d 875 (N.D. Ill. 2007) ..................................... 7

*SEC v. Singer*, 789 F. Supp. 1158 (S.D.N.Y. 1992) ....................................... 7

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) .................................... 1, 2

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011) ..................................................... 2

*United States v. First National City Bank*, 379 U.S. 378 (1965) .................... 1

The Court should enter a preliminary injunction freezing the assets of the "Amaryan Defendants," (David Amaryan, Copperstone Capital, Copperstone Alpha Fund, Intertrade Pacific S.A., and Ocean Prime, Inc.) until the conclusion of this case. The evidence presented at the preliminary injunction hearing and in the declarations and filed pleadings demonstrates that the Amaryan Defendants participated in a massive scheme to defraud the U.S. markets realizing over $8 million in illicit profits. Continuing to freeze the Amaryan Defendants' assets will preserve the status quo and the Commission's ability to recover disgorgement, prejudgment interest, and civil penalties after it prevails.

## I. The Commission Has Satisfied The Legal Standard For A Preliminary Injunction Freezing Assets

"A freeze of assets is designed to preserve the status quo by preventing the dissipation and diversion of assets." *SEC v. Infinity Grp., Co.*, 212 F.3d 180, 197 (3d Cir. 2000). *See also United States v. First National City Bank*, 379 U.S. 378, 385 (1965) (concluding that asset freeze was appropriate to prevent dissipation of assets or transfer of assets abroad). An asset freeze ensures "that any of the funds that may become due," such as disgorgement, civil penalty, and prejudgment interest, "can be collected." *SEC v. Unifund SAL*, 910 F.2d 1028, 1041-42 (2d Cir. 1990) (holding that a freeze order on a brokerage account in an amount equal to the potential disgorgement and civil monetary penalty was appropriate relief).

To obtain a preliminary injunction freezing assets, the Commission need only show "either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) (internal quotations omitted). Because the Commission has an obligation to protect the public interest, the standard for issuing an injunction sought by the Commission is considerably lower than those governing a private party's request for that relief. *Unifund Sal*, 910 F.2d at 1035-36. Moreover, "[w]here a freeze order is appropriate, a court may freeze any available assets, including assets not traceable to the fraud. *SEC v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995), *aff'd, SEC v. Estate of Hirshberg*, 101 F.3d 109 (2d Cir. 1996). Although the Commission has not had discovery of the Amaryan Defendants, the evidence the Commission submitted satisfies both standards and the Court should grant the preliminary injunction and continue the asset freeze established in the temporary restraining order.[1]

---

[1] The Commission incorporates by reference its discussion of the standard for obtaining an asset freeze and the claims against the Amaryan Defendants set forth in its Memoranda of Law in support of the temporary restraining orders. *See* Docket No. 3-3 (filed Aug. 10, 2015) and Docket No. 35-1 (filed Aug. 24, 2015).

## A. The Amaryan Defendants' Trading Matched The Hackers Access To The Newswire Services

The Amaryan Defendants' illegal trading matches the hackers' access to the different newswire services. (*See* Pl's Ex. 274 (Oscillation chart), Ex. 256 (Event listing for Copperstone); Ex. 257 (Event listing for Ocean Prime); and Ex. 258 (Event listing for Intertrade).)[2] When the hackers had illegally accessed Newswire Service 1 ("Marketwired"), the Amaryan Defendants traded in the securities of companies who issued their press releases through Marketwired. For a brief period in February 2013, when the hackers had access to Newswire Service 2 ("PRN"), the Amaryan Defendants traded in the securities of a few companies who issued press releases through PRN. From February 2014 through January 2015, the hackers did not have access to the newswire systems and the Amaryan Defendants did not trade. Then, on the same day hackers installed a back-door access module at Newswire Service 3 ("Businesswire"), the Amaryan Defendants, and other defendants, resumed trading, now in the securities of companies who issued their press releases through Businesswire. (Preliminary Injunction Hearing Tr. 17:9-22; 18:2-20, October 8, 2015 (hereinafter "Tr."). *See also* Pl's Exs. 256-258 and 259

---

[2] Citations to "Pl's Ex." refer to the pre-marked exhibits provided to the Court at the preliminary injunction hearing and provided to the Amaryan Defendants the day before.

