<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | : | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : : : | |
| | : | Civil Action No. 15-6076 |
| *Plaintiff,* | : : | |
| v. | : : | OPINION |
| **ARKADIY DUBOVOY, et al.,** | : : | |
| *Defendants.* | : : | |

**ARLEO**, UNITED STATES DISTRICT JUDGE

**THIS MATTER** comes before the Court by way of Plaintiff Securities and Exchange Commission's ("SEC") motion for a preliminary injunction freezing assets against certain Defendants in the above-captioned matter [Dkt. Nos. 12, 33]. The relevant Defendants are David Amaryan, Intertrade Pacific S.A. ("Intertrade"), Ocean Prime Inc. ("Ocean Prime"), Copperstone Capital, and Copperstone Alpha Fund (collectively, "Amaryan Defendants"). For the reasons set forth below, the SEC's motion is **GRANTED**.

**I.   FACTS**

    **A.  General Background**

This civil enforcement action arises from an allegedly fraudulent scheme to trade on nonpublic earnings information obtained by hacking into newswire company servers. The Amaryan Defendants are a subset of a larger group of Defendants accused of trading on the hacked information ("Trader Defendants"). They are an interconnected group of foreign trading

1

companies or funds all controlled by Mr. Amaryan. See Dkt. No. 28, Am. Compl. ¶ 115.[1] Intertrade and Ocean Prime are proprietary trading funds established in the British Virgin Islands with principal places of business in Moscow, Russian Federation. Id. ¶¶ 36-37. Copperstone Capital, another Cayman entity, manages Copperstone Alpha Fund, a hedge fund established in the Cayman Islands. Id. ¶¶ 34-35.

The structure of the allegedly fraudulent scheme is as follows. Newswire Service 1 ("Marketwired"), Newswire Service 2 ("PRN"), and Newswire Service 3 ("Businesswire") provide end-to-end content, news production, and distribution services to their clients, including many publicly-traded companies (also known as "issuers") in the United States. Id. ¶¶ 53-55; Tr. 15:3-8. Part of their distribution services entail editing and releasing issuers' press releases, which contained quarterly earnings data and other important financial information. Id. ¶ 67. After an issuer submits a draft press release to the Newswire Services, but before it is disseminated to the public, the Newswire Services electronically stores the release on its servers. Id. ¶ 68. Accordingly, for each press release, there is a window of time between the submission and publication of the release (the "window"). Id. ¶ 70. That window varies between a number of minutes and a number of days. Id.

From 2010 to 2015, two Defendants ("Hacker Defendants") took advantage of this window by hacking into the Newswire Services' computer systems and stealing thousands of press releases prior to their publication. Id. ¶¶ 55, 71. The Hacker Defendants then allegedly passed the information (directly or indirectly) to the Trader Defendants, including the Amaryan Defendants,

---

[1] Mr. Amaryan resides in Moscow, Russian Federation. He is the CEO of Defendant Ocean Prime and the sole director of Defendants Intertrade and Copperstone Capital. Id. ¶ 33. The SEC alleges that Intertrade owns all shares of Copperstone Capital, through Mr. Amaryan testified that Intertrade relinquished its ownership in 2014. Compare id. with Tr. 200:16-20.

who traded on that information before the press releases were publicly issued ("in-window"). Id. ¶ 71. When the Trader Defendants placed these in-window trades, they often did so within minutes of each other. Id. ¶¶ 149-221. After the press releases were issued, the Trader Defendants would close their trading positions within a matter of days. Id. ¶ 71; Dkt. No. 84, Declaration of Dr. Eugene Canjels ("Canjels Decl.") ¶ 11.[2]

The Hacker Defendants were not always able to simultaneously access each Newswire Service's networks, however. Id. ¶ 74. Depending on their access, the Hacker Defendants' theft of unpublished press releases oscillated between the three Newswire Services. Id. The Trader Defendants' trading activity largely mirrored this access, meaning when the Hacker Defendants only had access to press releases from a certain Newswire Service, the Trader Defendants traded in the securities of the issuers whose press releases were stolen from that Newswire Service. Id. ¶ 75.

