1

1      IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW JERSEY

3

4   SECURITIES AND EXCHANGE COMMISSION,  :   Civil No.
                                             15-cv-6076-MCA
5                          Plaintiff,    :

6              v.                        :
                                             TRANSCRIPT OF
7   ARKADIY DUBOVOY, et al,              :   HEARING ON ORDER
                                             TO SHOW CAUSE, ETC.
8                          Defendants.   :
    ------------------------------------x

9

10                                      Newark, New Jersey
                                        October 8, 2015

11

12

13

14   BEFORE:

15        THE HON. MADELINE COX ARLEO, U.S.D.J.

16

17
                                     Reported by:
18                                   CHARLES P. McGUIRE, C.C.R.
                                     Official Court Reporter
19

20

21        Pursuant to Section 753, Title 28, United States
          Code, the following transcript is certified to be
22        an accurate record as taken stenographically in
          the above entitled proceedings.

23

24                          s/CHARLES P. McGUIRE, C.C.R.

25

CHARLES P. McGUIRE, C.C.R.

1      **APPEARANCES:**

2          JOHN V. DONNELLY, III, ESQ.,
           DAVID ALEXROD, ESQ.,
3          KELLY GIBSON, ESQ.,
           LYNN HERBERT O'CONNOR, ESQ., and
4          ASSANTA VIVOLO, ESQ.
           U.S. Securities and Exchange Commission
5          701 Market Street
           Philadelphia, PA 19106
6          Attorneys for Plaintiff

7          BAKER HOSTETLER LLP
           45 Rockefeller Plaza
8          New York, New York 10111
           BY: JOHN W. MOSCOW, ESQ.,
9              MARC POWERS, ESQ.
               MARGARET E. HIRCE, ESQ., and
10             SAMMI MALEK, ESQ.
           Attorneys for Defendants Amaryan, Ocean Prime,
11         Intertrade Pacific, Copperstone Capital, and
           Copperstone Alpha Fund

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CHARLES P. McGUIRE, C.C.R.

1            THE COURT CLERK:  All rise.

2            THE COURT:  Okay.  Good morning, everyone.

3            Everyone can be seated, except for the lawyers,

4    who can put their appearances on the record.

5            Okay.  Mr. Donnelly, how are you?

6            MR. DONNELLY:  I'm fine, thank you, Your Honor.

7    How are you?

8            THE COURT:  Good.  Okay.  So we have appearances

9    first for the S.E.C.

10            MR. DONNELLY:  Yes, Your Honor.

11            John Donnelly, Securities and Exchange Commission,

12    from the Philadelphia office.  To my right is David Axelrod,

13    also an attorney with the S.E.C.  To his right is Assanta

14    Vivole who is also an attorney with the S.E.C., and behind

15    her is Kelly Gibson.

16            THE COURT:  Okay, the whole team out today, not to

17    be outnumbered by the Defendants, correct?

18            MR. DONNELLY:  Yes, Your Honor, and we also have

19    declarants Lynn O'Connor and Dr. Eugene Canjels with us in

20    the courtroom today.

21            THE COURT:  Okay.  Thank you.

22            And for the defense?

23            MR. MOSCOW:  Your Honor, my name is John Moscow,

24    Baker & Hostetler.  With me is my partner --

25            MR. POWERS:  Marc Powers from Baker & Hostetler.

1           THE COURT:  Okay.

2           MR. MOSCOW:  We also have Margaret Hirce from

3    Baker & Hostetler.

4           THE COURT:  Where is she?

5           MS. HIRCE:  Here, Your Honor.  Good morning.

6           THE COURT:  Good morning.

7           MR. MOSCOW:  And we have Sammi Malek from

8    Baker & Hostetler, who is not yet admitted in this Court,

9    and we would move her admission pro hac vice.

10          THE COURT:  He or she?

11          MR. MOSCOW:  She.

12          THE COURT:  Okay.  Any opposition to her appearing

13   today?

14          MR. DONNELLY:  No, Your Honor.

15          THE COURT:  Okay.  So she will be conditionally

16   admitted on the condition that she submits her papers in a

17   timely way.

18          MR. MOSCOW:  We'll get that done today.

19          MS. MALEK:  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          MR. MOSCOW:  We are appearing -- for the record,

22   we're appearing for the Amaryan Defendants.

23          THE COURT:  Thank you.  Okay.  So have a seat.

24          So you know that I had read everything that you

25   had submitted, and I had adjusted the timing a little bit

1          for today's hearing, so I'd like to try to keep you within,

2          you know, within -- I don't want to cut you off in the

3          middle, I'm not going to cut anyone off in the middle of a

4          sentence, but I've allocated an hour and a half to each

5          side, and then we've have some closing arguments.  So if you

6          can just budget your time accordingly, and I'll let you know

7          when we're getting close, and then we can move forward.

8                    So why don't we begin?

9                    This is, I take it, Defendants' application to

10         dissolve the restraints?

11                   MR. MOSCOW:  No, Your Honor.  This is the

12         Government's application for a preliminary injunction.

13                   THE COURT:  For continuation.

14                   So, Mr. Donnelly, why don't you begin with your

15         first witness.

16                   MR. DONNELLY:  Certainly, Your Honor.

17                   Your Honor, we call Lynn O'Connor.

18                   THE COURT:  Okay.

19                   And I want to state one point.  I know there's a

20         time constraint here.  I placed the time constraints because

21         I've been afforded the benefit of many affidavits in this

22         proceeding, so I don't think there's a need to repeat

23         anything.  If you want to hit the highlights and move on,

24         but I have everything.  I've considered everything, and I

25         will consider everything that's been submitted, both

CHARLES P. McGUIRE, C.C.R.

1    factually and legally, before I make a ruling, so you can

2    assume that as you proceed with your witnesses.

3           MR. DONNELLY:  Your Honor, just a couple of

4    housekeeping things.

5           THE COURT:  Sure.

6           MR. DONNELLY:  For documents that have already

7    been filed that are exhibits, should we move those into

8    evidence here, or because they've already been filed,

9    they're part of the record?

10          THE COURT:  I think it makes sense to mark them,

11   and you could either -- you could refer to them as -- for

12   ease, so we don't have a confusing record, consistent with

13   how they were marked.  I think attached to different

14   affidavits, they're like A, B, C, and D.  So we can also

15   mark them as Plaintiff's Exhibit 1 for the purposes of this

16   record.

17          MR. DONNELLY:  What we've done, Your Honor, is, we

18   have two binders -- we're not going to use them all,

19   promise, didn't know exactly what we were going to use --

20   that are marked Plaintiff's 1 through 275.

21          THE COURT:  Okay.

22          MR. DONNELLY:  And these are copies for Your

23   Honor.

24          THE COURT:  Thank you.  Give them to Amy and

25   she'll give them to me.

1               I just want to make one thing clear.  Are there

2       any documents here that were not previously disclosed in

3       discovery?  Are there any new documents?

4               MR. DONNELLY:  Your Honor, there hasn't been

5       discovery at all.  There's been some exchange upon

6       request --

7               THE COURT:  Okay.

8               MR. DONNELLY:  -- but no full-blown discovery or

9       exchange.  So there are some new exhibits, but for us,

10      either the bulk of those, I think, are summaries of what the

11      trading records and other things show, charts, things like

12      that.

13              MR. MOSCOW:  Your Honor, some of the --

14              THE COURT:  I'm going to ask a question before you

15      respond.

16              MR. MOSCOW:  Sure.

17              THE COURT:  Have you given a copy of these

18      exhibits to the Defendants?

19              MR. DONNELLY:  We exchanged exhibits

20      electronically last night, the two sides did, at

21      approximately 8:30 or nine o'clock.

22              THE COURT:  Okay.

23              MR. DONNELLY:  We have hard copies for them here.

24              THE COURT:  Okay.

25              MR. DONNELLY:  And we also have electronic copies

1    that we can put up on the screen for the witnesses who are

2    overseas.

3                    THE COURT:  Okay.  Thank you.

4                    Counsel?

5                    MR. MOSCOW:  Most of the Government Exhibits,

6    Your Honor, have been previously filed.  I would appreciate

7    a paper copy, because there are some new documents which

8    were sent late last night at whatever it was, 11:20 or

9    whatever, people were working late.  But if we could get

10   those, that would be helpful.

11                   THE COURT:  Okay.  Mr. Donnelly has a copy, so if

12   you can turn them over, it would be appreciated.

13                   MR. DONNELLY:  We have those organized by exhibit

14   for them as opposed to --

15                   THE COURT:  So what does that mean?  These are

16   organized by exhibit as well, right?

17                   MR. DONNELLY:  They are, but yours is the set 1

18   through 275.  What we have are folders with four additional

19   copies if someone's -- a witness is in the box, put the

20   exhibit in front of the witness, give one to defense

21   counsel.  That's how we were contemplating it.

22                   THE COURT:  Okay.  In the future, anything you

23   give to the Court before the hearing starts, I would

24   appreciate the same exact copy be given to your adversary in

25   a case.

1          But as I understand it, you have copies to give to

2     the witness, and you'll give a copy to Defendants as well.

3          MR. DONNELLY:  Yes.

4          MR. MOSCOW:  If I had a copy before it was shown

5     to the witness, it might be of use --

6          THE COURT:  Counsel, you don't, and that's how

7     we're going to proceed today.  Okay?  I understand there's

8     an objection.  It's noted.  This is how we're going to go

9     forward in the future.  This is the day of the hearing.

10    Hopefully we won't have any more hearings where there will

11    be surprise documents because we'll have discovery.  But

12    we're going to go forward today, you mark a copy, and if you

13    know, if you take a break, and there are additional

14    exhibits, give it to them in advance, okay?  If they need a

15    break before cross-examination, they'll be afforded that

16    break.  Okay?

17         MR. DONNELLY:  Thank you, Your Honor.

18         THE COURT:  Thank you.

19         MR. DONNELLY:  One other housekeeping matter that

20    we would request for the witnesses overseas, that just the

21    videographer and the witness who's testifying be in the

22    room, and not additional people who are off camera.

23         THE COURT:  I think that sounds reasonable.

24         MR. MOSCOW:  Your Honor, I understand that to be

25    basically a motion to exclude nonparty witnesses, to which

1    we do not object.  That's fine.  Mr. Papazian is in the

2    courtroom.  I know they're talking about Moscow, but I'm

3    suggesting the same rules should apply both there and here.

4              MR. DONNELLY:  That's fine with the nonparty fact

5    witnesses.

6              THE COURT:  Nonparty fact witnesses will testify

7    -- I want to know who's in the room.  So if there's a

8    representation that no one else is in the room except the

9    videographer and the counsel, and that will apply for both

10    sides.

11              Okay.  I don't need -- I've read everything, and

12    frankly, I will give you a heads-up, I'd be prepared to rule

13    today without this hearing.  I think I have a sufficient

14    record before me.  The hour and a half that you're each

15    allocated will be total today.  And so if you're going to

16    cross-examine, it's going to be part of your time.  I don't

17    need -- I'm not going to let this turn into a minitrial.

18    It's a preliminary injunction hearing, and I've been

19    afforded a ton of affidavits, so use your time wisely.  It's

20    not going to be an hour and a half -- your time is an hour

21    and a half, and if you want to reserve time to cross-examine

22    the defense witnesses, that will be permitted.  But we're

23    going to keep track of time.  It's an hour and a half.  So

24    I'm going to emphasize with all my -- with as much passion

25    as I can convey to you that, don't repeat the wheel.  I have

CHARLES P. McGUIRE, C.C.R.

1  everything, I've read everything, I've read Ms. O'Connor --

2  is it Ms. O'Connor?

3          MR. DONNELLY:  Yes, Your Honor.

4          THE COURT:  You don't need to redo it, unless you

5  want to do it in the most cursory way to make additional

6  points because I don't want to be here for two days.  I

7  don't think it's necessary.  I'm doing this because I think

8  it's fair, and I think it's fair for the Defendants to have

9  an opportunity to have their clients testify, since their

10  testimony is so critical to this case.

11          So with that as a caveat, Mr. Donnelly, it's your

12  witness.

13          MR. DONNELLY:  Thank you, Your Honor.

14          THE COURT CLERK:  If you can please raise your

15  right hand, place your left hand on the bible.

16  L Y N N    O ' C O N N O R, called as a witness on behalf of

17  the Plaintiff, and having been duly sworn, testified as

18  follows:

19          THE COURT CLERK:  Please state your full name for

20  the record and spell it, please.

21          THE WITNESS:  My name is Lynn O'Connor, L-y-n-n, O

22  apostrophe C-o-n-n-o-r.

23                      DIRECT EXAMINATION

24  BY MR. DONNELLY:

25  Q.    Good morning, Ms. O'Connor.

1    A.    Good morning.

2    Q.    You are currently employed with the Securities and

3    Exchange Commission; correct?

4    A.    Yes.

5    Q.    How long have you been employed with the Securities

6    and Exchange Commission?

7    A.    Approximately 10 years.

8    Q.    And how long have you been an attorney?

9    A.    Oh.

10    Q.    Approximately.

11    A.    Approximately, since 1985.

12    Q.    And prior to joining the Commission, what type of work

13    did you do?

14    A.    I worked in private practice for large firms, and then

15    I was a prosecutor.

16    Q.    And what's your current title with the S.E.C.?

17    A.    Senior counsel with the Market Abuse Unit, Unit

18    Enforcement.

19    Q.    And what are your responsibilities in that position?

20    A.    In the Market Abuse Unit, we investigate complex

21    financial fraud cases.

22    Q.    Ms. O'Connor, I'm going to put in front of you your

23    fourth declaration in this case, which is also on the

24    screen.

25            MR. DONNELLY:  May I approach, Your Honor?

1          THE COURT:  Yes.

2          MR. DONNELLY:  And this will be quick, but it's

3     just two lines that we'd like to clarify.

4          THE COURT:  And why is it duplicative?  What

5     document?

6          MR. DONNELLY:  It is 229, Your Honor.

7          MR. MOSCOW:  Is this the exhibit?

8          MR. DONNELLY:  Yes, it's 229, and it's previously

9     marked.

10    Q.   Ms. O'Connor, would you look at paragraph 17?

11    A.   Yes.

12    Q.   And approximately five lines from the bottom of that

13    paragraph, with the sentence beginning "This decrease in

14    stock price was," is there a word that is missing there?

15    A.   Yes.

16    Q.   Okay.  What --

17    A.   There should be -- towards the end of the sentence,

18    you'll see the line that starts with 2014?  It should have

19    "forecasted" before "earnings."

20    Q.   Okay.  That should have been "forecasted earnings."

21    A.   Correct.

22    Q.   Okay.  And then with respect to paragraph 19, I'd like

23    to direct your attention to that, beginning approximately

24    seven lines from the bottom of the paragraph, the sentence,

25    "The Amaryan Defendants buying the VFC shares was -- " --

1    A.    Yes.

2    Q.    Is there something that should be inserted there?

3    A.    Yes.

4    Q.    And what is it?

5    A.    Towards the end of the -- that sentence, after VFC,

6    plural, you should insert before there, "year-over-year,"

7    hyphen, year hyphen over hyphen year, "positive fourth

8    quarter and four year results" is how it should read.

9    Q.    Okay.  Thank you.

10          Ms. O'Connor, I know it fluctuates on a daily

11    basis, but approximately how many publicly traded companies

12    are there on the U.S. exchanges?

13    A.    It's approximately 5,000.  Between 2012 and the

14    present, it's fluctuated between about 4,500 and 5,000.

15    Q.    Thank you.

16          Ms. O'Connor, we're going to pull up what is

17    Exhibit 2, and this was your original declaration in this

18    case, and I'm going to direct you to page 20, paragraph 50.

19          MR. DONNELLY:  Your Honor, may I approach with a

20    copy for the witness?

21          THE COURT:  Yes.

22    Q.    Ms. O'Connor, paragraph 50 contains a chart.  What

23    does that chart describe?

24    A.    It describes the oscillation and the hacks into the

25    newswire services and when the hackers were in the newswire

1    services for Marketwired and PR Newswire.  Businesswire is

2    not listed here.

3    Q.    So Newswire Service 1 is Marketwired, Newswire Service

4    2 is PRN?

5    A.    Correct.

6    Q.    And Newswire Service 3 is used in prior filings in

7    this case as Businesswire?

8    A.    Correct.

9    Q.    Okay.  With respect to the last line of that chart,

10    November 2013 to the present, under the Marketwired,

11    Newswire Service 1, it says "Change in Newswire Service 1's

12    computer system blocked access.  Continued attempts by

13    hackers to access the network."

14         Did the hacking stop in November 2013?

15    A.    No, it did not.

16    Q.    Okay.  What happened?

17    A.    Well, from the trading patterns that we see and from

18    information that we received from Marketwired --

19         MR. MOSCOW:  Objection.  Can we have the source?

20         THE COURT:  What's the basis for your objection?

21         MR. MOSCOW:  Could we have a source?

22         THE COURT:  You could ask that when you

23    cross-examine her.  It's his question.

24         Continue and answer the question.

25         THE WITNESS:  Okay.

CHARLES P. McGUIRE, C.C.R.

1    A.    As I was saying, from the information that we received

2    from Marketwired and also from the trading patterns, we know

3    that the hacking continued into February 2014.

4    Q.    Did there come a time based on your review of the

5    information during the investigation, did there come a time

6    where it appears that the hackers did lose access to the

7    newswire services?

8    A.    Yes.

9    Q.    When was that?

10   A.    Between February 2014 and approximately December 2014.

11   Q.    And then between December and January -- December

12   2014, January 2015, was there a hack at Businesswire?

13   A.    What we know about Businesswire is that there were

14   attempts to get into their system starting in around

15   September 2014.  The trading patterns indicate that there

16   was limited access by certain Defendants during December of

17   2014, and then we know from Businesswire that there was a

18   wholesale hack on January 20th, 2015.

19         MR. DONNELLY:  Your Honor, I'd like to turn our

20   attention to Exhibits 256 through 259, start with 256, and

21   if I may approach, I would propose handing one of each of

22   these to the witness.

23         THE COURT:  Yes, you may.

24   BY MR. DONNELLY:

25   Q.    Ms. O'Connor, let me direct you to 256.  What is that?

1    A.    This is an event listing for Copperstone, and what

2    this means is, these are the round-trip trades that were

3    made in different tickers for Copperstone.

4    Q.    Okay.  And the column on the far right that is shaded,

5    where it says "Source," what does that refer to?

6    A.    The source is the source of the press release, and it

7    is the different newswire services.  MW is Marketwired, PR

8    is PR Newswire, and BW is Businesswire.

9    Q.    Okay.  And so for the period 10/17/2012, which is the

10   first listing, through February 20th, 2014, which is the

11   140th listing, what is the source of the newswire releases

12   relating to those earnings events primarily?

13   A.    Primarily, Marketwired.

14   Q.    All but a few; correct?

15   A.    Correct.

16   Q.    Okay.  And then after the break of approximately 11

17   months, starting with 141 at January 20th, 2015 through the

18   end of the listing -- this is shaded in green on the hard

19   copy of 5/28/2015 -- what's the source?

20   A.    Businesswire.

21   Q.    And that appears to be true for all of them; right?

22   A.    Correct.

23   Q.    Let me direct you to 257.

24         Is this the same type of listing for the trading

25   of Ocean Prime?

CHARLES P. McGUIRE, C.C.R.

1    A.    Yes.

2    Q.    And in terms of the timing and the source, what do we

3    see here?

4    A.    Again, we see Ocean Prime trading in Marketwired

5    solely from -- the beginning, which they started in April --

6    on April 25th, 2013, to, again, 2/20/2014, the same time

7    Copperstone stopped.

8          Then for Businesswire, we see it starts on January

9    20th, and only in that event -- I mean, that business -- or

10   newswire service, excuse me, until March 3rd, 2015.

11   Q.    Okay.  How about Exhibit 258?

12   A.    Exhibit 258 is the same thing for Intertrade, the same

13   pattern is reflected in Intertrade.  Intertrade starts the

14   same time that Copperstone starts trading in Marketwired,

15   October 17th, 2012.  It continues in Marketwired primarily

16   until February 20th, 2014.  Then we see the same gap between

17   February 20th, 2014, and trading doesn't resume in any

18   Businesswire until -- excuse me, any newswire service until

19   January 20th, the same date, when they start in Businesswire

20   and continue in Businesswire until they stop trading.

21   Q.    And so how about we pull up 259?

22   A.    259 is an event listing for Nikolai Slepenkov and his

23   company, Escada.  It reflects the same pattern.  He begins

24   his trading in his entities on October 17th, 2012, same date

25   that Copperstone and Intertrade start.  He continues trading

1    only in Marketwired, with the noted exception, a couple

2    exceptions in February 2013, until, again, 2/20/2014, where

3    we see the same exact break between February and January

4    2015, and on January 20th, 2015, the same date as the other

5    three, he gets into Businesswire and trades only in front of

6    Businesswire announcements.

7    Q.    Okay.  Let's pull 256 back up again for a minute,

8    please.

9         And, Ms. O'Connor, if you put 256 back in front of

10   you, in preparing for your testimony today, did you have

11   occasion to look at what some of these companies listed

12   were, what lines of business they're in?

13   A.    Yes.

14   Q.    And what did you see?  Is this something where they're

15   all in a single industry or sector?

16   A.    No, absolutely not.  They're all over the map.  If you

17   look at just on this first page of 256, if you look at Align

18   Technology, that's a computer software company.  Edwards

19   Lifesciences is a medical device company.  Waste Connections

20   is a trash company.  There is a real estate investment

21   company called Apollo Commercial Real Estate.  There's

22   energy companies, there's a coffee company down here, Coffee

23   Holdings.  So they're all over the place.

24   Q.    Thank you.

25         MR. DONNELLY:  Your Honor, we're pulling up what's

CHARLES P. McGUIRE, C.C.R.

1    been premarked 274, if I may approach with a copy for the

2    witness.

3            THE COURT:   Yes.

4    Q.    Ms. O'Connor, what does Exhibit 274 reflect?

5    A.    Exhibit 274 is a depiction of the oscillation of the

6    Amaryan Defendants' trading, and what it depicts here is

7    that it's consistent with the hacking.  So what we see is

8    that between October 2012 and February 2014, the hackers

9    were in the Marketwired system.  The blue-shaded part is the

10   Marketwired trading that was done by the Amaryan Defendants.

11           The little blip here in February 2013 is trading

12   by the Amaryan Defendants in PR Newswire.  What we know

13   about that period is that there was a confirmed hack into

14   PR Newswire which had during this period heretofore been

15   blocking access.  They had a small window where they were

16   hacked, and they contained it on March 2nd, so they got in

17   during that period.

18           Here, it also depicts the period where all the

19   newswire services had blocked access by the hackers,

20   February 2014 through January 20th, 2015, and then we see

21   the Amaryan Defendants' trading in Businesswire occurs

22   during this period, and only Businesswire.

23   Q.    And, Ms. O'Connor, does this trading pattern overlap

24   with the trading patterns of other Defendants in this case?

25   A.    Yes, absolutely.  And almost all -- actually, all the

1    Defendants that we have charged in this case traded in that

2    little blip in PRN as well.

3    Q.    And let's ask about a couple of Defendant groups

4    specifically.

5          How about Bering Explorer Fund?

6    A.    Yes.

7    Q.    And how about the Dubovoy Group?

8    A.    Yes, they follow this pattern.  They get in earlier,

9    but they follow this pattern.

10   Q.    And how about in 2015, that 2015 January to May time

11   period of Businesswire trading?  Was the Dubovoy Group in

12   that, too?

13   A.    Yes, they are.

14   Q.    Ms. O'Connor, in your review of the records in this

15   case and those trading records, the event listing that we

16   just looked at in Exhibits 256 through 259, the phrase "in

17   the window" has been used in this case.  What does that

18   phrase mean to you?

19   A.    Okay.  What that means is the window is the time in

20   between submission of a press release to the newswire

21   service and submission is not public, so it goes in and it

22   sits within the systems of the newswire service while it is

23   edited or getting ready to be released at a prearranged

24   time, and the other side of the window is the distribution

25   to the public.

CHARLES P. McGUIRE, C.C.R.

1    Q.    Okay.  And so the issuer, the company, sends their

2    press release to the newswire service company, and that's

3    the start of the window, the upload period; is that right?

4    A.    Correct.

5    Q.    And then there's -- the window is the period until it

6    actually gets publicly disseminated.

7    A.    Correct.

8    Q.    The trades that we looked at on Exhibits 256 to 259,

9    were those all in-the-window trades?

10    A.    Yes, they are.

11    Q.    Did you give an estimate typically of how long --

12    well, you know what?  Let's look at some of the other

13    exhibits.

14    A.    Okay.

15          MR. DONNELLY:  Your Honor, I'd like to approach

16    with Exhibit 264, 266, 268, and 269.

17          THE COURT:  Okay.

18    Q.    Ms. O'Connor, I've just handed you Exhibits 264, 266,

19    268, and 269.  We're going to take them one at a time.

20          Am I correct that these examples were in both the

21    amended complaint and prior declarations you've filed in

22    this case?

23    A.    Yes.

24    Q.    Let's take 264.

25          What does this chart reflect?

1  A.    This chart reflects the in-the-window trading of

2  Defendants that were charged in our case in -- in and around

3  the submission -- in the window, excuse me, in between the

4  submission time and the distribution time of the Zumiez

5  press release.  This is a routine sales earning release for

6  October 2012.

7  Q.    And so does this show that the press release was

8  uploaded approximately just before 1:30 p.m. on October

9  31st, 2012?

10  A.    Yes.

11  Q.    And it was distributed publicly at approximately

12  4 p.m. that same day?

13  A.    Yes.

14  Q.    Okay.  And the first three entries on this chart are

15  Intertrade, Copperstone, and then Slepenkov; correct?

16  A.    Yes.

17  Q.    And to your knowledge, Mr. Slepenkov is an employee of

18  Copperstone?

19  A.    I know that now, yes.

20  Q.    Because Defendants have said that.

21  A.    Yes.

22  Q.    And then there are other Defendants who traded in it

23  after those trades were placed.

24  A.    Yes.

25  Q.    Let me ask you about 266.

1          Okay.  And 266 relates to a different security;

2    correct?

3    A.    Yes, Edwards Lifesciences.

4    Q.    And what was the upload time?

5    A.    The upload time was 11:39 p.m. on April 23rd, 2013.

6    Q.    And on page two of this exhibit, the publication time

7    was what?

8    A.    Actually, this should say -- excuse me.  This should

9    be corrected.  This should be 11:39 a.m.

10   Q.    Thank you.

11   A.    Sorry.

12          And then the distribution time is 4:01 p.m.

13   Q.    Okay.  So a window of approximately four hours and 20

14   minutes?

15   A.    Yes.

16   Q.    And all of the trades listed here are Defendants in

17   this case; correct?

18   A.    Correct.

19   Q.    All right.  And let me take you down to approximately

20   1:28.

21   A.    Yes.

22   Q.    So from the 1:28 p.m. entry, you have the Dubovoy

23   Group, then the Dubovoy Group again, then the Dubovoy Group

24   again, and again, and then Copperstone, Intertrade, and

25   Bering; is that correct?

1    A.    Correct.

2    Q.    All in the window.

3          And did all the Defendants go in the same

4    direction on this stock?

5    A.    Yes, they all sold short.

6    Q.    And that was true of 264 as well, right?  All the

7    Defendants -- and you can pull it back up if you want -- all

8    the Defendants went in the same direction?

9    A.    Yes, that's correct.

10          And I just want to correct my testimony.  In the

11    Edwards Lifesciences, there are certain people who bought

12    CFDs, but they bought CFDs in the same manner, making the

13    same type of bet.

14    Q.    Understood.  CFD being --

15    A.    Contract for differences.

16    Q.    Thank you.

17          Let's look at 268.

18          Here, this is for VMware, correct?

19    A.    Right, this is the in-the-window trading for VMware in

20    this case.

21    Q.    And approximately how long is the window?

22    A.    The window begins at 12:09 p.m. on July 23rd, 2013,

23    and it stops at four o'clock, so it's four hours.

24    Q.    And after Mr. Makarov, the second entry is Slepenkov;

25    correct?

1    A.    Yes.

2    Q.    And then Copperstone?

3    A.    Yes.

4    Q.    Then Ocean Prime?

5    A.    Yes.

6    Q.    Then Bering?

7    A.    Yes.

8    Q.    And then further down, we see Intertrade at 2:25?

9    A.    Yes.

10   Q.    And Bering again at 2:48?

11   A.    Yes.

12   Q.    And then we see the Dubovoy Group and some others.

13   A.    Yes.

14   Q.    And again, everybody went the same direction,

15   everybody profited.

16   A.    That's correct.

17   Q.    Let me ask you about 269.

18         And this is for TIBCO Software; correct?

19   A.    Yes, this is the in-the-window trading in this case on

20   TIBCO Software on September 19th, 2013.

21   Q.    And the window opens when?

22   A.    The submission time is 1:47 p.m., and the distribution

23   time is 4:05 p.m., so it's approximately -- that's two

24   hours, a little bit more than two hours.

25   Q.    Okay.  And then here, based on the entries, again,

CHARLES P. McGUIRE, C.C.R.

1    they're all Defendants; correct?

2    A.    Correct.

3    Q.    And the Dubovoy group is in first at 2:35, and then a

4    little further down, you see Jaspen at 3:15 in the second

5    one?

6    A.    Correct.

7    Q.    And then at 3:17, it's Slepenkov; 3:18, Ocean Prime;

8    3:19, Bering; am I right so far?

9    A.    Yes, you are.

10   Q.    And then a little further down at 3:24 is Intertrade,

11   then Jaspen again at 3:31 as well as some Dubovoy trades,

12   and then at 3:37, we see Copperstone?

13   A.    That's correct.

14   Q.    And then we see some more Dubovoy trading.

15   A.    Yes.

16   Q.    And again, all the Defendants went the same direction,

17   all of them made a lot of money.

18   A.    Yes, that's correct.

19   Q.    Let me ask you about --

20           MR. DONNELLY:  Can I have 253 and 254, please?

21           Your Honor, may I approach with Exhibits 253 and

22   254?

23           THE COURT:  Sure.  253 and 254?

24           MR. DONNELLY:  Yes, Your Honor, 253 and 254.

25   Q.    And, Ms. O'Connor, what is Exhibit 253?

1    A.    253 is the earnings announcement issued by Marketwired

2    on May 1st, 2013 for Brocade, announcing preliminary fiscal

3    Q2 2013 results.

4    Q.    That's the press release.

5    A.    That's correct.

6    Q.    And then what's 254?

7    A.    254 is an article commenting on the press release

8    that's dated May 2nd, 2013 by an outfit called Storage Soup,

9    and it's entitled "Brocade says its FC SAN sales

10   disappointed last quarter."

11   Q.    Ms. O'Connor, am I correct that sometimes, when

12   companies -- frequently when companies report earnings, the

13   market is informed in advance the day that those earnings

14   will be released?

15   A.    Yes, that's correct.  Brocade, in fact, the quarter

16   before did announce that it was going to have earnings calls

17   on a certain date, and that's typical of companies.

18   Q.    Was the May 1 press release, Exhibit 253, was that

19   preannounced?

20   A.    No, it was not.

21         MR. DONNELLY:  And let's pull up Exhibit 265.

22         Your Honor, may I approach?

23         THE COURT:  Yes.

24   Q.    And again, Ms. O'Connor, this is an example from the

25   amended complaint and from prior declarations.

1          What is Exhibit 265?

2    A.    Exhibit 265 is the in-the-window trading by Defendants

3    in the Brocade -- in front of this Brocade announcement that

4    is in Exhibit 253.

5    Q.    Okay.  And what was the upload time?

6    A.    The upload time in this case was late.  It was at

7    3:29 p.m.

8    Q.    Okay, and when was the press release issued publicly?

9    A.    At 4:05 p.m. on the same date.

10   Q.    Okay.  So a window of about a half hour.

11   A.    Correct.

12   Q.    And the first Defendant trade is at 3:39; correct?

13   A.    Yes.

14   Q.    And then the last one that is on this chart is at

15   3:47.

16   A.    Yes.

17   Q.    So in a window of less than 10 minutes --

18   A.    Yes.

19   Q.    -- it's Makarov, Exante, Guibor, Omega, and then at

20   3:45, we see Copperstone; correct?

21   A.    Yes.

22   Q.    Then 3:46, Slepenkov?

23   A.    Yes.

24   Q.    3:46, Bering?

25   A.    Yes.

1    Q.    And 3:47, Ocean Prime?

2    A.    Correct.  And 3:49, Jaspen, just to complete the

3    picture.

4    Q.    I'm sorry, I missed that one on the way down.

5          Again, all the same direction, all profited?

6    A.    Yes.

7          MR. DONNELLY:  Your Honor, I have no further

8    questions at this time.

9          THE COURT:  Thank you, Mr. Donnelly.

10         Any cross?

11         MR. MOSCOW:  Can I have a moment, Your Honor?

12         THE COURT:  Sure.

13         MR. MOSCOW:  Thank you.

14         Excuse me.

15       (Pause)

16         THE COURT:  Are you ready to continue?

17         MR. MOSCOW:  Yes, Your Honor.

18         THE COURT:  All right.  Your witness.

19                   CROSS-EXAMINATION

20    BY MR. MOSCOW:

21    Q.    Good morning.

22    A.    Good morning.

23    Q.    My name is John Moscow.  If I ask any questions you

24    don't understand, please let me know.

25    A.    I will.

CHARLES P. McGUIRE, C.C.R.

1    Q.    It's been known to happen.

2          Directing your attention to the amended complaint

3    that was filed, what trades does it detail for 2015?

4    A.    I don't have it in front of me, sir.  It would be

5    helpful if I had it in front of me.  But it doesn't -- it

6    does not detail any trades in 2015.

7    Q.    I direct your attention to the request for the

8    temporary restraining order.  Was that based on the initial

9    -- on the amended complaint as to Copperstone?

10          THE COURT:  If you're going to ask a witness about

11    a document, it would be helpful to give her the document.

12          MR. MOSCOW:  Might I approach?

13          THE COURT:  Yes.  And first, identify what you're

14    showing her so we all know.

15          MR. MOSCOW:  Sure.  I'm showing her a copy of a

16    Pacer-filed documents 28 in this case, the amended complaint

17    for violation of Federal securities laws in U.S. v. Arkadiy

18    Dubovoy, et al.

19          THE COURT:  Okay.  This is document number 1, I

20    take it, correct?  Is that document number 1?

21          MR. MOSCOW:  I guess, yes.  It is the Defendants'

22    first exhibit.

23          THE COURT:  Okay.  So you reference it by a docket

24    number, a Pacer number.  What number is it on Pacer?  In

25    other words, we need to have a clean record so I know what

1    document you're showing the witness.

2              MR. MOSCOW:  My apologies.

3              THE COURT:  Do you have a copy for the Court and

4    for your adversary?

5              MR. MOSCOW:  It is document 28.

6              THE COURT:  Okay.

7              MR. MOSCOW:  We will get one to you and to my

8    adversaries.

9              If I might approach.

10             THE COURT:  Yes.  Give it directly to Amy.  Thank

11   you.

12             Thank you.

13             (Defendants' Exhibit 1 marked for identification)

14   BY MR. MOSCOW:

15   Q.    Ms. O'Connor, is the request for a temporary

16   restraining order based on that amended complaint?

17   A.    Yes.

18   Q.    Is there any discussion in there phrased in 2015?  I'm

19   sorry, is there any identification of any trades in 2015?

20   A.    There is no charts of trades in 2015.

21   Q.    Is there any listing of charts -- of trades in 2015?

22             MR. DONNELLY:  Sorry.  Your Honor, are we talking

23   about the amended complaint at this time?

24             MR. MOSCOW:  Yes.

25             THE COURT:  Well, I think he's referring to -- he

1    gave me D-1, which is docket number 28, which reads as

2    amended complaint for violation of the Federal securities

3    laws.  It's the complaint, and it's dated August 23rd of

4    2015.

5           MR. DONNELLY:  Thank you, Your Honor.

6           THE COURT:  Continue.

7    A.    If you just give me a minute, I want to look at

8    something.  Excuse me.

9           In paragraph 10 of the amended complaint, we make

10   a reference to continuing trading in front of press releases

11   in the third newswire, and that is a reference to trades in

12   front of Businesswire announcements.

13   Q.    And if you are a Defendant accused of this, which

14   trades does it refer you to so that you can rebut them?

15           It doesn't, does it?

16   A.    Trades in Businesswire.

17   Q.    It doesn't even say that, does it?

18   A.    It says Newswire 3, you're correct.

19   Q.    So directing your attention to the Exhibit 274 that

20   you testified about, --

21   A.    Yes.

22   Q.    -- did -- and let me step back.

23           I am speaking now about David Amaryan and the

24   companies associated with him.

25   A.    Yes.

CHARLES P. McGUIRE, C.C.R.

1    Q.    Did they conduct trades other than for companies whose

2    earnings were announced by Marketwired?

3    A.    Yes.

4    Q.    Did they conduct trades for companies other than those

5    done by Businesswire in the period that you have

6    Businesswire up?

7    A.    I believe so, but I have -- I looked at Businesswire

8    trading.

9    Q.    So you didn't look at the volume of their trading.

10   A.    I did look at the volume of their trading.

11   Q.    Okay.  Did they trade any companies whose earnings

12   were not announced on Businesswire?

13   A.    They did not trade in any round-trip trades in any

14   companies other than in Businesswire.

15   Q.    My question was, did they trade in any companies whose

16   results were not announced on Businesswire?

17   A.    Yes.

18   Q.    And was that a majority of their trades?

19   A.    No.

20   Q.    No?

21   A.    I don't believe so.

22   Q.    You believe that a majority of their -- of their total

23   trading, I'm talking about all trades, not the ones you've

24   selected, but all trades, in connection with all the trading

25   by Copperstone and the other companies in the period from

CHARLES P. McGUIRE, C.C.R.

1    January of 2015 through May of '15, are you saying that a

2    majority of them were companies whose results were announced

3    in Businesswire?

4    A.    Mr. Moscow, I don't -- there may be some trading that

5    I have not seen in these companies because some of the trade

6    is not on U.S. stock exchange, and there are -- and there

7    may be other companies that Mr. Amaryan owns.

8    Q.    How many thousands of trades were made in the period

9    January to May 2015?

10   A.    I do not know.

11   Q.    Did you look?

12   A.    Yes.

13   Q.    And did you check -- as to each of them, did you check

14   to see who announced the earnings for the company?

15   A.    Yes.

16   Q.    And you're saying the majority of the ones you found

17   were in Businesswire; yes or no.

18   A.    I told you what I don't know is all of the trades that

19   were made by the Amaryan companies, so I cannot tell you

20   that.  I cannot answer that question for all his companies.

21   Q.    How about for the ones that you sued?

22   A.    We haven't sued anybody in Businesswire yet.  We're

23   still collecting that data.

24   Q.    Okay.  Who hacked Businesswire?

25   A.    I don't know.

CHARLES P. McGUIRE, C.C.R.

1    Q.    As to the hackers alleged in the complaint, which is

2    document 28, Exhibit 1, Mr. Amaryan states that he has never

3    been in touch with them; is that correct?

4    A.    I don't know the answer to that question.

5    Q.    Mr. Amaryan states that he has never been in touch

6    with them; is that correct?

7    A.    I do not know the answer to that question.

8    Q.    Did you read his declaration?

9    A.    I did.

10         THE COURT:  Mr. Moscow, I don't think it's

11   productive to cross-examine the witness with what someone

12   else who is not here has testified in an affidavit.  It's a

13   waste of -- if you want to use your time that way, it's a

14   waste.

15         MR. MOSCOW:  I want to persuade you, Your Honor.

16         THE COURT:  Okay.  It's not working.  On that

17   point.

18   BY MR. MOSCOW:

19   Q.    Did you find any electronic -- any communications

20   between the hackers whom you did identify and David Amaryan?

21   A.    Not in the information to date.

22   Q.    Did you find any payments by David Amaryan or the

23   companies that you have sued to the hackers?

24   A.    Not in the information to date.

25   Q.    Did you -- you're asking for a preliminary injunction

1    at this stage, and you're saying you do not have connection

2    between the hackers' information to him or the money from

3    him to them; correct?

4    A.    No, I'm not saying that.

5    Q.    Okay.  Do you have a connection between the hackers --

6    withdrawn.

7          Do you have electronic communication between the

8    hackers and David Amaryan?

9    A.    I already answered that question no.

10   Q.    Directing your attention to the other Defendants in

11   this case, did you find any connection between David Amaryan

12   and a Mr. Zakharchenko?

13   A.    Zakharchenko?

14   Q.    Zakharchenko.

15   A.    Yes.

16   Q.    Did you find any connection between David Amaryan and

17   Bering?

18   A.    Yes.

19   Q.    Did you find any connection since 2009, when he set up

20   his firm?

21   A.    It would be helpful if I had the documents in front of

22   me that were attached to my declaration number four for the

23   time periods.

24          MR. MOSCOW:  I would ask the Government to produce

25   them.  This is your witness.  It's her exhibits.

1          THE COURT:  It's your cross-examination.  It's

2     your cross-examination.  You don't order the other side to

3     produce exhibits.  You can cross-examine her based on the

4     scope of the direct testimony.  And I've given you leeway to

5     go way beyond the scope of the direct because I think that's

6     fair, but they're not producing the documents.

7          MR. MOSCOW:  Okay.  Give me a moment, Your Honor.

8     And I'm sorry I did not --

9     Q.    Which exhibits are you looking for?  To the fourth?

10    A.    The exhibits to my fourth declaration.

11    Q.    Okay.  And that would be Exhibits 161 through 181.

12    A.    Yes.  That's correct.

13         MR. MOSCOW:  Your Honor, I do not have a set for

14    counsel or for the Court.

15         THE COURT:  So what documents are you referring to

16    now?

17         MR. MOSCOW:  These are Exhibits 161 to 181 that

18    are filed with the Court as exhibits, document 84-4 and

19    Exhibits 161 to 181.

20         THE COURT:  What is Exhibit 84-4?

21         MR. MOSCOW:  I believe it is the declaration --

22    I'm sorry.  84-4 is Exhibit 161.  The declaration appears to

23    be 86.

24         THE COURT:  Declaration of whom?

25         MR. MOSCOW:  The fourth declaration of Lynn

CHARLES P. McGUIRE, C.C.R.

1     O'Connor.

2               THE COURT:  Okay.  So do I understand that you

3     want to show her documents attached to her --

4               MR. MOSCOW:  Yes.

5               THE COURT:  In the future, it would be helpful if

6     you give the Court extra copies.

7               MR. MOSCOW:  I apologize.

8               THE COURT:  Okay.

9               MR. MOSCOW:  They are on file.  I just didn't know

10    that we would need them.

11              THE COURT:  Your Honor, there are copies in the

12    binder that we provided, beginning --

13              THE COURT:  What number?

14              MR. DONNELLY:  The declaration is at 229.

15              THE COURT:  Thank you.

16              MR. DONNELLY:  And the exhibits follow therefrom.

17              THE COURT:  Okay.  You can proceed.

18              MR. MOSCOW:  Might I approach?

19              THE COURT:  Yes.

20          (Documents were placed before the witness.)

21              THE WITNESS:  Thank you.

22              MR. MOSCOW:  You're welcome.

23              MR. DONNELLY:  Your Honor, if I may, I'm not sure

24    exactly what was handed up.  I know counsel represented it's

25    the attachments.  Was the declaration included in that

1          packet?

2                    THE WITNESS:  No.

3                    MR. DONNELLY:  If it would be helpful, we have a

4          copy of the declaration we can give to the witness, too, so

5          it's complete.

6                    THE COURT:  The fourth declaration?

7                    MR. DONNELLY:  Yes, Your Honor.

8                    THE COURT:  Let's hear what question is.

9                    Do you have an extra copy to give her?

10                   MR. DONNELLY:  Yes.

11                   THE COURT:  If you have a copy of the declaration,

12         give it up to the witness, because the exhibits are attached

13         to her declaration.

14                   And this is 229?

15                   MR. DONNELLY:  It's 229.

16                   Ms. O'Connor, you may have that from --

17                   THE WITNESS:  Oh, 229?

18                   MR. DONNELLY:  If I may approach?

19                   THE WITNESS:  Oh, yes, I found it.  I have it.

20                   THE COURT:  She has it.  That's fine.

21                   THE WITNESS:  Thank you.

22                   And, I'm sorry, could we have the question again?

23                   MR. MOSCOW:  No, I'd ask --

24                   THE COURT:  His name is Chuck.

25                   MR. MOSCOW:  Chuck.  Thank you.

 1              (Record read)

 2                   THE WITNESS:  Thank you.

 3      A.    Not in the documents I have attached, no.

 4      Q.    Thank you.

 5                   What evidence, if any, do you have that there was

 6      a connection between David Amaryan and Bering or

 7      Zakharchenko since January 1st, 2009?

 8      A.    I just know that they were former partners.

 9      Q.    Is that former partners, or former employees at a

10      investment bank?

11      A.    Again, you took my documents away.  Let me just look

12      at my declaration.

13                   Okay.  Zakharchenko was a director of -- again,

14      this is making me have to guess without my documents in

15      front of me.  Hold on.

16                   MR. DONNELLY:  Your Honor, could the witness

17      have --

18                   THE WITNESS:  Oh, here we go.  I can read it from

19      my -- Amaryan and Defendant Zakharchenko served as

20      investment advisors for Bering Capital.

21      Q.    Was Bering Capital funded during the time prior to

22      2009?

23      A.    Well, I know that they signed on behalf of Bering

24      Capital an investment advisory agreement on behalf of

25      Dizuchi Capital Partners.

                      CHARLES P. McGUIRE, C.C.R.

1    Q.    Was Bering Capital funded, ever, prior to 2009?

2    A.    I don't know.

3    Q.    And if you heard that there was an investment banker

4    who did not go forward with the deal, would that create the

5    possibility he might not remember?

6          MR. DONNELLY:  Objection.

7    A.    I can't speculate.

8          MR. DONNELLY:  Asking the witness to speculate.

9    Q.    Oh.  Okay.

10          During the period October 2012 through February

11   2014, did the Amaryan Defendants trade in any stocks other

12   than those whose results were announced on Marketwired?

13   A.    I think you already asked me that and I said yes.

14   Q.    No, I said it with Businesswire.

15   A.    I thought you asked me about Marketwired again.

16          Yes.

17   Q.    They did?

18   A.    I believe so, yes.

19   Q.    How many thousands of trades did they make, if you

20   know?

21   A.    I do not know.

22   Q.    Did you look at all of them?

23   A.    My answer remains the same:  I am not aware that we

24   know of all Mr. Amaryan's companies and his trading at

25   companies, so I cannot state affirmatively that we looked at

CHARLES P. McGUIRE, C.C.R.

1    all his trades.

2    Q.    As to the Amaryan companies that you sued, did you

3    look at all the trades?

4    A.    Yes.

5    Q.    Did you check to see which company issued news

6    releases for each of the trades?

7    A.    Yes.

8    Q.    And how many of those were at Marketwired?

9    A.    I do not have those numbers in front of me.

10   Q.    But to the --

11   A.    Actually, I do.  If you look at -- if you look at the

12   exhibits that we entered, those are all the events that are

13   round-trip trades in front of Marketwired.

14   Q.    Okay.  Now, how many trades did Copperstone make?

15   A.    I do not know.

16   Q.    Is it fair to say that you --

17   A.    Or I do not -- I do not know sitting here in this

18   seat.

19   Q.    Is it fair to say that you had the time for eight of

20   those trades?

21   A.    Eight of what trades?

22   Q.    Of the trades made by Copperstone.

23   A.    Eight total?

24   Q.    Yes.

25   A.    Yes, we have some -- we have received some limited

1    trade times for Copperstone.

2    Q.    And did you assume that all of these tickets -- all of

3    the Copperstone trades were in the window because you did

4    not have the time?

5    A.    No.

6    Q.    Did you assume that all of them were in the window

7    when you did not have the time?

8    A.    No.

9    Q.    Okay.

10            What actions did David Amaryan take that you

11    assert in the complaint in terms of obtaining information

12    from hackers?

13    A.    What actions did he take?

14    Q.    Yes.

15    A.    That I assert in the complaint?

16    Q.    Yes.

17    A.    We assert that there is a strong evidence of parallel

18    trading and oscillating between the newswire services that

19    is -- that is the same as with the other Defendants who had

20    contact with the hackers.

21    Q.    That would be consistent with his following other

22    traders, would it not?

23    A.    It could be.

24    Q.    What actions did David Amaryan take, if any, to

25    establish contact with the hackers or to -- do you allege

CHARLES P. McGUIRE, C.C.R.

1    any?  Let's start with that.

2                THE COURT:  What's the question?

3    A.    I'm sorry.

4                THE COURT:  Whoa, whoa, whoa.

5                What's the question?  Rephrase the whole question.

6                MR. MOSCOW:  Yes, Your Honor.

7    Q.    Do you allege that David Amaryan took any steps to

8    gather any evidence from hackers?

9                THE COURT:  And before you answer the question, I

10   just want to be clear:  She is not a representative of the

11   S.E.C.  She's a lawyer from the S.E.C. who prepared some

12   certifications about data.  So she does not speak for the

13   S.E.C. as far as I know.

14               You can ask her her personal knowledge, and you

15   can I guess ask her what she knows about the complaint; but

16   when you say "allege," that's a loaded question, because the

17   complaint speaks for itself.

18               MR. MOSCOW:  Fair enough.

19               THE COURT:  So you need to ask her what the

20   complaint alleges.

21               She's not alleging anything in this case.  She's a

22   lawyer who works for a government agency.  So you can ask

23   her that she knows.

24               And I would recommend that limiting your

25   cross-examination to her personal knowledge would be most

1     effective and helpful to me.

2                MR. DONNELLY:  Yes, Your Honor.  Thank you.

3                MR. MOSCOW:  Let me rephrase.

4     Q.    And bear in mind that if I misspeak in a question, the

5     first thing is what does the complaint allege, and the

6     second is, what else have you learned in the way of facts.

7     Okay?

8                So does the complaint allege that David Amaryan

9     was in touch with the hackers?

10    A.    The complaint will speak for itself.

11    Q.    Do you have any information based on the investigation

12    that's been conducted putting David Amaryan in connection

13    with the hackers?

14    A.    We have very strong circumstantial evidence that

15    indicates that he had the same information as the people who

16    did have direct contact with the hackers.

17    Q.    Are you saying that you do not have him speaking to

18    the hackers?

19    A.    Not at this point.

20    Q.    Have you looked at his e-mails from 2007 on?

21    A.    We have very limited access to his e-mails.

22    Q.    Did you obtain his e-mails?

23    A.    We obtained certain of his e-mails but not all of

24    them.  Certainly he has many other e-mail addresses that we

25    do not have access to.

1    Q.    Based on the e-mails -- withdrawn.

2          Did you get -- did you cite in the -- does the

3    complaint cite to a dropbox?

4    A.    Yes.

5    Q.    And that's at G-mail; correct?

6    A.    Correct.

7    Q.    Was that dropbox used?

8    A.    I do not know.

9    Q.    Did you obtain any e-mails from that dropbox?

10   A.    No.  We were in a covert state.

11   Q.    Did you call for them?

12   A.    No.  We were in a covert -- we were -- as part of a

13   covert investigation.

14   Q.    You obtained documents from e-mails by subpoena;

15   correct?

16   A.    No.

17   Q.    How did you obtain the e-mails?

18         MR. DONNELLY:  Objection, Your Honor.  Now we're

19   starting to get into investigative privilege.

20         THE COURT:  First of all -- yes.  Let me just

21   remind everyone.  Each side has already used a half an hour.

22   You are limited to an hour and a half.  This exercise is not

23   going to turn into trying to get discovery from this witness

24   or insight into the investigation which may involve work

25   product and privileged information.  It's to glean facts and

1    to elucidate facts for me as to why there should or should

2    not be a preliminary injunction over frozen assets of

3    Mr. Amaryan.

4              So I'm going to shut down this line of testimony.

5    It is not helpful to me.

6              If you want to use your -- you have an hour left

7    so use it wisely, and that includes your direct examination

8    of the witnesses that are appearing by videoconference.

9    Q.    Directing your attention to paragraph 33 of the

10   complaint --

11   A.    I went to page 33.  Sorry.

12             MR. MOSCOW:  It's page 14, Your Honor.

13   A.    I see it.

14   Q.    Look at paragraph 33, nine letters down -- eight

15   letters -- eight lines from the bottom.

16   A.    On page 14 or on page 13, because it -- on my amended

17   complaint, it goes on two pages.

18   Q.    The -- I'm sorry.  I'm referring to that portion of

19   paragraph 33 on page 14.

20   A.    Okay.

21   Q.    Do you see that?

22   A.    Yes.

23   Q.    Ms. O'Connor, does it list "the trades based on stolen

24   press releases were made on Ocean Prime and Intertrade

25   accounts, resulting in millions of dollars in ill-gotten

1     gains"?  Do you see that?

2     A.     Yes, I do.

3     Q.     Where are the assertions that stolen press releases

4     got to Ocean Prime or Intertrade?

5          MR. DONNELLY:  Objection, Your Honor.

6          THE COURT:  I'm going to strike the question.

7          Rephrase it.  It doesn't make sense.  I'm not

8     going to let you go through this complaint and ask her by

9     omission what's missing.  And we have a 62-page complaint.

10    I'm not going to allow you to ask this witness, where is

11    this allegation, where is that allegation.  This is a

12    document crafted by a government agency with a strategy and

13    their own professional judgment about what needs to be

14    included.  She is an employee, again, at the agency.  This

15    is not a verified complaint signed by an individual who has

16    an individual claim against somebody else; this is a

17    government agency.

18          It's a silly line of questioning.  I'm going to

19    shut it down.

20          And we have an hour left, so again, I'm going to

21    urge you to use your time wisely.

22          MR. MOSCOW:  Okay.

23    BY MR. MOSCOW:

24    Q.     Who are the foreign traders?

25    A.     Who are the foreign traders?

CHARLES P. McGUIRE, C.C.R.

1    Q.    In the complaint, the phrase is used, "foreign

2    traders."

3    A.    Okay.  Let's see.  We have -- I'm looking on the front

4    page.  We have Roman Lavlinskiy, we have Oleksandr Makarov,

5    we have Nikolai Slepenkov, we have Andriv Supranonok, we

6    have Maxim Zakharchenko, we have Bering Explorer Fund, we

7    have Concorde Bermuda Ltd., we have Escada Logistics Ltd.,

8    Exante Ltd., Global Hedge Capital Group, Guibor S.A.,

9    Intertrade Pacific S.A., Memelland Investments Ltd., Jaspen

10   Capital Partners Limited, Ocean Prime Inc., Omega 26

11   Investments Ltd., Copperstone Alpha Fund.

12   Q.    As to any of the Amaryan Defendants, do you have any

13   payments by them to hackers?  Alleged in the complaint

14   first, and known to you second.

15   A.    Again, I can't speak to the -- necessarily to the

16   allegations in the complaint.  It's not mine.  But I don't

17   have evidence -- excuse me -- not to my knowledge at this

18   point.

19           MR. DONNELLY:  Your Honor, if I may, we may get to

20   the same spot just by asking the witness, who is a fact

21   witness, if she is aware.

22           THE WITNESS:  Yes.

23           THE COURT:  Thank you.

24           MR. MOSCOW:  Thank you, counsel.

25   Q.    Do you have any -- you allege that there's a

1      connection between David Amaryan and Alfred Victor Brewster.

2              THE COURT:  I'm going to ask again.  I'm going to

3      have to stop you on, "do you allege."  For the third time,

4      she is a government lawyer.  She works for a government

5      agency.  She's not making any personal allegations.  Ask her

6      what she has knowledge about.  That would be most helpful

7      for me.  It's an inappropriate form of a question to ask a

8      government lawyer what she alleges.

9      BY MR. MOSCOW:

10     Q.     Did the Defendant communicate -- David Amaryan

11     communicate directly with Alfred Victor Brewster, according

12     to the information that you have gathered?

13     A.     I don't know.

14     Q.     Was Mr. Brewster's occupation that of nominal director

15     or owner -- nominee?

16     A.     He's listed as the owner of Ocean Prime Inc., which is

17     an Amaryan entity.

18     Q.     And was Mr. Brewster's occupation that of a nominee?

19     A.     I don't know what Mr. Brewster's occupation is.  I

20     just know he's listed as an owner of Ocean Prime.

21     Q.     Now, in the --

22              MR. MOSCOW:  Bear with me for a second, Your

23     Honor.

24     Q.     You said that there was in January -- on January 20th,

25     you said that there was a wholesale hack of a wire,

1    Businesswire.

2    A.    Yes.

3    Q.    Did that hack reveal the information that occurred

4    thereafter?

5    A.    I don't understand the question.

6    Q.    You said that there was a wholesale hack.  What would

7    be -- what was obtained in that hack, if you know?

8    A.    The information that I have is that a back door was

9    installed -- it's back-door malware which opened up

10    Businesswire's system to hackers.  That's the information I

11    have.

12    Q.    So that was an ongoing hack.

13            THE COURT:  Are you talking about in the January

14    2015 time frame?

15            MR. MOSCOW:  Yes.

16    A.    That's my understanding, back door opened.

17    Q.    And do you know of any connection between David

18    Amaryan and the hackers for that?

19    A.    The information that I have is that David Amaryan and

20    his entities started trading, again, the same exact day as

21    that hack occurred.

22    Q.    Okay.  And the answer is that you do not have any

23    connection other than that, no electronic connections

24    whatever?

25    A.    That's the connection I have, yes.

1    Q.    And you did not tell us about that in the --

2    withdrawn.

3              The data on Exhibit 256 that is in green, was that

4    data included in the events that the Commission gave to

5    Defendants in preparation for the motion in opposition to

6    the request for a permanent -- or a preliminary injunction?

7              MR. DONNELLY:  Your Honor, I'm going to object.

8    The witness can answer again to the extent that she knows.

9    A.    I don't know.

10             MR. MOSCOW:  Bear with me for a moment?

11        (Off the record discussion between defense counsel)

12             MR. MOSCOW:  No further questions of this witness,

13   Your Honor.

14             THE COURT:  Any redirect?

15             MR. DONNELLY:  Yes, Your Honor, very brief.

16                     REDIRECT EXAMINATION

17   BY MR. DONNELLY:

18   Q.    Ms. O'Connor, has there been any discovery from the

19   Amaryan Defendants in this case thus far?

20   A.    No.

21   Q.    With respect to a question, there may have been some

22   confusion, there was a question about trade times for

23   Copperstone Capital.

24   A.    Right.

25   Q.    And we know from the amended complaint that there are

CHARLES P. McGUIRE, C.C.R.

1  trade times for certain of the Copperstone Capital trades;

2  correct?

3  A.     Correct.

4  Q.     Okay.  I believe you testified earlier that there were

5  trade times for the other Copperstone trading.  I think that

6  may have been a misstatement, right?  Is it fair to say that

7  the S.E.C. has not obtained trade times for all of the

8  Copperstone --

9  A.     Yes, that was what I said --

10       MR. MOSCOW:  Objection.

11  A.     -- I thought I said.  If I didn't say that, that's

12  what I meant.

13  Q.     I'm sorry, you meant to say that --

14       THE COURT:  No, no, don't ask her what she meant

15  to say.

16       MR. DONNELLY:  Sure.

17  A.     My understanding is that we have -- we recently found

18  out about the Copperstone trading.  We have been requesting

19  documents from Credit Suisse.  We have been receiving -- we

20  have received some of the trade times and not all of the

21  trade times for the Copperstone trading.

22       MR. DONNELLY:  Thank you.

23  A.     That's my understanding.

24       MR. DONNELLY:  Nothing further, Your Honor.

25       THE COURT:  You're excused.  Thank you.

CHARLES P. McGUIRE, C.C.R.

1                    THE WITNESS:  Thank you.

2                    THE COURT:  Do you have any redirect -- recross?

3                    MR. MOSCOW:  I don't think so, Your Honor.

4                    THE COURT:  Okay.

5              (Witness excused)

6                    THE COURT:  Next witness.

7                    MR. DONNELLY:  Your Honor, we're setting up the

8         cable.

9                    We call Dr. Eugene Canjels.

10                   THE COURT:  Okay.

11                   THE COURT CLERK:  Sir, if you would raise your

12        right hand, place your left hand on the bible, please.

13        E U G E N E   C A N J E L S, called as a witness on behalf

14        of the Plaintiff, and having been duly sworn, testified as

15        follows:

16                   THE COURT CLERK:  Please state your full name for

17        the record and spell it, please.

18                   THE WITNESS:  Eugene Canjels, E-u-g-e-n-e,

19        C-a-n-j-e-l-s.

20                   MR. DONNELLY:  Your Honor, if I may approach, I

21        have a set of exhibits, and I will give Your Honor the

22        number that I intend to use.  They are 255, 193, 194, 195,

23        198, 196, 197, 275, 202, 212, 222, 207, 217, and 227.  I may

24        not use them all, but thought it best to deliver them in one

25        packet.

1          MR. POWERS:  If we could be given a copy.

2      (Off the record discussion)

3          MR. DONNELLY:  They have copies of the set.

4          THE COURT:  Okay.  Thank you.

5                  DIRECT EXAMINATION

6   BY MR. DONNELLY:

7   Q.    Mr. Canjels, let me direct you to Exhibit 255.

8   A.    Okay.

9   Q.    What is this?

10  A.    This is my CV.

11  Q.    And I'm not going to go through it, but does it

12  accurately set forth your experience and work history?

13  A.    It does.

14  Q.    Okay.  What's econometrics?

15  A.    Econometrics is the statistics for economists.

16  Q.    And currently, you work for the Securities and

17  Exchange Commission; correct?

18  A.    That's right.

19  Q.    And what's your position?

20  A.    I'm a supervisory financial economist in the Division

21  of Economic and Risk Analysis.

22  Q.    Okay, and how long have you worked for the Commission?

23  A.    I started in April 2010.

24  Q.    And in that position, generally, what are your duties?

25  A.    My main duties are to perform statistical economic and

1    statistical and financial analysis to assist the Commission

2    in its investigations.

3    Q.    And prior to today, you've never testified in court;

4    correct?

5    A.    That's correct.

6    Q.    And have you ever been deposed?

7    A.    I have never been deposed.

8    Q.    You did -- however, a declaration of yours was

9    submitted in one case in lieu of direct testimony?

10    A.    That's right.

11    Q.    Mr. Canjels, let's look at Exhibit 193.

12         MR. POWERS:  Objection, Your Honor.  There's 255.

13    I don't know if he's going to move it in or not.  We have

14    not been provided with an advance copy, and I don't know

15    whether he's being submitted here today as an expert

16    witness.

17         THE COURT:  Mr. Donnelly?

18         MR. DONNELLY:  Your Honor, we've provided them a

19    report.  Mr. Canjels is an expert, particularly in the area

20    of statistics and economics.  A good chunk of the report,

21    which was filed at docket 84-1 on September 24th, 2015, you

22    know, is math, and there is some statistical information in

23    there as well.  That was publicly docketed.

24         The CV is for, you know, ease of reference instead

25    of going through and wasting time on all of his --

1            THE COURT:  Well, let me stop you for a minute.

2            I don't think there's a need, given the brevity --

3    first of all, both sides have submitted expert reports,

4    expert declarations.

5            MR. POWERS:  The difference is, Your Honor, is

6    that we gave them the CV with the qualifications and all the

7    information, and we're just receiving this for the first

8    time right now.

9            THE COURT:  Okay.

10           MR. POWERS:  And that should have been attached to

11    his declaration.

12           THE COURT:  Your objection's overruled.

13           As I said, I would have been completely within my

14    discretion not to have this hearing today.  I did it as an

15    accommodation to you.  You requested it.  You wanted your

16    folks to testify from Russia.  I allowed it.  Okay?

17           You both submitted expert reports, expert

18    declarations.  I am not within the three-hour time frame

19    going to -- they may or may not qualify as experts at the

20    end of the day, and that will be the subject, if any, of a

21    very extensive or protracted Daubert hearing, and today is

22    not a Daubert hearing.  It's really to give both sides the

23    opportunity to highlight what was submitted previously and

24    to also make any new points with any witnesses that are on

25    in today's proceeding on the narrow issue that is before me.

CHARLES P. McGUIRE, C.C.R.

1    So just like I'm going to allow you to call your

2    expert today -- I expect you're going to call him -- I'm not

3    going to disallow this expert from testifying because his CV

4    was not given in advance.  I'm operating under the

5    assumption that they are going to testify roughly about

6    information that's already contained in their reports -- in

7    the declarations which you have, and you're free to

8    cross-examine him on that basis, but I'm not striking him at

9    all, and so I'm going to let this continue.

10    Next question, Mr. Donnelly.

11    MR. DONNELLY:  Thank you, Your Honor.

12    MR. POWERS:  Your Honor, I have a different

13    objection, then.  My objection isn't based on the fact that

14    we only received this for the first time now, if not in

15    conformity with the Rules of Civil Procedure or Evidence,

16    but really, the fact is, he's never testified before as an

17    expert, he has not -- he hasn't been established to have

18    qualifications to have given the opinions that he did in

19    that report.  If you'd like me to save all of that until

20    after he's testified --

21    THE COURT:  You could use that in your

22    cross-examination.

23    MR. POWERS:  Okay.  If you would like me to save

24    it, Your Honor, I will.  No problem.

25    THE COURT:  Thank you.

CHARLES P. McGUIRE, C.C.R.

1              continue.

2                   MR. DONNELLY:  Thank you, Your Honor.

3                   MR. POWERS:  I will make one further objection,

4       though, that I do want to note that I do think it is

5       inherently unfair that the hour and a half includes

6       cross-examination as well as our direct testimony, because

7       it's impossible to do effective cross-examination of two

8       governmental witnesses and do our entire defense where we

9       have to include both cross and direct.  I want to note that

10      for the record.

11                  THE COURT:  So noted.

12                  Continue.

13      BY MR. DONNELLY:

14      Q.    Mr. Canjels, please look at Exhibit 193.

15            Do you recognize this?

16      A.    I do.

17      Q.    Okay.  And I recognize that the attachments to it or

18      the Exhibits to your second declaration are not attached to

19      this, but what do you recognize this to be, independent of

20      those exhibits?

21      A.    I'm sorry, could you --

22      Q.    What do you recognize this to be?

23      A.    Exhibit 193?

24      Q.    Yes.

25      A.    That's my second declaration in this matter.

61

1    Q.    Okay.  Let me direct you to paragraph 12.  Can you

2    take a moment to look at that?

3    A.    Okay.

4    Q.    Does that accurately set forth your conclusions

5    regarding the Amaryan accounts trading from October 2012

6    through February 2014?

7    A.    It does.

8    Q.    And let me direct your attention to paragraph 15.

9           Again, I don't want to take up time going through

10    every point.  So in 15, does paragraph 15 and the bullet

11    points underneath that accurately set forth your conclusions

12    with respect to the Amaryan accounts trading related to

13    Newswires 1 and 2 and press releases from October 2012

14    through 2014?

15    A.    It does.

16    Q.    And then let me direct you to 16, and does that

17    accurately set forth your conclusions with respect to the

18    Amaryan accounts trading related to all three newswire

19    services, Marketwired, PRN, and Businesswire, from October

20    2002 through August 2015?

21    A.    You said 2002.

22    Q.    I'm sorry.  Thank you.  October 2012 through August

23    2015.

24    A.    Yes, it does.

25    Q.    And then paragraph 17, does that accurately set forth

1      your conclusions with respect to the Amaryan accounts

2      trading related to just the Businesswire trading, Newswire

3      Service 3, from January 2015 through August 2015?

4      A.     It does.

5      Q.     Okay.

6             In reaching these conclusions, Mr. Canjels, did

7      you review trading data?

8      A.     I did.

9      Q.     Okay.  Did you review events and newswire releases?

10     A.     Yes, I did.

11     Q.     Could you describe that for the Court?

12     A.     So I -- I reviewed the trading data of Mr. Amaryan,

13     and in particular in the Copperstone, Intertrade and Ocean

14     Prime accounts.  With that trading data, I constructed round

15     trips, which are transactions for -- opening of a

16     transaction, closing and possession, I call that a round

17     trip, and matched those round trips with data obtained from

18     the newswire services that shows where the newswire services

19     -- when a particular press release was uploaded, we call

20     that submission time, and when it was distributed to the

21     general public, I call that distribution time.

22     Q.     On the round trips that you identified as events, was

23     there a criteria with respect to the timing of the trading

24     and the day in which the round trip was closed?

25     A.     Yes.  So my Tables 1 through 4 in Chart 1 only looked

1    at round-trip trading in -- around news events distributed

2    by Marketwired and PR Newswire during -- for companies that

3    are listed on U.S. exchanges, and I'm focusing only on

4    shorts, to round trips up to three days.

5    Q.    And also as part of reaching your conclusions, did you

6    consider information from any publicly available commercial

7    databases?

8    A.    I did.  I also matched on data from the Center of

9    Research and Security Prices which contains stock price

10   information, return information and data from Ibis (ph),

11   which contains information on the timing of earnings

12   releases, and the content of those earnings releases.

13   Q.    And that's set forth in your declaration, second

14   declaration.

15   A.    Yes.

16   Q.    Mr. Canjels, will you please turn to what's been

17   premarked Plaintiff's Exhibit 194?

18   A.    Okay.

19   Q.    This was an attachment to your declaration; correct?

20   A.    That's right.

21   Q.    What does this show?

22   A.    So I observed for the Amaryan trading in the three

23   accounts that there was a lot of very short round-trip

24   trading around news events in the U.S.-listed companies.  I

25   found 150 times that Amaryan traded around those news

1    events, and the majority of those are earnings news events,

2    which are cases where the company releases earnings as well

3    as all the financial information to the markets.

4    Q.    And so to be clear, for trades where they held the

5    position longer than three days, those were excluded from

6    your lists.

7    A.    That's right.

8    Q.    Let's look at Exhibit 195, please.

9          And this was another attachment to your

10   declaration, correct, in Table 2?

11   A.    That's right.

12   Q.    And what does this show?

13   A.    This table shows -- it checks for the 150 trading

14   events whether or not the first trade time by Amaryan was

15   before or after the submission of the information to the

16   newswire services, and I split it up in two worlds.

17         First, Intertrade and Ocean Prime, I have detailed

18   time stamp data.  I find that they traded on 141 events.

19   Two of those events, they traded -- the first trade was

20   before submission time.  139 times, they were after -- after

21   the submission time.

22         For Copperstone data, I have date of trade, but I

23   don't have the time of trades, so there was a set of

24   events --

25   Q.    Let me ask you about that.

1           So you have the dates of the trades but not the

2      times for many of the Copperstone trades at the time you

3      prepared this.

4           What did you do about that?

5      A.    So I have very few Copperstone time stamps, so I

6      didn't use those at all.  I only used the trading days of

7      the Copperstone events.  And so for some of these trades, I

8      cannot positively determine whether or not it was before or

9      after submission time if the date of the trade is on the

10     same date as the submission time.  If the date of the first

11     trade is before the date of submission time, there were two

12     of those events, which necessarily have an exact window, and

13     then there's the set of events where Copperstone trades a

14     day later or one or more days later after the submission

15     date, and those I can determine that they were within

16     window.

17     Q.    So when you're using submission time, that's the same

18     as the upload from the company to the newswire services.

19     A.    That's right, yes.

20     Q.    And so if we look at the Intertrade and Ocean Prime,

21     what you've concluded is that of 141 events, only two of the

22     trades were before the submission time of the press release

23     to the newswire service.

24     A.    That's right.  Correct.

25     Q.    And so the other 139 were in the window.

1    A.    That's correct.

2    Q.    Is there anything else you'd like to say about this

3    table?

4    A.    I don't think so.

5    Q.    Okay.  Thank you.

6          Let's look at 198, please.

7    A.    Okay.

8    Q.    I've taken to calling this a bubble chart.  What does

9    this show?

10   A.    So this chart establishes that the trading of Amaryan

11   appears to be triggered by the submission of the news events

12   to the newswire services.

13   Q.    Okay.  And what does the line represent, this diagonal

14   horizontal line in the middle?

15   A.    So the diagonal line is the line -- is essentially a

16   45-degree line where the submission time -- if a trade were

17   falling exactly on that line, the submission time of the

18   trade would be exactly the same as the first trade time.

19   And so when you are above the line, the first trade is after

20   the submission time.  If you're below the line, the first

21   trade is before the submission time.

22   Q.    So if it's above the line, it's in the window; if it's

23   below the line, it's outside the window.

24   A.    That's right, yes.

25   Q.    And here -- and is there a correlation at all between

1    the placement of the circles or bubbles to the line?

2    A.    Yes.  So what this chart establishes is not only that

3    these trades are within the window, but it essentially shows

4    that the submission time is the trigger for Amaryan's

5    trading.  And you see that by the fact that the bubbles seem

6    to be hugging the diagonals.  So often, Amaryan starts

7    trading right after the submission time.  If the submission

8    is late in the day, like at three o'clock, Amaryan often

9    starts trading very close after three o'clock.  And when the

10    trading is early in the day, Amaryan often starts trading

11    early in the day.

12    Q.    And this was attached to your declaration as well;

13    correct?

14    A.    That's right.

15    Q.    Let me ask you about 196.

16    A.    Okay.

17    Q.    It was Table 3 to your second declaration; correct?

18    A.    That's correct.

19    Q.    What does this show?

20    A.    So this is another piece of evidence that Amaryan's

21    trading is influenced by the submission of the event to the

22    newswire service.

23    Q.    Okay.  And this relates to sometimes -- do sometimes

24    newswire services in your review of the information upload

25    their press release after the markets closed?

CHARLES P. McGUIRE, C.C.R.

1    A.    Right, so quite regularly, the upload time happens

2    after the markets closed mand then the distribution of the

3    events is done before the markets open the next day.  And so

4    we have a -- we have a window, but the window of possible

5    exploiting that information only if you get early access,

6    that window is entirely when the markets are closed, and so

7    it's very difficult to trade on those types of events.  That

8    happens about 28 percent of the time.  The other cases are

9    where the submission is either before or during market

10   hours, and you get a certain period of time to profitably

11   trade if you get early access to the -- to the information.

12   Q.    So if someone were pursuing a strategy of trading on

13   earnings that were announced, you would expect to see some

14   number of trades even if the press release was uploaded

15   after the close of the market.

16             MR. POWERS:  Objection; leading.

17             THE COURT:  I'll allow it.

18   A.    So what the chart really shows is that they weren't

19   just having a regular strategy of trading on earnings

20   events.  That is -- let me restart.

21             So what the chart shows is that there's a certain

22   set of news events that -- in which there's no possibility

23   of profitable trading.  If you were just pursuing a regular

24   trading strategy on earnings news coming out in the market,

25   you would expect that you get some trading on news events in

1    which the window is entirely -- entirely after market hours,

2    you get some trades early on.  And so what I would expect is

3    regular trading strategy on early news, I would expect 28,

4    roughly 28 percent of all the trades would be done on events

5    where the submission is after hours and the distribution is

6    before hours.  Instead, I see that Amaryan -- except for one

7    single time, I see that Amaryan never trades on those

8    events, and so it suggests that when he does trade, he

9    actually does have access to the -- to the news early.

10    Q.    Dr. Canjels, would you like some water?

11    A.    Yes.  I think I have some.

12         THE COURT:  It's spring water, everyone.  It's not

13    Newark water, just so you know.

14         (Laughter)

15    Q.    I see at the far end on the right-hand side there's a

16    column labeled p-value.  What is that?

17    A.    P-value is an outcome of a statistical task that

18    essentially measures whether the pattern that I observed can

19    come from random chance, just noise in the data, just

20    randomness in the trading that could possibly explain that I

21    don't observe an exact 28 percent.  And so the p-value here

22    is a probability that this pattern that is observed comes

23    from random chance, so the probability that this is random

24    chance is nearly zero, it's indistinguishable from zero.

25    Q.    Okay, and if you look at note three on this slide, you

CHARLES P. McGUIRE, C.C.R.

1    talk about p-value and a statistical test called Fisher's

2    Exact Test.

3                What is Fisher's Exact Test?

4    A.    Fisher's Exact Test is a kind of a standard

5    econometric statistical method to test essentially the

6    statistical significance of correlation in a two by two

7    table.  It's a standard technique that's described in many

8    textbooks, often used in academic literature.

9    Q.    It's a generally accepted methodology in the field of

10   statistics?

11   A.    That's right.

12   Q.    And it's considered reliable?

13   A.    Yes.

14   Q.    It's been subject to peer review?

15   A.    Yes.

16   Q.    And it's generally used in the field?

17   A.    Yes.  It's often used to test that there's exactly

18   situations like this.

19   Q.    Okay.  And then at the end of that note, it says

20   "P-values smaller than five percent are statistically

21   significant at conventional significance levels."

22                What does that mean?

23   A.    Right.  So if the p-value is zero, and then in order

24   to test whether something has statistical significance, you

25   compare the p-value to a cutoff value.  And so the kind of

CHARLES P. McGUIRE, C.C.R.

1    conventional cutoff values that are used are one percent,

2    five percent, and 10 percent, and these roughly correspond

3    to notions of 10 percent is weak evidence, five percent is

4    strong evidence, and one percent significance is very strong

5    evidence.

6         These p-values are far beyond one percent, even.

7    This is extremely strong evidence that this is not a -- this

8    is not coincidence.

9    Q.    Mr. Canjels, you can put that one aside.

10         Let me ask you about Exhibit 197.

11         This was Table 4 to your second declaration.

12         What does this show?

13   A.    This table shows that the trading by Amaryan on

14   earnings events overlaps frequently with trading by -- for

15   other account groups involved in this matter, and moreover,

16   when they trade together, they almost always trade in the

17   same direction, meaning either long or short.

18   Q.    And I see Column 7 is p-value, and again, that's

19   effectively zero.

20   A.    That's effectively zero, yes.

21   Q.    Let me ask you about Exhibit 275.

22   A.    Okay.

23   Q.    What does this show?

24   A.    So this is -- it shows the trading of Amaryan around

25   one particular event.  This event is an Intercept -- the

1    company Intercept, --

2    Q.    Try to slow down a little bit and speak clearly if you

3    can.

4    A.    Sorry.  Yes.

5          So I'm looking at a trade by the company

6    Intercept, and the company Intercept announced drug trial

7    results on January 9th, 2014, and those were positive

8    results.  The stock price dramatically increased.

9          Amaryan traded around this event.  He started

10   building a position in this company I think somewhere around

11   December 20th, and made -- made a very large profit on the

12   single one trade.

13   Q.    Okay.  And just to be clear, this particular chart was

14   not attached to your declaration.

15   A.    That's correct.

16   Q.    However, you did address the Intercept trade in your

17   declaration and the exhibits thereto.

18   A.    The Intercept trade is in my exhibits, yes.

19   Q.    Okay.  This trade is not part of the -- well, let me

20   rephrase that.

21         Does this trade fall outside the criteria we

22   talked about earlier in connection with this case with the

23   round-trip trades?

24   A.    Yes.  So my earlier tables all involved one-trip

25   trading of three days or less, so this kind of short window

1    trade around news events, because Amaryan started building

2    his position somewhere mid-December, this would not be part

3    of the same kind of trading activity, and it's not in my

4    earlier tables.

5    Q.    Okay, and is this trade in your review of the trading

6    information anomalous from a trading perspective for these

7    Defendants?

8              MR. POWERS:  Objection; leading.

9              THE COURT:  I'll allow it.

10   A.    So the Defendants have various trading.  My earlier

11   analysis looks at very short-time trading around news events

12   that are distributed by the companies.  This trading is

13   clearly of a different pattern than the other 150 events

14   that I looked at earlier.

15   Q.    All right.  Is there any other ticker symbol where

16   Defendants made anything close, based on your review,

17   anything close to $22 million in one stock in the period of

18   20 or 30 days?

19   A.    As far as I know, this is an extreme outlier.  I don't

20   really know what number two looked like.  I didn't review

21   that.  But this is -- this is a very large proportion of --

22   of other gains that they made.

23             MR. POWERS:  Objection, move to strike the answer,

24   because he just testified that he didn't look at all the

25   different data and all the monthly statements.

CHARLES P. McGUIRE, C.C.R.

1          THE COURT:  I'll allow it.

2          Continue.

3    Q.    And from a statistical -- let me ask your opinion, in

4    your view, from a statistical standpoint, when you're

5    evaluating a data set, does it make sense to exclude an

6    aberrational or anomalous trade when you're evaluating?

7          MR. POWERS:  Objection, Your Honor.  Could I have

8    a standing objection to all leading questions?

9          THE COURT:  Yes.

10         MR. POWERS:  Thank you.

11         Are you going to --

12         THE COURT:  On reconsideration, I'm going to give

13   leeway.  There's no jury here.  It's me.  It's an expert.

14   And I'm going to allow him a little bit of leeway.  I'm

15   going to allow you the same amount of leeway.

16         MR. POWERS:  Very well, Your Honor.

17         THE COURT:  Not all his questions are leading, I

18   want that to be clear, and to the extent that I think they

19   are inappropriate, I'll tell him to strike it, rephrase it,

20   just like I told you to do the same, and I'll do the same to

21   both of you.  Okay?

22         THE WITNESS:  Would you rephrase?

23         MR. DONNELLY:  I will.

24   Q.    When you're evaluating a data set from a statistical

25   standpoint, and you have an outlier or an aberrational

1    example, does it make sense to exclude it when evaluating

2    the set?

3    A.    Yes.  Generally, if you want to calculate means of

4    medians or something like that, you would worry about the

5    effect of outliers.  I think more --

6    Q.    Let me ask it a better way.

7          Here, looking at this trading, with your review of

8    the records and the trading for these various entities, does

9    it make sense to exclude this trade in Intercept and the

10   profits from it when you're looking at the profits from

11   unquestioned -- events that are not at issue in this case?

12   A.    Right.  So I believe that Professor Fischel's

13   declaration goes to the heart of the other comparable

14   trading activity in other time periods done by Dr. -- by

15   Mr. Amaryan, and that by making those comparisons, he says,

16   he concludes that they look similar.

17         This particular trade does not look similar to the

18   short round-trip trading on newswire events.

19   Q.    Right.  And in 275, in the last column, at the very

20   bottom, you say not only -- the exhibit says not only is

21   this $22 million in profits, but it reflects 87 percent of

22   the profits from Fischel's Exhibit K.  Is that right?

23   A.    Yes.  So a large proportion of Dr. -- Professor

24   Fischel's profits come from this single trade.

25   Q.    Let me direct your attention to Exhibit K-1, which is

1    207.

2    A.    Okay.

3    Q.    Now, in preparing the exhibits to your second

4    declaration, is it fair to say there are three sets

5    addressing the different time periods?

6    A.    That's right, yes.

7    Q.    Similar slides, but dash 1 reflects one time period,

8    dash 2 reflects a different time period, dash 3 reflects a

9    different time period.

10   A.    Yes, so these slides, these exhibits are labeled to

11   provide comparison to Professor Fischel's Exhibits, and my

12   K-1 comparison to Professor Fischel's key.  My dash 1 refers

13   to the time period from October 2012 until February 2014, my

14   dash 2 refers to from the time period October 2012 until

15   August 2015, and my dash 3 refers to the time period from

16   January 2015 until August 2015.

17   Q.    Okay.  So 207, Exhibit 207 is Exhibit K-1 to your

18   second declaration.  What does this show for the period

19   October 2012 to February 2014?

20   A.    So for this period of time, I show that the profits

21   made on the questioned events account for 78.2 percent of

22   all profits that are made by Amaryan during this window when

23   you exclude the one Intercept trade.  So once you exclude

24   the Intercept trade, the alleged questioned events account

25   for the vast majority of the profits.

1   Q.    And so is that row two -- what are we seeing at the

2   end of row two under "Totals" where it says "Other Trading,"

3   ICPT net profits, that's the Intercept trade?

4   A.    I'm sorry, you were referring to --

5   Q.    Under -- in the second kind of heading, "Other

6   Trading," --

7   A.    Yes.

8   Q.    -- immediately under that line is ICPT net profit.  Is

9   that the Intercept trade?

10   A.    That's right, yes.

11   Q.    And so we go across the total, during that time

12   period, they realized $22 million in profits from that

13   trade, correct, trades in that ticker?

14   A.    Yes.

15   Q.    And then the line below that would be their total net

16   profits from the unquestioned events with the Intercept

17   profits taken out; right?

18   A.    Right.  So the total profits made up 23.5 million, a

19   little bit over 23 million, and 22 million of those profits

20   are due to the Intercept trade.

21   Q.    And let's just take a look at one more Exhibit,

22   Exhibit K-2, which is Plaintiff's Exhibit 217.

23   A.    Yes.

24   Q.    Now, so this chart is very similar to what we just

25   looked at with K-1 but has a different time period; right?

1    A.    Yes, the other time period is from October 2012 until

2    August 2015.

3    Q.    Okay.  Now, if I'm looking under "Questioned Events,"

4    I'm seeing along the line of percentage of total net profits

5    less the Intercept trade for Copperstone 290 percent,

6    Intertrade, 520 percent, Ocean Prime, 101 percent, and

7    total, 196 percent.

8         Can you explain that?  What does that mean?

9    A.    Yes.  So total profits on all trading activity

10   consists of the profits made on the questioned events and

11   the profits made on the other events.

12        Now, it turns out that the profits made on all the

13   other events are actually losses, and so the questioned

14   profits on the questioned events is larger than the total

15   profits made by Amaryan, and that's why they come out to be

16   larger than 100 percent.

17   Q.    Okay.  And so those -- if we go again to the other

18   trading line, that section, the second section down, labeled

19   "Other Trading," we see the Intercept net profit, and then

20   below that is the total net profit less Intercept, so the

21   Intercept profit's taken out.  I see brackets around or

22   parentheses around those various numbers.  What does that

23   indicate?

24   A.    Parentheses are used to indicate negative numbers, so

25   these are -- these are losses.  So in total, Amaryan lost

1    about four million on all the other trading except

2    Intercept.

3                MR. DONNELLY:  No further questions at this time,

4    Your Honor.

5                THE COURT:  Counsel, I'm going to allow you --

6    thank you, Mr. Donnelly.

7                i take it from your comments earlier that you were

8    questioning the qualifications of this witness to testify as

9    an expert?

10                MR. POWERS:  Yes, Your Honor.

11                THE COURT:  So I will afford you an extra -- just

12    because I think it's fair, given the condensed nature of

13    this hearing, I'm going to afford you additional time to

14    question him on qualifications, I'll give Mr. Donnelly an

15    opportunity to cross, and then before you proceed into the

16    merits as to the reliability of his testimony and its fit

17    with this case.  So I'll give you an opportunity, and I

18    won't count it against your time, to voir dire him on

19    qualifications.

20                MR. POWERS:  Thank you, Your Honor.

21                THE COURT:  And that would also then tie into

22    certain of his exhibits, if I may.  Thank you.

23                THE COURT:  It's going to qualifications.  Okay?

24                You know what, I think it would be a more

25    efficient way to do this, and I probably should have done it

1      to start with.  Mr. Donnelly, would it make more sense for

2      you to establish his qualifications?  I know you just

3      identified his resume'.

4              Or I'll leave it up to counsel.  Would you rather

5      have Mr. Donnelly establish his qualifications and you can

6      cross on it, or do you just want to cross him based on the

7      resume' and information that's contained in the exhibit that

8      he referenced?

9              MR. POWERS:  I can cross.  I can --

10             THE COURT:  Okay.  So why don't we establish his

11     qualifications, and I'll give counsel an opportunity to

12     cross on him.

13             MR. POWERS:  No, I said I'm prepared to proceed

14     based upon --

15             THE COURT:  Okay.  That's fine.  The resume'.

16             MR. POWERS:  -- the CV.

17             THE COURT:  What document is the CV; do you

18     remember?

19             MR. DONNELLY:  255, Your Honor.

20                       VOIR DIRE

21     BY MR. POWERS:

22     Q.    Good morning, Doctor.  How are you?  My name is

23     Marc Powers from Baker Hostetler.

24             I just want to confirm, you've never testified in

25     court before in connection with your providing expert

1    testimony; correct?

2    A.    That's right.

3    Q.    And you've never been qualified by any court of law as

4    an expert for purposes of any type of hearing; correct?

5    A.    That's correct.

6    Q.    Isn't it also correct, sir, that part of the analysis

7    that you performed here today was done without the benefit

8    of any information concerning the trading times for the

9    Copperstone capital accounts?  Correct, sir?

10   A.    There was a set of Copperstone accounts for which I

11   don't have trading times.

12   Q.    Correct?

13   A.    Only trading dates.

14   Q.    And because you did not have the trading dates and

15   times, you would not know whether or not the trading

16   activity by Copperstone was before or after the submission

17   of the earnings announcements through the wire services;

18   correct, sir?

19   A.    That's true for a subset.

20   Q.    Correct.

21   A.    Two trades by Copperstone are before the submission.

22   There's a set, I forgot exactly how large it is, where it's

23   after submission, and then there is a set of -- for which I

24   can't determine whether it was before or after submission.

25   Q.    Now, you indicate in your report that you note various

1    conclusions or observations.  Is that any different than an

2    opinion by you, sir?

3    A.    I am not -- I am not a lawyer.  I'm not sure how to

4    answer that question in this context.  But my conclusions

5    are, I guess, in a layman's way, my opinions in this case,

6    yes.

7    Q.    And, sir, you work for the S.E.C.; correct?

8    A.    That's right.

9    Q.    And you're paid by the S.E.C.; correct?

10   A.    That's right.

11   Q.    And do they have the opportunity to fire or hire you

12   if -- fire you if they're dissatisfied with your

13   performance, sir?

14         THE COURT:  I'll allow it.

15   A.    If the S.E.C. is dissatisfied with my performance,

16   under certain conditions, they can fire me, yes.

17   Q.    Have you ever been cited by any courts of law for any

18   of your writings in insider trading cases?

19   A.    No, I haven't.

20   Q.    Have you ever been cited by any courts of law or by

21   other colleagues in literature for your findings in the area

22   of insider trading?

23   A.    No, not that I know of.

24   Q.    Excuse me?

25   A.    Not that I know of.  Presumably not.

1    Q.    And have you ever been cited by any courts of law for

2    your analysis with respect to oscillation of trading by

3    various parties and comparing and contrasting before at all?

4    A.    No.

5    Q.    Okay.  Have you been cited by any authorities, any

6    authorities that you're aware of saying that your

7    oscillation or presumptions or conclusions you've drawn in

8    this report suggest insider trading?

9    A.    I'm assuming that --

10            MR. DONNELLY:  I object to that question, Your

11    Honor.  I don't understand it.

12            THE COURT:  Why don't you rephrase it?

13            MR. POWERS:  Yes, Your Honor.

14    Q.    Have you been cited by any authorities or

15    authoritative sources for the view that -- for your views as

16    being considered expert in the area of considering

17    oscillations in trading for purposes of determining insider

18    trading?

19            MR. DONNELLY:  Your Honor, that's not what we went

20    through on the report.  It's not what the report's about.

21    It's not what we discussed with Dr. Canjels up there.

22            Moreover, that report was filed on the 24th.  I

23    don't see how it would be possible for anybody to, you know,

24    pick up and publish it in a week.

25            MR. POWERS:  My question is broader.

CHARLES P. McGUIRE, C.C.R.

1    Q.    Sir --

2              THE COURT:  Whoa, whoa, whoa.  Let me make a

3    ruling.

4              I'm going to allow it because -- I'm going to

5    allow it, and I see the point, and you can make your next

6    point.

7              MR. POWERS:  Thank you.

8              Please answer, sir.

9              THE WITNESS:  Can you repeat the question?

10             MR. POWERS:  May the reporter please read the

11   question back?

12        (Record read)

13   A.    No.

14   Q.    The time period that you were given by the S.E.C. for

15   purposes of your report and for which you're testifying

16   about today, you use a time period of October 2012 through

17   February 2014; correct, sir?

18   A.    I do use that time period, but I think it's incorrect

19   to say that it was given to me by the S.E.C.

20   Q.    Well, in your report, sir, you say that, among other

21   things, "I was asked to perform a qualitative and

22   statistical analysis."  On paragraph four I'm reading.  Do

23   you need a copy of it, sir?

24   A.    No, I think I remember that.

25   Q.    A better memory than Ms. O'Connor, then.

1          "I was asked to perform a quantitative and
2      statistical analysis of the trading activity in three
3      accounts linked to David Amaryan from October 2012 through
4      February 2014 to determine if the trading was based on
5      obtaining pre-publication press release information from
6      Newswires 1 and Newswires 2."
7          Do you remember being asked to do that by your
8      colleagues at the S.E.C.?  Yes or no, sir.
9      A.    I'm not sure what you're getting at.  If you were
10     asking me --
11     Q.    I'm asking you if you were asked by the S.E.C. to
12     observe that time period of --
13     A.    I --
14     Q.    -- as you say here in paragraph four, sir.
15     A.    No, I was not requested by the S.E.C. to limit my
16     analysis to that time period.  What I found was when I
17     looked at short round-trip trading activity by Dr. Amaryan
18     -- by Mr. Amaryan, I find that when -- and when I looked at
19     the correlation of Marketwired and PR Newswire, I find that
20     for all the data I had, I only had -- I found the trading
21     activity to be in February 2012 until October 2014.  So if
22     the S.E.C. asked me the same thing, that's possible, but
23     that's -- that's where the activity happens.
24     Q.    Sir, you said that you were asked to determine if
25     trading was based on obtaining prepublication press release

1    information.  In other words, inside information; correct?

2    A.    Yes.

3    Q.    So my question to you, sir, for purposes of qualifying

4    you as an expert, is it correct, sir, that you were asked to

5    make a determination as to whether or not insider trading

6    occurred in a particular time period?  Correct?  Your

7    opinion on that.

8    A.    In this declaration, I was asked that.

9    Q.    And by whom, sir?

10   A.    By -- by the S.E.C.

11   Q.    Who?  By whom?  Is there a name associated with the

12   S.E.C.?

13   A.    I -- I think it would be Mr. Donnelly, but --

14   Q.    So Mr. Donnelly told you the time period to look at;

15   correct?

16   A.    What I'm saying is that I looked at trading data

17   beyond the time periods.

18   Q.    But I'm asking you, was it Mr. Donnelly that asked you

19   to look at the time period which you put in your declaration

20   on page -- on paragraph four in document number 84-1 where

21   you state that there was this time period?  Did he ask you

22   to look at a time period, sir?

23   A.    The way that --

24   Q.    Yes or no.

25   A.    It does not deserve a simple yes-or-no answer.

1    Q.    I'm going to withdraw the question.  What I'm going to

2    do, then -- just a few more.

3                MR. POWERS:  Thank you for the latitude, Your

4    Honor.  Thank you for that.

5                THE COURT:  What's your plan?

6                MR. POWERS:  My plan is now to introduce Exhibit

7    2.

8                THE COURT:  Okay.

9                MR. POWERS:  Is it going to get confused on your

10   numbers?

11               THE COURT:  What is it?

12               MR. POWERS:  It's a document I'm going to

13   introduce, Your Honor.

14               THE COURT:  What's the it called?  Does it have a

15   name?

16               MR. POWERS:  Yes, it's a document from the S.E.C.

17   to us, identifying --

18               THE COURT:  Is it a letter?

19               MR. POWERS:  It's an e-mail.

20               THE COURT:  And what's the date of the e-mail?

21               MR. POWERS:  It's an e-mail dated August 25th,

22   2015 from Mr. Donnelly to myself and Mr. Moscow regarding

23   the case providing us with a list of the events for

24   Copperstone, Intertrade, and Ocean Prime trading as alleged

25   in the complaint as amended by the S.E.C.

CHARLES P. McGUIRE, C.C.R.

1              I'd like to approach the witness.

2              THE COURT:  Do you have a copy for me?

3              MR. POWERS:  Yes, I do.

4              THE COURT:  Give it to me first.

5              MR. POWERS:  Yes.

6              THE COURT:  Then give it to Mr. Donnelly.

7              MR. POWERS:  Yes.

8              THE COURT:  And then give it to the witness.

9              And is this your first exhibit other than --

10             MR. POWERS:  I think it's number 2, right?

11             THE COURT:  The first exhibit, if I recall, was

12    the complaint, correct?

13             MR. MOSCOW:  Correct.

14             THE COURT:  So that was part of the Court's

15    record.  We don't need that marked.

16             This exhibit is not a part of the Court's record,

17    I take it.

18             MR. POWERS:  Correct, Your Honor.

19             THE COURT:  So we will mark it D-2.

20             MR. POWERS:  D-2?

21             THE COURT:  Yes.

22             MR. POWERS:  Yes, Your Honor.

23             May I approach?

24             THE COURT:  Yes.

25             (Defendants' Exhibit 2 marked for identification)


                    CHARLES P. McGUIRE, C.C.R.

1    BY MR. POWERS:

2    Q.    Have you had a chance to look at it, Doctor?

3    A.    Excuse me?

4    Q.    Have you had a chance to look at the document, sir?

5    A.    I'm looking at it right now, yes.

6    Q.    Do you see in the first sentence it reads:  "Please

7    find attached three PDFs which set forth the list of

8    complaints in which Copperstone, Intertrade and Ocean Prime

9    traded in connection with what's alleged in the amended

10   complaint," and they are labeled S.E.C.-DUB-L-1 through 11.

11   Do you see that?

12   A.    I do.

13   Q.    And do you see attached to that, sir, a series of

14   documents which have those parallel Bates stamps in the

15   bottom right-hand corner?

16   A.    I do.

17   Q.    And have you seen this document?  Have you seen this

18   before, sir?

19   A.    I have not.  I don't think I've seen an e-mail.  The

20   listing of the events looks very similar to probably the

21   listing that was in Professor Fischel's declaration.  I

22   don't recall seeing the original event list.

23   Q.    But you see this is from the S.E.C.; correct?

24   A.    Yes.

25   Q.    And you see that the events start not in October, as

CHARLES P. McGUIRE, C.C.R.

1    in your declaration, but they start actually in February of

2    2012; correct?

3    A.    Yes.

4    Q.    And -- for Copperstone.  And then if you go to -- is

5    there a reason why you excluded the events in Copperstone

6    earlier in 2012, sir?  Was that because Mr. Donnelly told

7    you to?

8    A.    Are you referring to the Novidia and the --

9    Q.    I'm referring to the Caterpillar and Verizon.

10    A.    No, let me try to explain how this --

11    Q.    Sir, I'm asking -- let me ask you my question.  My

12    question to you, sir, is, did Mr. Donnelly tell you to

13    exclude the February 2012 and the September 2012 events?

14    A.    No.

15    Q.    Okay.  And you chose instead to just ignore them for

16    what you did in your analysis; correct?

17    A.    No, that's incorrect.

18    Q.    Okay.  Sir, let me ask the next question, then.

19         MR. DONNELLY:  Your Honor, I object.  I'd like to

20    let him finish the answer.

21         THE COURT:  You asked him a question, and he said

22    no, and he's going to explain it.

23    A.    So the -- I looked at this this week again.  So the

24    Caterpillar and Verizon trade and certain other trades later

25    on are trades that are done with much longer round-trip

1    transactions, so in my declaration Tables 1 through 4 and

2    Chart 1, what I focus on is the kind of short-term

3    round-trip trading around news events.  There's other

4    trading activity by Mr. Amaryan that also goes around news

5    events that's of a much longer duration.  I don't know

6    exactly how long these particular ones lasted, but they were

7    longer than three days.

8    Q.    Dr. Canjels, in your report, you say in paragraph four

9    in your declaration that you looked at the time period from

10   October 2012 forward.  You also just testified that you were

11   told to look at that by Mr. Donnelly.  Correct?

12              THE COURT:  Is it correct what he testified to

13   before, or correct that he was told something by

14   Mr. Donnelly?

15              MR. POWERS:  I am asking actually both parts of

16   that, yes.

17              THE COURT:  Well, then, you've got to break it up.

18              MR. POWERS:  No problem.

19              THE COURT:  Whoa, whoa, whoa.  You've got to speak

20   slowly because we have a Court Reporter, number one.

21              Number two, I'm not going to allow you to ask a

22   question to a witness, did you testify earlier about

23   something.

24              MR. POWERS:  Let me withdraw that, then.  Fair

25   comment, Your Honor.

1          THE COURT:  It's not fair, and it's not helpful to

2     me.  If you want to make a point, mate a point, make it

3     effectively.  Okay?

4          MR. POWERS:  Yes, Your Honor.

5          THE COURT:  Mr. Donnelly?

6          MR. DONNELLY:  Your Honor, if I may, if he's going

7     to quote from Exhibit 193, I think it should be in front of

8     the witness, and particularly, paragraph four starts out

9     "Among other things," and I haven't heard that.

10          THE COURT:  So noted.  And we're looking at the

11     events, but if we're going to be asking the witnesses

12     questions about statements in their sworn declarations, I'm

13     going to insist that they have that document because these

14     declarations are lengthy, and they're detailed.

15     BY MR. POWERS:

16     Q.   Let me ask you a question, sir, before I show you

17     this.  Did you review all the trading records for the

18     activity in Copperstone, Intertrade, and Ocean Prime for a

19     period of -- beginning when, sir?

20     A.    I reviewed all the trading data that I had available,

21     and I believe that may have started for Amaryan certainly

22     before February 20th, 2012.  But I can't exactly say what

23     year, the first date of trading that was in my data set.

24     Q.    Right.  And you are familiar with the complaint first

25     alleges, the amended complaint alleges that the act of

1    hacking started all the way back in 2010.  You're aware

2    generally of that, sir; right?

3    A.    I'm aware that the hacking started earlier than 2012.

4    Q.    '10.

5          THE COURT:  He said it started earlier than 2012.

6          MR. POWERS:  Got it.  I misheard him.  Thank you,

7    Your Honor.

8    Q.    So you did look at activity before 2012, but you chose

9    not to in your declaration to include any of those trades

10    for purposes of your analysis; correct, sir?

11    A.    So what I do --

12    Q.    Is that -- yes or no:  Did you include in your

13    analysis for the charts which were introduced in evidence by

14    the S.E.C. any of the trading activity that was occurring in

15    the accounts of either Copperstone, Ocean Prime or

16    Intertrade prior to the time that Mr. Donnelly told you to

17    start?  Yes or no.

18          MR. DONNELLY:  Your Honor, if I may.

19          THE COURT:  Go ahead.

20          MR. DONNELLY:  I would ask that the witness be

21    allowed to answer the question, and would also state -- the

22    witness has already testified that there was criteria for

23    what he addressed.  And so just to say, Did you include any

24    other trades, if they don't fit that criteria, they wouldn't

25    have been included.

1          THE COURT:  Okay.  He's not asking him to explain,

2     he's asking a yes or no question.  I'm going to let him ask

3     it because it's cross.  You can bring that point out when

4     you examine him in a minute.  Okay?

5          MR. DONNELLY:  Thank you, Your Honor.

6          THE WITNESS:  Would you repeat the question?

7          MR. POWERS:  Would the reporter please do so?

8        (Record read)

9     A.    So the trading data goes back earlier.  The first step

10    I take is a subset by trading data to round-trip events of

11    three days or less, and then -- so that is applied -- that

12    rule is applied to all trading data that I have access to.

13          After I apply that rule, what I'm left with is

14    trading activity between February of 2012 and October 2014.

15          MR. POWERS:  Your Honor.

16          THE COURT:  Can I just stop for a minute?

17          When we started this and I gave additional time,

18    it was based on your suggestion that he was not qualified,

19    he didn't have the qualifications to offer a statistical

20    analysis of the trades, and we looked at what his scope is

21    and what he did.  And so what these questions are really

22    going to is really not qualifications, it's really going to

23    more of reliability of his conclusions, which is what you're

24    allowed to do using your own time.

25          MR. POWERS:  Fine.  So why don't --

1            THE COURT:  Let me finish.

2            In the normal course, we would have a threshold

3    preliminary hearing as to whether he was qualified.  If he's

4    qualified, I would allow him to testify, you can cross him,

5    and at the end of the day I'll decide whether his testimony

6    was sufficiently reliable to utilize in this case.

7            But we're getting far afield from that now.

8    You're really crossing him on the merits of his -- and the

9    documents relied on the merits of his opinions, and I was

10   under the misimpression that you had serious reservations

11   about his threshold qualifications.  We talked a little bit

12   about how he hadn't testified before anywhere else.

13           That is what I want to focus on.  Otherwise,

14   you're going to utilize your time to cross-examine him as to

15   his conclusions, which is very different from his

16   qualifications.

17           MR. POWERS:  Okay.  Fair enough, Your Honor.

18           THE COURT:  Okay.

19           MR. POWERS:  I will conclude my questions about

20   qualifications at this point.

21           THE COURT:  Okay.

22           MR. POWERS:  I have heard Your Honor, and I would

23   move to strike him to not be qualified to testify about

24   these subject matters, and I want to reserve the opportunity

25   to be able to strike specific exhibits once I get into cross

1    and perhaps show the unreliability of the methodology he

2    used.

3            THE COURT:  Okay.  Before I do that, I'll let

4    Mr. Donnelly have his opportunity to examine him on his

5    qualifications and for the opinion that he's offered in this

6    case.

7                          VOIR DIRE

8    BY MR. DONNELLY:

9    Q.    Dr. Canjels, first, let me ask, I think it's well

10   established that you work for the S.E.C.

11           Who do you report to?

12   A.    I report to my direct supervisor, who is Chia Becker

13   (ph), who is heading the Office of Litigation.  She reports

14   directly to the chief economist, who reports to the director

15   of the Division of Economic Risk Analysis, and he reports

16   directly to the Commission.

17   Q.    You don't report to me.

18   A.    I don't.

19   Q.    You don't report to any of the lawyers at counsel

20   table?

21   A.    No, I don't.

22   Q.     In fact, you don't report to the Enforcement Division

23   of the S.E.C.

24   A.     I don't report to the Enforcement Division, that's

25   correct.

1    Q.    Let me ask you to take out 255, sir.  This is your CV.

2          I'm not even sure if this was touched upon in the

3    voir dire.

4          Okay.  What's your educational background?  I know

5    it's set forth accurately here.  Could you take us through

6    it in a little more detail?

7    A.    I have a Master's degree in quantitative economics

8    from Maastricht University in the Netherlands.  After that,

9    I received a Ph.D. in economics from Northwestern University

10   with specializations in applied macroeconomics and

11   econometrics.

12   Q.    And prior to joining the S.E.C., had you published any

13   papers?

14   A.    I have two publications in the field of economics and

15   statistics.  I also have a publication, very old publication

16   in a Dutch journal called "Kwantitatieve Methoden,"

17   "Quantitative Methods," translated.

18   Q.    And I see below you also have professional experience

19   before joining the S.E.C.  Is that professional experience

20   also in the area of economics and statistics?

21   A.    Yes.  So after obtaining my Ph.D., I taught at the New

22   School University, and I also did research at the New School

23   University in New York.  At the New School, I taught

24   econometrics, mathematical methods, applied macroeconomics,

25   development economics, various subjects like that.

1              After the New School, I went to the private sector

2        consulting.  I worked for a while at Deloitte Financial

3        Advisory Services, doing primarily litigation consulting

4        work, and after Deloitte, I went into Huron Consulting Group

5        doing essentially similar work.

6        Q.    And I also note from the end of your CV that you have

7        certain professional memberships?

8        A.    That's right.

9        Q.    Which ones?

10       A.    I'm a member of the American Economic Association, a

11       member of the Econometric Society, and a member of the

12       American Statistical Association.

13       Q.    And are those all professional associations dealing

14       with economics and statistics?

15       A.    They are professional associations.  Anybody can join

16       freely, but this is my area of interest in which I did

17       research, so these are associations that are in my area of

18       research in my current work.

19       Q.    And, Mr. Canjels, let me direct you to the part of

20       your CV labeled "Expert Witness Experience."

21             While I appreciate you have not testified before,

22       on the part two, it goes on to page three, it says rebuttal

23       expert report in the matter of Lawrence LaBine, was that an

24       administrative proceeding?  Was that an expert report or

25       declaration submitted to the administrative court?

1    A.    That's right.  Actually, your question triggers memory

2    of my answer to the defense counsel.  I don't know whether

3    that would qualify as being admitted in a court of law as an

4    expert or whatever exact phrase he uses, but it was accepted

5    as an expert report.

6    Q.    And is that the case where they accepted the

7    declaration in lieu of direct testimony?

8    A.    That's correct.

9    Q.    And I see several other cases listed, one of which is

10   S.E.C. v. Wyly.  Did you submit a declaration in connection

11   with that case?

12   A.    I did.

13   Q.    Okay.  And how about the one above that, U.S.A. v.

14   Winifred --

15   A.    Winifred Jiau, yes, I was offered as an -- yes, so I

16   was offered as a rebuttal witness in that case, but I never

17   was called.  The plaintiff -- the defense withdrew their

18   direct.

19   Q.    Okay.  And above that, there's another case filed in

20   the Southern District of New York.

21   A.    Correct.

22   Q.    What happened in that?

23   A.    I wrote a similar witness report.  That's a while

24   back.  It was a description of -- I forgot exactly what --

25   what we were describing right there.

CHARLES P. McGUIRE, C.C.R.

1  Q.    Okay.  And above that, did you submit a report in

2  connection with another publicly filed case, this one in the

3  Eastern District of Michigan?

4  A.    Yes.  I filed an expert report in that case.  The

5  issue that the expert report addressed became moot, and so I

6  never was deposed or testified at trial.

7  Q.    So while I appreciate sometimes cases settle,

8  sometimes cases become moot, have you ever been rejected by

9  any court as an expert?

10  A.    No.

11  Q.    Let me also direct you to 193.  This was your second

12  declaration, and in the first couple of paragraphs, you

13  identify some of your background and expertise.

14        Direct you to paragraph two.  Is this accurate,

15  that you taught graduate-level courses in financial

16  econometrics, microeconomics, time series analysis, cross

17  section econometrics, and mathematical methods?

18  A.    That's correct.

19  Q.    Okay.  And let me actually direct you back to 255 and

20  the Jiau case.

21        Do you recall if that Winifred Jiau case from the

22  Southern District was an insider trading case?

23  A.    It was a criminal insider trading case, yes.

24  Q.    Okay.  Dr. Canjels, you don't purport to be an expert

25  on insider trading and the legal issues relating to insider

1    trading, do you?

2    A.    In this declaration, I claim to be an expert in

3    statistical methods and mathematical methods, that's right.

4    Q.    And what your declaration does is it reviews the

5    information and applies statistics and economics.

6            MR. POWERS:  Just, objection.

7            THE COURT:  I'll allow it.

8    A.    That's correct.

9            MR. DONNELLY:  Your Honor, we tender him as an

10   expert witness.

11           MR. POWERS:  I just have a few redirect, very

12   briefly.

13           THE COURT:  Very brief.

14           MR. POWERS:  Very briefly.  Thank you.

15                   VOIR DIRE (CONTINUED)

16   BY MR. POWERS:

17   Q.    Dr. Canjels, under the papers and publications that

18   are listed in your CV --

19   A.    Yes.

20   Q.    -- only one of them seems to touch upon anything

21   relating to foreign exchange arbitration.  Is it correct,

22   sir, there are no papers and publications by you that

23   address specifically the securities markets, stock

24   securities markets; correct?

25   A.    That's right.

1    Q.    Of these four papers.

2    A.    That's right.  I -- this was in the time of my career,

3    I published these papers in time of my career when I was not

4    yet deeply involved with securities issues.

5    Q.    But you have not published any papers relating to

6    financial markets and the stock market; correct?

7    A.    That's right.

8    Q.    With respect to the expert witness experience that

9    Mr. Donnelly asked you about, is it correct, sir, that in

10   none of these cases are you cited or is there a document you

11   can produce in any of those cases that you show here under

12   your experience where the Court says they qualify you as an

13   expert?

14   A.    I'm not aware of it.  I don't know what exactly

15   happened in the LaBine case.  I gave my expert report to our

16   counsel.  The counsel submitted it.  I wasn't there at the

17   time in court.  I have no idea of what happened, and I don't

18   know --

19   Q.    So to your personal knowledge, there's never been a

20   court in any of these cases that are listed under your

21   experience where they have qualified you for any kind of

22   expert; correct?

23   A.    There's -- there's one case in which I can't tell, and

24   other than that one case, no.

25           THE COURT:  Okay.

1          MR. POWERS:  I so move.

2          THE COURT:  Well, I am satisfied that he is

3    qualified to serve as an expert.  Daubert requires me to

4    look at the qualifications, and not only look at the

5    qualifications, look at them in relation to the proffered

6    testimony of the expert.

7          So as to qualifications, he has a Ph.D. from

8    Northwestern University and a Master's from Maastricht

9    University in the Netherlands in quantitative economics.

10         He has published opinions in reputable journals,

11   maybe not about the narrow issue in this case regarding

12   insider trading and correlations between trading and

13   illegally gained information, but he certainly testified and

14   he certainly published papers on the issue that he's really

15   offered to the Court here, which is econometrics and

16   statistical analysis.

17         He also has a lifelong resume' of experience in

18   the issue of quantitative analysis, and that's exactly what

19   he's proffered for here.  He's not proffered here as an

20   expert in insider trading.  He's not proffered as an expert

21   in hacking.  He is, quote, asked to perform a quantitative

22   and statistical analysis of trading activity in three

23   accounts linked to David Amaryan and to review the analysis

24   described in the declaration of Professor Daniel Fischel,

25   the Defendants' expert.

CHARLES P. McGUIRE, C.C.R.

1          So certainly what counsel was addressing earlier

2     about data that may or may not have been excluded from the

3     statistical analysis is fair cross-examination that may go

4     to the weight of his testimony, but it certainly doesn't

5     change my view that he's qualified to offer an opinion to

6     this Court on quantitative and statistical analysis as set

7     forth in his second declaration filed with the Court in

8     connection with this application on September 24th, 2015.

9          So I am accepting him as an expert.  I'm satisfied

10    that he's qualified.

11         And right now, it's one o'clock, and I think it

12    makes sense to take a break.  I'm going to hold everyone to

13    45 minutes, and we'll resume.

14         And roughly, excluding the time for the

15    qualification testimony, the S.E.C. has utilized an hour,

16    the Plaintiff has used a half an hour.

17         We'll resume with testimony -- I think that's

18    right.  Is it right?  I'll double-check with Amy.  So we'll

19    resume, I take it, with the cross of the doctor.

20         I'm going to ask Defendants, how many witnesses do

21    you have in your case?

22         MR. MOSCOW:  Your Honor, we have two, each named

23    David, possibly a third, but I believe there's two, given

24    the time constraints.

25         THE COURT:  Okay.

CHARLES P. McGUIRE, C.C.R.

1          MR. MOSCOW:  Oh, I'm sorry.  My apologies.  Three.

2     I forgot Professor Fischel.  So there will be three.

3          THE COURT:  Okay.  So we'll see you at 1:45.

4     Thank you.

5          THE COURT CLERK:  All rise.

6        (Luncheon recess taken)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CHARLES P. McGUIRE, C.C.R.

1             A F T E R N O O N   S E S S I O N

2                 THE COURT CLERK:  All rise.

3                 THE COURT:  Okay.  Good afternoon, everyone.

4     We're back.

5                 MR. DONNELLY:  Good afternoon, Your Honor.

6                 THE COURT:  Okay.  So does the S.E.C. have any --

7     I'm sorry, we're going to resume.  Everyone can be seated.

8                 We're going to resume our cross-examination of the

9     doctor.

10                And, Mr. Donnelly, I take it you have no further

11    witnesses.

12                MR. DONNELLY:  No, Your Honor.

13                THE COURT:  Okay.  Thank you.  Okay.

14            (The witness resumed the stand.)

15                THE COURT:  Doctor, you remain sworn.  Okay?

16                You remain under oath.

17                THE WITNESS:  What's that?

18                THE COURT:  You remain under oath.  Okay?

19                THE WITNESS:  Yes, Your Honor.

20                MR. POWERS:  Good afternoon.  Thank you, Your

21    Honor.

22                      CROSS-EXAMINATION

23    BY MR. POWERS:

24    Q.    Good afternoon, Doctor.  I want to -- do you have it

25    in front of you your declaration, by any chance?  Your

                    CHARLES P. McGUIRE, C.C.R.

1    second declaration?

2    A.    I have Exhibit 193, which is my second declaration.

3    Q.    Fine.  So would you mind looking at page two of that

4    document, sir?

5    A.    Page two?

6    Q.    And the second bullet point?

7    A.    The one that starts with "Trading records"?

8    Q.    Yes.  Let me start with the first one, actually.

9            THE COURT:  Hold on a second.  We were at -- his

10    second declaration of Eugene Canjels?

11            MR. POWERS:  Yes, Your Honor.

12            THE COURT:  And what page are we on?

13            MR. POWERS:  Page two.

14            MR. DONNELLY:  Your Honor, there is a numbering

15    error on the page.  The first page was left blank, the

16    second page was numbered page one.  So I believe that

17    counsel is referring to the page with the number two.

18            THE COURT:  Okay.  Okay.  Thank you.

19    Q.    Among the information you used for your opinions that

20    you express herein, bullet point one says "Events Database,"

21    do you see that, on the first line on that page, sir?

22    A.    I'm looking at the bullet point starting with "Trading

23    records"?

24    Q.    No, the one right above it.

25    A.    "A database of press releases"?

CHARLES P. McGUIRE, C.C.R.

1   Q.    Yes.

2   A.    Yes.

3   Q.    That was part of what you used to underlie your

4   analysis; correct, sir?

5   A.    Yes.

6   Q.    And isn't it correct, sir, that that events database

7   does not include information about all earnings information

8   in 2015?  To your knowledge.

9   A.    Does not include what, exactly?

10   Q.    Okay.  Isn't it correct, sir, that to your knowledge,

11   you were unaware whether or not the events database which

12   underlies your opinion includes any information about

13   earnings and the like for 2015?

14   A.    It does include.

15   Q.    It does include?

16   A.    The events database that I use does include

17   information in 2015.

18   Q.    Are you aware, sir, that we had requested the S.E.C.

19   to produce to us their events database, and would you be

20   surprised to hear that it does not include any information

21   related to 2015?

22   A.    That was two questions.  I am not aware of it, but I

23   don't know whether I should or should not be surprised.

24   Q.    Are you aware, sir, that we requested the events

25   database that would include all the transactions and press

1    releases and everything that were relied upon by you for the

2    opinions you express herein for 2015?

3    A.    I'm not aware that you requested those, no.

4    Q.    Would it surprise you to hear that you had the

5    opportunity to review a different database of events rather

6    than what was given to other parties than the Defendants in

7    this case?

8    A.    I have no knowledge of what was provided to you or any

9    other Defendants.

10   Q.    Now, turning to bullet point two, --

11   A.    Yes.

12   Q.    -- it reads that you also obtained trading records

13   from various broker-dealers; correct, sir?

14   A.    Correct.

15   Q.    And dropping to the next line, it says that you have

16   "trading records include date and time of trading for

17   Intertrade and Ocean Prime." Do you see that, sir?

18   A.    Yes.

19   Q.    And it says in the next sentence that "For the

20   Copperstone account, the trading records report the date but

21   not the time of the trading." Do you see that, sir?

22   A.    I see that, yes.

23   Q.    And other than the trade times for the examples in the

24   amended complaint; correct? That's what it says there;

25   correct?

CHARLES P. McGUIRE, C.C.R.

1    A.    That's -- I'm not sure exactly what -- what you said.

2    Q.    In the parentheses, that's what it says, other than

3    for the examples in the amended complaint, for your

4    analysis, you did not have a time of the trades for

5    Copperstone; correct?

6    A.    It says that the Commission has obtained the trade

7    times for these examples, yes.

8    Q.    But other than the examples, you did not have the

9    trade times for the Copperstone transactions which underlie

10    your analysis; correct?

11    A.    I believe that there may be a few additional trade

12    times that were filed by the staff.  I'm not sure about it.

13    I am not using in my analysis trade times for Copperstone at

14    all.  So even these examples, I haven't used the trade time.

15    For Copperstone, I am assuming I don't know what time they

16    are traded.

17    Q.    Okay.  And so in the amended complaint, without having

18    to show it to you, it's a waste of time of the Court, there

19    are only eight examples that include information between --

20    I mean, relating to Copperstone or less; correct?

21    A.    I haven't reviewed the amended complaint.

22    Q.    At all in this case.

23    A.    Not for -- for this hearing today.

24    Q.    But you have reviewed the amended complaint.

25    A.    I am aware of its existence.  I have not studied it in

CHARLES P. McGUIRE, C.C.R.

1    detail.

2    Q.    Okay.  Looking at -- in item paragraph eight, the

3    second bullet point, in one of your observations.  Do you

4    see that?

5    A.    Second bullet point, "Publicly traded companies,"

6    paragraph eight?

7    Q.    Right.  Right, and you state here that they "typically

8    upload press releases containing earnings and non-earnings

9    news to the Newswires late in the morning or during the

10   afternoon"; correct?

11   A.    That's right.  That's what I stated.

12   Q.    So looking now at paragraph 12 on the next page, under

13   "Conclusions," --

14   A.    Yes.

15   Q.    -- in the second conclusion, you say that the trading

16   in the Amaryan accounts almost always commences after the

17   news release was uploaded to Newswires 1 and 2, and that's

18   your Table 2, correct?

19   A.    Correct.

20   Q.    That's one of your conclusions; right?

21   A.    Yes.

22   Q.    But you just testified and what you state under oath

23   in this document that you did not have the trading records

24   of the times of the Copperstone trades; correct?

25   A.    So --

1    Q.    Yes or no, sir.

2    A.    Can you repeat the question?

3    Q.    You say that the trading in the Amaryan accounts which

4    include the Copperstone almost always commenced after the

5    news release was uploaded.

6    A.    To the extent I can check this, yes, that's correct.

7    Q.    Okay.  But, in fact, you've testified that there were

8    -- you did not have the trading times for the Copperstone

9    trades other than those that were put in the example.

10   That's back in paragraph four.  Do you wish to look at it

11   again, sir?

12   A.    So to the extent that I can check whether the trade

13   time, the first trade time is before or after the submission

14   time, it's almost always after the submission time.  There's

15   a set of trading in Copperstone for which I do not have a

16   definite answer.

17   Q.    Now, let's direct your attention, sir, to Table 2.

18   A.    Okay.

19   Q.    Let me back up a moment.

20         Let's go to your fourth bullet point while we're

21   on that same page.

22         It says there's "virtually no trading in the

23   Amaryan accounts around earnings news releases that were

24   uploaded after the markets closed and disseminated before

25   the markets opened the next day"; is that correct?

CHARLES P. McGUIRE, C.C.R.

1    A.    That's what it says, yes.

2    Q.    Let's look at Table 2 now.

3    A.    Okay.

4    Q.    Table 2 here also is just for the period of October

5    2012 through February 2015, not -- doesn't account for any

6    transactions in any of the Defendants' accounts prior to

7    that time; correct?

8    A.    Table 2 is only for that period, correct.

9    Q.    And looking at -- tell me if I'm reading it correctly

10   -- footnote three there says due to missing trade times for

11   Copperstone, the information is insufficient -- these are

12   your words, right, sir?

13   A.    Yes.

14   Q.    That information is insufficient to determine whether

15   a trade was before or after submission by both -- that both

16   are on the same day.  You wrote those words for your report;

17   correct?

18   A.    That's correct.

19   Q.    So now let's go through the numbers.

20         You talk about a number of news events traded.

21   For Copperstone, you say it's 143; correct?

22   A.    Yes.

23   Q.    Okay.  And the number of which you have insufficient

24   information to know whether that even was -- whether a trade

25   was before the submission or after is 113; correct?

114

1    A.    That's right.

2    Q.    So for 113 of the 143 trades involving Copperstone, if

3    they didn't trade -- if they traded before the receipt of

4    the downloading of the submission of the news earnings

5    information, that wouldn't -- you wouldn't be able to say

6    that's inside information; correct?

7    A.    I don't observe trade times for Copperstone, yes.

8    Q.    So it's 113 transactions of 143 for which the S.E.C.

9    is freezing assets of our clients, which is -- that's

10   approximately 70 percent of all the trades in your analysis

11   for Copperstone; correct, sir?

12   A.    I don't calculate the percentage.

13   Q.    I thought you were qualified as an expert in

14   statistics, sir.  Can you tell me whether or not 113 of the

15   143 trades is approximately 70 percent or greater?

16   A.    That sounds about right.

17   Q.    Ah.  I knew I could qualify it.

18   A.    Yes.

19   Q.    Okay.  So now let's at all the trades.  So just to be

20   clear, to drive the point home, although we have a Judge

21   here, I'm sure she's gotten it, so for 70 percent of the

22   trades, 70 percent of the trades, you have no proof that

23   there was receipt of the -- the receipt of the earnings

24   released ahead of the trade; correct?

25   A.    No, I wouldn't say I have no proof.

1   Q.    You have no proof from trading records; correct?

2   A.    I have no proof that relates to trade times.

3   Q.    Yes.

4   A.    That's right.  I do think I have other proof.

5   Q.    Now let me ask you another question, sir.  The

6   Copperstone trades represent a large portion of all the

7   trades which you charge in your complaint, the amended

8   complaint, for Copperstone, Ocean Prime and Intertrade,

9   right?  It's a large amount of trades for which there's

10  allegations of insider trading; correct?

11           MR. DONNELLY:  Your Honor, I'm just going to

12  object to the questioning in terms of the form and language

13  used.  It's the same as with Ms. O'Connor this morning.

14  Mr. Canjels is here not -- is here a witness.  He is not

15  here as the S.E.C.  He's here as an expert witness, and they

16  could phrase accordingly as opposed to "you" and "your

17  amended complaint" and thing of that nature.

18           THE COURT:  I think that makes sense.

19           MR. POWERS:  I withdraw the question, Your Honor.

20           THE COURT:  Okay.  Good.

21  Q.    With respect to the amended complaint that was filed

22  in this case, you have read it relatively recently; correct?

23  A.    Yes.

24  Q.    Is it fair to say, sir, that the majority of the

25  transactions at issue for which the S.E.C. has froze several

1   million dollars in this case based on the temporary

2   restraining order and affidavits from other parties here

3   that a majority of those trades involve Copperstone?

4   Correct?

5           MR. DONNELLY:  Objection.  The document speaks for

6   itself.

7           MR. POWERS:  He's the one that looked at the

8   analysis.

9           THE COURT:  I'll allow it.  Go ahead.

10  A.    Can you repeat the question, please?

11          MR. POWERS:  If the reporter would please read it

12  back?

13      (Record read)

14  A.    Let me make sure I get that right.

15          So Copper -- I don't know what -- it's such a long

16  phrase that I'm not sure exactly what -- majority of what

17  you're referring to.

18  Q.    Why don't you pull it -- I handed you earlier today

19  before our lunch break the exhibit that was given to me by

20  the S.E.C. -- excuse me, the trades information.  Do you

21  have that handy, sir?

22          THE COURT:  Which one?

23          MR. POWERS:  The e-mail with the attached listing

24  of the events at issue in the case.

25          THE COURT:  D-2.

1          MR. POWERS:  D-2.  Yes, Your Honor.  Thank you.

2    A.    This?

3    Q.    Yes.

4          Looking at D-2, would it be correct to say, sir,

5    that the 113 transactions for which you have no proof

6    through trades time stamps that occurred before or after the

7    news releases were uploaded, that that represents a

8    substantial amount of all the trades at issue here?

9          MR. DONNELLY:  Your Honor I suppose he could ask

10   about that exhibit if he wants.  Dr. Canjels testified

11   before the break that he hadn't seen that, he's not copied

12   on that e-mail, and I think everybody agrees that the list

13   is slightly different than the list that was attached to his

14   report.

15         MR. MOSCOW:  Your Honor.

16         THE COURT:  Go ahead.

17         MR. MOSCOW:  On that point, I believe that that is

18   a legal admission against the Commission because, frankly,

19   we cannot do that.

20         THE COURT:  Okay.  Stop.  Just stop.  Okay?

21         It makes sense for me to make sure that the

22   witness is familiar with the document.  There's been no

23   foundation -- this is an e-mail from lawyer to lawyer with

24   an attachment, and there's been no testimony that he's even

25   familiar with this list.  So if you want me to understand

CHARLES P. McGUIRE, C.C.R.

1    what you're trying to demonstrate, it would be helpful to me

2    to know that this is the same list that's referred to in his

3    certification or his testimony, and if there's differences,

4    let him explain it.  Okay?

5            MR. POWERS:  Sure.  And I can do that one of two

6    ways, Your Honor.

7            THE COURT:  It's a fair point.

8            MR. POWERS:  It's up to you, but I'm happy to call

9    Mr. Donnelly to the stand right after this to confirm that

10   he sent me that.

11           THE COURT:  Counsel -- No.  Ask your next

12   question.  And I'm going to ensure that any document that

13   you show the witness that there's a foundation and that he

14   has knowledge about them.  Otherwise, it's useless testimony

15   to ask a witness about a document that they're not familiar

16   with.  That's it.

17           So we're on tight time frames here and there is a

18   reason why I placed time frames on this case:  Because I'm

19   not going to let this turn into a show.  It's here.  It's a

20   serious proceeding.  This is Federal District Court.

21           Sit down, sir, and listen to what I have to say.

22           We are here with witnesses.  You are wasting time.

23   To be asking about allegations in a complaint to witnesses

24   is not effective.  To ask him about documents that they have

25   not reviewed is not effective.  It's not helpful to me.

1          So please try your best to stick to the rough

2     rules of procedure in Federal Court, which is ask witnesses

3     what they have knowledge about, and ask them about documents

4     that they have knowledge about.

5          And with that instruction, you can ask your

6     witness the next question.

7          MR. POWERS:  Yes.

8     BY MR. POWERS:

9     Q.    Isn't it current, sir, that of all the transactions

10    that you did, in fact, look at, including Copperstone,

11    Ocean Prime, and Intertrade, that approximately 40 percent

12    of all those transactions for which you did not have trading

13    times -- 40 percent for which you did not have trading

14    times?

15    A.    You're mixing up evidence that I have for Intertrade

16    and Ocean Prime with evidence I have for Copperstone.  It's

17    different.  And so for Intertrade and Ocean Prime, nearly --

18    I can identify for all the records whether they were before

19    or after submission.  For Copperstone, I can do it only for

20    a subset.

21    Q.    By looking at that document, sir?

22    A.    So for Copperstone, it's presumably the 70 percent

23    that you mentioned.

24    Q.    Okay.  And looking at that document, sir, that's

25    before you, --

CHARLES P. McGUIRE, C.C.R.

120

1                    THE COURT:  D-2.

2                    MR. POWERS:  D-2.

3                    THE COURT:  Do you have the document?  He asked

4      you to look at the document.  Do you have it?

5                    THE WITNESS:  Which document, now?

6                    THE COURT:  It's called D-2.  It's a memo from

7      Mr. Donnelly to Mr. Moscow and others, and has documents

8      attached to it.  It's marked D-2.

9      A.    Yes.

10     Q.    Looking at that, sir, can you tell us whether or not

11     the majority of the transactions at issue for which the

12     S.E.C. claims that those are the events and the matters for

13     which they claim were improper trades, the majority of those

14     involving Copperstone?

15     A.    Can I refer back to my Table 2?

16     Q.    No, I'd like you to look at D-2, sir, and look at the

17     exhibits.

18     A.    I can give you the --

19     Q.    Look at D-2, sir, and tell me whether or not the

20     majority of the transactions which the S.E.C. says -- and

21     obviously not asserting it for the truth of the matter

22     asserted because we disagree that these trades actually

23     occurred, but the amount of trades that the S.E.C. actually

24     identified there, whether or not the majority is actually

25     for Copperstone.

CHARLES P. McGUIRE, C.C.R.

1    A.    So let me be precise.  So Copperstone, I see 150

2    trades for Copperstone, I see 126 for Intertrade, and 40 for

3    Ocean Prime.  I believe there's overlap between Intertrade

4    and for Ocean Prime, so they probably do not add up to 166,

5    and so it's likely that the 153 beats the -- beats the total

6    number for Intertrade and Ocean Prime combined by -- by a

7    small amount.

8    Q.    To your knowledge, your own personal knowledge, do you

9    have any evidence of communications between the hackers as

10   alleged -- to whom it is alleged to have hacked into the

11   computers and the Amaryan Defendants?

12   A.    Say --

13   Q.    To your personal knowledge, sir, are you aware of any

14   evidence of communications between the computer hackers and

15   the Amaryan Defendants?

16   A.    I have no knowledge of that.

17   Q.    To your personal knowledge, sir, are you aware of any

18   evidence of payments by the computer hackers to the Amaryan

19   Defendants -- payments to the computer hackers by the

20   Amaryan Defendants?

21   A.    I am not.

22             MR. POWERS:  No further questions.  Thank you,

23   Your Honor.

24             THE COURT:  Mr. Donnelly?

25             MR. POWERS:  One thing I would like to do is admit

1        into evidence Defendants' Exhibit 2.

2                  THE COURT:  No objection to Exhibit 2?

3                  MR. DONNELLY:  No, Your Honor.

4                  THE COURT:  Okay.  I mean, that's fine.  It's

5        moved in.

6              (Defense Exhibit 2 marked in evidence)

7                  MR. DONNELLY:  No questions, Your Honor.

8                  THE COURT:  Okay.  Thank you.

9                  Your witness.

10                 Thank you, sir.

11             (Witness excused)

12                 MR. DONNELLY:  Your Honor, with the binders that

13       we have, how would Your Honor like us to handle the

14       exhibits?  Move in the whole binders, or move in the ones

15       we've used?

16                 THE COURT:  I think you can note the ones that

17       you've used.

18                 Is there any objection to them?

19                 MR. MOSCOW:  No objection to the ones that have

20       been used or that have been filed with the Court previously.

21                 We would object to the ones that were recently

22       created about which there was no testimony.

23                 THE COURT:  Well, you gave me a lot of documents

24       here.  I take it you're only looking to move in the ones

25       that were discussed at the hearing today.

                        CHARLES P. McGUIRE, C.C.R.

1                    MR. MOSCOW:  Could I have a moment to speak with

2      counsel?

3                    THE COURT:  Sure.

4            (Off the record discussion)

5                    MR. DONNELLY:  Just one moment, Your Honor?

6            (Off the record discussion continues)

7                    MR. MOSCOW:  The record should reflect we have an

8      agreement.

9                    THE COURT:  Okay.  Yes?

10                   MR. DONNELLY:  Your Honor, would it be acceptable,

11     can we submit a list at the end of the hearing?

12                   THE COURT:  Yes.

13                   MR. DONNELLY:  And we would certainly move

14     everything that we've offered.  Because we were trying to

15     move quickly, we may have skipped some things that we

16     otherwise would have offered.

17                   THE COURT:  That's not a problem.

18                   MR. DONNELLY:  Thank you, Your Honor.

19                   THE COURT:  Thank you.

20                   MR. DONNELLY:  We have no further witnesses at

21     this time, Your Honor.

22                   THE COURT:  Okay.  Thank you.

23                   MR. DONNELLY:  Defense calls Professor Daniel

24     Fischel.

25                   THE COURT:  Okay.

1          THE COURT CLERK:  Sir, if you can raise your right

2     hand, place your left hand on the bible.

3     D A N I E L   F I S C H E L, called as a witness on behalf

4     of the Defendants, and having been duly sworn, testified as

5     follows:

6          THE COURT CLERK:  Please state your full name for

7     the record and spell it, please.

8          THE WITNESS:  My name is Daniel Robert Fischel,

9     last name is spelled F-i-s-c-h-e-l.

10          MR. POWERS:  May I proceed, Your Honor?

11          THE COURT:  Sure.  Yes.

12                    DIRECT EXAMINATION

13     BY MR. POWERS:

14     Q.    Good afternoon, Professor.

15     A.    Good afternoon.

16     Q.    Can you just spend two moments, if you would, to give

17     some of your qualifications?

18     A.    Yes.  I've had a parallel academic and consulting

19     career.  I've held academic appointments at the University

20     of Chicago and at Northwestern, both the law schools and the

21     business schools, at both those schools.

22          I've published a number of books, approximately 50

23     articles.  I've lectured widely on issues of finance as they

24     relate to various legal issues.

25          I have testified in I think approximately 60

1    trials.  I've also had a particular expertise on applying

2    economic data to allegations of wrongdoing in financial

3    markets, including insider trading.  I've been a consultant

4    or witness to virtually every government agency, Federal,

5    many state and local governments as well.  And -- well, I

6    guess I could go on, but I can stop there.

7    Q.    And can you tell me, sir, were you asked to form an

8    opinion with respect to matters concerning this case?

9    A.    Yes.

10    Q.    And those were contained in a declaration that was

11    submitted to the Court; correct, sir?

12    A.    Yes, and I've formed subsequent opinions based on the

13    declaration of Dr. Canjels, which I didn't have at the time

14    of my original report.

15    Q.    Can you tell us, sir, what those opinions are?

16    A.    Yes.

17    Q.    Are they contained in your report, sir?  So let me

18    direct the Court's attention --

19              MR. POWERS:  If I can approach the witness with

20    his declaration.

21              THE COURT:  Yes.  And that's the same declaration

22    that's document 168 of the S.E.C.'s?

23              MR. POWERS:  It should be.

24              That was Canjels, maybe?

25              THE COURT:  No, that's his -- what document

CHARLES P. McGUIRE, C.C.R.

126

1    number?

2              MR. POWERS:  I have one for Your Honor if you

3    would like, a courtesy copy.

4              THE COURT:  168 is his CV.

5              MR. POWERS:  Now, the document -- well, should we

6    move this in or -- because it's already part of the record.

7    It's up to you, Your Honor.

8              THE COURT:  You don't need to move it in.  It's

9    already part of the record.

10             MR. POWERS:  Very well.

11   Q.    So directing your attention to this declaration, this

12   is something that you had prepared in connection with this

13   matter; right?

14   A.    That's right.

15   Q.    And you talk about your opinions.  Do you summarize

16   those at someplace, and on what page, sir?

17   A.    Yes.  The basic summary of my opinions is contained in

18   paragraph eight.

19   Q.    I'd like to -- would you mind, sir, identifying for

20   the Court --

21             MR. POWERS:  This is a large copy of it, Your

22   Honor.

23             THE COURT:  That's taken right out of his expert

24   opinion?

25             MR. POWERS:  His exact, yes, it is.

1          THE COURT:  Where is it?  Has Mr. Donnelly seen

2     it?

3          MR. POWERS:  It's the summary of the opinion that

4     are contained in his report.

5          THE COURT:  Let me stop you.  Has Mr. Donnelly

6     seen it?

7          MR. POWERS:  Has he seen the blowup?

8          THE COURT:  Yes.  Let him look at it.

9          If you have any other demonstrative evidence that

10    you're going to show the witness, I'd appreciate it if you

11    would show it to the S.E.C. before you show it to him.

12         MR. POWERS:  Yes, Your Honor.

13         THE COURT:  And that summary is taken from where,

14    what paragraphs in his report?

15    Q.    Professor --

16         THE COURT:  Counsel, I had a question:  The

17    summary that you're about to show him is taken from where on

18    his report?

19         MR. POWERS:  Paragraph eight, Your Honor, page

20    four.

21         THE COURT:  Paragraph eight?

22         MR. POWERS:  Paragraph eight --

23         THE COURT:  Okay.

24         MR. POWERS:  -- page four, Your Honor.

25         THE COURT:  Both those exhibits, are they

1    different?  Are they all the same?  Are they all taken from

2    his report you have about --

3              MR. POWERS:  I have several of them which are

4    actually ultimately what is part of this and will be part of

5    further testimony by him.

6              THE COURT:  So here's my question.  You have a

7    number of demonstrative exhibits.  Are they all blowups

8    verbatim of information that is in his report, or are they

9    something different?

10             MR. POWERS:  They are a combination of -- they are

11   a combination of that and additional information that we

12   plan on presenting.

13             MR. AXELROD:  Excuse me.

14             THE COURT:  Hold on a second.

15             Did you get that, Chuck?

16             MR. McGUIRE (Court Reporter)  Yes, Your Honor.

17             THE COURT:  Okay.  So they're not blowups of

18   things taken out of his expert report.  They're additional

19   things that you have in blowups, which is perfectly fine,

20   but you need to give a copy to the S.E.C. in advance or as

21   you're showing the witness.  You can't just put a blowup up,

22   no different than if you have an exhibit that you're going

23   to show the witness that they haven't seen it before.  I

24   want them to have a copy of it.

25             Do you have copies of those exhibits, even in

CHARLES P. McGUIRE, C.C.R.

129

1       regular form, that you can give them?

2                   MR. POWERS:  Yes, we do.

3                   THE COURT:  Okay.  Then give it to them.

4                   MR. AXELROD:  And, Judge, we can probably deal

5       with this when they introduce this, I don't know that

6       they're going to, but this is new analysis that we've never

7       seen before.  This is not from Dr. Fischel's report, and it

8       looks a little bit complicated.  I'm saying we haven't had

9       time to study it.  That's my only point at this point.

10                  THE COURT:  Okay.

11                  MR. POWERS:  May I proceed?

12                  THE COURT:  Yes.

13                  MR. POWERS:  Okay.

14      BY MR. POWERS:

15      Q.    So, Professor Fischel --

16                  MR. DONNELLY:  We don't have the hard copies yet.

17                  THE COURT:  The hard copies, before you proceed,

18      give them the hard copies.

19            (Documents were provided to Plaintiff's counsel.)

20                  THE COURT:  Okay.  You can proceed.

21                  MR. POWERS:  Thank you, Your Honor.

22      Q.    Professor, will you tell us what your -- first, tell

23      us what you base your opinion on, and then tell us what your

24      opinion is.

25      A.    Yes.

1          I was provided with three documents that list the

2     questioned events by the S.E.C., one for Copperstone, one

3     for Intertrade, and one for Ocean Prime.  Those three

4     documents provided to me that were transmitted by the S.E.C.

5     contain 319 separate questioned events.

6          There is a well known methodology for analyzing

7     claims of insider trading in the academic literature and

8     things that I've analyzed and testified about many times,

9     and that is to compare the claims of trading based on inside

10    information in connection with particular events with other

11    trading that's not challenged or not questioned, because

12    there should be a difference.

13         If -- in terms of using economic evidence to

14    analyze claims of insider trading, trading in connection

15    with questioned events, for example, should be more

16    profitable, because you have allegedly access to inside

17    information.  The trades should be bigger, because you're

18    more confident in those trades than you are in other trades.

19    The trades should -- the dollar amount that you invest and

20    number of trades should focus on challenged events versus

21    unchallenged events.

22         And I compared the results of the -- on all those

23    different dimensions as I go through in my report in

24    connection with the 319 events listed by the S.E.C. with

25    trading in other periods and other events for the data that

1    I had in my possession, and I concluded, as I stated in my

2    report and in various exhibits to my report, on a whole

3    series of dimensions, size, profitability, frequency, there

4    is no qualitative difference between the results that the

5    related funds obtained from the trading around questioned

6    events, from other trading in connection with events that

7    weren't challenged, and therefore, I concluded that in terms

8    of economic evidence, the economic evidence did not support

9    the contention that there was any basis to conclude that

10   there was anything unusual or anything fundamentally

11   different between the results and pattern of trading around

12   the questioned events versus other events and other trades

13   that weren't questioned.

14   Q.    Now, directing your attention to paragraph four, the

15   primary bullet point has a number of subpoints.  Would you

16   mind running quickly through those?

17   A.    Yes.  And again, I have exhibits for each of these,

18   but it's basically what I just said, that if you look at the

19   trading around the questioned events, the trading by the

20   related funds is not concentrated around the questioned

21   events, it's dispersed across all kinds of events,

22   including, again, the unquestioned events, which, again,

23   there's no fundamental difference.

24           The related funds traded in a tight window around

25   earnings announcements, whether or not the earnings

CHARLES P. McGUIRE, C.C.R.

1    announcements were questioned, again, so no significant

2    difference there, either.

3        The size of the trades for the related funds ahead

4    of the questioned events was similar or smaller than the

5    size of the trades around other earnings announcements.

6        The related funds earned a majority of their

7    overall profits from trades that were not questioned by the

8    S.E.C., and a relatively high percentage of the questioned

9    trades that were supposedly based on access to inside

10    information resulted in losses rather than profits.

11        And I also point out in the report to put that

12    economic evidence in context that it's well documented in

13    the economic and academic literature that trading around

14    earnings announcements is not random, it is typically much

15    higher and much more concentrated than trading on a random

16    day, and it's also the case that trading frequently occurs

17    around the end of the day, something that, you know, the

18    significance of that I'll come back to later.

19    Q.    Yes.  And can you direct us by looking at the exhibits

20    specifically, the -- let me direct your attention, there's

21    been some criticism leveled about your approach and your

22    analysis by Dr. Canjels in his declaration.

23    A.    Correct.

24    Q.    Right.  I want to direct your attention to --

25        MR. POWERS:  If I may approach the witness.

133

1              THE COURT:  Tell us what you're showing him.

2              MR. POWERS:  I'm going to show him Professor

3      Canjels's declaration.

4              THE COURT:  Which one?  The second one?

5              MR. POWERS:  The only one that's relevant -- yes,

6      the second declaration.

7      Q.    Can you tell us, sir, by directing your attention to

8      paragraphs 15, 16 and 17 of his declaration --

9      A.    Okay.  I see them.

10     Q.    What is your understanding of what he did here?

11     A.    He did as I think he testified earlier this morning:

12     He purported to redo my analysis in connection with three

13     different time periods.

14     Q.    What do you mean by that?

15     A.    He -- again, he described what he did in ways that I

16     think I'll be able to comment on and criticize in a minute,

17     but what he did was in paragraph 15 analyze the trading

18     related to Newswires 1 and 2 from October 12th through

19     February 14th.  That's what he did in paragraph 15.

20             In paragraph 16, he did the same thing with

21     respect to all three newswire services from October 2012 to

22     August 2015.

23             In the third, in paragraph 17, again he purported

24     to redo my analysis from -- analyzing the data from January

25     15 through August 2015.

CHARLES P. McGUIRE, C.C.R.

134

1      Q.    And what I'm going to show you now and mark as

2      Defendants' Exhibit 3 --

3                  THE COURT:  I think so.

4                  MR. POWERS:  Yes.

5      Q.    -- is the Copperstone event listing previously

6      produced to us by the S.E.C. for the --

7                  THE COURT:  Wait.  Whoa, whoa, whoa.  What is it?

8      Do I have a copy of it?  Where is it?  You don't just hand

9      the witness documents.  I get the documents first, that's

10     the rule here, then your adversary gets the documents.

11     That's the rule I applied to them.  I'm going to apply it to

12     you.  You just don't go up to the witness with a document.

13     You give a copy to me, and I look at it first, then you give

14     a copy to the S.E.C. to see if they have any objection.

15                 MR. POWERS:  Yes, the S.E.C. has a copy.

16                 THE COURT:  And you identify it by either saying

17     it's D-3 or it's a pleading or it's in the S.E.C.'s binder.

18     So I want to know exactly what I'm looking at before you

19     show it to the witness.

20                 Give it to Amy, my deputy.

21                 MR. POWERS:  Sure.  Mark this as D-3?

22         (Defense Exhibit 3 marked for identification)

23                 THE COURT:  Thank you.  Did you give the S.E.C. a

24     copy?  Does the S.E.C. have a copy?

25                 MR. DONNELLY:  I do, Your Honor.  Thank you.

1    Q.    I show you what's been marked as D-3, Professor.  Can

2    you tell us what this is?

3    A.    Can I have it?  I don't have it.

4          MR. POWERS:  May I approach?

5          THE COURT:  Yes.

6          (Defendants' Exhibit 3 was placed before the witness.)

7    Q.    Can you tell us what this is, sir?

8    A.    Yes.  This is -- I mentioned before I received three

9    documents that were submitted by the S.E.C. listing the

10   events that the S.E.C. was questioning.  This is one of

11   those documents, the one for Copperstone, which is the

12   largest number of questioned trades.  So we can use this

13   illustratively.

14   Q.    And what does it show, sir?

15   A.    Well, one of the things that I noticed with respect to

16   Dr. Canjels's claim three analyses that's in his declaration

17   which purport to be redoing my analysis is what Dr. Canjels

18   did was to basically abandon the list of questioned events

19   that the S.E.C. provided in this case and come up with his

20   own list of questioned events which I'd never seen before,

21   it was never given to me before, it was never submitted by

22   the S.E.C. before, and did an analysis on a series of events

23   which overlap to some extent but with a lot of deletions and

24   a lot of additions to what the S.E.C. in fact has

25   challenged, and since -- so he abandoned the challenged

1   events by the S.E.C. and came up with his own list that was

2   never alleged by the S.E.C. to be challenged events.  It's

3   not surprising that he came up with different results by

4   dropping many of the events that the S.E.C. alleged as

5   challenged and adding a whole bunch of new events that the

6   S.E.C. never alleged as challenged in the documents that I

7   received.

8           So basically, after I demonstrated that there was

9   no difference on any of the criteria that I mentioned based

10  on the list that the S.E.C. itself provided, Dr. Canjels

11  simply changed the list by using different dates, different

12  events, and again, not surprising that he comes up with

13  different events, but it bears no relationship to the actual

14  list of challenged events submitted by the S.E.C., which is

15  what I based my analysis on.

16  Q.    So it's kind of like changing the playing field after

17  your report was submitted; correct?

18          MR. DONNELLY:  Objection to the argument, Your

19  Honor.

20          THE COURT:  I'll allow it.

21          MR. DONNELLY:  The witness may testify.

22          THE COURT:  I'll allow it.  Go ahead.

23  A.    It's not only a change in the playing field.  It's a

24  departure from what the S.E.C. itself provided in its list

25  of challenged events.

CHARLES P. McGUIRE, C.C.R.

1    Q.    And if you would, sir, take us through different color

2    codes, what they represent for the Court.

3    A.    Well, I think in order to do that, it would be helpful

4    if I had Dr. Canjels's comparable list with respect to

5    Copperstone.  If the Court could see both of those, I think

6    it would be very clear.

7               MR. POWERS:  May I approach, Your Honor?

8               THE COURT:  Tell me what you're going to approach

9    with.

10              MR. POWERS:  The second declaration.  I thought I

11    handed that to you.  I didn't?

12              THE COURT:  Well, I didn't say I didn't have it.

13    I said what are you showing him.  I want to know what you're

14    looking at.

15              MR. POWERS:  The second declaration of Dr.

16    Canjels.

17              THE COURT:  I have that.

18              MR. POWERS:  I apologize.  And I was actually

19    talking to the witness.

20    Q.    Do you have it?

21    A.    I think I have the highlighted one that's comparable

22    to this.

23              MR. POWERS:  So may I approach?

24              THE COURT:  Yes.

25              The second declaration of Canjels that I have in

1        the S.E.C.'s exhibit book, number 193, does not have any

2        attachments.

3                    MR. POWERS:  But I have one that does have the

4        attachments.  Would you like that?

5                    THE COURT:  Yes, I would.

6                    MR. POWERS:  Okay.

7                (A document was handed up to the Court and placed

8        before the witness.)

9                    THE COURT:  Thank you.

10               (Off the record discussion between the witness and Mr.

11       Powers)

12                   THE WITNESS:  In other words --

13                   THE COURT:  There's no question pending.

14                   THE WITNESS:  I'm sorry, Your Honor.

15                   THE COURT:  That's okay.

16       Q.    What is it precisely, Professor, that you would like

17       to see?

18                   THE COURT:  No, he's not going to talk.  If you

19       have a question, he answers it.  This is not a chat session.

20                   MR. POWERS:  No, it isn't.

21       Q.    My next question is, what else -- what would you like

22       to see as --

23       A.    Well, let me describe this --

24                   THE COURT:  Whoa.  What was the question?

25                   MR. POWERS:  My question was, what additional

1    information would you like to have before you for purposes

2    of answering the next question.

3            THE COURT:  He doesn't know what the next question

4    is.  So you have to ask the questions.  He's not just going

5    to chat.  Okay?  Ask a question, he'll answer it.

6    Q.    Professor, so could you explain to us what the color

7    coding represents?

8    A.    Yes.  This is the S.E.C. document that was provided to

9    me, and what this particular exhibit shows by the different

10   color coding is the difference between what the -- on the

11   S.E.C.'s event listing for Copperstone, particularly the

12   highlighting in yellow are the events listed by the S.E.C.

13   as questioned events that Dr. Canjels dropped from his

14   analysis.

15   Q.    So --

16   A.    And let me just -- can I just finish my answer, if

17   that's okay?

18           So if you look at the first page, you see three

19   different events highlighted in yellow.  If you look at the

20   second page, it looks like you see six different events

21   highlighted in yellow.  If you look at the third page, you

22   see two different events highlighted in yellow.  If you look

23   at the fourth page, you see one event highlighted in yellow,

24   and then you see a bunch of events that are highlighted in

25   looks like pink, going on to the last page, and one event,

1    the Wal-Mart, that's sort of both yellow and pink, it's

2    meant to be a hybrid.

3              And what the pink events represent is that even

4    though they were listed by the S.E.C. as questioned events

5    in the amended complaint, the S.E.C. stated that it wasn't

6    clear that the Defendants had access to any of the hacked

7    services from the period of November 2013 through February

8    14th, so I included them in questioned events because the

9    S.E.C. listed them, but I wanted to differentiate them in

10   that way.

11             And Wal-Mart, which is highlighted both ways, both

12   in yellow and pink, it's that way because it is both an

13   event that Dr. Canjels dropped even though the S.E.C.

14   alleged it as questioned, and it's also after the end of

15   November time period when it wasn't clear that Defendants

16   had any access to any of the hacked servers.

17   Q.    What I'd like to show you is -- as Defendants' Exhibit

18   4, the exhibit of Dr. Canjels, the exhibit which is called

19   S.E.C. Exhibits C-2 in the Court records.

20             MR. POWERS:  May I approach?

21             THE COURT:  That's attached to Exhibit C-2?

22             MR. POWERS:  That's right, to Dr. Canjels's second

23   declaration.

24             THE COURT:  Okay.

25   Q.    So looking at C-2, the first transaction referred to

1    on there is the Elan (ph) Technology; correct?

2    A.    Yes.  Actually, the first thing I want to note about

3    this is, this Dr. Canjels's exhibit.

4    Q.    Yes.

5    A.    But if you look at the heading, it's titled S.E.C.

6    Exhibit, and that in my opinion is fundamentally misleading.

7    This is not an S.E.C. exhibit.  This is Dr. Canjels's

8    exhibit, which is at significant variance from the S.E.C.

9    exhibit, and it's mislabeled as an S.E.C. exhibit --

10            THE COURT:  Okay.  I appreciate that, but you're

11    here as an expert in quantitative analysis, and I don't need

12    expert testimony on ownership of documents.  We're on tight

13    time constraints here.  I'd like to kind of move it along.

14    Okay?

15            THE WITNESS:  All right.

16    A.    Well, if you look at the -- again, the highlighting

17    beginning at the second-to-last page -- actually, I'm sorry,

18    the third-to-the-last page, the last three pages, again,

19    there's a whole list of highlighted events, and these are

20    events that Dr. Canjels labeled as questioned events, but

21    these events are nowhere found in the actual S.E.C. list of

22    questioned events.

23            THE COURT:  Which one?

24            THE WITNESS:  The last three pages, Your Honor,

25    that -- hopefully you have the same highlighting that I do.

CHARLES P. McGUIRE, C.C.R.

1                    THE COURT:  On D-3?

2                    THE WITNESS:  I don't know what --

3                    MR. POWERS:  Yes, the highlighting's on D-3, Your

4        Honor.

5                    THE COURT:  Are you referring to the Copperstone

6        event listing or the Ocean Prime?

7                    THE WITNESS:  Copperstone, Your Honor.  I'm

8        referring to --

9                    THE COURT:  The ones in pink?

10                   THE WITNESS:  I --

11                   THE COURT:  The copy I have from the attachment to

12       Dr. Canjels doesn't have any highlighting on it.

13                   MR. POWERS:  Correct.  That's D-4.

14                   THE COURT:  Right.

15                   MR. POWERS:  And D-3 is the one that has the

16       highlighting.

17                   THE COURT:  The witness is referring to

18       highlighting.  The only highlighting I have is on D-3.

19       BY MR. POWERS:

20       Q.    If you look at D-4, the last three pages are

21       highlighted.

22                   THE COURT:  There's a number of exhibits.  D-4

23       meaning the Canjels --

24                   MR. POWERS:  S.E.C. Exhibit C-2, yes, Your Honor.

25                   THE COURT:  Okay.  Are you talking about the

1    declaration of Dr. Canjels right now?

2                    MR. POWERS:  Yes, Your Honor.

3                    THE COURT:  Okay.  So I don't think that was

4    marked as a Court exhibit.  Was it?

5                    MR. POWERS:  I just marked it, I thought.

6                    THE COURT:  Okay.  We don't need to mark exhibits

7    that are already before the Court in connection with the

8    preliminary injunction hearing, and you don't need to mark

9    as your exhibit the S.E.C.'s expert's declaration.  Okay?

10   So we can just refer to the things that have already been

11   electronically filed and are sworn declarations by the

12   document number on our electronic Pacer system.  But be that

13   as it may.  We're not going to mark it as a D exhibit.  That

14   would be very confusing to me.  We're going to call it 84-1,

15   and that's the document, the second declaration.

16                   There's a number of attachments.  The declaration

17   is only 10 pages, but then there's a number of attachments

18   that are not numbered, and to my way of looking at them,

19   none of them have any coloration on them.

20                   MR. POWERS:  Your Honor, you do not have in front

21   of you an S.E.C. Exhibit C-2, which has the last three

22   pages --

23                   THE COURT:  When you say C-2, what are you

24   referring to; C, or D?

25                   MR. POWERS:  S.E.C. Exhibit C-2, Your Honor.

1           THE COURT:  Okay.  Exhibit C-2, is it part of the

2    exhibit you marked called D-4?

3           MR. POWERS:  Yes.

4           THE COURT:  Okay.  That, I have.  I thought we

5    were looking at the Canjels declaration.

6           MR. POWERS:  Good.

7           THE COURT:  Okay.

8           THE WITNESS:  So, Your Honor, if you look at the

9    last three pages --

10          THE COURT:  Okay.

11          THE WITNESS:  -- of this exhibit, all the events

12   are highlighted on what I have in front of me, and hopefully

13   what you have in front of you.

14          THE COURT:  Okay.

15          THE WITNESS:  And the point, Your Honor, is that

16   in Dr. Canjels' listing of Copperstone events, it's

17   significantly different from the S.E.C.'s listing of

18   Copperstone events, and all of the events in yellow in the

19   last three pages were events added by Dr. Canjels to the

20   list of questioned events which were not listed as

21   questioned events by the S.E.C. itself in the 309 events

22   that the S.E.C. provided which I analyzed as questioned

23   events.

24          And the point that I want to emphasize is that

25   when Dr. Canjels claims that he redid my analysis and got

CHARLES P. McGUIRE, C.C.R.

1    different results, the reason for that is because I analyzed

2    the actual list of questioned events that the S.E.C.

3    questioned, and what Dr. Canjels did is, he abandoned the

4    list that the S.E.C. alleged, has alleged in this case as

5    questioned events and has instead substituted his own list,

6    changing the dates, changing the number of questioned

7    events, dropping a lot of events that the S.E.C. alleged as

8    questioned, and adding a lot of events that the S.E.C. did

9    not allege as questioned, and that explains the difference

10   in results.   It's in no way inconsistent with the results

11   that I reached, that there's no qualitative difference

12   between the trading results from the -- in the trades that

13   the S.E.C. has alleged as questioned and the trades that the

14   S.E.C. has not alleged as questioned.

15           THE COURT:  Sir, isn't -- what I'm looking at, if

16   I follow it, the highlighted documents, which is D-4, which

17   is the attachment from Dr. Canjels's reports, they're all

18   from 2015 events, and that wasn't included in the events

19   that the S.E.C. gave in the memo of August of this year.

20           THE WITNESS:  That's right, Your Honor.  The last

21   questioned event in the 319 events that the S.E.C.

22   alleges --

23           THE COURT:  Right.  That's the data you used,

24   correct, these 319?

25           THE WITNESS:  Correct.

CHARLES P. McGUIRE, C.C.R.

1           THE COURT:  Okay.  So, and they end in '14, and it

2     looks like these are all events from '15.

3           THE WITNESS:  Yes, that's correct.

4           THE COURT:  Okay.  Thank you.

5     Q.    And they also dropped events previous to 2015;

6     correct?

7     A.    Yes, and they also dropped a lot of events previous to

8     2014 -- 2015, excuse me.  They started a different time, and

9     a lot of the events, the earlier events were dropped by

10    Dr. Canjels.

11          MR. POWERS:  I'm almost done, Your Honor.

12          THE COURT:  Okay.

13          MR. POWERS:  May I approach?  I want to show one

14    more document.

15          THE COURT:  Just tell me what you're approaching

16    with.

17          MR. POWERS:  It's called history of events

18    questioned by the S.E.C. for the Amaryan --

19          THE COURT:  Is it a document that you made?

20          MR. POWERS:  It's a document we made.  It's a

21    document provided to the S.E.C.

22          THE COURT:  Okay.  Can I have a copy of it?

23          MR. POWERS:  That's what I --

24          THE COURT:  Okay.

25          MR. POWERS:  -- want to do.

1          THE COURT:  Thank you.

2       (A document was handed up to the Court.)

3          MR. POWERS:  May I approach the witness with it?

4          THE COURT:  Yes, I may.

5          MR. POWERS:  I'd like to mark this as D-5, Your

6   Honor.

7          THE COURT:  Okay.  Amy?

8       (Defendants' Exhibit 5 marked for identification)

9   Q.    Professor Fischel, could you tell us what the document

10  is, sir?

11  A.    Yes.  This is just a summary of the differences

12  between the questioned events as alleged by the S.E.C. that

13  I based my analysis on, what my analysis analyzed, and what

14  Dr. Canjels analyzed.

15         Would you like me to explain the exhibit?

16  Q.    Yes.

17  A.    All right.  So just going across horizontally, the top

18  line is what the S.E.C. in fact has listed as questioned

19  events.  The date range is February 2012 to February 2014,

20  319 events altogether, 153 for Copperstone, 126 for

21  Intertrade, and 40 for Ocean Prime, recognizing that there's

22  overlaps.

23         The second line is what I analyzed to reach the

24  conclusions that I reached, and you can see that those

25  numbers are identical to the list of questioned events by

1    the S.E.C., because what I based my analysis on was what the

2    S.E.C. has alleged and provided to me as the events that

3    they were challenging in the case.

4            And then the last horizontal entry is the --

5    basically a description of what Dr. Canjels analyzed.  And

6    you can see that instead of analyzing 319 events, he

7    analyzed 464 events.  Instead of 153 events for Copperstone,

8    he analyzed 218, instead of 126 for Intertrade, he analyzed

9    162, and instead of 40 for Ocean Prime, he analyzed 84,

10   where all those differences represent events that were not

11   listed by the S.E.C. as challenged events.

12           And then the exhibit goes on to discuss the

13   deleted events by Dr. Canjels from 2012 to September 2012,

14   Dr. Canjels deleted two events.  From October 12th through

15   February 14th -- I'm sorry, October 2012 through February

16   2014, Dr. Canjels deleted 18 events.  And from January 2015

17   through May 2015, Dr. Canjels added 165 events.

18           So basically he just analyzed a completely

19   different set of events, which is very different, as I've

20   said several times now, from the list of events that I

21   analyzed, because what I analyzed was the list provided to

22   me of the challenged events by the S.E.C. itself.

23   Q.    And based upon what you analyzed, you draw the

24   conclusion that there was nothing indicating that the nature

25   of the transactions would suggest insider trading by the

1    Defendants; correct?

2    A.    Correct.  I have a whole series of exhibits in my

3    report which demonstrate that.

4    Q.    Let me ask you another question.  You had read

5    Dr. Canjels's report, and you saw when I asked him about

6    Exhibit 2, tab 2?

7    A.    I did.

8    Q.    And do you remember my asking him questions about

9    whether or not he had the trade data, specifically time of

10   the trades for Copperstone?  Do you remember that, sir?

11   A.    I do.

12   Q.    Do you have any analysis of how that should be

13   affecting one's analysis or viewpoint?

14   A.    Well, yes.  I mean, the whole basis of Dr. Canjels's

15   testimony was, you can draw inferences from what he

16   described and others have described as trading within the

17   window.  Now, I think that's an incorrect inference, even on

18   its own terms, as I can explain if you ask, but when close

19   to 50 percent of the trades even that Dr. Canjels analyzed

20   on his completed, modified list from what the S.E.C.

21   alleged, you don't have the relevant data, you don't know if

22   those trades occurred before the window or after the window,

23   have no relationship to the window, that seriously qualifies

24   the conclusions that you're able to reach, even though in

25   his declaration there's no such qualification by Dr. Canjels

1    in terms of the conclusions that he reached, even though he

2    doesn't have the ability to draw those conclusions because

3    he's missing the data by his own admission, and the data

4    that he does analyze, he analyzes incorrectly, in my

5    opinion.

6    Q.    And -- okay.  So finally, then, sir, you heard him

7    earlier.  Do you have any other observations you'd like to

8    share with the Court?

9              MR. DONNELLY:  Objection to form.  I mean --

10              THE COURT:  I'll allow it.

11              MR. DONNELLY:  Okay.

12   A.    Yes, I have a lot.  You know, I could comment on every

13   single one of Dr. Canjels's exhibits.

14              First of all, I would say his exhibit on its face

15   demonstrates that there is very little overlap between the

16   Amaryan Defendants' trading and some of the trading by other

17   Defendants just on its face.  But beyond that, there is a

18   fundamental economic and statistical error that really

19   permeates all of Dr. Canjels's analysis and conclusions, and

20   it's this:  That it is well known that it is a fundamental

21   economic error to equate correlation with causation.  So in

22   other words, Dr. Canjels presented a lot of data based on

23   his restructured sample different from what the S.E.C.

24   alleged showing in his opinion that there was trading that

25   occurred, when he had data, forgetting the fact that for

1    half the trades, he doesn't have the data for Copperstone,

2    but for what he does have that the trading occurred after

3    the time of uploads on the newswire but before the time of

4    an earnings release.

5           And from that, he draws the conclusion that the

6    trading was based on the uploads.  And that's the

7    fundamental economic error of equating correlation, the fact

8    that these things happened at the same time, with one caused

9    the other.  And what he does not consider is any one of a

10   number of other explanations, even using his I would say

11   adjusted set of data different from what the S.E.C. alleged,

12   that could explain the same phenomenon.

13          So, for example, it's well known as I said before

14   that trading is concentrated around earnings announcements

15   and trading occurs in a concentrated way at the end of the

16   day.  So if you have an upload sometime before the end of

17   the day, and then you have an earnings announcement after

18   the close of trading, you might observe that there's a lot

19   of trading after the upload, but the trading may have

20   nothing to do with the upload, it may just be trading at the

21   end of the day in connection with knowing that there's an

22   earnings announcement, or it's possible, taking the S.E.C.'s

23   allegations at face value, obviously I'm not a fact finder

24   in the case, but taking the S.E.C.'s allegations at face

25   value that some individuals have access to the newswires,

152

1    they trade on it, that creates unusual trading activity of

2    one kind or another, that's picked up by traders in the

3    marketplace who are following price and volume movements in

4    the marketplace, and they trade in the same direction, in

5    which case, again, it would be incorrect to draw the

6    conclusion because the trading occurred at the same time as

7    the gap in time between the upload and the announcement that

8    the trading is caused by access to the upload as opposed to

9    some completely different explanation.

10            There's a lot of other points I could make, all

11   kinds of things that Dr. Canjels left out - the fact that

12   round-trip trading occurs all the time, not just in

13   connection with questioned events, and similar other points

14   about left-out data or left-out events.  But I think that's

15   at least a summary of what I think.

16   Q.    Thank you for that, Professor.  I have only one or two

17   more questions.

18            So then what I heard you say is that one of the

19   statements that you explained to the Court is that trading

20   on earning announcements is not an uncommon legitimate

21   trading strategy; is that correct?

22   A.    Very common, as is trading at the end of the day, if

23   you look at Dr. Canjels's exhibit, he shows that.

24   Q.    Any final observations?

25            THE COURT:  No, no more -- no more --

1          MR. POWERS:  No more questions, Your Honor.

2          Thank you, Professor.

3          THE COURT:  So let me make an observation.  You're

4    almost at the maximum of your time.  I'm going to give

5    S.E.C. -- I'm going to give you both additional time.  I'm

6    going to give them time to cross-examine this witness, and

7    then we'll talk about a limited additional time for your --

8    you have two other witnesses and one by videoconference,

9    okay?  So why don't we talk about that after we have the

10   cross-examination of the witness.  Okay?

11         MR. POWERS:  Thank you, Your Honor.

12         MR. AXELROD:  Your Honor, may I begin?

13         THE COURT:  Yes.

14                     CROSS-EXAMINATION

15   BY MR. AXELROD:

16   Q.    Good afternoon, Professor Fischel.

17   A.    Good afternoon.

18   Q.    So as I understand it, you are the president of

19   Lexecon Compass; is that correct?

20   A.    That's right.

21   Q.    Okay, and Lexecon Compass is a company that I believe

22   one of the things they probably do is provide expert

23   testimony to firms like Baker Hostetler that are willing to

24   pay for that opinion; is that right?

25   A.    Well, I wouldn't characterize it exactly that way.  I

1    would say our clients include firms like Baker Hostetler.

2    They also include the Department of Justice, the S.E.C.,

3    many other government agencies, state and local governments,

4    other types of clients as well.

5    Q.    Sure, but you'd agree with me on the point being that

6    your firm has people like you, experts in fields, who are

7    paid to provide an opinion; is that right?

8    A.    You know, again, I wouldn't characterize it that way.

9    We're certainly a for-profit firm, and we charge for our

10   services, if that's what you're asking.

11   Q.    Okay.  That is what I'm asking.

12         And in this case, I believe your billing rate is

13   $1,250 per hour; is that right?

14   A.    That's right.

15   Q.    And I take it just from looking at your CV and seeing

16   all your great accomplishments that you're a pretty busy

17   guy.  If that fair to say?

18   A.    Very busy, yes.

19   Q.    So is it fair to conclude that the analysis and the

20   report that you've done, that isn't all your work in this

21   case; is that right?

22   A.    Well, I didn't have Dr. Canjels's report when I did

23   my --

24   Q.    That's not quite what I'm getting at.

25         Do you have people who work for you on your staff?

155

1    A.    Yes.

2    Q.    Okay.  So how many hours did you spend yourself

3    preparing and analyzing the data for your report?

4    A.    You know, we just submitted a bill, so I think in

5    September, I billed 43 hours.  I haven't submitted my time

6    yet for October, but I would say for the first few days of

7    October until this hearing, I've spent a lot of time getting

8    ready for this hearing.

9    Q.    Okay.  So fair to say a little north of 50 hours just

10   for your time; right?

11   A.    Yes, I think that is fair to say.

12   Q.    And how many staff members on your team do you have

13   working on this case?

14   A.    I don't know exactly.  I would say one primarily,

15   meaning nearly full time, and then a number of others who

16   have assisted as needed.

17   Q.    And how many hours total would you say that other

18   people at Lexecon Compass besides you have spent on this

19   case?

20   A.    I don't know exactly, but I'm sure it's in the

21   hundreds.

22   Q.    Okay.  So I think you testified that you've testified

23   over 60 times in Federal Court; is that right?

24   A.    That's right.

25   Q.    But that --

CHARLES P. McGUIRE, C.C.R.

1    A.    Well, actually, I meant all courts, Federal, state,

2    and State Court.

3    Q.    But that isn't to say that every time you've testified

4    that you've been deemed an expert; is that correct?

5    A.    I've never not been qualified as an expert.

6    Q.    Well, is it fair to say that there's been certain

7    times where your opinion has been rejected and hasn't

8    survived the Daubert challenge?

9    A.    There's been one instance where my opinion was

10    rejected on Daubert grounds for failure to provide

11    explanation for a particular calculation.  That case is

12    currently on appeal in the 2nd Circuit.  It was argued in

13    May.  The issue of whether the disqualification, not on

14    methodological grounds or qualifications grounds, but for

15    failing to provide sufficiently detailed explanation, that's

16    the sole issue on appeal.

17    Q.    Is that the In Re Pfizer Securities litigation?

18    A.    Yes.

19    Q.    And that's where the Court said that your testimony

20    was not deserving of the expert opinion label; is that

21    right?

22    A.    Because of, again, the alleged failure to provide

23    sufficient explanation.  I think the decision is expected

24    any day now, or so I'm told, from the appellate court.

25    Q.    But isn't it fair to say, Dr. Fischel, that also, in

1    <u>United States v. Nacchio</u>, the District Court in Colorado

2    rejected your opinion as not meeting Federal Rule of

3    Evidence 702 and excluded you from testifying in that case

4    as well?

5    A.    That's not fair to say.  That's inaccurate in terms of

6    what happened, as is clear from the various opinions in that

7    case.

8         I'm happy to tell you what happened if you're

9    interested.

10   Q.    The Judge can look at the opinion.

11   A.    That's fine.

12   Q.    And isn't it fair to say also that in <u>S.E.C. v. Wiley</u>,

13   which is a Southern District of New York case, your analysis

14   of disgorgement was rejected in that case as well?

15   A.    I don't think that's completely correct, either.

16        MR. AXELROD:  And, Your Honor, just for the

17   record, I'll give you the cites at the end of the cross.

18   Q.    Now, at the end of your testimony, I believe you were

19   criticizing Dr. Canjels's report because you said, and

20   correct me if I'm wrong, that there were plenty of other

21   possibilities that would explain the Defendants' trading;

22   correct?

23   A.    I didn't quite say that.

24   Q.    What did you say?

25   A.    I said there are other possible explanations that

CHARLES P. McGUIRE, C.C.R.

1    could explain the same phenomenon, and you could not infer

2    causation from correlation, as Dr. Canjels did.

3    Q.    But in fact, Dr. Canjels didn't infer causation for

4    correlation, did he?  In fact, if you look at his report,

5    and I can give it to you, he used a p-test, and as you

6    understand it, a p-test is a test that demonstrates

7    correlation, not causation; correct?

8    A.    A p-test is a test of statistical significance of

9    whether you could observe the same result by chance.

10    Q.    But it's a correlative test, it's not a regression

11    analysis; correct?

12    A.    It's not a regression analysis, which is -- and that's

13    the point:  It is a correlation test.

14    Q.    Right, and that's what Dr. Canjels used, and he didn't

15    even suggest that he was opining about causation, did he?

16    A.    On the contrary, I think if you look at his

17    declaration as well as his testimony, his opinion is that

18    the trading was -- cannot be explained other than access to

19    the uploads.

20    Q.    Well, do you have his report in front of you?

21    A.    I do.

22    Q.    Okay.  Where does he say that?  I'd just like you to

23    identify it for the Court.

24    A.    I'd be happy to do that.  Hold on for a second.

25    Q.    Okay.  The trading can't be explained but except for

CHARLES P. McGUIRE, C.C.R.

1    having access to the press releases; is that what you're

2    saying he testified?

3                   MR. POWERS:   Objection.   He was going to identify

4    where in the report.

5                   THE COURT:   Okay.   Let's ask him where he talks

6    about causation.

7    A.     Okay.   For example, take a look at paragraph four,

8    Your Honor, of Dr. Canjels's declaration, where he was asked

9    to perform a quantitative and statistical analysis, and then

10   -- and just let me highlight these words in the last couple

11   of lines of paragraph four, to, quote, "determine if the

12   trading was based on obtaining pre-publication press release

13   information from Newswire Service 1 and Newswire Service 2."

14                   So it seems to me if he's giving an opinion on

15   whether he's, quote, determining, which is even stronger

16   than causation, if the trading was based on obtaining

17   pre-publication press release information, that's exactly

18   what he's doing.   He's saying that the obtaining of

19   pre-publication press -- he has, quote, determined, in his

20   word, that the pre-publication press information, the

21   obtaining of which was responsible for the trading, and

22   that, I think, is a fundamental economic error because it

23   confuses correlation with causation.

24   Q.     And, Dr. Fischel, I'm not an English major, but I

25   think in this paragraph, correct me if I'm wrong, he was

1    explaining what he was asked to do.  This paragraph doesn't

2    talk about his opinions, does it?

3              THE COURT:  Why don't you focus on his analysis?

4    I get that that's what they might have asked him to do, but

5    let's focus on what he did.

6              He talks about section page one is data, page

7    three is data, observations, trading analysis, and paragraph

8    12 asks conclusions.

9              THE WITNESS:  Correct.

10             THE COURT:  Okay.

11   Q.    So where in his conclusions does he say that there's

12   virtually no explanation besides the fact that Amaryan

13   Defendants had access to the hacked press releases for their

14   trading?

15   A.    Again, I would -- because --

16   Q.    I withdraw it.  We can move on.

17   A.    Okay.  Fine.

18   Q.    Now, let me understand what you did in this case.

19             I think you testified that there is academic -- or

20   maybe -- I want to use your words.  I don't want to confuse

21   it.  You said there's well-known analysis of insider trade

22   that compares questioned events to unquestioned events.  Is

23   that right?

24   A.    To a benchmark, that's right.

25   Q.    To a benchmark.  So in this case, just so I understand

1    what you did is you took the list of questioned events and

2    then compared it to what you saw as the unquestioned events

3    in the Amaryan Defendants' trading; is that right?

4    A.    To other events that were in question, that's right.

5    Q.    Correct.  And really, the analysis you did in this

6    case wasn't rigorous, to use an economics or mathematics

7    term, it was just more of a comparison; is that right?

8    A.    I think it was quite rigorous.  I think the comparison

9    is itself rigorous.

10    Q.    But essentially what you did is you took questioned

11    events and averaged them and took unquestioned events and

12    averaged them and totaled them and then compared the two

13    sets; is that right?

14    A.    At the most general level, that's right, but I don't

15    think that's a fair characterization of what I did or the

16    results that I found.

17    Q.    Okay.  Well, if you would, do you have your

18    declaration in front of you?

19    A.    I do.

20    Q.    Okay.

21              MR. AXELROD:  And, Your Honor, it's S.E.C. 167.

22    Q.    And, Dr. Fischel, if you could turn to paragraph 14.

23    A.    Okay.  I have it.

24    Q.    And you said "The S.E.C.'s allegation of a widespread

25    scheme involving illicit trading around events which is an

1    earnings announcement for hundreds of companies over a more

2    than five-year period implies that one would expect to find

3    the trading done by the latest funds to have been

4    concentrated around the questioned events."  Is that right?

5    A.    Correct.

6    Q.    "I find the pattern of trading inconsistent with this

7    expectation."

8    A.    That's right.

9    Q.    You don't cite any literature or any basis for your

10   conclusion in this paragraph, do you?

11   A.    For this particular paragraph -- I cite a lot of

12   academic literature, but for this particular paragraph, I

13   don't think any citation is required.

14   Q.    But you don't cite anything.

15   A.    Correct, not in this paragraph.

16   Q.    So if you turn to --

17         MR. AXELROD:  If we could put up Exhibit 173, and

18   can I have that so I can show it to Dr. Fischel?

19   Q.    And, Doctor, it's Exhibit F to your report, but it's

20   S.E.C. Exhibit 173.  Let me know when you have that in front

21   of you.

22   A.    Exhibit F to my report?

23   Q.    Yes.

24   A.    I have it in front of me.

25   Q.    Okay.  So, again, this is your analysis of

1    unquestioned versus questioned, and if you just look down to

2    the bottom at the notes, what you did is, you analyzed, and

3    just correct me if I'm wrong, trading for Copperstone from

4    January 2012 to August 2015; is that right?

5    A.    That's right.

6    Q.    Trading for Intertrade from February 2012 to March

7    2015; correct?

8    A.    Correct.

9    Q.    And trading for Ocean Prime from April 2013 to March

10   of 2015; correct?

11   A.    Correct, because that's the data that we had.

12   Q.    Okay.  So you took the list of questioned events that

13   you received from counsel that you say the S.E.C. provided;

14   correct?

15   A.    When you say that I say, are you disputing it?  I

16   mean, I saw the e-mail and the attachment from you, which

17   listed the 319 events.

18   Q.    Sir, it wasn't from me, but to --

19   A.    From the S.E.C.

20   Q.    To say the S.E.C. sent it to you would be incorrect;

21   right?

22   A.    Correct.  I think they sent it to counsel, which gave

23   it to me.

24   Q.    Just trying to be precise.

25        So you took that list, and that was your subset of

164

1    questioned events; right?

2    A.    Because it was the S.E.C.'s list of questioned events,

3    correct.

4    Q.    And everything else within the analysis period that we

5    just discussed you called an unquestioned event; correct?

6    A.    Correct, because it wasn't questioned.

7    Q.    So despite the fact that the time period for the

8    questioned events was from 2012 to 2014, you extended out to

9    2015 and just deemed those unchallenged events, or

10   unquestioned events; is that right?

11   A.    Well, I also used the period from 2012 to 2014 for

12   events that weren't questioned, but because the list of

13   questioned events provided by the S.E.C. ended in February

14   2012, that was my end date as well, and --

15   Q.    I think you mean 2014; correct?

16   A.    I'm sorry, I misspoke.  Excuse me.  Because the list

17   that I was provided ended in February 2014, everything

18   before and after that that wasn't questioned in the data

19   that I had I treated as an unquestioned event.

20        THE COURT:  Hold on.  So you used different data

21   to compare the questioned to the unquestioned events?  You

22   used another base of data to come up with the amount of

23   money that was made that was different than the date of the

24   questioned events?  You didn't use the same database for

25   both; right?

CHARLES P. McGUIRE, C.C.R.

1           THE WITNESS:  What I did was, Your Honor, I

2    compared the questioned events to a benchmark period, and

3    the benchmark period and the benchmark events included both

4    periods before what the S.E.C. has included in its

5    questioned events and after what the S.E.C. --

6           THE COURT:  You used different databases for

7    questioned versus unquestioned.  It was broader for the

8    unquestioned?

9           THE WITNESS:  Correct.  That's right.

10   BY MR. AXELROD:

11   Q.    And on the edges outside the questioned events, you

12   just decided for the sake of your analysis that those were

13   unquestioned; right?

14   A.    It's not what I decided.  They weren't listed as

15   questioned events by the S.E.C., so I treated them as

16   unquestioned.

17   Q.    But you didn't stop at the last period, the late date

18   of the questioned events.  Instead, you took the analysis

19   out farther to look at a period longer than just the period

20   covered by the questioned events with which you were

21   provided; correct?

22   A.    Correct, and the reason for that is because, as I

23   said, it's standard methodology in the academic literature

24   and analyses that I've performed countless times.  You can't

25   look at, quote, questioned events in isolation.  You have to

1    compare events that are questioned to see whether there's

2    anything different from the results from events that aren't

3    questioned because, as I've said, if you just look at the

4    profitability of trades that are questioned or the size of

5    trades that are questioned or the timing of trades that are

6    questioned, you can't reach a conclusion whether there's any

7    basis to conclude that any of those results are based on

8    trading on the basis of inside information without

9    performing the exact same analysis for trades that aren't

10   questioned, and if the results are the same, then it doesn't

11   look like there's any difference, and if there's no

12   difference, then there's no support for the conclusion that

13   the challenged trades are based on trading on the basis of

14   inside information if the other trades that aren't

15   questioned are just as profitable, are no bigger, the timing

16   is no different.  That's what I did.

17   Q.    I'm not quibbling with your analysis, but the time

18   frame, there were unquestioned events in the period of

19   October 2012 to February 2014; correct?

20   A.    And we used those as well.

21   Q.    Okay.  And you could have combined your analysis to

22   the period of 10/12 through 2/14 and come up with an

23   analysis comparing the profitability of questioned events

24   versus unquestioned events for that time frame; correct?

25   A.    Could have done that, but I don't think that would

1    have been as methodologically sound as what I did.

2    Q.    And what are you basing that on besides your

3    experience?  Do you have any article that you would cite to

4    that would say you would need to increase the period out

5    longer to the time period that you chose?

6    A.    Not that specific, but it's standard in the economic

7    literature on insider trading to compare the results of

8    challenged trades with a benchmark that results in a -- a

9    time period or a different series of events, whatever, that

10   aren't challenged, and that's exactly what I did.

11             THE COURT:  Sir, your analysis, though, assumes

12   that all the trades from February 14 through 15 were all

13   unquestioned trades; right?

14             THE WITNESS:  Correct, because they're not listed

15   by the S.E.C. as challenged events.

16             THE COURT:  But the memo that you said I've seen

17   for the first time as you saw it said this is a preliminary

18   list, as our research goes forward, there may be additional

19   trades.  So if you now got dates for '15 that had

20   questionable trades, would that change your analysis?

21             THE WITNESS:  If There were a list of trades that

22   the S.E.C. was challenging, like the 319 that I had that was

23   different, yes, I would perform a different analysis.

24             THE COURT:  Okay.  Thank you.

25   BY MR. AXELROD:

CHARLES P. McGUIRE, C.C.R.

168

1    Q.    It would, and in fact, Dr. Fischel, the amended

2    complaint, which you're familiar with, alleges that there

3    was a newswire service that was being hacked in 2015;

4    correct?

5    A.    I think if you -- you know, I've looked at this pretty

6    carefully.  I think, if I remember correctly, there's an

7    information and belief allegation that some of the

8    Defendants attempted to hack a newswire in 2015.  I think

9    that's the extent of the allegation as I recall.  But again,

10   there's no specific allegation that there are questioned

11   events in connection with the related funds, and they're not

12   listed by the S.E.C. as the events that they're challenging

13   as questioned in this case.

14   Q.    Sir, you reviewed Dr. Canjels's second declaration and

15   the exhibits in that declaration; correct?

16   A.    Very carefully.

17   Q.    Okay.  And did you review -- and I'm going to pull

18   this up for you -- Dr. Canjels's Exhibit F-1, which is

19   S.E.C. Exhibit 202?

20   A.    Well, I don't know what it is, but whatever it is, I

21   reviewed it.

22        MR. AXELROD:  Your Honor, may I approach with

23   Exhibit 202?

24        THE COURT:  Okay.

25        Do the Defendants have it?

CHARLES P. McGUIRE, C.C.R.

1          MR. POWERS:  Which exhibit number is this?

2          MR. AXELROD:  It's 202, it's F-1 to Canjels, which

3     you have, but I'll give you another copy.

4          MR. POWERS:  Thank you.

5          MR. AXELROD:  You are welcome.

6     Q.    And Dr. Fischel, let me know when you've had a chance

7     to look at that exhibit.

8     A.    I've looked at it.

9     Q.    And your conclusion in portion 4A was that the size of

10    the questioned trades was roughly the same as the size of

11    the unquestioned trades, which leads you to believe that

12    there was no insider trading.  More or less what you

13    concluded?

14    A.    I would say that's one part --

15    Q.    One piece.

16    A.    -- of my analysis, correct.

17    Q.    So if you look at -- if you look at Mr. Canjels's,

18    Dr. Canjels's Exhibit F-1, he compared the same, made the

19    same comparison, but he used the time period 10/12 to

20    February 2014; do you see that?

21    A.    I do.

22    Q.    And he came up with the fact that the average that the

23    questioned trades were about $512,000 in value and the

24    unquestioned trades were about $269,000 in value.  Do you

25    see that?

CHARLES P. McGUIRE, C.C.R.

1    A.    I see that.

2    Q.    Okay.  So that Dr. Canjels's analysis wouldn't support

3    your conclusion that you can determine insider trading

4    versus noninsider trading by the size of the trades.

5    A.    I think that's incorrect and again just demonstrates

6    the fact that Dr. Canjels should change the sample.  This is

7    an analysis of a different sample.  The S.E.C. --

8    Q.    Well, a different sample than what, sir?

9         MR. POWERS:  Excuse me, Your Honor.  He's in the

10   middle of answering and he's being cut off.

11        THE COURT:  Let him answer his question.

12        MR. AXELROD:  Your Honor, if you would, I'm asking

13   questions and the Doctor is going far beyond the scope of my

14   questions.

15        THE COURT:  Let's stop.  Ask him another question.

16        MR. POWERS:  Your Honor, he was in the middle of

17   answering the question.

18        THE COURT:  Counsel, I said ask another question

19   and then we'll proceed from there.  Okay?  Thank you.

20   Q.    Dr. Fischel, there's no doubt that Dr. Canjels used a

21   different scope of time than you did; correct?

22   A.    A different scope of time and a different set of

23   transactions, so, again, it's not surprising he reached a

24   different result because he's not using the transactions in

25   the time period that the S.E.C. itself has challenged in

CHARLES P. McGUIRE, C.C.R.

1    this case.  He's using his own sample, which is not what the

2    S.E.C. has alleged.

3    Q.    Well, let's talk really quickly about the different

4    sample.

5          You testified on direct that there were a lot of

6    deletions from the Canjels questioned events you received

7    versus the one that was provided with his second

8    declaration.

9    A.    Twenty deletions.

10   Q.    Twenty deletions.  And have you had the chance to

11   review David Amaryan's declaration?

12   A.    You know, I think I looked at it briefly at an earlier

13   point in time.

14   Q.    So you don't know whether there's an explanation in

15   that declaration that talks about pair trades.

16   A.    I don't.

17   Q.    And you don't know whether Dr. Canjels removed certain

18   events from the event list based on his analysis of David

19   Amaryan's declaration, do you?

20   A.    You would have to ask Dr. Canjels.  I don't know.  I

21   know what the S.E.C. has alleged as questioned trades.

22   That's what I know.

23   Q.    And you also testified there were a lot of additions;

24   correct?

25   A.    Correct.

1    Q.    But in fact, as the Judge noted, all of the additions

2    were all in the period of 2015; correct?

3    A.    Correct.

4    Q.    Okay.  So if you go back to Exhibit F-1, there's no

5    additions to this document; correct?  There may be some

6    deletions but there's no additions because this is the

7    period 10/12 to 2/14; correct?

8    A.    That's right.

9             THE COURT:  Remind me again what court number that

10    exhibit that is.

11            MR. AXELROD:  It's 202, Your Honor.

12            THE COURT:  Okay.

13            MR. POWERS:  Your Honor, I object.  I mean, I

14    think it was a misleading question.

15            THE COURT:  Okay.  You can ask him again on

16    redirect.  You have a chance to rehabilitate your witness on

17    redirect.

18            Let's move this along.

19            MR. AXELROD:  Okay.  I will, Your Honor.

20            MR. POWERS:  I think he said it wasn't

21    challenged --

22            THE COURT:  Counsel, I made a ruling.  Sit down.

23            Ask your next question.

24    Q.    You also opined, sir, that the size of the questioned

25    trades was similar to the size of the unquestioned trades;

1    is that correct?

2    A.    Correct.

3    Q.    And if we go to your analysis, Exhibit G, which is

4    S.E.C. 174, which I'll provide you --

5              MR. AXELROD:  Your Honor, may I approach?

6              THE COURT:  And you're showing him 174, which is?

7              MR. AXELROD:  Which is Exhibit G to his report.

8              THE COURT:  Exhibit G to the expert's report.

9    Okay.

10         (A document was placed before the witness.)

11   Q.    And again, sir, for this analysis in Exhibit G, you

12   used the time frame expanding to August 2015 and March of

13   2015 for the three Amaryan entities; is that correct?

14   A.    Correct, based on the data that I had.

15   Q.    You did not confine it to 10/2012 through 2/2014;

16   correct?

17   A.    Well, first of all, it would be a mistake to confine

18   it to those time periods because the S.E.C.'s allegations of

19   challenged events are not based on that time period.  They

20   go from February 2012 until February 2014.

21             MR. AXELROD:  Mr. Court reporter, could you read

22   back that answer?

23         (Record read)

24   Q.    Okay.  But, sir, you extended your analysis past

25   February 2014 until way into 2015; correct?

CHARLES P. McGUIRE, C.C.R.

174

1    A.    Correct, to get a benchmark, including other -- as

2    part of the benchmark, I would say.

3    Q.    So your testimony is today that you could not have

4    developed the benchmark from just looking at the period from

5    10/2012 to 2/2014?

6    A.    You could, but it would be a mistake to do it, because

7    if you look at the period immediately proximate to the

8    challenged period, and I included the challenged period as

9    well, but if -- just focusing on the period after the period

10   of time that the S.E.C. alleged as including challenged

11   events, if the trades are just as profitable, if they're

12   just as big, if they're just as likely to be around earnings

13   announcements, that is in my opinion powerful economic

14   evidence that's inconsistent with the basic claim in this

15   case that the trades around the challenged events that the

16   S.E.C. has listed, the 319, were based on access to inside

17   information.

18   Q.    But your conclusion only holds up if you extended the

19   period into 2015 and you declare that all the trading in

20   2015 is unquestioned; isn't that correct?

21   A.    As well as all the trades in 2012 to 1214 that are

22   unquestioned are part of the same benchmark, that's correct.

23   Q.    And, in fact, if you deem the trades in 2015 as

24   questioned events, your conclusions fall apart; isn't that

25   right?

1    A.    It's not what I deem.  The's what the S.E.C. has

2    alleged as questioned events.  That's what I based my

3    analysis on.

4    Q.    Sir, I'm just asking you about your conclusions, and

5    if you deem the trading in 2015 as questioned, then your

6    opinions in your report aren't supported by your analysis;

7    isn't that correct?

8    A.    My problem with the question is, I'm not the one

9    deeming anything as questioned or unquestioned.  The S.E.C.

10   is deeming the events as questioned --

11            THE COURT:  Why don't you just move on from this

12   point, okay?

13            MR. AXELROD:  Okay.

14   Q.    And the last point is, you opine that the Amaryan

15   Defendants earned the majority of overall profits from the

16   unquestioned trades; correct?

17   A.    Correct.

18   Q.    And do you have your declaration in front of you?

19   A.    I do.

20   Q.    Now, obviously in preparing this report and preparing

21   to testify, you reviewed the Amaryan Defendants' trading;

22   correct?

23   A.    To the extent that's reflected in my report, correct.

24   Q.    And you looked at their questioned trades and their

25   unquestioned trades; correct?

176

1    A.    That's right.

2    Q.    And you became familiar with this Intercept trade;

3    correct?

4    A.    Very familiar.

5          MR. AXELROD:  If we could put up Exhibit K to Dr.

6    Fischel's report, which is Exhibit 178.

7          And, Your Honor, may I approach Dr. Fischel with

8    Exhibit 178 --

9          THE COURT:  Yes.

10         MR. AXELROD:  -- which is Exhibit K to his report.

11   Q.    And, Doctor, let me know when you've had a chance to

12   review that.

13   A.    I've looked at it.  I'm very familiar with it.

14   Q.    And again, you used the period going from August 2015

15   and March of 2015 for the various entities; correct?

16   A.    I used all the data that I have, correct.

17   Q.    And your analysis is that 13.4 percent came from the

18   questioned events and 86.6 came from the unquestioned

19   events; correct?

20   A.    That's right.

21   Q.    Now, so you saw the Intercept trade when you did this

22   analysis; correct?

23   A.    I did.

24   Q.    And you would agree with me, wouldn't you, that the

25   Intercept trade accounted for the overwhelming majority of

1    the unquestioned events by the Amaryan Defendants?

2    A.    The unquestioned profits.

3    Q.    The unquestioned profits; correct?

4    A.    Yes, I would agree, that's correct.

5    Q.    Okay.  And over all, in fact, they accounted for about

6    $22 million of the unquestioned trading; correct?

7    A.    Correct.

8    Q.    And you have a lot of experience in math and

9    statistical analysis.  You would agree with me that based on

10   their general profits from the trading that this trade was

11   highly anomalous?

12   A.    I would say it's far more profitable than any other

13   trade that I'm familiar with, that's correct.

14   Q.    What was the next most profitable trade you saw?

15   A.    I don't recall.

16   Q.    But it was way beyond any other profitable trade;

17   correct?

18   A.    Yes, I think it was far more profitable than any other

19   trade.

20   Q.    Okay.  And, in fact, I think you saw Dr. Canjels's

21   testimony about this, this was trading by the Amaryan

22   Defendants in about a two-week period leading up to a

23   surprise clinical drug test result; correct?

24   A.    I heard the testimony.  I'm not -- myself, I don't

25   recall that specifically, but that seems very likely to be a

1    plausible explanation for why the trade was so profitable.

2    Q.    And you would agree with me, wouldn't you, that to get

3    a better sense of the general profits that the Amaryan

4    Defendants made from unquestionable trading, you'd have to

5    remove this anomalous trade, otherwise it skews all of your

6    results.

7    A.    I disagree with that.  I think the fact that most of

8    the trades in this business came from unquestioned trades,

9    even if it's one trade that's not a questioned trade, I

10   think there's no basis to exclude it.  It's part of the

11   overall profitability of the trading strategy.  There are

12   many different types of strategies where you have many dry

13   holes and one big success.

14   Q.    So, sir --

15   A.    I think it would be misleading and incorrect to

16   exclude it.

17   Q.    Going off of your analysis, you said that the other

18   trading resulted in $25 million in profits; correct?

19   A.    Correct.

20   Q.    And that one trade accounted for $22 million in

21   profits; correct?

22   A.    That's right.

23   Q.    So I don't recall as I sit here today how many other

24   not-unquestioned trades were, but you would agree that all

25   those other trades made up the $3 million in revenue that

1    makes the difference between 25 and 22 million?

2    A.    I would agree with that.  I think if you exclude the

3    trade, which I think there is really no basis to exclude,

4    then the profits from the unquestioned trades are roughly

5    the same as the profits from the questioned trades.  I would

6    draw the same conclusion, but I think it's a stronger

7    conclusion if you include the highly profitable Intercept

8    trade.

9    Q.    And, in fact, Dr. Fischel, going back to your Exhibit

10   K, the questioned events generated about $4 million in the

11   time frame that you use; correct?

12   A.    Correct.

13   Q.    And that was actually more than the amount generated

14   from the unquestioned events once you remove the Intercept

15   trade; correct?

16   A.    They're very close, actually.  You're rounding.  If

17   you look at the exact numbers, they're very close, having

18   looked at it myself.

19   Q.    But of course, your whole analysis is premised on the

20   fact that you deemed the 2015 trade unquestioned; correct?

21   A.    You know, we went through this before.  It's not what

22   I deemed, it's what the S.E.C. deemed and what I based my

23   analysis on.

24   Q.    Because the S.E.C. didn't list those on the questioned

25   trades, you said they were unquestioned; is that correct?

180

1          MR. POWERS:  Objection; asked and answered.

2          THE COURT:  You can answer it.

3    A.    It's not what I said.  I took the --

4    Q.    I'm not asking what you said.  I'm asking for your

5    analysis, sir.

6          MR. POWERS:  Objection.  You have to let him

7    finish, then.  If you let him answer --

8          MR. AXELROD:  Your Honor, the witness is being

9    fairly unresponsive.  I'm just looking for very simple

10   answers.

11         THE COURT:  Let's read back the question and let

12   him answer it.

13      (Record read)

14   A.    In my analysis, I treated things that were not

15   challenged by the S.E.C. as unchallenged by the S.E.C.,

16   correct.

17   Q.    And, sir, you would agree that a regression analysis

18   is a rigorous analysis that lets you determine causation;

19   correct?  Generally.

20   A.    Sometimes, I would say.  It depends.

21   Q.    You didn't use a regression analysis in your

22   conclusions, did you?

23   A.    Did not.

24   Q.    Do you use any type of econometric tool to analyze the

25   trades?

CHARLES P. McGUIRE, C.C.R.

1    A.    No.

2            MR. AXELROD:  Your Honor, I was going to read the

3    cites for you:  United States v. Nacchio, from the

4    10th Circuit, 555 F.3d 1234; In Re Pfizer Inc. is 2014

5    Westlaw 3291230.

6            And I have no further questions, Your Honor.

7            THE COURT:  Okay.

8            I just wanted -- we're way past the time.  I will

9    allow some additional time for the videotape witnesses, a

10   half hour each, 15 minutes each.  You can use your time.

11   I'm going to give each side another hour -- I'm sorry,

12   another half hour each.  You can break it up with one

13   witnesses or two witnesses or however you want.  But if you

14   want to use it on this witness, then you're not going to use

15   it on the videoconference witnesses.

16           My suggestion all day is use your time wisely.  I

17   have a lot of documents before me.

18           Are you going to have any more questions for this

19   witness?

20           MR. MOSCOW:  Could we take a break and then

21   answer --

22           THE COURT:  No, you're going to answer that now.

23           MR. MOSCOW:  No, Your Honor.

24           THE COURT:  Okay.  Good.

25           MR. POWERS:  The only thing I would note, Your

1      Honor, is that obviously I want him qualified as an expert.

2      We'd like to have the documents admitted into evidence that

3      have been introduced.

4              THE COURT:  Any objection to having him qualified

5      as an objection?

6              MR. AXELROD:  No, Your Honor.

7              THE COURT:  There's no objection.  Both gentlemen

8      are qualified as experts.  Their testimony in my judgment

9      today goes to reliability and fit, not to qualifications,

10     and I have their reports, I have the testimony of them today

11     on the stand.

12             It's 3:35.  We'll come back at a quarter to four

13     and we'll go to quarter to five, okay?  So you'll each have

14     30 minutes.

15             Thank you.

16             THE COURT CLERK:  All rise.

17         (Recess taken)

18             THE COURT CLERK:  All rise.

19             THE COURT:  Okay.  Thank you.

20             All right.  Now, we have our next witness, I take

21     it, will be whom?

22             MR. MOSCOW:  David Amaryan.

23             THE COURT:  Okay.  We're going to place him under

24     oath?

25             MR. MOSCOW:  Yes.

CHARLES P. McGUIRE, C.C.R.

1    THE COURT CLERK:  Sir, I'm going to ask you to

2    raise your hand, raise your right hand, please.

3    D A V I D    A M A R Y A N, called as a witness on behalf of

4    the Defendant, and having been duly sworn, testified as

5    follows:

6    THE COURT CLERK:  Please state your full name for

7    the record, please.

8    THE WITNESS:  David Amaryan, and my last name is

9    spelled A-m-a-r-y-a-n.

10    THE COURT:  Okay.  Proceed.

11    MR. MOSCOW:  Thank you, Your Honor.

12    DIRECT EXAMINATION

13    BY MR. MOSCOW:

14    Q.    Mr. Amaryan, where were you born and raised?

15    A.    I was born and raised in Yerevan, Republic of Armenia.

16    Q.    And when did you start to learn English?

17    A.    I started to learn English in school in Armenia.

18    Q.    How old were you?

19    A.    I was about 11, 12 years old.

20    Q.    And did you take any steps to learn English for your

21    future?

22    A.    Yes, absolutely.

23    Q.    What?

24    A.    Besides studying in school, I also had an excellent

25    teacher outside of school, and I also tried to communicate

CHARLES P. McGUIRE, C.C.R.

184

1    with native speakers from the United States or anywhere else

2    whose native language was English.

3    Q.    And did there come a time that you started to attend

4    courses away from your school so that you could hear someone

5    from the United States speaking English?

6    A.    Yes, sir, that's correct.  I think that I was about 12

7    or 13 years old when I started attending American University

8    in Armenia.  "Attending" is probably the wrong word.  I

9    wasn't enrolled in it.  I just went to the university and

10   asked some of the professors if I could sit in the courses

11   that they teach so I can learn English and perfect my

12   English.

13   Q.    Did there come a time when you were in high school

14   that you came to New York to attend high school?

15   A.    That is correct.

16   Q.    And thereafter, did you return to Armenia?

17   A.    That's also correct.

18   Q.    Where did you go to college?

19   A.    I went to Miami University of Ohio, Oxford, Ohio.

20   Q.    And what did you study?

21   A.    I studied finance and international business.

22   Q.    And after you were graduated from Miami University,

23   what did you do?  In terms of work.

24   A.    I started my -- in terms of work, right?

25   Q.    Yes.

CHARLES P. McGUIRE, C.C.R.

1    A.    Right after college, I got a job with

2    AllianceBernstein as assistant portfolio manager.

3    Q.    What is that?

4    A.    I was a junior person, part of a four-member team

5    managing U.S. gross and value portfolios, equities.

6    Q.    And have you continued in that line of work for

7    various companies since then?

8    A.    Yes, that's correct.

9    Q.    Did there come a time that you moved to Russia?

10    A.    Yes, that's correct, in 2003.

11    Q.    Why?

12    A.    Mainly because of behest, on behest of my parents, who

13    did not want to move to the United States because they

14    already made a big move from Armenia to Russia.

15    Q.    And with what company did you work when you went to

16    Russia initially?

17    A.    I worked -- I worked for Citigroup when I went to

18    Russia.

19    Q.    Now, have you heard of a company called Troika Dialog?

20    A.    Of course.  That's where I spent most of my career

21    outside of my own company.

22    Q.    And what is Troika Dialog?

23    A.    Troika Dialog is one of the biggest and probably best

24    known Russian investment banks.

25    Q.    And as of 2008, before you left, how many employees

1    did it have, if you recall, approximately?

2    A.    Approximately, if I remember correctly, about a

3    thousand, maybe just a little under.

4    Q.    And what was your title?

5    A.    I was the vice president of sales and trading.

6    Q.    Were you dealing with wealthy people at Troika Dialog?

7    A.    That's correct, but I actually -- I was the one who

8    created the Department of ultra-high net worth individuals

9    within the sales and trading department.

10    Q.    And did there come a time that you left Troika Dialog

11    and set up your own firm?

12    A.    Yes, that's correct.

13    Q.    When was that?

14    A.    That was 2009.  Well, I left Troika Dialog -- I left

15    Troika Dialog I believe it was very end of 2008, and then

16    throughout the course of 2009, I was preparing to start my

17    firm.

18    Q.    What was the condition of the financial services

19    industry in 2008?

20    A.    I think everybody can say that it was terrible.

21    Q.    And with how many people did you set up your own firm

22    in 2009?

23    A.    In 2009, we started out with only three people.

24    Q.    Who were they?

25    A.    It was myself, my younger brother, Vardan Amaryan, who

1    is the chief operating officer, and Maxim Batashev, who was

2    our trader.

3    Q.    Now, where did the name Copperstone Capital come from?

4    A.    It comes from my homeland.  It's a mountain where I

5    grew up.  It's a direct translation from Armenian,

6    Copperstone.  It's a big red mountain.

7    Q.    Okay, and what is the business of Copperstone?

8    A.    Copperstone is an investment management firm.  We

9    manage assets for high net worth individuals and

10   institutions, and our areas of operations include investment

11   management, personal net worth management, private equity,

12   some advisory services.  It is also manager of Alpha Fund.

13   Q.    Now, in connection with Copperstone Capital, has it

14   won any awards as a hedge fund?

15   A.    Yes, numerous.

16   Q.    Can you hear me?

17   A.    Yes.

18   Q.    Okay.  When you started, you had three people; is that

19   correct?

20   A.    Yes.

21   Q.    As of August 2015, approximately how many employees

22   were you in charge of at Copperstone and its affiliated

23   companies?

24   A.    Copperstone and its affiliated companies are a little

25   bit over 80 people.

1  Q.    And is one of the affiliated companies a manufacturer

2  or seller, distributor of perfume?

3  A.    That's correct.

4  Q.    When you started, where were you located?

5  A.    I beg your pardon?

6  Q.    When you started in business, where did you go into

7  business as -- the predecessor of Copperstone?

8  A.    You mean our address?

9  Q.    Yes.

10  A.    We -- from day one, we have been in the same address,

11  which is Sadovnicheskaya Street, number 16.  The only

12  difference is that in 2009, we only occupied one room in

13  this building.  Now we are occupying all four floors of this

14  mansion, which is right in the center of Moscow.

15  Q.    Do you do more than trade securities?  Do you do

16  additional financial things than trading in securities?

17  A.    Yes, absolutely.  In fact, most of the people working

18  for Copperstone are working on other stuff.

19  Q.    Okay.  Now, did you get married?

20  A.    Yes, I did.

21  Q.    Do you have children?

22  A.    Yes, I do.

23  Q.    Did there come a time that you applied to take a

24  graduate course in business at the University of Chicago?

25  A.    Yes.  In 2014, I applied to -- for an M.B.A. program

1    at Chicago School of Business.  I was accepted, I am still

2    enrolled, but I am right now on a leave due to this case.

3    Q.    And did you write essays to apply to the University of

4    Chicago Business School?

5    A.    That's correct.  It was only part of the application

6    process, but yes.  I had to write two essays, which

7    described my business.

8    Q.    Did you send them to the S.E.C.?

9    A.    No, sir.

10   Q.    Did you see them in the filings by the S.E.C.?

11   A.    Yes, sir.

12   Q.    Do you know how they got your e-mail?

13   A.    No, sir.

14   Q.    Did there come a time that you found out that you were

15   charged with being involved in trading on hacked

16   information?

17   A.    Yes, sir.

18   Q.    Did you ever trade on hacked information?

19   A.    Absolutely not.

20   Q.    Did you ever receive hacked information from one of

21   the hackers or anyone else that you know of?

22   A.    Absolutely not.

23   Q.    Did you pay anyone for the information -- for any

24   information?  Put it that way.

25   A.    Absolutely not.

190

1    Q.    Have you paid any other Defendants in this case any

2    money for sharing information with you?

3    A.    No, sir, absolutely not.

4    Q.    Have you given anything of value to those people for

5    letting -- no, stop -- did you give anything of value to

6    those people?

7    A.    No, sir.

8    Q.    Now, directing your attention to your initial

9    meetings, how did you decide what to invest in when you

10    started out?

11    A.    Are we talking about this particular strategy, or

12    other strategies, because we have numerous strategies.

13    Q.    Generally, when you first started in business, how did

14    you decide what to invest in?

15    A.    Well, initially, we were focused on Russian equities,

16    and we were analyzing Russian equities.  This is the market

17    that we know very well.  And then gradually, we started

18    diversifying into other geographies and other strategies.

19    Q.    Okay.  When did you first meet David Cliason (ph)?

20    A.    If I believe correctly, it was sometime in 2009.

21    Q.    And did you become friends?

22    A.    Very, very close friends, yes.

23    Q.    Did there come a time that he would join you in

24    considering what investments to make?

25    A.    Yes, that's correct.

CHARLES P. McGUIRE, C.C.R.

191

1    Q.    And was he making investments himself?

2    A.    I assume he was, yes, but I don't know this.  You

3    should ask him this question.

4    Q.    Okay.

5          Now, when you found out that the S.E.C. had

6    accused you of trading in hacked information, did you return

7    to the office?

8    A.    Immediately.

9    Q.    And what, if anything, did you do to check whether

10   anyone working -- well, first of all, were you aware whether

11   or not you had done that?

12   A.    I beg your pardon?

13   Q.    Had you traded on such inside information?

14   A.    Absolutely not, sir.

15   Q.    And what did you do to check to see if anyone with you

16   had?

17   A.    Well, I -- my first course of action was to ask a

18   relevant law enforcement agency in Russia to come in, and we

19   voluntarily opened all our servers, and all our e-mails, we

20   gave access to all our phones and messages on the phones and

21   everything, and then these security people also went to the

22   homes of my employees and checked everything there as well.

23   Q.    And did they report to you on what they found in

24   connection with dealing with the other Defendants or the

25   hackers?

CHARLES P. McGUIRE, C.C.R.

1    A.    Yes, sir.

2    Q.    What did they find?

3    A.    They found no connection with alleged hackers.

4    Q.    Now, directing your attention specifically to the

5    investment strategy that is involved in this matter, could

6    you describe what the strategy or strategies are that you

7    use?

8    A.    As I just mentioned, it's multi-strategy fund that

9    invests in various geographies, and this diversification is

10   done not to depend on a single market or a single strategy.

11   And we have stringent standards.  For example, we have

12   fundamental or so-called value, deep value trading strategy,

13   in which we would buy undervalued companies and hold them

14   for a long time.  We had opportunity strategy.  We had an

15   impulse trading strategy.  And we had the pair trading

16   strategy.  And then we had a few strategies that were based

17   purely on technical analysis.

18   Q.    Okay.  What is the impulse-based strategy, and how did

19   it come to your attention?

20   A.    If I believe correctly, I think it was at the end of

21   2010 or beginning of 2011 where my team started looking for

22   inefficiencies in stock price movements after earnings

23   announcements - after earnings announcements - and the idea

24   was --

25   Q.    What -- continue.

CHARLES P. McGUIRE, C.C.R.

1    A.    The idea was that there is market inefficiency,

2    especially with small to midsized companies, when an

3    earnings announcement is announced, during the after-hours

4    trading, the effect could be exaggerated due to various

5    factors, some of which are lack of volume in after-hours

6    trading.  And trading done by computerized and algo trading

7    systems, and -- for example, if a company came out with bad

8    earnings, after hours, it could go down by 15, 20 percent,

9    and if our analysis told us that this is overdone, then the

10   company should have only gone down five to 10 percent, we

11   would enter this trade with the hopes that during the

12   regular market hours, this inefficiency would be corrected

13   by the market.

14   Q.    And did you engage in such trading?

15   A.    Some, but not a lot.

16   Q.    And did some -- who suggested the impulse trading?

17   A.    Well, the -- initially, in 2010-2011, the person that

18   came with the idea was Nikolai Slepenkov, but further

19   analysis and testing was done by my team, which we were part

20   of it.

21   Q.    Okay, and did there come a time that you focused on

22   certain midcap and small-cap stocks?

23   A.    Yes.  We trade -- we tested this theory extensively, I

24   think, over the course of six months without putting any

25   money into it, and we looked at hundreds of companies.  We

194

1     filtered them down by market cap and implied volatility,

2     implied volatility meaning how much it goes up and down

3     after news comes out.  But we -- during this testing period,

4     we noticed certain pattern with number of these -- number of

5     these companies, and this pattern was that the volatility

6     and the -- the increasing price and the increasing --

7     increasing volume and unusual activity in options were

8     present not only after the news announcement but also right

9     before the news announcement during the regular trading

10    hours.

11    Q.    And what conclusion did you draw from that?

12    A.    Well, it definitely caught our attention because, in a

13    number of these cases, the move that was -- the sharp move

14    that we observed before the earnings announcement was in the

15    same direction of amount, so it seemed to us that someone

16    somewhere was trading ahead of company events, such as

17    earnings announcements, and quite frankly, they were doing

18    this quite recklessly, without any regard to actual

19    liquidity or volumes or time or anything like that.  So a

20    lot of the moves were very exaggerated, it would seem.

21    Q.    And what decisions did you make in terms of those

22    trades?

23    A.    Well, we continued testing this, I think it was over

24    six months, maybe up to a year, without putting any money

25    into it, and we -- we continued seeing the same pattern in

CHARLES P. McGUIRE, C.C.R.

195

1    different companies, and the list of companies in our Excel

2    spreadsheets changed, we added some and deleted some others

3    where it was not obvious to us what was going on, and I

4    think it was 2012 where we decided that we should include

5    this as a trading strategy in our fund.

6    Q.    And was the strategy to act with people who were

7    trading early?

8    A.    It was only one of the components of our

9    decisionmaking.  We saw this trigger, that it was one of the

10   components of our decisionmaking.

11   Q.    And what were the other components?

12   A.    The other components, again, the price movements, the

13   movement in -- the increase, sharp increase in volumes,

14   unusual trading activity in options markets.  We always

15   coupled this with our fundamental view of the stock, and

16   then we integrated our technical trading strategies into

17   this as well.

18   Q.    And did you come to think that there were people with

19   money who thought they had inside information or thought

20   they had advance knowledge of what was happening?

21   A.    Honestly, it seemed that way.

22   Q.    And did you follow them on some occasions?

23   A.    I believe so.

24   Q.    And did you -- again, let me go back.  Did you discuss

25   these -- this strategy in the business?

1    A.    What do you mean?  "In the business" meaning with my

2    team?

3    Q.    Yes.

4    A.    Yes, this was my trading and management team that was

5    doing, you know, that came up with the strategy.

6    Q.    Okay.  Now, very quickly, how many people are on the

7    team?  Not their names, just how many.

8    A.    Right now, there are about 14 or 15 people that are

9    only dealing with the investment side of the business,

10   liquid investments.  Not the prime equity.

11   Q.    Okay, and do you -- withdrawn.

12         Do you now keep records of the discussions on

13   investments?

14   A.    Yes, we have -- I think it was mid-2014 or beginning

15   of 2014 where we started keeping minutes of our investment

16   committee meetings.

17   Q.    Do you keep -- did you receive data from analysts

18   before you made an investment to follow any strategy?

19   A.    I'm not sure what you're saying.  Analysts of major

20   investment firms and their reports were absolutely part of

21   our decisionmaking strategy, and we had access to all of the

22   major investment houses' analysts' reports.

23   Q.    Okay.  And what is a pair trade?

24   A.    A pair trade is basically a statistical arbitrage.

25   It's a market-neutral trading strategy that matches a long

CHARLES P. McGUIRE, C.C.R.

197

1    position with a short position that we think are highly

2    correlated, and the amounts that we put in each position are

3    identical, they should be the same for this to work.  It's

4    quite sophisticated.  In reality, it's quite difficult to

5    come up with two securities that are identical and

6    correlated but for some reason we believed that there is no

7    difference in performance.  So basically we are betting on a

8    change in spread of these two securities, but we are hedged

9    in terms of marketwide negative downturns because both of

10   them are highly correlative.

11   Q.    Now, were Caterpillar, Deere, Verizon, Vodafone, AT&T

12   and Verizon, AT&T and S & P Index among your pair trades?

13   A.    Yes.  Yes.  They were pair -- parts of the pair trades

14   strategy, yes, they were.

15   Q.    Now, have you ever met Alfred Victor Brewster?

16   A.    No, sir.

17   Q.    Do you know who he is?

18   A.    I now know that -- well, I don't know him.  I don't

19   know him personally.  I never met him.  I know he is the

20   nominal owner and director of Ocean Prime.

21   Q.    And did you get in touch with him through a company?

22   A.    Yes.  I think at the time Ocean Prime was set up, we

23   hired an outside law firm that in turn set up this company

24   for us through an administrator.

25   Q.    And did you ever meet or speak with this man?

198

1    A.    No, sir.

2    Q.    Now, I direct your attention to Mr. Slepenkov.

3          Did there come a time that he began to work for

4    you?

5    A.    Yes, sir.

6    Q.    And does he run a company by himself?

7    A.    Does he run a company by himself?

8    Q.    Yes, Escada.

9    A.    Well, he is responsible for making most of the trades

10   on Escada.  That's about it.

11   Q.    Now, where is the trading room in your office?

12   A.    It's on the second floor of our building.

13   Q.    And do the traders -- withdrawn.

14         Are you a trader?

15   A.    No, sir.

16   Q.    Do the traders for your company also conduct trades

17   for Mr. Slepenkov?

18   A.    I don't exclude that on a number of occasions they

19   might have put trades on Escada as well, but I don't know

20   that for sure.

21   Q.    When it is four o'clock in New York and the market

22   closes, what time is it in Moscow?

23   A.    Well, right now, it's 11 p.m. in Moscow, but because

24   of time changes, it varies throughout the year.  It could be

25   11, 12, or 1 a.m.

1          THE COURT:  And I would just note it's 20 after

2     four, so we're getting close to the end.

3          MR. MOSCOW:  Yes, Your Honor.

4     Q.    Let me ask again, did you -- I would like you to look

5     at the Judge and just say very clearly, did you ever trade

6     on hacked information from any source?

7     A.    I would like to very much look at the Judge, but just

8     for the record, I don't see the Judge.

9     Q.    Okay.  Would you answer the question?

10    A.    I -- the answer is no, negative, sir.  I have never

11    done that.

12          MR. MOSCOW:  Okay.  Thank you, Your Honor.

13          THE COURT:  Thank you.

14          MR. MOSCOW:  Hold on.

15      (Off the record discussion)

16          MR. MOSCOW:  For the record, I'm sorry, if I can

17    go a minute over:

18    Q.    Mr. Amaryan, are you aware of anyone in your company

19    doing anything like this?

20    A.    No, sir, and as I explained, I have a trust-but-verify

21    methodology, and I verified this to the best of my

22    abilities.  I even involved law enforcement.

23    Q.    Okay.

24    A.    And that's -- nothing.

25          MR. MOSCOW:  Thank you.

CHARLES P. McGUIRE, C.C.R.

1                          CROSS-EXAMINATION

2    BY MR. DONNELLY:

3    Q.    Good evening, Mr. Amaryan.  John Donnelly from the

4    Securities and Exchange Commission.

5              MR. DONNELLY:  Can you pull up 271?

6              We're connecting a cable.

7    Q.    Mr. Amaryan, what is appearing on your screen is

8    Plaintiff's Exhibit 271.  Do you see that?

9    A.    Yes, sir.

10   Q.    Is this an accurate description of the relationship

11   between yourself, Intertrade, Ocean Prime, Copperstone

12   Capital, Copperstone Alpha Fund, and Nikolai Slepenkov?

13   A.    At the present time, it is not, because Intertrade

14   does not -- does not have any connection with Copperstone

15   Capital.

16   Q.    At one point, did you hold your ownership of

17   Copperstone Capital through Intertrade Pacific?

18   A.    That's correct, but not anymore.

19   Q.    When did that stop?

20   A.    I believe it was in 2014.

21   Q.    Do you hold your ownership of Copperstone Capital

22   directly at this time?

23   A.    No, I hold it through another entity.

24   Q.    What entity is that?

25   A.    It's called Amabro Investments.

201

1    Q.    Could you spell the first record?

2    A.    A-m-a-b-r-o Investments.

3    Q.    Okay.  Does Mr. Slepenkov own Escada?

4    A.    Yes, he owns Escada.

5    Q.    Does he own that a hundred percent, to your knowledge?

6    A.    To my knowledge, he does.

7    Q.    You know Maxim Zakharchenko; correct?

8    A.    Incorrect.

9         MR. DONNELLY:  Would you pull up 239, please?

10   Q.    And, Mr. Amaryan, what should be appearing on your

11   screen is Plaintiff's Exhibit 239, which on its face

12   purports to be an investment advisory agreement between

13   Bering Capital Partners Company, Ltd. and Maxim Zakharchenko

14   and David Amaryan and Dizuchi Capital Partners, and it is

15   dated the 10th day of September, 2007.

16        Do you see that?

17   A.    Yes, I see it.  Yes.

18   Q.    Have you seen this document before?  And if you want

19   us to page through it, we're happy to do that to give you an

20   opportunity to review it.  It was attached to a prior

21   declaration in this case.

22   A.    I saw this documents when you attached it to the

23   declaration.

24   Q.    Okay.  And do you recognize this document?

25   A.    No, sir.

1    Q.    Okay.  Let me take you to page 21, please.

2          MR. DONNELLY:  If we could -- could we call out on

3    that?

4    A.    I see.

5    Q.    Can we call out -- all right.  Mr. Amaryan, is that

6    your signature over the line that says "David Amaryan"?

7    A.    That appears to be my signature, yes.

8    Q.    Okay.  And do you see the line above that?  Does it

9    say "Maxim Zakharchenko"?

10   A.    Yes, sir.

11   Q.    And that's signed as well.

12   A.    Obviously.

13   Q.    Okay.  And there are other signatures on this page on

14   behalf of Bering Capital Partners and Dizuchi Capital

15   Partners; correct?

16   A.    Yes, that's what I see.

17   Q.    You are familiar and know of Bering Capital Partners;

18   correct?

19   A.    No, sir.

20         MR. DONNELLY:  Let's call up Exhibit 240, please.

21   Q.    Mr. Amaryan, we're showing you what has been marked

22   Plaintiff's 240.  We'll blow up the first page so you can

23   see it a little better.

24         This is another --

25   A.    Yes, sir.

1    Q.    -- purports to be an investment advisory agreement

2    between Bering Capital Partners and Maxim Zakharchenko and

3    David Amaryan and Bering Explorer Fund.  Are you aware at

4    this time, sir, that Bering Explorer Fund is a Defendant in

5    this case?

6    A.    At this time, yes, sir.

7    Q.    And are you aware that Maxim Zakharchenko is also a

8    defendant in this case?

9    A.    Yes, sir.

10    Q.    And you were aware of that at the time you submitted

11    your declaration in opposition to the motion for preliminary

12    injunction in this case.

13    A.    Yes, sir, I went through the list of Defendants.

14    Q.    Mr. Amaryan, are you familiar with an entity called

15    Gorlindar?

16    A.    I don't recollect.  Not to my knowledge.

17         MR. DONNELLY:  Can you pull up 230, please?

18    Q.    Mr. Amaryan, I'm showing you what has been marked

19    Plaintiff's Exhibit 230, and we'll blow that up for you so

20    you can see it a little better.

21         Okay.  And at the top of that, it says "Bering

22    Capital Partners Ltd. - Investment Manager"; correct?

23    A.    Yes, sir.

24    Q.    Okay, and below that, there are three different

25    entities.  The entity on the right is Gorlindar Ltd.  Did I

204

1        read that correctly?

2        A.      Yes, sir.

3        Q.      And below that is your name, David Amaryan; correct?

4        A.      Yes, sir.

5        Q.      And below that is a handwritten note, "Passport letter

6        from bank."

7        A.      I can read that, yes.

8        Q.      The other two individuals -- there are some other

9        entities but the other two individuals at the bottom of the

10       charts are Vartan Vantanov.  Do you know Vartan Vantanov?

11       A.      Yes, sir.

12       Q.      And how do you know him?

13       A.      He was my client in Troika Dialog.  That's how I know

14       him.

15       Q.      Other than being a client, have you ever worked with

16       him as a business partner or colleague at an entity?

17       A.      Mr. Vantanov is still a client of Copperstone Capital

18       to this day.

19       Q.      Has he ever worked with you as an investment advisor

20       or as an officer of one of your companies?

21       A.      Him being my investment advisor?

22       Q.      Working with you in the capacity of investment advisor

23       or working as an officer or other employee for one of your

24       companies.

25       A.      Well, he has been working with me, and I was his

1    investment advisor.  To this day, I am.

2    Q.    I understand that.  I'm sorry.  I understand that,

3    sir.  What I'm asking is a little different.

4          Have you ever worked together as colleagues, not

5    you providing investment advisory services to him, but him

6    being part of your company as an officer or employee?

7    A.    He was one of the -- he was one of the seed investors

8    in 2009 in -- in my fund when I started -- when I went from

9    Troika and started my firm.

10   Q.    And what was the name of that firm?

11   A.    Well, it's the same firm, it just used to have BCD

12   Wealth Management, which was renamed to Copperstone Capital

13   later.

14   Q.    And at the time, he was a seed investor, you testified

15   just now.  Did he hold any other positions than investor?

16   A.    Well, there was a period where he was chairman of a

17   supervisory board on special -- special investments, such as

18   -- such as private equity and nonliquid investments, but

19   that's about it.

20   Q.    Let me show you what has been marked Plaintiff's

21   Exhibit 231, again, previously filed.

22          Mr. Amaryan, I am showing you Plaintiff's Exhibit

23   231.  This is a share register for Gorlindar Ltd., and

24   that's Gorlindar, G-o-r-l-i-n-d-a-r.

25   A.    Yes, I can see that.

1    Q.    And if you look down, would you agree that this

2    document indicates that you own a thousand shares of that

3    company as of May 10th, 2007?

4                MR. MOSCOW:  Objection.

5                THE COURT:  On what ground?

6                MR. MOSCOW:  The document is not in evidence.  I

7    don't know if there's anyone that can put it in evidence.

8    The witness has not been asked anything about it.

9                THE COURT:  He asked him a question.  What's the

10   objection to the question?

11               MR. MOSCOW:  Because we're going directly to the

12   content of the document.

13               THE COURT:  I'm going to allow him to ask him a

14   question about the document.  If he doesn't know the answer,

15   he can say he doesn't know the answer.  But it's not an

16   objectionable question.

17               You can answer it, Mr. Amaryan.

18               THE WITNESS:  Of course.

19   A.    I can see within this document that what you say is

20   correct.

21   Q.    And did you own Gorlindar Ltd.?

22   A.    I had no recollection of owning Gorlindar Ltd., but

23   again, based on this document, it shows that I did.

24               MR. DONNELLY:  How about 232?

25   Q.    Mr. Amaryan, we're putting up on your screen what's

1    been marked Plaintiff's Exhibit 232.

2            And do you recognize this document?

3    A.    No, I have no recollection of owning Gorlindar in any

4    of those documents, sir.

5    Q.    Would you agree that this document, which is labeled

6    the Share Certificate, appears to have a -- it's a

7    photocopy, so it appears to have some kind of seal in the

8    bottom right-hand corner.  In fact, in the bottom left-hand

9    corner, it says "Given under the Common Seal of the Company

10   this 5th day of October, 2007," that this document indicates

11   that you have 1,000 shares of Gorlindar Ltd.

12   A.    Yes, I can see the document, sir.

13   Q.    Okay.  And you agree that that's what it says.

14   A.    That's what -- that's what the document says.

15   Q.    Mr. Amaryan, I'm going to put another document in

16   front of you in one second.

17           Mr. Amaryan, I'm putting in front of you what has

18   been previously marked Plaintiff's Exhibit 234.  This

19   document is entitled the Register of Members.  Again, it

20   appears to have a seal.  This also appears to have the

21   signature of a notary public from 2008.

22           Have you had a chance to review this document?

23   A.    Yes, I believe this was part of -- one of the

24   documents I was provided.

25   Q.    And do you see at the bottom -- strike that.

1          Let's start at the top.  Does it say "Bering

2     Capital Partners Ltd., Formerly Bering Capital Partners

3     Company Ltd., Formerly Bering Asset Man"?  Did I read that

4     correctly?

5     A.     Yes.

6     Q.     And on the left-hand side, you see a column entitled

7     "Name of Member"?

8     A.     Yes, sir.

9     Q.     And at the bottom of that column is the name Gorlindar

10    Ltd.; correct?

11    A.     Yes, sir.

12    Q.     And across from Gorlindar Ltd., under certificates

13    issued, number of shares, it says 33; correct?

14    A.     Yes, sir.

15    Q.     And then when you add up the numbers for Fabius

16    Financial and Harleigh Holdings, each of those entities owns

17    about one-third interest, according to this document.

18    A.     Yes, sir.

19    Q.     Okay.  Mr. Amaryan, I believe you testified earlier

20    that after learning of the complaint, you contacted some

21    type of Russian law enforcement agency; is that correct?

22    A.     Yes, sir.

23    Q.     And you provided that -- you said you provided that

24    agency e-mails, access to phone records, and access to other

25    records; is that correct?

1    A.    Yes, sir.

2    Q.    And am I correct that you have not produced any

3    e-mails, phone records, or other records from your computers

4    or computers from your company or the employees of your

5    company to the Securities and Exchange Commission in this

6    case?

7              MR. MOSCOW:  Objection.

8              THE COURT:  What's the basis for the objection?

9              MR. MOSCOW:  We offered them and they weren't --

10    we asked if they wanted to send someone to look, and they

11    said no.  And they have not asked for them.

12              THE COURT:  Well, he asked directly the question

13    to him, so he can explain it, so I'm going to allow it.

14    A.    I can answer it.  We have not provided anything, but

15    we have offered, and my computers, all my servers, all --

16    all the communication devices, everything that you want,

17    including bank accounts, whatever you want, is open for your

18    investigation.

19    Q.    And am I correct that the Russian law enforcement

20    agency that you retained did not identify any connections

21    between you and Defendant Zakharchenko or Defendant Bering

22    Explorer Fund in their review of the information that you

23    say you provided them?

24    A.    Yeah, that's what they told me.

25    Q.    Mr. Amaryan, you previously submitted a declaration

1    under oath in this case; correct?

2    A.    Yes, sir.

3    Q.    I'm putting up in front of you what's been marked

4    Plaintiff's Exhibit 148.

5          Do you recognize this to be the declaration you

6    submitted in this case?

7    A.    Yes, it looks that way.

8    Q.    Let me direct you to paragraph six, the first sentence

9    of paragraph six states:  "Prior to seeing the S.E.C.'s

10    initial complaint in this Action, I had never heard of any

11    of the Trader Defendants named therein, with the exception

12    Nikolai Slepenkov and Escada Logistics LTD ('Escada')."

13          Did I read that correctly?

14    A.    Yes, sir, you did.

15    Q.    Let me direct you to paragraph 56, if you want to take

16    a moment to look at it, and let me know when you've had a

17    chance.

18    A.    I have read it, sir.  I just read it.

19    Q.    And this falls under the heading back in front of

20    paragraph 45 of impulse trading strategy.  And so in 56, you

21    were discussing the impulse trading strategy; correct?

22    A.    Yes, sir, it's part of -- part of the strategy.

23    Q.    And then you say in paragraph 56 that that is one

24    factor, and then now I'm going to quote from I believe it's

25    the third sentence:  "Other important factors included a

CHARLES P. McGUIRE, C.C.R.

1      fundamental value analysis of the company at issue.  This

2      meant looking at, for example, complete fundamental analysis

3      of the company, upgrades/downgrades, smart estimates

4      compared to market estimates, historical price, P/E ratios,

5      short interest, activity in the options market, third-party

6      analyst reports, company and sector news, or corporate

7      developments in the company."

8              Did I read that correctly?

9      A.    Yes, sir.

10     Q.    Any factors you didn't consider?

11     A.    Well, these were the factors we considered, sir.

12     Q.    Let me take you to paragraphs 64 to 71.

13             You indicated -- you discussed a little bit about

14     the pair trading strategy, and am I correct that under the

15     pair trading strategy, you hold the positions for longer

16     than three days?

17     A.    That's not a prerequisite of the strategy.  The

18     strategy can be eliminated if for some reason we didn't --

19     we stopped thinking that it was a correct pair that we

20     picked.  But generally, yes.

21     Q.    Okay, and fair enough.  I appreciate that.

22             Let's look at paragraph 67, the Caterpillar trade.

23     A.    Yes.

24     Q.    So it says that you executed the Caterpillar trade on

25     February 20th, 2012.  Is that accurate?

1    A.    It says February 17th.

2    Q.    I'm sorry.  I believe it says February 17th, 2012, it

3    was discussed, and then further down in the paragraph -- my

4    apologies.  I should have directed you to a better spot.

5    A.    Yeah.

6    Q.    Further down, three lines up from the bottom, it says

7    February 20th, 2012, and before that, it says executed the

8    trades on February 20, 2012.  Do you see that?

9    A.    Yes, sir.

10    Q.    Okay.  And then the last sentence says the pair of

11    trades were closed on April 9th, 2012; right?

12    A.    Yes, sir.

13    Q.    Okay.

14          And then let me take you to the next one, Verizon

15    Communications, and that's, if you go down one, two, three,

16    four, five lines, towards the second half of the fifth line,

17    it says:  "We sold Vodafone short and bought Verizon on

18    September 6, 2012."  The next sentence reads:  "The pair was

19    closed on December 1st, 2012."

20          Did I read that one correctly?

21    A.    Yes.

22    Q.    Like the prior one, a longer horizon than three days

23    for the round trip; correct?

24    A.    Yes, sir.

25    Q.    Okay.  You had the opportunity to listen to your

1   expert's testimony here in court today; correct?

2   A.   Yes, sir.

3   Q.   And you recall some discussion of time periods.

4        Are you aware that the two trades done by

5   Copperstone prior to the October 2012 time period were these

6   two trades, Caterpillar and Verizon?

7   A.   I beg your pardon?

8   Q.   There was discussion of two trades that were on an

9   original event list that took place prior to October 17,

10  2012.

11       Do you recall that discussion?

12  A.   Yes.

13  Q.   Were you aware that those two trades were this

14  Caterpillar trade on 2/20/2012 and the Verizon

15  Communications trade on 9/6/2012 that we just discussed?

16  A.   Those were the trades that we did.  I am not quite

17  certain right now the exact timing, if these trades were the

18  first or second.  I don't have the event list in front of

19  me.

20  Q.   Understood.  Understood.

21       Let me direct you to paragraph 83 of your

22  declaration.

23       One line up from the bottom of that page, this is

24  on page 23, paragraph 83, it says:  "Our net returns for

25  2012, 2013 and 2014 were plus 14 percent, plus 22 percent,

1    and plus 0.56 percent..."

2            Did I read that correctly?

3    A.    Yes, sir, you did.

4    Q.    So then am I correct that the Alpha Fund net returns

5    in 2014 were less than one percent?

6    A.    Yes, sir.

7    Q.    And then you say in the next sentence:  "For the first

8    six months of 2014, our returns were 12.18 percent."

9            Did I read that correctly?

10   A.    Yes, sir.

11   Q.    There was some discussion about trading and the time

12   difference between Moscow and here.

13           Strike that.

14           MR. DONNELLY:  No further questions at this time,

15   Your Honor.

16           THE COURT:  Okay.  Mr. Amaryan, this is

17   Judge Arleo.

18           I just have a quick question for you with respect

19   to your --

20           THE WITNESS:  Yes, Your Honor.

21           THE COURT:  -- with respect to your certification.

22           You talk about impulse trading, and you attach to

23   your certification Exhibit B, which you state was created in

24   2012, and that lists -- it's an Excel spreadsheet that keeps

25   track of the performance of the stocks we were monitoring.

1                    I look at Exhibit E.  Is there any way I could

2        tell what stocks you were monitoring from Exhibit E?

3                    THE WITNESS:  Could I see Exhibit E, please?

4                    THE COURT:  Does he have a copy of his

5        certification with him?

6                    MR. MOSCOW:  I may have, Your Honor.  Give me a

7        moment.

8                    THE COURT:  Do we have it on the screen?

9                    MR. DONNELLY:  We have.

10                   THE COURT:  Sir, can you take a look at it?  Sir,

11       this is attached to your certification as the Excel

12       spreadsheet you said you -- it says you created in 2012.

13                   Is there any way looking at this someone could see

14       what stocks you were monitoring?

15                   THE WITNESS:  Yes, for the record, I don't -- the

16       quality is quite poor, so I don't see the specific files,

17       but I know this -- this Excel spreadsheet, so I can answer

18       the question.

19                   THE COURT:  Okay.

20                   THE WITNESS:  For the record, this Excel

21       spreadsheet was created in 2012, and it is I think quite

22       easy to verify just by looking at the date the Excel was

23       created, but this Excel spreadsheet was constantly modified

24       on daily basis.

25                   First of all, the securities in this Excel

CHARLES P. McGUIRE, C.C.R.

1    spreadsheet were modified by our team.  Securities that were

2    not of our interest were deleted and securities that were of

3    our interest added.  And on top of that, this Excel

4    spreadsheet was directly linked to Bloomberg, so it was

5    being updated live pretty much every minute, and some of the

6    characteristics of this Excel spreadsheet is the main things

7    that we would look at.

8             For example, there are -- I think there was a

9    five-day, 15-day or 30-day volumes of the stocks traded, and

10    if a stock traded volume, significantly increased this

11    five-day or 30-day trading volume, this Excel spreadsheet

12    would highlight it in red and orange.  And it's like a

13    trigger thing.

14             THE COURT:  Is this the document that was -- first

15    of all, does it identify what stocks that you were

16    monitoring by name or by symbol?

17             THE WITNESS:  Yes, the -- yes, I believe it does.

18    This particular snapshot of this document, it has a lot of

19    securities, and it does identify it.

20             THE COURT:  Is this a snapshot of the document in

21    2012, your spreadsheet?

22             THE WITNESS:  No, ma'am.  This is a snapshot of a

23    document of recently.

24             MR. MOSCOW:  Excuse me, Your Honor.

25             THE COURT:  Yes.

CHARLES P. McGUIRE, C.C.R.

1          MR. MOSCOW:  There should be a page two to that

2     document.

3          THE COURT:  It's not a spreadsheet.

4          MR. POWERS:  But it shows from the system that it

5     took a snapshot of that it was from 2012, if you want him to

6     explain that to Your Honor.

7          THE COURT:  Okay.  I'm trying to understand what

8     this document is, because, from what I can gather, it's the

9     only document that you say captures your monitoring of these

10    stocks pursuant to your impulse trading strategy.

11         MR. MOSCOW:  Well, Your Honor, we will be putting

12    in additional documents through the next witness.

13         THE COURT:  Well, I'm not sure there will be

14    another witness, because we're going to run out of time.

15         We'll get to that in a minute.  Let's finish up

16    with this witness.  I have questions, and my questions are

17    important.

18         Yes?

19         THE WITNESS:  Your Honor, this is not the only

20    document.  There are other documents, documents of

21    fundamental analysis, documents of technical analysis,

22    which, as my attorney said, my partner will comment on if

23    he's given the chance.

24         THE COURT:  But here's my question.  In your

25    declaration, you said that this is a true and correct copy

1    of an Excel spreadsheet created in 2012.  Is this the

2    snapshot from 2012?

3                THE WITNESS:  No.  It was created in 2012, but the

4    snapshot was taken recently.

5                THE COURT:  So are there any other documents that

6    reflect your impulse trading strategy that you developed?

7                THE WITNESS:  Yes, there are other exhibits that

8    my attorneys were -- are planning to present for our next

9    witness.

10               MR. POWERS:  They're also in the declaration, Your

11   Honor.

12               THE COURT:  I'm aware of what's in the

13   declaration.

14               MR. POWERS:  There are several in the declaration.

15               THE COURT:  I understand that.  My question is

16   other than what's in the declaration.

17               MR. POWERS:  And also, I hope you understand the

18   next document that's part of what you're looking at shows

19   it's a document that was, in fact, created, and this

20   document was created in 2012.  Even though it was a snapshot

21   taken recently, it was created in 2012.

22               THE COURT:  Counsel, that certainly wasn't clear

23   to me.

24               MR. POWERS:  Well, that's why --

25               ATHE COURT:  I read it in plain English and here's

CHARLES P. McGUIRE, C.C.R.

1    what it says.  "Exhibit E is a true and correct copy of an

2    Excel spreadsheet created in 2012 which shows how we kept

3    track of the performance of the stocks we were monitoring."

4            There's no explanation in this very lengthy

5    document about it was constantly updated and the snapshot

6    was from -- the date had changed on a regular basis.

7    There's none of that here in the certification.  I'm trying

8    to understand it.  That's all.

9            MR. MOSCOW:  If I might, Your Honor, on the second

10   page --

11           THE COURT:  You know, we can talk about this

12   later.  Does anyone else have any questions for this

13   witness?

14           MR. MOSCOW:  I have three or four.

15           THE COURT:  Okay.  Well, let me -- I've given you

16   a lot of latitude today, and I began today's proceeding by

17   saying use your time wisely.  And I've listened and I

18   haven't commented, but we spent the first 15 minutes of this

19   witness talking about his education, his background, which

20   was all contained in his affidavit.  And I told everyone I

21   had read the affidavit.  I had asked that you just highlight

22   important points and use your time wisely.

23           And frankly, I'm not inclined to extend this, and

24   if you have another witness, you can submit his affidavit

25   for me.  And the reason is because I've given you a lot of

1    indulgence.  I originally said an hour and a half.  I've

2    gone way beyond that today.  And I did it, and there's no

3    concept of trying to focus the testimony on what's relevant

4    to these proceedings.  Bearing in mind that I have been

5    inundated with numerous affidavits that have background

6    about where someone grew up and they were born and they were

7    raised and they lived, really not the key issues here, and

8    to the extent -- and I read them, and I knew about all those

9    facts.  And now I'm here at five o'clock, when I told you

10   I'd give you an -- we took a break at 3:30 and I said we'll

11   come back at a quarter to four, we'll have an hour total,

12   use your time wisely.

13            And now you stand up in Federal Court and you say,

14   Judge, we had no idea.

15            And I've indulged you, and I've given you an

16   opportunity and I've given you a warning that it was going

17   to be an hour, and you didn't use your time wisely.  So now

18   I am supposed to just allow the rules to be disregarded?

19   Because, counsel, there comes a time when rules matter.  And

20   I know this is important to your client.  It's why I

21   extended my original thought.  But I said to you at 3:30

22   I'll give you an hour and you'll each have a half an hour,

23   and now I'm hearing at 10 to five we have another witness

24   left.

25            MR. MOSCOW:  If I may.

CHARLES P. McGUIRE, C.C.R.

1          YOUR Honor, I watched my watch.  I took 17

2    minutes.  Then I had to come back, and I went up to 21

3    minutes.  I did save nine for Mr. Papazian.  I want to put

4    him in.  I put in the documents, apparently about which you

5    are interested, I would like to put them in through him.

6    And I would ask the Court's indulgence.

7          THE COURT:  You know what?  I'm going to let

8    Mr. Donnelly finish with this witness.  I'll give you 10

9    minutes with your last witness, because, counsel, this is

10   not how it works in my courtroom.  There are reasons why I

11   have time frames.  Much of the testimony that was put before

12   me today was not useful.  Some of it was useful, some of it

13   wasn't useful.  And when I have the best lawyers in the

14   world coming before me and they give me many, many

15   documents, many, many briefs, I put time limits on for a

16   reason, because otherwise this hearing would have gone on

17   for weeks and weeks and weeks.  And to come out at 3:30 and

18   say you have an hour and spend a half hour, 15 minutes going

19   over his background, where he grew up, is not respectful of

20   my time and the restraint that I put upon you.

21          So I gave the two hours weeks ago, and I said you

22   each have two hours and a half hour for oral argument.  We

23   don't even have the oral arguments any more.  I'm not going

24   to allow them.  They can be done by written submission.  I'm

25   not going to be here until eight o'clock tonight.  I've

1    given you way more than an hour and a half, each of you,

2    more than two hours, counsel, frankly, and now here we are

3    at the 11th hour, we want some more time.  And I would be

4    more than indulgent to do that if I thought that all the

5    time that was utilized was used in a way that was most

6    productive, and I'm sorry to say that it wasn't.

7              So, no more questions.  I'm going to ask -- the

8    S.E.C. can finish up.  I'll give you 10 minutes with the

9    other witness.

10             I want you to get to the point.  I don't want

11   collateral information that is already before me that really

12   has nothing to do with the narrow issue before me today on

13   this preliminary injunction hearing.

14             Do I make myself clear?

15             MR. MOSCOW:  Very clear, Your Honor.

16             THE COURT:  Thank you.  Okay.

17             MR. MOSCOW:  I apologize for misunderstanding one

18   of the points.  It doesn't matter.  Thank you.

19             THE COURT:  Okay.  Mr. Donnelly, do you have any

20   further questioning of this witness?  I think we got off

21   track.

22             MR. DONNELLY:  Yes, I think -- just -- no, Your

23   Honor, we're fine.

24             THE COURT:  Okay.

25             Call your last witness.

CHARLES P. McGUIRE, C.C.R.

1              Thank you.

2         (Witness excused)

3              MR. MOSCOW:  Your Honor, bear with me and let me

4    get him from the outside.

5              THE COURT CLERK:  Sir, if you can raise your right

6    hand, place your left hand on the bible, please.

7              THE WITNESS:  Of course.

8    D A V I D   P A P A Z I A N, called as a witness on behalf

9    of the Defendants, and having been duly sworn, testified as

10   follows:

11             THE COURT CLERK:  Please state your full name for

12   the record and spell it, please.

13             THE WITNESS:  David Papazian, D-a-v-i-d,

14   P-a-p-a-z-i-a-n.

15             MR. MOSCOW:  May I?

16             THE COURT:  It's your witness.

17             MR. MOSCOW:  Thank you.

18                        DIRECT EXAMINATION

19   BY MR. MOSCOW:

20   Q.   Mr. Papazian, do you work at Copperstone Capital?

21   A.   I do, sir.

22   Q.   How long have you worked with David Amaryan without

23   necessarily being employed there?

24   A.   David and I met I believe the summer of 2009 whilst

25   playing soccer, became --

CHARLES P. McGUIRE, C.C.R.

1    Q.    Keep it -- 2009?

2    A.    Yes, 2009.

3    Q.    Thank you.

4              Did there come a time that you formally joined

5    Copperstone?

6    A.    May 2014.

7    Q.    In between then, did you attend meetings of an

8    investment committee at Copperstone?

9    A.    I did.  I suggested that they be set up in the first

10   place.

11   Q.    And were they?

12   A.    They were.

13   Q.    And directing your attention to the Copperstone

14   trades, did there come a time that you started to keep

15   records of the activity of trading?

16   A.    Yes.

17   Q.    And did you keep records of the investment advice?

18   A.    Yes.

19              MR. MOSCOW:  Your Honor, if I might, we have a

20   series of charts.

21              THE COURT:  Have these been disclosed before?

22              MR. MOSCOW:  They have not.  They've been given to

23   the S.E.C.

24              THE COURT:  Just now?

25              MR. MOSCOW:  Today.

225

1          MR. POWERS:  No, last night as part of the

2     exchange, Your Honor.  The same time we received their

3     reports.

4          THE COURT:  Okay.  Okay.

5     Q.    I also direct your attention to a big spreadsheet.

6     Did you work on that?

7     A.    My team did.

8          MR. MOSCOW:  What exhibit number are we up to?

9          MR. POWERS:  6 and 7.

10          MR. MOSCOW:  That would be Defendants' Exhibit 6,

11     previously given to the S.E.C.

12          MR. AXELROD:  Your Honor, I'd just like to make

13     sure the record's correct.  We agreed to exchange exhibits

14     last night.  We did not get this exhibit, which is a 10-page

15     oversize document containing reams of information, until

16     about 20 minutes ago.

17          THE COURT:  Okay.  Well, I'll give you plenty of

18     time to cross-examine on it.

19          MR. AXELROD:  Thank you.

20          MR. MOSCOW:  If I might approach the witness.

21          THE COURT:  Yes.

22     Q.    Does Exhibit 6 reflect the summary information

23     contained on the charts that are collectively -- that we

24     just gave to the Court?

25     A.    It does, sir.

1   Q.    And are there brief overviews of the trades on there?

2   A.    There are.

3   Q.    And are these the reasons that the company had at the

4   time that the trades were entered into, they were in its

5   files at the time?

6           MR. AXELROD:  Objection; foundation.

7           THE COURT:  Why don't you establish the foundation

8   for this document?

9   Q.    Did you collect the records from the company or cause

10  to be collected the records from the company of the trades

11  that were challenged by the S.E.C.?

12  A.    I assigned my team to do it, yes.

13  Q.    And did you examine the files when they arrived?

14  A.    I did.

15  Q.    And did you get all -- did you get files for all the

16  trades or most of the trades?

17  A.    Most of the trades, not all of them.

18  Q.    How many?

19  A.    133 out of the challenged 153 for Copperstone.

20  Q.    And do the charts that we gave -- you generate, caused

21  to be transmitted and this exhibit reflect the same

22  information that was available to the company at the time

23  the trades were made?

24  A.    Yes, sir.

25  Q.    Did you ever engage knowingly in trading on hacked

227

1    information?

2    A.    Absolutely not.  All the trades were done based on

3    information that anybody in this room could have had at the

4    time.

5    Q.    If they had thought it through?

6    A.    If they had thought it through, if they had done the

7    analysis we did, if -- there's a lot of ifs I can go into.

8    Q.    And did anyone ever discuss having access to hacked

9    information?

10          MR. AXELROD:  Objection; foundation again.

11          THE COURT:  Ask him who he spoke to.

12    Q.    In connection with the meetings of the investment

13    company and your discussions with employees of Copperstone,

14    did anyone ever discuss the use of hacked information?

15    A.    No, sir.

16    Q.    Did anyone ever discuss the concept of paying for

17    hacked information?

18    A.    No, sir.

19    Q.    Did anyone ever discuss the idea of letting someone

20    obtain part of your profits?

21    A.    No, sir.

22    Q.    Now, very quickly, did something happen to the Russian

23    markets in 2014?

24    A.    In 2014, the beginning of 2014, due to the Ukrainian

25    crisis, the markets went sharply lower, if that's what

1    you're referring to.

2    Q.    Yes, and it was brought out on cross that Copperstone

3    only made half a percent or less than one percent that year.

4    A.    Yes.

5    Q.    Was that a good showing for a Russian fund that year?

6    A.    We were awarded best Russian fund for that

7    performance.  Everybody else was down somewhere between 45

8    and 25 percent.

9    Q.    Okay.  Now, if I could just direct your attention --

10         MR. MOSCOW:  Your Honor, if I could ask, if you

11    will read the descriptions, I'm not going to ask the witness

12    to read them into the record; they're there.  This is on

13    Exhibit 6.  The charts --

14    Q.    Do the charts reflect the trading charts?

15    A.    They do, yes.

16    Q.    And do they reflect the use of analysis in deciding

17    whether to go forward?

18    A.    They do, yes.

19         MR. AXELROD:  Objection; foundation.

20    Q.    Now --

21         THE COURT:  Whoa, whoa, whoa.  So why don't you

22    ask him -- why don't you establish some foundation for how

23    each of these stack of documents that are unnumbered were --

24    when, how they were made, and who made them and when they

25    were made, so we have some idea of how they came to be?

CHARLES P. McGUIRE, C.C.R.

229

1          Because this seems to be, by the way, important

2     documents to you, so why don't you ask him how they came to

3     be?  This is the first time we've seen them.

4          MR. MOSCOW:  I'm sorry.

5     Q.    Did you cause to be transmitted trading charts for 133

6     trades?

7     A.    I asked for everything that we had on record.  I

8     received 133.

9     Q.    And did you go through them?

10    A.    I did.

11    Q.    What sort -- how were they gathered, and what sorts of

12    information do they reflect?

13    A.    They reflect the information that was analyzed at the

14    time by the team that was putting the trades on.  There were

15    back tests that were done that are also in the description,

16    and there's a description of why the moves were made the way

17    and at the time that they were made.

18    Q.    Are the trades dated?

19    A.    They are.

20    Q.    I'm sorry, are the charts dated?

21    A.    They are.

22    Q.    And are they -- is there a listing in date order on

23    Exhibit 6?

24    A.    There is, sir, yes.

25    Q.    And does Exhibit 6 reflect the number of profitable

230

1    trades versus losses?

2    A.    It does at the bottom, yes.

3    Q.    And what was the -- withdrawn.

4          What was the percentage of profitable trades?

5    A.    Fifty-three percent of the trades made were

6    profitable.

7    Q.    How do you get to that number?

8    A.    So out of the 153, nine trades are completely

9    unrelated to this particular strategy that we used.  I've

10   taken those nine out and simply divided the number of

11   profitable trades by the total number.

12         If, however, for any reason we would include those

13   completely unrelated trades, the number still is only at 59,

14   so barely better than a coin toss.

15   Q.    Okay.  Now, you checked with your colleagues this

16   morning, did you not, about the number of trades done by

17   Copperstone in the period from January 20th, 2015 to May of

18   2015 as reflected on Plaintiff's Exhibit 274?

19   A.    I did.

20   Q.    How many, if you recall, were traded in that period,

21   January to May?

22   A.    Just under -- January to May, 780, if I can remember

23   correctly.

24   Q.    There's a separate thing for October 2012 to February

25   2014.

CHARLES P. McGUIRE, C.C.R.

231

1    A.    Okay.

2    Q.    Would that be the 780?

3    A.    Correct.

4    Q.    And do you remember the other number?

5    A.    Over 300.  So together, during the whole period, we're

6    just under 1,100 trades.

7              MR. MOSCOW:  No further questions of this witness

8    at this time.

9              THE COURT:  Sir, I have a question for you.

10             Looking at the stack of data that you have for

11    each of -- for example, the first one is -- is this for --

12    it looks like the ticker symbol is Cat, right, Caterpillar,

13    the first sheet?

14             THE WITNESS:  Yes, ma'am.

15             THE COURT:  Okay.  Who prepared this?  It's an

16    unmarked exhibit, but the first data that says "ALGN/SHORT,"

17    I guess this is for the third trade that's on your D-6 list.

18    Who prepared this?

19             THE WITNESS:  Okay.  So it's possible that you

20    might be looking at two pieces of paper which should not be

21    together, I'm not sure, but the answer to the question of

22    who prepared it, it's my trader, my head of research, and my

23    portfolio manager in Moscow.  I have reviewed them.

24             THE COURT:  Okay.  So let me just make sure the

25    record is clear.

CHARLES P. McGUIRE, C.C.R.

1    We have D-6, which is a summary chart of some

2  charts that you said you -- and they're unmarked, and I

3  guess we should mark them D-6A through whatever -- D-6-1,

4  and we'll go down to the end, okay, and my deputy will mark

5  them.

6    The first one, it says on the top, "ALGN/SHORT,

7  Date:  17.10.2012" at the time, and it says "ALGN/SHORT,"

8  right?  So I would imagine that correlates to the third

9  entry on your D-6 exhibit?

10    THE WITNESS:  It does, ma'am, yes.

11    THE COURT:  Okay.  So this summary with the chart

12  on it that shows trends; who prepared this?  Do you know?

13    THE WITNESS:  Chief trader.

14    THE COURT:  Does he or she have a name?

15    THE WITNESS:  Maxim Batashev.

16    THE COURT:  And how did you obtain this document

17  for court here today?

18    THE WITNESS:  These documents were sent

19  electronically, transmitted to I believe directly to

20  counsel, and I reviewed them, or perhaps I received them and

21  forwarded on to them.  In any case, it was sent on my

22  instruction.  And these are -- the charts that you're

23  looking at, these are historic, meaning they were not

24  created yesterday.

25    THE COURT:  They were created the date that it

233

1    says on top, October 17th, 2012?

2              THE WITNESS:  Correct.

3              THE COURT:  Okay.  That's all I had.

4              THE WITNESS:  And, ma'am, just to answer, just to

5    give you the full color, this is only a summary of those

6    business records.  This is in order to show in a very

7    succinct form, I know the paper is big but it's pretty

8    short, what the profitability on the trading was, and this

9    is for all of the challenged trades for Copperstone.

10             THE COURT:  Okay.  Thank you.

11             MR. AXELROD:  Your Honor, may I proceed?

12             THE COURT:  Yes.

13             MR. AXELROD:  Thank you.

14                     CROSS-EXAMINATION

15   BY MR. AXELROD:

16   Q.    Mr. Papazian, just in the interest of getting this

17   thing going, I'll just move forward.

18             You joined Copperstone in May of 2014?

19   A.    Officially, yes, but I have been -- had been sitting

20   on meetings, been -- being there regularly, helping David,

21   helping the team out with -- becoming more formal, becoming

22   more, if you will, a firm that would become what it is in

23   the process of becoming now, a proper hedge fund.  Yes.

24             I have vast experience working at large firms,

25   Merrill Lynch one of them, U.P.S. the other, so that style

CHARLES P. McGUIRE, C.C.R.

234

1    was brought in.

2    Q.    I guess I don't understand.  So you started formally,

3    but you were informally working for Copperstone earlier?

4    Were you being paid?

5    A.    I was not getting paid, no.

6    Q.    Okay.  So you were just showing up sometimes?

7    A.    It would be, very simple way of saying it, I was there

8    regularly and participating in, say, a very significant,

9    north of 80 percent of significant business discussions.

10   Q.    Okay.  How many hours a day did you spend at

11   Copperstone before you joined the firm formally?

12   A.    It's a very hard guesstimate to make, sir.  If I have

13   to say, during the week, I would be there, well, north of

14   four days over the week.

15   Q.    North of four days.

16   A.    Yeah.

17   Q.    And what were you doing formally for your job at that

18   time?

19   A.    I was working, I was a board member in a Russian

20   entertainment conglomerate, helping out on finance issues.

21   That was a board -- it was a board involvement, so it did

22   not take too much time.

23   Q.    So you were essentially donating your time to

24   Copperstone four days a week and not being paid until you

25   joined the firm formally in May 2014.

CHARLES P. McGUIRE, C.C.R.

1    A.    I disagree with that formulation, sir.  I wasn't

2    donating my time.  Just the fact that I wasn't getting paid

3    a salary doesn't mean I wasn't involved with them.

4    Q.    In May of 2014, what was your title when you joined?

5    A.    Head of development.  My role was to open the London

6    office, which I did, in October of the same year, recruit

7    people there, and take -- take on board institutional

8    clients.

9    Q.    When was the London office opened?

10    A.    October 2014.  I moved there, we got registered

11    sometime probably before the -- before the end of the year,

12    around Christmas.  The office itself came to be, if I

13    remember correctly, May.

14    Q.    I think I lost you.  So --

15    A.    So I moved to London in October.

16    Q.    Okay.

17    A.    Okay?  I start the paperwork, starting from

18    registering companies, asking the equivalent of the S.E.C.

19    over there, called the FCA, for authorization to do

20    business.  I start to talk with people about hiring them.  I

21    get someone, a very senior higher person who verbally agreed

22    to come on board.  I started to look at analysts and office,

23    physically.  It happened, we rent an office April-May of

24    this year.

25    Q.    So these documents that you -- I guess you collected,

1    is that a fair thing to say, you collected from other

2    employees of Copperstone?

3    A.    I assigned them to find in the logs of the company,

4    put them together in a relatively organized way, I'm not

5    sure to what extent it was a well-done job, and to send them

6    over to us here, yes.

7    Q.    Okay, and these purport to be trading charts, it looks

8    like, from 2012 and 2013; correct?

9    A.    Well, 2012, they start, and then they end -- yes, they

10   do, sir, they end two thousand- -- hang on a second -- yes,

11   February 2014, yes.

12   Q.    Okay.  You didn't create any of these charts, did you?

13   A.    I did not.

14   Q.    In fact, you had no personal involvement at all in

15   creating these charts.

16   A.    No, I -- I had quite a few very sort of impactful

17   involvement in creating the setup for those charts at the

18   time that they were created, meaning I had guide -- I served

19   as a guide and someone who would assign what needs to be

20   done, and in terms of filling the numbers in, it was

21   something that I assigned others to do for me, and sometimes

22   I checked.  Other times, when I understood the job was well

23   done, I did not check.

24   Q.    Okay.  And let's take the fourth one randomly.  It

25   says E. W. Wong, it looks like the date is 19/10/12, which

1    would be October 19th of 2012.  Do you see that?

2    A.    Is that -- October 19, you said, yes?

3    Q.    Yes.  Do you see that, E. W. Wong?

4    A.    I do.

5    Q.    You had no personal involvement with creating this

6    chart; right?

7    A.    I'm -- it's very hard for me to say, sir.  It's very

8    possible that I did and I don't remember.  It's 2012 that

9    we're talking about, October.

10   Q.    So --

11   A.    I'm under oath, I'm not going to say yes, I do,

12   because I'm not sure.

13   Q.    That's fair, but fair to say because you can't recall

14   this individual chart, you have no idea really if this was

15   created on October 19th of 2012.

16            MR. MOSCOW:  Objection.

17            THE COURT:  Excuse me?

18            MR. MOSCOW:  Objection.

19            THE COURT:  Overruled.

20   A.    I'm in the position of the trusting husband.  I have

21   absolutely no reason to doubt that my people, my team have

22   cheated, all right?  So absolutely, you know, convinced that

23   they were created when my team say they were created.

24   Q.    And I hear you on that.  But my question was,

25   actually, you have no personal knowledge of when this

 1     document actually was created.  Personal knowledge, besides

 2     what somebody told you.

 3     A.     No, that's -- that's not -- it's not a -- it's not a

 4     correct way of putting it, sir.  I disagree with the

 5     statement.  I can say that I'm sure that it was created when

 6     the date says it was created because I have been very strict

 7     with everyone in the team.  When we were becoming -- when I

 8     told you about the process of becoming more and more

 9     layered, more and more formal, our disciplinary processes

10     that led them to, say, suffer consequences when they made

11     mistakes, so this did not happen.

12             THE COURT:  So you didn't actually see, you weren't

13     there on October 17th when this document was -- when the

14     data was put in to create this document; right?

15             THE WITNESS:  Your Honor, I cannot say.  It's very

16     much possible that I was, but again --

17             THE COURT:  But you don't know.

18             THE WITNESS:  Given my position, I cannot say a

19     hundred percent, yes.

20             THE COURT:  But nowhere in this document is there

21     a signoff as to who created it, is there?

22             THE WITNESS:  There is not, but we should be able

23     to -- should be able to get that, i.e., who specifically

24     did, we should be able to get a name for you who

25     specifically created that.

CHARLES P. McGUIRE, C.C.R.

1          THE COURT:  And was this kind of analysis done for

2     every single trade?

3          THE WITNESS:  It wasn't, unfortunately.  It was

4     done for a very large number of the trades.  In this case,

5     it's 133 out of 153.

6          THE COURT:  Was it done for all your -- because I

7     know you state that you did -- the Copperstone did impulse

8     trading in stocks other than the ones that are at issue in

9     this case.  Right?

10         THE WITNESS:  Correct.

11         THE COURT:  Did you have these kind of little

12    graphs for each of those as well?

13         THE WITNESS:  I would say the answer is more or

14    less the numbers that are for these 153, i.e., a significant

15    majority, yes.  There may be some for which there aren't.

16         THE COURT:  So for the one -- during the same

17    period of time, other than these 153, how many of the

18    impulse trading trades did the company engage in?

19         THE WITNESS:  We'd have to look at that, ma'am,

20    because we've been concentrating a short amount of time on

21    the challenged trades.

22         THE COURT:  So was there like a protocol in the

23    office with only respect to these impulse trading trades

24    that the trader should design this kind of spreadsheet to

25    see what the market's movement was?

240

1              THE WITNESS:  Of course, yes.

2              THE COURT:  So there should be these kind of

3     sheets for every impulse trade.

4              THE WITNESS:  Yes, there should be -- well, there

5     should be for all 153, the fact that there is in this case.

6     So I'm saying --

7              THE COURT:  But there's more than 153 out there,

8     right?

9              THE WITNESS:  There is, ma'am, yes.

10             THE COURT:  And there's charts for each of those

11    as well?

12             THE WITNESS:  By my answer -- maybe I didn't

13    formulate it in a clear manner -- is, proportionately, as

14    there is of 153, 133, for the rest, which are not part of

15    this one 133, we should get more or less that proportion on

16    the rest as well, i.e., 70 percent, 80 percent, there will

17    be data.  For others, there will not, and it's -- it's a bad

18    business practice which has been corrected later on during

19    the time.  But it is at the time how the firm -- how the

20    firm worked.

21             THE COURT:  When did the firm change its practices

22    and become more formalized?

23             THE WITNESS:  More or less the time that I joined,

24    May, around May 2014, maybe a little bit later.

25             THE COURT:  So the records following May of 2014

CHARLES P. McGUIRE, C.C.R.

1    would be more comprehensive?

2              THE WITNESS:  Yes, we would sort of tend toward

3    that idealistic number of 100 percent.

4              THE COURT:  Okay.  Thank you.

5              MR. AXELROD:  I'm almost finished, Your Honor.

6    Q.    And just to conclude, you can't say with certainty

7    with respect to any of these charts when they were actually

8    created; correct?

9    A.    What does "say with certainty" mean?  It's a very

10   difficult question to answer, sir.  You understand where I'm

11   coming from, meaning --

12   Q.    I guess I do.  I mean, my question is, when did you

13   receive all of these charts?

14   A.    I looked at all of those charts at the time that they

15   were created.  I'm not sure that I can say that for -- well,

16   let me rephrase that.  I'm not sure that I've considered

17   that I've looked at all of those charts at the time that

18   they were created.  I've looked at a very significant amount

19   of those charts at the time that they were created.  As I

20   said, I was the guy who came up with the second page format

21   of what should be looked at, how it should be cut, what

22   numbers, what comments, et cetera, we should be looking at

23   before putting trades on.

24              So I've been a very significant part of these docs

25   being created in the first place.  Can I say with confidence

242

1     that I looked at all of them at the time that they were

2     created?  Unfortunately, no.

3     Q.    Who created these documents?

4           THE COURT:  Which document are you referring to?

5     Q.    These analyses; who created these?

6     A.    Right.  So the format, as I said --

7     Q.    Not the format, but like the individual documents.  If

8     I pulled out one of the documents from the stack, could you

9     tell me who created it?

10    A.    So the graph would he be our chief trader all the

11    time, because he's our technical guy.

12    Q.    What is his name?

13    A.    Maxim Batashev.

14    Q.    Okay.

15    A.    With regards to the fundamental, what you're looking

16    at now, I believe, sir, that would be either our PM, Garnik

17    Maliksetyan, or our head of research, Igor, Igor Sitnikov.

18    And then sometimes they would do it together, they would

19    criticize one another, they would find mistakes, would say,

20    you know, for this company, we need to change that, for this

21    company, this is not -- it depends on the sector.  It was

22    very much, look, it's a small firm, even today, everybody

23    sits close to each other, so, you know, there isn't that

24    much segregated site of work as you would expect at Goldman

25    or Merrill.

CHARLES P. McGUIRE, C.C.R.

1           THE COURT:  Can I ask you a question?  And who

2      would make the decision to buy the stock and in what amount?

3      They would do the analysis.  Then who would make the

4      decision?  On this first one, which I'll mark as D-6-1 for

5      ALGN stock securities, it says "Bearish fundamental basis,

6      Second half of the trading day, Impulse move down with

7      peaking volumes, Retrace to send on 1 minute and 5 minute

8      charts, Both 1 minute and 5 minute 50MA's point in the

9      direction of the trade."  So that's their analysis, right?

10          THE WITNESS:  So the way that the decisions would

11     be made -- and if you allow, Your Honor, I'll give you as

12     much color as -- as I can -- is that a principal decision

13     would be made by David, myself, and Vardan, who are the

14     management committee of the firm, and we would tell the guys

15     that you're able to put on over the next, say, one month or

16     three months X amount of trades using this strategy using

17     Y amount of dollars.  Sometimes I would be physically in the

18     office.  Sometimes David would be physically in the office.

19     Rarely would we be there together, but it would happen.  But

20     in terms of making the decision, we're talking about a

21     five-minute period where, if you walk into our office, you

22     have a massive amount of screens, and you've got opened one

23     company that's about to report, a second company that has

24     reported, a third company that's about to report, and he is

25     looking at all of this and immediately right there and then

244

1    following a move, making a decision, and putting the trade

2    on.

3              So it would be, coming back to your question, Your

4    Honor, it would be usually one of the three guys that I

5    mentioned, Maxim Batashev, Igor Sitnikov, or Garnik

6    Maliksetyan.

7              THE COURT:  Thank you very much.

8              MR. AXELROD:  I have no further questions, Your

9    Honor.

10             THE COURT:  Anything further?

11             MR. MOSCOW:  No, Your Honor.

12             THE COURT:  Okay.  Thank you, sir.

13             THE WITNESS:  Thank you.

14        (Witness excused)

15             THE COURT:  All right.  So that concludes today's

16   hearing.

17             I'm going to ask the parties, given the late hour,

18   to submit to me by Monday their written summations.

19             I don't think there's any -- I have the briefs.  I

20   have the additional testimony.  I'm not sure that there's a

21   need for anything other than a written summation for the

22   Court.

23             Anyone?

24             MR. POWERS:  The only thing we would ask is that

25   when would we be able to get the transcript of the hearing,

CHARLES P. McGUIRE, C.C.R.

245

1      perhaps; by tomorrow sometime?

2              THE COURT:  Sure, and I can give you until, say,

3      Tuesday for those summations.

4          (Off the record discussion)

5              THE COURT:  Tomorrow.  He'll have it tomorrow.  So

6      if you can get the written summations to me by Tuesday.

7              But in the normal event, right now, we would be

8      doing oral summations, it wouldn't be based on the record.

9      So I want to get a ruling in as soon as possible.

10             I'm going to continue the temporary restraints

11     until such time -- they will be continued unless the

12     Plaintiff submits an order until such time as I issue my

13     written decision.  Okay?

14             So let's keep it to 15 pages, double spaced, and

15     if you can have that by -- if you can get that to me by

16     close of business on Tuesday, it would be much appreciated.

17             Thank you.

18             THE COURT CLERK:  All rise.

19         (Matter concluded)

20

21

22

23

24

25


                        CHARLES P. McGUIRE, C.C.R.

<u>**INDEX**</u>

|  | Direct | Voir Dire | Cross | Redirect | Recross |
|---|---|---|---|---|---|
| **WITNESSES FOR THE PLAINTIFF:** | | | | | |
| LYNN O'CONNOR | 11 | | 30 | 53 | |
| EUGENE CANJELS | 56 | 80, 96, 101 | 106 | | |
| **WITNESSES FOR THE DEFENDANTS:** | | | | | |
| DANIEL FISCHEL | 124 | | 153 | | |
| DAVID AMARYAN | 183 | | 200 | | |
| DAVID PAPAZIAN | 223 | | 233 | | |

| **EXHIBITS:** | Marked | Received: |
|---|---|---|
| D-1 | 32 | |
| D-2 | 88 | 122 |
| D-3 | 134 | |
| D-4 | | |
| D-5 | 147 | |

CHARLES P. McGUIRE, C.C.R.

247

## $

**$1,250** [1] - 154:13
**$22** [5] - 73:17, 75:21, 77:12, 177:6, 178:20
**$25** [1] - 178:18
**$269,000** [1] - 169:24
**$512,000** [1] - 169:23

## '

**'10** [1] - 93:4
**'14** [1] - 146:1
**'15** [3] - 35:1, 146:2, 167:19
**'Escada')** [1] - 210:12

## 0

**0.56** [1] - 214:1

## 1

**1** [24] - 6:15, 6:20, 8:17, 15:3, 15:11, 28:18, 31:19, 31:20, 32:13, 36:2, 61:13, 62:25, 76:7, 76:12, 85:6, 91:1, 91:2, 111:17, 133:18, 159:13, 198:25, 243:7, 243:8
**1's** [1] - 15:11
**1,000** [1] - 207:11
**1,100** [1] - 231:6
**10** [10] - 12:7, 29:17, 33:9, 71:2, 71:3, 143:17, 193:10, 220:23, 221:8, 222:8
**10-page** [1] - 225:14
**10/12** [3] - 166:22, 169:19, 172:7
**10/17/2012** [1] - 17:9
**10/2012** [2] - 173:15, 174:5
**100** [2] - 78:16, 241:3
**101** [1] - 78:6
**10th** [3] - 181:4, 201:15, 206:3
**11** [5] - 17:16, 89:10, 183:19, 198:23, 198:25
**113** [5] - 113:25, 114:2, 114:8, 114:14, 117:5
**11:20** [1] - 8:8
**11:39** [2] - 24:5, 24:9
**11th** [1] - 222:3
**12** [6] - 61:1, 111:12,

160:8, 183:19, 184:6, 198:25
**12.18** [1] - 214:8
**1214** [1] - 174:21
**1234** [1] - 181:4
**126** [1] - 121:2, 147:20, 148:8
**12:09** [1] - 25:22
**12th** [2] - 133:18, 148:14
**13** [2] - 48:16, 184:7
**13.4** [1] - 176:17
**133** [6] - 226:19, 229:5, 229:8, 239:5, 240:14, 240:15
**139** [2] - 64:20, 65:25
**14** [7] - 48:12, 48:16, 48:19, 161:22, 167:12, 196:8, 213:25
**140th** [1] - 17:11
**141** [3] - 17:17, 64:18, 65:21
**143** [1] - 113:21, 114:2, 114:8, 114:15
**148** [1] - 210:4
**14th** [3] - 133:19, 140:8, 148:15
**15** [14] - 61:8, 61:10, 133:8, 133:17, 133:19, 133:25, 167:12, 181:10, 193:8, 196:8, 219:18, 221:18, 245:14
**15-day** [1] - 216:9
**150** [4] - 63:25, 64:13, 73:13, 121:1
**153** [11] - 121:5, 147:20, 148:7, 226:19, 230:8, 239:5, 239:14, 239:17, 240:5, 240:7, 240:14
**16** [4] - 61:16, 133:8, 133:20, 188:11
**161** [4] - 38:11, 38:17, 38:19, 38:22
**162** [1] - 148:9
**165** [1] - 148:17
**166** [1] - 121:4
**167** [1] - 161:21
**168** [2] - 125:22, 126:4
**17** [6] - 13:10, 61:25, 133:8, 133:23, 213:9, 221:1
**17.10.2012** [1] - 232:7
**173** [2] - 162:17, 162:20
**174** [2] - 173:4, 173:6
**178** [2] - 176:6, 176:8
**17th** [2] - 18:15, 18:24, 212:1, 212:2,

233:1, 238:13
**18** [1] - 148:16
**181** [3] - 38:11, 38:17, 38:19
**19** [2] - 13:22, 237:2
**19/10/12** [1] - 236:25
**193** [8] - 55:22, 57:11, 60:14, 60:23, 92:7, 100:11, 107:2, 138:1
**194** [2] - 55:22, 63:17
**195** [2] - 55:22, 64:8
**196** [3] - 55:23, 67:15, 78:7
**197** [2] - 55:23, 71:10
**198** [2] - 55:23, 66:6
**1985** [1] - 12:11
**19th** [3] - 26:20, 237:1, 237:15
**1:28** [2] - 24:20, 24:22
**1:30** [1] - 23:8
**1:45** [1] - 105:3
**1:47** [1] - 26:22
**1st** [3] - 28:2, 41:7, 212:19

## 2

**2** [24] - 14:17, 15:4, 61:13, 64:10, 76:8, 76:14, 85:6, 87:7, 88:10, 88:25, 111:17, 111:18, 112:17, 113:2, 113:4, 113:8, 120:15, 122:1, 122:2, 122:6, 133:18, 149:6, 159:13
**2/14** [2] - 166:22, 172:7
**2/20/2012** [1] - 213:14
**2/20/2014** [2] - 18:6, 19:2
**2/2014** [2] - 173:15, 174:5
**20** [7] - 14:18, 24:13, 73:18, 193:8, 199:1, 212:8, 225:16
**2002** [2] - 61:20, 61:21
**2003** [1] - 185:10
**2007** [4] - 46:20, 201:15, 206:3, 207:10
**2008** [4] - 185:25, 186:15, 186:19, 207:21
**2009** [14] - 37:19, 41:7, 41:22, 42:1, 186:14, 186:16, 186:22, 186:23, 188:12, 190:20, 205:8, 223:24, 224:1, 224:2
**2010** [3] - 56:23, 93:1,

192:21
**2010-2011** [1] - 193:17
**2011** [1] - 192:21
**2012** [70] - 14:13, 18:15, 18:24, 20:8, 23:6, 23:9, 42:10, 61:5, 61:13, 61:22, 76:13, 76:14, 76:19, 78:1, 84:16, 85:3, 85:21, 90:2, 90:6, 90:13, 91:10, 92:22, 93:3, 93:5, 93:8, 94:14, 113:5, 133:21, 147:19, 148:13, 148:15, 163:4, 163:6, 164:8, 164:11, 164:14, 166:19, 173:20, 174:21, 195:4, 211:25, 212:2, 212:7, 212:8, 212:11, 212:18, 212:19, 213:5, 213:10, 213:25, 214:24, 215:12, 215:21, 216:21, 217:5, 218:1, 218:2, 218:3, 218:20, 218:21, 219:2, 230:24, 233:1, 236:8, 236:9, 237:1, 237:8, 237:15
**2013** [15] - 15:10, 15:14, 18:6, 19:2, 20:11, 24:5, 25:22, 26:20, 28:2, 28:3, 28:8, 140:7, 163:9, 213:25, 236:8
**2014** [52] - 13:18, 16:3, 16:10, 16:12, 16:15, 16:17, 17:10, 18:16, 18:17, 20:8, 20:20, 42:11, 61:6, 61:14, 72:7, 76:13, 76:19, 84:17, 85:4, 85:21, 94:14, 146:8, 147:19, 148:16, 164:8, 164:11, 164:15, 164:17, 166:19, 169:20, 173:20, 173:25, 181:4, 188:25, 196:15, 200:20, 213:25, 214:5, 214:8, 224:6, 227:23, 227:24, 230:25, 233:18, 234:25, 235:4, 235:10, 236:11, 240:24, 240:25
**2015** [63] - 16:12, 16:18, 17:17, 18:10, 19:4, 20:20, 21:10, 31:3, 31:6, 32:18, 32:19, 32:20, 32:21, 33:4, 35:1, 35:9, 52:14, 57:21, 61:20, 61:23, 62:3, 76:15, 76:16, 78:2, 87:22, 104:8,

108:8, 108:13, 108:17, 108:21, 109:2, 113:5, 133:22, 133:25, 145:18, 146:5, 146:8, 146:16, 148:17, 163:4, 163:7, 163:10, 164:9, 168:3, 168:8, 172:2, 173:12, 173:13, 173:25, 174:19, 174:20, 174:23, 175:5, 176:14, 176:15, 179:20, 187:21, 230:17, 230:18
**202** [5] - 55:23, 168:19, 168:23, 169:2, 172:11
**207** [4] - 55:23, 76:1, 76:17
**20th** [15] - 16:18, 17:10, 17:17, 18:9, 18:16, 18:17, 18:19, 19:4, 20:20, 51:24, 72:11, 92:22, 211:25, 212:7, 230:17
**21** [2] - 202:1, 221:2
**212** [1] - 55:23
**217** [2] - 55:23, 77:22
**218** [1] - 148:8
**22** [3] - 77:19, 179:1, 213:25
**222** [1] - 55:23
**227** [1] - 55:23
**229** [6] - 13:6, 13:8, 39:14, 40:14, 40:15, 40:17
**23** [2] - 77:19, 213:24
**23.5** [1] - 77:18
**230** [2] - 203:17, 203:19
**231** [2] - 205:21, 205:23
**232** [2] - 206:24, 207:1
**234** [1] - 207:18
**239** [2] - 201:9, 201:11
**23rd** [3] - 24:5, 25:22, 33:3
**240** [2] - 202:20, 202:22
**24th** [3] - 57:21, 83:22, 104:8
**25** [2] - 179:1, 228:8
**253** [8] - 27:20, 27:21, 27:23, 27:24, 27:25, 28:1, 28:18, 29:4
**254** [6] - 27:20, 27:22, 27:23, 27:24, 28:6, 28:7
**255** [6] - 55:22, 56:7, 57:12, 80:19, 97:1, 100:19
**256** [9] - 16:20, 16:25,

19:7, 19:9, 19:17, 21:16, 22:8, 53:3
**257** [1] - 17:23
**258** [2] - 18:11, 18:12
**259** [5] - 16:20, 18:21, 18:22, 21:16, 22:8
**25th** [2] - 18:6, 87:21
**26** [1] - 50:10
**264** [4] - 22:16, 22:18, 22:24, 25:6
**265** [3] - 28:21, 29:1, 29:2
**266** [4] - 22:16, 22:18, 23:25, 24:1
**268** [3] - 22:16, 22:19, 25:17
**269** [3] - 22:16, 22:19, 26:17
**271** [2] - 200:5, 200:8
**274** [5] - 20:1, 20:4, 20:5, 33:19, 230:18
**275** [5] - 6:20, 8:18, 55:23, 71:21, 75:19
**28** [8] - 31:16, 32:5, 33:1, 36:2, 68:8, 69:3, 69:4, 69:21
**290** [1] - 78:5
**2:25** [1] - 26:8
**2:35** [1] - 27:3
**2:48** [1] - 26:10
**2nd** [3] - 20:16, 28:8, 156:12

### 3

**3** [10] - 15:6, 33:18, 62:3, 67:17, 76:8, 76:15, 134:2, 134:22, 135:6, 178:25
**30** [2] - 73:18, 182:14
**30-day** [2] - 216:9, 216:11
**300** [1] - 231:5
**309** [1] - 144:21
**319** [5] - 130:5, 130:24, 145:21, 145:24, 147:20, 148:6, 163:17, 167:22, 174:16
**31st** [1] - 23:9
**3291230** [1] - 181:5
**33** [5] - 48:9, 48:11, 48:14, 48:19, 208:13
**3:15** [1] - 27:4
**3:17** [1] - 27:7
**3:18** [1] - 27:7
**3:19** [1] - 27:8
**3:24** [1] - 27:10
**3:29** [1] - 29:7
**3:30** [3] - 220:10,

220:21, 221:17
**3:31** [1] - 27:11
**3:35** [1] - 182:12
**3:37** [1] - 27:12
**3:39** [1] - 29:12
**3:45** [1] - 29:20
**3:46** [2] - 29:22, 29:24
**3:47** [2] - 29:15, 30:1
**3:49** [1] - 30:2
**3rd** [1] - 18:10

### 4

**4** [6] - 23:12, 62:25, 71:11, 91:1, 140:18, 179:10
**4,500** [1] - 14:14
**40** [5] - 119:11, 119:13, 121:2, 147:21, 148:9
**43** [1] - 155:5
**45** [3] - 104:13, 210:20, 228:7
**45-degree** [1] - 66:16
**464** [1] - 148:7
**4:01** [1] - 24:12
**4:05** [2] - 26:23, 29:9
**4A** [1] - 169:9

### 5

**5** [3] - 147:8, 243:7, 243:8
**5,000** [2] - 14:13, 14:14
**5/28/2015** [1] - 17:19
**50** [5] - 14:18, 14:22, 124:22, 149:19, 155:9
**50MA's** [1] - 243:8
**520** [1] - 78:6
**555** [1] - 181:4
**56** [3] - 210:15, 210:20, 210:23
**59** [1] - 230:13
**5th** [1] - 207:10

### 6

**6** [7] - 212:18, 225:9, 225:10, 225:22, 228:13, 229:23, 229:25
**60** [2] - 124:25, 155:23
**62-page** [1] - 49:9
**64** [1] - 211:12
**67** [1] - 211:22

### 7

**7** [2] - 71:18, 225:9
**70** [6] - 114:10, 114:15, 114:21, 114:22, 119:22, 240:16
**702** [1] - 157:3
**71** [1] - 211:12
**78.2** [1] - 76:21
**780** [2] - 230:22, 231:2

### 8

**80** [3] - 187:25, 234:9, 240:16
**83** [2] - 213:21, 213:24
**84** [1] - 148:9
**84-1** [3] - 57:21, 86:20, 143:14
**84-4** [3] - 38:18, 38:20, 38:22
**86** [1] - 38:23
**86.6** [1] - 176:18
**87** [1] - 75:21
**8:30** [1] - 7:21

### 9

**9/6/2012** [1] - 213:15
**9th** [2] - 72:7, 212:11

### A

**A-m-a-r-y-a-n** [1] - 183:9
**a.m** [2] - 24:9, 198:25
**abandon** [1] - 135:18
**abandoned** [2] - 135:25, 143:3
**aberrational** [2] - 74:6, 74:25
**abilities** [1] - 199:22
**ability** [1] - 150:2
**able** [9] - 95:25, 114:5, 133:16, 149:24, 238:22, 238:23, 238:24, 243:15, 244:25
**absolutely** [13] - 19:16, 20:25, 183:22, 188:17, 189:19, 189:22, 189:25, 190:3, 191:14, 196:20, 227:2, 237:21, 237:22
**Abuse** [2] - 12:17, 12:20

**academic** [8] - 70:8, 124:18, 124:19, 130:7, 132:13, 160:19, 162:12, 165:23
**acceptable** [1] - 123:10
**accepted** [4] - 70:9, 99:4, 99:6, 189:1
**accepting** [1] - 104:9
**access** [27] - 15:12, 15:13, 16:6, 16:16, 20:15, 20:19, 46:21, 46:25, 68:5, 68:11, 69:9, 94:12, 130:16, 132:9, 140:6, 140:16, 151:25, 152:8, 158:18, 159:1, 160:13, 174:16, 191:20, 196:21, 208:24, 227:8
**accommodation** [1] - 58:15
**accomplishments** [1] - 154:16
**according** [2] - 51:11, 208:17
**accordingly** [2] - 5:6, 115:16
**account** [5] - 71:15, 76:21, 76:24, 109:20, 113:5
**accounted** [3] - 176:25, 177:5, 178:20
**accounts** [17] - 48:25, 61:5, 61:12, 61:18, 62:1, 62:14, 63:23, 81:9, 81:10, 85:3, 93:15, 103:23, 111:16, 112:3, 112:23, 113:6, 209:17
**accurate** [3] - 100:14, 200:10, 211:25
**accurately** [6] - 56:12, 61:4, 61:11, 61:17, 61:25, 97:5
**accused** [2] - 33:13, 191:6
**act** [2] - 92:25, 195:6
**action** [1] - 191:17
**Action** [1] - 210:10
**actions** [3] - 44:10, 44:13, 44:24
**activity** [19] - 73:3, 75:14, 78:9, 81:16, 85:2, 85:17, 85:21, 85:23, 91:4, 92:18, 93:8, 93:14, 94:14, 103:22, 152:1, 194:7, 195:14, 211:5, 224:15
**actual** [4] - 136:13, 141:21, 145:2, 194:18

**add** [2] - 121:4, 208:15
**added** [4] - 144:19, 148:17, 195:2, 216:3
**adding** [2] - 136:5, 145:8
**additional** [17] - 8:18, 9:13, 9:22, 11:5, 79:13, 94:17, 110:11, 128:11, 128:18, 138:25, 153:5, 153:7, 167:18, 181:9, 188:16, 217:12, 244:20
**additions** [5] - 135:24, 171:23, 172:1, 172:5, 172:6
**address** [4] - 72:16, 101:23, 188:8, 188:10
**addressed** [2] - 93:23, 100:5
**addresses** [1] - 46:24
**addressing** [2] - 76:5, 104:1
**adjusted** [2] - 4:25, 151:11
**administrative** [2] - 98:24, 98:25
**administrator** [1] - 197:24
**admission** [3] - 4:9, 117:18, 150:3
**admit** [1] - 121:25
**admitted** [4] - 4:8, 4:16, 99:3, 182:2
**advance** [6] - 9:14, 28:13, 57:14, 59:4, 128:20, 195:20
**adversaries** [1] - 32:8
**adversary** [3] - 8:24, 32:4, 134:10
**advice** [1] - 224:17
**advisor** [4] - 204:19, 204:21, 204:22, 205:1
**advisors** [1] - 41:20
**Advisory** [1] - 98:3
**advisory** [5] - 41:24, 187:12, 201:12, 203:1, 205:5
**affecting** [1] - 149:13
**affidavit** [4] - 36:12, 219:20, 219:21, 219:24
**affidavits** [5] - 5:21, 6:14, 10:19, 116:2, 220:5
**affiliated** [3] - 187:22, 187:24, 188:1
**affirmatively** [1] - 42:25
**afford** [2] - 79:11, 79:13
**afforded** [3] - 5:21,

9:15, 10:19

**afield** [1] - 95:7

**after-hours** [2] - 193:3, 193:5

**afternoon** [9] - 106:3, 106:5, 106:20, 106:24, 111:10, 124:14, 124:15, 153:16, 153:17

**agencies** [1] - 154:3

**agency** [10] - 45:22, 49:12, 49:14, 49:17, 51:5, 125:4, 191:18, 208:21, 208:24, 209:20

**ago** [2] - 221:21, 225:16

**agree** [11] - 154:5, 176:24, 177:4, 177:9, 178:2, 178:24, 179:2, 180:17, 206:1, 207:5, 207:13

**agreed** [2] - 225:13, 235:21

**agreement** [4] - 41:24, 123:8, 201:12, 203:1

**agrees** [1] - 117:12

**ahead** [7] - 93:19, 114:24, 116:9, 117:16, 132:3, 136:22, 194:16

**al** [1] - 31:18

**Alfred** [3] - 51:1, 51:11, 197:15

**ALGN** [1] - 243:5

**ALGN/SHORT** [3] - 231:16, 232:6, 232:7

**algo** [1] - 193:6

**Align** [1] - 19:17

**allegation** [6] - 49:11, 161:24, 168:7, 168:9, 168:10

**allegations** [8] - 50:16, 51:5, 115:10, 118:23, 125:2, 151:23, 151:24, 173:18

**allege** [8] - 44:25, 45:7, 45:16, 46:5, 46:8, 50:25, 51:3, 145:9

**alleged** [27] - 36:1, 50:13, 76:24, 87:24, 89:9, 121:10, 136:2, 136:4, 136:6, 140:14, 145:4, 145:7, 145:13, 145:14, 147:12, 148:2, 149:21, 150:24, 151:11, 156:22, 171:2, 171:21, 174:10, 175:2, 192:3

**allegedly** [1] - 130:16

**alleges** [6] - 45:20, 51:8, 92:25, 145:22, 168:2

**alleging** [1] - 45:21

**AllianceBernstein** [1] - 185:2

**allocated** [2] - 5:4, 10:15

**allow** [24] - 49:10, 59:1, 68:17, 73:9, 74:1, 74:14, 74:15, 79:5, 82:14, 84:4, 84:5, 91:21, 95:4, 101:7, 116:9, 136:20, 136:22, 150:10, 181:9, 206:13, 209:13, 220:18, 221:24, 243:11

**allowed** [3] - 58:16, 93:21, 94:24

**almost** [8] - 20:25, 71:16, 111:16, 112:4, 112:14, 146:11, 153:4, 241:5

**Alpha** [4] - 50:11, 187:12, 200:12, 214:4

**altogether** [1] - 147:20

**Amabro** [1] - 200:25

**AMABRO** [1] - 201:2

**Amaryan** [103] - 4:22, 13:25, 20:6, 20:10, 20:12, 20:21, 33:23, 35:7, 35:19, 36:2, 36:5, 36:20, 36:22, 37:8, 37:11, 37:16, 41:6, 41:19, 42:11, 43:2, 44:10, 44:24, 45:7, 46:8, 46:12, 48:3, 50:12, 51:1, 51:10, 51:17, 52:18, 52:19, 53:19, 61:5, 61:12, 61:18, 62:1, 62:12, 63:22, 63:25, 64:14, 66:10, 67:6, 67:8, 67:10, 69:6, 69:7, 71:13, 71:24, 72:9, 73:1, 75:15, 76:22, 78:15, 78:25, 85:3, 85:17, 85:18, 91:4, 92:21, 103:23, 111:16, 112:3, 112:23, 121:11, 121:15, 121:18, 121:20, 146:18, 150:16, 160:12, 161:3, 173:13, 175:14, 175:21, 177:1, 177:21, 178:3, 182:22, 183:8, 183:14, 186:25, 199:18, 200:3, 200:7, 201:10, 201:14, 202:5, 202:6, 202:21, 203:3, 203:14, 203:18, 204:3, 205:22, 206:17, 206:25, 207:15, 207:17, 208:19, 209:25,

214:16, 223:22

**Amaryan's** [5] - 42:24, 67:4, 67:20, 171:11, 171:19

**amended** [24] - 22:21, 28:25, 31:2, 31:9, 31:16, 32:16, 32:23, 33:2, 33:9, 48:16, 53:25, 87:25, 89:9, 92:25, 109:24, 110:3, 110:17, 110:21, 110:24, 115:7, 115:17, 115:21, 140:5, 168:1

**American** [3] - 98:10, 98:12, 184:7

**amount** [15] - 74:15, 115:9, 117:8, 120:23, 121:7, 130:19, 164:22, 179:13, 194:15, 239:20, 241:18, 243:2, 243:16, 243:17, 243:22

**amounts** [1] - 197:2

**Amy** [5] - 6:24, 32:10, 104:18, 134:20, 147:7

**analyses** [3] - 135:16, 165:24, 242:5

**Analysis** [2] - 56:21, 96:15

**analysis** [92] - 57:1, 73:11, 81:6, 83:2, 84:22, 85:2, 85:16, 90:16, 93:10, 93:13, 94:20, 100:16, 103:16, 103:18, 103:22, 103:23, 104:3, 104:6, 108:4, 110:4, 110:10, 110:13, 114:10, 116:8, 129:6, 132:22, 133:12, 133:24, 135:17, 135:22, 136:15, 139:14, 141:11, 144:25, 147:13, 148:1, 149:12, 149:13, 150:19, 154:19, 157:13, 158:11, 158:12, 159:9, 160:3, 160:7, 160:21, 161:5, 162:25, 164:4, 165:12, 165:18, 166:9, 166:17, 166:21, 166:23, 167:11, 167:20, 167:23, 169:16, 170:2, 170:7, 171:18, 173:3, 173:11, 173:24, 175:3, 175:6, 176:17, 176:22, 177:9, 178:17, 179:19, 179:23, 180:5, 180:14, 180:17, 180:18, 180:21, 192:17, 193:9, 193:19, 211:1, 211:2, 217:21, 227:7, 228:16, 239:1, 243:3, 243:9

**analyst** [1] - 211:6

**analysts** [3] - 196:17, 196:19, 235:22

**analysts'** [1] - 196:22

**analyze** [4] - 130:14, 133:17, 150:4, 180:24

**analyzed** [18] - 130:8, 144:22, 145:1, 147:13, 147:14, 147:23, 148:5, 148:7, 148:8, 148:9, 148:18, 148:21, 148:23, 149:19, 163:2, 229:13

**analyzes** [1] - 150:4

**analyzing** [5] - 130:6, 133:24, 148:6, 155:3, 190:16

**Andriv** [1] - 50:5

**announce** [1] - 28:16

**announced** [9] - 34:2, 34:12, 34:16, 35:2, 35:14, 42:12, 68:13, 72:6, 193:3

**announcement** [10] - 28:1, 29:3, 151:17, 151:22, 152:7, 162:1, 193:3, 194:8, 194:9, 194:14

**announcements** [13] - 19:6, 33:12, 81:17, 131:25, 132:1, 132:5, 132:14, 151:14, 152:20, 174:13, 192:23, 194:17

**announcing** [1] - 28:2

**anomalous** [4] - 73:6, 74:6, 177:11, 178:5

**answer** [37] - 15:24, 35:20, 36:4, 36:7, 42:23, 45:9, 52:22, 53:8, 73:23, 82:4, 84:8, 86:25, 90:20, 93:21, 99:2, 112:16, 139:5, 139:16, 170:11, 173:22, 180:2, 180:7, 180:12, 181:21, 181:22, 199:9, 199:10, 206:14, 206:15, 206:17, 209:14, 215:17, 231:21, 233:4, 239:13, 240:12, 241:10

**answered** [2] - 37:9, 180:1

**answering** [3] - 139:2, 170:10, 170:17

**answers** [2] - 138:19, 180:10

**apart** [1] - 174:24

**Apollo** [1] - 19:21

**apologies** [2] - 32:2, 105:1, 212:4

**apologize** [3] - 39:7, 137:18, 222:17

**apostrophe** [1] -

11:22

**appeal** [2] - 156:12, 156:16

**appearing** [6] - 4:12, 4:21, 4:22, 48:8, 200:7, 200:10

**appellate** [1] - 156:24

**application** [4] - 5:9, 5:12, 104:8, 189:5

**applied** [7] - 94:11, 94:12, 97:10, 97:24, 134:11, 188:23, 188:25

**applies** [1] - 101:5

**apply** [5] - 10:3, 10:9, 94:13, 134:11, 189:3

**applying** [1] - 125:1

**appointments** [1] - 124:19

**appreciate** [7] - 8:6, 8:24, 98:21, 100:7, 127:10, 141:10, 211:21

**appreciated** [2] - 8:12, 245:16

**approach** [28] - 12:25, 14:19, 16:21, 20:1, 22:15, 27:21, 28:22, 31:12, 32:9, 39:18, 40:18, 55:20, 88:1, 88:23, 125:19, 132:21, 132:25, 135:4, 137:7, 137:8, 137:23, 140:20, 146:13, 147:3, 168:22, 173:5, 176:7, 225:20

**approaching** [1] - 146:15

**April** [7] - 18:5, 18:6, 24:5, 56:23, 163:9, 212:11, 235:23

**April-May** [1] - 235:23

**arbitrage** [1] - 196:24

**arbitration** [1] - 101:21

**area** [6] - 57:19, 82:21, 83:16, 97:20, 98:16, 98:17

**areas** [1] - 187:10

**argued** [1] - 156:12

**argument** [2] - 136:18, 221:22

**arguments** [2] - 5:5, 221:23

**Arkadiy** [1] - 31:17

**Arleo** [1] - 214:17

**Armenia** [5] - 183:15, 183:17, 184:8, 184:16, 185:14

**Armenian** [1] - 187:5

**arrived** [1] - 226:13

**article** [2] - 28:7,

167:3
  **articles** [1] - 124:23
  **aside** [1] - 71:9
  **assert** [3] - 44:11, 44:15, 44:17
  **asserted** [1] - 120:22
  **asserting** [1] - 120:21
  **assertions** [1] - 49:3
  **Asset** [1] - 208:3
  **assets** [3] - 48:2, 114:9, 187:9
  **assign** [1] - 236:19
  **assigned** [3] - 226:12, 236:3, 236:21
  **assist** [1] - 57:1
  **assistant** [1] - 185:2
  **assisted** [1] - 155:16
  **associated** [2] - 33:24, 86:11
  **Association** [2] - 98:10, 98:12
  **associations** [3] - 98:13, 98:15, 98:17
  **assume** [4] - 6:2, 44:2, 44:6, 191:2
  **assumes** [1] - 167:11
  **assuming** [2] - 83:9, 110:15
  **assumption** [1] - 59:5
  **AT&T** [2] - 197:11, 197:12
  **ATHE** [1] - 218:25
  **attach** [1] - 214:22
  **attached** [18] - 6:13, 37:22, 39:3, 40:12, 41:3, 58:10, 60:18, 67:12, 72:14, 89:7, 89:13, 116:23, 117:13, 120:8, 140:21, 201:20, 201:22, 215:11
  **attachment** [6] - 63:19, 64:9, 117:24, 142:11, 145:17, 163:16
  **attachments** [6] - 39:25, 60:17, 138:2, 138:4, 143:16, 143:17
  **attempted** [1] - 168:8
  **attempts** [2] - 15:12, 16:14
  **attend** [3] - 184:3, 184:14, 224:7
  **attending** [2] - 184:7, 184:8
  **attention** [24] - 13:23, 16:20, 31:2, 31:7, 33:19, 37:10, 48:9, 61:8, 75:25, 112:17, 125:18, 126:11, 131:14, 132:20, 132:24, 133:7, 190:8, 192:4, 192:19,

194:12, 198:2, 224:13, 225:5, 228:9
  **attorney** [2] - 12:8, 217:22
  **attorneys** [1] - 218:8
  **August** [15] - 33:3, 61:20, 61:22, 62:3, 76:15, 76:16, 78:2, 87:21, 133:22, 133:25, 145:19, 163:4, 173:12, 176:14, 187:21
  **authoritative** [1] - 83:15
  **authorities** [3] - 83:5, 83:6, 83:14
  **authorization** [1] - 235:19
  **available** [2] - 63:6, 92:20, 226:22
  **average** [1] - 169:22
  **averaged** [2] - 161:11, 161:12
  **awarded** [1] - 228:6
  **awards** [1] - 187:14
  **aware** [21] - 42:23, 50:21, 83:6, 93:1, 93:3, 102:14, 108:18, 108:22, 108:24, 109:3, 110:25, 121:13, 121:17, 191:10, 199:18, 203:3, 203:7, 203:10, 213:4, 213:13, 218:12
  **AXELROD** [34] - 128:13, 129:4, 153:12, 153:15, 157:16, 161:21, 162:17, 165:10, 167:25, 168:22, 169:2, 169:5, 170:12, 172:11, 172:19, 173:5, 173:7, 173:21, 175:13, 176:5, 176:10, 180:8, 181:2, 182:6, 225:12, 225:19, 226:6, 227:10, 228:19, 233:11, 233:13, 233:15, 241:5, 244:8

**B**

  **back-door** [1] - 52:9
  **background** [5] - 97:4, 100:13, 219:19, 220:5, 221:19
  **bad** [2] - 193:7, 240:17
  **Baker** [4] - 4:3, 4:8, 80:23, 153:23, 154:1
  **bank** [3] - 41:10, 204:6, 209:17
  **banker** [1] - 42:3

**banks** [1] - 185:24
  **barely** [1] - 230:14
  **base** [2] - 129:23, 164:22
  **based** [42] - 16:4, 26:25, 31:8, 32:16, 38:3, 46:11, 47:1, 48:23, 59:13, 73:16, 80:6, 80:14, 85:4, 85:25, 94:18, 116:1, 125:12, 130:9, 132:9, 136:9, 136:15, 147:13, 148:1, 148:23, 150:22, 151:6, 159:12, 159:16, 166:7, 166:13, 171:18, 173:14, 173:19, 174:16, 175:2, 177:9, 179:22, 192:16, 192:18, 206:23, 227:2, 245:8
  **basic** [2] - 126:17, 174:14
  **basing** [1] - 167:2
  **basis** [15] - 14:11, 15:20, 59:8, 131:9, 149:14, 162:9, 166:7, 166:8, 166:13, 178:10, 179:3, 209:8, 215:24, 219:6, 243:5
  **Batashev** [4] - 187:1, 232:15, 242:13, 244:5
  **Bates** [1] - 89:14
  **BCD** [1] - 205:11
  **bear** [4] - 46:4, 51:22, 53:10, 223:3
  **bearing** [1] - 220:4
  **Bearish** [1] - 243:5
  **bears** [1] - 136:13
  **beats** [2] - 121:5
  **became** [1] - 100:5, 176:2, 223:25
  **Becker** [1] - 96:12
  **become** [4] - 100:8, 190:21, 233:22, 240:22
  **becoming** [5] - 233:21, 233:23, 238:7, 238:8
  **beg** [3] - 188:5, 191:12, 213:7
  **began** [2] - 198:3, 219:16
  **begin** [3] - 5:8, 5:14, 153:12
  **beginning** [9] - 13:13, 13:23, 18:5, 39:12, 92:19, 141:17, 192:21, 196:14, 227:24
  **begins** [2] - 18:23, 25:22
  **behalf** [8] - 11:16, 41:23, 41:24, 55:13,

124:3, 183:3, 202:14, 223:8
  **behest** [2] - 185:12
  **belief** [1] - 168:7
  **below** [8] - 66:20, 66:23, 77:15, 78:20, 97:18, 203:24, 204:3, 204:5
  **benchmark** [10] - 160:24, 160:25, 165:2, 165:3, 167:8, 174:1, 174:2, 174:4, 174:22
  **benefit** [2] - 5:21, 81:7
  **Bering** [24] - 21:5, 24:25, 26:6, 26:10, 27:8, 29:24, 37:17, 41:6, 41:20, 41:21, 41:23, 42:1, 50:6, 201:13, 202:14, 202:17, 203:2, 203:3, 203:4, 203:21, 208:1, 208:2, 208:3, 209:21
  **Bermuda** [1] - 50:7
  **best** [6] - 55:24, 119:1, 185:23, 199:21, 221:13, 228:6
  **bet** [1] - 25:13
  **better** [7] - 75:6, 84:25, 178:3, 202:23, 203:20, 212:4, 230:14
  **betting** [1] - 197:7
  **between** [43] - 14:13, 14:14, 16:10, 16:11, 18:16, 19:3, 20:8, 21:20, 23:3, 36:20, 37:2, 37:5, 37:7, 37:11, 37:16, 41:6, 44:18, 51:1, 52:17, 53:11, 66:25, 94:14, 103:12, 110:19, 121:3, 121:9, 121:14, 131:4, 131:11, 138:10, 139:10, 145:12, 147:12, 150:15, 152:7, 179:1, 200:11, 201:12, 203:2, 209:21, 214:12, 224:7, 228:7
  **beyond** [7] - 38:5, 71:6, 86:17, 150:17, 170:13, 177:16, 220:2
  **bible** [4] - 11:15, 55:12, 124:2, 223:6
  **big** [6] - 174:12, 178:13, 185:14, 187:6, 225:5, 233:7
  **bigger** [2] - 130:17, 166:15
  **biggest** [1] - 185:23
  **bill** [1] - 155:4
  **billed** [1] - 155:5

**billing** [1] - 154:12
  **binder** [2] - 39:12, 134:17
  **binders** [3] - 6:18, 122:12, 122:14
  **bit** [10] - 4:25, 26:24, 72:2, 74:14, 77:19, 95:11, 129:8, 187:25, 211:13, 240:24
  **blank** [1] - 107:15
  **blip** [2] - 20:11, 21:2
  **blocked** [2] - 15:12, 20:19
  **blocking** [1] - 20:15
  **Bloomberg** [1] - 216:4
  **blow** [2] - 202:22, 203:19
  **blown** [1] - 7:8
  **blowup** [2] - 127:7, 128:21
  **blowups** [3] - 128:7, 128:17, 128:19
  **blue** [1] - 20:9
  **blue-shaded** [1] - 20:9
  **board** [6] - 205:17, 234:19, 234:21, 235:7, 235:22
  **book** [1] - 138:1
  **books** [1] - 124:22
  **born** [3] - 183:14, 183:15, 220:6
  **bottom** [14] - 13:12, 13:24, 48:15, 75:20, 89:15, 163:2, 204:9, 207:8, 207:25, 208:9, 212:6, 213:23, 230:2
  **bought** [2] - 25:11, 25:12, 212:17
  **box** [1] - 8:19
  **brackets** [1] - 78:21
  **break** [12] - 9:13, 9:15, 9:16, 17:16, 19:3, 91:17, 104:12, 116:19, 117:11, 181:12, 181:20, 220:10
  **brevity** [1] - 58:2
  **Brewster** [3] - 51:1, 51:11, 197:15
  **Brewster's** [3] - 51:14, 51:18, 51:19
  **brief** [3] - 53:15, 101:13, 226:1
  **briefly** [3] - 101:12, 101:14, 171:12
  **briefs** [2] - 221:15, 244:19
  **bring** [1] - 94:3
  **broader** [2] - 83:25,

165:7
   **Brocade** [5] - 28:2, 28:9, 28:15, 29:3
   **broker** [1] - 109:13
   **broker-dealers** [1] - 109:13
   **brother** [1] - 186:25
   **brought** [2] - 228:2, 234:1
   **bubble** [1] - 66:8
   **bubbles** [2] - 67:1, 67:5
   **budget** [1] - 5:6
   **building** [4] - 72:10, 73:1, 188:13, 198:12
   **bulk** [1] - 7:10
   **bullet** [9] - 61:10, 107:6, 107:20, 107:22, 109:10, 111:3, 111:5, 112:20, 131:15
   **bunch** [2] - 136:5, 139:24
   **business** [20] - 18:9, 19:12, 124:21, 178:8, 184:21, 187:7, 188:6, 188:7, 188:24, 189:7, 190:13, 195:25, 196:1, 196:9, 204:16, 233:6, 234:9, 235:20, 240:18, 245:16
   **Business** [2] - 189:1, 189:4
   **Businesswire** [32] - 15:1, 15:7, 16:12, 16:13, 16:17, 17:8, 17:20, 18:8, 18:18, 18:19, 18:20, 19:5, 19:6, 20:21, 20:22, 21:11, 33:12, 33:16, 34:5, 34:6, 34:7, 34:12, 34:14, 34:16, 35:3, 35:17, 35:22, 35:24, 42:14, 52:1, 61:19, 62:2
   **Businesswire's** [1] - 52:10
   **busy** [2] - 154:16, 154:18
   **buy** [2] - 192:13, 243:2
   **buying** [1] - 13:25
   **BW** [1] - 17:8
   **BY** [27] - 11:24, 16:24, 30:20, 32:14, 36:18, 49:23, 51:9, 53:17, 56:6, 60:13, 80:21, 89:1, 92:15, 96:8, 101:16, 106:23, 119:8, 124:13, 129:14, 142:19, 153:15, 165:10, 167:25, 183:13, 200:2,

223:19, 233:15

# C

   **C-2** [8] - 140:19, 140:21, 140:25, 142:24, 143:21, 143:23, 143:25, 144:1
   **C-a-n-j-e-l-s** [1] - 55:19
   **C-o-n-n-o-r** [1] - 11:22
   **cable** [2] - 55:8, 200:6
   **calculate** [2] - 75:3, 114:12
   **calculation** [1] - 156:11
   **camera** [1] - 9:22
   **canjels** [1] - 63:16
   **Canjels** [56] - 55:9, 55:18, 56:7, 57:11, 57:19, 60:14, 62:6, 69:10, 71:9, 83:21, 91:8, 96:9, 98:19, 100:24, 101:17, 107:10, 115:14, 117:10, 125:13, 125:24, 132:22, 135:17, 136:10, 137:16, 137:25, 139:13, 140:13, 140:18, 141:20, 142:12, 142:23, 143:1, 144:5, 144:19, 144:25, 145:3, 146:10, 147:14, 148:5, 148:13, 148:14, 148:16, 148:17, 149:19, 149:25, 150:22, 152:11, 158:2, 158:3, 158:14, 169:2, 170:6, 170:20, 171:6, 171:17, 171:20
   **Canjels'** [1] - 144:16
   **Canjels's** [21] - 133:3, 135:16, 137:4, 140:22, 141:3, 141:7, 145:17, 149:5, 149:14, 150:13, 150:19, 152:23, 154:22, 157:19, 159:8, 168:14, 168:18, 169:17, 169:18, 170:2, 177:20
   **cannot** [8] - 35:19, 35:20, 42:25, 65:8, 117:19, 158:18, 238:15, 238:18
   **cap** [2] - 193:22, 194:1
   **capacity** [1] - 204:22
   **Capital** [27] - 41:20, 41:21, 41:24, 41:25, 42:1, 50:8, 50:10, 53:23, 54:1, 187:3, 187:13, 200:12, 200:15,

200:17, 200:21, 201:13, 201:14, 202:14, 202:17, 203:2, 203:22, 204:17, 205:12, 208:2, 223:20
   **capital** [1] - 81:9
   **captures** [1] - 217:9
   **career** [4] - 102:2, 102:3, 124:19, 185:20
   **carefully** [2] - 168:6, 168:16
   **case** [83] - 8:25, 11:10, 12:23, 14:18, 15:7, 20:24, 21:1, 21:15, 21:17, 22:22, 23:2, 24:17, 25:20, 26:19, 29:6, 31:16, 37:11, 45:21, 53:19, 57:9, 72:22, 75:11, 79:17, 82:5, 87:23, 95:6, 96:6, 99:6, 99:11, 99:16, 99:19, 100:2, 100:4, 100:20, 100:21, 100:22, 100:23, 102:15, 102:23, 102:24, 103:11, 104:21, 109:7, 110:22, 115:22, 116:1, 116:24, 118:18, 125:8, 132:16, 135:19, 145:4, 148:3, 151:24, 152:5, 154:12, 154:21, 155:13, 155:19, 156:11, 157:3, 157:7, 157:13, 157:14, 160:18, 160:25, 161:6, 168:13, 171:1, 174:15, 189:2, 190:1, 201:21, 203:5, 203:8, 203:12, 209:6, 210:1, 210:6, 232:21, 239:4, 239:9, 240:5
   **cases** [11] - 12:21, 64:2, 68:8, 82:18, 99:9, 100:7, 100:8, 102:10, 102:11, 102:20, 194:13
   **Cat** [1] - 231:12
   **Caterpillar** [8] - 90:9, 90:24, 197:11, 211:22, 211:24, 213:6, 213:14, 231:12
   **caught** [1] - 194:12
   **causation** [9] - 150:21, 158:2, 158:3, 158:7, 158:15, 159:6, 159:16, 159:23, 180:18
   **caused** [3] - 151:8, 152:8, 226:20
   **caveat** [1] - 11:11
   **Center** [1] - 63:8
   **center** [1] - 188:14
   **certain** [16] - 16:16, 25:11, 28:17, 46:23, 54:1, 68:10, 68:21,

79:22, 82:16, 90:24, 98:7, 156:6, 171:17, 193:22, 194:4, 213:17
   **certainly** [10] - 5:16, 46:24, 92:21, 103:13, 103:14, 104:1, 104:4, 123:13, 154:9, 218:22
   **certainty** [2] - 241:6, 241:9
   **Certificate** [1] - 207:6
   **certificates** [1] - 208:12
   **certification** [6] - 118:3, 214:21, 214:23, 215:5, 215:11, 219:7
   **certifications** [1] - 45:12
   **cetera** [1] - 241:22
   **CFD** [1] - 25:14
   **CFDs** [2] - 25:12
   **chairman** [1] - 205:16
   **challenge** [1] - 156:8
   **challenged** [28] - 130:11, 130:20, 131:7, 135:25, 136:2, 136:5, 136:6, 136:14, 136:25, 148:11, 148:22, 166:13, 167:8, 167:10, 167:15, 170:25, 172:21, 173:19, 174:8, 174:10, 174:15, 180:15, 226:11, 226:19, 233:9, 239:21
   **challenging** [3] - 148:3, 167:22, 168:12
   **chance** [14] - 69:19, 69:23, 69:24, 89:2, 89:4, 106:25, 158:9, 169:6, 171:10, 172:16, 176:11, 207:22, 210:17, 217:23
   **change** [7] - 104:5, 136:23, 167:20, 170:6, 197:8, 240:21, 242:20
   **Change** [1] - 15:11
   **changed** [3] - 136:11, 195:2, 219:6
   **changes** [1] - 198:24
   **changing** [3] - 136:16, 145:6
   **characteristics** [1] - 216:6
   **characterization** [1] - 161:15
   **characterize** [2] - 153:25, 154:8
   **charge** [3] - 115:7, 154:9, 187:22
   **charged** [3] - 21:1, 23:2, 189:15
   **Chart** [2] - 62:25, 91:2

chart [18] - 14:22, 14:23, 15:9, 22:25, 23:1, 23:14, 29:14, 66:8, 66:10, 67:2, 68:18, 68:21, 72:13, 77:24, 232:1, 232:11, 237:6, 237:14
   **charts** [26] - 7:11, 32:20, 32:21, 93:13, 204:10, 224:20, 225:23, 226:20, 228:13, 228:14, 229:5, 229:20, 232:2, 232:22, 236:7, 236:12, 236:15, 236:17, 240:10, 241:7, 241:13, 241:14, 241:17, 241:19, 243:8
   **chat** [2] - 138:19, 139:5
   **cheated** [1] - 237:22
   **check** [9] - 35:13, 43:5, 104:18, 112:6, 112:12, 119:6, 191:15, 236:23
   **checked** [3] - 191:22, 230:15, 236:22
   **checks** [1] - 64:13
   **Chia** [1] - 96:12
   **Chicago** [4] - 124:20, 188:24, 189:1, 189:4
   **chief** [4] - 96:14, 187:1, 232:13, 242:10
   **children** [1] - 188:21
   **chose** [3] - 90:15, 93:8, 167:5
   **Christmas** [1] - 235:12
   **Chuck** [3] - 40:24, 40:25, 128:15
   **chunk** [1] - 57:20
   **circles** [1] - 67:1
   **Circuit** [2] - 156:12, 181:4
   **circumstantial** [1] - 46:14
   **citation** [1] - 162:13
   **cite** [6] - 47:2, 47:3, 162:9, 162:11, 162:14, 167:3
   **cited** [6] - 82:17, 82:20, 83:1, 83:5, 83:14, 102:10
   **cites** [2] - 157:17, 181:3
   **Citigroup** [1] - 185:17
   **Civil** [1] - 59:15
   **claim** [5] - 49:16, 101:2, 120:13, 135:16, 174:14
   **claims** [1] - 120:12, 130:7, 130:9, 130:14,

**clarify** [1] - 13:3
**clean** [1] - 31:25
**clear** [15] - 7:1, 45:10, 64:4, 72:13, 74:18, 114:20, 137:6, 140:6, 140:15, 157:6, 218:22, 222:14, 222:15, 231:25, 240:13
**clearly** [3] - 72:2, 73:13, 199:5
**CLERK** [15] - 11:14, 11:19, 55:11, 55:16, 105:5, 106:2, 124:1, 124:6, 182:16, 182:18, 183:1, 183:6, 223:5, 223:11, 245:18
**Cliason** [1] - 190:19
**client** [4] - 204:13, 204:15, 204:17, 220:20
**clients** [5] - 11:9, 114:9, 154:1, 154:4, 235:8
**clinical** [1] - 177:23
**close** [13] - 5:7, 67:9, 68:15, 73:16, 73:17, 149:18, 151:18, 179:16, 179:17, 190:22, 199:2, 242:23, 245:16
**closed** [7] - 62:24, 67:25, 68:2, 68:6, 112:24, 212:11, 212:19
**closes** [1] - 198:22
**closing** [2] - 5:5, 62:16
**codes** [1] - 137:2
**coding** [2] - 139:7, 139:10
**coffee** [2] - 19:22
**coin** [1] - 230:14
**coincidence** [1] - 71:8
**collateral** [1] - 222:11
**colleague** [1] - 204:16
**colleagues** [4] - 82:21, 85:8, 205:4, 230:15
**collect** [1] - 226:9
**collected** [3] - 226:10, 235:25, 236:1
**collecting** [1] - 35:23
**collectively** [1] - 225:23
**college** [2] - 184:18, 185:1
**color** [5] - 137:1, 139:6, 139:10, 233:5, 243:12
**Colorado** [1] - 157:1

**coloration** [1] - 143:19
**Column** [1] - 71:18
**column** [5] - 17:4, 69:16, 75:19, 208:6, 208:9
**combination** [2] - 128:10, 128:11
**combined** [2] - 121:6, 166:21
**coming** [4] - 68:24, 221:14, 241:11, 244:3
**commenced** [1] - 112:4
**commences** [1] - 111:16
**comment** [4] - 91:25, 133:16, 150:12, 217:22
**commented** [1] - 219:18
**commenting** [1] - 28:7
**comments** [2] - 79:7, 241:22
**Commercial** [1] - 19:21
**commercial** [1] - 63:6
**Commission** [12] - 12:3, 12:6, 12:12, 53:4, 56:17, 56:22, 57:1, 96:16, 110:6, 117:18, 200:4, 209:5
**committee** [3] - 196:16, 224:8, 243:14
**common** [1] - 152:22
**Common** [1] - 207:9
**communicate** [3] - 51:10, 51:11, 183:25
**communication** [2] - 37:7, 209:16
**Communications** [2] - 212:15, 213:15
**communications** [3] - 36:19, 121:9, 121:14
**companies** [40] - 14:11, 19:11, 19:22, 28:12, 28:17, 33:24, 34:1, 34:4, 34:11, 34:14, 34:15, 34:25, 35:2, 35:5, 35:7, 35:19, 35:20, 36:23, 42:24, 42:25, 43:2, 63:2, 63:24, 73:12, 111:5, 162:1, 185:7, 187:23, 187:24, 188:1, 192:13, 193:2, 193:25, 194:5, 195:1, 204:20, 204:24, 235:18
**company** [49] - 18:23, 19:18, 19:19, 19:20,

19:21, 19:22, 22:1, 22:2, 35:14, 43:5, 64:2, 65:18, 72:1, 72:5, 72:6, 72:10, 153:21, 185:15, 185:19, 185:21, 193:7, 193:10, 194:16, 197:21, 197:23, 198:6, 198:7, 198:16, 199:18, 205:6, 206:3, 209:4, 209:5, 211:1, 211:3, 211:6, 217:7, 226:3, 226:9, 226:10, 226:22, 227:13, 236:3, 239:18, 242:20, 242:21, 243:23, 243:24
**Company** [3] - 201:13, 207:9, 208:3
**comparable** [3] - 75:13, 137:4, 137:21
**compare** [5] - 70:25, 130:9, 164:21, 166:1, 167:7
**compared** [6] - 130:22, 161:2, 161:12, 165:2, 169:18, 211:4
**compares** [1] - 160:22
**comparing** [2] - 83:3, 166:23
**comparison** [5] - 76:11, 76:12, 161:7, 161:8, 169:19
**comparisons** [1] - 75:15
**Compass** [3] - 153:19, 153:21, 155:18
**complaint** [48] - 22:21, 28:25, 31:2, 31:9, 31:16, 32:16, 32:23, 33:2, 33:3, 33:9, 36:1, 44:11, 44:15, 45:15, 45:17, 45:20, 46:5, 46:8, 46:10, 47:3, 48:10, 48:17, 49:8, 49:9, 49:15, 50:1, 50:13, 50:16, 53:25, 87:25, 88:12, 89:10, 92:24, 92:25, 109:24, 110:3, 110:17, 110:21, 110:24, 115:7, 115:8, 115:17, 115:21, 118:23, 140:5, 168:2, 208:20, 210:10
**complaints** [1] - 89:8
**complete** [3] - 30:2, 40:5, 211:2
**completed** [1] - 149:20
**completely** [6] - 58:13, 148:18, 152:9, 157:15, 230:8, 230:13

**complex** [1] - 12:20
**complicated** [1] - 129:8
**components** [4] - 195:8, 195:10, 195:11, 195:12
**comprehensive** [1] - 241:1
**computer** [5] - 15:12, 19:18, 121:14, 121:18, 121:19
**computerized** [1] - 193:6
**computers** [4] - 121:11, 209:3, 209:4, 209:15
**concentrated** [5] - 131:20, 132:15, 151:14, 151:15, 162:4
**concentrating** [1] - 239:20
**concept** [2] - 220:3, 227:16
**concerning** [2] - 81:8, 125:8
**conclude** [5] - 95:19, 131:9, 154:19, 166:7, 241:6
**concluded** [5] - 65:21, 131:1, 131:7, 169:13, 245:19
**concludes** [2] - 75:16, 244:15
**conclusion** [13] - 111:15, 148:24, 151:5, 152:6, 162:10, 166:6, 166:12, 169:9, 170:3, 174:18, 179:6, 179:7, 194:11
**conclusions** [23] - 61:4, 61:11, 61:17, 62:1, 62:6, 63:5, 82:1, 82:4, 83:7, 94:23, 95:15, 111:13, 111:20, 147:24, 149:24, 150:1, 150:2, 150:19, 160:8, 160:11, 174:24, 175:4, 180:22
**Concorde** [1] - 50:7
**condensed** [1] - 79:12
**condition** [2] - 4:16, 186:18
**conditionally** [1] - 4:15
**conditions** [1] - 82:16
**conduct** [3] - 34:1, 34:4, 198:16
**conducted** [1] - 46:12
**confidence** [1] -

**confident** [1] - 130:18
**confine** [2] - 173:15, 173:17
**confirm** [2] - 80:24, 118:9
**confirmed** [1] - 20:13
**conformity** [1] - 59:15
**confuse** [1] - 160:20
**confused** [1] - 87:9
**confuses** [1] - 159:23
**confusing** [2] - 6:12, 143:14
**confusion** [1] - 53:22
**conglomerate** [1] - 234:20
**connecting** [1] - 200:6
**connection** [33] - 34:24, 37:1, 37:5, 37:11, 37:16, 37:19, 41:6, 46:12, 51:1, 52:17, 52:23, 52:25, 72:22, 80:25, 89:9, 99:10, 100:2, 104:8, 126:12, 130:10, 130:14, 130:24, 131:6, 133:12, 143:7, 151:21, 152:13, 168:11, 187:13, 191:24, 192:3, 200:14, 227:12
**Connections** [1] - 19:19
**connections** [2] - 52:23, 209:20
**consequences** [1] - 238:10
**consider** [4] - 5:25, 63:6, 151:9, 211:10
**considered** [5] - 5:24, 70:12, 83:16, 211:11, 241:16
**considering** [2] - 83:16, 190:24
**consistent** [3] - 6:12, 20:7, 44:21
**consists** [1] - 78:10
**constantly** [2] - 215:23, 219:5
**constraint** [1] - 5:20
**constraints** [3] - 5:20, 104:24, 141:13
**constructed** [1] - 62:14
**consultant** [1] - 125:3
**consulting** [3] - 98:2, 98:3, 124:18
**Consulting** [1] - 98:4
**contact** [3] - 44:20, 44:25, 46:16
**contacted** [1] -

208:20
  **contain** [1] - 130:5
  **contained** [9] - 20:16, 59:6, 80:7, 125:10, 125:17, 126:17, 127:4, 219:20, 225:23
  **containing** [2] - 111:8, 225:15
  **contains** [3] - 14:22, 63:9, 63:11
  **contemplating** [1] - 8:21
  **content** [2] - 63:12, 206:12
  **contention** [1] - 131:9
  **context** [2] - 82:4, 132:12
  **continuation** [1] - 5:13
  **continue** [9] - 15:24, 18:20, 30:16, 33:6, 59:9, 60:1, 74:2, 192:25, 245:10
  **Continue** [1] - 60:12
  **CONTINUED** [1] - 101:15
  **continued** [6] - 15:12, 16:3, 185:6, 194:23, 194:25, 245:11
  **continues** [3] - 18:15, 18:25, 123:6
  **continuing** [1] - 33:10
  **contract** [1] - 25:15
  **contrary** [1] - 158:16
  **contrasting** [1] - 83:3
  **conventional** [2] - 70:21, 71:1
  **convey** [1] - 10:25
  **convinced** [1] - 237:22
  **copied** [1] - 117:11
  **copies** [12] - 6:22, 7:23, 7:25, 8:19, 9:1, 39:6, 39:11, 56:3, 128:25, 129:16, 129:17, 129:18
  **Copper** [1] - 116:15
  **Copperstone** [113] - 17:1, 17:3, 18:7, 18:14, 18:25, 23:15, 23:18, 24:24, 26:2, 27:12, 29:20, 31:9, 34:25, 43:14, 43:22, 44:1, 44:3, 50:11, 53:23, 54:1, 54:5, 54:8, 54:18, 54:21, 62:13, 64:22, 65:2, 65:5, 65:7, 65:13, 78:5, 81:9, 81:10, 81:16, 81:21, 87:24, 89:8, 90:4, 90:5, 92:18,

93:15, 109:20, 110:5, 110:9, 110:13, 110:15, 110:20, 111:24, 112:4, 112:8, 112:15, 113:11, 113:21, 114:2, 114:7, 114:11, 115:6, 115:8, 116:3, 119:10, 119:16, 119:19, 119:22, 120:14, 120:25, 121:1, 121:2, 130:2, 134:5, 135:11, 137:5, 139:11, 142:5, 142:7, 144:16, 144:18, 147:20, 148:7, 149:10, 151:1, 163:3, 187:3, 187:6, 187:7, 187:8, 187:13, 187:22, 187:24, 188:7, 188:18, 200:11, 200:12, 200:14, 200:17, 200:21, 204:17, 205:12, 213:5, 223:20, 224:5, 224:8, 224:13, 226:19, 227:13, 228:2, 230:17, 233:9, 233:18, 234:3, 234:11, 234:24, 236:2, 239:7
  **copy** [35] - 7:17, 8:7, 8:11, 8:24, 9:2, 9:4, 9:12, 14:20, 17:19, 20:1, 31:15, 32:3, 40:4, 40:9, 40:11, 56:1, 57:14, 84:23, 88:2, 126:3, 126:21, 128:20, 128:24, 134:8, 134:13, 134:14, 134:15, 134:24, 142:11, 146:22, 169:3, 215:4, 217:25, 219:1
  **corner** [3] - 89:15, 207:8, 207:9
  **corporate** [1] - 211:6
  **Correct** [1] - 165:9
  **correct** [249] - 12:3, 13:21, 15:5, 15:8, 17:14, 17:15, 17:22, 22:4, 22:7, 22:20, 23:15, 24:2, 24:17, 24:18, 24:25, 25:1, 25:9, 25:10, 25:18, 25:25, 26:16, 26:18, 27:1, 27:2, 27:6, 27:13, 27:18, 28:5, 28:11, 28:15, 29:11, 29:12, 29:20, 30:2, 31:20, 33:18, 36:3, 36:6, 37:3, 38:12, 47:5, 47:6, 47:15, 54:2, 54:3, 56:17, 57:4, 57:5, 63:19, 64:10, 65:24, 66:1, 67:13, 67:17, 67:18, 72:15, 77:13, 81:1, 81:4, 81:5, 81:6,

81:9, 81:12, 81:18, 81:20, 82:7, 82:9, 84:17, 86:1, 86:4, 86:6, 86:15, 88:12, 88:13, 88:18, 89:23, 90:2, 90:16, 91:11, 91:12, 91:13, 93:10, 96:25, 99:8, 99:21, 100:18, 101:8, 101:21, 101:24, 102:6, 102:9, 102:22, 108:4, 108:6, 108:10, 109:13, 109:14, 109:24, 109:25, 110:5, 110:10, 110:20, 111:10, 111:18, 111:19, 111:24, 112:6, 112:25, 113:7, 113:8, 113:17, 113:18, 113:21, 113:25, 114:6, 114:11, 114:24, 115:1, 115:10, 115:22, 116:4, 117:4, 125:11, 132:23, 136:17, 141:1, 142:13, 145:24, 145:25, 146:3, 146:6, 149:1, 149:2, 152:21, 153:19, 156:4, 157:15, 157:20, 157:22, 158:7, 158:11, 159:25, 160:9, 161:5, 162:5, 162:15, 163:3, 163:7, 163:8, 163:10, 163:11, 163:14, 163:22, 164:3, 164:5, 164:6, 164:15, 165:21, 165:22, 166:19, 166:24, 167:14, 168:4, 168:15, 169:16, 170:21, 171:24, 171:25, 172:2, 172:3, 172:5, 172:7, 173:1, 173:2, 173:13, 173:14, 173:16, 173:25, 174:1, 174:20, 174:22, 175:7, 175:16, 175:17, 175:22, 175:23, 175:25, 176:3, 176:15, 176:16, 176:19, 176:22, 177:3, 177:4, 177:6, 177:7, 177:13, 177:17, 177:23, 178:18, 178:19, 178:21, 179:11, 179:12, 179:15, 179:20, 179:25, 180:16, 180:19, 184:6, 184:15, 184:17, 185:8, 185:10, 186:7, 186:12, 187:19, 188:3, 189:5, 190:25, 200:18, 201:7, 202:15, 202:18, 203:22, 204:3, 206:20, 208:10, 208:13, 208:21, 208:25, 209:2, 209:19, 210:1, 210:21, 211:14, 211:19, 212:23, 213:1, 214:4, 217:25, 219:1, 225:13, 231:3, 233:2,

236:8, 238:4, 239:10, 241:8
  **corrected** [3] - 24:9, 193:12, 240:18
  **correctly** [14] - 113:9, 168:6, 186:2, 190:20, 192:20, 204:1, 208:4, 210:13, 211:8, 212:20, 214:2, 214:9, 230:23, 235:13
  **correlated** [2] - 197:2, 197:6
  **correlates** [1] - 232:8
  **correlation** [10] - 66:25, 70:6, 85:19, 150:21, 151:7, 158:2, 158:4, 158:7, 158:13, 159:23
  **correlations** [1] - 103:12
  **correlative** [2] - 158:10, 197:10
  **correspond** [1] - 71:2
  **counsel** [31] - 8:4, 8:21, 9:6, 10:9, 12:17, 38:14, 39:24, 50:24, 53:11, 79:5, 80:4, 80:11, 96:19, 99:2, 102:16, 104:1, 107:17, 118:11, 123:2, 127:16, 129:19, 163:13, 163:22, 170:18, 172:22, 218:22, 220:19, 221:9, 222:2, 232:20
  **count** [1] - 79:18
  **countless** [1] - 165:24
  **couple** [5] - 6:3, 19:1, 21:3, 100:12, 159:10
  **coupled** [1] - 195:15
  **course** [10] - 95:2, 179:19, 185:20, 186:16, 188:24, 191:17, 193:24, 206:18, 223:7, 240:1
  **courses** [3] - 100:15, 184:4, 184:10
  **COURT** [377] - 4:1, 4:4, 4:6, 4:10, 4:12, 4:15, 4:20, 4:23, 5:13, 5:18, 6:5, 6:10, 6:21, 6:24, 7:7, 7:14, 7:17, 7:22, 7:24, 8:3, 8:11, 8:15, 8:22, 9:6, 9:18, 9:23, 10:6, 11:4, 11:14, 11:19, 13:1, 13:4, 14:21, 15:20, 15:22, 16:23, 20:3, 22:17, 27:23, 28:23, 30:9, 30:12, 30:16, 30:18, 31:10, 31:13, 31:19,

31:23, 32:3, 32:6, 32:10, 32:25, 33:6, 36:10, 36:16, 38:1, 38:15, 38:20, 38:24, 39:2, 39:5, 39:8, 39:11, 39:13, 39:15, 39:17, 39:19, 40:6, 40:8, 40:11, 40:20, 40:24, 45:2, 45:4, 45:9, 45:19, 47:20, 49:6, 50:23, 51:2, 52:13, 53:14, 54:14, 54:25, 55:2, 55:4, 55:6, 55:10, 55:11, 55:16, 56:4, 57:17, 58:1, 58:9, 58:12, 59:21, 59:25, 60:11, 68:17, 69:12, 73:9, 74:1, 74:9, 74:12, 74:17, 79:5, 79:11, 79:21, 79:23, 80:10, 80:15, 80:17, 82:14, 83:12, 84:2, 87:5, 87:8, 87:11, 87:14, 87:18, 87:20, 88:2, 88:4, 88:6, 88:8, 88:11, 88:14, 88:19, 88:21, 88:24, 90:21, 91:12, 91:17, 91:19, 92:1, 92:5, 92:10, 93:5, 93:19, 94:1, 94:16, 95:1, 95:18, 95:21, 96:3, 101:7, 101:13, 102:25, 103:2, 104:25, 105:3, 105:5, 106:2, 106:3, 106:6, 106:13, 106:15, 106:18, 107:9, 107:12, 107:18, 115:18, 115:20, 116:9, 116:22, 116:25, 117:16, 117:20, 118:7, 118:11, 120:1, 120:3, 120:6, 121:24, 122:2, 122:4, 122:8, 122:16, 122:23, 123:3, 123:9, 123:12, 123:17, 123:19, 123:22, 123:25, 124:1, 124:6, 124:11, 125:21, 125:25, 126:4, 126:8, 126:23, 127:1, 127:5, 127:8, 127:13, 127:16, 127:21, 127:23, 127:25, 128:6, 128:14, 128:17, 129:3, 129:10, 129:12, 129:17, 129:20, 133:1, 133:4, 134:3, 134:7, 134:16, 134:23, 135:5, 136:20, 136:22, 137:8, 137:12, 137:17, 137:24, 138:5, 138:9, 138:13, 138:15, 138:18, 138:24, 139:3, 140:21, 140:24, 141:10, 141:23, 142:1,

142:5, 142:9, 142:11, 142:14, 142:17, 142:22, 142:25, 143:3, 143:6, 143:23, 144:1, 144:4, 144:7, 144:10, 144:14, 145:15, 145:23, 146:1, 146:4, 146:12, 146:15, 146:19, 146:22, 146:24, 147:1, 147:4, 147:7, 150:10, 152:25, 153:3, 153:13, 159:5, 160:3, 160:10, 164:20, 165:6, 167:11, 167:16, 167:24, 168:24, 170:11, 170:15, 170:18, 172:9, 172:12, 172:15, 172:22, 173:6, 173:8, 175:11, 176:9, 180:2, 180:11, 181:7, 181:22, 181:24, 182:4, 182:7, 182:16, 182:18, 182:19, 182:23, 183:1, 183:6, 183:10, 199:1, 199:13, 206:5, 206:9, 206:13, 209:8, 209:12, 214:16, 214:21, 215:4, 215:8, 215:10, 215:19, 216:14, 216:20, 216:25, 217:3, 217:7, 217:13, 217:24, 218:5, 218:12, 218:15, 218:22, 218:25, 219:11, 219:15, 221:7, 222:16, 222:19, 222:24, 223:5, 223:11, 223:16, 224:21, 224:24, 225:4, 225:17, 225:21, 226:7, 227:11, 228:21, 231:9, 231:15, 231:24, 232:11, 232:14, 232:16, 232:25, 233:3, 233:10, 233:12, 237:17, 237:19, 238:12, 238:17, 238:20, 239:1, 239:6, 239:11, 239:16, 239:22, 240:2, 240:7, 240:10, 240:21, 240:25, 241:4, 242:4, 243:1, 244:7, 244:10, 244:12, 244:15, 245:2, 245:5, 245:18

**court** [12] - 57:3, 80:25, 81:3, 98:25, 99:3, 100:9, 102:17, 102:20, 156:24, 172:9, 213:1, 232:17

**Court** [37] - 4:8, 8:23, 32:3, 38:14, 38:18, 39:6, 62:11, 91:20, 102:12, 103:15, 104:6, 104:7, 110:18, 118:20, 119:2, 122:20, 125:11, 126:20, 128:16, 137:2, 137:5, 138:7, 140:19,

143:4, 143:7, 147:2, 150:8, 152:19, 155:23, 156:2, 156:19, 157:1, 158:23, 173:21, 220:13, 225:24, 244:22

**Court's** [4] - 88:14, 88:16, 125:18, 221:6

**courtesy** [1] - 126:3

**courtroom** [2] - 10:2, 221:10

**courts** [4] - 82:17, 82:20, 83:1, 156:1

**covered** [1] - 165:20

**covert** [3] - 47:10, 47:12, 47:13

**crafted** [1] - 49:12

**create** [3] - 42:4, 236:12, 238:14

**created** [32] - 122:22, 186:8, 214:23, 215:12, 215:21, 215:23, 218:1, 218:3, 218:19, 218:20, 218:21, 219:2, 232:24, 232:25, 236:18, 237:15, 237:23, 238:1, 238:5, 238:6, 238:21, 238:25, 241:8, 241:15, 241:18, 241:19, 241:25, 242:2, 242:3, 242:5, 242:9

**creates** [1] - 152:1

**creating** [3] - 236:15, 236:17, 237:5

**Credit** [1] - 54:19

**criminal** [1] - 100:23

**crisis** [1] - 227:25

**criteria** [5] - 62:23, 72:21, 93:22, 93:24, 136:9

**critical** [1] - 11:10

**criticism** [1] - 132:21

**criticize** [2] - 133:16, 242:19

**criticizing** [1] - 157:19

**cross** [33] - 9:15, 10:16, 10:21, 15:23, 30:10, 36:11, 38:1, 38:2, 38:3, 45:25, 59:8, 59:22, 60:6, 60:7, 60:9, 79:15, 80:6, 80:9, 80:12, 94:3, 95:4, 95:14, 95:25, 100:16, 104:3, 104:19, 106:8, 153:6, 153:10, 157:17, 225:18, 228:2

**CROSS** [5] - 30:19, 106:22, 153:14, 200:1, 233:14

**cross-examination** [10] - 9:15, 38:1, 38:2,

45:25, 59:22, 60:6, 60:7, 104:3, 106:8, 153:10

**CROSS- EXAMINATION** [5] - 30:19, 106:22, 153:14, 200:1, 233:14

**cross-examine** [9] - 10:16, 10:21, 15:23, 36:11, 38:3, 59:8, 95:14, 153:6, 225:18

**crossing** [1] - 95:8

**current** [3] - 12:16, 98:18, 119:9

**cursory** [1] - 11:5

**cut** [4] - 5:2, 5:3, 170:10, 241:21

**cutoff** [2] - 70:25, 71:1

**CV** [12] - 56:10, 57:24, 58:6, 59:3, 80:16, 80:17, 97:1, 98:6, 98:20, 101:18, 126:4, 154:15

# D

**D-1** [1] - 33:1

**D-2** [11] - 88:19, 88:20, 116:25, 117:1, 117:4, 120:1, 120:2, 120:6, 120:8, 120:16, 120:19

**D-3** [7] - 134:17, 134:21, 135:1, 142:1, 142:3, 142:15, 142:18

**D-4** [5] - 142:13, 142:20, 142:22, 144:2, 145:16

**D-5** [1] - 147:5

**D-6** [3] - 231:17, 232:1, 232:9

**D-6-1** [2] - 232:3, 243:4

**D-6A** [1] - 232:3

**daily** [2] - 14:10, 215:24

**Daniel** [3] - 103:24, 123:23, 124:8

**dash** [6] - 76:7, 76:8, 76:12, 76:14, 76:15

**data** [51] - 35:23, 45:12, 53:3, 53:4, 62:7, 62:12, 62:14, 62:17, 63:8, 63:10, 64:18, 64:22, 69:19, 73:25, 74:5, 74:24, 85:20, 86:16, 92:20, 92:23, 94:9, 94:10, 94:12,

104:2, 125:2, 130:25, 133:24, 145:23, 149:9, 149:21, 150:3, 150:22, 150:25, 151:1, 151:11, 152:14, 155:3, 160:6, 160:7, 163:11, 164:18, 164:20, 164:22, 173:14, 176:16, 196:17, 231:10, 231:16, 238:14, 240:17

**Database** [1] - 107:20

**database** [8] - 107:25, 108:6, 108:11, 108:16, 108:19, 108:25, 109:5, 164:24

**databases** [2] - 63:7, 165:6

**date** [27] - 18:19, 18:24, 19:4, 28:17, 29:9, 36:21, 36:24, 64:22, 65:9, 65:10, 65:11, 65:15, 87:20, 92:23, 109:16, 109:20, 147:19, 164:14, 164:23, 165:17, 215:22, 219:6, 229:22, 232:25, 236:25, 238:6

**Date** [1] - 232:7

**dated** [6] - 28:8, 33:3, 87:21, 201:15, 229:18, 229:20

**dates** [6] - 65:1, 81:13, 81:14, 136:11, 145:6, 167:19

**Daubert** [5] - 58:21, 58:22, 103:3, 156:8, 156:10

**DAVID** [1] - 223:13

**David** [34] - 33:23, 36:20, 36:22, 37:8, 37:11, 37:16, 41:6, 44:10, 44:24, 45:7, 46:8, 46:12, 51:1, 51:10, 52:17, 52:19, 85:3, 103:23, 104:23, 171:11, 171:18, 182:22, 183:8, 190:19, 201:14, 202:6, 203:3, 204:3, 223:13, 223:22, 223:24, 233:20, 243:13, 243:18

**days** [15] - 11:6, 63:4, 64:5, 65:6, 65:14, 72:25, 73:18, 91:7, 94:11, 155:6, 211:16, 212:22, 234:14, 234:15, 234:24

**deal** [2] - 42:4, 129:4

**dealers** [1] - 109:13

**dealing** [4] - 98:13, 186:6, 191:24, 196:9

**December** [7] - 16:10,

16:11, 16:16, 72:11, 73:2, 212:19

**decide** [3] - 95:5, 190:9, 190:14

**decided** [3] - 165:12, 165:14, 195:4

**deciding** [1] - 228:16

**decision** [7] - 156:23, 243:2, 243:4, 243:12, 243:20, 244:1, 245:13

**decisionmaking** [3] - 195:9, 195:10, 196:21

**decisions** [2] - 194:21, 243:10

**declaration** [92] - 12:23, 14:17, 36:8, 37:22, 38:10, 38:21, 38:22, 38:24, 38:25, 39:14, 39:25, 40:4, 40:6, 40:11, 40:13, 41:12, 57:8, 58:11, 60:18, 60:25, 63:13, 63:14, 63:19, 64:10, 67:12, 67:17, 71:11, 72:14, 72:17, 75:13, 76:4, 76:18, 86:8, 86:19, 89:21, 90:1, 91:1, 91:9, 93:9, 98:25, 99:7, 99:10, 100:12, 101:2, 101:4, 103:24, 104:7, 106:25, 107:1, 107:2, 107:10, 125:10, 125:13, 125:20, 125:21, 126:11, 132:22, 133:3, 133:6, 133:8, 135:16, 137:10, 137:15, 137:25, 140:23, 143:1, 143:9, 143:15, 143:16, 144:5, 149:25, 158:17, 159:8, 161:18, 168:14, 168:15, 171:8, 171:11, 171:15, 171:19, 175:18, 201:21, 201:23, 203:11, 209:25, 210:5, 213:22, 217:25, 218:10, 218:13, 218:14, 218:16

**declarations** [8] - 22:21, 28:25, 58:4, 58:18, 59:7, 92:12, 92:14, 143:11

**declare** [1] - 174:19

**decrease** [1] - 13:13

**deem** [3] - 174:23, 175:1, 175:5

**deemed** [3] - 156:4, 164:9, 179:20, 179:22

**deeming** [2] - 175:9, 175:10

**deep** [1] - 192:12

**deeply** [1] - 102:4

**Deere** [1] - 197:11
**Defendant** [9] - 21:3, 29:12, 33:13, 41:19, 51:10, 183:4, 203:4, 209:21
**defendant** [1] - 203:8
**Defendants** [53] - 4:22, 7:18, 9:2, 11:8, 13:25, 16:16, 20:10, 20:12, 20:24, 21:1, 23:2, 23:20, 23:22, 24:16, 25:3, 25:7, 25:8, 27:1, 27:16, 29:2, 37:10, 42:11, 44:19, 50:12, 53:5, 53:19, 73:7, 73:10, 73:16, 104:20, 109:6, 109:9, 121:11, 121:15, 121:19, 121:20, 124:4, 140:6, 140:15, 149:1, 150:17, 160:13, 168:8, 168:25, 175:15, 177:1, 177:22, 178:4, 190:1, 191:24, 203:13, 210:11, 223:9
**Defendants'** [18] - 5:9, 20:6, 20:21, 31:21, 32:13, 88:25, 103:25, 113:6, 122:1, 134:2, 135:6, 140:17, 147:8, 150:16, 157:21, 161:3, 175:21, 225:10
**defense** [7] - 8:20, 10:22, 53:11, 60:8, 99:2, 99:17, 123:23
**Defense** [2] - 122:6, 134:22
**definite** [1] - 112:16
**definitely** [1] - 194:12
**degree** [1] - 97:7
**deleted** [5] - 148:13, 148:14, 148:16, 195:2, 216:2
**deletions** [5] - 135:23, 171:6, 171:9, 171:10, 172:6
**deliver** [1] - 55:24
**Deloitte** [2] - 98:2, 98:4
**demonstrate** [2] - 118:1, 149:3
**demonstrated** [1] - 136:8
**demonstrates** [3] - 150:15, 158:6, 170:5
**demonstrative** [2] - 127:9, 128:7
**Department** [2] - 154:2, 186:8
**department** [1] - 186:9

**departure** [1] - 136:24
**depiction** [1] - 20:5
**depicts** [2] - 20:6, 20:18
**deposed** [3] - 57:6, 57:7, 100:6
**deputy** [2] - 134:20, 232:4
**describe** [4] - 14:23, 62:11, 138:23, 192:6
**described** [6] - 70:7, 103:24, 133:15, 149:16, 189:7
**describes** [1] - 14:24
**describing** [1] - 99:25
**description** [5] - 99:24, 148:5, 200:10, 229:15, 229:16
**descriptions** [1] - 228:11
**deserve** [1] - 86:25
**deserving** [1] - 156:20
**design** [1] - 239:24
**despite** [1] - 164:7
**detail** [4] - 31:3, 31:6, 97:6, 111:1
**detailed** [3] - 64:17, 92:14, 156:15
**determination** [1] - 86:5
**determine** [9] - 65:8, 65:15, 81:24, 85:4, 85:24, 113:14, 159:11, 170:3, 180:18
**determined** [1] - 159:19
**determining** [2] - 83:17, 159:15
**developed** [2] - 174:4, 218:6
**development** [2] - 97:25, 235:5
**developments** [1] - 211:7
**device** [1] - 19:19
**devices** [1] - 209:16
**diagonal** [2] - 66:13, 66:15
**diagonals** [1] - 67:6
**Dialog** [8] - 185:19, 185:22, 185:23, 186:6, 186:10, 186:14, 186:15, 204:13
**difference** [15] - 58:5, 130:12, 131:4, 131:23, 132:2, 136:9, 139:10, 145:9, 145:11, 166:11, 166:12, 179:1, 188:12,

197:7, 214:12
**differences** [4] - 25:15, 118:3, 147:11, 148:10
**different** [58] - 6:13, 17:3, 17:7, 24:1, 59:12, 73:13, 73:25, 76:5, 76:8, 76:9, 77:25, 82:1, 95:15, 109:5, 117:13, 119:17, 128:1, 128:9, 128:22, 130:23, 131:11, 133:13, 136:3, 136:11, 136:13, 137:1, 139:9, 139:19, 139:20, 139:22, 144:17, 145:1, 146:8, 148:19, 150:23, 151:11, 152:9, 164:20, 164:23, 165:6, 166:2, 166:16, 167:9, 167:23, 170:7, 170:8, 170:21, 170:22, 170:24, 171:3, 178:12, 195:1, 203:24, 205:3
**differentiate** [1] - 140:9
**difficult** [3] - 68:7, 197:4, 241:10
**dimensions** [2] - 130:23, 131:3
**dire** [2] - 79:18, 97:3
**DIRE** [3] - 80:20, 96:7, 101:15
**DIRECT** [5] - 11:23, 56:5, 124:12, 183:12, 223:18
**Direct** [1] - 100:14
**direct** [36] - 13:23, 14:18, 16:25, 17:23, 31:7, 38:4, 38:5, 46:16, 48:7, 56:7, 57:9, 60:6, 60:9, 61:1, 61:8, 61:16, 75:25, 96:12, 98:19, 99:7, 99:18, 100:11, 100:19, 112:17, 125:18, 132:19, 132:20, 132:24, 171:5, 187:5, 198:2, 210:8, 210:15, 213:21, 225:5, 228:9
**directed** [1] - 212:4
**directing** [10] - 31:2, 33:19, 37:10, 48:9, 126:11, 131:14, 133:7, 190:8, 192:4, 224:13
**direction** [9] - 25:4, 25:8, 26:14, 27:16, 30:5, 71:17, 152:4, 194:15, 243:9
**directly** [9] - 32:10, 51:11, 96:14, 96:16, 200:22, 206:11, 209:12, 216:4, 232:19

**director** [4] - 41:13, 51:14, 96:14, 197:20
**disagree** [4] - 120:22, 178:7, 235:1, 238:4
**disallow** [1] - 59:3
**disappointed** [1] - 28:10
**disciplinary** [1] - 238:9
**disclosed** [2] - 7:2, 224:21
**discovery** [6] - 7:3, 7:5, 7:8, 9:11, 47:23, 53:18
**discretion** [1] - 58:14
**discuss** [6] - 148:12, 195:24, 227:8, 227:14, 227:16, 227:19
**discussed** [6] - 83:21, 122:25, 164:5, 211:13, 212:3, 213:15
**discussing** [1] - 210:21
**discussion** [12] - 32:18, 53:11, 56:2, 123:4, 123:6, 138:10, 199:15, 213:3, 213:8, 213:11, 214:11, 245:4
**discussions** [3] - 196:12, 227:13, 234:9
**disgorgement** [1] - 157:14
**dispersed** [1] - 131:21
**disputing** [1] - 163:15
**disqualification** [1] - 156:13
**disregarded** [1] - 220:18
**dissatisfied** [2] - 82:12, 82:15
**disseminated** [2] - 22:6, 112:24
**dissolve** [1] - 5:10
**distributed** [4] - 23:11, 62:20, 63:1, 73:12
**distribution** [7] - 21:24, 23:4, 24:12, 26:22, 62:21, 68:2, 69:5
**distributor** [1] - 188:2
**District** [6] - 99:20, 100:3, 100:22, 118:20, 157:1, 157:13
**diversification** [1] - 192:9
**diversifying** [1] - 190:18
**divided** [1] - 230:10
**Division** [4] - 56:20,

96:15, 96:22, 96:24
**Dizuchi** [3] - 41:25, 201:14, 202:14
**docket** [3] - 31:23, 33:1, 57:21
**docketed** [1] - 57:23
**docs** [1] - 241:24
**Doctor** [7] - 80:22, 89:2, 106:15, 106:24, 162:19, 170:13, 176:11
**doctor** [1] - 104:19, 106:9
**document** [82] - 13:5, 31:11, 31:19, 31:20, 32:1, 32:5, 36:2, 38:18, 49:12, 80:17, 86:20, 87:12, 87:16, 89:4, 89:17, 92:13, 102:10, 107:4, 111:23, 116:5, 117:22, 118:12, 118:15, 119:21, 119:24, 120:3, 120:4, 120:5, 125:22, 125:25, 126:5, 134:12, 138:7, 139:8, 143:12, 143:15, 146:14, 146:19, 146:20, 146:21, 147:2, 147:9, 172:5, 173:10, 201:18, 201:24, 206:2, 206:6, 206:12, 206:14, 206:19, 206:23, 207:2, 207:5, 207:10, 207:12, 207:14, 207:15, 207:19, 207:22, 208:17, 216:14, 216:18, 216:20, 216:23, 217:2, 217:8, 217:9, 217:20, 218:18, 218:19, 218:20, 219:5, 225:15, 226:8, 232:16, 238:1, 238:13, 238:14, 238:20, 242:4
**documented** [1] - 132:12
**Documents** [1] - 129:19
**documents** [51] - 6:6, 7:2, 7:3, 8:7, 9:11, 31:16, 37:21, 38:6, 38:15, 39:3, 39:20, 41:3, 41:11, 41:14, 47:14, 54:19, 89:14, 95:9, 118:24, 119:3, 120:7, 122:23, 130:1, 130:4, 134:9, 134:10, 135:9, 135:11, 136:6, 141:12, 145:16, 181:17, 182:2, 201:22, 207:4, 207:24, 217:12, 217:20, 217:21, 218:5, 221:4, 221:15, 228:23, 229:2, 232:18, 235:25, 242:3,

242:7, 242:8
**dollar** [1] - 130:19
**dollars** [3] - 48:25, 116:1, 243:17
**donating** [2] - 234:23, 235:2
**done** [31] - 4:18, 6:17, 20:10, 34:5, 68:3, 69:4, 75:14, 79:25, 81:7, 90:25, 146:11, 154:20, 162:3, 166:25, 191:11, 192:10, 193:6, 193:19, 199:11, 213:4, 221:24, 227:2, 227:6, 229:15, 230:16, 236:5, 236:20, 236:23, 239:1, 239:4, 239:6
**Donnelly** [31] - 5:14, 8:11, 11:11, 30:9, 57:17, 59:10, 79:6, 79:14, 80:1, 80:5, 86:13, 86:14, 86:18, 87:22, 88:6, 90:6, 90:12, 91:11, 91:14, 92:5, 93:16, 96:4, 102:9, 106:10, 118:9, 120:7, 121:24, 127:1, 200:3, 221:8, 222:19
**donnelly** [1] - 127:5
**DONNELLY** [107] - 4:14, 5:16, 6:3, 6:6, 6:17, 6:22, 7:4, 7:8, 7:19, 7:23, 7:25, 8:13, 8:17, 9:3, 9:17, 9:19, 10:4, 11:3, 11:13, 11:24, 12:25, 13:2, 13:6, 13:8, 14:19, 16:19, 16:24, 19:25, 22:15, 27:20, 27:24, 28:21, 30:7, 32:22, 33:5, 39:14, 39:16, 39:23, 40:3, 40:7, 40:10, 40:15, 40:18, 41:16, 42:6, 42:8, 46:2, 47:18, 49:5, 50:19, 53:7, 53:15, 53:17, 54:16, 54:22, 54:24, 55:7, 55:20, 56:3, 56:6, 57:18, 59:11, 60:2, 60:13, 74:23, 79:3, 80:19, 83:10, 83:19, 90:19, 92:6, 93:18, 93:20, 94:5, 96:8, 101:9, 106:5, 106:12, 107:14, 115:11, 116:5, 117:9, 122:3, 122:7, 122:12, 123:5, 123:10, 123:13, 123:18, 123:20, 123:23, 129:16, 134:25, 136:18, 136:21, 150:9,

150:11, 200:2, 200:5, 201:9, 202:2, 202:20, 203:17, 206:24, 214:14, 215:9, 222:22
**door** [3] - 52:8, 52:9, 52:16
**double** [2] - 104:18, 245:14
**double-check** [1] - 104:18
**doubt** [2] - 170:20, 237:21
**down** [25] - 19:22, 24:19, 26:8, 27:4, 27:10, 30:4, 48:4, 48:14, 49:19, 72:2, 78:18, 118:21, 163:1, 172:22, 193:8, 193:10, 194:1, 194:2, 206:1, 212:3, 212:6, 212:15, 228:7, 232:4, 243:6
**downloading** [1] - 114:4
**downturns** [1] - 197:9
**Dr** [74] - 55:9, 69:10, 75:14, 75:23, 83:21, 85:17, 91:8, 96:9, 100:24, 101:17, 117:10, 125:13, 129:7, 132:22, 135:16, 135:17, 136:10, 137:4, 137:15, 139:13, 140:13, 140:18, 140:22, 141:3, 141:7, 141:20, 142:12, 143:1, 144:16, 144:19, 144:25, 145:3, 145:17, 146:10, 147:14, 148:5, 148:13, 148:14, 148:16, 148:17, 149:5, 149:14, 149:19, 149:25, 150:13, 150:19, 150:22, 152:11, 152:23, 154:22, 156:25, 157:19, 158:2, 158:3, 158:14, 159:8, 159:24, 161:22, 162:18, 168:1, 168:14, 168:18, 169:6, 169:18, 170:2, 170:6, 170:20, 171:17, 171:20, 176:5, 176:7, 177:20, 179:9
**dramatically** [1] - 72:8
**draw** [6] - 148:23, 149:15, 150:2, 152:5, 179:6, 194:11
**drawn** [1] - 83:7
**draws** [1] - 151:5
**drive** [1] - 114:20
**dropbox** [3] - 47:3, 47:7, 47:9
**dropped** [5] - 139:13,

140:13, 146:5, 146:7, 146:9
**dropping** [3] - 109:15, 136:4, 145:7
**drug** [2] - 72:6, 177:23
**dry** [1] - 178:12
**Dubovoy** [10] - 21:7, 21:11, 24:22, 24:23, 26:12, 27:3, 27:11, 27:14, 31:18
**due** [5] - 77:20, 113:10, 189:2, 193:4, 227:24
**duly** [5] - 11:17, 55:14, 124:4, 183:4, 223:9
**duplicative** [1] - 13:4
**duration** [1] - 91:5
**during** [19] - 16:5, 16:16, 20:14, 20:17, 20:22, 41:21, 63:2, 68:9, 76:22, 77:11, 111:9, 193:3, 193:11, 194:3, 194:9, 231:5, 234:13, 239:16, 240:18
**During** [1] - 42:10
**Dutch** [1] - 97:16
**duties** [2] - 56:24, 56:25

# E

**e-mail** [10] - 46:24, 87:19, 87:20, 87:21, 89:19, 116:23, 117:12, 117:23, 163:16, 189:12
**e-mails** [11] - 46:20, 46:21, 46:22, 46:23, 47:1, 47:9, 47:14, 47:17, 191:19, 208:24, 209:3
**early** [8] - 67:10, 67:11, 68:5, 68:11, 69:2, 69:3, 69:9, 195:7
**earned** [2] - 132:6, 175:15
**earning** [2] - 23:5, 152:20
**earnings** [42] - 13:19, 13:20, 17:12, 28:1, 28:12, 28:13, 28:16, 34:2, 34:11, 35:14, 63:11, 63:12, 64:1, 64:2, 68:13, 68:19, 68:24, 71:14, 81:17, 108:7, 108:13, 111:8, 112:23, 114:4, 114:23, 131:25, 132:5, 132:14,

140:13, 146:5, 146:7, 146:9
151:4, 151:14, 151:17, 151:22, 162:1, 174:12, 192:22, 192:23, 193:3, 193:8, 194:14, 194:17
**ease** [2] - 6:12, 57:24
**Eastern** [1] - 100:3
**easy** [1] - 215:22
**Econometric** [1] - 98:11
**econometric** [2] - 70:5, 180:24
**econometrics** [7] - 56:14, 56:15, 97:11, 97:24, 100:16, 100:17, 103:15
**Economic** [3] - 56:21, 96:15, 98:10
**economic** [13] - 56:25, 125:2, 130:13, 131:8, 132:12, 132:13, 150:18, 150:21, 151:7, 159:22, 167:6, 174:13
**economics** [10] - 57:20, 97:7, 97:9, 97:14, 97:20, 97:25, 98:14, 101:5, 103:9, 161:6
**economist** [2] - 56:20, 96:14
**economists** [1] - 56:15
**edges** [1] - 165:11
**edited** [1] - 21:23
**education** [1] - 219:19
**educational** [1] - 97:4
**Edwards** [3] - 19:18, 24:3, 25:11
**effect** [2] - 75:5, 193:4
**effective** [4] - 46:1, 60:7, 118:24, 118:25
**effectively** [3] - 71:19, 71:20, 92:3
**efficient** [1] - 79:25
**eight** [13] - 43:19, 43:21, 43:23, 48:14, 48:15, 110:19, 111:2, 111:6, 126:18, 127:19, 127:21, 127:22, 221:25
**either** [9] - 6:11, 7:10, 68:9, 71:17, 93:15, 132:2, 134:16, 157:15, 242:16
**Elan** [1] - 141:1
**electronic** [5] - 7:25, 36:19, 37:7, 52:23, 143:12
**electronically** [3] - 7:20, 143:11, 232:19

**eliminated** [1] - 211:18
**elucidate** [1] - 48:1
**emphasize** [2] - 10:24, 144:24
**employed** [3] - 12:2, 12:5, 223:23
**employee** [4] - 23:17, 49:14, 204:23, 205:6
**employees** [7] - 41:9, 185:25, 187:21, 191:22, 209:4, 227:13, 236:2
**end** [27] - 13:17, 14:5, 17:18, 58:20, 69:15, 70:19, 77:2, 95:5, 98:6, 123:11, 132:17, 140:14, 146:1, 151:15, 151:16, 151:21, 152:22, 157:17, 157:18, 164:14, 186:15, 192:20, 199:2, 232:4, 235:11, 236:9, 236:10
**ended** [2] - 164:13, 164:17
**energy** [1] - 19:22
**Enforcement** [3] - 12:18, 96:22, 96:24
**enforcement** [4] - 191:18, 199:22, 208:21, 209:19
**engage** [3] - 193:14, 226:25, 239:18
**English** [9] - 159:24, 183:16, 183:17, 183:20, 184:2, 184:5, 184:11, 184:12, 218:25
**enrolled** [2] - 184:9, 189:2
**ensure** [1] - 118:12
**enter** [1] - 193:11
**entered** [2] - 43:12, 226:4
**entertainment** [1] - 234:20
**entire** [1] - 60:8
**entirely** [3] - 68:6, 69:1
**entities** [8] - 18:24, 52:20, 75:8, 173:13, 176:15, 203:25, 204:9, 208:16
**entitled** [3] - 28:9, 207:19, 208:6
**entity** [6] - 51:17, 200:23, 200:24, 203:14, 203:25, 204:16
**entries** [2] - 23:14, 26:25
**entry** [4] - 24:22, 25:24, 148:4, 232:9
**equate** [1] - 150:21

**equating** [1] - 151:7

**equities** [3] - 185:5, 190:15, 190:16

**equity** [3] - 187:11, 196:10, 205:18

**equivalent** [1] - 235:18

**error** [5] - 107:15, 150:18, 150:21, 151:7, 159:22

**Escada** [8] - 18:23, 50:7, 198:8, 198:10, 198:19, 201:3, 201:4, 210:12

**especially** [1] - 193:2

**essays** [2] - 189:3, 189:6

**essentially** [7] - 66:15, 67:3, 69:18, 70:5, 98:5, 161:10, 234:23

**establish** [6] - 44:25, 80:2, 80:5, 80:10, 226:7, 228:22

**established** [2] - 59:17, 96:10

**establishes** [2] - 66:10, 67:2

**estate** [1] - 19:20

**Estate** [1] - 19:21

**estimate** [1] - 22:11

**estimates** [2] - 211:3, 211:4

**et** [2] - 31:18, 241:22

**Eugene** [3] - 55:9, 55:18, 107:10

**EUGENE** [1] - 55:18

**evaluating** [4] - 74:5, 74:6, 74:24, 75:1

**evening** [1] - 200:3

**event** [22] - 17:1, 18:9, 18:22, 21:15, 67:21, 71:25, 72:9, 89:22, 134:5, 139:11, 139:23, 139:25, 140:13, 142:6, 145:21, 164:5, 164:19, 171:18, 213:9, 213:18, 245:7

**Events** [2] - 78:3, 107:20

**events** [192] - 17:12, 43:12, 53:4, 62:9, 62:22, 63:1, 63:24, 64:1, 64:14, 64:18, 64:19, 64:24, 65:7, 65:12, 65:13, 65:21, 66:11, 68:3, 68:7, 68:20, 68:22, 68:25, 69:4, 69:8, 71:14, 73:1, 73:11, 73:13, 75:11,

75:18, 76:21, 76:24, 77:16, 78:10, 78:11, 78:13, 78:14, 87:23, 89:20, 89:25, 90:5, 90:13, 91:3, 91:5, 92:11, 94:10, 108:6, 108:11, 108:16, 108:19, 108:24, 109:5, 113:20, 116:24, 120:12, 130:2, 130:5, 130:10, 130:15, 130:20, 130:21, 130:24, 130:25, 131:6, 131:12, 131:19, 131:21, 131:22, 132:4, 135:10, 135:18, 135:20, 135:22, 136:1, 136:2, 136:4, 136:5, 136:12, 136:13, 136:14, 136:25, 139:12, 139:13, 139:19, 139:20, 139:22, 139:24, 140:3, 140:4, 140:8, 141:19, 141:20, 141:21, 141:22, 144:11, 144:16, 144:18, 144:19, 144:20, 144:21, 144:23, 145:2, 145:5, 145:7, 145:8, 145:18, 145:21, 146:2, 146:5, 146:7, 146:9, 146:17, 147:12, 147:19, 147:20, 147:25, 148:2, 148:6, 148:7, 148:10, 148:11, 148:13, 148:14, 148:16, 148:17, 148:19, 148:20, 148:22, 152:13, 152:14, 160:22, 161:1, 161:2, 161:4, 161:11, 161:25, 162:4, 163:12, 163:17, 164:1, 164:2, 164:8, 164:9, 164:10, 164:12, 164:13, 164:21, 164:24, 165:2, 165:3, 165:5, 165:11, 165:15, 165:18, 165:20, 165:25, 166:1, 166:2, 166:18, 166:23, 166:24, 167:9, 167:15, 168:11, 168:12, 171:6, 171:18, 173:19, 174:11, 174:15, 174:24, 175:2, 175:10, 176:18, 176:19, 177:1, 179:10, 179:14, 194:16

**evidence** [28] - 6:8, 41:5, 44:17, 45:8, 46:14, 50:17, 67:20, 71:3, 71:4, 71:5, 71:7, 93:13, 119:15, 119:16, 121:9, 121:14, 121:18, 122:1, 122:6, 127:9, 130:13, 131:8, 132:12, 174:14, 182:2, 206:6, 206:7

**Evidence** [2] - 59:15,

157:3

**exact** [10] - 8:24, 19:3, 52:20, 65:12, 69:21, 99:4, 126:25, 166:9, 179:17, 213:17

**Exact** [3] - 70:2, 70:3, 70:4

**exactly** [20] - 6:19, 39:24, 66:17, 66:18, 70:17, 81:22, 91:6, 92:22, 99:24, 102:14, 103:18, 108:9, 110:1, 116:16, 134:18, 153:25, 155:14, 155:20, 159:17, 167:10

**exaggerated** [2] - 193:4, 194:20

**examination** [11] - 9:15, 38:1, 38:2, 45:25, 48:7, 59:22, 60:6, 60:7, 104:3, 106:8, 153:10

**EXAMINATION** [11] - 11:23, 30:19, 53:16, 56:5, 106:22, 124:12, 153:14, 183:12, 200:1, 223:18, 233:14

**examine** [12] - 10:16, 10:21, 15:23, 36:11, 38:3, 59:8, 94:4, 95:14, 96:4, 153:6, 225:18, 226:13

**example** [11] - 28:24, 75:1, 112:9, 130:15, 151:13, 159:7, 192:11, 193:7, 211:2, 216:8, 231:11

**examples** [7] - 22:20, 109:23, 110:3, 110:7, 110:8, 110:14, 110:19

**Exante** [2] - 29:19, 50:8

**Excel** [13] - 195:1, 214:24, 215:11, 215:17, 215:20, 215:22, 215:23, 215:25, 216:3, 216:6, 216:11, 218:1, 219:2

**excellent** [1] - 183:24

**except** [4] - 10:8, 69:6, 79:1, 158:25

**exception** [2] - 19:1, 210:11

**exceptions** [1] - 19:2

**Exchange** [5] - 12:3, 12:6, 56:17, 200:4, 209:5

**exchange** [6] - 7:5, 7:9, 35:6, 101:21, 225:2, 225:13

**exchanged** [1] - 7:19

**exchanges** [2] -

14:12, 63:3

**exclude** [12] - 9:25, 74:5, 75:1, 75:9, 76:23, 90:13, 178:10, 178:16, 179:2, 179:3, 198:18

**excluded** [4] - 64:5, 90:5, 104:2, 157:3

**excluding** [1] - 104:14

**excuse** [16] - 18:10, 18:18, 23:3, 24:8, 30:14, 33:8, 50:17, 82:24, 89:3, 116:20, 128:13, 146:8, 164:16, 170:9, 216:24, 237:17

**excused** [5] - 54:25, 55:5, 122:11, 223:2, 244:14

**executed** [2] - 211:24, 212:7

**exercise** [1] - 47:22

**exhibit** [40] - 8:13, 8:16, 8:20, 13:7, 24:6, 31:22, 75:20, 80:7, 88:9, 88:11, 88:16, 116:19, 117:10, 128:22, 138:1, 139:9, 140:18, 141:3, 141:7, 141:8, 141:9, 143:4, 143:9, 143:13, 144:2, 144:11, 147:15, 148:12, 150:14, 152:23, 169:1, 169:7, 172:10, 225:8, 225:14, 226:21, 231:16, 232:9

**Exhibit** [91] - 6:15, 14:17, 18:11, 18:12, 20:4, 20:5, 22:16, 27:25, 28:18, 28:21, 29:1, 29:2, 29:4, 32:13, 33:19, 36:2, 38:20, 38:22, 53:3, 56:7, 57:11, 60:14, 60:23, 63:17, 64:8, 71:10, 71:21, 75:22, 75:25, 76:17, 77:21, 77:22, 87:6, 88:25, 92:7, 107:2, 122:1, 122:2, 122:6, 134:2, 134:22, 135:6, 140:17, 140:21, 141:6, 142:24, 143:21, 143:25, 144:1, 147:8, 149:6, 162:17, 162:19, 162:20, 162:22, 168:18, 168:19, 168:23, 169:18, 172:4, 173:3, 173:7, 173:8, 173:11, 176:5, 176:6, 176:8, 176:10, 179:9, 200:8, 201:11, 202:20, 203:19, 205:21, 205:22, 207:1, 207:18,

210:4, 214:23, 215:1, 215:2, 215:3, 219:1, 225:10, 225:22, 228:13, 229:23, 229:25, 230:18

**Exhibits** [12] - 8:5, 16:20, 21:16, 22:8, 22:18, 27:21, 38:11, 38:17, 38:19, 60:18, 76:11, 140:19

**exhibits** [37] - 6:7, 7:9, 7:18, 7:19, 9:14, 22:13, 37:25, 38:3, 38:9, 38:10, 38:18, 39:16, 40:12, 43:12, 55:21, 60:20, 72:17, 72:18, 76:3, 76:10, 79:22, 95:25, 120:17, 122:14, 127:25, 128:7, 128:25, 131:2, 131:17, 132:19, 142:22, 143:6, 149:2, 150:13, 168:15, 218:7, 225:13

**existence** [1] - 110:25

**expanding** [1] - 173:12

**expect** [7] - 59:2, 68:13, 68:25, 69:2, 69:3, 162:2, 242:24

**expectation** [1] - 162:7

**expected** [1] - 156:23

**experience** [10] - 56:12, 97:18, 97:19, 102:8, 102:12, 102:21, 103:17, 167:3, 177:8, 233:24

**Experience** [1] - 98:20

**expert** [46] - 57:15, 57:19, 58:3, 58:4, 58:17, 59:2, 59:3, 59:17, 74:13, 79:9, 80:25, 81:4, 83:16, 86:4, 98:23, 98:24, 99:4, 99:5, 100:4, 100:5, 100:9, 100:24, 101:2, 101:10, 102:8, 102:13, 102:15, 102:22, 103:3, 103:6, 103:20, 103:25, 104:9, 114:13, 115:15, 126:23, 128:18, 141:11, 141:12, 153:22, 156:4, 156:5, 156:20, 182:1

**Expert** [1] - 98:20

**expert's** [3] - 143:9, 173:8, 213:1

**expertise** [2] - 100:13, 125:1

**experts** [3] - 58:19,

154:6, 182:8
**explain** [14] - 69:20, 78:8, 90:10, 90:22, 94:1, 118:4, 139:6, 147:15, 149:18, 151:12, 157:21, 158:1, 209:13, 217:6
**explained** [4] - 152:19, 158:18, 158:25, 199:20
**explaining** [1] - 160:1
**explains** [1] - 145:9
**explanation** [8] - 152:9, 156:11, 156:15, 156:23, 160:12, 171:14, 178:1, 219:4
**explanations** [2] - 151:10, 157:25
**exploiting** [1] - 68:5
**Explorer** [5] - 21:5, 50:6, 203:3, 203:4, 209:22
**express** [2] - 107:20, 109:2
**extend** [1] - 219:23
**extended** [4] - 164:8, 173:24, 174:18, 220:21
**extensive** [1] - 58:21
**extensively** [1] - 193:23
**extent** [9] - 53:8, 74:18, 112:6, 112:12, 135:23, 168:9, 175:23, 220:8, 236:5
**extra** [3] - 39:6, 40:9, 79:11
**extreme** [1] - 73:19
**extremely** [1] - 71:7

# F

**F-1** [4] - 168:18, 169:2, 169:18, 172:4
**F-i-s-c-h-e-l** [1] - 124:9
**F.3d** [1] - 181:4
**Fabius** [1] - 208:15
**face** [5] - 150:14, 150:17, 151:23, 151:24, 201:11
**fact** [36] - 10:4, 10:6, 28:15, 50:20, 59:13, 59:16, 67:5, 96:22, 112:7, 119:10, 135:24, 147:18, 150:25, 151:7, 151:23, 152:11, 158:3, 158:4, 160:12, 164:7, 168:1, 169:22, 170:6, 172:1, 174:23, 177:5,

177:20, 178:7, 179:9, 179:20, 188:17, 207:8, 218:19, 235:2, 236:14, 240:5
**factor** [1] - 210:24
**factors** [4] - 193:5, 210:25, 211:10, 211:11
**facts** [4] - 46:6, 47:25, 48:1, 220:9
**factually** [1] - 6:1
**failing** [1] - 156:15
**failure** [2] - 156:10, 156:22
**fair** [28] - 11:8, 38:6, 43:16, 43:19, 45:18, 54:6, 76:4, 79:12, 91:24, 92:1, 95:17, 104:3, 115:24, 118:7, 154:17, 154:19, 155:9, 155:11, 156:6, 156:25, 157:5, 157:12, 161:15, 211:21, 236:1, 237:13
**fairly** [1] - 180:9
**fall** [2] - 72:21, 174:24
**falling** [1] - 66:17
**falls** [1] - 210:19
**familiar** [1] - 92:24, 117:22, 117:25, 118:15, 168:2, 176:2, 176:4, 176:13, 177:13, 202:17, 203:14
**far** [11] - 17:4, 27:8, 45:13, 53:19, 69:15, 71:6, 73:19, 95:7, 170:13, 177:12, 177:18
**FC** [1] - 28:9
**FCA** [1] - 235:19
**February** [44] - 16:3, 16:10, 17:10, 18:16, 18:17, 19:2, 19:3, 20:8, 20:11, 20:20, 42:10, 61:6, 76:13, 76:19, 84:17, 85:4, 85:21, 90:1, 90:13, 92:22, 94:14, 113:5, 133:19, 140:7, 147:19, 148:15, 163:6, 164:13, 164:17, 166:19, 167:12, 169:20, 173:20, 173:25, 211:25, 212:1, 212:2, 212:7, 212:8, 230:24, 236:11
**Federal** [9] - 31:1, 33:2, 118:20, 119:2, 125:4, 155:23, 156:1, 157:2, 220:13
**few** [8] - 17:14, 65:5, 87:2, 101:11, 110:11, 155:6, 192:16, 236:16
**field** [5] - 70:9, 70:16, 97:14, 136:16, 136:23

**fields** [1] - 154:6
**fifth** [1] - 212:16
**fifty** [1] - 230:5
**fifty-three** [1] - 230:5
**file** [1] - 39:9
**filed** [18] - 6:7, 6:8, 8:6, 22:21, 31:3, 31:16, 38:18, 57:21, 83:22, 99:19, 100:2, 100:4, 104:7, 110:12, 115:21, 122:20, 143:11, 205:21
**files** [4] - 215:16, 226:5, 226:13, 226:15
**filings** [2] - 15:6, 189:10
**filling** [1] - 236:20
**filtered** [1] - 194:1
**final** [1] - 152:24
**finally** [1] - 150:6
**finance** [3] - 124:23, 184:21, 234:20
**financial** [9] - 12:21, 56:20, 57:1, 64:3, 100:15, 102:6, 125:2, 186:18, 188:16
**Financial** [2] - 98:2, 208:16
**finder** [1] - 151:23
**findings** [1] - 82:21
**fine** [11] - 10:1, 10:4, 40:20, 80:15, 94:25, 107:3, 122:4, 128:19, 157:11, 160:17, 222:23
**finish** [7] - 90:20, 95:1, 139:16, 180:7, 217:15, 221:8, 222:8
**finished** [1] - 241:5
**fire** [3] - 82:11, 82:12, 82:16
**firm** [19] - 37:20, 154:6, 154:9, 186:11, 186:17, 186:21, 187:8, 197:23, 205:9, 205:10, 205:11, 233:22, 234:11, 234:25, 240:19, 240:20, 240:21, 242:22, 243:14
**firms** [5] - 12:14, 153:23, 154:1, 196:20, 233:24
**First** [2] - 64:17, 215:25
**first** [62] - 5:15, 17:10, 19:17, 23:14, 27:3, 29:12, 31:13, 31:22, 46:5, 47:20, 50:14, 58:3, 58:7, 59:14, 64:14, 64:19, 65:10, 66:18, 66:19, 66:20, 88:4, 88:9, 88:11, 89:6, 92:23, 92:24, 94:9,

96:9, 100:12, 107:8, 107:15, 107:21, 112:13, 129:22, 134:9, 134:13, 139:18, 140:25, 141:2, 150:14, 155:6, 167:17, 173:17, 190:13, 190:19, 191:10, 191:17, 201:1, 202:22, 210:8, 213:18, 214:7, 216:14, 219:18, 224:9, 229:3, 231:11, 231:13, 231:16, 232:6, 241:25, 243:4
**fiscal** [1] - 28:2
**Fischel** [16] - 103:24, 105:2, 123:24, 124:8, 129:15, 147:9, 153:16, 156:25, 159:24, 161:22, 162:18, 168:1, 169:6, 170:20, 176:7, 179:9
**Fischel's** [8] - 75:12, 75:22, 75:24, 76:11, 76:12, 89:21, 129:7, 176:6
**Fisher's** [3] - 70:1, 70:3, 70:4
**fit** [3] - 79:16, 93:24, 182:9
**five** [13] - 13:12, 70:20, 71:2, 71:3, 162:2, 182:13, 193:10, 212:16, 216:9, 216:11, 220:9, 220:23, 243:21
**five-day** [2] - 216:9, 216:11
**five-minute** [1] - 243:21
**five-year** [1] - 162:2
**floor** [1] - 198:12
**floors** [1] - 188:13
**fluctuated** [1] - 14:14
**fluctuates** [1] - 14:10
**focus** [6] - 91:2, 95:13, 130:20, 160:3, 160:5, 220:3
**focused** [2] - 190:15, 193:21
**focusing** [2] - 63:3, 174:9
**folders** [1] - 8:18
**folks** [1] - 58:16
**follow** [6] - 21:8, 21:9, 39:16, 145:16, 195:22, 196:18
**following** [4] - 44:21, 152:3, 240:25, 244:1
**follows** [5] - 11:18, 55:15, 124:5, 183:5, 223:10
**footnote** [1] - 113:10
**for-profit** [1] - 154:9

**forecasted** [2] - 13:19, 13:20
**foreign** [4] - 49:24, 49:25, 50:1, 101:21
**forgetting** [1] - 150:25
**forgot** [3] - 81:22, 99:24, 105:2
**form** [6] - 51:7, 115:12, 125:7, 129:1, 150:9, 233:7
**formal** [2] - 233:21, 238:9
**formalized** [1] - 240:22
**formally** [5] - 224:4, 234:2, 234:11, 234:17, 234:25
**format** [3] - 241:20, 242:6, 242:7
**formed** [1] - 125:12
**former** [3] - 41:8, 41:9
**Formerly** [2] - 208:2, 208:3
**formulate** [1] - 240:13
**formulation** [1] - 235:1
**forth** [10] - 56:12, 61:4, 61:11, 61:17, 61:25, 63:13, 89:7, 97:5, 104:7
**forward** [8] - 5:7, 9:9, 9:12, 42:4, 91:10, 167:18, 228:17, 233:17
**forwarded** [1] - 232:21
**foundation** [7] - 117:23, 118:13, 226:6, 226:7, 227:10, 228:19, 228:22
**four** [30] - 8:18, 14:8, 24:13, 25:23, 37:22, 79:1, 84:22, 85:14, 86:20, 91:8, 92:8, 102:1, 112:10, 127:20, 127:24, 131:14, 159:7, 159:11, 182:12, 185:4, 188:13, 198:21, 199:2, 212:16, 219:14, 220:11, 234:14, 234:15, 234:24
**four-member** [1] - 185:4
**fourth** [9] - 12:23, 14:7, 38:9, 38:10, 38:25, 40:6, 112:20, 139:23, 236:24
**frame** [6] - 52:14, 58:18, 166:18, 166:24, 173:12, 179:11
**frames** [2] - 118:17, 118:18, 221:11

**frankly** [5] - 10:12, 117:18, 194:17, 219:23, 222:2
**fraud** [1] - 12:21
**free** [1] - 59:7
**freely** [1] - 98:16
**freezing** [1] - 114:9
**frequency** [1] - 131:3
**frequently** [3] - 28:12, 71:14, 132:16
**friends** [2] - 190:21, 190:22
**front** [29] - 8:20, 12:22, 19:5, 19:9, 29:3, 31:4, 31:5, 33:10, 33:12, 37:21, 41:15, 43:9, 43:13, 50:3, 92:7, 106:25, 143:20, 144:12, 144:13, 158:20, 161:18, 162:20, 162:24, 175:18, 207:16, 207:17, 210:3, 210:19, 213:18
**froze** [1] - 115:25
**frozen** [1] - 48:2
**full** [8] - 7:8, 11:19, 55:16, 124:6, 155:15, 183:6, 223:11, 233:5
**full-blown** [1] - 7:8
**Fund** [9] - 21:5, 50:6, 50:11, 187:12, 200:12, 203:3, 203:4, 209:22, 214:4
**fund** [7] - 187:14, 192:8, 195:5, 205:8, 228:5, 228:6, 233:23
**fundamental** [12] - 131:23, 150:18, 150:20, 151:7, 159:22, 192:12, 195:15, 211:1, 211:2, 217:21, 242:15, 243:5
**fundamentally** [2] - 131:10, 141:6
**funded** [2] - 41:21, 42:1
**funds** [7] - 131:5, 131:20, 131:24, 132:3, 132:6, 162:3, 168:11
**future** [4] - 8:22, 9:9, 39:5, 183:21

# G

**G-mail** [1] - 47:5
**G-o-r-l-i-n-d-a-r** [1] - 205:24
**gained** [1] - 103:13
**gains** [2] - 49:1, 73:22
**gap** [2] - 18:16, 152:7
**Garnik** [2] - 242:16,

244:5
**gather** [2] - 45:8, 217:8
**gathered** [2] - 51:12, 229:11
**general** [4] - 62:21, 161:14, 177:10, 178:3
**generally** [6] - 56:24, 70:9, 70:16, 75:3, 93:2, 180:19, 190:13, 211:20
**generate** [1] - 226:20
**generated** [2] - 179:10, 179:13
**gentlemen** [1] - 182:7
**geographies** [2] - 190:18, 192:9
**Given** [1] - 207:9
**given** [25] - 7:17, 8:24, 38:4, 56:1, 58:2, 59:4, 59:18, 79:12, 84:14, 84:19, 104:23, 109:6, 116:19, 135:21, 190:4, 217:23, 219:15, 219:25, 220:15, 220:16, 222:1, 224:22, 225:11, 238:18, 244:17
**glean** [1] - 47:25
**Global** [1] - 50:8
**Goldman** [1] - 242:24
**Gorlindar** [10] - 203:15, 203:25, 205:23, 205:24, 206:21, 206:22, 207:3, 207:11, 208:9, 208:12
**Government** [2] - 8:5, 37:24
**government** [8] - 45:22, 49:12, 49:17, 51:4, 51:8, 125:4, 154:3
**Government's** [1] - 5:12
**governmental** [1] - 60:8
**governments** [2] - 125:5, 154:3
**gradually** [1] - 190:17
**graduate** [2] - 100:15, 188:24
**graduate-level** [1] - 100:15
**graduated** [1] - 184:22
**graph** [1] - 242:10
**graphs** [1] - 239:12
**great** [1] - 154:16
**greater** [1] - 114:15
**green** [2] - 17:18, 53:3
**grew** [3] - 187:5, 220:6, 221:19

**gross** [1] - 185:5
**ground** [1] - 206:5
**grounds** [3] - 156:10, 156:14
**Group** [8] - 21:7, 21:11, 24:23, 26:12, 50:8, 98:4
**group** [1] - 27:3
**groups** [2] - 21:3, 71:15
**guess** [10] - 31:21, 41:14, 45:15, 82:5, 125:6, 231:17, 232:3, 234:2, 235:25, 241:12
**guesstimate** [1] - 234:12
**Guibor** [2] - 29:19, 50:8
**guide** [2] - 236:18, 236:19
**guy** [3] - 154:17, 241:20, 242:11
**guys** [2] - 243:14, 244:4

# H

**hac** [1] - 4:9
**hack** [10] - 16:12, 16:18, 20:13, 51:25, 52:3, 52:6, 52:7, 52:12, 52:21, 168:8
**hacked** [20] - 20:16, 35:24, 121:10, 140:6, 140:16, 160:13, 168:3, 189:15, 189:18, 189:20, 191:6, 199:6, 226:25, 227:8, 227:14, 227:17
**hackers** [28] - 14:25, 15:13, 16:6, 20:8, 20:19, 36:1, 36:20, 36:23, 37:5, 37:8, 44:12, 44:20, 44:25, 45:8, 46:9, 46:13, 46:16, 46:18, 50:13, 52:10, 52:18, 121:9, 121:14, 121:18, 121:19, 189:21, 191:25, 192:3
**hackers'** [1] - 37:2
**hacking** [5] - 15:14, 16:3, 20:7, 93:1, 93:3, 103:21
**hacks** [1] - 14:24
**half** [21] - 5:4, 10:14, 10:20, 10:21, 10:23, 29:10, 47:21, 47:22, 60:5, 104:16, 151:1, 181:10, 181:12, 212:16, 220:1, 220:22, 221:18,

221:22, 222:1, 228:3, 243:6
**hand** [16] - 11:15, 55:12, 69:15, 89:15, 124:2, 134:8, 183:2, 207:8, 208:6, 223:6
**handed** [6] - 22:18, 39:24, 116:18, 137:11, 138:7, 147:2
**handing** [1] - 16:21
**handle** [1] - 122:13
**handwritten** [1] - 204:5
**handy** [1] - 116:21
**hang** [1] - 236:10
**happy** [4] - 118:8, 157:8, 158:24, 201:19
**hard** [7] - 7:23, 17:18, 129:16, 129:17, 129:18, 234:12, 237:7
**Harleigh** [1] - 208:16
**head** [3] - 231:22, 235:5, 242:17
**heading** [4] - 77:5, 96:13, 141:5, 210:19
**heads** [1] - 10:12
**heads-up** [1] - 10:12
**hear** [6] - 40:8, 108:20, 109:4, 184:4, 187:16, 237:24
**heard** [8] - 42:3, 92:9, 95:22, 150:6, 152:18, 177:24, 185:19, 210:10
**hearing** [22] - 5:1, 8:23, 9:9, 10:13, 10:18, 58:14, 58:21, 58:22, 79:13, 81:4, 95:3, 110:23, 122:25, 123:11, 143:8, 155:7, 155:8, 220:23, 221:16, 222:13, 244:16, 244:25
**hearings** [1] - 9:10
**heart** [1] - 75:13
**hedge** [2] - 187:14, 233:23
**Hedge** [1] - 50:8
**hedged** [1] - 197:8
**held** [2] - 64:4, 124:19
**helpful** [13] - 8:10, 31:5, 31:11, 37:21, 39:5, 40:3, 46:1, 48:5, 51:6, 92:1, 118:1, 118:25, 137:3
**helping** [3] - 233:20, 233:21, 234:20
**herein** [2] - 107:20, 109:2
**heretofore** [1] - 20:14
**high** [5] - 132:8, 184:13, 184:14, 186:8,

187:9
**higher** [1] - 132:15, 235:21
**highlight** [4] - 58:23, 159:10, 216:12, 219:21
**highlighted** [11] - 137:21, 139:19, 139:21, 139:22, 139:23, 139:24, 140:11, 141:19, 142:21, 144:12, 145:16
**highlighting** [7] - 139:12, 141:16, 141:25, 142:12, 142:16, 142:18
**highlighting's** [1] - 142:3
**highlights** [1] - 5:23
**highly** [4] - 177:11, 179:7, 197:1, 197:10
**himself** [3] - 191:1, 198:6, 198:7
**Hirce** [1] - 4:2
**HIRCE** [1] - 4:5
**hire** [1] - 82:11
**hired** [1] - 197:23
**hiring** [1] - 235:20
**historic** [1] - 232:23
**historical** [1] - 211:4
**history** [2] - 56:12, 146:17
**hit** [1] - 5:23
**hold** [13] - 41:15, 104:12, 107:9, 128:14, 158:24, 164:20, 192:13, 199:14, 200:16, 200:21, 200:23, 205:15, 211:15
**Holdings** [1] - 208:16
**holdings** [1] - 19:23
**holds** [1] - 174:13
**holes** [1] - 178:13
**home** [1] - 114:20
**homeland** [1] - 187:4
**homes** [1] - 191:22
**honestly** [1] - 195:21
**Honor** [179] - 4:5, 4:14, 4:19, 5:11, 5:16, 5:17, 6:3, 6:17, 6:23, 7:4, 7:13, 8:6, 9:17, 9:24, 11:3, 11:13, 12:25, 13:6, 14:19, 16:19, 19:25, 22:15, 27:21, 27:24, 28:22, 30:7, 30:11, 30:17, 32:22, 33:5, 36:15, 38:7, 38:13, 39:11, 39:23, 40:7, 41:16, 45:6, 46:2, 47:18, 48:12, 49:5, 50:19, 51:23, 53:7, 53:13, 53:15, 54:24, 55:3, 55:7, 55:20, 55:21,

57:12, 57:18, 58:5, 59:11, 59:12, 59:24, 60:2, 74:7, 74:16, 79:4, 79:10, 79:20, 80:19, 83:11, 83:13, 83:19, 87:4, 87:13, 88:18, 88:22, 90:19, 91:25, 92:4, 92:6, 93:7, 93:18, 94:5, 94:15, 95:17, 95:22, 101:9, 104:22, 106:5, 106:12, 106:19, 106:21, 107:11, 107:14, 115:11, 115:19, 117:1, 117:9, 117:15, 118:6, 121:23, 122:3, 122:7, 122:12, 122:13, 123:5, 123:10, 123:18, 123:21, 124:10, 126:2, 126:7, 126:22, 127:12, 127:19, 127:24, 128:16, 129:21, 134:25, 136:19, 137:7, 138:14, 141:24, 142:4, 142:7, 142:24, 143:2, 143:20, 143:25, 144:8, 144:15, 145:20, 146:11, 147:6, 153:1, 153:11, 153:12, 157:16, 159:8, 161:21, 165:1, 168:22, 170:9, 170:12, 170:16, 172:11, 172:13, 172:19, 173:5, 176:7, 180:8, 181:2, 181:6, 181:23, 182:1, 182:6, 183:11, 199:3, 199:12, 214:15, 214:20, 215:6, 216:24, 217:6, 217:11, 217:19, 218:11, 219:9, 221:1, 222:15, 222:23, 223:3, 224:19, 225:2, 225:12, 228:10, 233:11, 238:15, 241:5, 243:11, 244:4, 244:9, 244:11
**hope** [1] - 218:17
**hopefully** [3] - 9:10, 141:25, 144:12
**hopes** [1] - 193:11
**horizon** [1] - 212:22
**horizontal** [2] - 66:14, 148:4
**horizontally** [1] - 147:17
**Hostetler** [5] - 4:3, 4:8, 80:23, 153:23, 154:1
**hour** [29] - 5:4, 10:14, 10:20, 10:23, 29:10, 47:21, 47:22, 48:6, 49:20, 58:18, 60:5, 104:15, 104:16, 154:13, 181:10, 181:11, 181:12,

220:1, 220:11, 220:17, 220:22, 221:18, 221:22, 222:1, 222:3, 244:17
**hours** [21] - 24:13, 25:23, 26:24, 68:10, 69:1, 69:5, 69:6, 155:2, 155:5, 155:9, 155:17, 193:3, 193:5, 193:8, 193:12, 194:10, 221:21, 221:22, 222:2, 234:10
**housekeeping** [2] - 6:4, 9:19
**houses'** [1] - 196:22
**hugging** [1] - 67:6
**hundred** [2] - 201:5, 238:19
**hundreds** [3] - 155:21, 162:1, 193:25
**Huron** [1] - 98:4
**husband** [1] - 237:20
**hybrid** [1] - 140:2
**hyphen** [1] - 14:7

## I

**i.e** [3] - 238:23, 239:14, 240:16
**Ibis** [1] - 63:10
**ICPT** [2] - 77:3, 77:8
**idea** [8] - 102:17, 192:23, 193:1, 193:18, 220:14, 227:19, 228:25, 237:14
**idealistic** [1] - 241:3
**identical** [3] - 147:25, 197:3, 197:5
**identification** [5] - 32:13, 32:19, 88:25, 134:22, 147:8
**identified** [3] - 62:22, 80:3, 120:24
**identify** [10] - 31:13, 36:20, 100:13, 119:18, 134:16, 158:23, 159:3, 209:20, 216:15, 216:19
**identifying** [2] - 87:17, 126:19
**ifs** [1] - 227:7
**ignore** [1] - 90:15
**Igor** [3] - 242:17, 244:5
**ill** [1] - 48:25
**ill-gotten** [1] - 48:25
**illegally** [1] - 103:13
**illicit** [1] - 161:25
**illustratively** [1] - 135:13
**imagine** [1] - 232:8
**immediately** [4] -

77:8, 174:7, 191:8, 243:25
**impactful** [1] - 236:16
**implied** [2] - 194:1, 194:2
**implies** [1] - 162:2
**important** [5] - 210:25, 217:17, 219:22, 220:20, 229:1
**impossible** [1] - 60:7
**improper** [1] - 120:13
**Impulse** [1] - 243:6
**impulse** [12] - 192:15, 192:18, 193:16, 210:20, 210:21, 214:22, 217:10, 218:6, 239:7, 239:18, 239:23, 240:3
**impulse-based** [1] - 192:18
**in-the-window** [5] - 22:9, 23:1, 25:19, 26:19, 29:2
**inaccurate** [1] - 157:5
**inappropriate** [2] - 51:7, 74:19
**Inc** [3] - 50:10, 51:16, 181:4
**inclined** [1] - 219:23
**include** [20] - 60:9, 93:9, 93:12, 93:23, 108:7, 108:9, 108:14, 108:15, 108:16, 108:20, 108:25, 109:16, 110:19, 112:4, 154:1, 154:2, 179:7, 187:10, 195:4, 230:12
**included** [10] - 39:25, 49:14, 53:4, 93:25, 140:8, 145:18, 165:3, 165:4, 174:8, 210:25
**includes** [4] - 48:7, 60:5, 108:12
**including** [6] - 119:10, 125:3, 131:22, 174:1, 174:10, 209:17
**inconsistent** [3] - 145:10, 162:6, 174:14
**incorrect** [8] - 84:18, 90:17, 149:17, 152:5, 163:20, 170:5, 178:15, 201:8
**incorrectly** [1] - 150:4
**increase** [3] - 167:4, 195:13
**increased** [2] - 72:8, 216:10
**increasing** [3] - 194:6, 194:7
**independent** [1] - 60:19

**Index** [1] - 197:12
**indicate** [4] - 16:15, 78:23, 78:24, 81:25
**indicated** [1] - 211:13
**indicates** [3] - 46:15, 206:2, 207:10
**indicating** [1] - 148:24
**indistinguishable** [1] - 69:24
**individual** [4] - 49:15, 49:16, 237:14, 242:7
**individuals** [5] - 151:25, 186:8, 187:9, 204:8, 204:9
**indulged** [1] - 220:15
**indulgence** [2] - 220:1, 221:6
**indulgent** [1] - 222:4
**industry** [2] - 19:15, 186:19
**inefficiencies** [1] - 192:22
**inefficiency** [2] - 193:1, 193:12
**infer** [2] - 158:1, 158:3
**inference** [1] - 149:17
**inferences** [1] - 149:15
**influenced** [1] - 67:21
**informally** [1] - 234:3
**information** [83] - 15:18, 16:1, 16:5, 36:21, 36:24, 37:2, 44:11, 46:11, 46:15, 47:25, 51:12, 52:3, 52:8, 52:10, 52:19, 57:22, 58:7, 59:6, 63:6, 63:10, 63:11, 64:3, 64:15, 67:24, 68:5, 68:11, 73:6, 80:7, 81:8, 85:5, 86:1, 101:5, 103:13, 107:19, 108:7, 108:12, 108:17, 108:20, 110:19, 113:11, 113:14, 113:24, 114:5, 114:6, 116:20, 128:8, 128:11, 130:10, 130:17, 132:10, 139:1, 159:13, 159:17, 159:20, 166:8, 166:14, 168:7, 174:17, 189:16, 189:18, 189:20, 189:23, 189:24, 190:2, 191:6, 191:13, 195:19, 199:6, 209:22, 222:11, 225:15, 225:22, 226:22, 227:1, 227:3, 227:9, 227:14, 227:17, 229:12, 229:13
**informed** [1] - 28:13

**inherently** [1] - 60:5
**initial** [3] - 31:8, 190:8, 210:10
**injunction** [8] - 5:12, 10:18, 36:25, 48:2, 53:6, 143:8, 203:12, 222:13
**insert** [1] - 14:6
**inserted** [1] - 14:2
**inside** [10] - 86:1, 114:6, 130:9, 130:16, 132:9, 166:8, 166:14, 174:16, 191:13, 195:19
**insider** [20] - 82:18, 82:22, 83:8, 83:17, 86:5, 100:22, 100:23, 100:25, 103:12, 103:20, 115:10, 125:3, 130:7, 130:14, 148:25, 160:21, 167:7, 169:12, 170:3
**insight** [1] - 47:24
**insist** [1] - 92:13
**installed** [1] - 52:9
**instance** [1] - 156:9
**instead** [9] - 57:24, 69:6, 90:15, 145:5, 148:6, 148:7, 148:8, 148:9, 165:18
**institutional** [1] - 235:7
**institutions** [1] - 187:10
**instruction** [2] - 119:5, 232:22
**insufficient** [3] - 113:11, 113:14, 113:23
**integrated** [1] - 195:16
**intend** [1] - 55:22
**Intercept** [23] - 71:25, 72:1, 72:6, 72:16, 72:18, 75:9, 76:23, 76:24, 77:3, 77:9, 77:16, 77:20, 78:5, 78:19, 78:20, 78:21, 79:2, 176:2, 176:21, 176:25, 179:7, 179:14
**interest** [6] - 98:16, 208:17, 211:5, 216:2, 216:3, 233:16
**interested** [2] - 157:9, 221:5
**international** [1] - 184:21
**Intertrade** [34] - 18:12, 18:13, 18:25, 23:15, 24:24, 26:8, 27:10, 48:24, 49:4, 50:9, 62:13, 64:17, 65:20, 78:6, 87:24,

89:8, 92:18, 93:16, 109:17, 115:8, 119:11, 119:15, 119:17, 121:2, 121:3, 121:6, 130:3, 147:21, 148:8, 163:6, 200:11, 200:13, 200:17
**introduce** [3] - 87:6, 87:13, 129:5
**introduced** [2] - 93:13, 182:3
**inundated** [1] - 220:5
**invest** [3] - 130:19, 190:9, 190:14
**investigate** [1] - 12:20
**investigation** [5] - 16:5, 46:11, 47:13, 47:24, 209:18
**investigations** [1] - 57:2
**investigative** [1] - 47:19
**Investment** [1] - 203:22
**investment** [24] - 19:20, 41:10, 41:20, 41:24, 42:3, 185:24, 187:8, 187:10, 192:5, 196:9, 196:15, 196:18, 196:20, 196:22, 201:12, 203:1, 204:19, 204:21, 204:22, 205:1, 205:5, 224:8, 224:17, 227:12
**investments** [6] - 190:24, 191:1, 196:10, 196:13, 205:17, 205:18
**Investments** [4] - 50:9, 50:11, 200:25, 201:2
**investor** [2] - 205:14, 205:15
**investors** [1] - 205:7
**invests** [1] - 192:9
**involve** [2] - 47:24, 116:3
**involved** [7] - 71:15, 72:24, 102:4, 189:15, 192:5, 199:22, 235:3
**involvement** [4] - 234:21, 236:14, 236:17, 237:5
**involving** [3] - 114:2, 120:14, 161:25
**isolation** [1] - 165:25
**issue** [16] - 58:25, 75:11, 100:5, 103:11, 103:14, 103:18, 115:25, 116:24, 117:8, 120:11, 156:13, 156:16, 211:1, 222:12, 239:8, 245:12

**issued** [4] - 28:1, 29:8, 43:5, 208:13
**issuer** [1] - 22:1
**issues** [6] - 100:25, 102:4, 124:23, 124:24, 220:7, 234:20
**item** [1] - 111:2
**itself** [10] - 45:17, 46:10, 116:6, 136:10, 136:24, 144:21, 148:22, 161:9, 170:25, 235:12

## J

**January** [25] - 16:11, 16:12, 16:18, 17:17, 18:8, 18:19, 19:3, 19:4, 20:20, 21:10, 35:1, 35:9, 41:7, 51:24, 52:13, 62:3, 72:7, 76:16, 133:24, 148:16, 163:4, 230:17, 230:21, 230:22
**Jaspen** [2] - 27:4, 27:11, 30:2, 50:9
**Jiau** [3] - 99:15, 100:20, 100:21
**job** [4] - 185:1, 234:17, 236:5, 236:22
**John** [2] - 30:23, 200:3
**join** [2] - 98:15, 190:23
**joined** [6] - 224:4, 233:18, 234:11, 234:25, 235:4, 240:23
**joining** [3] - 12:12, 97:12, 97:19
**journal** [1] - 97:16
**journals** [1] - 103:10
**Judge** [9] - 114:20, 129:4, 157:10, 172:1, 199:5, 199:7, 199:8, 214:17, 220:14
**judgment** [2] - 49:13, 182:8
**July** [1] - 25:22
**junior** [1] - 185:4
**jury** [1] - 74:13
**Justice** [1] - 154:2

## K

**K-1** [4] - 75:25, 76:12, 76:17, 77:25
**K-2** [1] - 77:22
**keep** [8] - 5:1, 10:23, 196:12, 196:17, 224:1, 224:14, 224:17, 245:14

**keeping** [1] - 196:15
**keeps** [1] - 214:24
**kept** [1] - 219:2
**key** [2] - 76:12, 220:7
**kind** [15] - 70:4, 70:25, 72:25, 73:3, 77:5, 91:2, 102:21, 136:16, 141:13, 152:2, 207:7, 239:1, 239:11, 239:24, 240:2
**kinds** [2] - 131:21, 152:11
**knowing** [1] - 151:21
**knowingly** [1] - 226:25
**knowledge** [23] - 23:17, 45:14, 45:25, 50:17, 51:6, 102:19, 108:8, 108:10, 109:8, 118:14, 119:3, 119:4, 121:8, 121:13, 121:16, 121:17, 195:20, 201:5, 201:6, 203:16, 237:25, 238:1
**known** [7] - 31:1, 50:14, 130:6, 150:20, 151:13, 160:21, 185:24
**knows** [3] - 45:15, 45:23, 53:8
**Kwantitatieve** [1] - 97:16

## L

**label** [1] - 156:20
**labeled** [7] - 69:16, 76:10, 78:18, 89:10, 98:20, 141:20, 207:5
**LaBine** [2] - 98:23, 102:15
**lack** [1] - 193:5
**language** [2] - 115:12, 184:2
**large** [10] - 12:14, 72:11, 73:21, 75:23, 81:22, 115:6, 115:9, 126:21, 233:24, 239:4
**larger** [2] - 78:14, 78:16
**largest** [1] - 135:12
**last** [27] - 7:20, 8:8, 15:9, 28:10, 29:14, 75:19, 124:9, 139:25, 141:17, 141:18, 141:24, 142:20, 143:21, 144:9, 144:19, 145:20, 148:4, 159:10, 165:17, 175:14, 183:8, 212:10, 221:9, 222:25, 225:1, 225:14

**lasted** [1] - 91:6
**late** [7] - 8:8, 8:9, 29:6, 67:8, 111:9, 165:17, 244:17
**latest** [1] - 162:3
**latitude** [2] - 87:3, 219:16
**Laughter** [1] - 69:14
**Lavlinskiy** [1] - 50:4
**law** [11] - 81:3, 82:17, 82:20, 83:1, 99:3, 124:20, 191:18, 197:23, 199:22, 208:21, 209:19
**Lawrence** [1] - 98:23
**laws** [2] - 31:17, 33:3
**lawyer** [7] - 45:11, 45:22, 51:4, 51:8, 82:3, 117:23
**lawyers** [2] - 96:19, 221:13
**layered** [1] - 238:9
**layman's** [1] - 82:5
**leading** [5] - 68:16, 73:8, 74:8, 74:17, 177:22
**leads** [1] - 169:11
**learn** [4] - 183:16, 183:17, 183:20, 184:11
**learned** [1] - 46:6
**learning** [1] - 208:20
**least** [1] - 152:15
**leave** [2] - 80:4, 189:2
**lectured** [1] - 124:23
**led** [1] - 238:10
**leeway** [4] - 38:4, 74:13, 74:14, 74:15
**left** [18] - 11:15, 48:6, 49:20, 55:12, 94:13, 107:15, 124:2, 152:11, 152:14, 185:25, 186:10, 186:14, 207:8, 208:6, 220:24, 223:6
**left-hand** [2] - 207:8, 208:6
**left-out** [2] - 152:14
**legal** [3] - 100:25, 117:18, 124:24
**legally** [1] - 6:1
**legitimate** [1] - 152:20
**lengthy** [2] - 92:14, 219:4
**less** [12] - 29:17, 72:25, 78:5, 78:20, 94:11, 110:20, 169:12, 214:5, 228:3, 239:14, 240:15, 240:23
**letter** [1] - 87:18, 204:5
**letters** [2] - 48:14,

48:15
**letting** [1] - 190:5, 227:19
**level** [2] - 100:15, 161:14
**leveled** [1] - 132:21
**levels** [1] - 70:21
**Lexecon** [3] - 153:19, 153:21, 155:18
**lieu** [1] - 57:9, 99:7
**lifelong** [1] - 103:17
**Lifesciences** [3] - 19:19, 24:3, 25:11
**likely** [3] - 121:5, 174:12, 177:25
**limit** [1] - 85:15
**limited** [5] - 16:16, 43:25, 46:21, 47:22, 153:7
**Limited** [1] - 50:10
**limiting** [1] - 45:24
**limits** [1] - 221:15
**line** [18] - 13:18, 15:9, 48:4, 49:18, 66:13, 66:14, 66:15, 66:16, 66:17, 66:19, 66:20, 66:22, 66:23, 67:1, 77:8, 77:15, 78:4, 78:18, 107:21, 109:15, 147:18, 147:23, 185:6, 202:6, 202:8, 212:16, 213:23
**lines** [8] - 13:3, 13:12, 13:24, 19:12, 48:15, 159:11, 212:6, 212:16
**linked** [1] - 85:3, 103:23, 216:4
**liquid** [1] - 196:10
**liquidity** [1] - 194:19
**list** [43] - 48:23, 87:23, 89:7, 89:22, 117:12, 117:13, 117:25, 118:2, 123:11, 130:1, 135:18, 135:20, 136:1, 136:10, 136:11, 136:14, 136:24, 137:4, 141:19, 141:21, 144:20, 145:2, 145:4, 145:5, 147:25, 148:20, 148:21, 149:20, 161:1, 163:12, 163:25, 164:2, 164:12, 164:16, 167:18, 167:21, 171:18, 179:24, 195:1, 203:13, 213:9, 213:18, 231:17
**listed** [21] - 15:2, 19:11, 24:16, 51:16, 51:20, 63:3, 99:9, 101:18, 102:20, 130:24, 139:12, 140:4, 140:9, 144:20, 147:18, 148:11,

163:17, 165:14, 167:14, 168:12, 174:16
**listen** [2] - 118:21, 212:25
**listened** [1] - 219:17
**listing** [18] - 17:1, 17:10, 17:11, 17:18, 17:24, 18:22, 21:15, 32:21, 89:20, 89:21, 116:23, 134:5, 135:9, 139:11, 142:6, 144:16, 144:17, 229:22
**lists** [2] - 64:6, 214:24
**literature** [8] - 70:8, 82:21, 130:7, 132:13, 162:9, 162:12, 165:23, 167:7
**Litigation** [1] - 96:13
**litigation** [2] - 98:3, 156:17
**live** [1] - 216:5
**lived** [1] - 220:7
**loaded** [1] - 45:16
**local** [2] - 125:5, 154:3
**located** [1] - 188:4
**Logistics** [2] - 50:7, 210:12
**logs** [1] - 236:3
**London** [3] - 235:5, 235:9, 235:15
**look** [82] - 13:10, 19:11, 19:17, 22:12, 25:17, 33:7, 34:9, 34:10, 35:11, 41:11, 42:22, 43:3, 43:11, 48:14, 57:11, 60:14, 61:2, 64:8, 65:20, 66:6, 69:25, 73:24, 75:16, 75:17, 77:21, 86:14, 86:19, 86:22, 89:2, 89:4, 91:11, 93:8, 103:4, 103:5, 112:10, 113:2, 119:10, 120:4, 120:16, 120:19, 127:8, 131:18, 134:13, 139:18, 139:19, 139:21, 139:22, 141:5, 141:16, 142:20, 144:8, 152:23, 157:10, 158:4, 158:16, 159:7, 163:1, 165:19, 165:25, 166:3, 166:11, 169:7, 169:17, 174:7, 179:17, 199:4, 199:7, 206:1, 209:10, 210:16, 211:22, 215:1, 215:10, 216:7, 235:22, 239:19, 242:22
**looked** [28] - 21:16, 22:8, 34:7, 42:25, 46:20, 62:25, 73:14,

73:20, 77:25, 85:17, 85:18, 86:16, 90:23, 91:9, 94:20, 116:7, 168:5, 169:8, 171:12, 175:24, 176:13, 179:18, 193:25, 241:14, 241:17, 241:18, 241:21, 242:1
**Looking** [1] - 117:4
**looking** [38] - 38:9, 50:3, 72:5, 75:7, 75:10, 78:3, 89:5, 92:10, 107:3, 107:22, 111:2, 111:12, 113:9, 119:21, 119:24, 120:10, 122:24, 132:19, 134:18, 137:14, 140:25, 143:18, 144:5, 145:15, 154:15, 174:4, 180:9, 192:21, 211:2, 215:13, 215:22, 218:18, 231:10, 231:20, 232:23, 241:22, 242:15, 243:25
**looks** [10] - 73:11, 89:20, 129:8, 139:20, 139:25, 146:2, 210:7, 231:12, 236:7, 236:25
**lose** [1] - 16:6
**losses** [4] - 78:13, 78:25, 132:10, 230:1
**lost** [2] - 78:25, 235:14
**lower** [1] - 227:25
**LTD** [1] - 210:12
**Ltd** [16] - 50:7, 50:8, 50:9, 50:11, 201:13, 203:22, 203:25, 205:23, 206:21, 206:22, 207:11, 208:2, 208:3, 208:10, 208:12
**lunch** [1] - 116:19
**luncheon** [1] - 105:6
**Lynch** [1] - 233:25
**LYNN** [1] - 11:21
**Lynn** [3] - 5:17, 11:21, 38:25

# M

**M.B.A** [1] - 188:25
**ma'am** [6] - 216:22, 231:14, 232:10, 233:4, 239:19, 240:9
**Maastricht** [2] - 97:8, 103:8
**macroeconomics** [2] - 97:10, 97:24
**mail** [11] - 46:24, 47:5, 87:19, 87:20, 87:21, 89:19, 116:23, 117:12, 117:23, 163:16,

189:12
**mails** [11] - 46:20, 46:21, 46:22, 46:23, 47:1, 47:9, 47:14, 47:17, 191:19, 208:24, 209:3
**main** [2] - 56:25, 216:6
**major** [3] - 159:24, 196:19, 196:22
**majority** [17] - 34:18, 34:22, 35:2, 35:16, 64:1, 76:25, 115:24, 116:3, 116:16, 120:11, 120:13, 120:20, 120:24, 132:6, 175:15, 176:25, 239:15
**Makarov** [3] - 25:24, 29:19, 50:4
**Malek** [1] - 4:7
**MALEK** [1] - 4:19
**Maliksetyan** [2] - 242:17, 244:6
**malware** [1] - 52:9
**Man** [1] - 208:3
**man** [1] - 197:25
**manage** [1] - 187:9
**Management** [1] - 205:12
**management** [5] - 187:8, 187:11, 196:4, 243:14
**Manager** [1] - 203:22
**manager** [2] - 185:2, 187:12, 231:23
**managing** [1] - 185:5
**mand** [1] - 68:2
**manner** [2] - 25:12, 240:13
**mansion** [1] - 188:14
**manufacturer** [1] - 188:1
**map** [1] - 19:16
**Marc** [1] - 80:23
**March** [6] - 18:10, 20:16, 163:6, 163:9, 173:12, 176:15
**Margaret** [1] - 4:2
**mark** [13] - 6:10, 6:15, 9:12, 88:19, 134:1, 134:21, 143:6, 143:8, 143:13, 147:5, 232:3, 232:4, 243:4
**marked** [20] - 6:13, 6:20, 13:9, 32:13, 88:15, 88:25, 120:8, 122:6, 134:22, 135:1, 143:4, 143:5, 144:2, 147:8, 202:21, 203:18, 205:20, 207:1, 207:18,

210:3
**market** [16] - 28:13, 68:9, 68:15, 68:24, 69:1, 102:6, 190:16, 192:10, 193:1, 193:12, 193:13, 194:1, 196:25, 198:21, 211:4, 211:5
**Market** [2] - 12:17, 12:20
**market's** [1] - 239:25
**market-neutral** [1] - 196:25
**marketplace** [2] - 152:3, 152:4
**markets** [14] - 64:3, 67:25, 68:2, 68:3, 68:6, 101:23, 101:24, 102:6, 112:24, 112:25, 125:3, 195:14, 227:23, 227:25
**marketwide** [1] - 197:9
**Marketwired** [22] - 15:1, 15:3, 15:10, 15:18, 16:2, 17:7, 17:13, 18:4, 18:14, 18:15, 19:1, 20:9, 20:10, 28:1, 34:2, 42:12, 42:15, 43:8, 43:13, 61:19, 63:2, 85:19
**married** [1] - 188:19
**Mart** [2] - 140:1, 140:11
**massive** [1] - 243:22
**Master's** [2] - 97:7, 103:8
**matched** [2] - 62:17, 63:8
**matches** [1] - 196:25
**mate** [1] - 92:2
**math** [2] - 57:22, 177:8
**mathematical** [3] - 97:24, 100:17, 101:3
**mathematics** [1] - 161:6
**matter** [10] - 9:19, 60:25, 71:15, 98:23, 120:21, 126:13, 192:5, 220:19, 222:18, 245:19
**matters** [3] - 95:24, 120:12, 125:8
**Maxim** [10] - 50:6, 187:1, 201:7, 201:13, 202:9, 203:2, 203:7, 232:15, 242:13, 244:5
**maximum** [1] - 153:4
**McGUIRE** [1] - 128:16
**mean** [18] - 8:15, 18:9, 21:18, 70:22,

78:8, 110:20, 122:4, 133:14, 149:14, 150:9, 163:16, 164:15, 172:13, 188:8, 196:1, 235:3, 241:9, 241:12
**meaning** [8] - 71:17, 142:23, 155:15, 194:2, 196:1, 232:23, 236:18, 241:11
**means** [3] - 17:2, 21:19, 75:3
**meant** [6] - 54:12, 54:13, 54:14, 140:2, 156:1, 211:2
**measures** [1] - 69:18
**medians** [1] - 75:4
**medical** [1] - 19:19
**meet** [2] - 190:19, 197:25
**meeting** [1] - 157:2
**meetings** [5] - 190:9, 196:16, 224:7, 227:12, 233:20
**member** [5] - 98:10, 98:11, 185:4, 234:19
**Member** [1] - 208:7
**members** [1] - 155:12
**Members** [1] - 207:19
**memberships** [1] - 98:7
**Memelland** [1] - 50:9
**memo** [3] - 120:6, 145:19, 167:16
**memory** [2] - 84:25, 99:1
**mentioned** [5] - 119:23, 135:8, 136:9, 192:8, 244:5
**merits** [3] - 79:16, 95:8, 95:9
**Merrill** [2] - 233:25, 242:25
**messages** [1] - 191:20
**met** [3] - 197:15, 197:19, 223:24
**method** [1] - 70:5
**Methoden** [1] - 97:16
**methodological** [1] - 156:14
**methodologically** [1] - 167:1
**methodology** [5] - 70:9, 96:1, 130:6, 165:23, 199:21
**Methods** [1] - 97:17
**methods** [4] - 97:24, 100:17, 101:3
**Miami** [2] - 184:19, 184:22

**Michigan** [1] - 100:3
**microeconomics** [1] - 100:16
**mid** [1] - 73:2
**mid-2014** [1] - 196:14
**mid-December** [1] - 73:2
**midcap** [1] - 193:22
**middle** [5] - 5:3, 66:14, 170:10, 170:16
**midsized** [1] - 193:2
**might** [12] - 9:5, 31:12, 32:9, 39:18, 42:5, 151:18, 160:4, 198:19, 219:9, 224:19, 225:20, 231:20
**million** [14] - 73:17, 75:21, 77:12, 77:18, 77:19, 79:1, 116:1, 177:6, 178:18, 178:20, 178:25, 179:1, 179:10
**millions** [1] - 48:25
**mind** [5] - 46:4, 107:3, 126:19, 131:16, 220:4
**mine** [1] - 50:16
**minitrial** [1] - 10:17
**minute** [14] - 19:7, 33:7, 58:1, 94:4, 94:16, 133:16, 199:17, 216:5, 217:15, 243:7, 243:8, 243:21
**minutes** [13] - 24:14, 29:17, 104:13, 181:10, 182:14, 196:15, 219:18, 221:2, 221:3, 221:9, 221:18, 222:8, 225:16
**misheard** [1] - 93:6
**misimpression** [1] - 95:10
**mislabeled** [1] - 141:9
**misleading** [3] - 141:6, 172:14, 178:15
**missed** [1] - 30:4
**missing** [4] - 13:14, 49:9, 113:10, 150:3
**misspeak** [1] - 46:4
**misspoke** [1] - 164:16
**misstatement** [1] - 54:6
**mistake** [2] - 173:17, 174:6
**mistakes** [2] - 238:11, 242:19
**misunderstanding** [1] - 222:17
**mixing** [1] - 119:15
**modified** [3] - 149:20,

215:23, 216:1
**moment** [9] - 30:11, 38:7, 53:10, 61:2, 112:19, 123:1, 123:5, 210:16, 215:7
**moments** [1] - 124:16
**Monday** [1] - 244:18
**money** [7] - 27:17, 37:2, 164:23, 190:2, 193:25, 194:24, 195:19
**monitoring** [6] - 214:25, 215:2, 215:14, 216:16, 217:9, 219:3
**month** [1] - 243:15
**monthly** [1] - 73:25
**months** [5] - 17:7, 193:24, 194:24, 214:8, 243:16
**moot** [2] - 100:5, 100:8
**moreover** [2] - 71:15, 83:22
**morning** [11] - 4:5, 4:6, 11:25, 12:1, 30:21, 30:22, 80:22, 111:9, 115:13, 133:11, 230:16
**Moscow** [11] - 10:2, 30:23, 35:4, 36:10, 87:22, 120:7, 188:14, 198:22, 198:23, 214:12, 231:23
**MOSCOW** [104] - 4:2, 4:7, 4:11, 4:18, 4:21, 5:11, 7:13, 7:16, 8:5, 9:4, 9:24, 13:7, 15:19, 15:21, 30:11, 30:13, 30:17, 30:20, 31:12, 31:15, 31:21, 32:2, 32:5, 32:7, 32:14, 32:24, 36:15, 36:18, 37:24, 38:7, 38:13, 38:17, 38:21, 38:25, 39:4, 39:7, 39:9, 39:18, 39:22, 40:23, 40:25, 45:6, 45:18, 46:3, 48:12, 49:22, 49:23, 50:24, 51:9, 51:22, 52:15, 53:10, 53:12, 54:10, 55:3, 88:13, 104:22, 105:1, 117:15, 117:17, 122:19, 123:1, 123:7, 181:20, 181:23, 182:22, 182:25, 183:11, 183:13, 199:3, 199:12, 199:14, 199:16, 199:25, 206:4, 206:6, 206:11, 209:7, 209:9, 215:6, 216:24, 217:1, 217:11, 219:9, 219:14, 220:25, 222:15, 222:17, 223:3,

223:15, 223:17, 223:19, 224:19, 224:22, 224:25, 225:8, 225:10, 225:20, 228:10, 229:4, 231:7, 237:16, 237:18, 244:11
**most** [13] - 8:5, 11:5, 45:25, 51:6, 161:14, 177:14, 178:7, 185:20, 188:17, 198:9, 222:5, 226:16, 226:17
**motion** [3] - 9:25, 53:5, 203:11
**mountain** [2] - 187:4, 187:6
**move** [26] - 4:9, 5:7, 5:23, 6:7, 57:13, 73:23, 95:23, 103:1, 122:14, 122:24, 123:13, 123:15, 126:6, 126:8, 141:13, 160:16, 172:18, 175:11, 185:13, 185:14, 194:13, 233:17, 243:6, 244:1
**moved** [4] - 122:5, 185:9, 235:10, 235:15
**movement** [2] - 195:13, 239:25
**movements** [3] - 152:3, 192:22, 195:12
**moves** [2] - 194:20, 229:16
**MR** [395] - 4:7, 4:11, 4:14, 4:18, 4:21, 5:11, 5:16, 6:3, 6:6, 6:17, 6:22, 7:4, 7:8, 7:13, 7:16, 7:19, 7:23, 7:25, 8:5, 8:13, 8:17, 9:3, 9:4, 9:17, 9:19, 9:24, 10:4, 11:3, 11:13, 11:24, 12:25, 13:2, 13:6, 13:7, 13:8, 14:19, 15:19, 15:21, 16:19, 16:24, 19:25, 22:15, 27:20, 27:24, 28:21, 30:7, 30:11, 30:13, 30:17, 30:20, 31:12, 31:15, 31:21, 32:2, 32:5, 32:7, 32:14, 32:22, 32:24, 33:5, 36:15, 36:18, 37:24, 38:7, 38:13, 38:17, 38:21, 38:25, 39:4, 39:7, 39:9, 39:14, 39:16, 39:18, 39:22, 39:23, 40:3, 40:7, 40:10, 40:15, 40:18, 40:23, 40:25, 41:16, 42:6, 42:8, 45:6, 45:18, 46:2, 46:3, 47:18, 48:12, 49:5, 49:22, 49:23, 50:19, 50:24, 51:9, 51:22, 52:15,

53:7, 53:10, 53:12, 53:15, 53:17, 54:10, 54:16, 54:22, 54:24, 55:3, 55:7, 55:20, 56:1, 56:3, 56:6, 57:12, 57:18, 58:5, 58:10, 59:11, 59:12, 59:23, 60:2, 60:3, 60:13, 68:16, 73:8, 73:23, 74:7, 74:10, 74:16, 74:23, 79:3, 79:10, 79:20, 80:9, 80:13, 80:16, 80:19, 80:21, 83:10, 83:13, 83:19, 83:25, 84:7, 84:10, 87:3, 87:6, 87:9, 87:12, 87:16, 87:19, 87:21, 88:3, 88:5, 88:7, 88:10, 88:13, 88:18, 88:20, 88:22, 89:1, 90:19, 91:15, 91:18, 91:24, 92:4, 92:6, 92:15, 93:6, 93:18, 93:20, 94:5, 94:7, 94:15, 94:25, 95:17, 95:19, 95:22, 96:8, 101:6, 101:9, 101:11, 101:14, 101:16, 103:1, 104:22, 105:1, 106:5, 106:12, 106:20, 106:23, 107:11, 107:13, 107:14, 115:11, 115:19, 116:5, 116:7, 116:11, 116:23, 117:1, 117:9, 117:15, 117:17, 118:5, 118:8, 119:7, 119:8, 120:2, 121:22, 121:25, 122:3, 122:7, 122:12, 122:19, 123:1, 123:5, 123:7, 123:10, 123:13, 123:18, 123:20, 123:23, 124:10, 124:13, 125:19, 125:23, 126:2, 126:5, 126:10, 126:21, 126:25, 127:3, 127:7, 127:12, 127:19, 127:22, 127:24, 128:3, 128:10, 128:13, 128:16, 129:2, 129:4, 129:11, 129:13, 129:14, 129:16, 129:21, 132:25, 133:2, 133:5, 134:4, 134:15, 134:21, 134:25, 135:4, 136:18, 136:21, 137:7, 137:10, 137:15, 137:18, 137:23, 138:3, 138:6, 138:20, 138:25, 140:20, 140:22, 142:3, 142:13, 142:15, 142:19, 142:24, 143:2, 143:5, 143:20, 143:25, 144:3, 144:6, 146:11, 146:13, 146:17, 146:20, 146:23,

146:25, 147:3, 147:5, 150:9, 150:11, 153:1, 153:11, 153:12, 153:15, 157:16, 159:3, 161:21, 162:17, 165:10, 167:25, 168:22, 169:1, 169:2, 169:4, 169:5, 170:9, 170:12, 170:16, 172:11, 172:13, 172:19, 172:20, 173:5, 173:7, 173:21, 175:13, 176:5, 176:10, 180:1, 180:6, 180:8, 181:2, 181:20, 181:23, 181:25, 182:6, 182:22, 182:25, 183:11, 183:13, 199:3, 199:12, 199:14, 199:16, 199:25, 200:2, 200:5, 201:9, 202:2, 202:20, 203:17, 206:4, 206:6, 206:11, 206:24, 209:7, 209:9, 214:14, 215:6, 215:9, 216:24, 217:1, 217:4, 217:11, 218:10, 218:14, 218:17, 218:24, 219:9, 219:14, 220:25, 222:15, 222:17, 222:22, 223:3, 223:15, 223:17, 223:19, 224:19, 224:22, 224:25, 225:1, 225:8, 225:9, 225:10, 225:12, 225:19, 225:20, 226:6, 227:10, 228:10, 228:19, 229:4, 231:7, 233:11, 233:13, 233:15, 237:16, 237:18, 241:5, 244:8, 244:11, 244:24
**MS** [2] - 4:5, 4:19
**multi** [1] - 192:8
**multi-strategy** [1] - 192:8
**MW** [1] - 17:7

# N

**Nacchio** [2] - 157:1, 181:3
**Name** [1] - 208:7
**name** [22] - 11:19, 11:21, 30:23, 40:24, 55:16, 80:22, 86:11, 87:15, 124:6, 124:8, 124:9, 183:6, 183:8, 187:3, 204:3, 205:10, 208:9, 216:16, 223:11, 232:14, 238:24, 242:12
**named** [2] - 104:22, 210:11
**names** [1] - 196:7
**narrow** [3] - 58:25, 103:11, 222:12

264

**native** [2] - 184:1, 184:2
**nature** [3] - 79:12, 115:17, 148:24
**nearly** [3] - 69:24, 119:17, 155:15
**necessarily** [3] - 50:15, 65:12, 223:23
**necessary** [1] - 11:7
**need** [19] - 5:22, 9:14, 10:11, 10:17, 11:4, 31:25, 39:10, 45:19, 58:2, 84:23, 88:15, 126:8, 128:20, 141:11, 143:6, 143:8, 167:4, 242:20, 244:21
**needed** [1] - 155:16
**needs** [2] - 49:13, 236:19
**negative** [3] - 78:24, 197:9, 199:10
**net** [11] - 77:3, 77:8, 77:15, 78:4, 78:19, 78:20, 186:8, 187:9, 187:11, 213:24, 214:4
**Netherlands** [2] - 97:8, 103:9
**network** [1] - 15:13
**neutral** [1] - 196:25
**never** [21] - 36:2, 36:5, 57:3, 57:7, 59:16, 69:7, 80:24, 81:3, 99:16, 100:6, 102:19, 129:6, 135:20, 135:21, 136:2, 136:6, 156:5, 197:19, 199:10, 210:10
**new** [6] - 7:3, 7:9, 8:7, 58:24, 129:6, 136:5
**New** [9] - 97:21, 97:22, 97:23, 98:1, 99:20, 157:13, 184:14, 198:21
**Newark** [1] - 69:13
**news** [26] - 43:5, 63:1, 63:24, 63:25, 64:1, 66:11, 68:22, 68:24, 68:25, 69:3, 69:9, 73:1, 73:11, 91:3, 91:4, 111:9, 111:17, 112:5, 112:23, 113:20, 114:4, 117:7, 194:3, 194:8, 194:9, 211:6
**newswire** [28] - 14:25, 16:7, 17:7, 17:11, 18:10, 18:18, 20:19, 21:20, 21:22, 22:2, 33:11, 44:18, 61:18, 62:9, 62:18, 64:16, 65:18, 65:23, 66:12, 67:22, 67:24,

75:18, 133:21, 151:3, 168:3, 168:8
**Newswire** [15] - 15:1, 15:3, 15:6, 15:11, 17:8, 20:12, 20:14, 33:18, 62:2, 63:2, 85:19, 159:13
**Newswires** [6] - 61:13, 85:6, 111:9, 111:17, 133:18
**newswires** [1] - 151:25
**next** [24] - 55:6, 59:10, 68:3, 84:5, 90:18, 109:15, 109:19, 111:12, 112:25, 118:11, 119:6, 138:21, 139:2, 139:3, 172:23, 177:14, 182:20, 212:14, 212:18, 214:7, 217:12, 218:8, 218:18, 243:15
**night** [4] - 7:20, 8:8, 225:1, 225:14
**Nikolai** [5] - 18:22, 50:5, 193:18, 200:12, 210:12
**nine** [5] - 7:21, 48:14, 221:3, 230:8, 230:10
**noise** [1] - 69:19
**nominal** [2] - 51:14, 197:20
**nominee** [2] - 51:15, 51:18
**non** [1] - 111:8
**non-earnings** [1] - 111:8
**none** [3] - 102:10, 143:19, 219:7
**noninsider** [1] - 170:4
**nonliquid** [1] - 205:18
**nonparty** [3] - 9:25, 10:4, 10:6
**normal** [2] - 95:2, 245:7
**north** [4] - 155:9, 234:9, 234:13, 234:15
**Northwestern** [3] - 97:9, 103:8, 124:20
**not-unquestioned** [1] - 178:24
**notary** [1] - 207:21
**note** [11] - 60:4, 60:9, 69:25, 70:19, 81:25, 98:6, 122:16, 141:2, 181:25, 199:1, 204:5
**noted** [5] - 9:8, 19:1, 60:11, 92:10, 172:1
**notes** [1] - 163:2
**nothing** [5] - 54:24, 148:24, 151:20, 199:24,

222:12
**noticed** [2] - 135:15, 194:4
**notions** [1] - 71:3
**November** [4] - 15:10, 15:14, 140:7, 140:15
**Novidia** [1] - 90:8
**nowhere** [2] - 141:21, 238:20
**number** [50] - 31:19, 31:20, 31:24, 33:1, 37:22, 39:13, 55:22, 68:14, 73:20, 86:20, 88:10, 91:20, 107:17, 113:20, 113:23, 121:6, 124:22, 126:1, 128:7, 130:20, 131:15, 135:12, 138:1, 142:22, 143:12, 143:16, 143:17, 145:6, 151:10, 155:15, 169:1, 172:9, 188:11, 194:4, 194:13, 198:18, 208:13, 225:8, 229:25, 230:7, 230:10, 230:11, 230:13, 230:16, 231:4, 239:4, 241:3
**Number** [1] - 91:21
**numbered** [2] - 107:16, 143:18
**numbering** [1] - 107:14
**numbers** [11] - 43:9, 78:22, 78:24, 87:10, 113:19, 147:25, 179:17, 208:15, 236:20, 239:14, 241:22
**numerous** [3] - 187:15, 190:12, 220:5

## O

**o'clock** [8] - 7:21, 25:23, 67:8, 67:9, 104:11, 198:21, 220:9, 221:25
**O'Connor** [26] - 5:17, 11:1, 11:2, 11:21, 11:25, 12:22, 13:10, 14:10, 14:16, 14:22, 16:25, 19:9, 20:4, 20:23, 21:14, 22:18, 27:25, 28:11, 28:24, 32:15, 39:1, 40:16, 48:23, 53:18, 84:25, 115:13
**oath** [6] - 106:16, 106:18, 111:22, 182:24, 210:1, 237:11
**object** [7] - 10:1,

53:7, 83:10, 90:19, 115:12, 122:21, 172:13
**objection** [39] - 9:8, 15:19, 15:20, 42:6, 47:18, 49:5, 54:10, 57:12, 59:13, 60:3, 68:16, 73:8, 73:23, 74:7, 74:8, 101:6, 116:5, 122:2, 122:18, 122:19, 134:14, 136:18, 150:9, 159:3, 180:1, 180:6, 182:4, 182:5, 182:7, 206:4, 206:10, 209:7, 209:8, 226:6, 227:10, 228:19, 237:16, 237:18
**objection's** [1] - 58:12
**objectionable** [1] - 206:16
**observation** [1] - 153:3
**observations** [5] - 82:1, 111:3, 150:7, 152:24, 160:7
**observe** [5] - 69:21, 85:12, 114:7, 151:18, 158:9
**observed** [4] - 63:22, 69:18, 69:22, 194:14
**obtain** [5] - 46:22, 47:9, 47:17, 227:20, 232:16
**obtained** [8] - 46:23, 47:14, 52:7, 54:7, 62:17, 109:12, 110:6, 131:5
**obtaining** [8] - 44:11, 85:5, 85:25, 97:21, 159:12, 159:16, 159:18, 159:21
**obvious** [1] - 195:3
**obviously** [5] - 120:21, 151:23, 175:20, 182:1, 202:12
**occasion** [1] - 19:11
**occasions** [2] - 195:22, 198:18
**occupation** [3] - 51:14, 51:18, 51:19
**occupied** [1] - 188:12
**occupying** [1] - 188:13
**occurred** [9] - 52:3, 52:21, 86:6, 117:6, 120:23, 149:22, 150:25, 151:2, 152:6
**occurring** [1] - 93:14
**occurs** [4] - 20:21, 132:16, 151:15, 152:12

**Ocean** [34] - 17:25, 18:4, 26:4, 27:7, 30:1, 48:24, 49:4, 50:10, 51:16, 51:20, 62:13, 64:17, 65:20, 78:6, 87:24, 89:8, 92:18, 93:15, 109:17, 115:8, 119:11, 119:16, 119:17, 121:3, 121:4, 121:6, 130:3, 142:6, 147:21, 148:9, 163:9, 197:20, 197:22, 200:11
**October** [14] - 18:15, 18:24, 20:8, 23:6, 23:8, 42:10, 61:5, 61:13, 61:19, 61:22, 76:13, 76:14, 76:19, 78:1, 84:16, 85:3, 85:21, 89:25, 91:10, 94:14, 113:4, 133:18, 133:21, 148:14, 148:15, 155:6, 155:7, 166:19, 207:10, 213:5, 213:9, 230:24, 233:1, 235:6, 235:10, 235:15, 237:1, 237:2, 237:9, 237:15, 238:13
**offer** [2] - 94:19, 104:5
**offered** [8] - 96:5, 99:15, 99:16, 103:15, 123:14, 123:16, 209:9, 209:15
**office** [11] - 191:7, 198:11, 235:6, 235:9, 235:12, 235:22, 235:23, 239:23, 243:18, 243:21
**Office** [1] - 96:13
**officer** [4] - 187:1, 204:20, 204:23, 205:6
**officially** [1] - 233:19
**often** [5] - 67:6, 67:8, 67:10, 70:8, 70:17
**Ohio** [2] - 184:19
**old** [4] - 97:15, 183:18, 183:19, 184:7
**Oleksandr** [1] - 50:4
**Omega** [2] - 29:19, 50:10
**omission** [1] - 49:9
**once** [3] - 76:23, 95:25, 179:14
**one** [121] - 5:19, 7:1, 8:2, 70:19, 10:8, 16:21, 22:19, 27:5, 29:14, 30:4, 32:7, 55:24, 57:9, 60:3, 65:14, 69:6, 71:1, 71:4, 71:6, 71:9, 71:25, 72:12, 72:24, 73:17, 76:7, 76:23, 77:21, 91:20, 99:9, 99:13,

100:2, 101:20, 102:23, 102:24, 104:11, 107:7, 107:8, 107:16, 107:20, 107:24, 111:3, 111:20, 116:7, 116:22, 118:5, 121:25, 123:5, 126:2, 130:2, 130:3, 133:4, 133:5, 135:10, 135:11, 135:15, 137:21, 138:3, 139:23, 139:25, 141:23, 142:15, 146:13, 150:13, 151:8, 151:9, 152:2, 152:16, 152:18, 153:8, 153:22, 155:14, 156:9, 160:6, 162:2, 169:14, 169:15, 171:7, 175:8, 178:9, 178:13, 178:20, 181:12, 185:23, 186:7, 188:1, 188:10, 188:12, 189:20, 195:8, 195:9, 200:16, 204:20, 204:23, 205:7, 207:16, 207:23, 208:17, 210:23, 212:14, 212:15, 212:20, 212:22, 213:23, 214:5, 222:17, 228:3, 231:11, 232:6, 233:25, 236:24, 239:16, 240:15, 242:8, 242:19, 243:4, 243:15, 243:22, 244:4

**one's** [1] - 149:13
**one-third** [1] - 208:17
**one-trip** [1] - 72:24
**ones** [12] - 34:23, 35:16, 35:21, 91:6, 98:9, 122:14, 122:16, 122:19, 122:21, 122:24, 142:9, 239:8
**ongoing** [1] - 52:12
**open** [3] - 68:3, 209:17, 235:5
**opened** [6] - 52:9, 52:16, 112:25, 191:19, 235:9, 243:22
**opening** [1] - 62:15
**opens** [1] - 26:21
**operating** [2] - 59:4, 187:1
**operations** [1] - 187:10
**opine** [1] - 175:14
**opined** [1] - 172:24
**opining** [1] - 158:15
**opinion** [24] - 74:3, 82:2, 86:7, 96:5, 104:5, 108:12, 125:8, 126:24, 127:3, 129:23, 129:24, 141:6, 150:5, 150:24, 153:24, 154:7, 156:7, 156:9, 156:20, 157:2,

157:10, 158:17, 159:14, 174:13
**opinions** [13] - 59:18, 82:5, 95:9, 103:10, 107:19, 109:2, 125:12, 125:15, 126:15, 126:17, 157:6, 160:2, 175:6
**opportunity** [13] - 11:9, 58:23, 79:15, 79:17, 80:11, 82:11, 95:24, 96:4, 109:5, 192:14, 201:20, 212:25, 220:16
**opposed** [3] - 8:14, 115:16, 152:8
**opposition** [3] - 4:12, 53:5, 203:11
**options** [3] - 194:7, 195:14, 211:5
**oral** [3] - 221:22, 221:23, 245:8
**orange** [1] - 216:12
**order** [9] - 31:8, 32:16, 38:2, 70:23, 116:2, 137:3, 229:22, 233:6, 245:12
**organized** [3] - 8:13, 8:16, 236:4
**original** [5] - 14:17, 89:22, 125:14, 213:9, 220:21
**originally** [1] - 220:1
**oscillating** [1] - 44:18
**oscillation** [4] - 14:24, 20:5, 83:2, 83:7
**oscillations** [1] - 83:17
**otherwise** [5] - 95:13, 118:14, 123:16, 178:5, 221:16
**outcome** [1] - 69:17
**outfit** [1] - 28:8
**outlier** [2] - 73:19, 74:25
**outliers** [1] - 75:5
**outside** [7] - 66:23, 72:21, 165:11, 183:25, 185:21, 197:23, 223:4
**overall** [2] - 132:7, 175:15, 178:11
**overdone** [1] - 193:9
**overlap** [4] - 20:23, 121:3, 135:23, 150:15
**overlaps** [2] - 71:14, 147:22
**overruled** [1] - 58:12, 237:19
**overseas** [2] - 8:2, 9:20
**oversize** [1] - 225:15

**overviews** [1] - 226:1
**overwhelming** [1] - 176:25
**own** [16] - 49:13, 94:24, 121:8, 135:20, 136:1, 145:5, 149:18, 150:3, 171:1, 185:21, 186:11, 186:21, 201:3, 201:5, 206:2, 206:21
**owner** [4] - 51:15, 51:16, 51:20, 197:20
**ownership** [3] - 141:12, 200:16, 200:21
**owning** [2] - 206:22, 207:3
**owns** [1] - 35:7, 201:4, 208:16
**Oxford** [1] - 184:19

## P

**P-a-p-a-z-i-a-n** [1] - 223:14
**p-test** [3] - 158:5, 158:6, 158:8
**p-value** [7] - 69:16, 69:17, 69:21, 70:1, 70:23, 70:25, 71:18
**P-values** [1] - 70:20
**p-values** [1] - 71:6
**p.m** [11] - 23:8, 23:12, 24:5, 24:12, 24:22, 25:22, 26:22, 26:23, 29:7, 29:9, 198:23
**P/E** [1] - 211:4
**Pacer** [4] - 31:16, 31:24, 143:12
**Pacer-filed** [1] - 31:16
**Pacific** [2] - 50:9, 200:17
**packet** [2] - 40:1, 55:25
**page** [44] - 14:18, 19:17, 24:6, 48:11, 48:12, 48:16, 48:19, 50:4, 86:20, 98:22, 107:3, 107:5, 107:12, 107:13, 107:15, 107:16, 107:17, 107:21, 111:12, 112:21, 126:16, 127:19, 127:24, 139:18, 139:20, 139:21, 139:23, 139:25, 141:17, 141:18, 160:6, 201:19, 202:1, 202:13, 202:22, 213:23, 213:24, 217:1, 219:10, 241:20
**pages** [9] - 48:17, 141:18, 141:24, 142:20, 143:17, 143:22, 144:9,

144:19, 245:14
**paid** [7] - 82:9, 154:7, 190:1, 234:4, 234:5, 234:24, 235:2
**pair** [12] - 171:15, 192:15, 196:23, 196:24, 197:12, 197:13, 211:14, 211:15, 211:19, 212:10, 212:18
**Papazian** [5] - 10:1, 221:3, 223:13, 223:20, 233:16
**paper** [3] - 8:7, 231:20, 233:7
**papers** [8] - 4:16, 97:13, 101:17, 101:22, 102:1, 102:3, 102:5, 103:14
**paperwork** [1] - 235:17
**paragraph** [52] - 13:10, 13:13, 13:22, 13:24, 14:18, 14:22, 33:9, 48:9, 48:14, 48:19, 61:1, 61:8, 61:10, 61:25, 84:22, 85:14, 86:20, 91:8, 92:8, 100:14, 111:2, 111:6, 111:12, 112:10, 126:18, 127:19, 127:21, 127:22, 131:14, 133:17, 133:19, 133:20, 133:23, 159:7, 159:11, 159:25, 160:1, 160:7, 161:22, 162:10, 162:11, 162:12, 162:15, 210:8, 210:9, 210:15, 210:20, 210:23, 211:22, 212:3, 213:21, 213:24
**paragraphs** [4] - 100:12, 127:14, 133:8, 211:12
**parallel** [3] - 44:17, 89:14, 124:18
**pardon** [3] - 188:5, 191:12, 213:7
**parentheses** [3] - 78:22, 78:24, 110:2
**parents** [1] - 185:12
**part** [35] - 6:9, 10:16, 20:9, 47:12, 63:5, 72:19, 73:2, 81:6, 88:14, 88:16, 98:19, 98:22, 108:3, 126:6, 126:9, 128:4, 144:1, 169:14, 174:2, 174:22, 178:10, 185:4, 189:5, 193:19, 196:20, 205:6, 207:23, 210:22, 218:18, 225:1, 227:20, 240:14,

241:24
**participating** [1] - 234:8
**particular** [16] - 62:13, 62:19, 71:25, 72:13, 75:17, 86:6, 91:6, 125:1, 130:10, 139:9, 156:11, 162:11, 162:12, 190:11, 216:18, 230:9
**particularly** [3] - 57:19, 92:8, 139:11
**parties** [4] - 83:3, 109:6, 116:2, 244:17
**partner** [2] - 204:16, 217:22
**partners** [2] - 41:8, 41:9
**Partners** [11] - 41:25, 50:10, 201:13, 201:14, 202:14, 202:15, 202:17, 203:2, 203:22, 208:2
**parts** [2] - 91:15, 197:13
**party** [1] - 211:5
**passion** [1] - 10:24
**Passport** [1] - 204:5
**past** [2] - 173:24, 181:8
**pattern** [13] - 18:13, 18:23, 20:23, 21:8, 21:9, 69:18, 69:22, 73:13, 131:11, 162:6, 194:4, 194:5, 194:25
**patterns** [4] - 15:17, 16:2, 16:15, 20:24
**pause** [1] - 30:15
**pay** [2] - 153:24, 189:23
**paying** [1] - 227:16
**payments** [4] - 36:22, 50:13, 121:18, 121:19
**PDFs** [1] - 89:7
**peaking** [1] - 243:7
**peer** [1] - 70:14
**pending** [1] - 138:13
**people** [23] - 8:9, 9:22, 25:11, 46:15, 154:6, 154:25, 155:18, 186:6, 186:21, 186:23, 187:18, 187:25, 188:17, 190:4, 190:6, 191:21, 195:6, 195:18, 196:6, 196:8, 235:7, 235:20, 237:21
**per** [1] - 154:13
**percent** [43] - 68:8, 69:4, 69:21, 70:20, 71:1, 71:2, 71:3, 71:4, 71:6, 75:21, 76:21,

78:5, 78:6, 78:7, 78:16, 114:10, 114:15, 114:21, 114:22, 119:11, 119:13, 119:22, 149:19, 176:17, 193:8, 193:10, 201:5, 213:25, 214:5, 214:8, 228:3, 228:8, 230:5, 234:9, 238:19, 240:16, 241:3

**percent..** [1] - 214:1
**percentage** [4] - 78:4, 114:12, 132:8, 230:4
**perfect** [1] - 184:11
**perfectly** [1] - 128:19
**perform** [6] - 56:25, 84:21, 85:1, 103:21, 159:9, 167:23
**performance** [6] - 82:13, 82:15, 197:7, 214:25, 219:3, 228:7
**performed** [2] - 81:7, 165:24
**performing** [1] - 166:9
**perfume** [1] - 188:2
**perhaps** [3] - 96:1, 232:20, 245:1
**period** [78] - 17:9, 20:13, 20:14, 20:17, 20:18, 20:22, 21:11, 22:3, 22:5, 34:5, 34:25, 35:8, 42:10, 68:10, 73:17, 76:7, 76:8, 76:9, 76:13, 76:14, 76:15, 76:18, 76:20, 77:12, 77:25, 78:1, 84:14, 84:16, 84:18, 85:12, 85:16, 86:6, 86:14, 86:19, 86:21, 86:22, 91:9, 92:19, 113:4, 113:8, 140:7, 140:15, 162:2, 164:4, 164:7, 164:11, 165:2, 165:3, 165:17, 165:19, 166:18, 166:22, 167:4, 167:5, 167:9, 169:19, 170:25, 172:2, 172:7, 173:19, 174:4, 174:7, 174:8, 174:9, 174:19, 176:14, 177:22, 194:3, 205:16, 213:5, 230:17, 230:20, 231:5, 239:17, 243:21
**periods** [9] - 37:23, 75:14, 76:5, 86:17, 130:25, 133:13, 165:4, 173:18, 213:3
**permanent** [1] - 53:6
**permeates** [1] - 150:19
**permitted** [1] - 10:22

**person** [3] - 185:4, 193:17, 235:21
**personal** [12] - 45:14, 45:25, 51:5, 102:19, 121:8, 121:13, 121:17, 187:11, 236:14, 237:5, 237:25, 238:1
**personally** [1] - 197:19
**perspective** [1] - 73:6
**persuade** [1] - 36:15
**Pfizer** [2] - 156:17, 181:4
**ph** [4] - 63:10, 96:13, 141:1, 190:19
**Ph.D** [3] - 97:9, 97:21, 103:7
**phenomenon** [2] - 151:12, 158:1
**phone** [2] - 208:24, 209:3
**phones** [2] - 191:20
**photocopy** [1] - 207:7
**phrase** [6] - 21:16, 21:18, 50:1, 99:4, 115:16, 116:16
**phrased** [1] - 32:18
**physically** [3] - 235:23, 243:17, 243:18
**pick** [1] - 83:24
**picked** [2] - 152:2, 211:20
**picture** [1] - 30:3
**piece** [2] - 67:20, 169:15
**pieces** [1] - 231:20
**pink** [5] - 139:25, 140:1, 140:3, 140:12, 142:9
**place** [9] - 11:15, 19:23, 55:12, 124:2, 182:23, 213:9, 223:6, 224:10, 241:25
**placed** [7] - 5:20, 23:23, 39:20, 118:18, 135:6, 138:7, 173:10
**placement** [1] - 67:1
**plain** [1] - 218:25
**plaintiff** [1] - 99:17
**Plaintiff** [4] - 11:17, 55:14, 104:16, 245:12
**Plaintiff's** [15] - 6:15, 6:20, 63:17, 77:22, 129:19, 200:8, 201:11, 202:22, 203:19, 205:20, 205:22, 207:1, 207:18, 210:4, 230:18
**plan** [3] - 87:5, 87:6, 128:12
**planning** [1] - 218:8

**plausible** [1] - 178:1
**playing** [3] - 136:16, 136:23, 223:25
**pleading** [1] - 134:17
**plenty** [2] - 157:20, 225:17
**plural** [1] - 14:6
**plus** [3] - 213:25, 214:1
**PM** [1] - 242:16
**point** [35] - 5:19, 36:17, 46:19, 50:18, 61:10, 84:5, 84:6, 92:2, 94:3, 95:20, 107:6, 107:20, 107:22, 109:10, 111:3, 111:5, 112:20, 114:20, 117:17, 118:7, 129:9, 131:15, 132:11, 144:15, 144:24, 154:5, 158:13, 171:13, 175:12, 175:14, 200:16, 222:10, 243:8
**points** [7] - 11:6, 58:24, 61:11, 152:10, 152:13, 219:22, 222:18
**poor** [1] - 215:16
**portfolio** [2] - 185:2, 231:23
**portfolios** [1] - 185:5
**portion** [3] - 48:18, 115:6, 169:9
**position** [11] - 12:19, 56:19, 56:24, 64:5, 72:10, 73:2, 197:1, 197:2, 237:20, 238:18
**positions** [2] - 205:15, 211:15
**positive** [2] - 14:7, 72:7
**positively** [1] - 65:8
**possession** [2] - 62:16, 131:1
**possibilities** [1] - 157:21
**possibility** [2] - 42:5, 68:22
**possible** [9] - 68:4, 83:23, 85:22, 151:22, 157:25, 231:19, 237:8, 238:16, 245:9
**possibly** [2] - 69:20, 104:23
**powerful** [1] - 174:13
**powers** [1] - 138:11
**POWERS** [150] - 56:1, 57:12, 58:5, 58:10, 59:12, 59:23, 60:3, 68:16, 73:8, 73:23, 74:7, 74:10, 74:16, 79:10, 79:20, 80:9,

80:13, 80:16, 80:21, 83:13, 83:25, 84:7, 84:10, 87:3, 87:6, 87:9, 87:12, 87:16, 87:19, 87:21, 88:3, 88:5, 88:7, 88:10, 88:18, 88:20, 88:22, 89:1, 91:15, 91:18, 91:24, 92:4, 92:15, 93:6, 94:7, 94:15, 94:25, 95:17, 95:19, 95:22, 101:6, 101:11, 101:14, 101:16, 103:1, 106:20, 106:23, 107:11, 107:13, 115:19, 116:7, 116:11, 116:23, 117:1, 118:5, 118:8, 119:7, 119:8, 120:2, 121:22, 121:25, 124:10, 124:13, 125:19, 125:23, 126:2, 126:5, 126:10, 126:21, 126:25, 127:3, 127:7, 127:12, 127:19, 127:22, 127:24, 128:3, 128:10, 129:2, 129:11, 129:13, 129:14, 129:21, 132:25, 133:2, 133:5, 134:4, 134:15, 134:21, 135:4, 137:7, 137:10, 137:15, 137:18, 137:23, 138:3, 138:6, 138:20, 138:25, 140:20, 140:22, 142:3, 142:13, 142:15, 142:19, 142:24, 143:2, 143:5, 143:20, 143:25, 144:3, 144:6, 146:11, 146:13, 146:17, 146:20, 146:23, 146:25, 147:3, 147:5, 153:1, 153:11, 159:3, 169:1, 169:4, 170:9, 170:16, 172:13, 172:20, 180:1, 180:6, 181:25, 217:4, 218:10, 218:14, 218:17, 218:24, 225:1, 225:9, 244:24
**Powers** [1] - 80:23
**PR** [7] - 15:1, 17:7, 17:8, 20:12, 20:14, 63:2, 85:19
**practice** [2] - 12:14, 240:18
**practices** [1] - 240:21
**pre** [5] - 85:5, 159:12, 159:17, 159:19, 159:20
**pre-publication** [5] - 85:5, 159:12, 159:17, 159:19, 159:20
**preannounced** [1] - 28:19
**prearranged** [1] - 21:23

**precise** [2] - 121:1, 163:24
**precisely** [1] - 138:16
**predecessor** [1] - 188:7
**preliminary** [11] - 5:12, 10:18, 28:2, 36:25, 48:2, 53:6, 95:3, 143:8, 167:17, 203:11, 222:13
**premarked** [2] - 20:1, 63:17
**premised** [1] - 179:19
**preparation** [1] - 53:5
**prepared** [9] - 10:12, 45:11, 65:3, 80:13, 126:12, 231:15, 231:18, 231:22, 232:12
**preparing** [6] - 19:10, 76:3, 155:3, 175:20, 186:16
**prepublication** [1] - 85:25
**prerequisite** [1] - 211:17
**present** [5] - 14:14, 15:10, 194:8, 200:13, 218:8
**presented** [1] - 150:22
**presenting** [1] - 128:12
**president** [2] - 153:18, 186:5
**press** [28] - 17:6, 21:20, 22:2, 23:5, 23:7, 28:4, 28:7, 28:18, 29:8, 33:10, 48:24, 49:3, 61:13, 62:19, 65:22, 67:25, 68:14, 85:5, 85:25, 107:25, 108:25, 111:8, 159:1, 159:12, 159:17, 159:19, 159:20, 160:13
**presumably** [2] - 82:25, 119:22
**presumptions** [1] - 83:7
**pretty** [4] - 154:16, 168:5, 216:5, 233:7
**previous** [2] - 146:5, 146:7
**previously** [10] - 7:2, 8:6, 13:8, 58:23, 122:20, 134:5, 205:21, 207:18, 209:25, 225:11
**price** [8] - 13:14, 63:9, 72:8, 152:3, 192:22, 194:6, 195:12, 211:4

**Prices** [1] - 63:9
**primarily** [5] - 17:12, 17:13, 18:15, 98:3, 155:14
**primary** [1] - 131:15
**prime** [1] - 196:10
**Prime** [34] - 17:25, 18:4, 26:4, 27:7, 30:1, 48:24, 49:4, 50:10, 51:16, 51:20, 62:14, 64:17, 65:20, 78:6, 87:24, 89:8, 92:18, 93:15, 109:17, 115:8, 119:11, 119:16, 119:17, 121:3, 121:4, 121:6, 130:3, 142:6, 147:21, 148:9, 163:9, 197:20, 197:22, 200:11
**principal** [1] - 243:12
**private** [4] - 12:14, 98:1, 187:11, 205:18
**privilege** [1] - 47:19
**privileged** [1] - 47:25
**PRN** [3] - 15:4, 21:2, 61:19
**pro** [1] - 4:9
**probability** [2] - 69:22, 69:23
**problem** [4] - 59:24, 91:18, 123:17, 175:8
**procedure** [1] - 119:2
**Procedure** [1] - 59:15
**proceed** [12] - 6:2, 9:7, 39:17, 79:15, 80:13, 124:10, 129:11, 129:17, 129:20, 170:19, 183:10, 233:11
**proceeding** [5] - 5:22, 58:25, 98:24, 118:20, 219:16
**proceedings** [1] - 220:4
**process** [3] - 189:6, 233:23, 238:8
**processes** [1] - 238:9
**produce** [4] - 37:24, 38:3, 102:11, 108:19
**produced** [2] - 134:6, 209:2
**producing** [1] - 38:6
**product** [1] - 47:25
**productive** [2] - 36:11, 222:6
**professional** [6] - 49:13, 97:18, 97:19, 98:7, 98:13, 98:15
**Professor** [19] - 75:12, 75:23, 76:11, 76:12, 89:21, 103:24, 105:2, 123:23, 124:14,

129:15, 129:22, 133:2, 135:1, 138:16, 139:6, 147:9, 152:16, 153:2, 153:16
**professor** [1] - 127:15
**professors** [1] - 184:10
**proffered** [4] - 103:5, 103:19, 103:20
**profit** [5] - 72:11, 77:8, 78:19, 78:20, 154:9
**profit's** [1] - 78:21
**profitability** [5] - 131:3, 166:4, 166:23, 178:11, 233:8
**profitable** [14] - 68:23, 130:16, 166:15, 174:11, 177:12, 177:14, 177:16, 177:18, 178:1, 179:7, 229:25, 230:4, 230:6, 230:11
**profitably** [1] - 68:10
**profited** [2] - 26:15, 30:5
**profits** [33] - 75:10, 75:21, 75:22, 75:24, 76:20, 76:22, 76:25, 77:3, 77:12, 77:16, 77:17, 77:18, 77:19, 78:4, 78:9, 78:10, 78:11, 78:12, 78:14, 78:15, 132:7, 132:10, 175:15, 177:2, 177:3, 177:10, 178:3, 178:18, 178:21, 179:4, 179:5, 227:20
**program** [1] - 188:25
**promise** [1] - 6:19
**proof** [6] - 114:22, 114:25, 115:1, 115:2, 115:4, 117:5
**proper** [1] - 233:23
**proportion** [3] - 73:21, 75:23, 240:15
**proportionately** [1] - 240:13
**propose** [1] - 16:21
**prosecutor** [1] - 12:15
**protocol** [1] - 239:22
**protracted** [1] - 58:21
**provide** [7] - 76:11, 153:22, 154:7, 156:10, 156:15, 156:22, 173:4
**provided** [25] - 39:12, 57:14, 57:18, 109:8, 129:19, 130:1, 130:4, 135:19, 136:10, 136:24,

139:8, 144:22, 146:21, 148:2, 148:21, 163:13, 164:13, 164:17, 165:21, 171:7, 207:24, 208:23, 209:14, 209:23
**providing** [3] - 80:25, 87:23, 205:5
**proximate** [1] - 174:7
**public** [4] - 21:21, 21:25, 62:21, 207:21
**publication** [8] - 24:6, 85:5, 97:15, 159:12, 159:17, 159:19, 159:20
**publications** [3] - 97:14, 101:17, 101:22
**publicly** [7] - 14:11, 22:6, 23:11, 29:8, 57:23, 63:6, 100:2
**Publicly** [1] - 111:5
**publish** [1] - 83:24
**published** [6] - 97:12, 102:3, 102:5, 103:10, 103:14, 124:22
**pull** [10] - 14:16, 18:21, 19:7, 25:7, 28:21, 116:18, 168:17, 200:5, 201:9, 203:17
**pulled** [1] - 242:8
**pulling** [1] - 19:25
**purely** [1] - 192:17
**purport** [1] - 100:24, 135:17, 236:7
**purported** [2] - 133:12, 133:23
**purports** [2] - 201:12, 203:1
**purposes** [7] - 6:15, 81:4, 83:17, 84:15, 86:3, 93:10, 139:1
**pursuant** [1] - 217:10
**pursuing** [2] - 68:12, 68:23
**put** [25] - 8:1, 8:19, 12:22, 19:9, 71:9, 86:19, 112:9, 128:21, 132:11, 162:17, 176:5, 189:24, 197:2, 198:19, 206:7, 207:15, 221:3, 221:4, 221:5, 221:11, 221:15, 221:20, 236:4, 238:14, 243:15
**putting** [11] - 46:12, 193:24, 194:24, 206:25, 207:17, 210:3, 217:11, 229:14, 238:4, 241:23, 244:1

**Q**

**Q2** [1] - 28:3
**qualification** [2] - 104:15, 149:25
**qualifications** [21] - 58:6, 59:18, 79:8, 79:14, 79:19, 79:23, 80:2, 80:5, 80:11, 94:19, 94:22, 95:11, 95:16, 95:20, 96:5, 103:4, 103:5, 103:7, 124:17, 156:14, 182:9
**qualified** [14] - 81:3, 94:18, 95:3, 95:4, 95:23, 102:21, 103:3, 104:5, 104:10, 114:13, 156:5, 182:1, 182:4, 182:8
**qualifies** [1] - 149:23
**qualify** [4] - 58:19, 99:3, 102:12, 114:17
**qualifying** [1] - 86:3
**qualitative** [3] - 84:21, 131:4, 145:11
**quality** [1] - 215:16
**Quantitative** [1] - 97:17
**quantitative** [8] - 85:1, 97:7, 103:9, 103:18, 103:21, 104:6, 141:11, 159:9
**quarter** [1] - 14:8, 28:10, 28:15, 182:12, 182:13, 220:11
**questionable** [1] - 167:20
**questioned** [93] - 76:21, 76:24, 78:10, 78:13, 78:14, 130:2, 130:5, 130:11, 130:15, 131:5, 131:12, 131:13, 131:19, 131:20, 132:1, 132:4, 132:7, 132:8, 135:12, 135:18, 135:20, 139:13, 140:4, 140:8, 140:14, 141:20, 141:22, 144:20, 144:21, 144:22, 145:2, 145:3, 145:5, 145:6, 145:8, 145:9, 145:13, 145:14, 145:21, 146:18, 147:12, 147:18, 147:25, 152:13, 160:22, 161:1, 161:10, 162:4, 163:1, 163:12, 164:1, 164:2, 164:6, 164:8, 164:12, 164:13, 164:18, 164:21, 164:24, 165:2, 165:5, 165:7, 165:11,

165:15, 165:18, 165:20, 165:25, 166:1, 166:3, 166:4, 166:5, 166:6, 166:10, 166:15, 166:23, 168:10, 168:13, 169:10, 169:23, 171:6, 171:21, 172:24, 174:24, 175:2, 175:5, 175:9, 175:10, 175:24, 176:18, 178:9, 179:5, 179:10, 179:24
**Questioned** [1] - 78:3
**questioning** [5] - 49:18, 79:8, 115:12, 135:10, 220:20
**questions** [27] - 30:8, 30:23, 53:12, 74:8, 74:17, 79:3, 92:12, 94:21, 95:19, 108:22, 121:22, 122:7, 139:4, 149:8, 152:17, 153:1, 170:13, 170:14, 181:6, 181:18, 214:14, 217:16, 219:12, 222:7, 231:7, 244:8
**quibbling** [1] - 166:17
**quick** [2] - 13:2, 214:18
**quickly** [5] - 123:15, 131:16, 171:3, 196:6, 227:22
**quite** [12] - 68:1, 154:24, 157:23, 161:8, 194:17, 194:18, 197:4, 213:16, 215:16, 215:21, 236:16
**quote** [7] - 92:7, 103:21, 159:11, 159:15, 159:19, 165:25, 210:24

**R**

**raise** [6] - 11:14, 55:11, 124:1, 183:2, 223:5
**raised** [3] - 183:14, 183:15, 220:7
**random** [5] - 69:19, 69:23, 132:14, 132:15
**randomly** [1] - 236:24
**randomness** [1] - 69:20
**range** [1] - 147:19
**rarely** [1] - 243:19
**rate** [1] - 154:12
**rather** [5] - 80:4, 109:5, 132:10
**ratios** [1] - 211:4
**Re** [2] - 156:17, 181:4
**reach** [3] - 147:23,

149:24, 166:6
  **reached** [4] - 145:11, 147:24, 150:1, 170:23
  **reaching** [2] - 62:6, 63:5
  **read** [35] - 4:24, 10:11, 11:1, 14:8, 36:8, 41:1, 41:18, 84:10, 84:12, 94:8, 115:22, 116:11, 116:13, 149:4, 173:21, 173:23, 180:11, 180:13, 181:2, 204:1, 204:7, 208:3, 210:13, 210:18, 211:8, 212:20, 214:2, 214:9, 218:25, 219:21, 220:8, 228:11, 228:12
  **reading** [2] - 84:22, 113:9
  **reads** [4] - 33:1, 89:6, 109:12, 212:18
  **ready** [3] - 21:23, 30:16, 155:8
  **real** [1] - 19:20
  **Real** [1] - 19:21
  **reality** [1] - 197:4
  **realized** [1] - 77:12
  **really** [16] - 58:22, 59:16, 68:18, 73:20, 94:21, 94:22, 95:8, 103:14, 150:18, 161:5, 171:3, 179:3, 220:7, 222:11, 237:14
  **reams** [1] - 225:15
  **reason** [10] - 90:5, 118:18, 145:1, 165:22, 197:6, 211:18, 219:25, 221:16, 230:12, 237:21
  **reasonable** [1] - 9:23
  **reasons** [2] - 221:10, 226:3
  **rebut** [1] - 33:14
  **rebuttal** [2] - 98:22, 99:16
  **receipt** [3] - 114:3, 114:23
  **receive** [3] - 189:20, 196:17, 241:13
  **received** [13] - 15:18, 16:1, 43:25, 54:20, 59:14, 97:9, 135:8, 136:7, 163:13, 171:6, 225:2, 229:8, 232:20
  **receiving** [2] - 54:19, 58:7
  **recently** [6] - 54:17, 115:22, 122:21, 216:23, 218:4, 218:21
  **recess** [2] - 105:6, 182:17

  **recklessly** [1] - 194:18
  **recognize** [7] - 60:15, 60:17, 60:19, 60:22, 201:24, 207:2, 210:5
  **recognizing** [1] - 147:21
  **recollect** [1] - 203:16
  **recollection** [2] - 206:22, 207:3
  **recommend** [1] - 45:24
  **reconsideration** [1] - 74:12
  **record** [40] - 4:21, 6:9, 6:12, 6:16, 10:14, 11:20, 31:25, 41:1, 53:11, 55:17, 56:2, 60:10, 84:12, 88:15, 88:16, 94:8, 116:13, 123:4, 123:6, 123:7, 124:7, 126:6, 126:9, 138:10, 157:17, 173:23, 180:13, 183:7, 199:8, 199:15, 199:16, 201:1, 215:15, 215:20, 223:12, 228:12, 229:7, 231:25, 245:4, 245:8
  **record's** [1] - 225:13
  **records** [25] - 7:11, 21:14, 21:15, 75:8, 92:17, 107:7, 107:23, 109:12, 109:16, 109:20, 111:23, 115:1, 119:18, 140:19, 196:12, 208:24, 208:25, 209:3, 224:15, 224:17, 226:9, 226:10, 233:6, 240:25
  **recross** [1] - 55:2
  **recruit** [1] - 235:6
  **red** [2] - 187:6, 216:12
  **redid** [1] - 144:25
  **redirect** [5] - 53:14, 55:2, 101:11, 172:16, 172:17
  **REDIRECT** [1] - 53:16
  **redo** [3] - 11:4, 133:12, 133:24
  **redoing** [1] - 135:17
  **refer** [5] - 6:11, 17:5, 33:14, 120:15, 143:10
  **reference** [4] - 31:23, 33:10, 33:11, 57:24
  **referenced** [1] - 80:8
  **referred** [2] - 118:2, 140:25
  **referring** [14] - 32:25, 38:15, 48:18, 77:4, 90:8, 90:9, 107:17,

116:17, 142:5, 142:8, 142:17, 143:24, 228:1, 242:4
  **refers** [3] - 76:12, 76:14, 76:15
  **reflect** [11] - 20:4, 22:25, 123:7, 218:6, 225:22, 226:21, 228:14, 228:16, 229:12, 229:13, 229:25
  **reflected** [3] - 18:13, 175:23, 230:18
  **reflects** [6] - 18:23, 23:1, 75:21, 76:7, 76:8
  **regard** [1] - 194:18
  **regarding** [3] - 61:5, 87:22, 103:11
  **regards** [1] - 242:15
  **register** [1] - 205:23
  **Register** [1] - 207:19
  **registered** [1] - 235:10
  **registering** [1] - 235:18
  **regression** [4] - 158:10, 158:12, 180:17, 180:21
  **regular** [7] - 68:19, 68:23, 69:3, 129:1, 193:12, 194:9, 219:6
  **regularly** [4] - 68:1, 233:20, 234:8
  **rehabilitate** [1] - 172:16
  **rejected** [5] - 100:8, 156:7, 156:10, 157:2, 157:14
  **relate** [1] - 124:24
  **related** [11] - 61:12, 61:18, 62:2, 108:21, 131:5, 131:20, 131:24, 132:3, 132:6, 133:18, 168:11
  **relates** [3] - 24:1, 67:23, 115:2
  **relating** [5] - 17:12, 100:25, 101:21, 102:5, 110:20
  **relation** [1] - 103:5
  **relationship** [3] - 136:13, 149:23, 200:10
  **relatively** [3] - 115:22, 132:8, 236:4
  **release** [21] - 17:6, 21:20, 22:2, 23:5, 23:7, 28:4, 28:7, 28:18, 29:8, 62:19, 65:22, 67:25, 68:14, 85:5, 85:25, 111:17, 112:5, 151:4, 159:12, 159:17

  **released** [3] - 21:23, 28:14, 114:24
  **releases** [17] - 17:11, 33:10, 43:6, 48:24, 49:3, 61:13, 62:9, 63:12, 64:2, 107:25, 109:1, 111:8, 112:23, 117:7, 159:1, 160:13
  **relevant** [4] - 133:5, 149:21, 191:18, 220:3
  **reliability** [3] - 79:16, 94:23, 182:9
  **reliable** [2] - 70:12, 95:6
  **relied** [2] - 95:9, 109:1
  **remain** [3] - 106:15, 106:16, 106:18
  **remains** [1] - 42:23
  **remember** [12] - 42:5, 80:18, 84:24, 85:7, 149:8, 149:10, 168:6, 186:2, 230:22, 231:4, 235:13, 237:8
  **remind** [2] - 47:21, 172:9
  **remove** [2] - 178:5, 179:14
  **removed** [1] - 171:17
  **renamed** [1] - 205:12
  **rent** [1] - 235:23
  **repeat** [6] - 5:22, 10:25, 84:9, 94:6, 112:2, 116:10
  **rephrase** [8] - 45:5, 46:3, 49:7, 72:20, 74:19, 74:22, 83:12, 241:16
  **report** [63] - 28:12, 57:19, 57:20, 59:19, 81:25, 83:8, 83:20, 83:22, 84:15, 84:20, 91:8, 96:11, 96:12, 96:17, 96:19, 96:22, 96:24, 98:23, 98:24, 99:5, 99:23, 100:1, 100:4, 100:5, 102:15, 109:20, 113:16, 117:14, 125:14, 125:17, 127:4, 127:14, 127:18, 128:2, 128:8, 128:18, 129:7, 130:23, 131:2, 132:11, 136:17, 149:3, 149:5, 154:20, 154:22, 155:3, 157:19, 158:4, 158:20, 159:4, 162:19, 162:22, 173:7, 173:8, 175:6, 175:20, 175:23, 176:6, 176:10, 191:23, 243:23, 243:24

  **report's** [1] - 83:20
  **reported** [1] - 243:24
  **Reporter** [2] - 91:20, 128:16
  **reporter** [4] - 84:10, 94:7, 116:11, 173:21
  **reports** [12] - 58:3, 58:17, 59:6, 96:13, 96:14, 96:15, 145:17, 182:10, 196:20, 196:22, 211:6, 225:3
  **represent** [5] - 66:13, 115:6, 137:2, 140:3, 148:10
  **representation** [1] - 10:8
  **representative** [1] - 45:10
  **represented** [1] - 39:24
  **represents** [2] - 117:7, 139:7
  **Republic** [1] - 183:15
  **reputable** [1] - 103:10
  **request** [5] - 7:6, 9:20, 31:7, 32:15, 53:6
  **requested** [5] - 58:15, 85:15, 108:18, 108:24, 109:3
  **requesting** [1] - 54:18
  **required** [1] - 162:13
  **requires** [1] - 103:3
  **research** [6] - 97:22, 98:17, 98:18, 167:18, 231:22, 242:17
  **Research** [1] - 63:9
  **reservations** [1] - 95:10
  **reserve** [2] - 10:21, 95:24
  **respect** [18] - 13:22, 15:9, 53:21, 61:12, 61:17, 62:1, 62:23, 83:2, 102:8, 115:21, 125:8, 133:21, 135:15, 137:4, 214:18, 214:21, 239:23, 241:7
  **respectful** [1] - 221:19
  **respond** [1] - 7:15
  **responsibilities** [1] - 12:19
  **responsible** [2] - 159:21, 198:9
  **rest** [2] - 240:14, 240:16
  **restart** [1] - 68:20
  **restraining** [2] - 31:8, 32:16, 116:2
  **restraint** [1] - 221:20

**restraints** [2] - 5:10, 245:10
**restructured** [1] - 150:23
**result** [3] - 158:9, 170:24, 177:23
**resulted** [2] - 132:10, 178:18
**resulting** [1] - 48:25
**results** [22] - 14:8, 28:3, 34:16, 35:2, 42:12, 72:7, 72:8, 130:22, 131:4, 131:11, 136:3, 145:1, 145:10, 145:12, 161:16, 166:2, 166:7, 166:10, 167:7, 167:8, 178:6
**resume** [6] - 18:17, 104:13, 104:17, 104:19, 106:7, 106:8
**resume'** [4] - 80:3, 80:7, 80:15, 103:17
**resumed** [1] - 104:16
**retained** [1] - 209:20
**Retrace** [1] - 243:7
**return** [3] - 63:10, 184:16, 191:6
**returns** [3] - 213:24, 214:4, 214:8
**reveal** [1] - 52:3
**revenue** [1] - 178:25
**review** [19] - 16:4, 21:14, 62:7, 62:9, 67:24, 70:14, 73:5, 73:16, 73:20, 75:7, 92:17, 103:23, 109:5, 168:17, 171:11, 176:12, 201:20, 207:22, 209:22
**reviewed** [10] - 62:12, 92:20, 110:21, 110:24, 118:25, 168:14, 168:21, 175:21, 231:23, 232:20
**reviews** [1] - 101:4
**right-hand** [3] - 69:15, 89:15, 207:8
**rigorous** [4] - 161:6, 161:8, 161:9, 180:18
**rise** [5] - 105:5, 106:2, 182:16, 182:18, 245:18
**Risk** [2] - 56:21, 96:15
**Robert** [1] - 124:8
**role** [1] - 235:5
**Roman** [1] - 50:4
**room** [6] - 9:22, 10:7, 10:8, 188:12, 198:11, 227:3
**rough** [1] - 119:1
**roughly** [6] - 59:5, 69:4, 71:2, 104:14,

169:10, 179:4
**round** [19] - 17:2, 34:13, 43:13, 62:14, 62:16, 62:17, 62:22, 62:24, 63:1, 63:4, 63:23, 72:23, 75:18, 85:17, 90:25, 91:3, 94:10, 152:12, 212:23
**round-trip** [12] - 17:2, 34:13, 43:13, 63:1, 63:23, 72:23, 75:18, 85:17, 90:25, 91:3, 94:10, 152:12
**rounding** [1] - 179:16
**routine** [1] - 23:5
**row** [2] - 77:1, 77:2
**rule** [5] - 10:12, 94:12, 94:13, 134:10, 134:11
**Rule** [1] - 157:2
**Rules** [1] - 59:15
**rules** [4] - 10:3, 119:2, 220:18, 220:19
**ruling** [4] - 6:1, 84:3, 172:22, 245:9
**run** [3] - 198:6, 198:7, 217:14
**running** [1] - 131:16
**Russia** [6] - 58:16, 185:9, 185:14, 185:16, 185:18, 191:18
**Russian** [3] - 185:24, 190:15, 190:16, 208:21, 209:19, 227:22, 228:5, 228:6, 234:19

# S

**S.A** [2] - 50:8, 50:9
**S.E.C** [131] - 12:16, 45:11, 45:13, 54:7, 82:7, 82:9, 82:15, 84:14, 84:19, 85:8, 85:11, 85:15, 85:22, 86:10, 86:12, 87:16, 87:25, 89:23, 93:14, 96:10, 96:23, 97:12, 97:19, 99:10, 104:15, 106:6, 108:18, 114:8, 115:15, 115:25, 116:20, 120:12, 120:20, 120:23, 127:11, 128:20, 130:2, 130:4, 130:24, 132:8, 134:6, 134:14, 134:15, 134:23, 134:24, 135:9, 135:10, 135:19, 135:22, 135:24, 136:1, 136:2, 136:4, 136:6, 136:10, 136:14, 136:24, 139:8,

139:12, 140:4, 140:5, 140:9, 140:13, 140:19, 141:5, 141:7, 141:8, 141:9, 141:21, 142:24, 143:21, 143:25, 144:21, 144:22, 145:2, 145:4, 145:7, 145:8, 145:13, 145:14, 145:19, 145:21, 146:18, 146:21, 147:12, 147:18, 148:1, 148:2, 148:11, 148:22, 149:20, 150:23, 151:11, 153:5, 154:2, 157:12, 161:21, 162:20, 163:13, 163:19, 163:20, 164:13, 165:4, 165:5, 165:15, 167:15, 167:22, 168:12, 168:19, 170:7, 170:25, 171:2, 171:21, 173:4, 174:10, 174:16, 175:1, 175:9, 179:22, 179:24, 180:15, 189:8, 189:10, 191:5, 222:8, 224:23, 225:11, 226:11, 235:18
**S.E.C.'s** [12] - 125:22, 134:17, 138:1, 139:11, 143:9, 144:17, 151:22, 151:24, 161:24, 164:2, 173:18, 210:9
**S.E.C.-DUB-L-1** [1] - 89:10
**Sadovnicheskaya** [1] - 188:11
**sake** [1] - 165:12
**salary** [1] - 235:3
**sales** [4] - 23:5, 28:9, 186:5, 186:9
**Sammi** [1] - 4:7
**sample** [6] - 150:23, 170:6, 170:7, 170:8, 171:1, 171:4
**SAN** [1] - 28:9
**satisfied** [2] - 103:2, 104:9
**save** [3] - 59:19, 59:23, 221:3
**saw** [9] - 149:5, 161:2, 163:16, 167:17, 176:21, 177:14, 177:20, 195:9, 201:22
**scheme** [1] - 161:25
**school** [6] - 183:17, 183:24, 183:25, 184:4, 184:13, 184:14
**School** [6] - 97:22, 97:23, 98:1, 189:1, 189:4
**schools** [3] - 124:20, 124:21
**scope** [6] - 38:4, 38:5,

94:20, 170:13, 170:21, 170:22
**screen** [6] - 8:1, 12:24, 200:7, 201:11, 206:25, 215:8
**screens** [1] - 243:22
**seal** [2] - 207:7, 207:20
**Seal** [1] - 207:9
**seat** [2] - 4:23, 43:18
**seated** [1] - 106:7
**second** [47] - 25:24, 27:4, 46:6, 50:14, 51:22, 60:18, 60:25, 63:13, 67:17, 71:11, 76:3, 76:18, 77:5, 78:18, 100:11, 104:7, 107:1, 107:2, 107:6, 107:9, 107:10, 107:16, 111:3, 111:5, 111:15, 128:14, 133:4, 133:6, 137:10, 137:15, 137:25, 139:20, 140:22, 141:17, 143:15, 147:23, 158:24, 168:14, 171:7, 198:12, 207:16, 212:16, 213:18, 219:9, 236:10, 241:20, 243:23
**Second** [1] - 243:6
**second-to-last** [1] - 141:17
**section** [4] - 78:12, 100:17, 160:6
**sector** [4] - 19:15, 98:1, 211:6, 242:21
**securities** [14] - 31:17, 33:2, 101:23, 101:24, 102:4, 188:15, 188:16, 197:5, 197:8, 215:25, 216:1, 216:2, 216:19, 243:5
**Securities** [6] - 12:2, 12:5, 56:16, 156:17, 200:4, 209:5
**security** [2] - 24:1, 191:21
**Security** [1] - 63:9
**see** [87] - 13:18, 15:17, 18:3, 18:4, 18:8, 18:16, 19:3, 19:14, 20:7, 20:20, 26:8, 26:12, 27:4, 27:12, 27:14, 29:20, 35:14, 43:5, 48:13, 48:21, 49:1, 50:3, 67:5, 68:13, 69:6, 69:7, 69:15, 71:18, 78:19, 78:21, 83:23, 84:5, 89:6, 89:11, 89:13, 89:23, 89:25, 97:18, 99:9,

105:3, 107:21, 109:17, 109:21, 109:22, 111:4, 121:1, 121:2, 133:9, 134:14, 137:5, 138:17, 138:22, 139:18, 139:20, 139:22, 139:23, 139:24, 147:24, 148:6, 166:1, 169:20, 169:25, 170:1, 189:10, 191:15, 199:8, 200:8, 201:16, 201:17, 202:4, 202:8, 202:16, 202:23, 203:20, 205:25, 206:19, 207:12, 207:25, 208:6, 212:8, 215:3, 215:13, 215:16, 237:1, 237:3, 238:12, 239:25
**seed** [2] - 205:7, 205:14
**seeing** [6] - 77:1, 78:4, 89:22, 154:15, 194:25, 210:9
**seem** [2] - 67:5, 194:20
**segregated** [1] - 242:24
**selected** [1] - 34:24
**seller** [1] - 188:2
**send** [4] - 189:8, 209:10, 236:5, 243:7
**sends** [1] - 22:1
**senior** [2] - 12:17, 235:21
**sense** [6] - 6:10, 49:7, 74:5, 75:1, 75:9, 80:1, 104:12, 115:18, 117:21, 178:3
**sent** [6] - 8:8, 118:10, 163:20, 163:22, 232:18, 232:21
**sentence** [12] - 5:4, 13:13, 13:17, 13:24, 14:5, 89:6, 109:19, 210:8, 210:25, 212:10, 212:18, 214:7
**separate** [2] - 130:5, 230:24
**September** [9] - 16:15, 26:20, 57:21, 90:13, 104:8, 148:13, 155:5, 201:15, 212:18
**series** [2] - 89:13, 100:16, 131:3, 135:22, 149:2, 167:9, 224:20
**serious** [2] - 95:10, 118:20
**seriously** [1] - 149:23
**serve** [1] - 103:3
**served** [2] - 41:19, 236:18
**servers** [3] - 140:16,

191:19, 209:15
  **Service** [8] - 15:3, 15:6, 15:11, 62:3, 159:13
  **service** [8] - 18:10, 18:18, 21:21, 21:22, 22:2, 65:23, 67:22, 168:3
  **Services** [1] - 98:3
  **services** [20] - 14:25, 15:1, 16:7, 17:7, 20:19, 44:18, 61:19, 62:18, 64:16, 65:18, 66:12, 67:24, 81:17, 133:21, 140:7, 154:10, 186:18, 187:12, 205:5
  **session** [1] - 138:19
  **set** [33] - 8:17, 37:19, 38:13, 55:21, 56:3, 56:12, 61:4, 61:11, 61:17, 61:25, 63:13, 64:23, 65:13, 68:22, 74:5, 74:24, 75:2, 81:10, 81:22, 81:23, 89:7, 92:23, 97:5, 104:6, 112:15, 148:19, 151:11, 170:22, 186:11, 186:21, 197:22, 197:23, 224:9
  **sets** [2] - 76:4, 161:13
  **setting** [1] - 55:7
  **settle** [1] - 100:7
  **setup** [1] - 236:17
  **seven** [1] - 13:24
  **several** [5] - 99:9, 115:25, 128:3, 148:20, 218:14
  **shaded** [3] - 17:4, 17:18, 20:9
  **Share** [1] - 207:6
  **share** [2] - 150:8, 205:23
  **shares** [4] - 13:25, 206:2, 207:11, 208:13
  **sharing** [1] - 190:2
  **sharp** [2] - 194:13, 195:13
  **sharply** [1] - 227:25
  **sheet** [1] - 231:13
  **sheets** [1] - 240:3
  **short** [13] - 25:5, 63:23, 71:17, 72:25, 73:11, 75:18, 85:17, 91:2, 197:1, 211:5, 212:17, 233:8, 239:20
  **short-term** [1] - 91:2
  **short-time** [1] - 73:11
  **shorts** [1] - 63:4
  **show** [32] - 7:11, 23:7, 39:3, 63:21,

64:12, 66:9, 67:19, 71:12, 71:23, 76:18, 76:20, 92:16, 96:1, 102:11, 110:18, 118:13, 118:19, 127:10, 127:11, 127:17, 128:23, 133:2, 134:1, 134:19, 135:1, 135:14, 140:17, 146:13, 162:18, 205:20, 233:6
  **showing** [13] - 31:14, 31:15, 32:1, 128:21, 133:1, 137:13, 150:24, 173:6, 202:21, 203:18, 205:22, 228:5, 234:6
  **shown** [1] - 9:4
  **shows** [14] - 62:18, 64:13, 67:3, 68:18, 68:21, 71:13, 71:24, 139:9, 152:23, 206:23, 217:4, 218:18, 219:2, 232:12
  **shut** [2] - 48:4, 49:19
  **side** [8] - 5:5, 21:24, 38:2, 47:21, 69:15, 181:11, 196:9, 208:6
  **sides** [4] - 7:20, 10:10, 58:3, 58:22
  **signature** [3] - 202:6, 202:7, 207:21
  **signatures** [1] - 202:13
  **signed** [3] - 41:23, 49:15, 202:11
  **significance** [6] - 70:6, 70:21, 70:24, 71:4, 132:18, 158:8
  **significant** [8] - 70:21, 132:1, 141:8, 234:8, 234:9, 239:14, 241:18, 241:24
  **significantly** [2] - 144:17, 216:10
  **signoff** [1] - 238:21
  **silly** [1] - 49:18
  **similar** [10] - 75:16, 75:17, 76:7, 77:24, 89:20, 98:5, 99:23, 132:4, 152:13, 172:25
  **simple** [3] - 86:25, 180:9, 234:7
  **simply** [2] - 136:11, 230:13
  **single** [8] - 19:15, 69:7, 72:12, 75:24, 150:13, 192:10, 239:2
  **sit** [3] - 172:22, 178:23, 184:10
  **Sit** [1] - 118:21
  **site** [1] - 242:24
  **Sitnikov** [2] - 242:17,

244:5
  **sits** [2] - 21:22, 242:23
  **sitting** [2] - 43:17, 233:19
  **situations** [1] - 70:18
  **six** [6] - 139:20, 193:24, 194:24, 210:8, 210:9, 214:8
  **size** [9] - 131:3, 132:3, 132:5, 166:4, 169:9, 169:10, 170:4, 172:24, 172:25
  **skews** [1] - 178:5
  **skipped** [1] - 123:15
  **Slepenkov** [13] - 18:22, 23:15, 23:17, 25:24, 27:7, 29:22, 50:5, 193:18, 198:2, 198:17, 200:12, 201:3, 210:12
  **slide** [1] - 69:25
  **slides** [2] - 76:7, 76:10
  **slightly** [1] - 117:13
  **slow** [1] - 72:2
  **slowly** [1] - 91:20
  **small** [5] - 20:15, 121:7, 193:2, 193:22, 242:22
  **small-cap** [1] - 193:22
  **smaller** [2] - 70:20, 132:4
  **smart** [1] - 211:3
  **snapshot** [8] - 216:18, 216:20, 216:22, 217:5, 218:2, 218:4, 218:20, 219:5
  **so-called** [1] - 192:12
  **soccer** [1] - 223:25
  **Society** [1] - 98:11
  **Software** [2] - 26:18, 26:20
  **software** [1] - 19:18
  **sold** [2] - 25:5, 212:17
  **sole** [1] - 156:16
  **solely** [1] - 18:5
  **someone** [10] - 36:11, 68:12, 184:4, 194:15, 209:10, 215:13, 220:6, 227:19, 235:21, 236:19
  **someplace** [1] - 126:16
  **sometime** [4] - 151:16, 190:20, 235:11, 245:1
  **sometimes** [11] - 28:11, 67:23, 100:7, 100:8, 180:20, 234:6,

236:21, 242:18, 243:17, 243:18
  **somewhere** [4] - 72:10, 73:2, 194:16, 228:7
  **soon** [1] - 245:9
  **sophisticated** [1] - 197:4
  **sorry** [28] - 24:11, 30:4, 32:19, 32:22, 38:8, 38:22, 40:22, 45:3, 48:11, 48:18, 54:13, 60:21, 61:22, 72:4, 77:4, 105:1, 106:7, 138:14, 141:17, 148:15, 164:16, 181:11, 199:16, 205:2, 212:2, 222:6, 229:4, 229:20
  **sort** [4] - 140:1, 229:11, 236:16, 241:2
  **sorts** [1] - 229:11
  **sound** [1] - 167:1
  **sounds** [2] - 9:23, 114:16
  **Soup** [1] - 28:8
  **source** [8] - 15:19, 15:21, 17:6, 17:11, 17:19, 18:2, 199:6
  **Source** [1] - 17:5
  **sources** [1] - 83:15
  **Southern** [3] - 99:20, 100:22, 157:13
  **spaced** [1] - 245:14
  **speakers** [1] - 184:1
  **speaking** [3] - 33:23, 46:17, 184:5
  **speaks** [2] - 45:17, 116:5
  **special** [2] - 205:17
  **specializations** [1] - 97:10
  **specific** [4] - 95:25, 167:6, 168:10, 215:16
  **specifically** [6] - 21:4, 101:23, 132:20, 149:9, 177:25, 192:4, 238:23, 238:25
  **speculate** [2] - 42:7, 42:8
  **spell** [5] - 11:20, 55:17, 124:7, 201:1, 223:12
  **spelled** [2] - 124:9, 183:9
  **spend** [4] - 124:16, 155:2, 221:18, 234:10
  **spent** [4] - 155:7, 155:18, 185:20, 219:18
  **split** [1] - 64:16
  **spot** [1] - 50:20,

212:4
  **spread** [1] - 197:8
  **spreadsheet** [15] - 214:24, 215:12, 215:17, 215:21, 215:23, 216:1, 216:4, 216:6, 216:11, 216:21, 217:3, 218:1, 219:2, 225:5, 239:24
  **spreadsheets** [1] - 195:2
  **spring** [1] - 69:12
  **stack** [3] - 228:23, 231:10, 242:8
  **staff** [3] - 110:12, 154:25, 155:12
  **stage** [1] - 37:1
  **stamp** [1] - 64:18
  **stamps** [1] - 65:5, 89:14, 117:6
  **stand** [4] - 106:14, 118:9, 182:11, 220:13
  **standard** [1] - 70:4, 70:7, 165:23, 167:6
  **standards** [1] - 192:11
  **standing** [1] - 74:8
  **standpoint** [2] - 74:4, 74:25
  **start** [16] - 16:20, 18:19, 18:25, 22:3, 45:1, 80:1, 89:25, 90:1, 93:17, 107:8, 183:16, 186:16, 208:1, 235:17, 235:20, 236:9
  **started** [29] - 18:5, 52:20, 56:23, 72:9, 73:1, 92:21, 93:1, 93:3, 93:5, 94:17, 146:8, 183:17, 184:3, 184:7, 184:24, 186:23, 187:18, 188:4, 188:6, 190:10, 190:13, 190:17, 192:21, 196:15, 205:8, 205:9, 224:14, 234:2, 235:22
  **starting** [5] - 16:14, 17:17, 47:19, 107:22, 235:17
  **starts** [10] - 8:23, 13:18, 18:8, 18:13, 18:14, 67:6, 67:9, 67:10, 92:8, 107:7
  **state** [17] - 5:19, 11:19, 42:25, 47:10, 55:16, 86:21, 93:21, 111:7, 111:22, 124:6, 125:5, 154:3, 156:1, 183:6, 214:23, 223:11, 239:7
  **State** [1] - 156:2
  **statement** [1] - 238:5

**statements** [3] - 73:25, 92:12, 152:19

**states** [3] - 36:2, 36:5, 210:9

**States** [5] - 157:1, 181:3, 184:1, 184:5, 185:13

**statistical** [24] - 56:25, 57:1, 57:22, 69:17, 70:1, 70:5, 70:6, 70:24, 74:3, 74:4, 74:24, 84:22, 85:2, 94:19, 101:3, 103:16, 103:22, 104:3, 104:6, 150:18, 158:8, 159:9, 177:9, 196:24

**Statistical** [1] - 98:12

**statistically** [1] - 70:20

**statistics** [8] - 56:15, 57:20, 70:10, 97:15, 97:20, 98:14, 101:5, 114:14

**step** [2] - 33:22, 94:9

**steps** [2] - 45:7, 183:20

**stick** [1] - 119:1

**still** [4] - 35:23, 189:1, 204:17, 230:13

**stock** [13] - 13:14, 25:4, 35:6, 63:9, 72:8, 73:17, 101:23, 102:6, 192:22, 195:15, 216:10, 243:2, 243:5

**stocks** [10] - 42:11, 193:22, 214:25, 215:2, 215:14, 216:9, 216:15, 217:10, 219:3, 239:8

**stolen** [2] - 48:23, 49:3

**stop** [13] - 15:14, 18:20, 51:3, 58:1, 94:16, 117:20, 125:6, 127:5, 165:17, 170:15, 190:5, 200:19

**stopped** [2] - 18:7, 211:19

**stops** [1] - 25:23

**Storage** [1] - 28:8

**strategies** [7] - 178:12, 190:12, 190:18, 192:6, 192:16, 195:16

**strategy** [36] - 49:12, 68:12, 68:19, 68:24, 69:3, 152:21, 178:11, 190:11, 192:5, 192:6, 192:8, 192:10, 192:12, 192:14, 192:15, 192:16, 192:18, 195:5, 195:6, 195:25, 196:5, 196:18,

196:21, 196:25, 197:14, 210:20, 210:21, 210:22, 211:14, 211:15, 211:17, 211:18, 217:10, 218:6, 230:9, 243:16

**Street** [1] - 188:11

**strict** [1] - 238:6

**strike** [7] - 49:6, 73:23, 74:19, 95:23, 95:25, 207:25, 214:13

**striking** [1] - 59:8

**stringent** [1] - 192:11

**strong** [5] - 44:17, 46:14, 71:4, 71:7

**stronger** [2] - 159:15, 179:6

**studied** [2] - 110:25, 184:21

**study** [2] - 129:9, 184:20

**studying** [1] - 183:24

**stuff** [1] - 188:18

**style** [1] - 233:25

**subject** [3] - 58:20, 70:14, 95:24

**subjects** [1] - 97:25

**submission** [37] - 21:20, 21:21, 23:3, 23:4, 26:22, 62:20, 64:15, 64:20, 64:21, 65:9, 65:10, 65:11, 65:14, 65:17, 65:22, 66:11, 66:16, 66:17, 66:20, 66:21, 67:4, 67:7, 67:21, 68:9, 69:5, 81:16, 81:21, 81:23, 81:24, 112:13, 112:14, 113:15, 113:25, 114:4, 119:19, 221:24

**submit** [5] - 99:10, 100:1, 123:11, 219:24, 244:18

**submits** [2] - 4:16, 245:12

**submitted** [19] - 4:25, 5:25, 57:9, 57:15, 58:3, 58:17, 58:23, 98:25, 102:16, 125:11, 135:9, 135:21, 136:14, 136:17, 155:4, 155:5, 203:10, 209:25, 210:6

**subpoena** [1] - 47:14

**subpoints** [1] - 131:15

**subsequent** [1] - 125:12

**subset** [4] - 81:19, 94:10, 119:20, 163:25

**substantial** [1] - 117:8

**substituted** [1] - 145:5

**success** [1] - 178:13

**succinct** [1] - 233:7

**sued** [4] - 35:21, 35:22, 36:23, 43:2

**suffer** [1] - 238:10

**sufficient** [2] - 10:13, 156:23

**sufficiently** [2] - 95:6, 156:15

**suggest** [2] - 83:8, 148:25, 158:15

**suggested** [2] - 193:16, 224:9

**suggesting** [1] - 10:3

**suggestion** [2] - 94:18, 181:16

**suggests** [1] - 69:8

**Suisse** [1] - 54:19

**summaries** [1] - 7:10

**summarize** [1] - 126:15

**summary** [10] - 126:17, 127:3, 127:13, 127:17, 147:11, 152:15, 225:22, 232:1, 232:11, 233:5

**summation** [1] - 244:21

**summations** [4] - 244:18, 245:3, 245:6, 245:8

**summer** [1] - 223:24

**supervisor** [1] - 96:12

**supervisory** [2] - 56:20, 205:17

**support** [3] - 131:8, 166:12, 170:2

**supported** [1] - 175:6

**suppose** [1] - 117:9

**supposed** [1] - 220:18

**supposedly** [1] - 132:9

**Supranonok** [1] - 50:5

**surprise** [3] - 9:11, 109:4, 177:23

**surprised** [2] - 108:20, 108:23

**surprising** [3] - 136:3, 136:12, 170:23

**survived** [1] - 156:8

**sworn** [8] - 11:17, 55:14, 92:12, 106:15, 124:4, 143:11, 183:4, 223:9

**symbol** [2] - 73:15, 216:16, 231:12

**system** [6] - 15:12, 16:14, 20:9, 52:10, 143:12, 217:4

**systems** [2] - 21:22, 193:7

**T**

**tab** [1] - 149:6

**Table** [9] - 64:10, 67:17, 71:11, 111:18, 112:17, 113:2, 113:4, 113:8, 120:15

**table** [5] - 64:13, 66:3, 70:7, 71:13, 96:20

**tables** [2] - 72:24, 73:4

**Tables** [2] - 62:25, 91:1

**talks** [3] - 159:5, 160:6, 171:15

**task** [1] - 69:17

**taught** [3] - 97:21, 97:23, 100:15

**teach** [1] - 184:11

**teacher** [1] - 183:25

**team** [5] - 155:12, 185:4, 192:21, 193:19, 196:2, 196:4, 196:7, 216:1, 225:7, 226:12, 229:14, 233:21, 237:21, 237:23, 238:7

**technical** [4] - 192:17, 195:16, 217:21, 242:11

**technique** [1] - 70:7

**Technology** [2] - 19:18, 141:1

**temporary** [4] - 31:8, 32:15, 116:1, 245:10

**tend** [1] - 241:2

**tender** [1] - 101:9

**term** [2] - 91:2, 161:7

**terms** [14] - 18:2, 44:11, 115:12, 130:13, 131:7, 149:18, 150:1, 157:5, 184:23, 184:24, 194:21, 197:9, 236:20, 243:20

**terrible** [1] - 186:20

**test** [12] - 70:1, 70:5, 70:17, 70:24, 158:5, 158:6, 158:8, 158:10, 158:13, 177:23

**Test** [3] - 70:2, 70:3, 70:4

**tested** [1] - 193:23

**testified** [35] - 11:17, 33:20, 36:12, 54:4,

55:14, 57:3, 59:16, 59:20, 73:24, 80:24, 91:10, 91:12, 93:22, 95:12, 98:21, 100:6, 103:13, 111:22, 112:7, 117:10, 124:4, 124:25, 130:8, 133:11, 155:22, 156:3, 159:2, 160:19, 171:5, 171:23, 183:4, 205:14, 208:19, 223:9

**testify** [10] - 10:6, 11:9, 58:16, 59:5, 79:8, 91:22, 95:4, 95:23, 136:21, 175:21

**testifying** [4] - 9:21, 59:3, 84:15, 157:3

**testimony** [35] - 11:10, 19:10, 25:10, 38:4, 48:4, 57:9, 60:6, 79:16, 81:1, 95:5, 99:7, 103:6, 104:4, 104:15, 104:17, 117:24, 118:3, 118:14, 122:22, 128:5, 141:12, 149:15, 153:23, 156:19, 157:18, 158:17, 174:3, 177:21, 177:24, 182:8, 182:10, 213:1, 220:3, 221:11, 244:20

**testing** [3] - 193:19, 194:3, 194:23

**tests** [1] - 229:15

**textbooks** [1] - 70:8

**THE** [449] - 4:1, 4:4, 4:6, 4:10, 4:12, 4:15, 4:20, 4:23, 5:13, 5:18, 6:5, 6:10, 6:21, 6:24, 7:7, 7:14, 7:17, 7:22, 7:24, 8:3, 8:11, 8:15, 8:22, 9:6, 9:18, 9:23, 10:6, 11:4, 11:14, 11:19, 11:21, 13:1, 13:4, 14:21, 15:20, 15:22, 15:25, 16:23, 20:3, 22:17, 27:23, 28:23, 30:9, 30:12, 30:16, 30:18, 31:10, 31:13, 31:19, 31:23, 32:3, 32:6, 32:10, 32:25, 33:6, 36:10, 36:16, 38:1, 38:15, 38:20, 38:24, 39:2, 39:5, 39:8, 39:11, 39:13, 39:15, 39:17, 39:19, 39:21, 40:2, 40:6, 40:8, 40:11, 40:17, 40:19, 40:20, 40:21, 40:24, 41:2, 41:18, 45:2, 45:4, 45:9, 45:19, 47:20, 49:6, 50:22, 50:23, 51:2,

52:13, 53:14, 54:14,
54:25, 55:1, 55:2, 55:4,
55:6, 55:10, 55:11,
55:16, 55:18, 56:4,
57:17, 58:1, 58:9,
58:12, 59:21, 59:25,
60:11, 68:17, 69:12,
73:9, 74:1, 74:9, 74:12,
74:17, 74:22, 79:5,
79:11, 79:21, 79:23,
80:10, 80:15, 80:17,
82:14, 83:12, 84:2,
84:9, 87:5, 87:8, 87:11,
87:14, 87:18, 87:20,
88:2, 88:4, 88:6, 88:8,
88:11, 88:14, 88:19,
88:21, 88:24, 90:21,
91:12, 91:17, 91:19,
92:1, 92:5, 92:10, 93:5,
93:19, 94:1, 94:6,
94:16, 95:1, 95:18,
95:21, 96:3, 101:7,
101:13, 102:25, 103:2,
104:25, 105:3, 105:5,
106:2, 106:3, 106:6,
106:13, 106:15, 106:17,
106:18, 106:19, 107:9,
107:12, 107:18, 115:18,
115:20, 116:9, 116:22,
116:25, 117:16, 117:20,
118:7, 118:11, 120:1,
120:3, 120:5, 120:6,
121:24, 122:2, 122:4,
122:8, 122:16, 122:23,
123:3, 123:9, 123:12,
123:17, 123:19, 123:22,
123:25, 124:1, 124:6,
124:8, 124:11, 125:21,
125:25, 126:4, 126:8,
126:23, 127:1, 127:5,
127:8, 127:13, 127:16,
127:21, 127:23, 127:25,
128:6, 128:14, 128:17,
129:3, 129:10, 129:12,
129:17, 129:20, 133:1,
133:4, 134:3, 134:7,
134:16, 134:23, 135:5,
136:20, 136:22, 137:8,
137:12, 137:17, 137:24,
138:5, 138:9, 138:12,
138:13, 138:14, 138:15,
138:18, 138:24, 139:3,
140:21, 140:24, 141:10,
141:15, 141:23, 141:24,
142:1, 142:2, 142:5,
142:7, 142:9, 142:10,
142:11, 142:14, 142:17,
142:22, 142:25, 143:3,
143:6, 143:23, 144:1,
144:4, 144:7, 144:8,
144:10, 144:11, 144:14,

144:15, 145:15, 145:20,
145:23, 145:25, 146:1,
146:3, 146:4, 146:12,
146:15, 146:19, 146:22,
146:24, 147:1, 147:4,
147:7, 150:10, 152:25,
153:3, 153:13, 159:5,
160:3, 160:9, 160:10,
164:20, 165:1, 165:6,
165:9, 167:11, 167:14,
167:16, 167:21, 167:24,
168:24, 170:11, 170:15,
170:18, 172:9, 172:12,
172:15, 172:22, 173:6,
173:8, 175:11, 176:9,
180:2, 180:11, 181:7,
181:22, 181:24, 182:4,
182:7, 182:16, 182:18,
182:19, 182:23, 183:1,
183:6, 183:8, 183:10,
199:1, 199:13, 206:5,
206:9, 206:13, 206:18,
209:8, 209:12, 214:16,
214:20, 214:21, 215:3,
215:4, 215:8, 215:10,
215:15, 215:19, 215:20,
216:14, 216:17, 216:20,
216:22, 216:25, 217:3,
217:7, 217:13, 217:19,
217:24, 218:3, 218:5,
218:7, 218:12, 218:15,
218:22, 219:11, 219:15,
221:7, 222:16, 222:19,
222:24, 223:5, 223:7,
223:11, 223:13, 223:16,
224:21, 224:24, 225:4,
225:17, 225:21, 226:7,
227:11, 228:21, 231:9,
231:14, 231:15, 231:19,
231:24, 232:10, 232:11,
232:13, 232:14, 232:15,
232:16, 232:18, 232:25,
233:2, 233:3, 233:4,
233:10, 233:12, 237:17,
237:19, 238:12, 238:15,
238:17, 238:18, 238:20,
238:22, 239:1, 239:3,
239:6, 239:10, 239:11,
239:13, 239:16, 239:19,
239:22, 240:1, 240:2,
240:4, 240:7, 240:9,
240:10, 240:12, 240:21,
240:23, 240:25, 241:2,
241:4, 242:4, 243:1,
243:10, 244:7, 244:10,
244:12, 244:13, 244:15,
245:2, 245:5, 245:18
   **the's** [1] - 175:1
   **theory** [1] - 193:23
   **thereafter** [2] - 52:4,
184:16

   **therefore** [1] - 131:7
   **therefrom** [1] - 39:16
   **therein** [1] - 210:11
   **thereto** [1] - 72:17
   **they've** [2] - 6:8,
224:22
   **thinking** [1] - 211:19
   **third** [12] - 33:11,
51:3, 104:23, 133:23,
139:21, 141:18, 208:17,
210:25, 211:5, 231:17,
232:8, 243:24
   **third-party** [1] - 211:5
   **third-to-the-last** [1] -
141:18
   **thousand** [3] - 186:3,
206:2, 236:10
   **thousands** [2] - 35:8,
42:19
   **three** [47] - 19:5,
23:14, 58:18, 61:18,
63:4, 63:22, 64:5, 67:8,
67:9, 69:25, 72:25,
76:4, 85:2, 89:7, 91:7,
94:11, 98:22, 103:22,
105:1, 105:2, 113:10,
130:1, 130:3, 133:12,
133:21, 135:8, 135:16,
139:18, 141:18, 141:24,
142:20, 143:21, 144:9,
144:19, 160:7, 173:13,
186:23, 187:18, 203:24,
211:16, 212:6, 212:15,
212:22, 219:14, 230:5,
243:16, 244:4
   **three-hour** [1] - 58:18
   **threshold** [2] - 95:2,
95:11
   **throughout** [2] -
186:16, 198:24
   **TIBCO** [2] - 26:18,
26:20
   **ticker** [3] - 73:15,
77:13, 231:12
   **tickers** [1] - 17:3
   **tickets** [1] - 44:2
   **tie** [1] - 79:21
   **tight** [3] - 118:17,
131:24, 141:12
   **timely** [1] - 4:17
   **timing** [7] - 4:25,
18:2, 62:23, 63:11,
166:5, 166:15, 213:17
   **title** [3] - 12:16, 186:4,
235:4
   **titled** [1] - 141:5
   **today** [29] - 4:13,
4:18, 9:7, 9:12, 10:13,
10:15, 19:10, 57:3,
57:15, 58:14, 58:21,

59:2, 81:7, 84:16,
110:23, 116:18, 122:25,
174:3, 178:23, 182:9,
182:10, 213:1, 219:16,
220:2, 221:12, 222:12,
224:25, 232:17, 242:22
   **today's** [4] - 5:1,
58:25, 219:16, 244:15
   **together** [7] - 71:16,
205:4, 231:5, 231:21,
236:4, 242:18, 243:19
   **tomorrow** [2] - 245:1,
245:5
   **ton** [1] - 10:19
   **tonight** [1] - 221:25
   **took** [13] - 41:11,
45:7, 161:1, 161:10,
161:11, 163:12, 163:25,
165:18, 180:3, 213:9,
217:5, 220:10, 221:1
   **tool** [1] - 180:24
   **top** [6] - 147:17,
203:21, 208:1, 216:3,
232:6, 233:1
   **toss** [1] - 230:14
   **total** [16] - 10:15,
34:22, 43:23, 77:11,
77:15, 77:18, 78:4,
78:7, 78:9, 78:14,
78:20, 78:25, 121:5,
155:17, 220:11, 230:11
   **totaled** [1] - 161:12
   **Totals** [1] - 77:2
   **touch** [5] - 36:3, 36:5,
46:9, 101:20, 197:21
   **touched** [1] - 97:2
   **toward** [1] - 241:2
   **towards** [3] - 13:17,
14:5, 212:16
   **track** [4] - 10:23,
214:25, 219:3, 222:21
   **trade** [100] - 29:12,
34:11, 34:13, 34:15,
35:5, 42:11, 44:1,
53:22, 54:1, 54:5, 54:7,
54:20, 54:21, 64:14,
64:19, 64:22, 65:9,
65:11, 66:16, 66:18,
66:19, 66:21, 68:7,
68:11, 69:8, 71:16,
72:5, 72:12, 72:16,
72:18, 72:19, 72:21,
73:1, 73:5, 74:6, 75:9,
75:17, 75:24, 76:23,
76:24, 77:3, 77:9,
77:13, 77:20, 78:5,
90:24, 109:23, 110:6,
110:9, 110:11, 110:13,
110:14, 112:12, 112:13,
113:10, 113:15, 113:24,

114:3, 114:7, 114:24,
115:2, 149:9, 152:1,
152:4, 160:21, 176:2,
176:21, 176:25, 177:10,
177:13, 177:14, 177:16,
177:19, 178:1, 178:5,
178:9, 178:20, 179:3,
179:8, 179:15, 179:20,
188:15, 189:18, 193:11,
193:23, 196:23, 196:24,
199:5, 211:22, 211:24,
213:14, 213:15, 231:17,
239:2, 240:3, 243:9,
244:1
   **traded** [17] - 14:11,
21:1, 23:22, 63:25,
64:18, 64:19, 72:9,
89:9, 110:16, 111:5,
113:20, 114:3, 131:24,
191:13, 216:9, 216:10,
220:20
   **trader** [6] - 187:2,
198:14, 231:22, 232:13,
239:24, 242:10
   **Trader** [1] - 210:11
   **traders** [7] - 44:22,
49:24, 49:25, 50:2,
152:2, 198:13, 198:16
   **trades** [169] - 17:2,
19:5, 22:8, 22:9, 23:23,
24:16, 27:11, 31:3,
31:6, 32:19, 32:20,
32:21, 33:11, 33:14,
33:16, 34:1, 34:4,
34:13, 34:18, 34:23,
34:24, 35:8, 35:18,
42:19, 43:1, 43:3, 43:6,
43:13, 43:14, 43:20,
43:21, 43:22, 44:3,
48:23, 54:1, 64:4,
64:23, 65:1, 65:2, 65:7,
65:13, 65:22, 67:3,
68:14, 69:2, 69:4, 69:7,
72:23, 77:13, 81:21,
90:24, 90:25, 93:9,
93:24, 94:20, 110:4,
111:24, 112:9, 114:2,
114:10, 114:15, 114:19,
114:22, 115:6, 115:7,
115:9, 116:3, 116:20,
117:6, 117:8, 120:13,
120:22, 120:23, 121:2,
130:17, 130:18, 130:19,
130:20, 131:12, 132:3,
132:5, 132:7, 132:9,
135:12, 145:12, 145:13,
149:10, 149:19, 149:22,
151:1, 166:4, 166:5,
166:9, 166:13, 166:14,
167:8, 167:12, 167:13,

167:19, 167:20, 167:21, 169:10, 169:11, 169:23, 169:24, 170:4, 171:15, 171:21, 172:25, 174:11, 174:15, 174:21, 174:23, 175:16, 175:24, 175:25, 178:8, 178:24, 178:25, 179:4, 179:5, 179:25, 180:25, 194:22, 197:12, 197:13, 198:9, 198:16, 198:19, 212:8, 212:11, 213:4, 213:6, 213:8, 213:13, 213:16, 213:17, 224:14, 226:1, 226:4, 226:10, 226:16, 226:17, 226:23, 227:2, 229:6, 229:14, 229:18, 230:1, 230:4, 230:5, 230:8, 230:11, 230:13, 230:16, 231:6, 233:9, 239:4, 239:18, 239:21, 239:23, 241:23, 243:16

**trading** [243] - 7:11, 15:17, 16:2, 16:15, 17:24, 18:4, 18:14, 18:17, 18:20, 18:24, 18:25, 20:6, 20:10, 20:11, 20:21, 20:23, 20:24, 21:11, 21:15, 23:1, 25:19, 26:19, 27:14, 29:2, 33:10, 34:8, 34:9, 34:10, 34:23, 34:24, 35:4, 42:24, 44:18, 52:20, 54:5, 54:18, 54:21, 61:5, 61:12, 61:18, 62:2, 62:7, 62:12, 62:14, 62:23, 63:1, 63:22, 63:24, 64:13, 65:6, 66:10, 67:5, 67:7, 67:9, 67:10, 67:21, 68:12, 68:19, 68:23, 68:24, 68:25, 69:3, 69:20, 71:13, 71:14, 71:24, 72:25, 73:3, 73:5, 73:6, 73:10, 73:11, 73:12, 75:7, 75:8, 75:14, 75:18, 78:9, 78:18, 79:1, 81:8, 81:11, 81:13, 81:14, 81:15, 82:18, 82:22, 83:2, 83:8, 83:17, 83:18, 85:2, 85:4, 85:17, 85:20, 85:25, 86:5, 86:16, 87:24, 91:3, 91:4, 92:17, 92:20, 92:23, 93:14, 94:9, 94:10, 94:12, 94:14, 100:22, 100:23, 100:25, 101:1, 103:12, 103:20, 103:22, 109:12,

109:16, 109:20, 109:21, 111:15, 111:23, 112:3, 112:8, 112:15, 112:22, 115:1, 115:10, 119:12, 119:13, 125:3, 130:7, 130:9, 130:11, 130:14, 130:25, 131:5, 131:6, 131:11, 131:19, 132:13, 132:15, 132:16, 133:17, 145:12, 148:25, 149:16, 150:16, 150:24, 151:2, 151:6, 151:14, 151:15, 151:18, 151:19, 151:20, 152:1, 152:6, 152:8, 152:12, 152:19, 152:21, 152:22, 157:21, 158:18, 158:25, 159:12, 159:16, 159:21, 160:7, 160:14, 161:3, 161:25, 162:3, 162:6, 163:3, 163:6, 163:9, 166:8, 166:13, 166:7, 169:12, 170:3, 170:4, 174:19, 175:5, 175:21, 177:6, 177:10, 177:21, 178:4, 178:11, 178:18, 186:5, 186:9, 188:16, 189:15, 191:6, 192:12, 192:15, 193:4, 193:6, 193:14, 193:16, 194:9, 194:16, 195:5, 195:7, 195:14, 195:16, 196:4, 196:25, 198:11, 210:20, 210:21, 211:14, 211:15, 214:11, 214:22, 216:11, 217:10, 218:6, 224:15, 226:25, 228:14, 229:5, 233:8, 236:7, 239:8, 239:18, 239:23, 243:6

**Trading** [5] - 77:2, 77:6, 78:19, 107:7, 107:22

**transaction** [2] - 62:16, 140:25

**transactions** [15] - 62:15, 91:1, 108:25, 110:9, 113:6, 114:8, 115:25, 117:5, 119:9, 119:12, 120:11, 120:20, 148:25, 170:23, 170:24

**transcript** [1] - 244:25

**translated** [1] - 97:17

**translation** [1] - 187:5

**transmitted** [4] - 130:4, 226:21, 229:5, 232:19

**trash** [1] - 19:20

**treated** [3] - 164:19, 165:15, 180:14

**trends** [1] - 232:12

**trial** [2] - 72:6, 100:6

**trials** [1] - 125:1

**tried** [1] - 183:25

**trigger** [3] - 67:4, 195:9, 216:13

**triggered** [1] - 66:11

**triggers** [1] - 99:1

**trip** [16] - 17:2, 34:13, 43:13, 62:17, 62:24, 63:1, 63:23, 72:23, 72:24, 75:18, 85:17, 90:25, 91:3, 94:10, 152:12, 212:23

**trips** [4] - 62:15, 62:17, 62:22, 63:4

**Troika** [9] - 185:19, 185:22, 185:23, 186:6, 186:10, 186:14, 186:15, 204:13, 205:9

**true** [5] - 17:21, 25:6, 81:19, 217:25, 219:1

**trust** [1] - 199:20

**trust-but-verify** [1] - 199:20

**trusting** [1] - 237:20

**truth** [1] - 120:21

**try** [4] - 5:1, 72:2, 90:10, 119:1

**trying** [7] - 47:23, 118:1, 123:14, 163:24, 217:7, 219:7, 220:3

**Tuesday** [3] - 245:3, 245:6, 245:16

**turn** [9] - 8:12, 10:17, 16:19, 47:23, 63:16, 118:19, 161:22, 162:16, 197:23

**turning** [1] - 109:10

**turns** [1] - 78:12

**twenty** [2] - 171:9, 171:10

**two** [56] - 6:18, 7:20, 11:6, 13:3, 24:6, 26:23, 26:24, 48:17, 60:7, 64:16, 64:19, 65:11, 65:21, 70:6, 73:20, 77:1, 77:2, 81:21, 91:21, 97:14, 98:22, 100:14, 104:22, 104:23, 107:3, 107:5, 107:13, 107:17, 108:22, 109:10, 118:5, 124:16, 139:22, 148:14, 152:16, 153:8, 161:12, 177:22, 181:13, 189:6, 197:5, 197:8, 204:8, 204:9, 212:15, 213:4, 213:6, 213:8, 213:13, 217:1, 221:21, 221:22, 222:2, 231:20,

236:10

**two-week** [1] - 177:22

**type** [6] - 12:12, 17:24, 25:13, 81:4, 180:24, 208:21

**types** [3] - 68:7, 154:4, 178:12

**typical** [1] - 28:17

**typically** [3] - 22:11, 111:7, 132:14

## U

**U.P.S** [1] - 233:25

**U.S** [5] - 14:12, 31:17, 35:6, 63:3, 185:5

**U.S.-listed** [1] - 63:24

**U.S.A** [1] - 99:13

**Ukrainian** [1] - 227:24

**ultimately** [1] - 128:4

**ultra** [1] - 186:8

**ultra-high** [1] - 186:8

**unaware** [1] - 108:11

**unchallenged** [3] - 130:21, 164:9, 180:15

**uncommon** [1] - 152:20

**under** [25] - 15:10, 59:4, 77:2, 77:5, 77:8, 78:3, 82:16, 95:10, 101:17, 102:11, 102:20, 106:16, 106:18, 111:12, 111:22, 182:23, 186:3, 207:9, 208:12, 210:1, 210:19, 211:14, 230:22, 231:6, 237:11

**underlie** [2] - 108:3, 110:9

**underlies** [1] - 108:12

**underneath** [1] - 61:11

**understood** [4] - 25:14, 213:20, 236:22

**undervalued** [1] - 192:13

**unfair** [1] - 60:5

**unfortunately** [2] - 239:3, 242:2

**Unit** [3] - 12:17, 12:20

**United** [5] - 157:1, 181:3, 184:1, 184:5, 185:13

**University** [12] - 97:8, 97:9, 97:22, 97:23, 103:8, 103:9, 124:19, 184:7, 184:19, 184:22, 188:24, 189:3

**university** [1] - 184:9

**unless** [2] - 11:4,

245:11

**unmarked** [2] - 231:16, 232:2

**unnumbered** [1] - 228:23

**unquestionable** [1] - 178:4

**unquestioned** [37] - 75:11, 77:16, 131:22, 160:22, 161:2, 161:11, 163:1, 164:5, 164:10, 164:19, 164:21, 165:7, 165:8, 165:13, 165:16, 166:18, 166:24, 167:13, 169:11, 169:24, 172:25, 174:20, 174:22, 175:9, 175:16, 175:25, 176:18, 177:1, 177:2, 177:3, 177:6, 178:8, 178:24, 179:4, 179:14, 179:20, 179:25

**unrelated** [2] - 230:9, 230:13

**unreliability** [1] - 96:1

**unresponsive** [1] - 180:9

**unusual** [4] - 131:10, 152:1, 194:7, 195:14

**up** [76] - 8:1, 10:12, 14:16, 18:21, 19:7, 19:25, 25:7, 28:21, 34:6, 37:19, 39:24, 40:12, 52:9, 55:7, 61:9, 63:4, 64:16, 77:18, 80:4, 83:21, 83:24, 91:17, 112:19, 118:8, 119:15, 121:4, 126:7, 128:21, 134:12, 135:19, 136:1, 136:3, 136:12, 138:7, 147:2, 152:2, 162:17, 164:22, 166:22, 168:18, 169:22, 174:18, 176:5, 177:22, 178:25, 181:12, 186:11, 186:21, 187:5, 194:2, 194:24, 196:5, 197:5, 197:22, 197:23, 200:5, 201:9, 202:20, 202:22, 203:17, 203:19, 206:25, 208:15, 210:3, 212:6, 213:23, 217:15, 220:6, 220:13, 221:2, 221:19, 222:8, 224:9, 225:8, 234:6, 241:20

**updated** [2] - 216:5, 219:5

**upgrades/ downgrades** [1] - 211:3

**upload** [14] - 22:3, 24:4, 24:5, 29:5, 29:6,

65:18, 67:24, 68:1, 111:8, 151:16, 151:19, 151:20, 152:7, 152:8
**uploaded** [7] - 23:8, 62:19, 68:14, 111:17, 112:5, 112:24, 117:7
**uploads** [1] - 151:3, 151:6, 158:19
**urge** [1] - 49:21
**useful** [3] - 221:12, 221:13
**useless** [1] - 118:14
**uses** [1] - 99:4
**utilize** [2] - 95:6, 95:14
**utilized** [2] - 104:15, 222:5

**V**

**value** [18] - 69:16, 69:17, 69:21, 70:1, 70:23, 70:25, 71:18, 151:23, 151:25, 169:23, 169:24, 185:5, 190:4, 190:5, 192:12, 211:1
**values** [3] - 70:20, 71:1, 71:6
**Vantanov** [3] - 204:10, 204:17
**Vardan** [2] - 186:25, 243:13
**variance** [1] - 141:8
**varies** [1] - 198:24
**various** [14] - 73:10, 75:8, 78:22, 81:25, 83:3, 97:25, 109:13, 124:24, 131:2, 157:6, 176:15, 185:7, 192:9, 193:4
**Vartan** [2] - 204:10
**vast** [2] - 76:25, 233:24
**verbally** [1] - 235:21
**verbatim** [1] - 128:8
**verified** [2] - 49:15, 199:21
**verify** [2] - 199:20, 215:22
**Verizon** [8] - 90:9, 90:24, 197:11, 197:12, 212:14, 212:17, 213:6, 213:14
**versus** [8] - 130:20, 131:12, 163:1, 165:7, 166:24, 170:4, 171:7, 230:1
**VFC** [2] - 13:25, 14:5
**vice** [2] - 4:9, 186:5

**Victor** [3] - 51:1, 51:11, 197:15
**videoconference** [3] - 48:8, 153:8, 181:15
**videographer** [2] - 9:21, 10:9
**videotape** [1] - 181:9
**view** [4] - 74:4, 83:15, 104:5, 195:15
**viewpoint** [1] - 149:13
**views** [1] - 83:15
**violation** [2] - 31:17, 33:2
**virtually** [3] - 112:22, 125:4, 160:12
**VMware** [2] - 25:18, 25:19
**Vodafone** [2] - 197:11, 212:17
**voir** [2] - 79:18, 97:3
**VOIR** [3] - 80:20, 96:7, 101:15
**volatility** [3] - 194:1, 194:2, 194:5
**volume** [7] - 34:9, 34:10, 152:3, 193:5, 194:7, 216:10, 216:11
**volumes** [4] - 194:19, 195:13, 216:9, 243:7
**voluntarily** [1] - 191:19

**W**

**wait** [1] - 134:7
**Wal** [2] - 140:1, 140:11
**Wal-Mart** [2] - 140:1, 140:11
**walk** [1] - 243:21
**wants** [1] - 117:10
**warning** [1] - 220:16
**waste** [3] - 36:13, 36:14, 110:18
**Waste** [1] - 19:19
**wasting** [2] - 57:25, 118:22
**watch** [1] - 221:1
**watched** [1] - 221:1
**water** [3] - 69:10, 69:12, 69:13
**ways** [3] - 118:6, 133:15, 140:11
**weak** [1] - 71:3
**Wealth** [1] - 205:12
**wealthy** [1] - 186:6
**week** [6] - 83:24, 90:23, 177:22, 234:13,

234:14, 234:24
**weeks** [4] - 221:17, 221:21
**weight** [1] - 104:4
**welcome** [2] - 39:22, 169:5
**well-done** [1] - 236:5
**well-known** [1] - 160:21
**Westlaw** [1] - 181:5
**wheel** [1] - 10:25
**whilst** [1] - 223:24
**whoa** [16] - 45:4, 84:2, 91:19, 134:7, 138:24, 228:21
**whole** [9] - 45:5, 122:14, 131:2, 136:5, 141:19, 149:2, 149:14, 179:19, 231:5
**wholesale** [3] - 16:18, 51:25, 52:6
**widely** [1] - 124:23
**widespread** [1] - 161:24
**Wiley** [1] - 157:12
**willing** [1] - 153:23
**window** [38] - 20:15, 21:17, 21:19, 21:24, 22:3, 22:5, 22:9, 23:1, 23:3, 24:13, 25:2, 25:19, 25:21, 25:22, 26:19, 26:21, 29:2, 29:10, 29:17, 44:3, 44:6, 65:12, 65:16, 65:25, 66:22, 66:23, 67:3, 68:4, 68:6, 69:1, 72:25, 76:22, 131:24, 149:17, 149:22, 149:23
**Winifred** [3] - 99:14, 99:15, 100:21
**wire** [2] - 51:25, 81:17
**wisely** [8] - 10:19, 48:7, 49:21, 181:16, 219:17, 219:22, 220:12, 220:17
**wish** [1] - 112:10
**withdraw** [4] - 87:1, 91:24, 115:19, 160:16
**withdrawn** [5] - 37:6, 47:1, 53:2, 196:11, 198:13, 230:3
**withdrew** [1] - 99:17
**WITNESS** [73] - 11:21, 15:25, 39:21, 40:2, 40:17, 40:19, 40:21, 41:2, 41:18, 50:22, 55:1, 55:18, 74:22, 84:9, 94:6, 106:17, 106:19, 120:5, 124:8, 138:12, 138:14,

141:15, 141:24, 142:2, 142:7, 142:10, 144:8, 144:11, 144:15, 145:20, 145:25, 146:3, 160:9, 165:1, 165:9, 167:14, 167:21, 183:8, 206:18, 214:20, 215:3, 215:15, 215:20, 216:17, 216:22, 217:19, 218:3, 218:7, 223:7, 223:13, 231:14, 231:19, 232:10, 232:13, 232:15, 232:18, 233:2, 233:4, 238:15, 238:18, 238:22, 239:3, 239:10, 239:13, 239:19, 240:1, 240:4, 240:9, 240:12, 240:23, 241:2, 243:10, 244:13
**Witness** [3] - 98:20, 122:11, 223:2
**witness** [96] - 5:15, 8:19, 8:20, 9:2, 9:5, 9:21, 11:12, 11:16, 14:20, 16:22, 20:2, 30:18, 31:10, 32:1, 36:11, 37:25, 39:20, 40:4, 40:12, 41:16, 42:8, 47:23, 49:10, 50:20, 50:21, 53:8, 53:12, 55:5, 55:6, 55:13, 57:16, 79:8, 88:1, 88:8, 91:22, 92:8, 93:20, 93:22, 99:16, 99:23, 101:10, 102:8, 106:14, 115:14, 115:15, 117:22, 118:13, 118:15, 119:6, 122:9, 124:3, 125:4, 125:19, 127:10, 128:21, 128:23, 132:25, 134:9, 134:12, 134:19, 135:6, 136:21, 137:19, 138:8, 138:10, 142:17, 147:3, 153:6, 153:10, 172:16, 173:10, 180:8, 181:14, 181:19, 182:20, 183:3, 206:8, 217:12, 217:14, 217:16, 218:9, 219:13, 219:19, 219:24, 220:23, 221:8, 221:9, 222:9, 222:20, 222:25, 223:8, 223:16, 225:20, 228:11, 231:7, 244:14
**witnesses** [22] - 6:2, 8:1, 9:20, 9:25, 10:5, 10:6, 10:22, 48:8, 58:24, 60:8, 92:11, 104:20, 106:11, 118:22, 118:23, 119:2, 123:20, 153:8, 181:9, 181:13, 181:15
**won** [1] - 187:14

**Wong** [2] - 236:25, 237:3
**word** [2] - 13:14, 159:20, 184:8
**words** [8] - 31:25, 86:1, 113:12, 113:16, 138:12, 150:22, 159:10, 160:20
**works** [3] - 45:22, 51:4, 221:10
**world** [1] - 221:14
**worlds** [1] - 64:16
**worry** [1] - 75:4
**worth** [3] - 186:8, 187:9, 187:11
**write** [2] - 189:3, 189:6
**writings** [1] - 82:18
**written** [5] - 221:24, 244:18, 244:21, 245:6, 245:13
**wrongdoing** [1] - 125:2
**wrote** [2] - 99:23, 113:16
**Wyly** [1] - 99:10

**Y**

**year** [15] - 14:6, 14:7, 14:8, 92:23, 145:19, 162:2, 194:24, 198:24, 228:3, 228:5, 235:6, 235:11, 235:24
**year-over-year** [1] - 14:6
**years** [3] - 12:7, 183:19, 184:7
**yellow** [8] - 139:12, 139:19, 139:21, 139:22, 139:23, 140:1, 140:12, 144:18
**Yerevan** [1] - 183:15
**yes-or-no** [1] - 86:25
**yesterday** [1] - 232:24
**York** [5] - 97:23, 99:20, 157:13, 184:14, 198:21
**younger** [1] - 186:25
**YOUR** [1] - 221:1
**yourself** [2] - 155:2, 200:11

**Z**

**Zakharchenko** [13] - 37:12, 37:13, 37:14, 41:7, 41:13, 41:19,

50:6, 201:7, 201:13,
202:9, 203:2, 203:7,
209:21
   **zero** [5] - 69:24,
70:23, 71:19, 71:20
   **Zumiez** [1] - 23:4