NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff*,<br><br>v.<br><br>ARKADIY DUBOVOY, et al.,<br><br>*Defendants*. | Civil Action No. 15-6076<br><br>OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court on Defendant Memelland Investments Ltd.'s ("Memelland") motion to dismiss under Fed. R. Civ. P. 12(b)(6) against Plaintiff Securities and Exchange Commission ("SEC"). Dkt. No. 251. In this civil enforcement action, the SEC alleges that Memelland and several other securities traders were involved in a fraudulent scheme to trade on hacked nonpublic press releases. Memelland moves to dismiss the claims against it on the grounds that the SEC has not alleged that Memelland received the stolen information or made payments to the hackers. Because the SEC particularly pled its fraud and aiding and abetting claims, the motion is **DENIED**.

I.  **Background**

This case arises out of allegations that an international ring of computer hackers and securities traders worked together to commit securities fraud. Memelland, a British Virgin Islands hedge fund with a principal place of business in Cyprus, is one of a group of Defendants accused of trading on hacked information ("Trader Defendants"). Am. Compl. ¶ 46, Dkt. No. 28.

1

The alleged fraudulent scheme was carried out against three newswire services—Marketwired, PRN, and Businesswire (collectively "Newswire Services"). Id. ¶¶ 53-55, 67. The Newswire Services provide end-to-end content, news production, and distribution to their clients, including many publicly traded companies in the United States. Id. Part of their distribution services entail editing and publishing companies' press releases. Id. ¶ 67. The press releases often contain important financial information about earnings announcements and forecasts. Id. ¶¶ 67, 69, 76.

The publication of earnings information often has a significant short-term effect on a given company's share price. Id. ¶ 69. It is common for financial analysis firms to estimate or predict a given company's quarterly or annual earnings. Id. ¶ 77. The market then reaches a consensus expectation based on these different predictions. Id. When an issuer releases its earnings, the share price for that company generally increases if its earnings exceed the market consensus and decreases if its earnings fall short of the consensus prediction. Id.

To facilitate the publication process, the Newswire Companies received draft press releases from a given company, which they edited, prepared, and stored electronically on their servers. Id. ¶ 68. That created a window of time between when the companies provided draft press releases to the Newswire Service and when the Newswire Service published the releases. Id. ¶ 70. This window ranged from a number of minutes to a number of days. Id. Until the Newswire Services published the press releases, the information was not available to the general public. See id. ¶ 67.

Two Ukrainian hackers ("Hacker Defendants") exploited this window many times from 2010 to 2015 by gaining unauthorized access to the Newswire Services' computer systems. Id. ¶¶ 71, 74. They gained entry into the systems through the use of several different tactics, including posing as authorized users, deploying malicious computer code, concealing the identity and

2

location of the computers the Hacker Defendants used to access the systems, and other surreptitious access mechanisms. Id. ¶ 73. In doing so, they stole over 100,000 unpublished press releases. Id. ¶¶ 71-72.

The Hacker Defendants monetized this access by working in concert with the network of Trader Defendants, including Memelland. Id. ¶ 3. In exchange for payment, the Hacker Defendants passed the stolen press releases, "directly or indirectly," to the Trader Defendants in the window of time between when the releases were uploaded to the nonpublic system and when the releases were publically issued. Id. ¶¶ 3, 5. The Trader Defendants would then initiate trades in the respective companies in anticipation of how the market would respond to the information. Id. ¶¶ 6, 71. After the press releases were publicly issued, the Trader Defendants closed the trading positions within minutes or hours. Id. ¶ 71.

The Hacker Defendants were not always able to access all of the Newswire Services' systems at the same time, however. Id. ¶ 74. Their theft of unpublished press releases oscillated between the systems depending on their ability to gain access. Id. The Trader Defendants' trading activity mirrored the access and focus of the Hacker Defendants. Id. ¶ 75. When the Hacker Defendants stole press releases from Marketwired, the Trader Defendants traded in the securities of the companies whose press releases were stolen from Marketwired. Id. When the Hacker Defendants stole press releases from PRN, the Trader Defendants traded in the securities of issuers whose press releases were stolen from PRN. Id. The Trader Defendants likewise traded in front of press releases issued from Businesswire, which was also hacked. Id. ¶ 10.

