EXHIBIT 1

                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

SECURITIES AND EXCHANGE            .
COMMISSION,                        .
                                   .
          Plaintiff,               .  Case No. 15-cv-06076
                                   .
vs.                                .  Newark, New Jersey
                                   .  June 5, 2019
DUBOVOY et al.,                    .
                                   .
          Defendants.              .


                      TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE MICHAEL A. HAMMER
                  UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


For the Plaintiff        JOHN V. DONNELLY, III, ESQ.
Securities and           U.S. Securities & Exchange Commission
Exchange                 1617 JFK Boulevard
Commission:              Suite 520
                         Philadelphia, PA 19103
                         (215) 597-3100
                         donnellyj@sec.gov

                         JENNIFER CHUN BARRY, ESQ.
                         U.S. Securities and Exchange
                         Commission




Audio Operator:

Transcription Service:    KING TRANSCRIPTION SERVICES
                          3 South Corporate Drive, Suite 203
                          Riverdale, NJ  07457
                          (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

```
 1   (APPEARANCES continued)

 2
     For the Defendant      LEONID MOMOTOK
 3   Leonid Momotok:        1610 Pepperbush Court
                            Suwanee, Ga 30024
 4                          Pro Se

 5
     For All Other          No one was present
 6   Defendants:

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (Commencement of proceedings at 12:02 P.M.)

2

3              THE COURT:  All right.  We are on the record in

4    Securities and Exchange Commission versus Dubovoy, Civil

5    No. 15-6076.

6              I have counsel for the SEC here.

7              Can I ask counsel to please place their appearances

8    on the record.

9              MR. DONNELLY:  Good afternoon, Your Honor.  John

10   Donnelly from the Securities and Exchange Commission.

11             MS. BARRY:  Good afternoon, Your Honor.  Jennifer

12   Barry for the SEC.

13             THE COURT:  All right.  Welcome.

14             And I believe I have Mr. Momotok on the phone.

15             Is that correct?

16             MR. MOMOTOK:  Yes, Your Honor.

17             THE COURT:  All right.

18             All right.  So I think I will turn it over to

19   Mr. Donnelly and Ms. Barry to update me.  I know that there

20   are certain parties who, I believe -- oh, I'm proceeding, by

21   the way, on the record.

22             Is there any part of this that we need to seal the

23   record for or?

24             MR. DONNELLY:  I don't think so, Your Honor.

25             THE COURT:  If that changes, let me know in

```
 1   advance.

 2            MR. DONNELLY:  If that comes up, I think it depends

 3   on how in-depth we get on some things.

 4            THE COURT:  Okay.

 5            MR. DONNELLY:  But, in general, I think we're fine.

 6            THE COURT:  Okay.  So why don't you folks take the

 7   lead on bringing me up to speed.  I know -- the last thing I

 8   did, obviously, is I had denied without prejudice the

 9   application for alternative service.  I'm not sure whether

10   we'll be covering that.  You may want to bring me up to speed

11   with regard to some of the resolution of the other

12   defendants.  But I'll defer to you.

13            Take it away.

14            MR. DONNELLY:  Thanks, Your Honor.  And I'm happy

15   to take it in whatever order it pleases the Court.

16            The way it's organized in our status update

17   letter --

18            THE COURT:  Yup.

19            MR. DONNELLY:  -- is the three outstanding

20   defendants who remain to be served.

21            THE COURT:  Okay.

22            MR. DONNELLY:  And those consist of the two

23   hackers, Ieremenko and Turchynov, and Pavel Dubovoy.  And to

24   take each of those in turn.

