UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES & EXCHANGE COMMISSION,<br><br>*Plaintiff*,<br><br>v.<br><br>ARKADIY DUBOVOY, et al.,<br><br>*Defendants*. | Civil Action No. 15-06076<br><br>OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court on Plaintiff Securities and Exchange Commission's (the "Commission") Motions for Default Judgment as to Defendants Maxim Zakharchenko ("Zakharchenko"), Bering Explorer Fund, Ltd. ("Bering"), Nicolai Slepenkov ("Slepenkov"), Escada Logistic Ltd. ("Escada"), Nelia Dubova ("Dubova"), and Beratto Group LLC ("Beratto," or, collectively, "Defaulting Defendants") pursuant to Federal Rule of Civil Procedure 55(b)(2). ECF Nos. 370, 388. For the reasons set forth herein, the Motions are **GRANTED**.

I. **BACKGROUND**[1]

   A. **The Fraudulent Scheme**

This case arises out of Defaulting Defendants' participation in an immense fraud on the U.S. securities markets that involved two Ukrainian computer hackers (the "Hacker Defendants")

---

[1] Because Defaulting Defendants have failed to file an answer or otherwise respond in this case, the Court accepts as true the facts as alleged in the Amended Complaint. See Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990).

stealing more than 100,000 press releases from three newswire services (collectively, the "Newswire Services") before they were published.[2] Am. Compl. ¶¶ 1-10, 53-55, ECF No. 28. The stolen press releases contained quarterly and annual earnings data for publicly-traded companies. Id. ¶ 2. The Hacker Defendants transmitted the releases to numerous securities traders, including Defaulting Defendants, who then executed trades based on information therein before it became public. Id. ¶¶ 3, 5-6, 99-103. Over approximately five years, the traders realized more than $100 million in illegal profits using this non-public information, with Defaulting Defendants reaping over $13 million in profits. Id. ¶ 9; see also Declaration of Eugene Canjels dated April 16, 2019 ¶¶ 10-12, ECF No. 371 ("Canjels Decl. 1"); Declaration of Eugene Canjels dated September 30, 2019 ¶ 10, ECF No. 389 ("Canjels Decl. 2").[3]

### B. The Defaulting Defendants

Zakharchenko, who resides in Russia, is one of two directors of Bering, a Bahamanian company with its principal place of business in Moscow, Russia. Am. Compl. ¶¶ 49-50. Zakharchenko had trading authority and directed illegal trades as part of the fraudulent scheme through two Bering accounts with Cantor Fitzgerald Europe. Id. Bering traded in contracts for difference ("CFD")[4] in connection with U.S. securities listed on national exchanges, including the New York Stock Exchange ("NYSE") and the NASDAQ. Id. ¶¶ 133, 135-146.

---

[2] The Amended Complaint refers to the hacked newswire services as "Newswire Service 1," "Newswire Service 2," and "Newswire Service 3." Am. Compl. ¶¶ 53-55.

[3] Dr. Eugene P. Canjels, Ph.D., Assistant Director of the Commission's Division of Economic and Risk Analysis, conducted a trading analysis to calculate the gross profits earned by each of the Defaulting Defendants. Because the Commission filed two Motions for Default Judgment—the first as to Zakharchenko, Bering, Slepenkov, Escada, and Beratto, see ECF No. 370, and the second as to Dubova, see ECF No. 388—Canjels provided two declarations.

[4] A CFD "is a stock derivative that is an agreement between two parties to exchange the difference in value of an underlying stock between the time the contract is opened and the time at which it is closed." Am. Compl. ¶ 60. If the stock price increases, the seller pays the difference to the buyer; if it decreases, the buyer pays the difference to the seller. Id. A CFD "typically mirrors the movement and pricing of its underlying stock . . . such that any fluctuation in the market price of the underlying security is reflected in the unrealized gain or loss of the CFD position." Id. ¶ 61.

Slepenkov, who also resides in Russia, is the CEO and owner of Escada, a proprietary trading fund formed in the British Virgin Islands. Id. ¶¶ 38-39. He executed illegal trades of securities on the NYSE and NASDAQ in connection with the fraudulent scheme, on behalf of both his own account as well as Escada's account with Interactive Brokers. Id. ¶¶ 38-39, 175-78, 182-85, 189-91, 195-98, 202-205, 209-12.