3

(Event listing for Slepenkov/Escada).) This shift is not a coincidence; it is compelling evidence of the Amaryan Defendants' participation in the fraudulent scheme.

### B. The Amaryan Defendants Traded In The Narrow Window Of Time Between Upload And Public Dissemination Of The Press Release

It is also not coincidental that the Amaryan Defendants traded in the narrow window of time between the upload of the press release from the issuing company to the newswire service and the public dissemination of the press release by the newswire service company. In Chart 1 to his Second Declaration, Dr. Canjels shows that nearly all of the Amaryan Defendants' illegal trading was in the window. (Pl's Ex. 198 (also at Docket No 84-1, Sep. 24, 2015); Tr. 66:6-67:11. *See also* Pl's Ex. 193 ¶12 (Second Canjels' Decl., also at Docket No. 84-1).) This too is neither an accident nor part of some legitimate trading strategy. As Dr. Canjels demonstrated, had the Amaryan Defendants been trading in front of earnings releases without advance knowledge of the press releases, approximately 28% of the time they should have traded in front of press releases that were uploaded after the market closed and released the next day before the market opened, but they did not. (Pl's Ex. 193 ¶12 (Second canjels' Decl.) and Ex. 196 (Table 3 to Second Canjels' Decl., Docket 84-1); Tr. 67:15-69:9.)

4

One trade in particular demonstrates that the Amaryan Defendants' trading in this narrow window of time was based on access to stolen information. The Amaryan Defendants' trading in connection with the Brocade press release on May 1, 2013 is telling. That day, at 3:29 p.m., Brocade uploaded to Newswire Service 1 an unanticipated announcement revising its earnings guidance downward. (Pl's Ex. 265.) Although the announcement was a surprise, within 20 minutes of the press release upload, the Amaryan Defendants, Bering Explorer Fund (through Maxim Zakharchenko), and other defendants all traded in Brocade securities with the expectation that the price of the stock would drop. (*Id.*) At 4:05 p.m., Marketwired publicly disseminated the Brocade press release. (*Id.*) As defendants expected, the price of Brocade stock declined. The Amaryan Defendants and the other defendants who traded reaped substantial profits. (*Id.*) It is notable that the Amaryan Defendants do not even attempt to explain this trade.

Although the Amaryan Defendants' broker has not yet produced all of the trade times for the trades of the Copperstone Alpha Fund, the available trade times indicate that Copperstone traded alongside Ocean Prime and Intertrade when they traded in the same ticker symbols. Indeed, the original complaint was written without reference to Copperstone. When Copperstone was added as a defendant, all of their trades in the examples used in the complaint were in the window trades.

5

There is no evidence to suggest and no reason to infer that Copperstone's trades in the securities at issue would be outside the window when Ocean Prime and Intertrade traded in the window.

### C. The Amaryan Defendants' Trading Overlaps With the Trading of Other Defendants, Including Bering (Through Zakharchenko)

Further illustrating the Amaryan Defendants' involvement in the scheme is the overlap between their trading and the trading of the other defendants. During the relevant time period, the U.S. market had between 4,500 and 5,000 publicly traded companies. Yet, the Amaryan Defendants traded an overwhelmingly large number of the same stocks traded by the Dubovoy Group, Bering, Jaspen Capital Partners, and the other defendants in this case and on the same days and in the same direction. As Dr. Canjels concluded and testified at the hearing, the overlap in trading is not a coincidence. (Pl's Ex. 193 ¶ 12 (Second Canjels' Decl.), Pl's Ex. 197 (Table 4 to Second Canjels' Decl., also at Docket 84-1.).) The Amaryan Defendants were trading on the same stolen press releases as the other defendants.