Through this fraudulent scheme, the Trader Defendants realized over $100 million. Id. 222. The Amaryan Defendants, in particular, allegedly reaped over $8 million in ill-gotten gains. See id. ¶ 102.

### B. Procedural Background

This case was initially filed on August 10, 2015. Dkt. No. 1. On the same day, this Court entered a temporary restraining order freezing assets ("TRO") and an order to show cause against all Defendants, including David Amaryan, Intertrade Pacific S.A., and Ocean Prime Inc. Dkt. No. 12. On August 23, 2015, the SEC filed an Amended Complaint asserting allegations against Defendants Copperstone Capital and Copperstone Alpha Fund. Dkt. No. 28. The following day,

---

[2] This process of opening a trading position and closing it within a matter of days—usually, three days or less, in this case—is referred to as a "short-term roundtrip" transaction. See Canjels Decl. ¶¶ 10-11.

the Court entered a TRO and Order to Show Cause against the Copperstone entities. Dkt. No. 33. Both the SEC and the Amaryan Defendants submitted briefings with voluminous exhibits in advance of the preliminary injunction hearing.

The Court held the preliminary injunction hearing on October 8, 2015. During the hearing, the Court heard testimony from Lynn O' Connor and Dr. Eugene P. Canjels on behalf of the SEC, and from David Amaryan, Daniel R. Fischel, and David Papazian on behalf of the Amaryan Defendants.[3]

### C. Evidence Pertaining to the Amaryan Defendants' Hearing

In their briefing and testimony, the SEC offered evidence relating to the timing of the Amaryan Defendants' trading activity. See generally Dkt. No. 5, Declaration of Lynn O'Connor ("First O'Connor Decl."); Dkt. No. 35, Declaration of Lynn O'Connor ("Third O'Connor Decl."); Dkt. No. 84, Declaration of Lynn O'Connor ("Fourth O'Connor Decl."); Tr. 11:25-30:8. Trading in their accounts oscillated along with the Hacker Defendant's access to pre-publication press releases from the three Newswire Services. First O'Connor Decl. ¶¶ 50-51; Third O'Connor Decl. ¶ 11. When the Amaryan Defendants traded in the securities of companies who submitted press releases to the Newswire Services, they almost always traded in the narrow window of time between upload of the press release and its public dissemination. First O'Connor Decl. ¶¶ 72, 81-86; Third O'Connor Decl. ¶ 11. The SEC also identified similarities between the Amaryan Defendants' trading and the trading of other Defendants, including Bering Explorer Fund Ltd. ("Bering"), a group of traders known as the Dubovoy Group, Jaspen Capital Partners Limited, and

---

[3] At the hearing, the parties submitted Dr. Canjels and Mr. Fischel as experts. The Court determined that both individuals were qualified to serve as experts for the purpose of the preliminary injunction hearing. Tr. 103:2-104:10 (qualifying Dr. Canjels); Tr. 181:25-182:11 (qualifying Mr. Fischel).

Nikolai Slepenkov, an employee of Copperstone Capital who also owns Defendant Escada Logistics Ltd. First O'Connor Decl. ¶¶ 100-172; Fourth O'Connor Decl. ¶¶ 3-11.

The SEC also offered statistical analysis of the Defendants' trading activity conducted by Dr. Canjels. <u>See generally</u> Canjels Decl.; Tr. 55:11-104:10. Dr. Canjels reached the following conclusions regarding the Amaryan Defendants' trading activity from October 2012 to February 2014: (1) trading in the Amaryan accounts concentrated around the public dissemination of earnings news; (2) trading in their accounts almost always commenced after a news release was uploaded and appeared to be triggered by the upload; (3) trading in the accounts almost never occurred around earnings releases that were uploaded to the Newswire Services after the markets closed and disseminated before the markets opened the next day; and (4) trading in the accounts mirrored trades that occurred in accounts held by other defendants, suggesting that they were trading in advance of press releases based on the same or similar information. Canjels Decl. ¶¶ 12.