The Amended Complaint connects Memelland to the scheme in four ways. First, like the rest of the Trader Defendants, Memelland's trading moved in lock-step with the Hacker Defendants' access to the Newswire Services. Id. ¶ 114. Second, Memelland was connected to

certain other Trader Defendants through common IP address usage and common account ownership. Id. ¶ 109. The same IP address that Memelland used to access a trading account was used by both another hedge fund named in the case and two individual Defendants, Arkadiy Dubovoy and Pavel Dubovoy. Id. ¶¶ 110-13. The Hacker Defendants had access to Arkadiy Dubovoy's brokerage accounts and received e-mails from Pavel Dubovoy with instructions to target certain press releases. Id. ¶¶ 84, 90. Third, Memelland's trading occurred in the window of time between when the press releases were uploaded and when they were publically released, often close in time to the companies' upload of releases to the servers. Id. ¶ 113. But for the hacking, such events would only be known by the client and the Newswire Service. Id. ¶¶ 102. Fourth, the SEC provides three examples where Memelland and other Defendants traded in the same securities tied to stolen press releases, on the same days, in the window, in the same direction. Id. ¶¶ 195-201, 202-08, 216, 221. Memelland realized profits of approximately $375,000 by participating in the scheme. Id. ¶ 46.

## II. Procedural History

The SEC filed this action on August 10, 2015, asserting violations under (1) Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); (2) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; and (3) Sections 20(b) and (e) of the Exchange Act, 25 U.S.C. § 78t(b),(e). Dkt. No. 1. The next day, the Court entered a temporary restraining order freezing assets and an order to show cause why a preliminary injunction should not enter against all Defendants. Dkt. Nos. 12, 13. In January 2016, Memelland consented to the preliminary

injunction.[1]  Dkt. No. 231.  Memelland filed the instant motion to dismiss on February 12, 2016. Dkt. No. 251.

**III.    LEGAL STANDARD**

When considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all of the facts in the complaint and draws all reasonable inferences in favor of the plaintiff. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).  Dismissal is inappropriate "merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Id.  The facts alleged, however, must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.  Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Where the claims sound in fraud, the allegations must comply with Rule 9(b).  Rule 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud."  In re Rockefeller Ctr. Properties, Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002).  To satisfy this standard, a plaintiff must state the circumstances of his alleged cause of action with "sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged."  Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (internal citation and quotations omitted).

---

[1] A subset of the Trader Defendants known as the Amaryan Defendants opposed the asset freeze. After an evidentiary hearing, the Court granted the Commission's motion for a preliminary injunction against the group because the SEC "raise[d] a strong inference that the Amaryan Defendants violated federal securities laws . . . ."  See S.E.C. v. Dubovoy, No. 15-6076, 2015 WL 6122261, at *4 (D.N.J. Oct. 16, 2015).

5

**IV.   ANALYSIS**

Memelland argues that the Court should dismiss the fraud claims under Section 17(a), Section 10(b), and Rule 10b-5 and the aiding and abetting claim under Section 20(e). The Court will address each in turn.

### A. Fraud Claims

Section 17(a), Section 10(b), and Rule 10b-5 "all proscribe fraudulent conduct in connection with the purchase and/or sale of securities, and the elements required to prove violations are essentially the same."[2] S.E.C. v. Desai, 145 F. Supp. 3d 329, 335 (D.N.J. 2015) (citing S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996)). The SEC must show (1) use of fraudulent device or scheme; (2) in connection with the sale of a security; (3) materiality; and (4) scienter. See id. at 335-36 (citing First Jersey Sec., 101 F.3d at 1467; In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997)).