25            As there has been --
```

1           THE COURT:  Wait.  So let me just stop you.

2           So Nelia Dubova is out in terms of the service

3    issue.

4           MR. DONNELLY:  Yes.  She is no longer a service

5    issue.  She has now been served.  And we filed a declaration

6    relating to service or notice of service on May 30th.  She

7    was served pursuant to The Hague in Ukraine in the Kiev area,

8    December 26th, 2018.  We received notice of that from Ukraine

9    May 13th, 2019.  And that was -- we had --

10          THE COURT:  I don't know whether that means I was

11   right to deny your motion or you were right to make the

12   motion, because on the one hand, it shows she was actually

13   served, and on the other hand that puts her exactly where you

14   said service would cover.

15          MR. DONNELLY:  It -- we were right in the -- where

16   she ended up.  We had sent that for service in 2017.

17          THE COURT:  Right.

18          MR. DONNELLY:  So the service itself took over a

19   year.  And then the service with notification took

20   approximately 18 months.

21          THE COURT:  Okay.  And then nobody thought to tell

22   the SEC?

23          MR. DONNELLY:  No.  And our prior inquiries about

24   the status of service had gone --

25          THE COURT:  Unrequited.

1           MR. DONNELLY:  -- unanswered.  Correct.

2           THE COURT:  So she was serve -- actually served

3   when?

4           MR. DONNELLY:  December 26th of --

5           THE COURT:  Of what year again?  I'm sorry.

6           MR. DONNELLY:  2018.

7           THE COURT:  Oh, okay.  So not that long ago.  Okay.

8           MR. DONNELLY:  No.  And we've learned of it

9   May 13th, 2019.

10          THE COURT:  Okay.

11          MR. DONNELLY:  Apparently, there's a court

12  proceeding, and we've attached to the declaration.

13          THE COURT:  Yup.  Okay.

14          MR. DONNELLY:  So she's no longer -- she was part

15  of that motion from October 2018.  She's now taken care of.

16          We will be filing for entry of a clerk's default

17  and then subsequently moving to add her to the motion for

18  default.

19          THE COURT:  I gather she was served even under the

20  Hague Convention in the end of December, her time to answer

21  has expired.

22          MR. DONNELLY:  Correct, Your Honor.

23          THE COURT:  Okay.  Okay.  So where does that put

24  us, then, vis-à-vis the remaining three?

25          MR. DONNELLY:  Okay.  So, again, Ieremenko is one

```
 1    of the hackers.   Turchynov is one of the hackers.   And Pavel

 2    Dubovoy, the third defendant is the third Dubovoy.   He is the

 3    brother of Arkadiy.

 4                THE COURT:  Yes.

 5                MR. DONNELLY:  -- and is the Dubovoy -- at SEC, the

 6    Dubovoy.  And he is the uncle of Igor.

 7                Let me take Ieremenko first.

 8                THE COURT:  Okay.

 9                MR. DONNELLY:  Again, one of the hackers, we filed

10    our motion back in October 2018.  Subsequent to the filing of

11    that motion, the SEC commenced another case against

12    Ieremenko, SEC v. Ieremenko, which was filed January 2019.

13    There is a parallel criminal case, U.S. v. Radchenko, which

14    is also in this court, also filed at the same time.

15                THE COURT:  Right.  And that was also assigned to

16    Judge Arleo?

17                MR. DONNELLY:  Correct.

18                THE COURT:  Yeah.

19                MR. DONNELLY:  Those are assigned to Judge Arleo

20    and Magistrate Judge Wettre.

21                THE COURT:  Right.

22                MR. DONNELLY:  So, apparently, after this hack was

23    shut down and we filed our case.

24                THE COURT:  That's an EDGAR hack?

25                MR. DONNELLY:  Yes.
```

|Hearing
|15-cv-06076, June 5, 2019

1          THE COURT:  Right.

2          MR. DONNELLY:  The 2000- -- so apparently what

3   Mr. Ieremenko did in conjunction with Mr. Radchenko, was turn

4   the hacking skills and the same type of scheme at issue here,

5   stealing of material nonpublic information, providing that to

6   traders to trade on before it's disseminated to the market,

7   and then they focused their specific talents, not just on the

8   U.S. markets and disabling U.S. markets and undermining

9   credibility in our markets, but attacking our governmental

10  institutions, specifically the SEC and EDGAR, which is the

11  system that we use for filing -- we have public company

12  documents, the 10-Ks, the 8-Ks --

13         THE COURT:  Right.

14         MR. DONNELLY:  -- and other publicly available

15  information.

16         THE COURT:  Right.  And that's the one where you

17  had new information that puts Ieremenko in Kiev.

18         MR. DONNELLY:  There was additional information

19  that we were not able to use in the October filing --

20         THE COURT:  Right.

21         MR. DONNELLY:  -- that was used in the subsequent

22  filing before Magistrate Judge Wettre, which was ultimately

23  granted for service by publication in that case.

24         THE COURT:  Right.

25         MR. DONNELLY:  Which order came out subsequent to

1    Your Honor's April order.

2              THE COURT:  Right.

3              MR. DONNELLY:  So that wasn't available to either

4    the Court or to us when that happened.

5              THE COURT:  Right.

6              MR. DONNELLY:  But I think there are a few

7    important things that come out of that, Your Honor.  And one

8    of the things, obviously, there was no opposition for us to

9    respond to as these defendants were not here.

10             THE COURT:  Right.

11             MR. DONNELLY:  And we hadn't had the chance to

12   speak to some of the questions that Your Honor quite

13   legitimately would have before granting a motion for

14   alternative service.

15             And one of the things I'd like to address is

16   Ieremenko's knowledge of our underlying case.

17             THE COURT:  Okay.

18             MR. DONNELLY:  Which --

19             THE COURT:  I know you had addressed -- I think I

20   had expressed at least a little skepticism over, but go

21   ahead.

22             MR. DONNELLY:  And I appreciate that.

23             And here's why I think under the standard

24   applicable to a motion for alternative service, which is

25   reasonably calculated to provide notice and discretion of the