Dubova is a resident of Ukraine. Id. ¶ 24. She owned a personal account with the brokerage APX that was implicated in the fraudulent scheme. Id. Dubova was also signatory officer for Beratto, a real estate and investment company based in the British Virgin Islands. Id. ¶¶ 24, 30. Beratto owned an APX brokerage account that was used to make illegal trades of securities on NASDAQ in connection with the fraudulent scheme. Id. ¶¶ 30, 195-98, 209-12, 216-18.[5]

### C. Procedural History

On August 10, 2015, the Commission filed the Complaint, which it amended on August 23, 2015. ECF Nos. 1, 28. On August 10, 2015, the Court granted the Commission's motion for a temporary restraining order ("TRO"), which froze assets and granted other relief, ECF No. 12, and revised that TRO on August 11, 2015. ECF No. 13. On August 24, 2015, the Court granted a preliminary injunction which, as relevant here, froze the assets of Slepenkov, Escada, and Bering. ECF No. 31.

On October 19, 2018, the Commission requested that the Clerk of Court enter a default as to Zakharchenko, Bering, Slepenkov, Escada, and Beratto, and default was entered against them on October 31, 2018. See ECF No. 345. On June 10, 2019, the Commission requested that the

---

[5] While Dubova was allegedly involved with Beratto, the Commission only seeks disgorgement and civil monetary penalties against her for trades associated with her personal account. See Dubova Commission Memo at 4, ECF No. 388.1 ("Dubova Mem.").

Clerk of Court enter a default as to Dubova, and default was entered on August 5, 2019. See ECF No. 382.

## II. LEGAL STANDARD

"The district court has the discretion to enter default judgment, although entry of default judgments is disfavored as decisions on the merits are preferred." Animal Sci. Prods., Inc. v. China Nat'l Metals & Minerals Imp. & Exp. Corp., 596 F. Supp. 2d 842, 847 (D.N.J. 2008). Before entering default judgment, the Court must: (1) determine it has jurisdiction over the subject matter and parties; (2) determine whether the defendants have been properly served; (3) analyze the complaint to determine whether it sufficiently pleads a cause of action; and (4) determine whether the plaintiff has proved damages. See Chanel, Inc. v. Gordashevsky, 558 F. Supp. 2d 532, 535-36 (D.N.J. 2008); Wilmington Savings Fund Soc., FSB v. Left Field Props., LLC, No. 10-4061, 2011 WL 2470672, at *1 (D.N.J. June 20, 2011). Although the facts pled in the complaint are accepted as true for the purpose of determining liability, the plaintiff must prove damages. See Comdyne I, 908 F.2d at 1149.

In addition, before granting default judgment, the Court must make explicit factual findings as to: (1) whether the party subject to default has a meritorious defense; (2) the prejudice suffered by the party seeking default judgment; and (3) the culpability of the party subject to default. Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds, 250 F.R.D. 171, 177 (D.N.J. 2008).

## III. ANALYSIS

### A. Jurisdiction & Service of Process

The Court has subject matter jurisdiction pursuant to 28 U.S.C § 1331 because the Amended Complaint raises questions of federal securities law, including: Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), Am. Compl. ¶¶ 226-28; Section

10(b) of the Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, Am. Compl. ¶¶ 229-231; and Sections 20(b) and (e) of the Exchange Act, 15 U.S.C. 78t(b), (e), Am. Compl. ¶¶ 232-38. The Securities Act and the Exchange Act both apply extraterritorially. See 15 U.S.C. § 77v(c), 15 U.S.C. § 78aa(b).