### D. The Amaryan Defendants Made Enormous Profits From Their Illegal Trading

Comparing the Amaryan Defendants' profits from the illegal trading with their profits from trading not connected to the scheme yields telling results. The Amaryan Defendants profited from the illegal trading and were far less successful

6

when trading independent of the scheme, save for a single outlier trade, which itself his highly suspicious. The Amaryan Defendants built a position in the stock of Intercept Pharmaceuticals over a 20-day period just before Intercept announced a successful clinical drug trial. On that positive news, the price of Intercept stock skyrocketed, and the Amaryan Defendants collectively realized over $22 million in profits. (Pl's Ex. 193 ¶ 15; Pl's Ex. 275.) As set forth in Exhibit K-1 to the Second Canjels' Declaration and as Dr. Canjels testified at the hearing, for the period October 2012 – February 2014, when the aberrational trade in Intercept securities is removed—the Amaryan Defendants' trading profits come overwhelmingly from the illicit trading in connection with the scheme, with over 78% of their combined profits coming from the scheme. (Pl's Ex. 193 ¶¶ 15-16 (Second Canjels' Decl.); Pl's Ex. 207.) When the time period is extended to August 2015 and the Amaryan Defendants' illegal trading in connection with the hacked Newswire Service 3 press releases properly construed as questioned events, the discrepancy becomes even greater—196% of their combined profits come from the scheme. (Pl's Ex. 217, also Ex. K-2, Docket 84-1; Pl's Ex. 193 ¶¶ 15-16.)

*******

The Commission has presented overwhelming evidence from which the Court should conclude that the Commission is likely to prevail on the merits or that

7

an inference can be drawn that the Amaryan Defendants violated the securities laws. As a result, the Court should grant the motion for preliminary injunction, continuing the freeze of the Amaryan Defendants' assets. It is irrelevant whether or not the Commission can show that the Amaryan Defendants communicated directly with the hacker defendants. The Commission can prove its case through circumstantial evidence. *E.g., SEC v. Johnson*, 174 Fed. Appx. 111, 115 (3d Cir. 2006) (*per curiam*) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.3 (1983)); *SEC v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004); *SEC v. Roszak*, 495 F. Supp. 2d 875, 886-87 (N.D. Ill. 2007); *SEC v. Singer*, 789 F. Supp. 1158, 1164-65 (S.D.N.Y. 1992). Here, the overwhelming evidence demonstrates that the Amaryan Defendants participated in the fraudulent scheme, and the motion for preliminary injunction should be granted.

## II. The Amaryan Defendants' Purported Defenses Fail

The evidence demonstrates that the Amaryan Defendants participated in the fraud. In response, the Amaryan Defendants offer only after-the-fact efforts to explain the evidence put forth by the Commission. These efforts fall flat.

### A. David Amaryan Lied Under Oath, Again.

In his declaration submitted under penalty of perjury, Amaryan stated that "he had never heard of any of the other defendants." (Amaryan Decl. at ¶ 6, Pl's

8

Ex. 148, also at Docket No. 73, filed Sep. 16, 2015.) This statement was false. In its reply and at the hearing, the Commission submitted Investment Advisory Agreements in which Zakharchenko and Amaryan are listed as Investment Advisors, operating under the Investment Manager, Bering Capital Partners. (*See* Pl's Exs. 239 and 240; Pl's Reply Br. at 5-6, Docket No. 84, filed Sep. 24, 2015; Fourth Dec. of Lynn O'Connor at ¶¶ 5-11, Pl's Ex. 229, also at Docket Nos. 84 and 86 (corrected). *See also* Pl's Exs. 230-234, 239, and 240.) Indeed, Plaintiff's Exhibit 239 shows Zakharchenko and Amaryan signed the document and that their signatures are one above the other on the same page. And, Plaintiff's Exhibit 240 is an unsigned Investment Advisory agreement indicating that Zakharchenko and Amaryan were to serve as the investment advisors for defendant Bering Explorer Fund. (*See* Pl's Exs. 273 and 272, which are flow charts of the relationships detailed in Pl's Exs. 230-234, 239, and 240.)[3]

At the hearing, Amaryan's counsel made no effort to rehabilitate Amaryan, declining to question him about his false declaration. When questioned by counsel for the Commission, Amaryan continued to deny his relationship with Zakharchenko and Bering—despite the overwhelming documentary evidence to

---

[3] Plaintiff's Exhibits 272 and 273 were not used during the preliminary injunction hearing due to time constraints. For the convenience of the Court and the Amaryan Defendants, copies are attached hereto as Exhibits 272 and 273.