In response, the Amaryan Defendants argued that their trading activity was not based insider information, but on investment strategies developed and implemented by the Copperstone Capital analysts and traders. Dkt. No. 73, Declaration of David Amaryan ("Amaryan Decl."); Tr. 192:4-196:22. Specifically, they offer evidence of an "impulse trading" strategy, which took advantage of the behavior of certain stocks caused by algorithmic trading after the companies released their earnings reports, and a "pair trading" strategy, which involves matching a long position with a short position in a pair of highly correlated securities. Amaryan Decl. ¶¶ 45-63. They submitted evidence from Mr. Amaryan and David Papazian, the head of the United Kingdom operations for Copperstone Capital, in support of these strategies. Tr. 223:20-233:9.

The Amaryan Defendants also offered their own analysis of the trading records by Mr. Fischel. Dkt. No. 74, Declaration of Daniel R. Fischel ("Fischel Decl."). Mr. Fischel reached the following conclusions: (1) the Related Funds (i.e., Alpha Fund, Ocean Prime, and Intertrade) had a large volume of trading that is not questioned by the SEC; (2) it was common for the Related Funds to trade in a tight window around earnings announcements; (3) the size of the Related Funds' trades ahead of the questioned events was similar to or smaller than the trades ahead of other earnings announcements; (4) the Related Funds earned a majority of their overall profits from trades that were not questioned by the SEC; (5) many of the questioned trades resulted in losses, not profits; and (6) trading in advance of earnings announcements is common. Fischel Decl. ¶ 8.

## II. PRELIMINARY INJUNCTION STANDARD

The SEC seeks a preliminary injunction to maintain the freeze on the Amaryan Defendant's assets. "A freeze of assets is designed to preserve the status quo by preventing the dissipation and diversion of assets." S.E.C. v. Infinity Grp. Co., 212 F.3d 180, 197 (3d Cir. 2000) (internal citations omitted). The standard for an asset freeze is not as high as the usual standard for a preliminary injunction. S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc., No. 13-4645, 2014 WL 5026153, at *8 (S.D.N.Y. Sept. 29, 2014). The SEC must show either (1) a likelihood of success on the merits; or (2) that an inference can be drawn that the party has violated the federal securities laws. Smith v. S.E.C., 653 F.3d 121, 128 (2d Cir. 2011). The Court may also factor the concern that defendants will dissipate their assets or transfer them beyond the jurisdiction of the United States. S.E.C. v. Gonzalez de Castilla, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) modified in part sub nom. S.E.C. v. Duclaud Gonzalez de Castilla, 170 F. Supp. 2d 427 (S.D.N.Y. 2001) (citing S.E.C. v. Unifund SAL, 910 F.2d 1028, 1042 (2d Cir. 1990)). The

SEC's burden of proof rises depending on the hardship the injunction would create for the defendants. Id.

The SEC brings this action alleging violations under (1) Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); (2) Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; and (3) Sections 20(b) and (e) of the Securities Exchange Act of 1934, 25 U.S.C. § 78t(b),(e).

Section 17(a), Section 10(b), and Rule 10b–5 prohibit the employment of fraudulent devices in connection with the offer, purchase, or sale of securities. Pursuant to Section 10(b), the SEC has promulgated Rule 10b–5, which provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The SEC must prove that the defendant acted with scienter, but it need not prove either reliance or damages. S.E.C. v. Lucent Technologies, Inc., 610 F. Supp. 2d 342, 349 (D.N.J. 2009). Section 17(a) provides the same, except that claims under Section 17(a) may be premised on "offers" of securities as well as completed sales. See 15 U.S.C. § 77q; S.E.C. v. Graulich, No. 09-4355, 2013 WL 3146862, at *5 (D.N.J. June 19, 2013) (internal citation omitted).