Memelland first challenges the particularity of the SEC's allegations. Memelland argues that the Amended Complaint does not allege "how, when or from whom" Memelland received any press releases, so it does not meet the pleading requirements for fraud under Rule 9(b). Memelland argues that this missing information is also required to plead scienter. The Court disagrees with both points.

---

[2] Section 17(a) makes it unlawful for any person in the offer or sale of any security to "(1) "employ any device, scheme, or artifice to defraud . . . or (3) engage in any transaction, practice, or course of business which operates . . . as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1), (3); S.E.C. v. Johnson, 174 F. App'x 111, 113 (3d Cir. 2006). Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, in turn, makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

6

The Amended Complaint meets Rule 9(b)'s particularity requirement. It contains allegations that the Hacker Defendants stole numerous press releases and passed those releases to the Trader Defendants, including Memelland, who traded on them. It supports this contention with a mix of detailed factual allegations and strong inferences that arise therefrom.

The SEC alleges that the Hacker Defendants' primary contact with the Trader Defendants was a group identified in the Amended Complaint as the Dubovoy Group, a close-knit group of traders consisting primarily of family, friends, and business associates of Defendants Arkadiy and Pavel Dubovy. See Am. Compl. ¶¶ 19, 87-91. The Dubovoy Group gave the Hacker Defendants access to several brokerage accounts and e-mailed them lists of certain press releases to target. Id. ¶¶ 87-91. The Amended Complaint provides the specific dates these events and e-mails occurred. See id. The SEC connects the Dubovoy Group to Memelland through common IP address usage and account ownership: The SEC alleges that a certain IP address was used to access an e-mail account used by Arkadiy Dubovoy in July 2013, a brokerage account owned by Memelland in March 2014, and an e-mail account used by Pavel Dubovoy in April 2014. Id. ¶¶ 111-12. Memelland then traded in securities of issuers who issued their press releases through the hacked newswire services; traded in the same securities, on the same days, in the window of time between the upload of the press releases to the newswire service and its public dissemination, and traded in the same direction as the other Trader Defendants.

This connection to Trader Defendants and the Dubovoy Group, coupled with Memelland's trading pattern, provides a reasonable inference that Memelland had access to the press releases that were stolen during that time period and traded on the information. See S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc., No. 13-4645, 2014 WL 5026153, at *7 (S.D.N.Y. Sept. 29, 2014) (denying motion to dismiss where SEC did not identify "specific content of the

7

tip" but defendants placed "remarkably well-timed" trades just before information about two companies was published, closed positions immediately after publication, and SEC identified limited class of people who leaked unpublished information).

The Amended Complaint reinforces this inference with three specific instances of such trades over two days in 2013, where Memelland took positions in securities within minutes (and, on one occasion, the same minute) as the Dubovoy Group—a short sale of Panera stock on July 23, 2013, purchase of VMware stock on the same day, and purchase of Align stock in October 17, 2013. See AC ¶¶ 198, 205, 218. Memelland realized over $100,000.00 from these three trades, alone. See id.

Memelland counters that there are no direct allegations that Memelland received stolen press releases or communicated with the Hacker Defendants on either July 23 or October 17, 2013. But such allegations are not required. Rule 9(b) does not require plaintiffs to plead "every material detail of the fraud such as date, location, and time," so long as they use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." In re Rockefeller, 311 F.3d at 216 (internal citation omitted). "Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'" Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989) (quoting Christidis v. First Pa. Mortg. Tr., 717 F.2d 96, 99-100 (3d Cir. 1983)). In such circumstances, Rule 9(b) is satisfied when a plaintiff supports its allegations with facts indicating why the charges against defendants are not baseless and why additional information lies exclusively within defendants' control. Id. at 646.