```
 1    Court, as opposed to, say, for motion for summary judgment

 2    where a higher standard of evidentiary rules would apply.

 3              THE COURT:  Right.

 4              MR. DONNELLY:  I don't think that level applies

 5    here.  I think it's just what's reasonable under the

 6    circumstances with the information that we have available

 7    knowing that while these defendants are reaching into the

 8    country to undermine the integrity of our markets and to now

 9    attack the institutions --

10              THE COURT:  Right.

11              MR. DONNELLY:  -- they're also trying to hide

12    behind an iron curtain and avoid service and accountability.

13    And they shouldn't be allowed to do that.

14              I think the first reason why we can safely conclude

15    that Ieremenko and Turchynov know about our case is this was

16    such a lucrative fraud, such a lucrative --

17              THE COURT:  You're talking about the alleged fraud

18    here, not in the EDGAR --

19              MR. DONNELLY:  Yes.

20              THE COURT:  Okay.

21              MR. DONNELLY:  I'll come to the subsequent case --

22              THE COURT:  Okay.

23              MR. DONNELLY:  -- shortly.

24              But the alleged fraud here.

25              If we go back to when we brought this case in
```

1    August 2015, the scheme was going at least to May 2015, and

2    we saw the trading, and that's been included, and that's part

3    of the public record in this case.

4            They made hundreds of millions of dollars across

5    all of these traders, and it's wide-ranging and far-flung.

6            THE COURT:  Right.

7            MR. DONNELLY:  We bring our case.  Seven to nine

8    individuals are arrested in the United States in connection

9    with the case.  Millions of dollars, approximately $80

10   million of assets for frozen worldwide against the

11   30-some-odd defendants that we've name.

12           THE COURT:  Right.

13           MR. DONNELLY:  And then within 60 days of bringing

14   the case, Jaspen Capital Partners, who is large

15   hedge-fund-type entity, in Kiev, the home base of where

16   Turchynov and Ieremenko are operating out of, settles with us

17   and pays $30 million.

18           So the fact that the coconspirators have been

19   caught up, massive amounts of money were frozen.  People were

20   arrested.  They were sued both by the SEC and criminally,

21   Ieremenko and Turchynov and Pavel were all named criminally

22   in parallel cases here in New Jersey, is the first indication

23   that the two guys at the center of that scheme are going to

24   be aware that these cases have been brought.

25           THE COURT:  Let me ask you a quick question.

1            What's the time frame of the alleged EDGAR hack

2    compared to -- so we know that the time frame alleged in this

3    case ends in or around May of 2015.

4            Right?

5            MR. DONNELLY:  Right.

6            THE COURT:  What's the time frame of the alleged

7    EDGAR hack?  I'm guessing it postdates this case.

8            MR. DONNELLY:  It does.

9            THE COURT:  Right.

10           MR. DONNELLY:  It's subsequent.  And Mr. Ieremenko

11   has what I think the British describe as a little bit of

12   cheek, maybe moxie or some other word for it here in the

13   United States.

14           But I think cheekiness addresses it well in that

15   his email address is Alex Boesky -- or one of his email

16   addresses --

17           THE COURT:  Boesky?

18           MR. DONNELLY:  Exactly.

19           THE COURT:  To the uninitiated, Boesky is a

20   reference to a famous or infamous 1980s Wall Street trader.

21           MR. DONNELLY:  Who was famous for insider

22   trading -- yes.  Exactly.

23           THE COURT:  On who, at least allegedly, the

24   character Gordon Gekko, Wall Street, was at least very

25   loosely based, as I understand it, who had that sort of line,

1   "Greed is good."

2           MR. DONNELLY:  Well, that's not exactly what --

3           THE COURT:  Boesky said.

4           MR. DONNELLY:  That is a fair summary and

5   approximation.  So that's -- that's from my time.

6           THE COURT:  Den of Thieves was the book that I read

7   that made me know that I absolutely wanted to be an assistant