The Court also has personal jurisdiction over Defaulting Defendants. The Securities Act and Exchange Act authorize nationwide service of process and permit the exercise of personal jurisdiction to the full extent of the Due Process Clause of the Fifth Amendment. See 15 U.S.C. §§ 77v(a), 78aa; Pinker v. Roche Holdings Ltd., 292 F.3d 361, 369 (3d Cir. 2002). Personal jurisdiction may only be exercised when "the defendant has constitutionally sufficient 'minimum contacts' with the forum . . . and where subjecting the defendant to the court's jurisdiction comports with 'traditional notions of fair play and substantial justice.'" Pinker, 292 F.3d at 369 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Under the minimum contacts analysis, the Court considers whether the defendant "purposefully avail[s] itself of the privilege of conducting activities" within the United States,[6] "thus invoking the benefits and protections of its laws." J. McIntyre Machinery, Ltd. v. Nicastro, 564 U.S. 873, 878 (2011) (citations omitted). Here, Defaulting Defendants purposefully availed themselves of the privilege of conducting activities within the United States by placing numerous trades in its securities markets, reaping vast profits.[7]

---

[6] Analysis of Defaulting Defendants' contacts with the United States as a whole is appropriate because the Securities Act and Exchange Act authorize nationwide service of process. See 15 U.S.C. §§ 77v(a), 78aa.

[7] Slepenkov, Escada, Beratto, and Dubova traded U.S. securities on U.S. exchanges through U.S. brokers. See Am. Compl. ¶¶ 1-11, 24, 30, 38-39. While Zakharchenko and Bering traded in CFDs through providers in London, the CFDs were associated with U.S. securities, such that personal jurisdiction is appropriate. Id. ¶¶ 137-39; see also SEC v. Compania Internacional Financiera S.A., No. 11-4904, 2011 WL 3251813, at *4-5 (S.D.N.Y. July 29, 2011) (finding personal jurisdiction in case of insider trading related to foreign CFDs because "[p]urchasers of CFDs specifically target their investments at the U.S. market . . . [and] CFDs provide foreign investors with a way to access American exchange-traded securities without opening U.S. brokerage accounts").

In assessing whether the Court may exercise personal jurisdiction, it also considers "the burden on the defendant, . . . the plaintiff's interest in obtaining convenient and effective relief . . . [and] the national interest in furthering the policies of the law(s) under which the plaintiff is suing." Pinker, 292 F.3d at 370-71 (citations and internal quotation marks omitted). The Court finds that any burden on Defaulting Defendants is far outweighed by the Commission's interest in obtaining relief, given the strong national interest in effectively enforcing U.S. securities law and protecting the integrity of U.S. securities markets, and the scope of the fraud at issue in this case. See id. at 372-73.

Additionally, Defaulting Defendants have been properly served. On December 13, 2016, the Court granted the Commission's motion for leave to serve Zakharchenko and Slepenkov through alternate means and ordered that both be served via email and, for Slepenkov, via mail upon his broker. ECF No. 320. The Commission complied with that Order. ECF No. 324. On December 26, 2018, Dubova was properly served under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("the Hague Convention"), pursuant to Federal Rule of Civil Procedure 4(f)(1). ECF No. 376. The entity defendants were also properly served. Escada and Beratto received the summons via hand delivery in the British Virgin Islands to their corporate agents on September 26, 2018 and August 25, 2017, respectively. See ECF Nos. 343, 330. For Bering, the Clerk of Court sent the summons, Amended Complaint, and Complaint to Bering's registered agent in the Bahamas via mail, with signature required. ECF No. 336. The documents were received and signed for on September 17, 2018. ECF No. 344.[8]

---

[8] The Bahamas is a Hague Convention signatory and has not registered an objection to service by mail under Article 10(a).

**B. Liability**

As Defaulting Defendants have not filed an Answer or otherwise responded to the Amended Complaint, the Court must accept the truthfulness of the Commission's well-pled allegations as to liability. Comdyne I, 908 F.2d at 1149. The Commission's Amended Complaint consists of four counts: (1) violations of Section 17(a) of the Securities Act for perpetrating a scheme to defraud; (2) violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder for perpetrating a scheme to defraud; (3) violations of Section 20(e) of the Exchange Act for aiding and abetting the Hacker Defendants' scheme to defraud; and (4) violations of Section 20(b) of the Exchange Act for advancing a scheme to defraud "through or by means of" the Hacker Defendants ("control person liability"). Am. Compl. ¶¶ 226-238.