9

the contrary. (*See* Pl's Exs. 239, 240; Tr. 202:17-19.) Likewise, Amaryan denied owning an entity named Gorlindar Ltd. and holding a 33% interest in Bering Capital Partners. (*See* Tr. 203:14-16; 206:21-23; Pl's Exs. 230-232.)

Amaryan's testimony is not credible. Amaryan not only knows Zakharchenko and Bering, but frequently traded alongside them in connection with this scheme, overlapping on 67% of Bering's trades (which were made by Zakharchenko) and trading in the same direction 94% of the time. (Pl's Ex. 193 ¶ 12; Pl's Ex. 197 (Table 4).) Accordingly, Amaryan's self-serving declaration and statements should be disregarded. *See Dressler v. Busch Entertainment Corp.*, 143 F.3d 778, 781 (3d Cir. 1998) (Noting that "it is consistent with the longstanding principles of jury deliberation[,]" that a jury may disbelieve the testimony, in whole or in part, of a witness who has "deliberately testified falsely" as to a "'material fact.'").

### B. Dean Fischel's Expert Report Is Fundamentally Flawed And, Thus, Unreliable.

As set forth in the Commission's reply, Dean Fischel's analysis was flawed for several reasons: (1) he compared inconsistent time periods; (2) he failed to take into account the aberrational profits from the questionable Intercept trade; and (3) even using an expanded time frame, he deemed the Amaryan Defendants' trading on the press releases issued by Newswire Service 3 in 2015 to be

10

unquestioned events. (Pl's Reply Br. at 11-14, Docket No. 84, filed Sep. 24, 2015.) Dr. Canjels corrected Dean Fischel's mistakes and replicated his exhibits. (Pl's Ex. 193 ¶¶ 15-17; Pl's Exs. 194-228.) In so doing Dr. Canjels demonstrated that even when viewed under the lens urged by the Amaryan Defendants' highly-compensated expert, their trading illustrates their involvement in the fraudulent scheme.[4]

Unable to defend his flawed analysis, Dean Fischel baselessly and unpersuasively attacked Dr. Canjels' work. Although he claimed that Dr. Canjels added many new events to his analysis, Dean Fischel ultimately was forced to admit that those new events were all trades from 2015 in connection with the securities of companies who issued their press releases through Newswire Service 3. (Tr. 172:1-3.) Similarly, while Dean Fischel complained that Dr. Canjels deleted certain events from the analysis, Dean Fischel did not dispute that those

---

[4] The Amaryan Defendants' statements regarding the initial event list that was provided by counsel for the Commission the day after the Amended Complaint was filed are puzzling. The email transmitting that list states: "The allegations in the Amended Complaint regarding the ill-gotten gains your clients derived from the scheme are derived from these trades. Please note that, as alleged in paragraph 10 of the Amended Complaint, on information and belief, at least some of the defendants have continued to pursue this scheme at one or more newswire services. As a result, the amounts of the alleged ill-gotten gains for your clients may increase." Accordingly, the Amaryan Defendants had ample notice that their trading in connection with the hack into Newswire Service 3 would be added to the events list.

11

events did not fit the criteria applied by Dr. Canjels. (Dean Fischel seemed unaware that these events included trades which the Amaryan Defendants had argued were not part of the scheme and were so-called "pair trades.").[5] (*See* Tr. 171:10-13 (admitting he had "briefly" looked at Amaryan's Declaration).) Likewise, Dean Fischel claimed that Dr. Canjels erroneously equated causation with correlation. (Tr. 150:6-152:15, 157:18-158:2.) But when pressed to identify where Dr. Canjels made this "fundamental economic and statistical error," Fischel could not point to any portion of Dr. Canjels' opinion that supported this criticism.

In short, Dean Fischel's analysis is flawed and, in light of his unsubstantiated attacks on Dr. Canjels, his credibility is suspect. Neither his analysis nor his testimony dents the overwhelming evidence that demonstrates that the Amaryan Defendants' participated in the scheme.