7

Section 20 establishes for liability for aiding and abetting as well as control of others. Section 20(e) provides: "[A]ny person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(e). Section 20(b) provides: "It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person." 15 U.S.C. § 78t(b).

### III. ANALYSIS

The Court finds that the evidence submitted by the SEC raises a strong inference that the Amaryan Defendants violated federal securities laws, which was not rebutted by the evidence offered in opposition by the Amaryan Defendants. Given Mr. Amaryan's residence in Moscow, there is a concern that if the funds are unfrozen, they might be dissipated. Finally, the Amaryan Defendants have not produced evidence of hardship if a preliminary injunction is entered.

#### A. The SEC has satisfied its burden to maintain the asset freeze

In support of continuing the asset freeze, the SEC offers evidence of the Amaryan Defendants' highly suspicious trading activity as well as statistical evidence corroborating the same. The Court finds this evidence persuasive.

##### i. Amaryan Defendants' Trading Activity

The SEC first demonstrated that, during the relevant period, the Amaryan Defendants' trading activity mirrored the Hacker Defendants' oscillating access to the Newswire Services. The SEC submitted the following date ranges for the Hacker Defendants' access to the Newswire Services. First O'Connor Decl. ¶ 50; Tr. 17:1-18:20. From March 2012 to February 2014, the

Hacker Defendants had access to the network and press releases of Marketwired, but were largely blocked access from PRN's network. First O'Connor Decl. ¶ 50; Tr. 15:14-16:10. The Hacker Defendants then lost access to all Newswire Services for approximately 10 months, from February 2014 until December 2014. Tr. 15:14-16:10. Then, on January 20, 2015, Businesswire's network was hacked. Tr. 16:11-18. A comparison of this information with trades made in the Amaryan Defendants' accounts during the same period reveals substantial overlap. From October 17, 2012, to February 20, 2014, all but a few of Copperstone trades were made in companies who submitted press releases to Marketwired. Tr. 17:9-15. Copperstone's accounts then ceased trading for approximately eleven months, until trading began again on January 20, 2015, in companies who submitted press releases to Businesswire. Tr. 17:16-21. Virtually identical trading patterns occurred in accounts belonging to Ocean Prime and Intertrade. Tr. 17:24-18:20. The SEC therefore demonstrated that the Amaryan Defendants' trade timing strongly correlates with the Hacker Defendant's access to the Newswire Services, the subsequent loss of access in 2014, and access regained in or around the beginning of 2015.

The SEC next demonstrated that the Amaryan Defendants almost always traded during the narrow window of time between upload of the press release to the newswire service and the public dissemination of that press release. In one representative example, on July 23, 2013, a public company called VMware, Inc. uploaded a press release to Marketwired at 12:09 p.m. and publically disseminated it at 4:01 p.m. that same day. Am. Compl. ¶ 203-05; Tr. 25:18-26:16. Within that time, Copperstone Alpha Fund, Ocean Prime, and Intertrade bought VMware securities and profited. Id. ¶ 205. The bulk of the Amaryan Defendants' trading during the relevant time period adhered to this in-window strategy. Tr. 22:8-10.

This trading pattern also overlaps with the trading of other Defendants in the case. The SEC provided numerous examples where other Trader Defendants took positions in the same questioned securities as the Amaryan Defendants. For example, within a window of approximately four hours and twenty minutes, the SEC identified positions taken in Edwards Lifesciences by Copperstone Alpha Fund and Intertrade, as well as accounts belonging to Defendants Dubovoy Group and Bering. Tr. 24:3-25. At times, other Trader Defendants would take a position in a security during the window within mere minutes of the Amaryan Defendants. See Tr. 27:3-13 (identifying in-window trading in TIBCO Software). Moreover, of the eleven examples of illegal trading detailed in the Amended Complaint, the Amaryan Defendants and Bering both traded in six of those events, at times within a three-minute time period of each other. And of the 136 different in-window trades made by the Amaryan Defendants from October 2012 to February 2014, Bering made overlapping trades 67 times, Jaspen 93 times, and the Dubovoy group 36 times. Canjels Decl., Table 4.