The SEC has done so here. The scheme alleged in the Amended Complaint is a complex one, involving a number of individuals, entities, and straw owners who worked together to

perpetrate a complex, high-tech fraud.  Prior to discovery, it is not feasible to expect the SEC to obtain details of communications between Memelland and the Hacker Defendants on July 23rd or October 17th.  The allegations make plain that those communications are exclusively in the control of these sophisticated foreign parties.  And the SEC has alleged Memelland's participation in this scheme with a high level of specificity, such that Memelland has adequate notice of its misconduct and the Court is satisfied the SEC is not asserting a baseless or unsubstantiated claim.[3]

These circumstances also support a strong inference that Memelland acted with scienter.  "Scienter is a mental state embracing intent to deceive, manipulate or defraud," and can be established by showing recklessness.  S.E.C. v. Infinity Grp. Co., 212 F.3d 180, 192 (3d Cir. 2000) (internal citations omitted); see also Aaron v. Sec. & Exch. Comm'n, 446 U.S. 680, 695 (1980) ("[T]he language of § 17(a) requires scienter under § 17(a)(1), but not under . . . § 17(a)(3).").  It "may be alleged generally," provided that the SEC's factual allegations support a plausible

---

[3] In support of its argument that the claims are baseless, Memelland cites to several cases that were purportedly dismissed because they were based "solely on the existence of suspicious trades." Def.'s Br. at 8.  But all of these cases involved summary judgment motions or trials where the parties already engaged in discovery.  See S.E.C. v. Goldinger, No. 95-56092, 1997 WL 21221, at *3 (9th Cir. Jan. 14, 1997) (granting summary judgment where SEC's only allegation of insider trading was a legal tip); S.E.C. v. All Know Holdings, Ltd., 949 F. Supp. 2d 814, 823 (N.D. Ill. 2013) (granting summary judgment where SEC did not identify insider or whether disclosure of information constituted breach of fiduciary duty); S.E.C. v. Garcia, No. 10-5268, 2011 WL 6812680, at *15 (N.D. Ill. Dec. 28, 2011) (granting summary judgment where "SEC has not shown that [the defendant] ever had an opportunity to acquire nonpublic information"); S.E.C. v. Horn, No. 10-955, 2010 WL 5370988, at *7 (N.D. Ill. Dec. 16, 2010) (granting summary judgment where, after chance to conduct discovery, SEC could not show that defendant acquired any nonpublic information); S.E.C. v. Rorech, 720 F. Supp. 2d 367, 414 (S.D.N.Y. 2010) (granting judgment for defendant after bench trial where SEC only showed existence of calls between parties followed by allegedly suspicious trades, and trades were consistent with defendant's past investment practices and trading history); S.E.C. v. Truong, 98 F. Supp. 2d 1086, 1097-1101 (N.D. Cal. 2000) (granting summary judgment in part as to one defendant where SEC only alleged defendant worked in office where nonpublic information was located); but see SEC v. One Or More Purchasers of Telvent GIT, SA, No. 11-3794, 2013 WL 1683665 at *1 (S.D.N.Y. Nov. 21, 2013) (dismissing case on SEC's Fed. R. Civ. P. 41 motion for voluntary dismissal).

inference of scienter.  See S.E.C. v. McGee, 895 F. Supp. 2d 669, 683 (E.D. Pa. 2012) (internal citations omitted).  Memelland's sophistication, the temporal proximity of its trades to the publication of the press releases, the similarity of its trading pattern to other Trader Defendants with conspicuous ties to the Hacker Defendants, its shared IP channels with the Dubovoy Group, and the fact that the stolen press releases contained financial information that had not yet been reported in the news all strongly support an inference that Memelland intended to participate in the fraud.

The SEC has satisfied its pleading obligations under Rule 9(b).  The Court will not dismiss the Section 17(a), Section 10(b), or Rule 10b-5 claims.[4][5]

### B.  Aiding and Abetting Claim

Memelland next argues that the SEC has not sufficiently alleged a claim for aiding and abetting the fraud.