8   U.S. attorney.  So I'm familiar with that stuff.

9           MR. DONNELLY:  And that was his email.  But that's

10  an email address that he's used --

11          THE COURT:  Right.

12          MR. DONNELLY:  -- an alias that he has used on the

13  Internet and things of that nature.

14          So then we bring our case.  We seize all -- seize

15  all this money.  And, as I suggest, if you're at the

16  epicenter of the fraud and you're collecting payments from

17  all of these people that you're providing this information to

18  and all of these people have just had a lot of money frozen,

19  you're either not going to have coconspirators anymore

20  because they're all dropping out and not sending you checks

21  because their money got frozen, or they're emailing you and

22  calling you or the middleman who's operating between you,

23  saying, "What's going on?  I've just been sued for the SEC

24  and had millions of dollars frozen."

25          And, again, one of the main defendants who paid the

 1   most money of any defendant in this case so far is in Kiev.

 2              So I think he knows about it.

 3              And then what he does is, okay, you want to shut

 4   down that fraud, you want to shut down that scheme, I'm going

 5   to turn my hacking abilities to you, where there's another

 6   repository of material, nonpublic information.

 7              THE COURT:  Right.

 8              MR. DONNELLY:  How do you like that --

 9              THE COURT:  As opposed to unpublished press

10   releases that they were allegedly using in this case.

11              MR. DONNELLY:  Correct.  And so now they're going

12   after EDGAR, and they're getting information from filings

13   that still are disclosed earnings and disclosing, you know,

14   outlook information.  So it's information that you can trade

15   on successfully and gives you an advantage over other market

16   participants.

17              But, now, as part of that cheek, there's a little

18   bit of, you know, poking at the bear, saying I can not only

19   do this to newswire services, I can do this to the federal

20   government.

21              THE COURT:  Right.

22              MR. DONNELLY:  I can do this to the Securities and

23   Exchange Commission, who sued me.  I'm going to get back at

24   them.

25              And they did that for some period of time, as set

1    forth there.  And Radchenko was part of it.  They profited on

2    that.

3              So that's what results in the second case.

4              But I do believe that for purposes of a motion for

5    alternative service, that is an additional data point that

6    can give the Court comfort:  This guy knows about the SEC

7    case.  This -- and obviously when we filed, it was published

8    all over the world, at least on those first few days.  It was

9    a new claim.  Russia, it's on our website.  Wall Street

10   Journal.  Washington Post.  It was everywhere.  It was a big

11   case.  It's one of the biggest -- actually at the time, it is

12   the biggest hacking and trading fraud in the United States

13   and, likely, the world.

14             So that's another data point that he knows.

15             And --

16             THE COURT:  I think -- two more data points that I

17   need for your renewed motion.

18             One is -- because I think your initial application

19   didn't address this.  I have to be confident that there's no

20   international agreement that prohibits.  Right?  That's the

21   one.

22             The second is to the extent you're still going to

23   seek to use the emails, I need at least to know that those

24   are viable emails.

25             One of the -- right?  We dropped a footnote in the

 1    old decision that distinguished -- sorry.

 2             MR. DONNELLY:  I'm familiar with it, Your Honor,

 3    the prior decision.

 4             THE COURT:  Slepenkov and Zakharchenko.

 5             MR. DONNELLY:  Zakharchenko, certainly.

 6             THE COURT:  I need -- at least need to know --

 7    look, you're not going to be able to prove -- I doubt you're

 8    going to be able to prove that they're actively using the

 9    email.  But I don't know that the -- the application doesn't

10    need to go that far, because it doesn't need to say -- the