Section 17(a) of the Securities Act prohibits fraudulent conduct in the offer or sale of securities, while Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraudulent conduct in connection with the purchase or sale of securities. See 15 U.S.C. §§ 77q(a), 78j(b); 17 C.F.R. § 240.10b-5. The standard for stating a claim under these provisions is "essentially the same." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996); see also SEC v. Desai, 145 F. Supp. 3d 329, 335-36 (D.N.J. 2015). The Commission must show: (1) Defaulting Defendants made a misrepresentation or omission, or employed a device, scheme, or artifice to defraud; (2) with scienter; (3) in connection with the offer, purchase, and/or sale of a security. Desai, 145 F. Supp. 3d at 335.[9]

Here, the Court is satisfied that those elements are met. First, Defaulting Defendants employed a scheme to defraud in connection with the purchase or sale of U.S. securities—namely,

---

[9] While Sections 17(a)(2) and (3) of the Securities Act do not require a showing of scienter, Aaron v. SEC, 446 U.S. 680, 701-02 (1980), the Court finds this distinction immaterial, as scienter is clearly established in this case. See infra at 8.

7

by trading on material, non-public corporate information that they unlawfully obtained from the Hacker Defendants. See Am. Compl. ¶¶ 67-76. Second, scienter, which the Supreme Court has defined as "a mental state embracing intent to deceive, manipulate, or defraud," Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1986), can be inferred from circumstantial evidence, see Valicenti Advisory Servs. v. SEC, 198 F.3d 62, 65 (2d Cir. 1999). Here, the Amended Complaint contains ample circumstantial evidence from which the Court can infer an intent to manipulate and defraud the U.S. securities markets. For example, the Commission alleges that Defaulting Defendants consistently traded during the narrow window of time between when the Hacker Defendants accessed the unpublished corporate releases and the time when those releases were made public. See, e.g., Am. Compl. ¶¶ 1-10, 115-120, 135-47. Moreover, Defaulting Defendants' "trading oscillated between securities of issuers who disseminated their press releases through Newswire Service 1 or Newswire Service 2 in lock-step with the hackers' shifting access." Id. ¶ 120. And, after the trades were executed, Defaulting Defendants compensated the Hacker Defendants for stealing the press releases, either through a flat fee or a percentage of the profits obtained. Id. ¶¶ 83-86. Defaulting Defendants' trading patterns and coordination with the Hacker Defendants evince a clear intent to defraud. As such, the Commission has met its burden to establish liability for Defaulting Defendants under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.[10]

### C. Appropriateness of Default Judgment

Before entering a default judgment, the Court must consider: (1) whether the party subject to the default has a meritorious defense; (2) the prejudice suffered by the party seeking default

---

[10] Because the remedies for control person liability and aiding and abetting liability under Sections 20(b) and 20(e) of the Exchange Act are identical to those available for primary violations under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, see 15 U.S.C. § 78t, the Court need not address the Commission's arguments under Counts 3 and 4 of the Amended Complaint.

judgment; and (3) the culpability of the party subject to default. Doug Brady, 250 F.R.D. at 177. In the absence of any responsive pleading and based upon the facts alleged in the Amended Complaint, the Court concludes that Defaulting Defendants do not have a meritorious defense. See U.S. Small Business Admin. v. Silver Creek Const. LLC, No. 13-6044, 2014 WL 3920489, at *5 (D.N.J. Aug. 11, 2014). The Court finds that the Commission will suffer prejudice absent an entry of default judgment as it will have no other means of obtaining relief. Finally, the Court is convinced that Defaulting Defendants acted culpably in failing to respond to this lawsuit, as they have been served with the Amended Complaint and are not infants or otherwise incompetent. Id.; see also Nationwide Mut. Ins. Co. v. Starlight Ballroom Dance Club, Inc., 175 F. App'x 519, 523 (3d Cir. 2006) (holding that a defendant's failure to respond to communications from the plaintiff and the court can constitute culpability).