### C. The Amaryan Defendants Cannot Establish That Their Illegal Trades Were Actually The Result Of A Legitimate Trading Strategy

---

[5] In their Opposition the Amaryan Defendants argued that the Commission had incorrectly identified certain "paired" trades in which they had placed the trades as part of a strategy where they bought two related securities and held them for much longer than three-days. Commission staff reviewed that information and ultimately agreed that those trades were inconsistent with the criteria applied by Dr. Canjels. Remarkably, at the hearing, the Amaryan Defendants criticized Dr. Canjels from removing those same trades from his analysis. (*Compare* Tr. 144:24-145:14, *with*, Tr. 171:3-22.)

12

The Amaryan Defendants' illegal trades did not result from a legal trading strategy. In his declaration in opposition to the Motion for Preliminary Injunction, Amaryan asserted that the trades at issue were part of an "impulse" trading strategy that had been suggested by defendant Slepenkov. (Amaryan Decl. at ¶¶ 45-46, 53-59, Pl's Ex. 148, also at Docket No. 73, filed Sep. 16, 2015.) He attached certain charts that he claims supported that contention. However, he was careful to say that the impulse trading was but one factor that the Amaryan Defendants considered, and that they also considered, "complete fundamental analysis of the company, upgrades/downgrades, smart estimates compared to market estimates, historical price, P/E ratios, short interest activity in the options market, third party analyst reports, company and sector news, or corporate developments in the company." (Tr. 210:23-211:11 (quoting Amaryan Decl. at ¶ 56).) In other words, the Amaryan Defendants claim to have traded as they saw fit and not based on the impulse strategy or any other strategy. Accordingly, their purported "trading strategy" is meaningless. It does not explain why they traded or why they did not trade in a particular security on a particular day.

Indeed, the charts the Amaryan Defendants produced to the Court and to the Commission at the end of the preliminary injunction hearing do not exculpate the Amaryan Defendants for three reasons. First, on their face, they do not support

defendants' claim that the trades were the result of an "impulse" strategy as the Amaryan Defendants previously claimed. The charts reflect a number of different "strategies," such as: "retrace," "reversal," or "fundamental." For others, the Amaryan Defendants don't even try to make up a justification, writing "N/A."[6] (Defs' Ex. 6.) And, of course, many charts are missing. If the charts actually supported the Amaryan Defendants' arguments, they would have been submitted long before the hearing and the Amaryan Defendants' high-priced expert would have done a complete analysis.

Second, there is no credible evidence that the charts were prepared contemporaneously with the trading. The individuals who allegedly prepared these charts did not testify or even submit declarations. (Tr. 241:5-242:25)

Third, even if they were contemporaneously prepared, the charts are not inconsistent with the fraud. The scheme revolved around earnings releases. To profit from the advantage gained by early access to the earnings news in the non-public press release, the defendants needed to understand what the market and analysts expected to happen, compare the news to expectations, and trade based on whether they expected the price of the stock to increase or decrease when the news

---

[6] Even using the Amaryan Defendants' descriptions and classifications, of the questioned events they discuss—which does not include the 2015 trading at all—they label only 30% of the events as "impulse" trades. The remaining categories are 35% "retrace"; 17% "reversal"; 13% "n/a"; and 6% "pair / unrelated strat."

14

was publicly released. Thus, one would expect them to review analyst reports and market expectations and other information when trading on the stolen press releases.[7]

## CONCLUSION

For the foregoing reasons, and those set forth in the Commission's prior pleadings, the Court should grant the motion for a preliminary injunction and continue the asset freeze as it applies to the Amaryan Defendants.

Respectfully submitted,

By: s/ John Donnelly
David Axelrod
Kelly Gibson
John Donnelly

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(215) 597-3100
DonnellyJ@sec.gov

Dated: October 13, 2015

---

[7] The nature of the scheme also explains why defendants' trades were not always successful. Many earnings releases include mixed news, which would make the market's reaction more difficult to predict. Similarly, broader issues beyond a particular issuer, such as world events, could impact the market's response and resulted in a losing trade that was otherwise smartly placed based on the press release.

15