### ii. Dr. Canjels' Statistical Analysis of Trading Activity

To reinforce these findings, the SEC also submitted statistical analysis of Dr. Canjels, who analyzed trading activity that occurred in advance of the public distribution of company press releases by the three Newswire Services. The Court is persuaded by Dr. Canjel's findings.

Dr. Canjels analyzed "questioned" or "challenged" trades—i.e., roundtrip transactions in the Amaryan accounts that were completed within three days and straddled the public dissemination of company news by the three Newswires—against trades that did not meet this criteria. Canjels Decl. ¶¶ 11, 13. He compiled information for Amaryan accounts trading from (1) October 2012 through February 2014, representing the Amaryan accounts trading in Newswire Services 1 and 2, 309 of which were "questioned events"; (2) October 2012 to August 2015,

representing the Amaryan accounts trading related to all three Newswire Services; and (3) January 2015 to August 2015, representing the Amaryan accounts' trading related to Newswire Service 3, 85 of which were "questioned events." Id. ¶¶ 12-13.

For the period ending February 2014, Dr. Canjels concluded that (1) 66 percent of the money traded in the Amaryan accounts involved securities with at least one "questioned event"; (2) 84 percent of earnings events traded in the Amaryan accounts were related to questioned events and 90 percent of the dollars traded before those events were concentrated on "questioned events,"; (3) the Amaryan accounts generated $4.5 million in net profits trading in "questioned events,"; and (4) excluding a single outlier trade, the Amaryan accounts generated $1.3 million in net profits for unquestioned events between October 2012 and February 2014. Id. ¶ 15, Exs. F-1, G-1, H-1, I-1, J-1, K-1. The single outlier was a trade in Intercept Pharmaceuticals Inc. made in January 2014 that lasted longer than three days, but which accounted for the vast majority ($22.1 million of $23.3 million) of new profits that resulted from unquestioned trades. Id. ¶ 15; Tr. 72:24-73:4.

For the period extending to August 2015, Dr. Canjels concluded that (1) 62 percent of the Amaryan account's trading was related to securities with at least one "questioned event"; (2) roughly 85 percent of the earnings announcements traded and 93 of the dollars traded before earnings announcements were related to "questioned events"; (3) the Amaryan accounts generated roughly $8 million in net profits trading in "questioned events"; and (4) exclusive of the outlier, "unquestioned event" trading in the Amaryan accounts generated a loss of $4.0 million over the extended period through August 2015. Id. ¶ 16, Exs. G-2, H-2, I-2, J-2, K-2.

For the period covering only January 2015 to August 2015, Dr. Canjels concluded that (1) the Amaryan accounts jointly traded in 85 "questioned events," all of which involved trading in advance of news releases by Newswire Service 3; (2) 79 percent of trading in the accounts was

11

related to securities with at least one "questioned event"; (3) over 91 percent of the earnings announcements traded and 95 percent of the dollars traded before earnings announcements were related to "questioned events"; (4) Amaryan accounts generated $3.6 million in net profits trading in "questioned events" from January 2015 through August 2015; and (5) outside of the "questioned events," trading in the Amaryan accounts generated a profit of $0.8 million over the period January 2015 through August 2015. Id. ¶ 17, Exs. C-3, D-3, E-3, F-3, G-3, H-3, I-3, J-3, K-3.