Section 20(e) of the Securities Exchange Act permits the SEC to bring an action against "any person that knowingly or recklessly provides substantial assistance" to a primary violator of the securities laws.  15 U.S.C. § 78t(e).  To prove a violation of the Section, the SEC must show that (1) there is an underlying securities law violation by a primary party; (2) the defendant

---

[4] Memelland also argues that the SEC has not alleged the personal benefit element of an insider trading claim.  Def.'s Br. at 5.  But the claims in this case are based on the type of securities fraud asserted in SEC v. Dorozhko, 574 F.3d 42 (2d Cir. 2009), not on an insider trading theory, so the personal benefit element does not apply here.  Moreover, Memelland's argues in its reply brief that there are no allegations that Memelland engaged in any deceptive act.  See Reply at 4-5.  This issue was not raised in Memelland's initial brief or the SEC's opposition brief, and the SEC has not had an opportunity to respond to this newly minted argument.  See Bayer AG v. Schein Pharm., Inc., 129 F. Supp. 2d 705, 716 (D.N.J. 2001).  Memelland may raise the issue in a motion for summary judgment, but the Court will not consider it now.

[5] Memelland moves to dismiss the Section 20(b) claim for the same reasons as the Section 10(b) claim.  See Def.'s Br. at 5 n.2.  Because the Court will not dismiss the Section 10(b) claim, Memelland's argument fails.

provided substantial assistance to the violator; and (3) the defendant knowingly or recklessly provided that assistance.  See Monsen v. Consol. Dressed Beef Co., Inc., 579 F.2d 793, 799 (3d Cir. 1978); In re Amaranth Nat. Gas Commodities Litig., 730 F.3d 170, 182 n.15 (2d Cir. 2013); S.E.C. v. Apuzzo, 689 F.3d 204, 211 (2d Cir. 2012).

Memelland only challenges the second and third elements—knowledge and substantial assistance.  Memelland argues that the SEC does not plead these elements because they "do[] not identify any communications between Memelland and the Ukrainian Hacker Defendants nor does the [SEC] identify any payments made by Memelland, directly or indirectly to the Ukrainian Hacker Defendants."  Def.'s Br. at 10.  The Court again disagrees.

To demonstrate substantial assistance, "the SEC must show that the defendant in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed."  Apuzzo, 689 F.3d at 207 (citations and alterations omitted).  The Amended Complaint sufficiently demonstrates this.  As the SEC correctly argues, the same facts that support Memelland's primary securities fraud violations also support its involvement as an aider and abettor.  There are plausible allegations that Memelland traded on stolen information and was connected to the Dubovoy Group, so it is equally plausible that Memelland knew of (or was reckless about) the scheme, associated itself with the scheme, and participated in it with the hope that it would succeed.

As such, the SEC need not allege directly that Memelland communicated with or paid the Hacker Defendants.  Such allegations would make Memelland's accomplice liability a foregone conclusion, but the pleading standard does not require so much.  See Phillips, 515 F.3d at 234 ("[S]tating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest" the required element.  This "does not impose a probability requirement at the pleading stage," but

instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element.) (quoting Twombly, 550 U.S. at 545); In re Rockefeller, 311 F.3d at 216 ("[W]hen the defendant retains control over the flow of information . . . Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible.") (quoting In re Burlington, 114 F.3d at 1418). Moreover, the facts as pled are not "merely consistent with" liability, as Memelland suggests. See Reply at 4, Dkt. No. 265 (citing Iqbal, 556 U.S. at 678). Memelland contends that thousands of other people make the same trading decisions as they are accused of, so the SEC's allegations stop short of the line between possibility and plausibility. But their argument ignores the shared IP usage with primary violators, trading patterns that match the primary violators' trading by the second, and trading in securities about which the primary violators stole information. These factual allegations separate Memelland from the run-of-the-mill innocent trader, and permit a strong inference that Memelland aided and abetted the main actors.

In light of the foregoing, the Court will not dismiss the Section 20(e) claim against Memelland.

V. **CONCLUSION**

For the reasons set forth herein, Memelland's motion to dismiss, Dkt. No. 251, is **DENIED**. An appropriate Order accompanies this Opinion.

*/s Madeline Cox Arleo*
**Hon. Madeline Cox Arleo**
**United States District Judge**