11    standard isn't, you know, beyond all reasonable doubt that

12    they're going to get notice.  It's, you know -- it's what's

13    reasonable.

14             I at least need to know, to the extent you're going

15    to rely on the emails, that those are still active email

16    accounts.

17             MR. DONNELLY:  And, Your Honor, I could speak to

18    that, because we took Your Honor's instruction from that

19    opinion --

20             THE COURT:  Yeah.

21             MR. DONNELLY:  -- and earlier this month before

22    appearing here, I sent emails to the Gmail accounts that I

23    had --

24             THE COURT:  Right.

25             MR. DONNELLY:  -- to every email account I have.  I

1   can't get into some of them.  This is where it might end --

2   but I think I can do this without going off the record.  All

3   of the Gmail accounts went through --

4            THE COURT:  Okay.

5            MR. DONNELLY:  -- and did not get bounced back.

6            THE COURT:  And nothing was returned as

7   undeliverable.

8            MR. DONNELLY:  Right.  Nobody responded to me.

9            There were two other accounts that were not Gmail

10  that did get bounced back as undeliverable.

11           But we have at least one Gmail account for Pavel;

12  one Gmail account for Turchynov; and at least one for

13  Ieremenko.  I believe we have more than one.

14           THE COURT:  Okay.

15           MR. DONNELLY:  And I sent -- when I sent that

16  email, I sent them a copy of the summons, a copy of the

17  amended complaint in both English and Ukrainian.

18           Now, perhaps unsurprisingly, no one responded.  But

19  they did go through and did not get bounced back.

20           THE COURT:  Okay.

21           MR. DONNELLY:  So that -- that is data point that I

22  believe we can check that box now.

23           THE COURT:  Okay.  I'm sorry.  Go ahead.

24           MR. DONNELLY:  Then I was going to say the third

25  piece -- and this is something that I think, as events have

1   developed in 2018 and 2019, perhaps will give the Court more

2   comfort with respect to that article that appeared in The

3   Verge that we had attached to our motion at Exhibit 1.

4            THE COURT:  Right.

5            MR. DONNELLY:  And I understand the Court's

6   concern, because, you know, it's the Internet.  People can

7   publish anything that they want on the Internet.  And The

8   Verge, while appears to be an online publication, certainly

9   does not have a history in the United States like the Wall

10  Street Journal or the Washington Post that provides a little

11  more comfort if an article appears --

12           THE COURT:  Right.  This is the interview with

13  Dubovoy?

14           MR. DONNELLY:  So it's an article about the hacking

15  in general.

16           THE COURT:  Right.

17           MR. DONNELLY:  Including an interview with Dubovoy.

18           And here's why I think with the standard applicable

19  here, that is another data point that can provide comfort of

20  knowledge for all of these defendants.

21           There's indicia of credibility on the face of the

22  article itself.  So it's not anonymous.  There's a name

23  attached to it.  There's a website attached where he's

24  public, that has published other articles, and it's gotten

25  picked up by other things.

1            It's a 10-page article that -- at least 10 pages --

2   that is well-researched, that there's information in there

3   relating to filings in our case, relating to filings in the

4   criminal case, relating either from -- I'm not sure if it was

5   from transcripts or from personal observation of the criminal

6   trial -- or maybe from filings in that case that accurately

7   described the events.

8            And here's another piece with respect to

9   Ieremenko -- and I'll come back to Pavel in a minute, as well

10  as Turchynov, but with respect to Ieremenko, at the end of

11  that article -- and this is August 2018 --

12           THE COURT:  Right.

13           MR. DONNELLY:  -- so several months before the SEC

14  files this case in January against Ieremenko and the

15  Radchenko -- it talks about Ieremenko and Radchenko teaming

16  up to hack EDGAR and to engage in the scheme to trade on

17  EDGAR and that.  That wasn't public at that time.  So, to me,