### D. Damages & Other Relief Sought

The Commission has requested that the Court (1) permanently enjoin Defaulting Defendants from future securities laws violations; (2) order disgorgement of their ill-gotten gains, including pre-judgment interest; and (3) order a civil monetary penalty ("CMP") of three times the disgorgement amount. Zakharchenko, Slepenkov, Bering, Escada, and Beratto Commission Memo at 26, ECF No. 370.1 ("Commission Mem."); Dubova Mem. at 21.

#### 1. Injunction

The Court is "empowered to issue injunctions commanding compliance with the [federal securities] laws and [the Commission's] regulations promulgated thereunder." SEC v. Savoy Indus., Inc., 665 F.2d 1310, 1317 n.54 (D.C. Cir. 1981). An injunction is an appropriate remedy where "there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the

illegal conduct." SEC v. Bonastia, 614 F.2d 908, 912 (3d Cir. 1980).[11] The Court considers the "scienter involved on the part of the defendant, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, the sincerity of his assurances against future violations, and the likelihood, because of defendant's professional occupation, that future violations might occur." Id.

Each of these factors counsel in favor of granting an injunction in this case. As to scienter, the Court has already found sufficient circumstantial evidence that Defaulting Defendants acted intentionally in carrying out their scheme to defraud the U.S. securities markets. See supra Section III.B. Their scheme was extensive and recurrent, involving millions of dollars in securities trading across hundreds of trades over the course of nearly five years. See Am. Compl. ¶¶ 2, 10; Canjels Decl. 1 ¶¶ 10-12 and Table 1; Canjels Decl. 2, ¶ 10 and Tables 1, 2. In failing to appear in this action, Defaulting Defendants have shown no respect for U.S. securities laws, demonstrated no contrition for their unlawful conduct, and offered no assurances that they will act lawfully in the future. Given their roles as securities traders (or, in the case of Bering, Escada, and Beratto, investment firms), future securities law violations are likely. Accordingly, the Court will enter an order enjoining Defaulting Defendants from future violations of the Securities Act and Exchange Act.

**2. Disgorgement**

The Commission requests disgorgement of Defaulting Defendants' ill-gotten gains. "Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating securities laws." SEC v. Hughes Capital Corp., 124 F.3d 449,

---

[11] Unlike injunctions in the private-litigant context, the Commission need not show risk of irreparable injury or the unavailability of adequate remedies at law. See, e.g., SEC v. Unifund SAL, 910 F.2d 1028, 1035-36 (2d Cir. 1990).

455 (3d Cir. 1997) (quotations and citations omitted). To set the disgorgement amount, the Commission must provide the Court with a "reasonable approximation of profits causally related to the violation." SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989).

The Commission has requested the following disgorgement amounts based on the analysis of Dr. Canjels:

- Bering, with Zakharchenko held jointly and severally liable: $8,071,135;
- Escada, with Slepenkov held jointly and severally liable:[12] $3,074,024;
- Slepenkov, individually: $1,261,871;
- Beratto: $282,802;
- Dubova: $725,762.

See Canjels Decl. 1, ¶¶ 8-12; Canjels Decl. 2, ¶¶ 8-10; Commission Mem. at 30. Dr. Canjels conducted a quantitative and statistical analysis of the trading activity for the accounts held by Defaulting Defendants. Canjels Decl. 1, ¶ 4. He created a database of "roundtrip" transactions, which are transactions that are "open[ed] (i.e., a new position, either long or short) and then subsequently closed (i.e., an offsetting position, the opposite of what was done to 'open' the position, is taken)." Id. ¶ 8; Canjels Decl. 2, ¶ 8. He then identified all roundtrips where a position was (1) opened after a company's press release was uploaded to the Newswire Services but before the press release was disseminated to the public, and (2) closed within three days. Canjels Decl. 1, ¶ 9; Canjels Decl. 2, ¶ 9. He then calculated the gross profits realized on each of those roundtrips

---

[12] The Commission argues that (1) Zakharchenko should be held jointly and severally liable for Bering's disgorgement because Zakharchenko only participated in the fraudulent scheme by trading through Bering's account; and (2) Slepenkov should be held jointly and severally liable for Escada's disgorgement because he was its CEO and directed its trading. Commission Mem. at 30-31; Am. Compl. ¶¶ 38-39, 49-50. Joint and several liability is appropriate "when two or more individuals or entities collaborate or have close relationships in engaging in the illegal conduct." Hughes Capital, 124 F.3d at 455. The Court finds that standard satisfied here, because Zakharchenko and Slepenkov directed and controlled the relevant entities. Id.