The court is persuaded that Dr. Canjels' methodology and conclusions are reliable. Dr. Canjels distinguished trades based on whether they fell into his in-window criteria. Dr. Canjels determined this by looking to complete trading time data for all Amaryan accounts, except for those belonging to Copperstone where he used trading date data instead of time. Tr. 65:1-16. He also applied identical timeframes to each of the three date ranges when comparing questioned events to unquestioned events. He likewise provided a reasonable basis for omitting trades from his analysis. As to the outlier trade, Dr. Canjels' testified that, from a statistical standpoint, when calculating means and medians, an extreme outlier such as the Intercept trade would affect the accuracy of the calculation. Tr. 72:16-74:24. Dr. Canjels also removed certain "paired" trades—i.e., trades placed as part of a strategy where the Amaryan Defendants bought two related securities and held them for longer than three-days—from the "questionable" list because they were inconsistent with his criteria. See Tr. 90:4-91:7; 211:22-213:19. Lastly, contrary to arguments raised by the Amaryan Defendants at the hearing, the fact that Dr. Canjels' opinion establishes strong correlations, as opposed to causation, about trading patterns does not render his findings unreliable. S.E.C. v. Compania Internacional Financiera S.A., No. 11-4904, 2011 WL 3251813, at *9 (S.D.N.Y. July 29, 2011) (grating asset freeze where SEC demonstrated suspicious trading patterns and timing). Accordingly, the Court is persuaded by Dr. Canjels' findings.

In sum, between evidence of the Amaryan Defendants' trading patterns and the statistical analysis offered by Dr. Canjels, the Court finds that the SEC has provided sufficient evidence to infer that the Amaryan Defendants have violated the federal securities laws

### B.  The Amaryan Defendants' evidence is not persuasive

In response, the Amaryan Defendants contends that Mr. Fischel's expert analysis and the existence of a legitimate trading strategy negate any suspicion that arises from the SEC's evidence.[4]  The Court disagrees.

### i.  Mr. Fischel's Statistical Analysis of Trading Activity

Mr. Fischel purports to show that the pattern and profitability of the questioned trades are indistinguishable from those of the non-questioned trades.  Fischel Decl. ¶ 8.  He also opines that trading in advance of earnings announcements is common.  Id.  His analysis, however, suffers from fundamental methodological flaws.

### 1.  Analysis of Trading Pattern

Mr. Fischel found that (1) approximately two-thirds of the trading analyzed was unrelated to the alleged scheme, Fischel Decl. ¶¶ 14-15; (2) the Amarayn Defendants traded shortly before approximately 118 unique earnings announcements that were not challenged by the SEC and 139 unique earnings announcement that were challenged, id. ¶ 16; and (3) the Related Funds traded an average of $1.9 million in challenged securities compared to $2.4 in unchallenged securities, id. ¶

---

[4] The Amaryan Defendants also argue that the SEC failed to show direct evidence that the Amaryan Defendants were connected to the Hacker Defendants.  The Court disagrees.  The SEC is not required to provide such evidence in order to obtain a freeze on the Amaryan Defendants' assets.  The SEC may rely on circumstantial evidence, of which it has provided substantial amounts.  See S.E.C. v. Johnson, 174 F. App'x 111, 115 (3d Cir. 2006) (permitting reliance on circumstantial evidence to prove case); S.E.C. v. Unifund SAL, 910 F.2d 1028, 1041 (2d Cir. 1990) (permitting asset freeze where SEC identified tippee but not tipper).

19.  Mr. Fischel derived these figures by comparing trades that the SEC deemed illicit with all trading activity for the Amaryan accounts.

In reaching these conclusions, however, Mr. Fischel used different time periods to compare questioned and unquestioned events. Mr. Fischel based his data on the SEC's preliminary list of 319 "questioned" trades identified in the Amaryan accounts from October 2012 to February 2014. For the purposes of identifying "unquestioned" events, however, Mr. Fischel included all trades made by the Amaryan Defendants through 2015. Tr. 162:25-165:9. He thereby extended the data set for those entities months beyond the timeframe used for "questioned" events.