18  is another indicia that the article overall can be seen as

19  credible, even if we can't verify necessarily every single --

20  every single point.

21           THE COURT:  Right.

22           MR. DONNELLY:  And then with respect to Pavel, the

23  author does purport to talk to Pavel about the case.  Pavel,

24  as one might expect, if the article is accurate, denies

25  involvement in the case.  I am not concerned by the denial,

1    because that denial's been undermined by the testimony of his

2    brother Arkadiy and his nephew Igor at the criminal trial

3    against Mr. Korchevsky that happened in the Eastern District

4    of New York in front of Judge Dearie, that's in the

5    transcript where they talk about Pavel's involvement in the

6    scheme and his central position in bringing this about and

7    bringing the opportunity to Arkadiy.

8            THE COURT:  There's also more fundamentally, you

9    know, if the author were going to make up an article, they

10   probably would have made up a more -- far more salacious one

11   than just denials.

12           MR. DONNELLY:  Right.  Absolutely.

13           And it's not something -- it's not a straight

14   comment on the -- on the Internet saying, hey, Ieremenko's in

15   Kiev, if you're looking for him, SEC.

16           It's a full-blown reasoned article going through

17   the steps.  I don't know the official in Ukraine that they

18   cite, but I did do some Google research, and that person

19   appears to have that position.

20           And it all -- it's consistent with what we know.

21           THE COURT:  Right.

22           MR. DONNELLY:  So there is obviously some things in

23   there that we don't know -- don't know for sure -- often talk

24   to Pavel.  But it's all consistent in the things that we can

25   verify from pleadings in this case; from testimony at the

 1  criminal trial is consistent; and then the Radchenko piece

 2  with Ieremenko hacking EDGAR that -- that wasn't out there.

 3              THE COURT:  Right.

 4              MR. CRITCHLEY:  -- in August 2018.

 5              THE COURT:  So when can I expect your renewed

 6  motion?

 7              MR. DONNELLY:  Whenever Your Honor -- a couple of

 8  weeks?

 9              THE COURT:  Fine.  Do you want to say by June 21?

10              MR. DONNELLY:  Perfect.

11              THE COURT:  I don't -- I am not trying to put you

12  in a position where you have to go back and spend

13  all-nighters getting this stuff together.

14              MR. DONNELLY:  I appreciate that.

15              THE COURT:  So you tell me.

16              MR. DONNELLY:  I appreciate that.

17              I think we can -- we can make that pitch and --

18              THE COURT:  Do you want me to give you to

19  July 12th?  And if you file it before then -- you can file it

20  tomorrow, for all I care.

21              MR. DONNELLY:  I don't think I'd be able to file

22  tomorrow.

23              THE COURT:  But if you want until -- this is the

24  outermost deadline, not -- you know, you can certainly file

25  before then.

1        MR. DONNELLY:  Okay.

2        THE COURT:  All right.

3        MR. DONNELLY:  Thank you, Your Honor.

4        THE COURT:  Great.  All right.  Look forward to it.

5        All right.

6        MR. DONNELLY:  And then -- so our second category

7   of defendants are the defendants who were charged

8   criminally --

9        THE COURT:  Right.

10       MR. DONNELLY:  -- and their related entities, and

11  there's nine of them.  Five of them have been signed up with

12  offers of settlement.

13       We have four others; one of whom is Mr. Momotok,

14  who's on phone.  And Mr. Momotok and I talked on Monday.  We

15  had a positive conversation.  I would let him, you know,

16  speak for himself.  But my understanding of our conversation

17  was that he wanted to take a little more time to review it,

18  because English is not his first language.

19       THE COURT:  Right.

20       MR. DONNELLY:  And he wanted to talk to some other

21  people.  But on its face, he thought it was reasonable and

22  something that he would likely sign, but he just wanted to

23  consider it a little bit more --

24       THE COURT:  All right.  And then we have those who

25  are in default.  Right?

|Hearing
|15-cv-06076, June 5, 2019