11

and aggregated the profits for each of Defaulting Defendants' relevant accounts. Canjels Decl. 1, ¶¶ 10-12 and accompanying Tables; Canjels Decl. 2, ¶ 10 and accompanying Tables. The Court finds that this method provides a reasonable approximation of Defaulting Defendants' ill-gotten gains in this case and will accordingly order disgorgement of the amounts enumerated above.[13]

The Commission also asks the Court to award prejudgment interest on the disgorgement amounts. Commission Mem. at 30-31; Dubova Mem. at 25-26. Prejudgment interest "is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws," SEC v. Falbo, 14 F. Supp. 2d 508, 528 (S.D.N.Y. 1998) (citation omitted), and its award falls within the Court's broad discretionary powers, SEC v. Antar, 97 F. Supp. 2d 576, 589 (D.N.J. 2000). Here, the Commission has calculated prejudgment interest based on the Internal Revenue Service's interest rate for tax underpayments under 26 U.S.C. § 6621(a)(2), an approach that this Court has previously endorsed. See Antar, 97 F. Supp. 2d at 588 (collecting cases and applying the formula). The Court finds an award of prejudgment interest is proper in this case to prevent Defaulting Defendants from further profiting off of the ill-gotten gains that flowed from their fraudulent scheme. Accordingly, the Court adopts the Commission's calculations and will order prejudgment interest in the following amounts:

- Bering, with Zakharchenko held jointly and severally liable: $40,516.95;
- Escada, with Slepenkov held jointly and severally liable: $15,431.55;
- Slepenkov, individually: $71,063.83;
- Beratto: $15,170.90;

---

[13] Because the conduct on which disgorgement is based occurred within the five years preceding the filing date of the Complaint (August 10, 2015), the Commission has complied with the statute of limitations on disgorgement announced in Kokesh v. SEC, 137 S. Ct. 1635, 1644 (2017). See Canjels Decl. 1, ¶ 4 (noting that analysis was conducted for trades between June 26, 2012 and July 17, 2015); Canjels Decl. 2, ¶ 4 (noting that analysis was conducted for trades between July 19, 2012 and March 15, 2013).

- Dubova: $52,446.55.

See April 17, 2019 Declaration of John Donnelly, ¶¶ 14-17, Exs. 1-4, ECF No. 372 ("Donnelly Decl. 1"); September 30, 2019 Declaration of John Donnelly, ¶¶ 8-10, Ex. 1, ECF No. 390 ("Donnelly Decl. 2").

### 3. CMP

The Commission requests that the Court order a CMP of three times the disgorgement amount, pursuant to Section 21A of the Exchange Act. Commission Mem. at 33; Dubova Mem. at 27. Section 21A provides: "Whenever it shall appear to the Commission that any person has violated any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security . . . while in possession of material, nonpublic information," the Commission "may bring an action in a United States district court to seek . . . a civil penalty to be paid by the person who committed such violation," which "shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase, sale, or communication." 15 U.S.C. §§ 78u-1(a)(1)-(2) (the "Insider Trading CMP"). In setting the penalty amount, the Court considers "(1) the egregiousness of the defendant's violations; (2) the isolated or recurrent nature of the violations; (3) the degree of scienter; (4) the amount of illegal profits; and (5) the deterrent effect of the penalty in light of defendant's net worth." SEC v. Johnson, No. 02-5490, 2004 WL 5561799, at *5 (D.N.J. Aug. 27, 2004).