Mr. Fischel suggests that the use of dissimilar comparator groups is "standard methodology in academic literature." Tr. 165:22-25. But Mr. Fischel offers no specific academic citation or support for his analysis. When asked whether he could have restrained the data set for unquestioned trades to the period provided by the SEC, Mr. Fischel responded:

> A. Could have done that, but I don't think that would have been as methodologically sound as what I did.
>
> Q. And what are you basing that on besides your experience? Do you have any article that you would cite to that would say you would need to increase the period out longer to the time period that you chose?
>
> A. Not that specific, but it's standard in the economic literature on insider trading to compare the results of challenged trades with a benchmark that results in a – a time period or a different series of events, whatever, that aren't challenged, and that's exactly what I did.

Tr. 166:25-167:10. Absent any showing of support beyond personal preference or experience, the Court gives little weight to Mr. Fischel's decision to use inconsistent time frames.

Nor does Mr. Fischel provide a basis for deeming trades made after the SEC's preliminary two-year period as "unquestioned." Mr. Fischel testified that his assumption was appropriate

because the SEC did not originally list events after 2014 as challenged events. Tr. 167:11-14. But his response is belied by the Amended Complaint, which indicates the Hacker Defendants attempted to hack into the Newswire Services in 2015. Am. Compl. ¶ 10, 55; Tr. 168:1-13. The SEC also expressly stated to counsel for the Amaryan Defendants that the two-year period was a preliminary list that was subject to change as research went forward. Tr. 167:16-19. And when questioned by the Court whether the SEC's new information on questionable trades in 2015 would change his analysis, Mr. Fischel replied, "[i]f there were a list of trades that the S.E.C. was challenging . . . yes, I would perform a different analysis." Tr. 167:21-23. Accordingly, the Court gives little weight to Mr. Fichel's assessment of the Amaryan Defendants' trading pattern.

### 2. Analysis of Profitability

Mr. Fischel's conclusion about the profitability of questioned and unquestioned trades also suffers from methodological defects. Mr. Fischel found that that the challenged trading generated $3.9 million in profits, while the remainder of the trading generated $25.4 million of the Related Funds' profits. Fischel Decl. ¶ 21. However, Mr. Fischel failed to distinguish a single anomalous trade that accounted for virtually all the $25.4 million in unchallenged profits. As Dr. Canjels identified in his declaration, the vast majority of the unchallenged profits are attributable to a position held in Intercept Pharmaceuticals Inc., which earned roughly $22 million for the Amaryan Defendants. Canjels Decl. ¶ 15, Ex. K-2. Mr. Fischel offers no reason for keeping the anomalous trade besides it being "part of the overall profitability of the trading strategy." Tr. 178:10-11. Yet Mr. Fischel testified that he did not use a regression analysis or any type of econometric tool to analyze these trades. Tr. 180:21-181:1. Accordingly, the Court gives little weight to Mr. Fischel's profitability assessment.

### 3. Industry Custom

Mr. Fischel also argues that investors frequently trade in the periods surrounding earnings releases and that this activity typically increases trading volume. Fischel Decl. ¶¶ 23-27. The Court is not persuaded.

Mr. Fischel incorrectly frames the argument. The SEC does not allege the Amaryan Defendants violated the securities laws because they traded "in the periods surrounding" earnings announcements. The SEC has offered substantial evidence, explained above, tying the Amaryan Defendants to trades made in the precise window between when press releases are uploaded to the Newswire Services and when they are published. See Sec. III.A.i, supra. Moreover, Mr. Fischel's opinion rests on the assumption that investors trade in anticipation of earnings releases. Indeed, as the SEC acknowledges, markets are often informed that a company will report earnings in advance of the day those earnings are released. Tr. 28:11-17. But this does not explain how the Amaryan Defendants were able to make in-window trades on unanticipated earnings announcements—that is, earnings releases that companies did not preannounce and therefore of which the market was not aware. See Tr. 28:1-30:6 (explaining trade made by Amaryan Defendants and several other Trader Defendants on surprise earnings announcement). Mr. Fischel's opinions about industry custom are therefore not persuasive.