```
 1              MR. DONNELLY:  Yeah, just to finish the --

 2              THE COURT:  Oh, I'm sorry.  Go ahead.  I didn't

 3    mean to interrupt you.

 4              MR. DONNELLY:  -- story on those people, there's

 5    Mr. Korchevsky and his entity, NTS Capital.  I've had

 6    positive conversations with his attorneys as well.

 7              THE COURT:  Okay.

 8              MR. DONNELLY:  They have the settlement documents.

 9    They're not signed yet.  So I expect to have some more

10    conversations with them.  But they've been transmitted.

11              And then there's one entity that Mr. Momotok and

12    Arkadiy Dubovoy are both managing members before, and that

13    has proven a little tricky logistically in terms of who can

14    sign and who should sign.

15              THE COURT:  Right.

16              MR. DONNELLY:  And so my proposed solution to both

17    of them is that they both sign.

18              THE COURT:  Yeah.

19              MR. DONNELLY:  And I am working on that with both

20    Mr. Momotok and counsel for Mr. Dubovoy and hope to achieve

21    that.

22              THE COURT:  Good.  Good.

23              MR. DONNELLY:  And then the remaining defendants

24    are in default, as you know.  Last time we were here,

25    Memelland still had some time to find new counsel and appear.
```

1          THE COURT:  Right.

2          MR. DONNELLY:  They have not done so.  I have not

3    heard since we were last here anybody either purporting to

4    represent them or from Memelland themselves.  So in the last

5    two months, I've had no communications from them.  So at this

6    point -- and we're happy to be guided by Your Honor as to the

7    logistics of that.  But I would envision a motion to strike

8    the answer -- because when they were represented, they had

9    answered -- strike the answer, enter default.  And then if

10   Your Honor wants, we can include a request for default

11   judgment as part of the same papers, or we could do that

12   subsequently as a separate filing.

13         THE COURT:  You mean as part of the same papers as

14   the substituted service?

15         MR. DONNELLY:  No.

16         THE COURT:  Oh, I'm sorry.

17         MR. DONNELLY:  An independent motion.  So I think

18   we need to file a motion to strike --

19         THE COURT:  You mean a motion to strike -- I think

20   you would do that first --

21         MR. DONNELLY:  -- Memelland's answer -- and for --

22   and entry of default.  We could do that together.

23         THE COURT:  And then entry of default, and then

24   separately a default judgment --

25         MR. DONNELLY:  Okay.

1           THE COURT:  -- because, obviously, they have to at

2   least have an opportunity to oppose.  And then you can't do

3   default judgment until there's default.

4           MR. DONNELLY:  Okay.

5           THE COURT:  Yeah, you could do strike and enter

6   default all together and then stagger that with default

7   judgment.

8           MR. DONNELLY:  Okay.

9           And then with respect to Nelia Dubova, we filed a

10  notice of service.  We will be filing in the coming days for

11  entry of the clerk's default.

12          THE COURT:  Right.

13          MR. DONNELLY:  And then subsequently we will be

14  filing --

15          THE COURT:  Default judgment.

16          MR. DONNELLY:  Yeah, default judgment.

17          And that leaves -- that's everybody, save one

18  defendant we'll hedge, who we anticipate requesting when we

19  go to the Commission with the settlements, requesting that

20  the Commission authorize us to dismiss Global Hedge; it

21  appears to have ceased to exist.

22          THE COURT:  Okay.  Okay.

23          Mr. Momotok, do you have anything that you want to

24  say, sir?

25          MR. MOMOTOK:  -- Mr. Donnelly, he told it

1   correctly, we discussed with -- the agreement to sign, but I

2   do -- more time -- looks like -- not to sign, because --

3   agreements are going to be approved, they are going to be

4   deemed satisfied.

5          So basically, you know, because -- kind of tied to

6   my -- to the criminal decision, and the criminal decision

7   is -- so I think -- Your Honor -- but I need some more time

8   to consult with my friend, because I don't have counsel.

9          THE COURT:  I understand.

10          Is there anything that he said that you disagree

11   with, Mr. Donnelly?

12          MR. DONNELLY:  No, Your Honor.  I think just --

13   just for the Court's benefit, because that audio was maybe a

14   little hard to understand --

15          THE COURT:  He basically said that once he signs,

16   as he understands, he's not going to have any additional

17   exposure under the signed settlement agreement, because it's

18   going to basically run coextensively with the criminal

19   judgment.  Right?

20          MR. DONNELLY:  Right.  So -- so what we explained

21   to Mr. Momotok is -- and what the documents say is, yes,