Here, the Court finds that the Insider Trading CMP applies because Defaulting Defendants profited from the trades they executed while in possession of material, non-public information—namely, the unpublished corporate press releases stolen from the Newswire Services. Am. Compl. ¶¶ 1-10, 67-70. The Commission has not provided any evidence of Defaulting Defendants' net

worth and cites to only two cases imposing treble penalties. Commission Mem. at 34 (describing order entered at Docket No. 33, SEC v. Hong, No. 16-cv-9947 (S.D.N.Y.), which imposed a treble penalty "where defendants hacked into the computer networks of two law firms and stole, through deception, confidential information concerning several publicly traded companies . . . and successfully traded on that information"); Dubova Mem. at 28 (describing order entered at Docket No. 51, SEC v. Zavodchikov, No. 16-845 (D.N.J.), which imposed a treble penalty on other defendants involved in the fraudulent scheme at issue in this case). Here, the Court finds that the first four factors counsel in favor of a treble penalty in this case, given the breadth and length of the fraudulent scheme, Defaulting Defendants' scienter as discussed supra, their failure to respond or accept responsibility herein, and their more than $13 million in illegal profits.[14] See Am. Compl. ¶¶ 1-10; Canjels Decl. 1 ¶¶ 10-12 and Table 1; Canjels Decl. 2, ¶ 10 and Tables 1, 2. As such, the Court will impose the following Insider Trading CMPs, equal to three times the disgorgement discussed above:

- Bering, with Zakharchenko held jointly and severally liable: $24,213,405;
- Escada, with Slepenkov held jointly and severally liable: $9,222,077;
- Slepenkov, individually: $3,785,613;
- Beratto: $848,406;
- Dubova: $2,177,286.

---

[14] The Court has not found a case in this Circuit imposing a treble Insider Trading CMP. However, the facts of this case are distinguishable from those that imposed lesser penalties. Cf., e.g., Johnson, 2004 WL 5561799, at *5 (imposing penalty equal to disgorgement amount because defendant's illegal profits were only $42,262); SEC v. Clay Capital Mgmt., LLC, No. 11-05020, 2013 WL 5946989, *8-9 (D.N.J. Nov. 6, 2013) (imposing no penalty because defendant had a low net worth, received limited financial benefit from his unlawful conduct, and his violations were "isolated" to two incidents over five-month period).

#### 4. Other Relief

Finally, the Commission asks that the asset freeze previously ordered by this Court, ECF Nos. 13, 31, be temporarily lifted for the limited purpose of transferring assets to the Commission to satisfy the disgorgement and CMP amounts described supra. Commission Mem. at 36. The Court finds this request reasonable, particularly given Defaulting Defendants' failure to appear in this action and the associated difficulty in collecting the judgment that the Commission will likely face. Such relief will be so ordered.

## IV. CONCLUSION

For the reasons described above, the Commission's Motions for Default Judgment, ECF Nos. 370, 388, are **GRANTED** as to its request for judgment in the following amounts:

a) Defendants Zakharchenko and Bering are jointly and severally liable for $8,071,135 in disgorgement, $40,519.95 in prejudgment interest, and a monetary penalty of $24,213,405;

b) Defendants Slepenkov and Escada are jointly and severally liable for $3,074,024 in disgorgement, $15,431.55 in prejudgment interest, and a monetary penalty of $9,222,077;

c) Defendant Slepenkov is liable for $1,261,871 in disgorgement, $71,063.83 in prejudgment interest, and a monetary penalty of $3,785,613;

d) Defendant Beratto is liable for $282,802 in disgorgement, $15,170.90 in prejudgment interest, and a monetary penalty of $848,406; and

e) Defendant Dubova is liable for $725,762 in disgorgement, $52,446.55 in prejudgment interest, and a monetary penalty of $2,177,286.

The Commission's request for injunctive relief is **GRANTED**, and Defaulting Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise are enjoined from future violations of Section 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C.§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

The Commission's request that the Temporary Restraining Order issued on August 11, 2015 and the Preliminary Injunction issued on August 24, 2015 be lifted for the limited purpose of transferring the assets, up to the amount owed under this Order, to an account designated by the Commission is **GRANTED**. An appropriate order follows.

**Date: November 25, 2019.**

                                             */s Madeline Cox Arleo*_____
                                             **Hon. Madeline Cox Arleo**
                                             **United States District Judge**