### ii. Legitimate Trading Strategy

The Amaryan Defendants also assert that their use of a legitimate trading strategy called "impulse" trading explains their questioned trading activity. This also does not prevail.

Mr. Amaryan claims that "impulse" trading is an investment strategy that took advantage of specific market inefficiencies that revolved around earnings announcements. Amaryan Decl. ¶¶ 48-49. It identified exaggerated movements in certain stock prices before earnings

16

announcements and entered trades on those stocks with the expectation that the resulting price movement after the announcement would correspond to the exaggeration. Id. ¶ 49.

The Amaryan Defendants offer no credible evidence to support this explanation. Mr. Amaryan provided a spreadsheet document allegedly created in 2012 that identified stocks that the Amaryan Defendants were monitoring as part of their impulse strategy. But the document provided to the Court was a snapshot of the spreadsheet taken "recently," not in 2012. Tr. 216:20-23. It therefore does not reflect the impulse strategy as it existed during the time of the alleged newswire hacking. Moreover, given serious questions about Mr. Amaryan's credibility, the Court does not find his testimony persuasive.[5] See Tr. 201:7-204:7.

Mr. Papazian produced a series of charts during his testimony purporting to show a contemporary analysis of questioned trades made in 2012 to 2014. Tr. 229:13-24; Defs.' Ex. 6. But Mr. Papazian provided no authority for the creation of these charts, he was unable to identify who prepared them or when they were prepared, and he testified that charts were only created for certain trades but not others, creating an incomplete record. See Tr. 231:9-223:10. Therefore, the Court attaches little if any weight to these documents.

### C. Hardship to Amaryan Defendants

Finally, any hardship the Amaryan Defendants may suffer because of the asset freeze does not justify lifting the restraint. Mr. Amaryan asserts that he suffers from reputational and financial harm because of this lawsuit. Amaryan Decl. ¶¶ 82-83. None of Mr. Amaryan's stated harms are

---

[5] Mr. Amaryan stated in his Declaration that he "had never heard of any of the Trader Defendants named therein, with the exception of Nikolai Slepenkov and Escada Logistics LTD." Amaryan Decl. ¶ 6. But the SEC produced signed agreements whereby Mr. Amaryan and Defendant Maxim Zakharchenko served as investment advisors under Bering Capital Partners and an unsigned agreement for the two to serve as investment advisors for Defendant Bering Explorer Fund. Fourth O'Connor Decl. ¶ 10, Exs. 169, 170. This fact calls Mr. Amaryan's credibility into question.

attributable to the freeze itself. See id. ¶ 82. And Mr. Amaryan's assertion that the Copperstone Alpha Fund has lost $1.5 million of its value since the institution of this action does little given that he has $300 million in assets under management. Fourth O'Connor Decl. ¶ 21, Ex. 180. Finally, the fact that Mr. Amaryan, who controls the foreign entities, lives abroad raises a serious concern that he may transfer corporate funds beyond the Court's jurisdiction and dissipate the assets available for any eventual award. See Gonzalez de Castilla, 145 F. Supp. 2d at 420-21.

The SEC requests that the Preliminary Injunction remain in effect until entry of a Final Judgment in, or other final disposition of, this action. The Court, in its discretion, deems the duration appropriate. See S.E.C. v. Unifund Sal, 917 F.2d 98, 99 (2d Cir. 1990) ("In fashioning preliminary relief, district courts retain ample discretion to assess all the relevant circumstances and, in those cases where the SEC has demonstrated entitlement to a freeze order, to determine the coverage, terms, and duration of that order.").

### IV. CONCLUSION

For the foregoing reasons, the SEC's motion for a preliminary injunction is **GRANTED**. An appropriate order accompanies this Opinion.

Date: October 16, 2015  /s/ *Madeline Cox Arleo*         .
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**