22   there will be a monetary judgment.  The monetary judgment

23   will be deemed satisfied by the entry of the criminal

24   judgment; so he's not paying twice.  He'll pay the criminal

25   authorities what he owes them.

1                THE COURT:  Right.

2                MR. DONNELLY:  And we also, you know, made an

3    important point routinely and repeatedly, as we must, that

4    all we can do is negotiate.  Even after he signs it, from our

5    standpoint, it's subject to Commission approval.

6                THE COURT:  Right.

7                MR. DONNELLY:  Commission has to authorize it

8    first.  And then because of the way our consents and proposed

9    order works, we submit it to the Court for the Court's

10   consideration and for the Court's entry of the order.  So

11   there are additional steps, even after he signs it.  And he's

12   aware of those.

13               THE COURT:  Right.  Okay.

14               When do you folks think you're going to have the

15   motion to strike and enter default as to -- which were the

16   parties again?  I'm sorry.

17               MR. DONNELLY:  That one is for Memelland, who had

18   previously appeared --

19               THE COURT:  Right.

20               MR. DONNELLY:  -- and had been represented by Sher

21   Tremonte, but --

22               THE COURT:  Right.  I remember them at some of the

23   earlier conferences.

24               MR. DONNELLY:  They have withdrawn.

25               THE COURT:  Yup.

 1          You tell me in terms of -- deadline to file.  If

 2  it's July, it's fine.  I could tell you this.  We're busy,

 3  and Judge Arleo is on a significant criminal trial right now.

 4  So --

 5          MR. DONNELLY:  Okay.

 6          THE COURT:  -- Her Honor has her hands full.

 7          MR. DONNELLY:  I appreciate that.

 8          THE COURT:  Yeah.

 9          MR. DONNELLY:  How about a little bit of

10  staggering, so maybe July 20th -- I'm not sure --

11          THE COURT:  I'll give you July 26th.

12          MR. DONNELLY:  Thank you.

13          THE COURT:  Great.

14          MR. DONNELLY:  And if we can file them earlier, we

15  will.

16          THE COURT:  You -- certainly.

17          MR. DONNELLY:  And then with respect to the

18  proposed settlements, Your Honor, what I'd like to do --

19          THE COURT:  Yeah.

20          MR. DONNELLY:  -- and it takes a little while to go

21  through the process.  What I'd -- internally.  What I'd like

22  to do is get them signed and bundle them --

23          THE COURT:  Okay.

24          MR. DONNELLY:  -- and submit them to our client in

25  one fell swoop.  So that --

|Hearing
|15-cv-06076, June 5, 2019                                                    29

1           THE COURT:  Yeah, that would help -- that will

2   help; rather than a trickle.

3           MR. DONNELLY:  Right.

4           THE COURT:  In terms of getting in front of the

5   Commission.

6           MR. DONNELLY:  And so I'm thinking that might take

7   until -- until the end of the summer on that.

8           But the faster I can get them signed --

9           THE COURT:  So why don't we say, then, that by -- I

10  mean, already have the renewed motion to -- for a substituted

11  service; the motion to strike and enter default by the end

12  of -- why don't we say by August 30th, you'll just give me a

13  status report?

14          MR. DONNELLY:  Yes, Your Honor.

15          THE COURT:  Does that make sense?

16          MR. DONNELLY:  Yes.  Thank you.

17          THE COURT:  Okay.  Terrific.

18          Anything else?

19          MR. DONNELLY:  Nothing from me, Your Honor.

20          THE COURT:  No?  All right.

21          Thank you.

22          Mr. Momotok?  Do you have anything else, sir?

23          MR. MOMOTOK:  No, thank you, sir.

24          THE COURT:  All right.  Thank you, Mr. Momotok.

25          We are adjourned.

1                    (Conclusion of proceedings at 12:30 P.M.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3     that the 31 pages contained herein constitute a full, true,

4     and accurate transcript from the official electronic

5     recording of the proceedings had in the above-entitled

6     matter; that research was performed on the spelling of proper

7     names and utilizing the information provided, but that in

8     many cases the spellings were educated guesses; that the

9     transcript was prepared by me or under my direction and was

10    done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12    the parties hereto nor am I in any way interested in the

13    outcome hereof.

14

15

16

17

18    s/ *Sara L. Kern*                    17th of June, 2019

19    _____    _____
      Signature of Approved Transcriber          Date

20

21

      Sara L. Kern, CET**D-338
22    King Transcription Services
      3 South Corporate Drive, Suite 203
23    Riverdale, NJ  07457
      (973) 237-6080

24

25